No. 25-1726

**In the United States Court of Appeals for the First Circuit**

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, *Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States; PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCORMICK, in the official capacity as Commissioner of the U.S. Election Assistance Commission; BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S. Election Assistance Commission; PETE HEGSETH, in the official capacity as Secretary of Defense, *Defendants-Appellants*.

**On Appeal from the United States District Court for the District of Massachusetts**

Brief *Amicus Curiae* of Citizens United, Citizens United Foundation, The Presidential Coalition, America's Future, and Conservative Legal Defense and Education Fund in Support of Defendants-Appellants and Reversal

PATRICK M. MCSWEENEY
  Powhatan, VA
MICHAEL BOOS
  Washington, DC
RICK BOYER
  Lynchburg, VA
*Attorneys for Amici Curiae*

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
*Attorney of Record
October 14, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   THE STATES LACK STANDING TO CHALLENGE THE PROVISIONS
     OF THE EXECUTIVE ORDER WHICH THE DISTRICT COURT ENJOINED . . . . . . 7

     A.   Section 2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.   Section 2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     C.   Section 3(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     D.   Section 4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     E.   Section 7(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     F.   Section 7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.  THE DISTRICT COURT ERRED IN GRANTING INJUNCTIVE RELIEF . . . . . . . . 14

     A.   The States Are Not Likely to Succeed on the Merits . . . . . . . . . . . . 15

     B.   The States Failed to Establish Irreparable Harm . . . . . . . . . . . . . . . 15

          1.   There Is No Invasion of State Constitutional Power . . . . . . . 15

          2.   The States' Alleged Economic "Injuries" Cannot
               Constitute Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.      The States Are Not Harmed by Requiring Votes to Be Cast by Election Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.    The District Court Improperly Balanced the Equities and the Public Interest Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

Page

U.S. CONSTITUTION
Article I, Section 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

STATUTES
2 U.S.C. § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19
3 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19
3 U.S.C. § 21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
10 *Ill. Comp. Stat. Ann*. 5/19-8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
52 U.S.C. § 20506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
52 U.S.C. § 20508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

CASES
*Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176 (9th Cir. 2010) . . . . . . 14
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Baker v. Carr*, 369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
*Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008). . . . . . . . . . . . . 21
*J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928). . . . . . . . . . . . . 16
*Louisiana v. Biden*, 64 F.4th 674 (5th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . 11-14
*Missouri v. Biden*, 52 F.4th 362 (8th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . 11, 14
*Nken v. Holder*, 556 U.S. 418 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Republican Nat'l Comm. v. Aguilar*, 558 P.3d 805 (Nev. 2024). . . . . . . . . . . . . 19
*Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). . . . . . . . . 21, 22
*Saline Parents v. Garland*, 88 F.4th 298 (D.C. Cir. 2023) . . . . . . . . . . . . . . . . . . 7
*Sampson v. Murray*, 415 U.S. 61 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
*Trump v. New York*, 592 U.S. 125 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20
*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) . . . . . 17, 18
*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001) . . . . . . 22
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . 14

MISCELLANEOUS
*Building Confidence in U.S. Elections*, Report of the Commission on Federal
        Election Reform (Sept. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Executive Order No. 13990, "Protecting Public Health and the Environment
        and Restoring Science To Tackle the Climate Crisis" (Jan. 20, 2021) . . . . 13

Executive Order No. 14248, "Preserving and Protecting the Integrity of
American Elections" (Mar. 25, 2025) . . . . . . . . . . . . . . . . . . . . . . 1, *passim*
National Conference of State Legislatures, "Early In-Person Voting,"
*NCSL.org* (Mar. 18, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTEREST OF *AMICI CURIAE*[1]

The *amici* herein, Citizens United, Citizens United Foundation, America's Future, and Conservative Legal Defense and Education Fund, are nonprofit organizations exempt from federal income taxation under Internal Revenue Code ("IRC") sections 501(c)(3) or 501(c)(4). The Presidential Coalition is an IRC section 527 organization. The activities of these organizations include filing *amicus* briefs in important constitutional and public policy cases.

## STATEMENT OF THE CASE

**Executive Order 14248.** On March 25, 2025, President Donald Trump issued Executive Order ("EO") No. 14248, "Preserving and Protecting the Integrity of American Elections."[2] In identifying the purpose of the EO, President Trump stated:

> Free, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election.... [E]lections must be honest and worthy of the public trust. That requires voting methods that produce a voter-verifiable paper record allowing voters to efficiently check

---

[1] The parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] The White House, Executive Order, "Preserving and Protecting the Integrity of American Elections," (Mar. 25, 2025) (hereinafter "EO").

their votes to protect against fraud or mistake.  Election-integrity
standards must be modified accordingly.  [EO 14248, Sec. 1.]

Of particular relevance here is the "Federal prohibition on foreign nationals
voting in Federal elections." *Id.* at Sec. 2.  To achieve that objective, the EO
provides that the U.S. Election Assistance Commission ("EAC') "require, in its
national mail voter registration form ... documentary proof of United States
citizenship" as specified in the EO.  *Id*. at 2(a)(i)(A).

The EO also commands the Attorney General to take action against states
that have laws allowing for the counting of ballots received after Election Day.
The EO also directs the EAC to condition statutory funding upon compliance with
a ballot receipt deadline of Election Day.  Finally, the EO directs the "Secretary of
Defense ... to require ... documentary proof of U.S. citizenship" for members of the
military living abroad.

**Preliminary Injunction**.  California chose not to bring its challenge in any
of the four California district courts — Northern, Eastern, Central, or Southern —
but rather in a district court across the country — the U.S. District Court for the
District of Massachusetts — where an appeal would be heard by the First Circuit.
California was joined by 18 other states in challenging a number of provisions of
the EO, seeking a preliminary injunction against their enforcement.  Injunctive
relief was granted "as to §§ 2(a), 3(d), 2(d), 7(b) of the Executive Order and § 7(a)

of the Executive Order as to civil or criminal enforcement actions." *California v. Trump*, 2025 U.S. Dist. LEXIS 112853 (D. Mass. 2025) *4, *63 ("*California I*").

**Section 2(a).** Section 2(a) directs the EAC to require, in its national mail voter registration form, "documentary proof" of citizenship. This could include a passport, a REAL ID-compliant driver's license, or any federal or state government-issued ID card confirming the applicant's citizenship. *Id.* at *21-22.

The district court reasoned that "neither the Constitution nor the [National Voter Registration Act ('NVRA')] grants the President the authority to direct the EAC to change the content of the Federal Form," and that "only Congress has the power to adjust state election rules." *Id*. at *25 (internal quotation omitted). Thus, the court found the Plaintiffs likely to prevail on the merits on Section 2(a).

**Section 3(d).** Section 3(d) requires the Secretary of Defense to update the Federal Post Card Application for military absentee ballots to require "documentary proof of United States citizenship," similar to the requirements in Section 2(a). Military voters are currently required to submit a "Federal Post Card Application" which requires applicants to attest to their citizenship via a signed oath. *Id.* at *31-32. The district court accepted the Plaintiff States' argument that "by mandating that the form is a postcard, 'Congress necessarily precluded any

requirement that an applicant submit documentation with the Form.'" *Id.* at *33. Thus, it found the Plaintiffs likely to succeed on the merits against Section 3(d).

**Section 2(d).**  Section 2(d) requires "[t]he head of each Federal voter registration executive department or agency ... under the [NVRA]" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." *Id.* at *15.  The district court ruled that "[n]either the Constitution nor the NVRA ... affords the President the power to conscript ... voter registration agencies in the States ... to carry out his Executive Order," and thus the Plaintiffs were likely to succeed on the merits against Section 2(d). *Id.* at *37.

**Section 7(b)**.  Section 7(b) provides that:

> [c]onsistent with 52 U.S.C. 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. 7 and 3 U.S.C. 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting.

The district court concluded that "'uniform and nondiscriminatory standards' appears to refer to uniformity within each State, not among the several States," and that "§ 7(b) thus purports to impose an extra-statutory condition on the disbursement of congressionally authorized funds." *California I* at *48-49.

Accordingly, the court found that the states were likely to prevail on their challenge to Section 7(b).

**Section 7(a).** Section 7(a) of the EO provides that "[t]he Attorney General shall take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes...." *Id.* at *38-39. The district court ruled that "the Executive Branch has offered no evidence suggesting that [state statutes allowing counting of ballots arriving after Election Day] result in the counting of votes cast after Election Day." *Id.* at *44. The court ruled that statutes requiring Election Day to be held on a given day do not textually provide for civil or criminal penalties as enforcement, and therefore the attorney general has no enforcement power, and the Plaintiffs were likely to succeed on the merits against Section 7(a). *Id.* at *45-46. Accordingly, the district court enjoined the attorney general from taking civil or criminal action against the Plaintiff States for counting late-arriving ballots. *Id.* at *46.

The district court believed that the Plaintiffs suffered irreparable harm in being prevented from enforcing their election laws of choice. *Id.* at *54. Finally, the court found that "there is little evidence in the record" suggesting that the EO would increase confidence in elections by reducing illegal alien participation and

preventing ballots cast after Election Day from being counted. *Id.* at *59.

Accordingly, the court found that the balance of equities and public interest

supported an injunction against the EO. *Id.* at *61.

**Motion to Dismiss**. After the preliminary injunction was granted, the

Government filed a motion to dismiss the complaint. The court denied the motion

on grounds similar to its previous grant of injunctive relief. The court also ruled

that, despite the fact that Section 2(d) of the EO referred to federal agencies, there

is "ambiguity over whether § 2(d) applies to state agencies," and thus found injury

and denied dismissal. *California v. Trump*, 2025 U.S. Dist. LEXIS 182329, at

*25-26 (D. Mass. 2025).

The district court also considered the plaintiff states' ability to bring a

"nonstatutory" challenge to the EO, which was necessary since the EO did not

involve a completed agency action to which the Administrative Procedure Act

would apply, and the APA does not apply to a presidential EO. The court ruled

that "'some residuum of power remains with the district court to review agency

action that is *ultra vires*'" even where no statutory cause of action exists. *Id.* at

*26 (quoting *Commonwealth of Puerto Rico v. United States,* 490 F.3d 50, 59 (1st

Cir. 2007)). Since the challenged action was an EO, "the APA falls short of

providing a mechanism to challenge the Executive Order, and as such an equitable

action may go forward." *Id.* at *29 (internal quotation omitted).

Finally, the court ruled that the Help America Vote Act ("HAVA") "does

not allow the EAC to condition states' funding upon their ballot receipt

deadlines." *Id.* at *39 (internal quotation omitted). Thus, the court denied

Defendants' motion to dismiss.

**ARGUMENT**

**I.    THE STATES LACK STANDING TO CHALLENGE THE
       PROVISIONS OF THE EXECUTIVE ORDER WHICH THE
       DISTRICT COURT ENJOINED.**

The District Court erred in ruling that the States established subject matter

jurisdiction for the court's review of any of their claims. The States lack standing

because the injuries they asserted are speculative and not imminent. In addition,

their claims do not satisfy the ripeness requirement. *See Trump v. New York*, 592

U.S. 125, 134 (2020) (*per curiam*) ("standing and ripeness inquiries both lead to

the conclusion that judicial resolution of this dispute is premature"); *see also*

*Saline Parents v. Garland*, 88 F.4th 298, 307-08 (D.C. Cir. 2023), *cert. denied*,

145 S.Ct. 144 (2024).

**A.     Section 2(a).**

The States complained that EO Section 2(a) orders the EAC "'to require, in its national mail voter registration form issued under 52 U.S.C. 20508 ... documentary proof of United States citizenship….'"  Complaint at 9.  But there is no injury to the States as a result of the issuance of the EO.  State offices registering voters are required to verify the voter's identity regardless of the EO. The EO merely requires state officers to "record on the form the type of document that the applicant presented as documentary proof of United States citizenship." EO at Sec. 2(a)(i)(B).  Thus, the EO only requires the registering agency to document that it has made the verification required under existing law.  The States have no obligation to assist the voter in obtaining any documentation.  The only requirement is simply to note the document supplied on the form.  If the final rule promulgated by the EAC requires only that the state officer "record on the form" the type of document used to prove citizenship, there would be no injury.

In any event, as discussed *infra*, the EAC cannot require a new form until it completes the notice and comment requirement.  Consequently, the States cannot show that there is any injury at this time.

**B.     Section 2(d).**

The States complain that EO Section 2(d) orders "'the head of each Federal voter registration executive department or agency' to 'assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs,' raising the specter of commandeering Plaintiff State agencies and resources in violation of fundamental State sovereignty if it extends to State and local agencies…." Complaint at 9-10. By definition, that allegation is speculative.

EO Section 2(d) provides:

> The head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. 20506(a), shall assess citizenship prior to providing a Federal voter registration form ….

Subsection (a) of that statute provides in relevant part: "Each State shall designate agencies for the registration of voters in elections for Federal office…."

52 U.S.C. § 20506(a), subsection (3) provides:

> (A) In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies. (B) Voter registration agencies designated under subparagraph (A) may include … Federal and nongovernmental offices….

The States cannot demonstrate that the EO will apply to any office other than "federal" offices, until notice and comment rulemaking by the EAC to

implement the EO is completed.  Accordingly, the States' assumption that they will be affected is pure speculation at this juncture.

### C.    Section 3(d).

The States complain that Section 3(d) requires the Secretary of Defense to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require documentary proof of United States citizenship."  They argue that the citizenship verification requirement will "render[] the application costly and challenging to implement." Complaint at 10.  They fail to offer any factual support for their argument that the Secretary of Defense imposes any costs on them.  The federal pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### D.    Section 4(a).

The States complain that the EO instructs the EAC to "'take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145 … including any requirement for documentary proof of United States citizenship adopted pursuant to'" the EO. Complaint at 10.  But the EAC has neither taken any action nor announced any proposed rulemaking.

The complaint in this case mirrors that involved in *Missouri v. Biden*, 52 F.4th 362 (8th Cir. 2022), where the Eighth Circuit dismissed a challenge to Executive Order No. 13990 issued by President Biden.  EO 13990 re-established the Interagency Working Group on the Social Cost of Greenhouse Gases ("IWG"), which had been established by President Barack Obama and later disbanded by President Trump in his first term.  "E.O. 13990 re-established the IWG with members from multiple cabinet-level and executive branch agencies, directed the IWG to publish interim and then final estimates of the social costs of greenhouse gas emissions, ... and required federal agencies to use these estimates when monetizing the costs and benefits of future agency actions and regulations." *Missouri* at 365.  The court in *Missouri v. Biden* ruled that the plaintiff states in that case were "requesting a federal court to grant injunctive relief that directs 'the current administration to comply with prior administrations' policies on regulatory analysis [without] a specific agency action to review,' a request that is 'outside the authority of the federal courts' under Article III of the Constitution." *Id.* at 366.

The following year, in a similar case challenging the same EO, the Fifth Circuit dismissed a challenge on the same grounds in *Louisiana v. Biden*, 64 F.4th 674 (5th Cir. 2023).  The court ruled that:

> E.O. 13990 does not *require* any action from federal agencies.
> Agencies are neither punished nor rewarded for their treatment of the

Interim Estimates.  Agencies must exercise discretion in conducting their cost-benefit analyses and deciding to use the Interim Estimates as "appropriate and consistent with applicable law."  Since nothing in E.O. 13990 requires States to implement the Interim Estimates, Plaintiffs rely on harms wrought by regulations that may result from the Interim Estimates.  It is well accepted that the mere "possibility of regulation" fails to satisfy injury in fact.  [*Id.* at 681.]

The reasoning of the Fifth and Eighth Circuit decisions applies here.  Once the EAC determines to take some action, this Court can determine whether injury exists.  At this juncture, the EO itself imposes no requirements on the States.  The States cannot establish injury based on what **might** be imposed by any action the EAC might take **in the future**.  The States are seeking an advisory opinion that the EO itself is illegal without any demonstration of immediate or identifiable harm.  The complaint is legally defective because the States have presented claims that are not ripe for review.

E.     **Section 7(a)**.

The States complain that Section 7(a) is illegal because it requires the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and

House of Representatives." EO at Sec. 7(a). No enforcement action has been announced or taken. The challenge to 7(a) is a textbook example of unripeness.

The EO says nothing about curing technical defects in ballots after Election Day. The States also imply that the EO might prevent curing technical defects in ballots after Election Day, despite the fact that the EO never addresses the question. The complaint argues, "[w]hile unclear, [the EO] **may** also prohibit voters in Plaintiff States from curing minor technical problems with timely ballots after Election Day." Complaint at 3 (emphasis added). Again, the assertion that a government action "may" cause a given effect is speculative by definition.

### F. Section 7(b).

The States complain that 7(b) "will harm Plaintiff States by targeting them for loss of federal funding." Complaint at 37. That provision states:

> Consistent with 52 U.S.C. 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement … that … there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. 20301 *et seq*., after which no additional votes may be cast. [EO at Sec. 7(b).]

Again, the reasoning of the decisions that dismissed similar challenges to President Biden's EO No. 13990 is dispositive here. The Fifth Circuit found no standing because the agencies subject to the EO "must exercise discretion in

conducting their … analyses and deciding to [proceed] as 'appropriate and consistent with applicable law.'" *Louisiana* at 681. That court declined to assume that the agencies would act lawlessly when the EO expressly confined action to that "consistent with applicable law." Likewise, the Eighth Circuit noted that the EO enjoined agencies to act "only to the extent consistent with applicable law." *Missouri* at 370 (internal citation omitted). The States ask the courts to assume that the EAC will act lawlessly. Such an assumption would be contrary to the presumption of good faith that courts routinely accord the Government. *See, e.g., Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010).

## II. THE DISTRICT COURT ERRED IN GRANTING INJUNCTIVE RELIEF.

In determining whether to grant or deny a request for a preliminary injunction, a court must consider four factors: whether the applicant has made a strong showing that he is likely to succeed on the merits; whether the applicant will be irreparably injured absent an injunction; whether issuance of the injunction will substantially injure the other parties interested in the proceeding; and where the public interest lies. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). When the Government is the opposing party the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court misapplied these factors.

## A. The States Are Not Likely to Succeed on the Merits.

For the reasons stated in Section I, *supra*, the States are unlikely to succeed on the merits because their lack of standing and the absence of ripeness for review of their claims means that the district court lacked subject matter jurisdiction to entertain the merits of the claims.

## B. The States Failed to Establish Irreparable Harm.

The States present three allegations of harm. First, they allege an "invasion of State constitutional power" that "amounts to concrete constitutional injury." Complaint at 23. Second, they allege a threatened loss of federal funding. *Id*. at 23-25. Finally, they allege that the Attorney General will enforce the requirement to stop ballot collection on Election Day against the States. *Id.* at 26. Whether the asserted "injury" arises by requiring States to "assess" whether an applicant is a citizen, or requiring States to ensure that no votes cast after Election Day may be counted, all three State arguments fail to demonstrate irreparable harm.

### 1. There Is No Invasion of State Constitutional Power.

There is no harm suffered by States in requiring them to ensure that only American citizens may vote, or in requiring them to ensure that votes must actually be cast by the federally mandated Election Day. The "invasion of constitutional power" argument is vitiated by Article I, Section 4 of the

15

Constitution, which provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Congress set the national Election Day in 2 U.S.C. § 7 and 3 U.S.C. § 1.

The States have no argument that federal election law is an "invasion of state constitutional power." It is a power expressly provided to the federal government. Congress can delegate to the Executive Branch the authority to determine what information must be provided on a form. "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized [to exercise delegated power] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

Additionally, 52 U.S.C. § 20508 provides in subsection (a) that "[t]he Election Assistance Commission — (1) in consultation with the chief election officers of the States, shall **prescribe such regulations as are necessary** to carry out paragraphs (2) and (3); (2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office…." (Emphasis added.) Subsection (b) provides:

The mail voter registration form … may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is **necessary to enable the appropriate State election official to assess the eligibility of the applicant** and to administer voter registration and other parts of the election process. [Emphasis added.]

The EO simply requires that election officials actually "assess citizenship prior to providing a Federal voter registration form." EO at Sec. (2)(d). Since citizenship is required in order to vote, documentation of citizenship is in fact necessary to actually "assess the eligibility of the applicant." The EO requires only that the election official identify the document used to "assess eligibility." Accordingly, the statute provides ample discretion to the EAC to require proof of the citizenship status of the applicant, just as most states already require proof of the identity of the applicant.

### 2. The States' Alleged Economic "Injuries" Cannot Constitute Irreparable Harm.

The States' fiscal arguments fare no better. As the Supreme Court and this Court have repeatedly held, economic damages are rarely irreparable. Unless "the potential economic loss is so great as to threaten the existence of the movant's business," or "absent a restraining order, [a party] would lose incalculable revenues and sustain harm to its goodwill," in this Court "it has long been held that traditional economic damages can be remedied by compensatory awards, and

thus do not rise to the level of being irreparable." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).  Likewise, the Supreme Court has stated, "the temporary loss of  income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Any "injury" to the States' fiscs can be remedied here by an order to restore the funding, including any past due amounts.  Accordingly, Plaintiffs have utterly failed to demonstrate irreparable harm, and the court erred in finding that they did.

### 3.    The States Are Not Harmed by Requiring Votes to Be Cast by Election Day.

Nor are the States injured by a requirement that votes cast after Election Day may not be counted.  The concept that once the clock runs out on the fourth quarter neither team can run more plays is not difficult to understand.  The States have no legitimate interest in allowing play to continue after the clock runs out.

Article I, Section 4 is clear that "the Congress may at any time by Law make or alter such Regulations" as states may make to govern federal elections. Congress has done so.  One way in which Congress has done so is to "establish" an Election Day.  That "establishment" has pre-empted the field, and the states have no residual power to accept ballots cast thereafter.

The term "election day" has both a constitutional and statutory meaning.

- 2 U.S.C. § 7 provides, "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress,"

- 3 U.S.C. § 1 provides, "[t]he electors of President and Vice President shall be appointed, in each State, on election day," and

- 3 U.S.C. § 21 provides that for presidential elections, "'election day' means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."

The threat the EO seeks to address is not a theoretical one. In 2024, the Nevada Supreme Court required counting of mail-in ballots if received by three days after the election, **even if not postmarked**. *See Republican Nat'l Comm. v. Aguilar*, 558 P.3d 805 (Nev. 2024). Thus, voters may have had up to two extra days after "the clock ran out" to mail in their ballots and change the election outcome.

Given that all but three States now allow early voting by all voters, allowing broad access to the vote, the irreparable injury is not the risk that a voter might miss the broad opportunity available, but that others' votes may count after the clock expired.[3] The integrity of federal elections is entirely in the hands of sometimes politicized state courts, if the federal government cannot police an

_____

[3] *See* National Conference of State Legislatures, "Early In-Person Voting," *NCSL.org* (Mar. 18, 2025).

Election Day cutoff.  The irreparable injury is not to the States under the EO, but to the federal government and the public with the *status quo*.

The States' argument that the Attorney General might, at some indeterminate future point, take some unknown enforcement action, possibly against one or more of the Plaintiff States, founders on the same rocks of speculation, for purposes of irreparable harm, as it does for purposes of ripeness. *See Trump v. New York* at 134.

C.     **The District Court Improperly Balanced the Equities and the Public Interest Factors.**

The district court failed to consider the likely harm to the Defendants and the public if the request for an injunction were granted.  It summarily concluded that the public has an important interest in making sure the Government follows the law, that the Government has no "countervailing interest in perpetuating unlawful practices," and that the States were likely to succeed on the merits. *California I* at *59.  Nowhere in that analysis is there any consideration of the likely harm to the Government or the public.  The grant of injunctive relief deprives the Government and the public of their undeniable interest in assuring that the voters who select federal officials are eligible to do so, both by virtue of being American citizens and by virtue of actually voting before Election Day is over.

The Supreme Court has recognized that "[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally … or by a stuffing of the ballot box." *Baker v. Carr*, 369 U.S. 186, 208 (1962). How much more when an American citizen's vote may be cancelled by that of a citizen of another nation? The most basic requirement to participate in choosing federal elected officials is being a citizen of the United States.

As the Supreme Court has recognized, "not only is the risk of voter fraud real but that it could affect the outcome of a close election. There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196 (2008). The irreparable harm here is the continuation of the injunction below, as the States refuse to ensure this most basic requirement.

The risk of counting ineligible ballots is demonstrated by the manner in which mail is handled. "The postal service permits senders to recall mail," *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 208 (5th Cir. 2024) (citing *Domestic Mail Manual*, §§ 507.5, 703.8; 39 C.F.R. § 111.1 and 39 C.F.R. § 211.2 (incorporating the Domestic Mail Manual by reference into the Postal Service Regulations)), which could permit "voters [to] ... change their votes after Election

Day." *Id.* Some states, such as Illinois, even provide for counting mail-in ballots lacking a postmark so long as they are "received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" and "the date inserted on the certification," after opening the ballot, "is election day or earlier." 10 *Ill. Comp. Stat. Ann*. 5/19-8(c).

Under that regime, it is not hard to imagine that an un-postmarked ballot, delivered after Election Day but before counting is concluded, could be counted based on a person's fraudulent certification date. Congress intended the Election Day statutes to curb that type of behavior, which results in treating some votes differently. *See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173-74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (Quoting *Cong. Globe*, 42d Cong., 2d Sess. 618 (1872)). Permitting it to continue by allowing ballots to be received after Election Day contradicts Congress's purpose.

The challenged EO was issued to restore the public's confidence in the election process. For years, the need for restoration of that confidence has been

recognized. *See Building Confidence in U.S. Elections*, Report of the Commission on Federal Election Reform at 1 (Sept. 2005) ("Democracy is endangered when people believe that their votes do not matter or are not counted correctly.... Public confidence in the electoral system is critical for our nation's democracy.").

The district court devoted much of its discussion to the interest of reducing roadblocks to participation in elections but ignored the countervailing interest in preserving the integrity of elections when participation is expanded, as by mail-in, absentee voting. *Id.* at 46 ("Absentee ballots remain the largest source of potential voter fraud."). The failure to acknowledge the trade-off between the two interests is telling and colors the decision to grant the injunction.

## CONCLUSION

For the foregoing reasons, this Court should vacate and reverse the district court's preliminary injunction.

Respectfully submitted,

PATRICK M. MCSWEENEY
  3358 John Tree Hill Rd.
  Powhatan, VA  23139

MICHAEL BOOS
  CITIZENS UNITED
  1006 Pennsylvania Ave. SE
  Washington, DC 20003

RICK BOYER

   /s/ *William J. Olson*
WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West,
  Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*

INTEGRITY LAW FIRM                                    October 14, 2025
P.O. Box 10953
Lynchburg, VA  24506

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of Citizens United, *et al*., in Support of Defendants-Appellants and Reversal contains 5,214 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

      /s/ *William J. Olson*
      William J. Olson
      Attorney for *Amici Curiae*

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Citizens United, *et al.*, in Support of Defendants-Appellants and Reversal, was made, this 14th day of October, 2025, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

  /s/ *William J. Olson*
William J. Olson
Attorney for *Amici Curiae*