No. 25-1726

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW
YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States;
PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED
STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official
capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the official
capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCORMICK, in
the official capacity as Commissioner of the U.S. Election Assistance Commission; BENJAMIN W.
HOVLAND, in the official capacity as Commissioner of the U.S. Election Assistance Commission;
PETE HEGSETH, in the official capacity as Secretary of Defense,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Massachusetts

————————————

### BRIEF FOR APPELLANTS

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

MICHAEL S. RAAB
JOSHUA WALDMAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7527*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0236*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUE ...................................................................1

STATEMENT OF THE CASE...................................................................1

    A.    Statutory Background and Executive Order 14,248....................................1

        1.    Federal Form for Voter Registration and
Section 2(a) of the Order. ...................................................1

        2.    Distribution of Federal Form and
Section 2(d) of the Order.....................................................5

        3.    Registration for Overseas Voting and
Section 3(d) of the Order.....................................................6

        4.    Election Day Statues and
Section 7(a) of the Order. ...................................................7

    B.    Factual Background ........................................................9

    C.    Prior Proceedings.........................................................9

        1.    Section 2(a).............................................................9

        2.    Section 2(d). ...........................................................11

        3.    Section 3(d). ...........................................................12

        4.    Section 7(a)............................................................13

STANDARD OF REVIEW ...................................................................14

SUMMARY OF ARGUMENT................................................................14

ARGUMENT ...........................................................................16

# TABLE OF CONTENTS (cont'd)

**Page**

I.    SECTION 2(A) IS CONSISTENT WITH THE NATIONAL VOTER REGISTRATION ACT AND PLAINTIFFS' CHALLENGE IS NOT RIPE ........................................................................................... 17

    A.    Section 2(a) Requires Only Appropriate Action Consistent With Applicable Law ....................................................18

    B.    The District Court's Judicial Estoppel Rationale Is Meritless .................22

    C.    Plaintiffs' Challenge to Section 2(a) Is Not Ripe ........................................23

II.    PLAINTIFFS LACK STANDING TO CHALLENGE SECTION 2(D), WHICH IN ANY EVENT IS CONSISTENT WITH THE NATIONAL VOTER REGISTRATION ACT .................................................... 24

    A.    Plaintiffs Lack Standing to Challenge Section 2(d)....................................25

    B.    Section 2(d) Is Consistent With Statutory Authority .................................27

III.    SECTION 3(D) IS CONSISTENT WITH THE UNIFORMED AND OVERSEAS CITIZENS ABSENTEE VOTING ACT AND PLAINTIFFS LACK STANDING ......................................................... 28

    A.    Section 3(d) Is Consistent With Statutory Authority .................................28

    B.    Plaintiffs Lack Standing to Challenge Section 3(d) and Their Claims Are Not Ripe......................................................................33

IV.    SECTION 7(A) IS LAWFUL AND PLAINTIFFS' CHALLENGE IS NOT RIPE ........................................................................................... 35

    A.    Plaintiffs' Challenge to Section 7(a) Is Not Ripe ........................................35

    B.    Ballot Receipt State Laws Are Preempted by the Federal Election Day Statutes ........................................................................38

# TABLE OF CONTENTS (cont'd)

**Page**

V.    THE PRELIMINARY INJUNCTION SHOULD BE VACATED BECAUSE IT EXTENDS BEYOND THE NAMED PLAINTIFFS AND PLAINTIFFS CANNOT SHOW IRREPARABLE HARM .................. 41

    A.    The Injunction Is Overbroad With Respect to Sections 2(a) and 3(d) ..................................................................................... 41

    B.    Plaintiffs Cannot Show Irreparable Harm With Respect to Sections 3(d) and 7(a) ..................................................................................... 43

CONCLUSION ............................................................................................ 45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Inter Tribal Council of Arizona,*
   570 U.S. 1 (2013)..................................................................2, 3, 4, 20, 29, 30

*Bayley's Campground, Inc. v. Mills,*
   985 F.3d 153 (1st Cir. 2021).....................................................................14

*Bost v. Illinois State Bd. of Elections,*
   145 S. Ct. 2751 (2025)...............................................................................40

*Bost v. Illinois State Board of Elections,*
   114 F.4th 634 (7th Cir. 2024)....................................................................40

*Building & Constr. Trades Dep't v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002)...............................................................21, 36

*City of Erie v. Pap's A.M.,*
   529 U.S. 277 (2000) ..................................................................................23

*Donald J. Trump for President, Inc. v. Way,*
   492 F. Supp.3d 354 (D.N.J. 2020)...........................................................40

*Foster v. Love,*
   522 U.S. 67 (1997) ..........................................................................7, 38, 39

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ..................................................................................26

*Heckler v. Community Health Servs.,*
   467 U.S. 51 (1984) ....................................................................................23

*Kobach v. U.S. Elec. Assistance Comm'n,*
   772 F.3d 1183 (10th Cir. 2014)................................................................21

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ..................................................................................26

# TABLE OF AUTHORITIES (cont'd)

<u>**Page(s)**</u>

**Cases**

*League of United Latin American Citizens v. Executive Office of the President (LULAC),*
    780 F. Supp.3d 135 (D.D.C. 2025) ..................................................11, 21, 22, 26, 37

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) ..............................................................................................19

*Minerals Separation Ltd. v. Butte & Superior Mining Co.,*
    250 U.S. 336 (1919) ..............................................................................................23

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ..............................................................................................22

*Republican National Committee v. Wetzel,*
    120 F.4th 200 (5th Cir. 2024)..........................................7, 8, 13, 16, 38, 39, 40, 41

*Trump v. CASA,*
    606 U.S. 831 (2025) ..............................................................................................42

*Trump v. New York,*
    592 U.S. 125 (2020) (per curiam) .........................................................................28

*United States v. Mendoza,*
    464 U.S. 154 (1984) ..............................................................................................23

**Statutes**

2 U.S.C. § 7 ..................................................................................................7, 8, 35, 38

3 U.S.C. § 1 ..................................................................................................7, 8, 35, 38

28 U.S.C. § 1292(a)(1) ........................................................................................................1

52 U.S.C. § 20301 ................................................................................................................7

52 U.S.C. § 20301(a)...........................................................................................................6

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Statutes**

52 U.S.C. § 20301(b) ..................................................................................6

52 U.S.C. § 20301(b)(1) ............................................................................29

52 U.S.C. § 20301(b)(2) ......................................6, 12, 15, 29, 30, 31

52 U.S.C. § 20301(b)(7) ....................................................................12, 30

52 U.S.C. § 20302(a)(1) ..................................................................6, 31, 32

52 U.S.C. § 20302(a)(4) ..............................................................................6

52 U.S.C. § 20307(a) ................................................................................40

52 U.S.C. § 20310(1) ..................................................................................6

52 U.S.C. § 20310(5) ..........................................................................6, 31

52 U.S.C. § 20505(a)(1) ..............................................................................2

52 U.S.C. § 20506(a)(1) ............................................................................25

52 U.S.C. § 20506(a)(3) ............................................................................25

52 U.S.C. § 20506(a)(3)(B)(ii) ....................................................................5

52 U.S.C. § 20506(a)(4)(A)(i) ................................................................5, 27

52 U.S.C. § 20506(a)(6)(A) ......................................................................27

52 U.S.C. § 20506(a)(6)(A)(i) ....................................................................5

52 U.S.C. § 20506(b) ..................................................................................5

52 U.S.C. § 20506(c)(2) ..............................................................................5

# TABLE OF AUTHORITIES (cont'd)

<u>Page(s)</u>

**Statutes**

52 U.S.C. § 20508 ................................................................................30

52 U.S.C. § 20508(a)(1) .........................................................................2

52 U.S.C. § 20508(a)(2) ..................................................................... 2, 18

52 U.S.C. § 20508(b) ......................................................................... 3, 29

52 U.S.C. § 20508(b)(1) ........................................................ 4, 10, 17, 19

52 U.S.C. § 20508(b)(2)(A) ...................................................................27

52 U.S.C. § 20508(b)(2)(C) ...................................................................27

52 U.S.C. § 20921 ..................................................................................2

52 U.S.C. § 20923(a)(2) ........................................................................21

52 U.S.C. § 20928 ................................................................................21

52 U.S.C. § 20929 ..................................................................................2

52 U.S.C. § 20932(a)(1) ........................................................................21

52 U.S.C. § 21082 ................................................................................40

Help America Vote Act of 2002 (HAVA),
    Pub. L. No. 107-252, 116 Stat. 1666..........................................................2

National Voter Registration Act of 1993,
    Pub. L. No. 103-31, 107 Stat. 77 (NVRA)................................................2

## TABLE OF AUTHORITIES (cont'd)

<u>**Page(s)**</u>

**Other Authorities**

U.S. Const. art. I § 2, cl. 1 ...........................................................................................1

U.S. Const. art. I § 4, cl. 1 ...........................................................................................1

U.S. Const. amend XII ..................................................................................................1

U.S. Const. amend. XVII ..............................................................................................1

Executive Order 12,642 (June 10, 1988), 53 Fed. Reg. 21,975. .........................................6

Executive Order 14,248.........................................................................................1, 7, 11

**Regulations**

32 C.F.R. pt, 233..........................................................................................................6

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This Court should hear oral argument in this appeal, which presents important questions of first impression in this Circuit concerning whether Executive Order 14,248 is consistent with federal statutory authority.

## STATEMENT OF JURISDICTION

The district court entered a preliminary injunction on June 13, 2025, as amended on July 18, 2025.  Addendum 1-2.  Defendants filed a timely notice of appeal on July 31, 2025.  JA 22-23.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a preliminary injunction barring the Government from enforcing Sections 2(a), 2(d), 3(d), and 7(a) of Executive Order 14,248.

## STATEMENT OF THE CASE

**A.     Statutory Background and Executive Order 14,248**

1.     <u>Federal Form for Voter Registration and Section 2(a) of the Order.</u>

Under the Voter Qualifications Clause and the 12th and 17th Amendments, the Constitution empowers the States to determine who is qualified to vote in federal elections.  U.S. Const. art. I § 2, cl. 1 (House of Representatives); U.S. Const. amend. XVII (Senators); U.S. Const. amend XII (President).  Under the Elections Clause, U.S. Const. art. I § 4, cl. 1, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as

to the Places of chusing Senators." That Clause allows Congress to pre-empt state legislative choices with respect to "the mechanics" of federal elections, including "regulations relating to registration," and "*how* federal elections are held, but not *who* may vote in them." *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 9, 16 (2013).

The National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (NVRA), addresses registration for federal elections. It requires "[e]ach State" to "accept and use the mail voter registration application form" prescribed by the Election Assistance Commission (EAC). 52 U.S.C. § 20505(a)(1).[1] That form is commonly called the "Federal Form." The Federal Form contains a General Application, as well as "a number of state-specific instructions which tell residents of each State what additional information they must provide and where they must submit the form." *Inter Tribal*, 570 U.S. at 5-6; *see* JA 66-92. The EAC has authority, in consultation with the chief election officers of the States, to prescribe regulations that "are necessary" to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a)(1)-(2); *see id.* § 20929 (EAC has

---

[1] This authority was originally exercised by the Federal Election Commission, but the Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666, reassigned that authority to the newly created Election Assistance Commission, 52 U.S.C. § 20921; *see id.* § 20508(a)(2) (EAC "in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office").

rulemaking authority to "take … action which imposes any requirement on any State or unit of local government … to the extent permitted under section 20508(a) of this title."); *Inter Tribal*, 570 U.S. at 5 (EAC has "rulemaking authority to prescribe the contents of that Federal Form").

Congress also set forth the "[c]ontents of [the] mail voter registration form" as follows:

> The mail voter registration form …
>
> (1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
>
> (2) shall include a statement that —
>    (A) specifies each eligibility requirement (including citizenship);
>    (B) contains an attestation that the applicant meets each such requirement; and
>    (C) requires the signature of the applicant, under penalty of perjury;
>
> (3) may not include any requirement for notarization or other formal authentication.

52 U.S.C. § 20508(b).  The Federal Form does not currently require documentary proof of U.S. citizenship but only requires an applicant to attest to citizenship under penalty of perjury.

In *Inter Tribal*, the Supreme Court held that Section 20508 allows "a State [to] request that the EAC alter the Federal Form," 570 U.S. at 19, including an amendment to its state-specific instructions, *id.* at 6.  A State may request that

the EAC add a documentary proof-of-citizenship requirement to its state-specific instructions on the Federal Form, which the EAC may grant, *id.* at 19-20, if it determines that adding the requirement "is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," 52 U.S.C. § 20508(b)(1).  The Supreme Court left open whether, in those circumstances, the EAC is "statutorily required" to add the requirement or whether the EAC's decision in those circumstances is "discretionary."  *Inter Tribal*, 570 U.S. at 18-19.

> Executive Order 14,248 provides as follows:
>
> To enforce the Federal prohibition on foreign nationals voting in Federal elections … Within 30 days of the date of this order, the Election Assistance Commission shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. 20508 … *documentary proof of United States citizenship*, consistent with 52 U.S.C. 20508(b)(3).

Addendum 48 (Section 2(a)(i)(A)).  Section 2(a)(ii) specifies the documents that suffice for proof of citizenship, including a U.S. passport, an identification document compliant with the REAL ID Act of 2005 that indicates U.S. citizenship, an official military identification card indicating citizenship, or a valid Federal or State issued photo identification that indicates citizenship. Addendum 49.  Section 2(a)(i)(B) directs "a State or local official to record on the form the type of document that the applicant presented as documentary

proof of United States citizenship" and other relevant information.  Addendum

48.

        2.     <u>Distribution of Federal Form and Section 2(d) of the Order.</u>

Certain federal agencies are "voter registration agencies" within the

meaning of the NVRA.  "A recruitment office of the Armed Forces of the

United States shall be considered to be a voter registration agency," 52 U.S.C.

§ 20506(c)(2), as are any "Federal … offices" that agree to become a voter

registration agency, *id.* § 20506(a)(3)(B)(ii); *see id.* § 20506(b) ("All departments,

agencies, and other entities of the executive branch of the Federal Government

shall, to the greatest extent practicable, cooperate with the States in carrying out

subsection (a).").  "[E]ach voter registration agency" "shall" "[d]istribut[e] …

mail voter registration application forms," 52 U.S.C. § 20506(a)(4)(A)(i), and

where that "voter registration agency that is an office that provides service or

assistance in addition to conducting voter registration," it "shall … distribute

with each application for such service or assistance … the mail voter

registration application form," *id.* § 20506(a)(6)(A)(i).

       The Executive Order provides, in relevant part, as follows:

> The head of each Federal voter registration executive department
> or agency (agency) under the National Voter Registration Act, 52
> U.S.C. 20506(a), shall assess citizenship prior to providing a
> Federal voter registration form to enrollees of public assistance
> programs.

Addendum 50 (Section 2(d)).

       3.    <u>Registration for Overseas Voting and Section 3(d) of
the Order.</u>

In the Uniformed and Overseas Citizens Absentee Voting Act
(UOCAVA), Congress directed that "[e]ach State shall permit absent
uniformed services voters and overseas voters to use absentee registration
procedures and to vote by absentee ballot in general, special, primary, and
runoff elections for Federal office." 52 U.S.C. § 20302(a)(1); *see* 52 U.S.C.
§ 20310(1), (5). States are also required to "use the official post card form …
for simultaneous voter registration application and absentee ballot application."
*Id.* § 20302(a)(4). UOCAVA also directs the Secretary of Defense to "prescribe
an official post card form, containing both an absentee voter registration
application and an absentee ballot application," for the States to use to fulfill
Congress' requirements. 52 U.S.C. § 20301(b)(2).[2] Like the Federal Form, the
Federal Post Card Application contains a General Application, but it also
directs the applicant to state-specific instructions that are found on the Federal
Voting Assistance Program website (fvap.gov). *See* JA 93-94; *see also* 32 C.F.R.
pt, 233.

---

[2] UOCAVA specifies that the official post card form shall be prescribed
by a "Presidential designee." 52 U.S.C. § 20301(a), (b). The Secretary of
Defense was designated as the Presidential designee pursuant to Executive
Order 12,642 (June 10, 1988), 53 Fed. Reg. 21,975.

Section 3(d)(i) of Executive Order 14,248 states that "[t]he Secretary of Defense shall update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301, to require … documentary proof of United States citizenship, as defined in section 2(a)(ii) of this order."  Addendum 51.

    4.    <u>Election Day Statues and Section 7(a) of the Order.</u>

Under federal law, "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."  2 U.S.C. § 7; *see* 2 U.S.C. § 1 (Senators).  In addition, "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day."  3 U.S.C. § 1.

In *Foster v. Love*, 522 U.S. 67 (1997), the Supreme Court addressed in part the meaning and effect of 2 U.S.C. § 7.  It held that when the statute speaks of "the election" it "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder," and thus "establish[es] a particular day as 'the day' on which these actions must take place."  *Id.* at 71. Guided by *Foster,* the Fifth Circuit held in *Republican National Committee v. Wetzel*, 120 F.4th 200, 203-04 (5th Cir. 2024), *petition for certiorari filed*, No. 24-1260 (U.S.

June 10, 2025), that the statutory references to "the election" means that election day "is the day by which ballots must be both *cast* by voters and *received* by state officials." Accordingly, 2 U.S.C. § 7 and 3 U.S.C. § 1 preempted a Mississippi statute permitting mail-in absentee ballots to be accepted if they are postmarked on or before the day of election and received up to five days after the federal election. *Id.* at 204-05.

Section 1 of the Executive Order states that "Federal law establishes a uniform Election Day across the Nation for Federal elections, 2 U.S.C. 7 and 3 U.S.C. 1." Addendum 47. Under the Order, "[i]t is the policy of my Administration to enforce those statutes and require that votes be cast and received by the election date established in law. As the United States Court of Appeals for the Fifth Circuit recently held in Republican National Committee v. Wetzel (2024), those statutes set 'the day by which ballots must be both cast by voters and received by state officials.'" Addendum 47.

Section 7(a) of the Executive Order states that "[t]o achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress … [t]he Attorney General shall take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the

appointment of Presidential electors and the election of members of the United States Senate and House of Representatives."  Addendum 53.

### B.    Factual Background

Plaintiffs are the Attorney Generals of 19 States, including 13 (called the "Ballot Receipt States") with laws that either allow for counting ballots that are mailed on or before election day but received afterwards, or laws that allow voters to cure timely-submitted ballots with minor technical problems. Addendum 3-4.  Their district court complaint contends that various provisions of the Executive Order are contrary to statutory authority or otherwise unlawful.  JA 24-65.  Plaintiffs also filed a motion for a preliminary injunction seeking to bar Defendants from implementing or enforcing Sections 2(a), 2(d), 3(d) and 7(a).  JA 14; D. Ct. Dkts. 75, 76.

### C.    Prior Proceedings

The district court granted the preliminary injunction.  Addendum 1-2.

### 1.    Section 2(a).

The district court held that Plaintiffs' challenge to Section 2(a) was ripe and likely to succeed on the merits.  The court understood Section 2(a) to dictate that the EAC must include a documentary proof-of-citizenship requirement on the Federal Form regardless of its consultation with the States and regardless of whether the EAC finds that documentary proof-of-

9

citizenship requirement is "necessary" for the States to enforce their own eligibility requirements.  Addendum 16-17.

Based on that understanding, the district court concluded that Plaintiffs' challenge is ripe because the consequences of the Order flow immediately and directly from Section 2(a) itself, and because the EAC has already started to implement Section 2(a) by sending a letter to State chief election officials seeking consultation on the Federal Form in light of Section 2(a)'s directive. Addendum 17.  *See* JA 126-127.

For similar reasons, the district court held that Plaintiffs are likely to succeed on the merits.  Because, in the court's view, Section 2(a) dictates what the EAC must do regardless of any consultation with the States or any finding that a documentary proof-of-citizenship requirement is "necessary," it is contrary to the statutory requirements in Section 20508(b)(1), Addendum 18, which requires the EAC to consult with the States before amending the Federal Form, and then permits the EAC to amend the Federal Form only when requiring additional information is "necessary" to enable the States to enforce their own eligibility requirements, Addendum 18-19.  The court further held that "the EAC can revise the Federal Form 'only with the approval of at least three' of its four members."  Addendum 19.

The district court rejected the Government's argument that Section 2(a) has a far narrower meaning.  Addendum 19-20.  In prior litigation concerning

10

the same Executive Order, the Government had advanced a different understanding of Section 2(a), asserting in a preliminary injunction hearing that "even after consultation with the states and notice and comment rulemaking, documentary proof of citizenship would have to be required."  Addendum 20; *see League of United Latin American Citizens v. Executive Office of the President (LULAC)*, 780 F. Supp.3d 135, 199 (D.D.C. 2025).  The district court held that "the Executive Branch is judicially estopped from suggesting otherwise here." Addendum 20.

Finally, the district court held that the Order's saving clause — which instructs that the Order "shall be implemented consistent with applicable law," Addendum 54 (Section 11(b)) — did not help the Government because, in the court's view, there was no way to interpret Section 2(a) to be a lawful directive. Addendum 21-22.

2.    Section 2(d).

The district court held that Section 2(d) is also contrary to federal law, because it assertedly "conscript[s] states … to carry out [the] Executive Order['s] mandate[s]" and thus "the States' separation of powers argument is likely to succeed on the merits."  Addendum 26-27.  The district court viewed Section 2(d)'s purported requirements to be "clear" on their face so that they "cannot be more narrowly interpreted" in light of the Order's saving clause. Addendum 27.

11

3.    Section 3(d).

The court held that Plaintiffs' Section 3(d) challenge is ripe.  In the court's view, Section 3(d) contained a "clear" "command" to the Secretary of Defense to include a documentary proof-of-citizenship requirement in the federal post card application form for absentee voter registration, and thus Plaintiffs' claim is ripe even if the Order does not specify a timeline for implementing that change.  Addendum 22-23.

On the merits, the district court concluded that Section 3(d) is contrary to law.  The court reasoned that under UOCAVA, applicants may attest to their citizenship with a "standard oath" taken under penalty of perjury.  52 U.S.C. § 20301(b)(7).  Addendum 23.  In addition, the absentee voter registration form requires a "post card form," 52 U.S.C. § 20301(b)(2), and the ordinary meaning of a "postcard" is a card for mailing without an envelope.  Addendum 24.  The court reasoned that Congress must have precluded any requirement that an applicant submit additional documentation because a "post card" would not allow for the applicant to include such additional information without an envelope.  Addendum 24.  Finally, the court noted that Congress's statutory purpose was to remove election registration roadblocks for American citizens living abroad, but in the court's view Section 3(d) creates such a roadblock because many citizens lack the proper documentation, such as a passport, that the Order would require.  Addendum 25.

12

4.    Section 7(a).

On Section 7(a), the district court held that Plaintiffs' claims are ripe. Addendum 28-29. The court acknowledged that the Attorney General can lawfully enforce Section 7(a) by sending letters to the States encouraging compliance with federal election day laws as interpreted in the Order, and that the Order's saving clause directs the Attorney General only to act consistent with applicable law. Addendum 28. But the court stated that because the government "has not indicated that the Attorney General will cabin enforcement of § 7(a)" in this way, there is imminent risk of harm under Section 7(a). Addendum 28.

On the merits, the district court opined that the Fifth Circuit's interpretation of the Election Day statutes in *Wetzel* was wrong, Addendum 29-30, and thus "the Executive Branch's interpretation of the Election Day statutes" is contrary to the meaning of those statutes, Addendum 31. The court did not enjoin the Attorney General from sending letters to the States encouraging their compliance with the Order and would "not enjoin all applications of § 7(a)," but it nonetheless "enjoin[ed] the Attorney General from taking civil or criminal enforcement actions to enforce § 7(a)" against the Plaintiffs. Addendum 32.

## STANDARD OF REVIEW

The district court's preliminary injunction is reviewed for abuse of discretion, with conclusions of law reviewed *de novo* and findings of fact for clear error. *Bayley's Campground, Inc. v. Mills,* 985 F.3d 153 (1st Cir. 2021).

## SUMMARY OF ARGUMENT

The district court erred in holding that Section 2(a) is contrary to the National Voter Registration Act. The Order requires the EAC only to "take appropriate action" that is "consistent with applicable law," and Section 2(a) does exactly that, by requiring the EAC to consult with the chief election officers of the States regarding a documentary proof-of-citizenship requirement, and to add that requirement only if, after such consultation, the EAC determines that adding the requirement is "necessary." Defendants are not judicially estopped from making this argument based on isolated statements from a preliminary injunction hearing in different litigation. Nor is Plaintiffs' challenge ripe because at this juncture the outcome of EAC's consultation with the States, and whether the EAC will make any finding that a documentary proof-of-citizenship requirement is "necessary," are entirely speculative.

Plaintiffs also lack standing to challenge Section 2(d) of the Order, which is directed exclusively at *Federal* voter registration agencies and does not purport to regulate or require *State* voter registration agencies to do anything. In any event, Section 2(d) is consistent with the National Voter Registration

14

Act.  That Act requires Federal voter registration agencies to distribute the Federal Form, but nothing in Section 2(d) instructs Federal voter registration agencies to withhold the Federal Form under any circumstances.  For the same reason, Plaintiffs' challenge is not ripe:  it is not yet clear how Federal voter registration agencies will implement Section 2(d), and it is entirely speculative whether they would do so in a manner inconsistent with statute.

Plaintiffs' argument with respect to Section 3(d) is also without merit. The Secretary of Defense is authorized to "prescribe an official post card form," 52 U.S.C. § 20301(b)(2), and that statute does not preclude him from including a documentary proof-of-citizenship requirement as part of the voter registration application post card form.  The district court read far too much into the statute's use of a standard oath and the words "post card," neither of which implicitly precludes a documentary proof-of-citizenship requirement. The court's concern that applicants would lack the required documentary evidence is unsupported by the record.  Moreover, the Plaintiff States lack standing to bring their challenge because Section 3(d) imposes no recordkeeping requirements on the States or otherwise imposes any compliance costs.  Similarly, Plaintiffs' challenge is not ripe; at this stage of the litigation, it is unclear how the Secretary will implement Section 3(d), and it is mere speculation whether he would do so in a way inconsistent with the statute.

15

Plaintiffs' challenge to Section 7(a) lacks merit. The Order requires the Attorney General to implement Section 7(a) "consistent with applicable law," Addendum 54, and where there are lawful ways to implement the Order — as all parties and the district court agree there are — there is no sound basis for enjoining the Executive Order based on speculation that the Attorney General may nonetheless implement it in an unlawful manner. That should have been the end of Plaintiffs' challenge. For the same reasons, any challenge to Section 7(a) is not ripe and Plaintiffs cannot show any irreparable harm from that Section; the Attorney General has not brought any enforcement action pursuant to Section 7(a) and even if she did the Plaintiffs here could assert all the same arguments in that litigation, without need for a preliminary injunction here. Finally, Section 7(a)'s understanding of the Election Day statutes is correct and consistent with the holding in *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024).

Finally, even if Plaintiffs were correct on the merits, the district court's injunction should be vacated in part because it is overbroad with respect to Sections 2(a) and 3(d), and Plaintiffs cannot show irreparable harm with respect to Sections 3(d) and 7(a).

## ARGUMENT

For the reasons explained below, Plaintiffs cannot show they are likely to succeed on the merits of their claims, and for many of their arguments they

lack standing, their claims are not ripe, and they fail to demonstrate irreparable harm.  And even assuming Plaintiffs could overcome those hurdles, the district court's injunction was overbroad.  This Court should reverse the judgment below and vacate the preliminary injunction.

## I.    SECTION 2(A) IS CONSISTENT WITH THE NATIONAL VOTER REGISTRATION ACT AND PLAINTIFFS' CHALLENGE IS NOT RIPE

Section 2(a) directs the EAC to "take appropriate action to require … documentary proof of United States citizenship" on the Federal Form. Addendum 48.  The district court enjoined this portion of the Order because, in its view, Section 2(a) commands the EAC to add a documentary proof-of-citizenship requirement to the Federal Form regardless of any consultation with the States and regardless of whether that consultation results in the conclusion that adding such a requirement is "necessary" within the meaning of 52 U.S.C. § 20508(b)(1).  Addendum 16-18, 21.  But Section 2(a) does no such thing; it simply directs the EAC to take lawful action consistent with statutory requirements.  The court also erred in holding that the Government is judicially estopped from advancing this understanding of Section 2(a).  Finally, Plaintiffs' challenge to Section 2(a) is not ripe.

A.     **Section 2(a) Requires Only Appropriate Action Consistent With Applicable Law**

Section 2(a) instructs the EAC to "take appropriate action to require" documentary proof of citizenship in the Federal Form.  The "appropriate action" required by Section 2(a) consist solely of actions consistent with law, including Section 20508.  That understanding is reinforced by the saving clause in Section 11(b) of the Order, which directs that the Order "shall be implemented consistent with applicable law."  Addendum 54.  Specifically, Section 2(a) directs the EAC to take two appropriate actions, one procedural and one substantive, both of which are consistent with statutory requirements in Section 20508.

The first "appropriate action" under Section 2(a) is for the EAC to consult with the chief election officers of the States.  That procedural requirement is consistent with the NVRA's instruction that the EAC shall develop the Federal Form "in consultation with the chief election officers of the States."  52 U.S.C. § 20508(a)(2).  And as the district court noted, the EAC has in fact followed the Order's instructions to begin the consultation process by sending appropriate letters to the chief election officers of the States.  Addendum 17.  The court thought that the Order "preordain[ed] the outcome" that the President hoped to reach at the end of the process, Addendum 20, but even if that were true it would have no bearing on whether the consultation

18

directed by Section 2(a) is consistent with the consultation procedures required by the NVRA. Just as the procedural requirements of the Administrative Procedure Act contains no "'open-mindedness' test" requiring agencies to have a "flexible and open-minded attitude," during a notice-and-comment period, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020), neither does the NVRA impose such a procedural rule that the EAC approach its consultation with an open mind.

The second "appropriate action" instructed by Section 2(a) is that if the EAC, after consulting with the States, determines that a documentary proof-of-citizenship requirement is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," 52 U.S.C. § 20508(b)(1), then Section 2(a) instructs the EAC to add that requirement to the Federal Form.

The second instruction in Section 2(a) is thus consistent with Section 20508(b)(1), which likewise requires the EAC to find that the requirement is "necessary" before adding it to the Federal Form. The second instruction also answers the statutory question left open in *Inter Tribal* — namely, whether the EAC, after making a finding that adding other information to the Federal Form is "necessary," is *statutorily required* to add that information to the Federal Form, or whether the EAC has *discretion* to choose not to do so. *See supra* at 4; *Inter*

19

*Tribal*, 570 U.S. at 18-19 (noting Government's argument that Section 20508(b)(1) "acts as both a ceiling and a floor with respect to the contents of the Federal Form," but holding that it "need not consider the Government's contention" to resolve that case).

Thus, while the district court was correct that Section 2(a) contains a "command" to the EAC, Addendum 19, it is a lawful command that is consistent with the governing statute. The court acknowledged that "the Vesting Clause grants the President some supervisory authority over subordinate executive officials," Addendum 20; *see Inter Tribal*, 570 U.S. at 19 (describing EAC as vested with "discretionary executive authority"), but held that the President may not direct subordinate executive officials to act contrary to statute, Addendum 20. As noted above, however, Section 2(a) directs the EAC to add a documentary proof-of-citizenship requirement only after consulting with the States and only if it makes the required "necessary" finding, and it is uncontested that the EAC has statutory authority to do so under those circumstances, *Inter Tribal*, 570 U.S. at 19-20; Addendum 21 n.6. To the extent the district court meant to suggest otherwise — *i.e.*, that the President lacks the authority to direct the EAC to take lawful actions consistent with its statutory authority — that would be a clear error of law.[3]

---

[3] The district court characterized the EAC as an "independent and

*Continued on next page.*

Because the Executive Order directs the EAC to take only appropriate and lawful actions, and because (as discussed above), Section 2(a) may be implemented in a lawful manner consistent with relevant statutory provisions, the district court erred in enjoining the Order based on speculation that the Order may be carried out in an unlawful manner. Where, as here, an Executive Order "is not self executing," and instructs subordinate officers to take action only to the extent permitted by law, "[t]he mere possibility that some agency might make a legally suspect decision … to deny funding for a project does not justify an injunction." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). It cannot be unlawful for a President to direct subordinate executive officers to carry out his policies consistent with all applicable law, and an injunction prohibiting such instructions is seriously at odds with the President's Article II authority. Courts should be especially reluctant to enjoin

---

bipartisan panel," Addendum 19, noting that by statute the majority and minority leaders of the Senate and House of Representatives submit recommendations to the President for appointments to the EAC, 52 U.S.C. § 20923(a)(2), *see* Addendum 9, and that the EAC can take certain action only with the approval of three members, Addendum 19. But the bipartisan recommendations are recommendations only; the President is free under the statute to appoint whomever he chooses (with the consent of the Senate). 52 U.S.C. § 20932(a)(1); *LULAC*, 780 F. Supp. 3d at 163. The statutory requirement for approval by three of the four members of the EAC, 52 U.S.C. § 20928, applies only to actions "under this chapter," meaning chapter 209, Sections 20901-21145, while the EAC's authority to amend the Federal Form is in Section 20508 (chapter 205). *See Kobach v. U.S. Elec. Assistance Comm'n*, 772 F.3d 1183, 1193 (10th Cir. 2014).

the Order at issue here before the EAC even has an opportunity to carry out the President's instructions in a lawful manner (as it began to do by implementing the consultation process with the States).

### B.    The District Court's Judicial Estoppel Rationale Is Meritless

The district court also held that the Government is "judicially estopped" from advancing its view of Section 2(a), and how it is consistent with the NVRA's requirements, because the Government took a different view in *LULAC*, 780 F. Supp.3d at 199 — other district court litigation addressing Section 2(a), in which Plaintiffs were not parties.  Addendum 20 (citing *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001)).  *New Hampshire* provides no support for the district court's estoppel holding.  As the Supreme Court explained in *New Hampshire*, judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  532 U.S. at 749.  But the Government did not *prevail* in the *LULAC* case with respect to Section 2(a); it lost at the preliminary injunction stage.  More broadly, *New Hampshire* emphasized that judicial estoppel should not apply to a State in "a case where estoppel would compromise a governmental interest in enforcing the law."  *Id.* at 755.  "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry

as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Servs.*, 467 U.S. 51, 60 (1984); *cf. United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("A rule allowing nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.").

The district court provided no persuasive rationale for concluding that the statements of a single government lawyer, in the heat of a hearing in a preliminary injunction posture, can forever lock into place and bind the President's understanding of his own Executive Order. The district court was wrong to freeze the Government's understanding of Section 2(a) "on the basis of counsel's initial footfault." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 309 n.5 (2000) (Scalia, J., concurring in the judgment). *See Minerals Separation Ltd. v. Butte & Superior Mining Co.,* 250 U.S. 336, 352 (1919) ("[P]arties should not be held rigidly to statements made by their counsel in the stress of argument.").

## C.    Plaintiffs' Challenge to Section 2(a) Is Not Ripe

For similar reasons, the district court erred in holding that Plaintiffs' challenge to Section 2(a) is ripe. As with its conclusion on the merits, the district court's ripeness holding (Addendum 16-17) turns on its erroneous understanding that the Order short-circuits the statutory consultation process

with the States and requires a documentary proof-of-citizenship requirement regardless of whether the EAC, after consultation, finds that such a requirement is "necessary." As explained above, however, Section 2(a) does not pretermit the consultation process or disregard whether the EAC finds that a documentary proof-of-citizenship requirement is "necessary." Because Section 2(a) requires the EAC to "take appropriate action to require" documentary proof of citizenship, the Order still requires that the EAC follow the statutory consultation process, and because the outcome of that process is distant in time and uncertain, and contingent upon the EAC's ultimate conclusion as to whether such a requirement is "necessary," Plaintiffs' challenge to Section 2(a) is not ripe. Nor does it matter that the EAC has sent a letter to the chief election officers of the States regarding how to implement Section 2(a). Addendum 17. That letter is only the first step in the consultation process and does not change the fact that the outcome of that process is still uncertain, meaning that Plaintiffs' challenge is not ripe.

## II. PLAINTIFFS LACK STANDING TO CHALLENGE SECTION 2(D), WHICH IN ANY EVENT IS CONSISTENT WITH THE NATIONAL VOTER REGISTRATION ACT

Section 2(d) of the Executive Order requires "[t]he head of each Federal voter registration executive department or agency" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance

programs." Addendum 50. The district court erred in enjoining this provision because Plaintiffs lack standing to challenge it and, in any event, Section 2(d) is consistent with statutory requirements.

### A. Plaintiffs Lack Standing to Challenge Section 2(d)

Because Section 2(d) of the Executive Order does not cause Plaintiffs any injury and does not regulate them in any way, Plaintiffs lack standing to challenge that Section. While both States and the Federal Government may designate agencies as voter registration agencies under the NVRA, *see* 52 U.S.C. § 20506(a)(1)-(3), Section 2(d) of the Order is directed only at "[t]he head of each *Federal* voter registration executive department or agency," Addendum 50 (emphasis added), and thus does not directly regulate voter registration agencies designated by the States. Because the Plaintiff States are not harmed or regulated by Section 2(d), they lack standing to challenge that provision.

The district court did not directly address why the Plaintiff States would have standing to challenge a provision directed only at federal voter registration agencies. The district court believed that Section 2(d) "conscript[s]" the State voter registration agencies into carrying out Section 2(d), Addendum 26, but the Order on its face is directed only to federal agencies; it does not require the State voter registration agencies to assess citizenship prior to distributing the Federal Form. The court likewise stated that Section 2(d) "would impose new and complex duties on agencies across the States and would divert and require

25

significant resources to train personnel in these agencies to assess citizenship."
Addendum 36-37.  Again, however, Section 2(d) is directed only to federal
voter registration agencies, not State agencies, and does not require State voter
registration agencies to do anything.  Nor do the Plaintiff States "have standing
as *parens patriae* to bring an action against the Federal Government," *Haaland v.
Brackeen*, 599 U.S. 255, 295 (2023), or third-party standing to assert the rights of
applicants for voter registration, particularly because there is no "hindrance" to
individual voter registration applicants' ability to protect their own interests.
*Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *cf. LULAC*, 780 F. Supp.3d at 191-
92 (associational standing to challenge Section 2(d) on behalf of individual
applicants for voter registration).

For similar reasons, Plaintiffs' challenge to Section 2(d) fails on the
merits.  The district court held the Order "conscript[s] states" to carry out
Section 2(d), but because the President "has no authority to command [State]
agencies," Plaintiffs' "separation of powers argument is likely to succeed on the
merits."  Addendum 26-27.  Again, that argument is mistaken:  Section 2(d) is
directed only at *federal* voter registration agencies, not State voter registration
agencies, and thus does not conscript the States in any way or command State
agencies to act in certain ways.

**B.    Section 2(d) Is Consistent With Statutory Authority**

Although this Court need not reach the question, Section 2(d)'s direction to federal voter registration agencies is consistent with the statute.  The NVRA specifies that "each voter registration agency" "shall" "[d]istribut[e] … mail voter registration application forms."  52 U.S.C. § 20506(a)(4)(A)(i).  But nothing in Section 2(d) is contrary to that requirement.  The Order nowhere states that federal voter registration agencies should withhold the Federal Form under any circumstances (although the statute permits withholding the form when the applicant declines in writing to register to vote, 52 U.S.C. § 20506(a)(6)(A)).  Nor does the Order define what steps a federal voter registration agency should take to "assess citizenship." Addendum 50.  A federal voter registration agency may therefore implement Section 2(d) by asking an applicant, prior to distributing the Federal Form, whether he or she is a citizen and reminding the applicant that the Federal Form itself requires attestation of citizenship under penalty of perjury.  *See* JA 69; 52 U.S.C. § 20508(b)(2)(A), (C).  In no event, however, should the federal voter registration agency withhold the distribution of the Federal Form unless the applicant "in writing, declines to register to vote."  52 U.S.C. § 20506(a)(6)(A). Particularly in light of the Order's saving clause, Addendum 54, and the lawful manner in which the Order may be implemented, Section 2(d) should not be

27

enjoined on its face based on the speculation that Section 2(d) could be implemented in unlawful ways.  *See supra* at 21-22.

 For the same reasons, any challenge to Section 2(d) would not be ripe. Although there are lawful ways in which federal voter registration agencies can implement Section 2(d), at this juncture no federal voter registration agency has indicated precisely how it will implement Section 2(d).  Thus, at this point in time, "[a]ny prediction how the Executive Branch might eventually implement" Section 2(d) is "no more than conjecture."  *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).  Because Plaintiffs can only speculate that Section 2(d) will be implemented in a way contrary to federal law, a ripe claim must await actual implementation of the Order by a federal voter registration agency in a manner that is allegedly inconsistent with Section 20506.

## III.   SECTION 3(D) IS CONSISTENT WITH THE UNIFORMED AND OVERSEAS CITIZENS ABSENTEE VOTING ACT AND PLAINTIFFS LACK STANDING

Section 3(d) of the Order directs "[t]he Secretary of Defense" to "update the Federal Post Card Application … to require … documentary proof of United States citizenship."  Addendum 51.  The district court erred in holding that Section 3(d) is contrary to statutory authority and in concluding that Plaintiffs have standing to challenge Section 3(d) and that their claims are ripe.

### A.   Section 3(d) Is Consistent With Statutory Authority

The district court erred in concluding that Section 3(d) conflicts with the

UOCAVA. The statute authorizes the Secretary of Defense to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application," 52 U.S.C. § 20301(b)(2), and on its face that provision does not preclude the Secretary from requiring documentary proof-of-citizenship as part of the voter registration application. Although the Secretary must "consult State and local election officials" before doing so, 52 U.S.C. § 20301(b)(1), the statute does not compel the Secretary to make a specific finding that a change is "necessary," as the EAC must do before adding additional information to the Federal Form under Section 20508(b). In this way, the text of Section 20301 provides the Secretary with greater latitude to implement changes to the federal post card form than the EAC has in changing the Federal Form. Yet the district court counterintuitively reached the opposite conclusion. While the court acknowledged that the EAC has authority under some circumstances to add a documentary proof-of-citizenship requirement, Addendum 21 n.6; *see Inter Tribal*, 570 U.S. at 19-20, its interpretation of Section 20301(b)(2) would leave no room for the Secretary of Defense to add such a requirement under any circumstances.

The district court also erred in ascribing far too much significance (Addendum 23) to the provision directing the Secretary to "prescribe a standard oath for use with any document under this chapter affirming that a

material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury." 52 U.S.C. § 20301(b)(7). That provision does not expressly relate to citizenship in any way and does not implicitly forbid the Secretary from requiring documentary proof-of-citizenship under his authority in Section 20301(b)(2). After all, under Section 20508 an applicant using the Federal Form must "attest[]" to citizenship "under penalty of perjury," *id.* § 20508, but that does not preclude the EAC from adding a documentary proof-of-citizenship requirement to the Federal Form under appropriate circumstances. *See Inter Tribal*, 570 U.S. at 19-20. Similarly, UOCAVA's "standard oath" provision provides no basis for precluding the Secretary from adding a similar documentary proof-of-citizenship requirement to the post card form.

Likewise, the district court read too much into the words "post card" in Section 20301(b)(2), construing those words to "preclude[] any requirement that [the] applicant submit documentation" because, in the court's view, that would be an impossibility with a literal postcard. Addendum 24. While the requirement that the form be a "post card" might place some limit on the format of the voter registration application, it does not preclude a proof-of-citizenship requirement unless it is impossible to provide documentary proof of citizenship within the confines of a "post card form." There is no reason to suppose that is the case. Indeed, the "Federal Post Card Application" as

currently constituted, is not a traditional "postcard" at all, but a two page 8 ½ x 11 form that explains to applicants that they can "[r]emove the adhesive liner from the top and sides" of the form and "[f]old and seal tightly," or, in the alternative, they may "print[] the form, fold it, and seal it in an envelope." JA 94. The form adds that "many states accept [the Federal Post Card Application] by email and fax." JA 94. If the district court's cramped understanding of Section 20301(b)(2) were correct, then the currently existing post card form would itself be inconsistent with the statute regardless of anything in the Executive Order.

Finally, the district court erred in relying on the statute's ostensible purpose to "remove procedural roadblocks which had prevented American citizens living abroad from voting." Addendum 25. Invoking that amorphous Congressional purpose is not a sound foundation for reading into the words "post card" a hidden and inflexible statutory prohibition on a documentary proof-of-citizenship requirement. More importantly, the court's reasoning — that some otherwise eligible applicants would lack the necessary documentary proof-of-citizenship — is not supported by the record. The district court observed that "according to the State Department, only 'approximately 50% of Americans have passports,'" Addendum 25 (quoting JA 276), but that observation has little force with respect to "overseas voters" who "reside outside the United States," 52 U.S.C. §§ 20302(a)(1), 20310(5), who presumably

31

obtained a passport before departing the United States. Nor does the court's observation or the record establish that "absent uniformed service voters" in particular are unlikely to have the required documentation. 52 U.S.C. § 20302(a)(1). In addition, a passport is not the only means of establishing citizenship. Section 2(a)(ii) of the Order specifies that documentary proof of citizenship "shall include" a United States passport but also that three other forms of identification will suffice, Addendum 49, and the words "shall include" leaves open the possibility that other forms of identification could be accepted as well.[4]

The district court also expressed concern that an applicant's proof of citizenship "'might not match their current identification due to a name change,'" Addendum 25 (quoting JA 119), but the Federal Post Card Application already requires the applicant to specify "[p]revious names (if applicable)," JA 93. The court also relied on a declarant who stated that it "can take weeks or even months" for local officials to "acquire" evidence of citizenship, Addendum 25 (quoting JA 164), but Section 2(b)(i) of the Order directs the Secretary of Homeland Security to "ensure that State and local

---

[4] Under Section 2(a)(ii)(B), a REAL ID that indicates the applicant is a citizen will suffice. Four Plaintiff States (Michigan, Minnesota, New York, and Vermont) issue enhanced drivers licenses that provide proof of U.S. citizenship. *See* https://www.dhs.gov/enhanced-drivers-licenses-what-are-they.

officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who have already registered," Addendum 49.[5]

### B. Plaintiffs Lack Standing to Challenge Section 3(d) and Their Claims Are Not Ripe

The district court also erred in holding that Plaintiffs have standing to challenge Section 3(d). The Plaintiff States are not injured by Section 3(d). The court relied on the assertion that the Order "impos[es] compliance costs" on the States, Addendum 15, because the Order's "recordkeeping requirements" would "force [the States] to undertake the expensive and arduous task of updating their voter registration databases and their voter registration processes," Addendum 35, as well as "issue guidance related to the documentary proof of citizenship requirement," Addendum 36. While that may be true with respect to Section 2(a)(i)(B), which contains a recordkeeping requirement applicable to the States, *see* Addendum 48-49, there is no similar recordkeeping requirement for the States under Section 3(d). Nothing in Section 3(d) requires the States to engage in any recordkeeping, to record the

---

[5] The district court's basis for enjoining Section 3(d) rested on its conclusion that federal law prohibits imposing a documentary proof of citizenship requirement for the federal post card application form. Addendum 23-26. But only Section 3(d)(i) imposes that requirement; Section 3(d)(ii) does not. And yet the district court's injunction extended to both Section 3(d)(i) and (d)(ii).

documentary proof-of-citizenship in its databases, or to issue guidance on how to do so. Accordingly, Section 3(d) does not injure the Plaintiff States by imposing any recordkeeping or related guidance requirements.

The district court also relied on an asserted injury to the States that would occur if fewer of their citizens could register to vote, even if they are eligible to do so, because they lack the necessary documentary proof of citizenship. Addendum 40-41. Even assuming such an injury to eligible voters also constitutes a cognizable injury to the Plaintiff States (which it does not), and assuming further that some Americans might not have passports, the assertion is far-fetched with respect to overseas voters who reside abroad, and thus presumably have a passport or other applicable document identifying their citizenship permitting them to travel abroad. Accordingly, any claimed injury to the Plaintiff States on this basis is illusory. For the same reasons, Plaintiffs have failed to show any irreparable harm from Section 3(d), because Plaintiffs' claim of irreparable harm with respect to Section 3(d) is indistinguishable from Plaintiffs' asserted Article III injury with respect to Section 3(d).

Nor is Plaintiffs' challenge to Section 3(d) ripe. Even if Section 3(d) is a "clear" "command" to the Secretary of Defense to include a documentary proof-of-citizenship requirement in the federal post card application form, Addendum 22-23, it remains to be seen how the Secretary will implement this requirement and whether he can do so consistent with any limitation that might

34

be implied by the statutory text ("post card"), *see supra* at 30-31.  Until that

implementation occurs, Plaintiffs' claim that the Secretary cannot implement

Section 3(d) in a manner consistent with the statutory text remains theoretical

and unripe.

## IV.    SECTION 7(A) IS LAWFUL AND PLAINTIFFS' CHALLENGE IS NOT RIPE

Section 7(a) directs the Attorney General to "take all necessary action to

enforce 2 U.S.C. § 7 and 3 U.S.C. § 1 against States that violate these provisions

by including absentee or mail-in ballots received after Election Day in the final

tabulation of votes for the appointment of Presidential electors and the election

of members of the United States Senate and House of Representatives."

Addendum 53.  Plaintiffs' challenge to Section 7(a) is not ripe and the district

court erred in holding that the state law provisions of the Ballot Receipt States

would not be preempted by the Election Day statutes.

### A.    Plaintiffs' Challenge to Section 7(a) Is Not Ripe

The district court acknowledged that the Attorney General may lawfully

enforce Section 7(a) of the Order by sending letters to States encouraging their

compliance with the Order's understanding of the federal election day laws,

Addendum 32, but because "the government has not indicated that the

Attorney General will cabin enforcement of § 7(a) merely to sending such

letters," Addendum 28, the court enjoined Defendants from "implementing

35

civil or criminal enforcement actions pursuant to Section 7(a) of the Executive Order" with respect to the Plaintiff States that permit late absentee or mail-in ballots to be received and counted, Addendum 1-2. That injunction should be vacated.

The district court's first error was enjoining Section 7(a) based on its speculation that the Attorney General might implement the Order in an unlawful way. The Order's saving clause (Addendum 54) requires the Attorney General to implement Section 7(a) "consistent with applicable law." As previously discussed, *supra* at 21-22, where an Executive Order instructs subordinate officers to take only lawful actions, "[t]he mere possibility that some agency might make a legally suspect decision … does not justify an injunction." *Allbaugh*, 295 F.3d at 33. Thus, if there are lawful ways to implement Section 7(a) of the Order — and the district court conceded there were, Addendum 32 — then there is no basis for enjoining that provision based on speculation that the Attorney General would nonetheless choose unlawful means to implement it. More broadly, if the Attorney General were to bring an enforcement action against Plaintiffs pursuant to Section 7(a), Plaintiffs could challenge her authority to do so in that enforcement action, including by contesting the Government's understanding of what the Election Day statutes require. But there is no basis in *this* litigation for enjoining speculative future enforcement action before it even commences. In short, any

36

challenge to the way the Attorney General might implement Section 7(a), beyond sending letters to the States, is not ripe unless and until the Attorney General takes such action.  For the same reasons, Plaintiffs are not likely to succeed on the merits of their Section 7(a) challenge.  Because Section 7(a) can be implemented in a lawful way, Plaintiffs cannot show that Section 7(a), on its face, is unlawful and must be enjoined.  More broadly, it is not the Defendants' burden at the preliminary injunction stage to prove that it will act lawfully; it is the Plaintiffs' burden, in seeking equitable relief, to show that the Government will act unlawfully in the absence of an injunction.

The district court's second error was its conclusion that the Government would implement the Order unlawfully based on a single sentence from the preliminary injunction hearing in separate district court litigation that also challenged Section 7(a).  Addendum 28 (citing JA 104).  Here, the district court repeated the same error regarding judicial estoppel discussed *supra* at 22-23; the district court's reliance on a stray sentence from a preliminary injunction hearing in another case is not a sound basis for enjoining Defendants in this litigation.  It is all the more inappropriate where the district court in that other litigation ultimately concluded that "it is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" and the court "'cannot simply assume' that the Attorney General will disregard the requirement of lawful implementation."  *LULAC*, 780 F. Supp.3d at 213-14.

**B.    Ballot Receipt State Laws Are Preempted by the Federal Election Day Statutes**

Although this Court need not reach the question because Plaintiff's challenge to Section 7(a) is not ripe, the district court also erred in holding that the relevant state laws in the Ballot Receipt States are not preempted by the federal Election Day statutes.  Addendum 29-31.

In *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), *petition for certiorari filed*, No. 24-1260 (U.S. June 10, 2025), the court addressed a Mississippi statute permitting mail-in absentee ballots to be accepted if they are postmarked on or before the day of election and received up to five days after the federal election, *id.* at 204-05.  The court held that the Mississippi statute was preempted by 2 U.S.C. § 7 and 3 U.S.C. § 1 and their establishment of "the day for the election" and "election day."  *See id.* at 206-09.

The *Wetzel* court reasoned that the Supreme Court's decision in *Foster v. Love* (*see supra* at 7), understood the text of the Election Day statutes — particularly the words "the day for the election" — to entail three elements: "(1) official action, (2) finality, and (3) consummation."  *Wetzel*, 120 F.4th at 207; *see Love*, 522 U.S. at 71 ("When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder" and the statutes "establish[] a particular day as 'the day' in which these actions must

38

take place."); *id.* at 72 n.4 (federal election "may not be consummated prior to federal election day").

The "official action" required by the Election Day means that "a ballot is 'cast' when the State takes custody of it." *Wetzel*, 120 F.4th at 207. Were it otherwise, a State could "allow voters to mark their ballots and place them in a drawer," or "mark a ballot and then post a picture on social media," which would be "obviously absurd." *Id.*

The "finality" required by the Election Day statutes requires "final ballots" to be "received." *Wetzel*, 120 F.4th at 207. Under state regulations, however, an absentee ballot "is 'final' when accepted by [State] election officials," *id.* at 208, not merely when the voter submits in the mail. Federal postal service regulations likewise "permit[] senders to recall [domestic] mail," which further reinforces the conclusion "that at least domestic ballots are not cast when mailed." *Id.*

As for "consummation," the Election Day statutes require "the proverbial ballot box [to be] closed" on the day specified in the statute, at which point "officials know there are X ballots to count" because no further ballots can be received. *Wetzel*, 120 F.4th at 209. While "*counting* ballots" may continue after Election Day, because "it can take additional time to tabulate the election results," the "[*r*]*eceipt* of the last ballot, by contrast, constitutes consummation of the election, and it must occur on Election Day." *Id.*

39

The court in *Wetzel* acknowledged that the Help America Vote Act, 52 U.S.C. § 21082, "authorize[s] post-Election Day voting," and UOCAVA, 52 U.S.C. § 20307(a), "also permits post-Election Day balloting." 120 F.4th 212-13. The court correctly concluded, however, that these statutes merely show that "Congress knew how to authorize post-Election Day voting when it wanted to do so," and that such narrow exceptions "do[] not impliedly repeal all of the other federal laws that impose a singular, uniform Election Day for every other voter in America." *Id.* at 212. The same is true for "other Election Day exceptions" in federal law, such as congressional election in the event of a vacancy, authorization for a run-off election, or modifying the period of voting for force majeure events. *Id.* at 213.

The district court's reasons for concluding otherwise are without merit. Addendum 30-31. *Bost v. Illinois State Board of Elections*, 114 F.4th 634 (7th Cir. 2024), reached only the question of standing, not the merits, and even on that question the Supreme Court granted certiorari, *Bost v. Illinois State Bd. of Elections*, 145 S. Ct. 2751 (2025). The remaining decision, *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp.3d 354 (D.N.J. 2020), is an un-appealed district court opinion decided in the context of a preliminary injunction motion seeking injunctive relief on the eve of an election, *id.* at 375-76. As such, it has no precedential force here, especially as compared to the unanimous court of appeals decision in *Wetzel*. Nor does the district court's reliance (Addendum

30) on specific statutory exceptions like that in UOCAVA undermine *Wetzel*'s

holding. *Wetzel* itself acknowledged such statutory provisions, but correctly

held Congress' enactment of specific exceptions permitting post-Election Day

ballots in narrow circumstances does not alter the general rule set forth in the

Election Day statutes, which establishes a single, uniform Election Day in every

other circumstance.

## V. THE PRELIMINARY INJUNCTION SHOULD BE VACATED BECAUSE IT EXTENDS BEYOND THE NAMED PLAINTIFFS AND PLAINTIFFS CANNOT SHOW IRREPARABLE HARM

For the reasons discussed above, Plaintiffs are not likely to succeed on

the merits, and the preliminary injunction should be reversed for that reason

alone. Even assuming Plaintiffs were right on the merits, however, the

preliminary injunction should be reversed for two independent reasons. First,

the injunction with respect to Sections 2(a) and 3(d) is overbroad because it is

not limited to providing relief to the named parties in this litigation. Second,

Plaintiffs cannot show any irreparable harm with respect to Sections 3(d) and

7(a); the injunction with respect to those sections was therefore unwarranted

and should be vacated.

### A. The Injunction Is Overbroad With Respect to Sections 2(a) and 3(d)

By its terms, *see* Addendum 1-2, the district court's injunction with

respect to Sections 2(a) and 3(d) would prohibit the EAC or the Secretary of

41

Defense from amending *any* of the 50 state-specific instructions on the Federal
Form or on the Federal Post Card Application to include a documentary proof-
of-citizenship requirement, even though this litigation was brought by only 19
States. That injunction is inconsistent with *Trump v. CASA, Inc.*, which
affirmed the "general rule" that "an injunction [can]not bind one who was not
a party to the cause," and that courts should "rebuff[] requests for relief that
extend[] beyond the parties." 606 U.S. 831, 842-43 (2025); *see id.* at 844 (noting
"the party-specific principles that permeate our understanding of equity"); *id.* at
851 ("the complete-relief principle" does not "justif[y] the award of relief to
nonparties").

The district court asserted that its injunction was not "nationwide" or
"universal," and that its remedy is "tailored to the irreparable harm that
Plaintiffs … would suffer in the absence of an injunction" and its benefits to
nonparties are "merely incidental." Addendum 45 n.20. That is incorrect. The
injunction could and should have been more narrowly tailored to prohibit the
EAC and Secretary of Defense from adding such requirement to the Federal
Form or Federal Post Card Application in the state-specific instruction for the
19 *Plaintiff States*, without prohibiting the addition of such a requirement in the
state-specific instructions for the remaining 31 States (plus the District of
Columbia). The district court opined that a narrower injunction "would
undermine the national uniformity" for the Federal Form and Federal Post

Card Application.  Addendum 45-46 n.20.  An injunction prohibiting the EAC and Secretary of Defense from amending the state-specific instructions for 19 Plaintiff States would still provide national uniformity — the forms would have the same state-specific instructions for those 19 States wherever those forms are distributed throughout the Nation.  That uniformity does not require an injunction freezing the state-specific instructions for the other 31 States.  By extending the injunction to prohibit the addition of such a requirement in the state-specific instructions for non-Plaintiff States, the district court abused its discretion.

### B. Plaintiffs Cannot Show Irreparable Harm With Respect to Sections 3(d) and 7(a)

Even assuming Plaintiffs were likely to succeed on the merits, the injunction should still be vacated in part because Plaintiffs cannot show any irreparable harm with respect to Sections 3(d) and 7(a).

As noted above, the Plaintiff States suffer no harm at all with respect to Section 3(d).  Unlike Section 2(a), which expressly requires the States to keep records with respect to a documentary proof-of-citizenship requirement in the Federal Form, there is no similar recordkeeping requirement in Section 3(d).  Thus, Plaintiffs would not be harmed at all in terms of "compliance costs" "recordkeeping requirements" or "issu[ing] guidance" related to the same.  Addendum 15, 35-36.  Similarly, Section 3(d) does not harm the States by

ostensibly making it harder for eligible State citizens to register to vote. Addendum 40-41.  That assertion does not entail any harm to the States themselves; at most, it would be harm to those citizens, not to the States. Moreover, the premise of the supposed harm — that citizens might not have a passport and thus find it difficult to comply with a documentary proof-of-citizenship requirement — has little force as applied to overseas voters who already reside abroad.  *See supra* at 31-32.  While the absence of such harm demonstrates why Plaintiffs lack Article III standing to challenge these parts of the Executive Order, they likewise demonstrate why Plaintiffs cannot claim any irreparable harm with respect to Section 3(d).

The same is true for Section 7(a).  As noted before, in the nearly three months between the date the Executive Order was issued (March 25, 2025) and the district court's injunction (June 13, 2025), the Attorney General had not initiated any enforcement action of any kind under Section 7(a) against any State.  But even if the Attorney General had brought such an action again the Plaintiff States that would *still* not have caused any irreparable harm to the Plaintiffs.  And that is because the Plaintiffs, in defending against such an action, would be entitled to assert their view that the Attorney General is not authorized to bring such an action, as well as their view that the Election Day statutes do not preempt their respective State laws.  The commencement of such an action by the Attorney General, in other words, would cause Plaintiffs

no harm at all (irreparable or otherwise) because Plaintiffs could assert all the same arguments in the context of that separate litigation, and Plaintiffs' respective State laws would remain untouched unless and until the Attorney General prevailed in that action. Because Section 7(a) causes Plaintiffs no irreparable harm *even if* the Attorney General were to seek to enforce that Section in future litigation, the district court abused its discretion in enjoining that provision even before such litigation could even occur.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated and reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

MICHAEL S. RAAB

 *s/ Joshua Waldman*
JOSHUA WALDMAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7527*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0236*
  *Joshua.waldman@usdoj.gov*

October 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,365 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua Waldman*
Joshua Waldman
Counsel for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Joshua Waldman*
Joshua Waldman

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order (June 13, 2025 as amended July 18, 2025) ......... Addendum 1

Order of Preliminary Injunction (June 13, 2025) .......................................... Addendum 3

Executive Order 14,248 .................................................................................. Addendum 47

2 U.S.C. § 7 ..................................................................................................... Addendum 55

3 U.S.C. § 1 ..................................................................................................... Addendum 56

52 U.S.C. § 20301 ........................................................................................... Addendum 57

52 U.S.C. § 20506 ........................................................................................... Addendum 59

52 U.S.C. § 20508 ........................................................................................... Addendum 63

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **STATE OF CALIFORNIA, et al.,** | ) ) ) ) |  |
| **Plaintiffs** | ) ) |  |
| **v.** | ) ) ) | **No. 25-cv-10810-DJC** |
| **DONALD TRUMP, et al.,** | ) ) ) |  |
| **Defendants.** | ) ) ) ) |  |

## Amended ORDER OF PRELIMINARY INJUNCTION

**CASPER, J.**                                                              **June 13, 2025**
                                                                               amended July 18, 2025

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, and for the reasons explained by the Court in its Memorandum and Order, D. 107 (entered June 13, 2025), the Court finds that Plaintiff States are likely to succeed on the merits of their claims in their motion for preliminary injunction, D. 75, that Section 2(a), Section 2(d), Section 3(d), Section 7(a), and Section 7(b) of Executive Order No. 14248 are unlawful and unconstitutional; that Plaintiffs will suffer irreparable harm absent the preliminary injunctive relief granted herein; that the balance of equities and public interest favor granting this injunctive relief; and, a bond is not warranted here.

Accordingly, the Court hereby **ALLOWS** Plaintiff States' motion for preliminary injunction, D. 75, and Defendants, their officers, agents, servants, and employees, other than the President, are enjoined from:

(1) implementing Section 2(a) of the Executive Order that mandates that the EAC require documentary proof of citizenship in the federal voter registration form and that the States

Addendum 1

record information concerning such documentary proof;

(2) implementing Section 3(d) of the Executive Order that requires Defendant Secretary of Defense to update the federal postcard application to require documentary proof of citizenship and proof of eligibility to vote in a particular State;

(3)  implementing Section 2(d) that requires the head of each federal voter registration executive department or agency to assess citizenship prior to providing the federal voter registration form to enrollees of public assistance programs✗ as to the Plaintiff States; ᵈᴶᶜ

(4) implementing civil or criminal enforcement actions pursuant to Section 7(a) of the Executive Order as to the Ballot Receipt States (Plaintiffs California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island); and

(5) implementing Section 7(b) of the Executive Order, which conditions any available funding from the EAC to the States on the adoption of a ballot receipt deadline of Election Day, against the Ballot Receipt States (Plaintiffs California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island).

This Order shall remain in effect unless and until modified by the Court.

**SO ORDERED.**

By:    /s Denise J. Casper
       United States District Judge

Addendum 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| STATE OF CALIFORNIA, et al., ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | **No. 25-cv-10810-DJC** |
| ) | |
| DONALD TRUMP, et al., ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **June 13, 2025**

## I.      Introduction

On March 25, 2025, President Donald J. Trump issued Executive Order No. 14248, Preserving and Protecting the Integrity of American Elections (the "Executive Order").  Among other things, the Executive Order requires the United States Election Assistance Commission (the "EAC") and the Secretary of Defense to implement documentary proof of citizenship requirements with federal voter registration forms required to be used by Plaintiffs, Attorney Generals representing nineteen states, California, Nevada, Massachusetts, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Rhode Island, Vermont and Wisconsin (collectively, the "Plaintiffs" or the "States"), commands the Attorney General to take action against thirteen of the States that have laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems ("Ballot

1

Receipt States"), and directs the EAC to condition statutory funding upon compliance with a ballot receipt deadline that is contrary to the respective state laws established by those thirteen States. The States have moved for a preliminary injunction barring the named Defendants (collectively, the "Defendants" or the "Executive Branch"), from implementing these mandates of the Executive Order.

After careful consideration of the parties' filings, briefs from *amici curiae* and oral argument by counsel, the Court ALLOWS the States' motion for preliminary injunction for the reasons explained at length below.

In sum, the challenges by the States to certain provisions of the Executive Order, namely §§ 2(a), 2(d), 3(d), 7(a) and 7(b), are ripe for review. Their challenge to § 2(a), that requires the EAC to take appropriate action to require documentary proof of U.S. citizenship for voter registration, is ripe because it imposes a deadline and dictates the precise contours of this new requirement and implementation of same poses an imminently threatened economic injury on the States. The same is true with § 3(d), that similarly mandates the Secretary of Defense to require documentary proof of U.S. citizenship for members of the military and other U.S. citizens living abroad. Although the Executive Order does not establish a deadline for this requirement, the command of § 3(d) is clear and, accordingly, fit for review and would pose the same hardship for the States as § 2(a). The States have a likelihood of success on the merits as to their challenges to both sections. There is no dispute (nor could there be) that U.S. citizenship is required to vote in federal elections and the federal voter registration forms require attestation of citizenship. The issue here is whether the President can require documentary proof of citizenship where the authority for election requirements is in the hands of Congress, its statutes (the UOCAVA, the NVRA and the HAVA) do not require it, and the statutorily created EAC is required to go through a notice and

2

comment period and consult with the States before implementing any changes to the federal forms for voter registration. As to both of their challenges to §§ 2(a) and 3(d), the States are likely to succeed on the merits.

The States are also reasonably likely to succeed as to their challenge to § 2(d) of the Executive Order, which requires the head of each voter registration agency to assess citizenship prior even to providing the federal voter registration form to enrollees of public assistance agencies. Defendants cannot point to any source of authority for the President to impose this requirement on the States, particularly where the Elections Clause gives power over federal elections to Congress, and, in acting on that authority, Congress established the EAC to prescribe rules and regulations for elections and the NVRA requires voter registration agencies, including all offices in the States that provide public assistance, to distribute the federal voter registration form.

As to §§ 7(a) and 7(b), the States have standing to challenge both provisions (unlike the DC Court found as to the private parties in that case) and these challenges are ripe for consideration. Pre-enforcement review of a threatened government action is appropriate if the threat of enforcement is sufficiently imminent. This is particularly true where the government has suggested that it could take civil and criminal enforcement action against the Ballot Receipt States for purported violation of the Election Day statutes. As to the merits of the challenge to § 7(a), there is nothing in the text of the Election Day statutes that bars the Ballot Receipt States from counting ballots received in accordance with their ballot receipt laws or that provides for civil enforcement or criminal action by the Attorney General against the Ballot Receipt States. Even if the Attorney General could take some other actions to enforce the Executive Branch's interpretation of the Election Day statutes (which is beyond what the States challenge here), that does not include civil or criminal enforcement action against the thirteen Ballot Receipt States under the current statutory

Addendum 5

scheme.  As to the challenge to § 7(b), the HAVA does not condition election funding to States to their ballot receipt deadline and the President does not have the authority to direct the EAC to impose such a condition.  Accordingly, the States are likely to succeed on the merits of this challenge.

The States have also shown the risk of irreparable harm in the absence of an injunction where the challenged sections of the Executive Order would burden the States with significant efforts and substantial costs to revamp voter registration procedures and would impede the registration of eligible voters, many of whom lack ready access to documentary evidence of citizenship (e.g., U.S. passport and other forms of identification that reflect citizenship).  In light of the likelihood of success on the merits of their challenges to these aforementioned sections of the Executive Order, the risk of irreparable harm in the absence of the relief sought and having considered the balance of equities and the public interest in granting such relief, the Court ALLOWS the States' motion for a preliminary injunction.

## II.    Background

The Constitution's Elections Clause empowers states to prescribe the "Times, Places, and Manner of holding" congressional elections.  U.S. Const. art. I, § 4, cl. 1.  "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes" among other issues.  Smiley v. Holm, 285 U.S. 355, 366 (1932).  The Elections Clause empowers Congress to "make or alter" state election laws.  U.S. Const. art. I, § 4, cl. 1.  "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  Arizona v. Inter Tribal Council of

4

Arizona, Inc., 570 U.S. 1, 9 (2013) ("ITCA") (quoting Foster v. Love, 522 U.S. 67, 69 (1997)).  For presidential elections, the Electors Clause provides States with the primary authority to decide how electors are chosen.  U.S. Const. art. II, § 1, cl. 2.

The Constitution does not grant the President any specific powers over elections.  Rather, the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, §§ 1, 3.  The President "plays no direct role in the process" of appointing electors, "nor does he have authority to control the state officials who do."  Trump v. United States, 603 U.S. 593, 627 (2024).  As the Supreme Court has observed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  Medellín v. Texas, 552 U.S. 491, 526-27 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).

### A.    Existing Federal Law

#### 1.    The Uniform Overseas Citizens Absentee Voting Act ("UOCAVA")

In the exercise of its constitutional authority, Congress has adopted a comprehensive scheme regarding voter registration and federal elections.  In 1986, Congress enacted the UOCAVA to streamline registration and voting rules for members of the military and for U.S. citizens living abroad.  52 U.S.C. §§ 20301 et seq.  The UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application and an absentee ballot application" and requires States to use the prescribed form.  Id. §§ 20301(b)(2), 20302(a)(4).  The UOCAVA does not include a documentary proof of citizenship requirement, but requires that voters are citizens and verifies their citizenship through attestation.  Federal Post Card Application (FPCA), https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf (last visited June 12, 2025).

5

2.    *The National Voter Registration Act ("NVRA")*

Seven years later, in 1993, Congress, recognizing that "the right of citizens of the United States to vote is a fundamental right," enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," make it possible for federal, state and local governments to implement its provisions to enhance voter participation by eligible citizens, "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b). The "NVRA's primary emphasis is on simplifying the methods for registering to vote in federal elections." Colón-Marrero v. Vélez, 813 F.3d 1, 10 n.13 (1st Cir. 2016); see 52 U.S.C. § 20506(a)(2)-(3).

As part of its effort to enhance voter participation, the NVRA established baseline voter registration procedures which every state must implement, alongside "any other method of voter registration provided for under State law." 52 U.S.C. § 20503(a). Specifically, the NVRA requires states to establish procedures to allow voters to register by mail, in tandem with a driver's license application or at designated voter registration agencies. Id. Designated voter registration agencies must include "all offices in the State that provide public assistance," "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" and other offices designated by the state. Id. § 20506(a)(2)-(3).

As relevant here, the NVRA requires the development of a mail voter registration application form for elections for Federal office (the "Federal Form"), which "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." Id. § 20508(b)(1). Citizenship is an eligibility requirement for which the Federal Form requires attestation. Id. § 20508(b)(2). States subject to the NVRA

6

"shall accept and use" the Federal Form.  Id. § 20505(a)(1).  The NVRA requires that certain federal and state agencies ("voter registration agencies") distribute the Federal Form.  Id. §§ 20506(a)(4)(i), (a)(6).  "[A]ll offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" must be designated as voter registration agencies.  Id. § 20506(a)(2)(A)-(B).

Congress initially gave responsibility for promulgating the Federal Form to the Federal Election Commission ("FEC"), an "inherently bipartisan" six-member body.  See Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981).  In 2002, Congress passed the Help America Vote Act ("HAVA"), which created the EAC, a multi-member, bipartisan, "independent entity" and transferred responsibility for the Federal Form to this body.  52 U.S.C. §§ 20508(a), 20921, 20923, 20928.

The contents of the Federal Form are set by regulation, 11 C.F.R. § 9428.4, and alterations to the Federal Form require notice-and-comment rulemaking, 5 U.S.C. § 553.  The NVRA also requires the EAC to consult "with the chief election officers of the States" on changes to the Federal Form. 52 U.S.C. § 20508(a)(2).  "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop:  [n]o matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available."  ITCA, 570 U.S. at 12.

### 3.    The HAVA

In addition to creating the EAC, see 52 U.S.C. §§ 20508(a), 20921, 20923, 20928, the HAVA also established a funding program to support states' administration of elections and required that the EAC distribute the associated funds in accordance with statutory mandates.  These payments include "requirements payments," which support compliance with federal standards for

election systems and other improvements, 52 U.S.C. §§ 21001, 21002, 21003, election improvement funds, id. § 20901, and election security matching grants, Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 562 (2018); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2461 (2019); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 268 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4679 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 549 (2024) (each appropriating funds for election security grants to be administered under the election improvement funding statute, 52 U.S.C. §§ 20901, 20903, 20904); see U.S. Elections Assistance Comm'n, Election Sec. Grant, https://www.eac.gov/grants/election-security-funds (last visited June 12, 2025).  For example, in March of this year, Congress appropriated an additional $15 million for election security grants. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No., 119-4, 139 Stat. 9, 10-11, 26 (2025).

## B.    <u>The Executive Order</u>

The States here seek to enjoin the sections of the Executive Order which would require the EAC and the Secretary of Defense to implement a documentary proof of citizenship requirement with the federal voter registration form, would require voter registration agencies to assess citizenship before distributing the Federal Form to enrollees in public assistance programs, would prohibit Plaintiff States from counting ballots timely cast but received shortly after Election Day and would condition statutorily mandated funds under the HAVA upon compliance with an Election Day ballot receipt rule.

Specifically, the States challenge:  (1) § 2(a) of the Executive Order, which instructs the EAC to require "documentary proof of United States citizenship, consistent with 52 U.S.C.

8

[§] 20508(b)(3)," and to record information concerning that documentation; (2) § 2(d) of the Executive Order, which provides that "[t]he head of each Federal voter registration executive department or agency . . . under the [NVRA], shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs"; (3) § 3(d) of the Executive Order, which commands the Secretary of Defense to update the Federal Post Card Application provided under the UOCAVA to require documentary proof of citizenship and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote"; (4) § 7(a) of the Executive Order, which orders the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that "violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives," and (5) § 7(b) of the Executive Order, which requires the EAC to condition "any available funding to a State" upon its compliance with "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . ."  Exec. Order No. 14248, 90 Fed. Reg. 14,005 (Mar. 25, 2025).[1]  On April 11, 2025, numerous States' chief election officials received a letter from the EAC's Executive Director citing the Executive Order's instruction that the Federal Form require documentary proof of citizenship and seeking feedback pursuant to the consultation requirements of the NVRA.  D. 76-3 at 17-18 (April 11 letter); D. 76-3 ¶ 8 (attesting to California's receipt of April 11 letter).

The lawfulness of §§ 2(a), 2(d), 7(a) and 7(b) has already been considered by the United States District Court for the District of Columbia (the "DC Court"), in consolidated cases brought

---

[1] Plaintiffs' complaint also purports to challenge § 4(a) of the Executive Order, D. 1 ¶ 49(d), but Plaintiffs raise no such challenge in their motion for preliminary injunction, D. 75, and the Court, therefore, does not consider the lawfulness of this section at this juncture.

by private parties comprised of two groups of nonpartisan, not-for-profit organizations, including the League of United Latin American Citizens, the League of Women Voters Education Fund and several national organizations affiliated with the Democratic Party, including the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC").  League of United Latin Am. Citizens v. Exec. Off. of the President, No. 25-cv-0946-CKK, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ("LULAC").  The Plaintiffs before the DC Court sought to preliminarily enjoin enforcement of §§ 2(a), 2(b), 2(d), 7(a) and 7(b) of the Executive Order.  Id. at *1.  On April 24, 2025, the DC Court granted the injunction as to §§ 2(a) and 2(d) of the Executive Order, but denied relief as to §§ 2(b), 7(a) and 7(b).  Id. at *63.  As to §§ 7(a) and 7(b), the sections that concern ballot counting (which are parts of the Executive Order that the States challenge here), the DC Court concluded that the plaintiffs before it were not the proper parties to challenge these sections.  Id. at *52, *56 (noting that "the most natural parties to seek an injunction against enforcement under [§] 7(a) are the States themselves, not the Democratic Party Plaintiffs" and observing that the standing of States to challenge § 7(b) presents "a question for another day").

## III.    Procedural History

The States filed this action on April 3, 2025.  D. 1.  On April 23, 2025, Defendants moved to transfer and consolidate this case with the matter before the DC Court, or in the alternative, stay the matter pending resolution of the matter before the DC Court.  D. 62.  On May 5, 2025, following the DC Court's ruling on the preliminary injunction in its case, the States moved to preliminarily enjoin §§ 2(a), 2(d), 3(d), 7(a) and 7(d) of the Executive Order, D. 75.  On May 9, 2025, the Court denied the Executive Branch's motion to transfer and consolidate and denied the alternate motion

to stay this matter.  D. 79.  The Court heard oral argument from the parties on the motion for preliminary injunction on June 6, 2025, and took the matter under advisement.  D. 103.[2]

## IV.  Standard of Review

In deciding whether to grant a preliminary injunction, the Court must assess "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden [the nonmovant] less than denying an injunction would burden [the movant]; and (4) the effect, if any, on the public interest." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).  "The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor:  "likelihood of success on the merits." New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)).  Accordingly, the Court turns to this analysis as to each of the States' challenges.

## V.  Discussion

### A.  The States are the Proper Parties to Seek the Injunctive Relief Sought Here

While the consolidated matters before the DC Court raised questions concerning the standing of private parties to seek to enjoin the Executive Order, see LULAC, 2025 WL 1187730,

---

[2] The Court has received and considered three briefs from *amici curiae*.  Local election officials from thirty jurisdictions, and a bipartisan group of former secretaries of state have filed briefs in support of the States' motion for a preliminary injunction.  D. 87; D. 100.  The Republican Party of Arizona also has filed an *amicus curiae* brief to contend that regardless of whether the President can direct the EAC's activity, the EAC has the statutory authority to require documentary proof of citizenship.  D. 101.

at *21-25, *31-35, *46-48, *50-56, the States' standing to seek an injunction as to §§ 2(a), 2(d), 3(d), 7(a) and 7(b) presents a different question.  "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"  TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends."  Gustavsen v. Alcon Lab'ys., Inc., 903 F.3d 1, 6-7 (1st Cir. 2018) (citations and internal quotation marks omitted).  "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing."  Ramirez, 594 U.S. at 423 (citation and internal quotation marks omitted).  To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  Id.  "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve."  Id. (citation and internal quotation marks omitted).  In addition, a plaintiff must establish that the issues are ripe for review.  "[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal citation and quotation marks omitted).

Here, the Executive Branch argues that §§ 2(a), 3(d) and 7(a) are not ripe for consideration, because they do not threaten a sufficiently imminent injury.[3]  D. 91 at 4-10.  Defendants do not contest that once enacted, these and the other challenged sections of the Executive Order would

---

[3] At oral argument, the Executive Branch confirmed that they only challenge the ripeness of the States' challenges to §§ 2(a), 3(d) and 7(a).  D. 104 at 25.

injure states by, at a minimum, imposing compliance costs and jeopardizing a federal funding source.  See generally D. 91.  Nor do they contest that an order enjoining these sections could prevent each of these harms.[4]  Id.  Accordingly, the States are the appropriate parties to seek this injunction, but the Court will address the contested issue of ripeness as to §§ 2(a), 3(d) and 7(a) of the Executive Order in the discussion that follows.

**B.     Likelihood of Success on the Merits**

*1.     Section 2(a)*

The States seek to enjoin the implementation of § 2(a) of the Executive Order.  That section provides:

> (i) Within 30 days of the date of this order, the [EAC] shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508:
>
> > (A) documentary proof of United States citizenship, consistent with 52 [§] U.S.C. 20508(b)(3); and
> >
> > (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. [§] 21083(a)(5)(A), while taking appropriate measures to ensure information security.
>
> (ii) For purposes of subsection (a) of this section, ''documentary proof of United States citizenship'' shall include a copy of:
>
> > (A) a United States passport;

---

[4] The States move for a preliminary injunction against all Defendants except for the President.  D. 75 at 2.  In general, courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties."  Franklin v. Massachusetts, 505 U.S. 788, 803 (1992).  Accordingly, here, the States seek to enjoin members of the Executive Branch from carrying out the Executive Order.  Id.

(B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Pub. L. 109–13, Div. B) that indicates the applicant is a citizen of the United States;

(C) an official military identification card that indicates the applicant is a citizen of the United States; or

(D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

Exec. Order No. 14248 § 2(a).

a)    The Challenge to § 2(a) is Ripe

As an initial matter, the Executive Branch contends that § 2(a) is not ripe for review because it "contemplates that future action is necessary—the EAC still needs to go through its rulemaking process before any changes to the federal form can be finalized." D. 91 at 6. "The question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas, 461 U.S. at 201 (internal citation and quotation marks omitted).

"The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992). The fitness for review prong is more easily satisfied when it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)). This prong is satisfied here, where, as the DC Court observed, § 2(a) of the Executive Order imposes a deadline (which effectively was April 24, 2024) and dictates the "precise contours of [its]

requirement." <u>LULAC</u>, 2025 WL 1187730, at *27.  "Section 2(a) does not merely 'authorize' the EAC to change the Federal Form, or suggest that it 'consider' doing so.  Instead, it purports to require the EAC to amend the Federal Form and dictate[s] the precise contents of the new rule." <u>Id.</u> at *28 (citations omitted).  Indeed, the EAC has already started to implement this requirement, D. 76-3 at 4 (noting that "[s]ince the [Executive Order] was issued, the EAC has communicated to states that it is moving forward with implementing [it]"); <u>see, e.g.</u>, D. 76-3 at 17-18 (April 11 letter), and the Executive Branch represented to the DC Court that the administrative process prior to implementation will address only technical details.  <u>See</u> D. 76-2 at 5-9.

The hardship prong is also met here.  "[R]unning a statewide election is a complicated endeavor" requiring a "massive coordinated effort" and "rules of the road" which are "clear and settled." <u>Democratic Nat'l Comm. v. Wis. State Legislature</u>, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).  In addition, § 2(a) would force a diversion of state resources to implement its mandate.[5]  As this Court later discusses in more detail with respect to the irreparable harm requirement, and the States illustrate in their declarations, the Executive Order will require the States to immediately update their voter registration processes and databases, issue new guidance, conduct trainings and "fund and mount public education campaigns to counter confusion and disenfranchisement resulting from the changes." D. 96 at 9.  Each of these responses has associated costs, and an imminently threatened economic injury can ground a federal court's jurisdiction.  <u>Katz</u>

---

[5] Relying upon the Supreme Court's decision in <u>FDA v. All. for Hippocratic Med.</u>, 602 U.S. 367, 370 (2024), the Executive Branch suggests that an organization's diversion of resources in response to a defendant's actions does not routinely establish standing.  D. 91 at 25 n.8.  The Executive Branch does not, however, cite any cases applying this principle to a lawsuit brought by states against the federal government.  <u>Id.</u>  Even if it did, actions directly interfering with an organization's core mission suffice to ground standing, <u>Havens Realty Corp v. Coleman</u>, 455 U.S. 363, 379 (1982), and election administration is an integral function of the state, <u>see</u> U.S. Const. art. I, § 4, cl. 1.

15

v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012); Dep't of Commerce v. New York, 588 U.S. 752, 766-67 (2019); Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 222-27 (1st Cir. 2019) (concluding a state had standing when the "likely chain of events" resulted in its imminent fiscal injury). Accordingly, the challenge to § 2(a) is ripe for consideration.

b)  <u>Merits as to § 2(a) Challenge</u>

As to merits, the DC Court has already enjoined enforcement of this section as to each of the defendants named here, LULAC, 2025 WL 1187730, at *25-44, and this Court is persuaded by its reasoning. In short, § 2(a) "purports to require the EAC to amend the Federal Form" and precisely dictates what should be included, id. at *28, but "neither the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form," id. at *35. Rather, the Elections Clause of the Constitution provides that the "Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1. In other words, only Congress has the power to adjust state election rules. It has done so through its enactment of the NVRA, which as discussed, includes a mandatory procedure requiring States to "accept and use" the Federal Form. 52 U.S.C. § 20505(a)(1).

The Federal Form "may require only such" information "as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). The NVRA mandates a specific procedure to determine what information is necessary for the Federal Form, requiring that the agency responsible for maintaining it set that content "in consultation with the chief election officers of the States" and through notice and comment rulemaking. 52 U.S.C.

§ 20508(a)(1)-(2).  On April 16, 2025, the EAC's Executive Director sent an email to state officials instructing that new provisions are "required" and seeking "input" on how the States "would propose to implement" the President's policy.  D. 76-3 ¶ 8.  Such consultation appears to concern only the implementation of the President's policy and not the policy itself, and, therefore, does not appear to be in line with the consultation Congress had envisioned.  See D. 100 at 21-22; Lujan v. Defs. of Wildlife, 504 U.S. 555, 585 (1992) (Stevens, J., concurring) (describing congressionally required consultation between agencies and explaining that "if Congress has required consultation . . . we must presume that such consultation will have a serious purpose that is likely to produce tangible results"); Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 118 (1st Cir. 2002) (interpreting "consultation" in the context of Atlantic Coastal Act and explaining that it "must mean something more than general participation . . . otherwise the consultation requirement would be rendered nugatory").

Moreover, when Congress enacted the HAVA, it assigned responsibility for the Federal Form to the EAC, an independent and bipartisan panel, and required that the EAC can revise the Federal Form "only with the approval of at least three" of its four members.  52 U.S.C. §§ 20921-20923, 20928.  Section 2(a) flouts this procedure and is thus "contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA."  LULAC, 2025 WL 1187730, at *37.

The Executive Branch insists that this is not the case, arguing that Plaintiffs misread the Executive Order's command to "take appropriate action to require . . . documentary proof of United States citizenship," by ignoring the words "take appropriate action" and focusing only upon the words "to require."  D. 91 at 12.  They insist that here, "'to require' must be read in conjunction with 'take appropriate action,' and the appropriate action required here involves 'consult[ing] with

17

the chief election officers of the States,' to 'prescribe . . . regulations' to 'develop a mail voter registration application form for elections for Federal office.'" Id. (quoting 52 U.S.C. § 20508(a)). The Executive Branch was, however, much firmer before the DC Court, where it characterized the documentary proof of citizenship requirement as "binary," D. 76-2 at 5, and explained that even after consultation with the states and notice and comment rulemaking, documentary proof of citizenship would have to be required, id. at 6, 9.  Given this position, the Executive Branch is judicially estopped from suggesting otherwise here.  New Hampshire v. Maine, 532 U.S. 742, 755 (2001) (holding the State of New Hampshire judicially estopped from taking a position inconsistent from its position in a previous case which the Court there had accepted).  By purporting to preordain the outcome of these required procedures, the Executive Order renders them meaningless.  See LULAC, 2025 WL 1187730, at *40-41 (concluding same).

The Executive Branch also suggests that "[t]he EAC exercises executive power when it carries out [its] duties and is therefore subject to the administrative control of the President."  D. 91 at 11.  As the DC Court explained, this argument "is untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution."  LULAC, 2025 WL 1187730, at *39 (citing U.S. Const. art. II, § 1, cl. 1).  While the Vesting Clause grants the President some supervisory authority over subordinate executive officials, that authority is not absolute and restrictions upon that authority that do "not unduly interfere with the functioning of the Executive Branch" are upheld.  Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 217 (2020).  Here, where "the President has no constitutional duty to prescribe the content of election regulations," see LULAC, 2025 WL 1187730, at *40, the mandate of the Executive Order to the EAC, a bipartisan and independent entity, is such an undue interference.

Further, as the DC Court observed, "when enacting the NVRA, Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary proof of citizenship requirement that the President's Executive Order now directs the EAC to adopt, concluding that such a requirement was 'not necessary or consistent with the purposes of [the] Act.'" LULAC, 2025 WL 1187730, at *37 (alteration in original) (quoting H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.).  The Supreme Court has made this point clear and has concluded that the NVRA's requirement that states "accept and use" the Federal Form preempts an Arizona state-law requirement that officials "reject" the application of a prospective voter who submits a completed Federal Form unaccompanied by documentary evidence of citizenship.  ITCA, 570 U.S. at 14-15.[6] In short, § 2(a)'s instruction to add a documentary proof of citizenship requirement to the Federal Form conflicts with the will of Congress, rendering the President's power "at its lowest ebb." Youngstown, 343 U.S. at 637 (Jackson, J., concurring).  "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."  Id. at 585. Congress, not the President, has the ultimate constitutional authority over elections.

The question then is whether § 2(a) can lawfully be interpreted more narrowly through its saving clause, i.e. that "[t]his order shall be implemented consistent with applicable law and subject to the availability of appropriations."  Exec. Order No. 14248 § 11(b).  The Supreme Court has "long rejected interpretations of sweeping saving clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found."  Atl. Richfield Co. v. Christian, 590 U.S. 1, 23 (2020) (quoting AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214, 228 (1998)).  "If 'consistent with

---

[6] Defendants and one of *amici curiae*, the Republican Party of Arizona, assert that the EAC would, on its own accord, have the power to adopt a documentary proof of citizenship requirement. D. 91 at 13; D. 101 at 9-17; see D. 96 at 17-18 (responding to same).  This issue is not before the Court on this preliminary injunction, and the Court, therefore, does not reach it.  See LULAC, 2025 WL 1187730, at *38 (declining to consider same).

law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1240 (9th Cir. 2018). "In other words, the act cannot be held to destroy itself" through a saving clause. Tex. & Pac. Ry. Co. v. Abilene Cotton Co., 204 U.S. 426, 446 (1907). Here, the saving clause cannot shield § 2(a) from review because that section unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form. The saving clause "does not and cannot override [this] meaning." City & Cnty. of San Francisco, 897 F.3d at 1240; see LULAC, 2025 WL 1187730, at *28 (concluding same). The States' separation of powers challenge to § 2(a) is, therefore, likely to succeed on the merits.

### 2.    Section 3(d)

The States also move to enjoin the implementation of § 3(d) of the Executive Order. That section provides:

> (d) The Secretary of Defense shall update the Federal Post Card Application, pursuant to the [UOCAVA] to require:
>
> (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and
>
> (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

Exec. Order No. 14248 § 3(d).

### a)    The Challenge to § 3(d) is Ripe

The Executive Branch argues that this section is not ripe for review because the Secretary of Defense has not yet updated the Federal Post Card Application and the Executive Order does not establish a deadline for it to do so. D. 91 at 9. In addition, both parties agree that "what proof of

20

eligibility might suffice, or how a UOCAVA voter might obtain such proof" have not yet been determined.  D. 76 at 24; D. 91 at 9.  Like § 2(a), however, § 3(d)'s command is clear:  "[t]he Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary proof of United States citizenship."  Exec. Order No. 14248 § 3(d).  Even if the timeframe for implementation and the specific form of identification § 3(d) requires are yet to be determined, § 3(d) does not merely authorize or suggest a change in the Federal Post Card Application, it leaves no doubt that documentary proof of citizenship will be required.  The fitness for review prong of the ripeness analysis is, therefore, satisfied.  The hardship prong is similarly met with respect to § 3(d) because its implementation would force a diversion of state resources and could cast uncertainty upon the "massive coordinated effort" necessary to run state elections.  See Democratic Nat'l Comm., 141 S. Ct. at 31 (Kavanaugh, J., concurring).

> b)    Merits as to § 3(d) Challenge

As to the likelihood of success on the merits, the "UOCAVA was passed in 1986 to protect the voting rights of military members, their families, and other United States citizens living overseas."  United States v. Alabama, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), aff'd, 778 F.3d 926 (11th Cir. 2015).  "By passing [the] UOCAVA, and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights."  United States v. Alabama, 778 F.3d 926, 928 (11th Cir. 2015).  Like the Federal Form, the Federal Post Card Application requires applicants to attest to their citizenship with a "standard oath," signed under penalty of perjury.  52 U.S.C. § 20301(b)(7).  This "standard oath" preempts state laws requiring "an oath or affirmation" from overseas voters.  52 U.S.C. § 20302(a)(5).  The Executive Branch now insists that this "standard oath" is not a substitute for proof of eligibility.  D. 91 at 24.

Rather, according to the Executive Branch, the standard oath is "merely a mechanism by which applicants are held accountable for the veracity of all statements they make in completing required application documents." Id. (emphasis omitted).

The States assert that by mandating that the form is a postcard, "Congress necessarily precluded any requirement that an applicant submit documentation with the Form to federally register." D. 76 at 24; see D. 96 at 18-19. A postcard is "a card . . . for mailing without an envelope and to which the sender must affix a stamp" (citing Postcard, Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/postcard (last visited June 12, 2025)). Although 52 U.S.C. § 20301(b)(2) contains no express requirement "limit[ing] what kind of document requirements the Secretary of Defense may 'prescribe,'" D. 91 at 23 (emphasis omitted), this Court cannot presume that Congress ignored the meaning of "postcard" when it employed it in the statute. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (observing that "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))); United States v. Abreu, 106 F.4th 1, 12 (1st Cir. 2024) (noting that statutes must be interpreted "based on their plain and ordinary meaning").[7]

In addition, as the States note, D. 96 at 20, the UOCAVA specifically enumerates eleven "Duties of [the] Presidential Designee." 52 U.S.C. § 20301(b). These include "consult[ing] State and local election officials in carrying out" the Act and "prescrib[ing] a suggested design for absentee ballot mailing envelopes." 52 U.S.C. § 20301(b)(1), (4). None of the enumerated duties

---

[7] The Executive Branch notes that "the [Federal Post Card Application] already contemplates the submission of additional information or documents in the case of Arizona, Vermont, and Puerto Rico," D. 91 at 24, but these state provisions affect only whether a voter can obtain a ballot for state elections and they have no impact on a voter's ability to obtain a ballot for federal selections, see D. 96 at 19; Alabama, 998 F. Supp. 2d at 1290-91.

contemplates a documentary proof of citizenship requirement.  See City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) (noting that "[w]hen an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress'" (citation omitted)).

Adding a documentary proof of citizenship requirement to the Federal Post Card Form also appears to be contrary to the will of Congress, which sought to remove procedural roadblocks which had prevented American citizens living abroad from voting.  See Alabama, 778 F.3d at 928; D. 76 at 24.  The Executive Branch denies that § 3(d) creates procedural roadblocks "because it involves existing voter qualifications that UOCAVA voters are already required to meet—citizenship and eligibility."  D. 91 at 23.  But many United States citizens who are otherwise eligible to vote lack access to the citizenship documents the Executive Order requires and cannot easily obtain them.  See, e.g., D. 76-14 ¶ 12 (observing that, according to the State Department, only "approximately 50% of Americans have passports"); D. 76-3 ¶ 21 (noting that "many people might not have their [documentary proof of citizenship] readily available, the [documentary proof of citizenship] might not match their current identification due to a name change . . . or the required documents may have been lost or destroyed"); D. 76-6 ¶ 8 (stating that obtaining "the proper supporting documentation can take weeks or even months to acquire").

In sum, neither the Constitution nor any statute grants the President the authority to enact § 3(d), and its mandate appears to be in conflict with the will of Congress, which is duly authorized to act in this area, and has acted through its enactment of the UOCAVA.  Nor can § 3(d) be interpreted through the lens of the saving clause because, like § 2(a), its command is clear:  "[t]he Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary proof of United States citizenship."  Exec. Order No. 14248 § 3(d).  Interpreting § 3(d) not to require such proof of citizenship would override its meaning.  See City & Cnty. of San Francisco,

23

897 F.3d at 1240.  The States' challenge to this provision of the Executive Order is, therefore, likely to succeed on the merits.

    3.    *Section 2(d)*

The States also challenge as *ultra vires* § 2(d), which requires the head of each federal voter registration agency within the meaning of the NVRA to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs."  Exec. Order No. 14248 § 2(d); see D. 76 at 24-25.  Per the NVRA, federal voter registration agencies include "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" and other offices designated by the state.  52 U.S.C. § 20506(a)(2)-(3).  The NVRA requires these voter registration agencies distribute the Federal Form,  Id. § 20506(a)(1), (a)(4), (a)(6), for voter registration with no pre-assessment of citizenship before doing so.

The Executive Branch suggests § 2(d)'s mandate is appropriate and lawful, insisting that "unlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to 'conscript state agencies to carry out' federal mandates."  D. 91 at 14 (quoting Gonzalez v. Arizona, 677 F.3d 383, 391 (9th Cir. 2012) (en banc) aff'd sub nom., ITCA, 570 U.S. 1 (2013)).  Exercising this authority, Congress established the EAC and charged it with "prescrib[ing] . . . regulations . . . necessary to . . . develop a mail voter registration application form for elections for Federal office."  52 U.S.C. § 20508(a)(1), (2).  Neither the Constitution nor the NVRA, however, affords the President the power to conscript states (here, voter registration agencies in the States that include public assistance agencies) to carry out his Executive Order mandates, or to direct the outcome of the EAC's processes.  As the Supreme Court has recognized, "States are not mere political subdivisions of the United States.  State governments are neither regional offices nor

24

administrative agencies of the Federal Government." <u>New York v. United States</u>, 505 U.S. 144, 188 (1992). Because the President, therefore, has no authority to command agencies to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs," the States' separation of powers argument is likely to succeed on the merits. Like §§ 2(a) and 3(d), § 2(d) cannot be more narrowly interpreted through the lens of the saving clause because its mandate to voter registration agencies to assess citizenship prior to providing the Federal Form is clear. <u>City & Cnty. of San Francisco</u>, 897 F.3d at 1240.

   4.   *Section 7(a)*

While the DC Court considered a challenge to §§ 7(a) and 7(b), it did not ultimately rule on the merits, as it determined the plaintiffs there, private parties, had no standing to challenge these sections. <u>LULAC</u>, 2025 WL 1187730, at *1, *52, *56. The States here raise such a challenge, and although the Executive Branch presses a ripeness objection, the Executive Branch does not otherwise dispute their standing to assert this challenge. D. 91 at 7-9, 16-22.

The Ballot Receipt States, California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island maintain laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems such as a missed signature.[8] The Ballot Receipt States move to preliminarily enjoin the implementation of § 7(a) of the Executive Order.

---

[8] <u>See</u> Cal. Elec. Code § 3020(b); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15; Mass. Gen. Laws ch. 54, § 93; Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4); Mich. Const. 1963, art. II, § 4(1)(b); Mich. Comp. Laws § 168.759a(18); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law §§ 8-412(1), 8-710(1); 17 R.I. Gen. Laws § 17-20-16. See Ariz. Rev. Stat. § 16-550; Cal. Elec. Code § 3019; Colo. Rev. Stat. § 1-7.5-107.3; Haw. Rev. Stat. § 11-106; 10 Ill. Comp. Stat. 5/19-8; Md. Elec. Law § 11-302; Mich. Comp. Laws § 168.766a;

"To achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress," Exec. Order No. 14248 § 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

Id.

### a)     The Challenge to § 7(a) is Ripe

With respect to justiciability, pre-enforcement review of a threatened government action is appropriate if the government's threat of enforcement is "sufficiently imminent." Susan B. Anthony List, 573 U.S. at 159; see Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999). Here, the Executive Branch insists that the Attorney General can lawfully enforce § 7(a) "by, for example, sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1." D. 91 at 8. According to the Executive Branch, "[b]ecause the President can enforce these statutes 'consistent with applicable law,'" as set forth in the Executive Order's saving clause, § 11, "there is no risk of imminent harm." Id. But the government has not indicated that the Attorney General will cabin enforcement of § 7(a) merely to sending such letters. Rather, it has suggested that the Attorney General can take "[a]ny number of actions, including criminal actions" to enforce this section. D. 76-2 at 10. "Where threatened government action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007) (emphasis omitted).

---

Nev. Rev. Stat. § 293.269927; N.J. Stat. Ann. § 19:63-17; N.M. Code R. § 1.10.12.16; N.Y. Elec. Law § 9-209; 410 Code R. § 20-00-23.12.

To the extent that the States must demonstrate that compliance with § 7(a) would pose hardship as they have with other ripeness challenges, they have done so. As this Court discusses below in more detail with respect to the showing of irreparable harm, and the States illustrate in their declarations, the Executive Order will require the States to undergo extensive training and voter education efforts related to ballot receipt deadlines. These efforts have associated costs, and an imminently threatened economic injury can ground a federal court's jurisdiction. See Katz, 672 F.3d at 76. The States' challenge to § 7(a) is, therefore, justiciable.

      b)      <u>Merits as to § 7(a) Challenge</u>

As to the merits, the Executive Branch insists that § 7(a) is consistent with the President's duty to enforce statutes setting a uniform date for congressional and presidential elections ("Election Day statutes"). D. 91 at 16-22; 2 U.S.C. § 7 (setting "the day for the election" for congressional representatives); 3 U.S.C. §§ 1, 21(1) (setting a Presidential election day). According to the Defendants, "[c]ontinuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and therefore violates the Election Day statutes." D. 91 at 18. In <u>Republican National Committee. v. Wetzel</u>, 120 F.4th 200 (5th Cir. 2024), a case invoked in the Executive Order and relied upon by the Defendants, the Fifth Circuit recently concluded that a Mississippi statute permitting the counting of ballots postmarked on or before the date of the election but received up to five days later was preempted by the Election Day statutes. <u>Id.</u> at 214. According to that court, "it makes no sense to say the electorate as a whole has made an election and finally chosen the winner before all voters' selections are received." <u>Id.</u> at 207. While the counting of ballots may conclude after Election Day, the Fifth Circuit held that "[r]eceipt of the last ballot . . . must occur on Election Day." <u>Id.</u> at 209.

27

As other courts have noted, however, the text of the Election Day statutes require only that all votes are cast by Election Day, not that they are received by that date.  2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1); see Bost v. Illinois State Bd. of Elections, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (upholding an Illinois law allowing ballots postmarked on or before Election Day to be counted if received up to fourteen days thereafter, concluding that this provision "is facially compatible with the relevant federal statutes"), aff'd on other grounds, 114 F.4th 634 (7th Cir. 2024); Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (concluding that "the Federal Election Day [s]tatutes are silent on methods of determining the timeliness of ballots" and, therefore, do not preempt a New Jersey law allowing ballots lacking a postmark to be counted if received within 48 hours after polls close).  The logic behind such a ruling is simple:  states that allow ballots received after Election Day to be counted still require that all votes are cast by Election Day, meaning a candidate's "electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact." Bost, 684 F. Supp. 3d at 733-34.

In addition, it is notable that Congress has not endorsed the Executive Branch's present interpretation of Election Day statutes even as Congress "has amended other aspects of federal election administration within the last few years."  D. 76 at 28-29; see Bost, 684 F. Supp. 3d at 736 (noting that "[d]espite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules").  Indeed, the UOCAVA acknowledges the variances in state ballot receipt deadlines.  52 U.S.C. § 20303(b)(3) (setting the deadline for counting absentee ballots of overseas voters as the "deadline for receipt of the State absentee ballot under State law"); 52 U.S.C. § 20304(b)(1) (noting that officials must count UOCAVA ballots if received by "the date by which an absentee ballot must be received in order to be counted in the election").  "The case for federal pre-emption is particularly weak where Congress has indicated its

28

awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." CTS Corp. v. Waldburger, 573 U.S. 1, 18 (2014) (alteration in original) (quoting Wyeth v. Levine, 555 U.S. 555, 575 (2009)). While "congressional silence, no matter how 'clanging,' cannot override the words of the statute," Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 n.13 (1985), here, where the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable.

The Executive Branch insists that "states arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day," noting that "[i]f postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes." D. 91 at 20. To underscore this threat, the Executive Branch points to an Illinois statute permitting certain ballots without postmarks to be counted even if they are received after Election Day. Id.; 10 Ill. Comp. Stat. Ann. 5/19-8(c). But the Executive Branch has offered no evidence suggesting that this statute, or others, result in the counting of votes cast after Election Day.[9] Nor do they explain why this hypothetical risk justifies the potential disenfranchisement of voters whose ballots may not be received by Election Day, simply because of mailing delays outside of their control. See Wise v. Circosta, 978 F.3d 93, 100-01 (4th Cir. 2020) (concluding that a state court consent judgment extending the receipt deadline for ballots mailed on or before Election Day was clear and uniform and "impacts only an element outside the voters' control: how quickly their ballots must be received to be counted"). Moreover, as the States note, "[t]he concern about counting non-postmarked ballots is also a red herring where the [Executive Order] prohibits the

---

[9] The Executive Branch also cites concerns with voters recalling mail, D. 91, but as the States countered at oral argument, mail recalled should receive a fresh postmark if it is then resent. D. 104 at 41.

counting of any mail ballots received after Election Day, whether postmarked or not." D. 96 at 23 n.11 (emphasis omitted).

Even if the Election Day statutes could be read to bar states from counting ballots received after Election Day, they do not authorize the President to enforce those statutes as he purports to through § 7(a). Contrary to the suggestion by the Executive Branch to the DC Court, D. 76-2 at 10, criminal enforcement actions do not appear to be authorized by the Election Day statutes, as the statutes do not define any criminal offenses and the Executive Branch cites no statute criminalizing the counting of ballots in accordance with a state's ballot-receipt deadlines. See LULAC, 2025 WL 1187730, at *51 (concluding same). Civil enforcement actions likewise appear unavailable as the Election Day statutes, unlike other election-related statutes, do not include provisions allowing them. Id. & n.65.

Nevertheless, as the Executive Branch and the DC Court have noted, there are at least some lawful actions the Attorney General can take to "enforce" his interpretation of Election Day statutes. Id. For example, "[t]he Attorney General could 'send letters' to the States to 'encourage compliance' with the President's interpretation of the Election Day [s]tatutes and to change their ballot-counting practices accordingly." Id. Because the Executive Order requires the Attorney General to implement its mandates "consistent with applicable law," Exec. Order No. 14248 § 11(b), the Court "cannot simply assume" that the Attorney General will disregard this directive with other undefined actions. LULAC, 2025 WL 1187730, at *51 (quoting Common Cause v. Trump, 506 F. Supp. 3d 39, 49 (D.D.C. 2020)) (further citation omitted). The Court will not enjoin all applications of § 7(a), but does, however, enjoin the Attorney General from taking civil or criminal enforcement actions to enforce § 7(a) against the thirteen Ballot Receipt States.

5.    *Section 7(b)*

The States move for a preliminary injunction barring the implementation of § 7(b) of the Executive Order.  Section 7(b), like § 7(a), is geared toward compliance with Election Day statutes and provides:

> Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 *et seq.,* after which no additional votes may be cast.

Exec. Order No. 14248 § 7(b).

a)    Merits as to § 7(b) Challenge

The States argue that § 7(b) "unlawfully imposes extra-statutory conditions on congressionally authorized funds."  D. 76 at 30.  "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'"  City of Providence, 954 F.3d at 31 (quoting City of Arlington v. FCC, 569 U.S. 290, 297 (2013)).  "Any action that an agency takes outside the bounds of its statutory authority is *ultra vires*."  Id.  Accordingly, an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute.  Id. at 45; see City & Cnty. of San Francisco, 897 F.3d at 1231 (concluding that "under the principle of Separation of Powers and in consideration of the Spending Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization").

In City of Providence, 954 F.3d at 26, the First Circuit considered the validity of a DOJ policy conditioning states' entitlement to federal formula grants for law enforcement activities upon

31

their assistance with federal enforcement of certain immigration-related laws.  The court concluded that these funding conditions were unlawful, explaining that "the statutory formula [for the grants] is not so elastic:  it simply does not allow the DOJ to impose by brute force conditions on . . . grants to further its own unrelated law enforcement priorities" and "[n]one of the challenged conditions falls within the compass of" those allowed by the statute.  Id. at 34-35.

This holding controls here, where the HAVA does not allow the EAC to condition states' funding upon their ballot receipt deadlines.  Relevantly, to receive the payments outlined by the HAVA, "[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State."  52 U.S.C. § 21081(a)(6); see 52 U.S.C. § 21003.  The Executive Order references these statutory provisions, see Exec. Order No. 14248 § 7(b), but as the DC Court observed, "the reference to 'uniform and nondiscriminatory standards' appears to refer to uniformity within each State, not among the several States."  LULAC, 2025 WL 1187730, at *52 (citing H.R. Rep. 107-329, at 39 (2001)) (noting that "[a]s Americans learned in November and December 2000, a major part of the problem in Florida was that the vote-counting process was subjective and inconsistent, with definitions of what constitutes a vote varying from jurisdiction to jurisdiction").  In short, while the Defendants assert here that "Congress itself" set its condition upon funding through § 21081(a)(6) "as well as [through] the Election Day statutes," D. 91 at 22, those statutes do not support this contention, just as they do not empower the EAC to add additional conditions to funding.  See D. 76 at 30; City of Providence, 954 F.3d at 34-35.

Nor can the saving clause shield § 7(b) from review, because that section leaves no ambiguity that it would condition funding to states upon their adoption of a uniform ballot receipt deadline.  Any other interpretation of that section would override its meaning.  City & Cnty. of San

Francisco, 897 F.3d at 1240. Because § 7(b) thus purports to impose an extra-statutory condition on the disbursement of congressionally authorized funds, the States' challenge to this section of the Executive Order is likely to succeed on the merits.

**C.    Irreparable Harm**

The documentary proof of citizenship requirements, the assessment of citizenship prior to distribution of the Federal Form to enrollees in public assistance programs and the requirements related to ballot receipt deadlines pose the risk of irreparable harm to the States for at least three reasons: (1) compliance with these provisions will require significant time, cost and effort; (2) with respect to § 7(b), the States may lose funding based upon their non-compliance with what this Court has determined is likely an unconstitutional condition and (3) these provisions threaten to chill voter registration and participation – the antithesis of Congress's purpose in enacting the UOCAVA and the NVRA.

*1.    The Time, Cost and Effort Associated with Compliance*

The States have attested that the documentary proof of citizenship requirement and the corresponding recordkeeping requirements would force them to undertake the expensive and arduous task of updating their voter registration databases and their voter registration processes.[10] The Chief of the Election Division of California, for example, has attested that adding new fields to the voter registration database could take up to one year and would require, among other things,

---

[10] See D. 76 at 32; D. 76-3 ¶¶ 9-13, 25-27 (attesting for California); D. 76-4 ¶¶ 13, 20-27 (attesting for Nevada); D. 76-5 ¶¶ 9, 12, 16 (attesting for Massachusetts); D. 76-7 ¶¶ 10-12, 19 (attesting for New Jersey); D. 76-8 ¶¶ 6, 8-10, 20 (attesting for Michigan); D. 76-9 ¶¶ 22-40, 54-56 (attesting for Maryland); D. 76-10 ¶¶ 12-13, 24-25 (attesting for Arizona); D. 76-11 ¶¶ 9, 11-12, 22 (attesting for Maine); D. 76-12 ¶¶ 8-12, 23 (attesting for Vermont); D. 76-15 ¶¶ 5-7 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 12-13, 15, 24-25 (attesting for Rhode Island); D. 76-17 ¶¶ 12, 15-16, 25-26 (attesting for Colorado); D. 76-18 ¶¶ 8-10, 12, 20 (attesting for New York); D. 76-19 ¶¶ 18-20, 38-40, 42 (attesting for Connecticut); D. 76-20 ¶¶ 8, 10-11 (attesting for New Mexico).

33

programming and testing new software, implementing the update and ensuring that all changes in the database are connected to all 58 California counties, each with its own election management systems. D. 76-3 ¶¶ 11-13, 16-17, 26. In Maryland, the documentary proof of citizenship requirement will also require the state to update its electronic security features to accommodate storage of personal identifying information. D. 76-9 ¶ 55.

The States have also shown that they would need to issue guidance related to the documentary proof of citizenship requirement, conduct trainings for agencies and local election officials and develop public education campaigns regarding registering to vote.[11] In Maryland, the concurrent development of training materials and guidance documents for a new documentary proof of citizenship requirement on the Federal Form would require "35-40% of [its election] agency's full time resources and 75% of [its] contractual resources." D. 76-9 ¶ 41. In New York, this effort is expected to be "all consuming" and will require the concurrent development of "new materials and guidance documents for use by state election officials," none of which has "been contemplated in any state or local budgetary processes." D. 76-18 ¶¶ 11-15, 22. The same is true with the implementation of the § 2(d) requirement that voter registration agencies assess citizenship before distributing the Federal Form to enrollees in public assistance programs. D. 76 at 34. As the States have explained, such a change would impose new and complex duties on agencies across the States

---

[11] See D. 76-3 ¶¶ 14-17, 19-20 (attesting for California); D. 76-4 ¶¶ 28-37 (attesting for Nevada); D. 76-5 ¶¶ 13-17 (attesting for Massachusetts); D. 76-7 ¶¶ 11-15, 19-20 (attesting for New Jersey); D. 76-8 ¶¶ 11-15, 21-22 (attesting for Michigan); D. 76-9 ¶¶ 41-48, 56-57 (attesting for Maryland); D. 76-10 ¶¶ 14-19, 26 (attesting for Arizona); D. 76-11 ¶¶ 13-17, 23 (attesting for Maine); D. 76-12 ¶¶ 13-18, 23 (attesting for Vermont); D. 76-13 ¶¶ 16-17, 19, 23-24 (attesting for Minnesota); D. 76-15 ¶¶ 5-7 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 9, 14-19, 25-26 (attesting for Rhode Island); D. 76-17 ¶¶ 17-19, 25-26 (attesting for Colorado); D. 76-18 ¶¶ 11-15, 22 (attesting for New York); D. 76-19 ¶¶ 24-27, 40-42 (attesting for Connecticut); D. 76-20 ¶¶ 8, 12-16, 22-23 (attesting for New Mexico); see also D. 76-6 ¶¶ 13-17 (attesting for Nevada County, California); D. 76-14 ¶¶ 14, 26-28 (attesting for Los Angeles County, California).

34

and would divert and require significant resources to train personnel in these agencies to assess citizenship where public assistance agencies do not have such expertise.  Id. (and declarations cited); see, e.g., D. 76-3 ¶¶ 22-24.

Compliance with § 7's requirements would also demand the States' time and resources. Specifically, the Ballot Receipt States will need to train local election officials "to ensure that votes are received and tabulated consistent with the [Executive Order]'s Election Day provisions."[12]  In Cook County, Illinois, compliance will require the County to hire at least one hundred additional staff members and "train and retain several hundred Cook County clerk staff and more than 8,000 election judges and deputy voter registrars."  D. 76-15 ¶ 14.  States will also need to update the public regarding the change, including by updating "[a]ll voter facing websites, documents, and ballot packet information."[13]  D. 76-9 ¶ 61.  In Nevada, public education will entail, "at a minimum, newspaper notices, social media posts, mail notifications, and press briefings throughout 2026." D. 76-4 ¶ 48.  To educate the public, Vermont has begun outreach on social media and community forums and will need to update its websites and public-facing resources "on the accelerated timeline contemplated by the [Executive Order]."  D. 76-12 ¶ 16. The Ballot Receipt States have attested

---

[12] See D. 76-3 ¶ 32 (attesting for California); D. 76-4 ¶ 48 (attesting for Nevada); D. 76-5 ¶ 33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-12 ¶¶ 13-14 (attesting for Vermont); D. 76-13 ¶ 16 (attesting for Minnesota); D. 76-14 ¶ 26 (attesting for Los Angeles County, California); D. 76-15 ¶ 14 (attesting for Cook County, Illinois); D. 76-16 ¶ 31 (attesting for Rhode Island); D. 76-18 ¶ 26 (attesting for New York); D. 76-19 ¶ 25 (attesting for Connecticut); D. 76-20 ¶ 27 (attesting for New Mexico).

[13] See D. 76-3 ¶ 32 (attesting for California); D. 76-4 ¶ 48 (attesting for Nevada); D. 76-5 ¶¶ 32-33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-10 ¶ 18 (attesting for Arizona); D. 76-11 ¶ 16 (attesting for Maine); D. 76-12 ¶ 16 (attesting for Vermont); D. 76-13 ¶ 16 (attesting for Minnesota); D. 76-16 ¶ 31 (attesting for Rhode Island); D. 76-18 ¶ 14 (attesting for New York); D. 76-19 ¶ 26 (attesting for Connecticut); D. 76-20 ¶¶ 15, 27 (attesting for New Mexico); see also D. 100 at 27.

that this "would be a significant undertaking."[14] *Amici*, local election officials, caution that these additional requirements would be devastating: "[i]f every voter registration application took even only a few more minutes to process, offices could be overwhelmed." D. 87 at 17.

In addition, each of these changes would, in turn, divert the States' resources from other key projects such as voter registration list maintenance and preparing for upcoming elections.[15] Michigan, for example, has attested that these changes will disrupt the "crucial work" performed by "virtually all staff associated with election administration in the Bureau of Elections." D. 76-8 ¶¶ 8-10, 21-22, 29. As *amici*, bipartisan former secretaries of state, explain, "[a]llowing the President to change election rules and procedures on [his] whim whenever [he] see[s] fit, without any input from election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice." D. 100 at 18.

---

[14] D. 76-3 ¶ 32 (attesting for California); D. 76-5 ¶¶ 32-33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-14 ¶¶ 26, 28 (attesting for Los Angeles County, California); D. 76-15 ¶ 14 (attesting for Cook County, Illinois); D. 76-17 ¶ 38 (attesting for Colorado); D. 76-18 ¶ 26 (attesting for New York); D. 76-20 ¶ 27 (attesting for New Mexico).

[15] See D. 76 at 36; D. 76-3 ¶¶ 13, 28 (attesting for California); D. 76-4 ¶¶ 10, 15-19, 40 (attesting for Nevada); D. 76-5 ¶¶ 13, 28 (attesting for Massachusetts); D. 76-6 ¶¶ 9, 13, 22 (attesting for Nevada County, California); D. 76-7 ¶¶ 13, 19-20, 23, 32-33 (attesting for New Jersey); D. 76-8 ¶¶ 8-10, 21-22, 25, 29 (attesting for Michigan); D. 76-9 ¶¶ 13-18, 26-28, 41, 56-57, 60-61 (attesting for Maryland); D. 76-10 ¶¶ 7-9, 14, 27 (attesting for Arizona); D. 76-11 ¶¶ 9, 11-12, 24 (attesting for Maine); D. 76-12 ¶¶ 8, 23 (attesting for Vermont); D. 76-13 ¶¶ 8, 15, 17-18 (attesting for Minnesota); D. 76-14 ¶¶ 8, 10, 27 (attesting for Los Angeles County, California); D. 76-15 ¶¶ 5, 7, 17 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 9, 14, 25-26, 28, 33 (attesting for Rhode Island); D. 76-17 ¶¶ 12-13, 17, 23, 26-27, 37-38 (attesting for Colorado); D. 76-18 ¶¶ 8, 22, 25 (attesting for New York); D. 76-19 ¶¶ 16, 18-20, 24, 27, 36, 41 (attesting for Connecticut); D. 76-20 ¶¶ 8-12, 14, 22-23, 26 (attesting for New Mexico).

The Executive Branch insists that "diverted resources and compliance costs are quantifiable amounts, and '[m]oney damages would adequately resolve all of the alleged harms.'" D. 91 at 26 (alteration in original) (quoting Together Emps. v. Mass. Gen. Brigham Inc., 19 F.4th 1, 8 (1st Cir. 2021)). This is not the case for the States, for whom "the inability to enforce [] duly enacted plans clearly inflicts irreparable harm." Abbott v. Perez, 585 U.S. 579, 603 n.17 (2018); see Louisiana v. Biden, 55 F.4th 1017, 1033-35 (5th Cir. 2022) (affirming a district court's finding of irreparable harm based upon plaintiff states' diversion of resources to comply with an invalid regulation); Kansas v. United States, 249 F.3d 1213, 1227 (10th Cir. 2001) (noting that harms to a state's "sovereign interests and public policies" are irreparable).

### 2. *Threatened Loss of Federal Funding*

The States receive millions of dollars in funding through the HAVA, which they rely upon to safely, securely and efficiently administer elections, including to purchase voting infrastructure and to pay employees.[16] As this Court has concluded, § 7(b) threatens to unlawfully deprive states of this crucial funding source. See City & Cnty. of San Francisco, 897 F.3d at 1236 (identifying harm where plaintiffs showed that "if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences").

---

[16] See D. 76-3 ¶ 35 (attesting that California, since 2003, has received $505 million in HAVA funding); D. 76-4 ¶ 51 (attesting that Nevada "has previously received over $36 million" in funding through HAVA); D. 76-7 ¶ 28 (attesting that New Jersey, between 2019 and 2025, received "$22.3 million in HAVA grants"); D. 76-8 ¶ 29 (attesting that in addition to the approximately $300,000 HAVA funding "recently approved by Congress" to go to Michigan, the state has received over $27.3 million through a HAVA Security Grant); D. 76-9 ¶ 66 (attesting that Maryland has received over $80.8 million under HAVA); D. 76-10 ¶ 31 (attesting that Arizona, since 2020, has received more than $12 million in HAVA grants); D. 76-16 ¶ 33 (attesting that Rhode Island, since 2018, has received $9.2 million under HAVA and attesting that the state has also received over $13 million HAVA section 251 grants through 2022); D. 76-17 ¶ 39 (attesting that Colorado, since 2022, has distributed through sub-grants $3.4 million in HAVA funding to counties); D. 76-18 ¶ 29 (attesting that New York, since 2003, has received over $237 million in HAVA grants); D. 76-20 ¶ 31 (attesting that New Mexico has received approximately $1 million under HAVA).

### 3.    Chilling of Voter Registration and Participation

The States' expectation is that as a result of the documentary proof of citizenship requirement, fewer of their eligible citizens will become registered to vote.[17]  This is unquestionably a harm to the States, with whom "[o]ur Constitution principally entrusts '[t]he safety and the health of the people . . . to guard and protect.'"  S. Bay United Pentecostal Church v. Newsom, __ U.S. __, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905)).

According to the States, many otherwise eligible voters "lack ready access to the necessary citizenship documents."  D. 76 at 34; see League of Women Voters of United States v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016) (characterizing proof of citizenship laws as "new obstacles [that] unquestionably make it more difficult" to register voters).  As amici, local election officials note, "when Kansas attempted to impose [documentary proof of citizenship] requirements in 2011, around 12 percent of all registrants' applicants were rejected, even though it was undisputed that nearly all of them were U.S. citizens."  D. 87 at 11-12 (citing Fish v. Schwab, 957 F.3d 1105, 1128 (10th Cir. 2020)).  Those who have changed their names, "elderly individuals, unhoused individuals and young persons" often have a particularly difficult time obtaining documentary proof of citizenship.  D. 76-6 ¶ 19.  Citizenship documents are also expensive.  For example, in Rhode Island, it can cost up to $165 to obtain a passport and, in the City of Providence, $22 to obtain a

---

[17] See D. 76-3 ¶¶ 18, 21 (attesting for California); D. 76-4 ¶¶ 7, 19, 32, 34, 38 (attesting for Nevada); D. 76-5 ¶¶ 15-16, 21, 25 (attesting for Massachusetts); D. 76-6 ¶¶ 18-19 (attesting for Nevada County, California); D. 76-8 ¶ 16 (attesting for Michigan); D. 76-9 ¶¶ 28, 49 (attesting for Maryland); D. 76-10 ¶ 20 (attesting for Arizona); D. 76-11 ¶ 18 (attesting for Maine); D. 76-12 ¶ 19 (attesting for Vermont); D. 76-13 ¶¶ 19, 21 (attesting for Minnesota); D. 76-14 ¶¶ 12, 16, 28-29 (attesting for Los Angeles County, California); D. 76-15 ¶ 8 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 20-21 (attesting for Rhode Island); D. 76-17 ¶¶ 19-20 (attesting for Colorado); D. 76-18 ¶ 16 (attesting for New York); D. 76-19 ¶¶ 25, 28 (attesting for Connecticut); D. 76-20 ¶ 17 (attesting for New Mexico).

birth certificate. D. 76-16 ¶ 20. For this reason and others, § 2(a) appears likely to disproportionately disenfranchise Black and poorer Americans. See, e.g., Owen Backskai & Eliza Sweren-Becker, "House Bill Would Hurt American Voters," Brennan Ctr., https://www.brennancenter.org/our-work/analysis-opinion/house-bill-would-hurt-american-voters (Jan. 31, 2025) (reporting that approximately fifty percent of Americans do not have a passport, two-thirds of Black Americans lack a passport and passport ownership increases dramatically with income).

Some states' citizens will face specific challenges with respect to obtaining documentary proof of citizenship. For example, in regions of Maine along the Canadian border, many residents are citizens but lack the required documentary proof of citizenship because they have Canadian birth certificates and do not have passports. D. 76-11 ¶ 18. New Mexico has attested that its "unique population and geographic dynamics," namely its remote villages and nineteen "federally-recognized Native American pueblo tribes, many of which are also remotely located," will cause the proof of citizenship requirement to have a greater impact. D. 76-20 ¶ 17. Massachusetts has a significant student population, many of whom will be registering to vote for the first time, and may not "have ready access to [documentary proof of citizenship] documents such as their birth certificate or passport." D. 76-5 ¶ 21.

This likelihood of disenfranchisement is a serious harm because "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555 (1964); see Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (explaining that the right to vote "is regarded as a fundamental political right, because preservative of all rights").

4.     *These Risks of Harm are Imminent*

The Executive Branch questions the imminence of any of these harms because the Executive Order is geared towards the November 2026 election.  D. 91 at 26.  Voter registration is, however, a year-round process, and the implementation of voter registration requirements, the corresponding record-keeping requirements and voter-education campaigns demands significant lead time.  D. 96 at 10.  Further, any argument that what the Executive Order will require is still uncertain, see D. 91 at 24-27, "is belied by both the text of the Executive Order and the factual record before this Court," which make clear that documentary proof of citizenship will be required.  LULAC, 2025 WL 1187730, at *42 (noting this with respect to § 2(a)); Newby, 838 F.3d at 8-9 (concluding that states need not be currently enforcing laws which would require proof-of citizenship to accompany the Federal Form for voter groups to challenge their enforcement as "it seems almost certain that similar obstacles to registration will spring up" and "a preliminary injunction requires only a likelihood of irreparable injury").  The documentary proof of citizenship requirements, assessment of citizenship prior to distribution of the Federal Form to enrollees in public assistance programs and the ballot counting requirements use mandatory language and would require states to imminently undertake the extensive efforts associated with compliance to avoid consequences.  This is sufficient to ground a finding of imminent, irreparable harm.[18]

_____

[18] The Executive Branch also argues that the States' more than thirty-day delay between filing their complaint and moving for preliminary injunctive relief "belies their claim of imminent irreparable harm."  D. 91 at 27.  To make this point, however, they highlight cases involving months or a year of delay.  See Seafreeze Shoreside, Inc v. United States Dep't of Interior, No. 22-cv-11091-IT, 2023 WL 3660689, at *5 (D. Mass. May 25, 2023), appeal dismissed, No. 23-1473, 2023 WL 8259107 (1st Cir. Oct. 20, 2023); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162-63 (1st Cir. 2004).  Not only is any delay here much less significant, but it may also reflect a decision to wait for the DC Court's ruling as to the lawfulness of overlapping sections of the Executive Order.  Such a strategic decision is not unreasonable in these circumstances and does not undermine the risk of irreparable harm.

## VI.    Equities and the Public Interest

To obtain a preliminary injunction against the implementation of the challenged sections of the Executive Order, the States must demonstrate that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest." Winter, 555 U.S. at 20.  The analysis regarding the balance of the equities and the public interest "merge when the [g]overnment is the opposing party." Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (alteration in original) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).  "[T]he public has an important interest in making sure government agencies follow the law," Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin., 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006), and agencies have no countervailing interest in perpetuating unlawful practices, Newby, 838 F.3d at 12; Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013).  Here, where, as determined, the States' challenge to the Executive Order is likely to succeed on the merits, the equities and the public interest favor an injunction.

The Executive Branch asserts that the "Executive Order seeks to increase [] confidence [in federal elections] by directing executive officials to carry out their statutory duties to prohibit foreign nationals from participating in elections and [by] enforc[ing] the Election Day statutes." D. 91 at 27.  But there is little evidence in the record suggesting the Executive Order would accomplish these goals.  See LULAC, 2025 WL 1187730, at *43 (concluding same); Fish, 957 F.3d at 1142 (affirming that, after a trial on the merits, plaintiff had not shown "that substantial numbers of noncitizens successfully registered to vote" under the current attestation procedures).  In fact, Congress has already determined that a documentary proof of citizenship requirement is "not necessary or consistent with the purposes of the [NVRA]," LULAC, 2025 WL 1187730, at *6 (quoting H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.)), which include "protect[ing] the integrity

41

of the electoral process," 52 U.S.C. § 20501(b)(3).  The Executive Branch can, instead, use the "other tools at their disposal to ensure the integrity of elections, including protections against voter fraud."  Newby, 838 F.3d at 13.  For example, the President can continue to enforce criminal statutes prohibiting non-citizens from voting or registering to vote in federal elections.  18 U.S.C. §§ 611, 1015(f).

The States, on the other hand, have shown a "substantial risk" that, absent an injunction, citizens will be disenfranchised.  LULAC, 2025 WL 1187730, at *43 (citing Newby, 838 F.3d at 12); see Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (noting the "strong interest in exercising the fundamental political right to vote" and observing that "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration" to a challenge) (internal citation and quotation marks omitted).  The States have also credibly attested that the challenged requirements could create chaos and confusion that could result in voters losing trust in the election process.  See D. 76-9 ¶ 62; D. 87 at 24-25.  On balance, the equities and the public interest favor granting a preliminary injunction in the States' favor as to §§ 2(a), 2(d), 3(d), 7(a) and 7(b) of the Executive Order.[19]

## VII.    Injunction Bond

The Executive Branch asks that the Court require a bond if it issues a preliminary injunction.  D. 91 at 28.  "The bond requirement is not jurisdictional," and district courts have discretion to issue an injunction without requiring the States to post a bond.  Pineda v. Skinner Servs., Inc., 22

---

[19] In Purcell, 549 U.S. at 4-5, the Supreme Court cautioned that "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."  The principle articulated in this decision does not counsel against this Court issuing a preliminary injunction because here it is the Executive Order, not the Court's injunction of certain of its provisions, that purports to disturb the status quo by changing decades of established practice with respect to voter registration and ballot counting.  LULAC, 2025 WL 1187730, at *57 (concluding same).

F.4th 47, 57 (1st Cir. 2021) (citing cases); see Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (observing that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond").

The Executive Branch does not suggest and has not demonstrated that it will suffer a monetary loss from this Court's injunction. See D. 91 at 28. Further, as the DC Court observed, "requiring a bond as a condition of obtaining an injunction against unlawful executive action under the circumstances presented here would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action." LULAC, 2025 WL 1187730, at *62. Other courts have declined to require a bond under these circumstances. See New York v. McMahon, No. 25-10601-MJJ, 2025 WL 1463009, at *39 (D. Mass. May 22, 2025) (declining to require a bond in a suit to enforce important federal rights and the public interest); Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting "a nominal bond of zero dollars" where plaintiffs sought to protect their Constitutional rights and a bond "would essentially forestall [p]laintiffs' access to judicial review"). The Court, therefore, declines to require the States to post a bond.

## VIII. Conclusion

For the foregoing reasons, the Court shall grant the motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d),[20] 7(b) of the Executive Order and § 7(a) of the Executive Order as

---

[20] The Court's injunction as to §§ 2(a), 2(d), 3(d) applies as to all states, but it "is neither 'nationwide' nor 'universal.' It is a remedy tailored to the irreparable harm that Plaintiffs in these consolidated case would suffer in the absence of an injunction." LULAC, 2025 WL 1187730, at *59. "To the extent the Court's 'injunction advantage[s] nonparties, that benefit [is] merely incidental.'" Id. (quoting Trump v. Hawaii, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). Were the Court to enjoin the Defendants only with respect to Plaintiff States, it would undermine

43

to civil or criminal enforcement actions.[21]

None of the States shall be required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order.

Nothing in this Memorandum or the accompanying Order shall prevent the Executive Branch from taking any lawful action that is not based upon §§ 2(a), 2(d), 3(d), 7(a) or 7(b) of the Executive Order as described herein and in the accompanying Order.  An Order of preliminary injunction shall be entered today in accordance with this Memorandum.

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

the national uniformity central to the NVRA, the HAVA and the UOCAVA.  "In these unique circumstances, an injunction tailored to the Plaintiffs before the Court is coextensive with an injunction tailored to the Defendants before the Court, who happen to be actors with . . . power . . . nationwide."  Id. at *59.  The injunctive relief sought as to §§ 7(a) and 7(b) is only sought as to the thirteen Ballot Receipt States and, accordingly, is limited as to them.

[21] The Executive Order contains a severability clause which provides that "[i]f any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby."  Exec. Order No. 14248 § 10.  In the absence of "strong evidence" suggesting otherwise, the Court will not presume that "the validity of the [Executive Order will] depend on the validity of the constitutionally offensive [sections]."  Seila L. LLC, 591 U.S. at 234.  Accordingly, the Court's ruling applies only to the challenged sections, §§ 2(a), 2(d), 3(d), 7(a) and 7(b) and only to the extent discussed above and incorporated into the accompanying Order.

**Executive Order 14,248 (Mar. 25, 2025)**

**Preserving and Protecting the Integrity of American Elections**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1. Purpose and Policy.** Despite pioneering self-government, the United States now fails to enforce basic and necessary election protections employed by modern, developed nations, as well as those still developing. India and Brazil, for example, are tying voter identification to a biometric database, while the United States largely relies on self-attestation for citizenship. In tabulating votes, Germany and Canada require use of paper ballots, counted in public by local officials, which substantially reduces the number of disputes as compared to the American patchwork of voting methods that can lead to basic chain-of-custody problems. Further, while countries like Denmark and Sweden sensibly limit mail-in voting to those unable to vote in person and do not count late-arriving votes regardless of the date of postmark, many American elections now feature mass voting by mail, with many officials accepting ballots without postmarks or those received well after Election Day.

Free, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election.

Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error. Yet the United States has not adequately enforced Federal election requirements that, for example, prohibit States from counting ballots received after Election Day or prohibit non-citizens from registering to vote.

Federal law establishes a uniform Election Day across the Nation for Federal elections, 2 U.S.C. 7 and 3 U.S.C. 1. It is the policy of my Administration to enforce those statutes and require that votes be cast and received by the election date established in law. As the United States Court of Appeals for the Fifth Circuit recently held in Republican National Committee v. Wetzel (2024), those statutes set "the day by which ballots must be both cast by voters and received by state officials." Yet numerous States fail to comply with those laws by counting ballots received after Election Day. This is like allowing persons who arrive 3 days after Election Day, perhaps after a winner has been declared, to vote in person at a former voting

Addendum 47

precinct, which would be absurd. Several Federal laws, including 18 U.S.C. 1015 and 611, prohibit foreign nationals from registering to vote or voting in Federal elections. Yet States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions. Even worse, the prior administration actively prevented States from removing aliens from their voter lists.

Additionally, Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. And the Department of Homeland Security is required to share database information with States upon request so they can fulfill this duty. See 8 U.S.C. 1373(c). Maintaining accurate voter registration lists is a fundamental requirement in protecting voters from having their ballots voided or diluted by fraudulent votes.

Federal law, 52 U.S.C. 30121, prohibits foreign nationals from participating in Federal, State, or local elections by making any contributions or expenditures. But foreign nationals and non-governmental organizations have taken advantage of loopholes in the law's interpretation, spending millions of dollars through conduit contributions and ballot-initiative-related expenditures. This type of foreign interference in our election process undermines the franchise and the right of American citizens to govern their Republic.

Above all, elections must be honest and worthy of the public trust. That requires voting methods that produce a voter-verifiable paper record allowing voters to efficiently check their votes to protect against fraud or mistake. Election-integrity standards must be modified accordingly.

It is the policy of my Administration to enforce Federal law and to protect the integrity of our election process.

**Sec. 2. Enforcing the Citizenship Requirement for Federal Elections.** To enforce the Federal prohibition on foreign nationals voting in Federal elections:

    (a)    (i)    Within 30 days of the date of this order, the Election Assistance Commission shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. 20508:

        (A)    documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3); and

        (B)    a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the

document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

(ii)    For purposes of subsection (a) of this section, "documentary proof of United States citizenship" shall include a copy of:

(A)    a United States passport;

(B)    an identification document compliant with the requirements of the REAL ID Act of 2005 (Pub. L. 109-13, Div. B) that indicates the applicant is a citizen of the United States;

(C)    an official military identification card that indicates the applicant is a citizen of the United States; or

(D)    a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

(b)    To identify unqualified voters registered in the States:

(i)    the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered;

(ii)    the Secretary of State shall take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered; and

(iii)    the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

(c)     Within 90 days of the date of this order, the Secretary of Homeland Security shall, consistent with applicable law, provide to the Attorney General complete information on all foreign nationals who have indicated on any immigration form that they have registered or voted in a Federal, State, or local election, and shall also take all appropriate action to submit to relevant State or local election officials such information.

(d)     The head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs.

(e)     The Attorney General shall prioritize enforcement of 18 U.S.C. 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting, including through use of:

(i)     databases or information maintained by the Department of Homeland Security;

(ii)     State-issued identification records and driver license databases; and

(iii)     similar records relating to citizenship.

(f)     The Attorney General shall, consistent with applicable laws, coordinate with State attorneys general to assist with State-level review and prosecution of aliens unlawfully registered to vote or casting votes.

**Sec. 3. Providing Other Assistance to States Verifying Eligibility.** To assist States in determining whether individuals are eligible to register and vote:

(a)     The Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered. In determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations.

(b)     The Attorney General shall ensure compliance with the requirements of 52 U.S.C. 20507(g).

(c)     The Attorney General shall take appropriate action with respect to States that fail to comply with the list maintenance requirements of the

National Voter Registration Act and the Help America Vote Act contained in 52 U.S.C. 20507 and 52 U.S.C. 21083.

(d)    The Secretary of Defense shall update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require:

(i)    documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and

(ii)    proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

## Sec. 4. Improving the Election Assistance Commission.

(a)    The Election Assistance Commission shall, pursuant to 52 U.S.C. 21003(b)(3) and 21142(c) and consistent with applicable law, take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.

(b)    (i)    The Election Assistance Commission shall initiate appropriate action to amend the Voluntary Voting System Guidelines 2.0 and issue other appropriate guidance establishing standards for voting systems to protect election integrity. The amended guidelines and other guidance shall provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities, and should provide a voter-verifiable paper record to prevent fraud or mistake.

(ii)    Within 180 days of the date of this order, the Election Assistance Commission shall take appropriate action to review and, if appropriate, re-certify voting systems under the new standards established under subsection (b)(i) of this section, and to rescind all previous certifications of voting equipment based on prior standards.

(c)    Following an audit of Help America Vote Act fund expenditures conducted pursuant to 52 U.S.C. 21142, the Election Assistance Commission shall report any discrepancies or issues with an audited

State's certifications of compliance with Federal law to the Department of Justice for appropriate enforcement action.

(d)     The Secretary of Homeland Security and the Administrator of the Federal Emergency Management Agency, consistent with applicable law, shall in considering the provision of funding for State or local election offices or administrators through the Homeland Security Grant Programs, 6 U.S.C. 603 et seq., heavily prioritize compliance with the Voluntary Voting System Guidelines 2.0 developed by the Election Assistance Commission and completion of testing through the Voting System Test Labs accreditation process.

**Sec. 5. Prosecuting Election Crimes.** To protect the franchise of American citizens and their right to participate in fair and honest elections:

(a)     The Attorney General shall take all appropriate action to enter into information-sharing agreements, to the maximum extent possible, with the chief State election official or multi-member agency of each State. These agreements shall aim to provide the Department of Justice with detailed information on all suspected violations of State and Federal election laws discovered by State officials, including information on individuals who:

(i)     registered or voted despite being ineligible or who registered multiple times;

(ii)    committed election fraud;

(iii)   provided false information on voter registration or other election forms;

(iv)    intimidated or threatened voters or election officials; or

(v)     otherwise engaged in unlawful conduct to interfere in the election process.

(b)     To the extent that any States are unwilling to enter into such an information sharing agreement or refuse to cooperate in investigations and prosecutions of election crimes, the Attorney General shall:

(i)     prioritize enforcement of Federal election integrity laws in such States to ensure election integrity given the State's demonstrated unwillingness to enter into an information-sharing agreement or to cooperate in investigations and prosecutions; and

(ii)    review for potential withholding of grants and other funds that the Department awards and distributes, in the Department's

discretion, to State and local governments for law enforcement and other purposes, as consistent with applicable law.

(c)     The Attorney General shall take all appropriate action to align the Department of Justice's litigation positions with the purpose and policy of this order.

**Sec. 6. Improving Security of Voting Systems.** To improve the security of all voting equipment and systems used to cast ballots, tabulate votes, and report results:

(a)     The Attorney General and the Secretary of Homeland Security shall take all appropriate actions to the extent permitted by 42 U.S.C. 5195c and all other applicable law, so long as the Department of Homeland Security maintains the designation of election infrastructure as critical infrastructure, as defined by 42 U.S.C. 5195c(e), to prevent all non-citizens from being involved in the administration of any Federal election, including by accessing election equipment, ballots, or any other relevant materials used in the conduct of any Federal election.

(b)     The Secretary of Homeland Security shall, in coordination with the Election Assistance Commission and to the maximum extent possible, review and report on the security of all electronic systems used in the voter registration and voting process. The Secretary of Homeland Security, as the head of the designated Sector Risk Management Agency under 6 U.S.C. 652a, in coordination with the Election Assistance Commission, shall assess the security of all such systems to the extent they are connected to, or integrated into, the Internet and report on the risk of such systems being compromised through malicious software and unauthorized intrusions into the system.

**Sec. 7. Compliance with Federal Law Setting the National Election Day.** To achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress:

(a)     The Attorney General shall take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

(b)     Consistent with 52 U.S.C. 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory

standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. 7 and 3 U.S.C. 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. 20301 et seq., after which no additional votes may be cast.

**Sec. 8. Preventing Foreign Interference and Unlawful Use of Federal Funds.** The Attorney General, in consultation with the Secretary of the Treasury, shall prioritize enforcement of 52 U.S.C. 30121 and other appropriate laws to prevent foreign nationals from contributing or donating in United States elections. The Attorney General shall likewise prioritize enforcement of 31 U.S.C. 1352, which prohibits lobbying by organizations or entities that have received any Federal funds.

**Sec. 9. Federal Actions to Address Executive Order 14019.** The heads of all agencies, and the Election Assistance Commission, shall cease all agency actions implementing Executive Order 14019 of March 7, 2021 (Promoting Access to Voting), which was revoked by Executive Order 14148 of on January 20, 2025 (Initial Rescissions of Harmful Executive Orders and Actions), and, within 90 days of the date of this order, submit to the President, through the Assistant to the President for Domestic Policy, a report describing compliance with this order.

**Sec. 10. Severability.** If any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby.

**Sec. 11. General Provisions.**

    (a)    Nothing in this order shall be construed to impair or otherwise affect:

        (i)    the authority granted by law to an executive department or agency, or the head thereof; or

        (ii)    the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

    (b)    This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

    (c)    This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**2 U.S.C. § 7**

The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter.

**3 U.S.C. § 1**

The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day.

**52 U.S.C. § 20301**

(a)    Presidential designee

The President shall designate the head of an executive department to have primary responsibility for Federal functions under this chapter.

(b)    Duties of Presidential designee

The Presidential designee shall--

(1)    consult State and local election officials in carrying out this chapter, and ensure that such officials are aware of the requirements of this Act;

(2)    prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States as required under section 20302(a)(4) of this title;

(3)    carry out section 20303 of this title with respect to the Federal write-in absentee ballot for absent uniformed services voters and overseas voters in general elections for Federal office;

(4)    prescribe a suggested design for absentee ballot mailing envelopes;

(5)    compile and distribute (A) descriptive material on State absentee registration and voting procedures, and (B) to the extent practicable, facts relating to specific elections, including dates, offices involved, and the text of ballot questions;

(6)    not later than the end of each year after a Presidential election year, transmit to the President and the Congress a report on the effectiveness of assistance under this chapter, including a statistical analysis of uniformed services voter participation, a separate statistical analysis of overseas nonmilitary participation, and a description of State-Federal cooperation;

(7)    prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury;

(8)    carry out section 20304 of this title with respect to the collection and delivery of marked absentee ballots of absent overseas uniformed services voters in elections for Federal office;

(9)    to the greatest extent practicable, take such actions as may be necessary--

(A)    to ensure that absent uniformed services voters who cast absentee ballots at locations or facilities under the jurisdiction of the

Addendum 57

Presidential designee are able to do so in a private and independent manner; and

(B)    to protect the privacy of the contents of absentee ballots cast by absentee uniformed services voters and overseas voters while such ballots are in the possession or control of the Presidential designee;

(10)    carry out section 20305 of this title with respect to Federal Voting Assistance Program Improvements; and

(11)    working with the Election Assistance Commission and the chief State election official of each State, develop standards--

(A)    for States to report data on the number of absentee ballots transmitted and received under section 20302(c) of this title and such other data as the Presidential designee determines appropriate; and

(B)    for the Presidential designee to store the data reported.

(c)    Duties of other Federal officials

(1)    In general

The head of each Government department, agency, or other entity shall, upon request of the Presidential designee, distribute balloting materials and otherwise cooperate in carrying out this chapter.

(2)    Administrator of General Services

As directed by the Presidential designee, the Administrator of General Services shall furnish official post card forms (prescribed under subsection (b)) and Federal write-in absentee ballots (prescribed under section 20303 of this title).

(d)    Authorization of appropriations for carrying out Federal Voting Assistance Program Improvements

There are authorized to be appropriated to the Presidential designee such sums as are necessary for purposes of carrying out subsection (b)(10).

**52 U.S.C. § 20506**

(a)     Designation

    (1)     Each State shall designate agencies for the registration of voters in elections for Federal office.

    (2)     Each State shall designate as voter registration agencies--

        (A)     all offices in the State that provide public assistance; and

        (B)     all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

    (3)     (A)     In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies.

        (B)     Voter registration agencies designated under subparagraph (A) may include--

            (i)     State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) that provide services to persons with disabilities; and

            (ii)     Federal and nongovernmental offices, with the agreement of such offices.

    (4)     (A)     At each voter registration agency, the following services shall be made available:

            (i)     Distribution of mail voter registration application forms in accordance with paragraph (6).

            (ii)     Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

            (iii)     Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

(B)    If a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home.

(5)    A person who provides service described in paragraph (4) shall not--

(A)    seek to influence an applicant's political preference or party registration;

(B)    display any such political preference or party allegiance;

(C)    make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote; or

(D)    make any statement to an applicant or take any action the purpose or effect of which is to lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits.

(6)    A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall--

(A)    distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance--

(i)    the mail voter registration application form described in section 20508(a)(2) of this title, including a statement that--

(I)    specifies each eligibility requirement (including citizenship);

(II)    contains an attestation that the applicant meets each such requirement; and

(III)    requires the signature of the applicant, under penalty of perjury; or

(ii) the office's own form if it is equivalent to the form described in section 20508(a)(2) of this title,

  unless the applicant, in writing, declines to register to vote;

(B)    provide a form that includes--

(i)    the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(ii)    if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii)    boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv)    the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(v)    the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C)    provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

(7)    No information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration.

(b)    Federal Government and private sector cooperation

All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a), and all nongovernmental entities are encouraged to do so.

(c)    Armed Forces recruitment offices

    (1)    Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States.

    (2)    A recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency designated under subsection (a)(2) for all purposes of this chapter.

(d)    Transmittal deadline

    (1)    Subject to paragraph (2), a completed registration application accepted at a voter registration agency shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

    (2)    If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

**52 U.S.C. § 20508**

(a)    In general

The Election Assistance Commission--

(1)    in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2)    in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3)    not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4)    shall provide information to the States with respect to the responsibilities of the States under this chapter.

(b)    Contents of mail voter registration form

The mail voter registration form developed under subsection (a)(2)--

(1)    may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2)    shall include a statement that--

(A)    specifies each eligibility requirement (including citizenship);

(B)    contains an attestation that the applicant meets each such requirement; and

(C)    requires the signature of the applicant, under penalty of perjury;

(3)    may not include any requirement for notarization or other formal authentication; and

(4)    shall include, in print that is identical to that used in the attestation portion of the application--

(i)    the information required in section 20507(a)(5)(A) and (B) of this title;

Addendum 63

(ii)    a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii)    a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.