# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States; PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCORMICK, in the official capacity as Commissioner of the U.S. Election Assistance Commission; BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S. Election Assistance Commission; PETE HEGSETH, in the official capacity as Secretary of Defense,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

## JOINT APPENDIX

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

LEAH B. FOLEY
*United States Attorney*

MICHAEL S. RAAB
JOSHUA WALDMAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7527*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0236*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries.................................................................JA 1

Notice of Appeal (July 31, 2025), Dkt. 123...........................................JA 22

Complaint (Apr. 3, 2025), Dkt. 1 ..........................................................JA 24

Federal Form...........................................................................................JA 66

Federal Post Card Application ...............................................................JA 93

Declaration of Anne P. Bellows and Exhibit A (May 5, 2025)
    Dkt. 76-2 (excerpts of transcript of preliminary injunction
    Hearing in *LUCA v. Executive Office of the President*,
    D.D.C. No. 1:25-cv-00946-CKK ......................................................JA 95

Declaration of Jana M. Lean and Exhibit A (May 5, 2025)
    Dkt. 76-3 ...........................................................................................JA 110

Declaration of Mark Wlaschin (May 5, 2025)
    Dkt. 76-4 ...........................................................................................JA 128

Declaration of Michelle Tassinari (May 5, 2025)
    Dkt. 76-5 ...........................................................................................JA 148

Declaration of Natalie Adona (May 5, 2025)
    Dkt. 76-6 ...........................................................................................JA 161

Declaration of Donna Barber (May 5, 2025)
    Dkt. 76-7 ...........................................................................................JA 173

Declaration of Jonathan Brater (May 5, 2025)
    Dkt. 76-8 ...........................................................................................JA 183

Declaration of Melissia Dorsey (May 5, 2025)
    Dkt. 76-9 ...........................................................................................JA 197

# TABLE OF CONTENTS (cont'd)

Declaration of Arizona Secretary of State Adrian Fontes (May 5, 2025)
Dkt. 76-10 ...................................................................................JA 223

Declaration of Julie L. Flynn (May 5, 2025)
Dkt. 76-11 ...................................................................................JA 237

Declaration of Sarah Copeland Hanzas (May 5, 2025)
Dkt. 76-12 ...................................................................................JA 248

Declaration of Paul Linnell (May 5, 2025)
Dkt. 76-13 ...................................................................................JA 260

Declaration of Dean C. Logan (May 5, 2025)
Dkt. 76-14 ...................................................................................JA 269

Declaration of Edmund Michalowski (May 5, 2025)
Dkt. 76-15 ...................................................................................JA 286

Declaration of Rob Rock (May 5, 2025)
Dkt. 76-16 ...................................................................................JA 293

Declaration of Hilary Rudy (May 5, 2025)
Dkt. 76-17 ...................................................................................JA 306

Declaration of Kristen Zebrowski Stavisky (May 5, 2025)
Dkt. 76-18 ...................................................................................JA 320

Declaration of Connecticut Director of Elections Kristin Sullivan (May 5, 2025)
Dkt. 76-19 ...................................................................................JA 330

Declaration of Mandy Vigil (May 5, 2025)
Dkt. 76-20 ...................................................................................JA 347

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25−cv−10810−DJC

State of California et al v. Trump et al
Assigned to: Chief District Judge Denise J. Casper
Case in other court:  USCA − First Circuit, 25−01726
Cause: 28:2201 Declaratory Judgment

Date Filed: 04/03/2025
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

**Plaintiff**

**State of California**                    represented by **Anne P. Bellows**
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415−510−3847
Fax: 415−703−5843
Email: anne.bellows@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Reiss Green**
California Attorney General's Office
455 Golden Gate Ave.
Ste 11000
San Francisco, CA 94102
415−510−3597
Email: nicholas.green@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Lee Quade**
California Attorney General's Office
1300 I Street
Ste 1101
Sacramento, CA 94244−2550
916−322−5272
Email: kevin.quade@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Lisa Catherine Ehrlich**
Office of The Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415−510−3489
Fax: 510−622−2270
Email: lisa.ehrlich@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Malcolm Andreas Brudigam**
California Attorney General's Office
1300 I Street
Ste 16th Floor
Sacramento, CA 95814
916−210−7873
Email: malcolm.brudigam@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Michael Surren Cohen**
California Attorney General's Office
1300 I Street, Suite 125

P.O. Box 944255
Sacramento, CA 94244
916–210–6090
Email: michael.cohen@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Nevada**                       represented by   **Craig A. Newby**
                                                           Nevada Attorney General's Office
                                                           Executive Team
                                                           1 State of Nevada Way
                                                           Ste 100
                                                           Las Vegas, NV 89119
                                                           702–486–9246
                                                           Fax: 702–486–3773
                                                           Email: cnewby@ag.nv.gov
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Heidi Parry Stern**
                                                           Nevada Attorney General's Office
                                                           Solicitor General
                                                           1 State of Nevada Way
                                                           Ste 100
                                                           Las Vegas, NV 89119
                                                           702–486–3594
                                                           Email: hstern@ag.nv.gov
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Commonwealth of Massachusetts**         represented by   **Anne L. Sterman**
                                                           Office of the Attorney General
                                                           One Ashburton Place
                                                           18th Floor
                                                           Boston, MA 02108
                                                           617–727–2200
                                                           Email: Anne.Sterman@mass.gov
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Michael P. Moore , Jr**
                                                           Office of the Attorney General
                                                           One Ashburton Place
                                                           Boston, MA 02108
                                                           617–727–2200
                                                           Email: pat.moore@mass.gov
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Phoebe Fischer–Groban**
                                                           Massachusetts Attorney General's Office
                                                           McCormack Building
                                                           One Ashburton Place
                                                           Boston, MA 02108
                                                           617–963–2589
                                                           Email: phoebe.fischer–groban@mass.gov
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Arizona**                      represented by   **Joshua M. Whitaker**
                                                           Arizona Attorney General's Office
                                                           2005 North Central Ave.

Phoenix, AZ 85004
602–542–7738
Email: joshua.whitaker@azag.gov
*ATTORNEY TO BE NOTICED*

**Kara M Karlson**
Office of The Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
602–542–8118
Fax: 602–542–4385
Email: kara.karlson@azag.gov
*ATTORNEY TO BE NOTICED*

**Karen Hartman–Tellez**
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
602–542–8326
Email: karen.hartman@azag.gov
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of Colorado**                    represented by **Shannon Wells Stevenson**
Colorado Department of Law
1300 Broadway
Denver, CO 80203
720–508–6749
Email: shannon.stevenson@coag.gov
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of Connecticut**                 represented by **Maura Bridget Murphy**
Office of the Connecticut Attorney General
165 Capitol Avenue
Ste 5000
Hartford, CT 06106
860–808–5020
Fax: 860–808–5347
Email: maura.murphy@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of Delaware**                    represented by **Maryanne Donaghy**
Delaware Department of Justice
Consumer Protection Unit
820 N. French Street
Wilmington, DE 19801
302–683–8843
Email: maryanne.donaghy@delaware.gov
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of Hawaii**                      represented by **David Dana Day**
State of Hawaii – Department of the
Attorney General
425 Queen Street
Honolulu, HI 96813
808–586–1346
Email: david.d.day@hawaii.gov
*ATTORNEY TO BE NOTICED*

**Kalikoonalani Diara Fernandes**
Department of the Attorney General, State of Hawaii
425 Queen Street
Honolulu, HI 96813
808–586–1360
Email: kaliko.d.fernandes@hawaii.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Illinois**                    represented by    **Alex Hemmer**
Illinois Attorney General's Office
115 S. LaSalle Street
23rd Floor
Chicago, IL 60603
312–814–5526
Email: alex.hemmer@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Maine**                    represented by    **Jonathan Richard Bolton**
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
207–626–8551
Email: jonathan.bolton@maine.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Maryland**                    represented by    **Daniel Michael Kobrin**
Office of the Attorney General– State of Maryland
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
410–576–6472
Email: dkobrin@oag.state.md.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Kirschner**
Office of the Attorney General– State of Maryland
200 Saint Paul Place
Baltimore, MD 21202
410–576–6424
Email: akirschner@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Michigan**                    represented by    **Erik Grill**
Michigan Department of Attorney General
PO Box 30736
Lansing, MI 48909
517–335–7659
Email: grille@michigan.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Minnesota**                    represented by

**Angela Behrens**
Minnesota Attorney General's Office
445 Minnesota Street
Suite 600
St. Paul, MN 55101
651–757–1204
Fax: 651–757–1235
Email: angela.behrens@ag.state.mn.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Farrell**
Office of the Minnesota Attorney General
445 Minnesota Street
Suite 600
St. Paul, MN 55101–2127
651–757–1424
Email: peter.farrell@ag.state.mn.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New Jersey**                     represented by
**Meghan Musso**
New Jersey Office of the Attorney General
124 Halsey St, 5th Floor
Newark, NJ 07101
609–696–5366
Email: meghan.musso@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan B. Mangel**
New Jersey Attorney General's Office
124 Halsey Street
Newark, NJ 07101
609–696–5366
Email: jonathan.mangel@law.njoag.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New Mexico**                     represented by
**James Grayson**
NM Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504–1508
505–218–0850
Email: jgrayson@nmag.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New York**                     represented by
**Colleen K. Faherty**
NYS Office of The Attorney General
28 Liberty St.
18th Floor
New York, NY 10005
212–416–6046
Fax: 212–416–6009
Email: colleen.faherty@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Rhode Island**                     represented by
**James J. Arguin**
RI Department of Attorney General

150 South Main Street
Providence, RI 02903
617–949–1844
Fax: 401–222–2995
Email: jarguin@riag.ri.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Vermont**              represented by  **Ryan Patrick Kane**
Attorney General's Office
109 State Street
Montpelier, VT 05609
802–828–2153
Email: ryan.kane@vermont.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Wisconsin**

V.

**Defendant**

**President Donald J. Trump**              represented by  **Bridget O'Hickey**
*in his official capacity as President of the*
*United States*
DOJ–Civ
950 Pennsylvania Avenue, NW
Washington, DC 20530–0001
202–856–4511
Email: bridget.k.o'hickey@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
DOJ–USAO
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3266
Email: Nicole.O'Connor@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pamela Bondi**              represented by  **Bridget O'Hickey**
*in her official capacity as Attorney*
*General of the United States*
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Election Assistance**              represented by  **Bridget O'Hickey**
**Commission**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Donald L. Palmer**
*in his official capacity as Chairman of the*
*U.S. Election Assistance Commission*

represented by **Bridget O'Hickey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas Hicks**
*in his official capacity as Vice Chair of*
*the U.S. Election Assistance Commission*

represented by **Bridget O'Hickey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christy McCormick**
*in their official capacities as*
*Commissioners of the U.S. Election*
*Assistance Commission*

represented by **Bridget O'Hickey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Benjamin W. Hovland**
*in their official capacities as*
*Commissioners of the U.S. Election*
*Assistance Commission*

represented by **Bridget O'Hickey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pete Hegseth**
*in his official capacity as Secretary of*
*Defense*

represented by **Bridget O'Hickey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. O'Connor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Local Election Officials**

represented by **Jonathan Benjamin Miller**
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
646−831−6113
Email: jon@publicrightsproject.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**Republican Party of Arizona**

represented by

**Thomas J. Basile**
Statecraft PLLC
649 North 4th Ave.
Suite B
Phoenix, AZ 85003
602–382–4066
Email: tom@statecraftlaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Bipartisan Group of Former Secretaries of State** | represented by | **Brendan T. Jarboe**<br>Block & Leviton<br>260 Franklin Street<br>Suite 1860<br>Boston, MA 02110<br>617–398–5600<br>Email: brendan@blockleviton.com<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Michigan Republican Party** | represented by | **Robert Neil Driscoll**<br>Dickinson Wright PLLC<br>1825 Eye Street NW<br>Suite 900<br>Washington, DC 20006<br>202–466–5955<br>Fax: 844–670–6009<br>Email: rdriscoll@dickinsonwright.com<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Cindy Berry** | represented by | **Robert Neil Driscoll**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/03/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission (Fee Status: Local Government), filed by State of California. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Green, Nicholas) (Entered: 04/03/2025) |
| 04/04/2025 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Denise J. Casper assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (NMC) (Entered: 04/04/2025) |
| 04/04/2025 | 3 | Summons Issued as to Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (SP) (Entered: 04/04/2025) |
| 04/04/2025 | 4 | NOTICE OF ATTORNEY PAYMENT OF FEES by Plaintiff State of California. Filing fee $ 405, receipt number AMADC–10934130. Payment Type : INITIATING DOCUMENT. (Green, Nicholas) (Entered: 04/04/2025) |
| 04/04/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Thomas S. Patterson, John D. Echeverria, Michael S. Cohen, Anne P. Bellows, Malcolm A. Brudigam, Kevin L. Quade Filing fee: $ 750, receipt number AMADC–10935282 by State of California. (Attachments: # 1 Certificate of Anne P. Bellows, # 2 Certificate of John D. Echeverria, # 3 Certificate of |

| | | |
|---|---|---|
| | | Kevin L. Quade, # 4 Certificate of Malcolm A. Brudigam, # 5 Certificate of Michael S. Cohen, # 6 Certificate of Thomas S. Patterson)(Green, Nicholas) (Entered: 04/04/2025) |
| 04/07/2025 | 6 | NOTICE of Appearance by Anne L. Sterman on behalf of Commonwealth of Massachusetts (Sterman, Anne) (Entered: 04/07/2025) |
| 04/07/2025 | 7 | NOTICE of Appearance by Phoebe Fischer−Groban on behalf of Commonwealth of Massachusetts (Fischer−Groban, Phoebe) (Entered: 04/07/2025) |
| 04/08/2025 | 8 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added Thomas S. Patterson, John D. Echeverria, Michael S. Cohen, Anne P. Bellows, Malcolm A. Brudigam, and Kevin L. Quade.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 04/08/2025) |
| 04/09/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Heidi Parry Stern Filing fee: $ 125, receipt number AMADC−10942876 by State of California. (Attachments: # 1 Certificate of Heidi Parry Stern)(Green, Nicholas) (Entered: 04/09/2025) |
| 04/09/2025 | 10 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 9 Motion for Leave to Appear Pro Hac Vice Added Heidi Parry Stern.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(SEC) (Entered: 04/09/2025) |
| 04/10/2025 | 11 | NOTICE of Appearance by Heidi Parry Stern on behalf of State of Nevada (Stern, Heidi) (Entered: 04/10/2025) |
| 04/10/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Lisa C. Ehrlich Filing fee: $ 125, receipt number AMADC−10945779 by State of California. (Attachments: # 1 Certificate of Lisa C. Ehrlich)(Green, Nicholas) (Entered: 04/10/2025) |
| 04/11/2025 | 13 | NOTICE of Appearance by Michael Surren Cohen on behalf of State of California (Cohen, Michael) (Entered: 04/11/2025) |
| 04/11/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Maura B. Murphy Filing fee: $ 125, receipt number AMADC−10947087 by State of California. (Attachments: # 1 Certificate of Maura B. Murphy)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 15 | NOTICE of Appearance by Kevin Lee Quade on behalf of State of California (Quade, Kevin) (Entered: 04/11/2025) |
| 04/11/2025 | 16 | NOTICE of Appearance by Anne P. Bellows on behalf of State of California (Bellows, Anne) (Entered: 04/11/2025) |
| 04/11/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of David D. Day, Kaliko'onlani D. Fernandes Filing fee: $ 250, receipt number AMADC−10947137 by State of California. (Attachments: # 1 Certificate of David D. Day, # 2 Certificate of Kaliko'onlani D. Fernandes)(Green, Nicholas) (Entered: 04/11/2025) |

| 04/11/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon Stevenson, Peter Baumann Filing fee: $ 250, receipt number AMADC–10947228 by State of California. (Attachments: # 1 Certificate of Shannon Stevenson, # 2 Certificate of Peter Baumann)(Green, Nicholas) (Entered: 04/11/2025) |
|---|---|---|
| 04/11/2025 | 19 | NOTICE of Appearance by Malcolm Andreas Brudigam on behalf of State of California (Brudigam, Malcolm) (Entered: 04/11/2025) |
| 04/11/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice for admission of Alex Hemmer Filing fee: $ 125, receipt number AMADC–10947377 by State of California. (Attachments: # 1 Certificate of Alex Hemmer)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Ryan P. Kane Filing fee: $ 125, receipt number AMADC–10947391 by State of California. (Attachments: # 1 Certificate of Ryan P. Kane)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 22 | NOTICE of Appearance by Nicole M. O'Connor on behalf of Donald J. Trump, Pamela Bondi, United States Election Assistance Commission, Donald L. Palmer, Thomas Hicks, Christy McCormick, Benjamin W. Hovland, Pete Hegseth (O'Connor, Nicole) (Entered: 04/11/2025) |
| 04/11/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice for admission of Peter J. Farrell, Angela Behrens Filing fee: $ 250, receipt number AMADC–10948197 by State of California. (Attachments: # 1 Certificate of Peter J. Farrell, # 2 Certificate of Angela Behrens)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice for admission of James W. Grayson Filing fee: $ 125, receipt number AMADC–10948214 by State of California. (Attachments: # 1 Certificate of James W. Grayson)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan B. Mangel, Meghan K. Musso Filing fee: $ 250, receipt number AMADC–10948231 by State of California. (Attachments: # 1 Certificate of Jonathan B. Mangel, # 2 Certificate of Meghan K. Musso)(Green, Nicholas) (Entered: 04/11/2025) |
| 04/11/2025 | 26 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice. Lisa C. Ehrlich added; granting 14 Motion for Leave to Appear Pro Hac Vice. Maura B. Murphy added; granting 17 Motion for Leave to Appear Pro Hac Vice. David D. Day, Kaliko'onlani D. Fernandes added; granting 18 Motion for Leave to Appear Pro Hac Vice. Shannon Stevenson, Peter Baumann added; granting 20 Motion for Leave to Appear Pro Hac Vice. Alex Hemmer added; granting 21 Motion for Leave to Appear Pro Hac Vice. Ryan P. Kane added; granting 23 Motion for Leave to Appear Pro Hac Vice. Peter J. Farrell, Angela Behrens added; granting 24 Motion for Leave to Appear Pro Hac Vice. James W. Grayson added; granting 25 Motion for Leave to Appear Pro Hac Vice. Jonathan B. Mangel, Meghan K. Musso added.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 04/11/2025) |
| 04/11/2025 | 27 | NOTICE of Appearance by Alex Hemmer on behalf of State of Illinois (Hemmer, Alex) (Entered: 04/11/2025) |
| 04/14/2025 | 28 | NOTICE of Appearance by Angela Behrens on behalf of State of Minnesota (Behrens, Angela) (Entered: 04/14/2025) |
| 04/14/2025 | 29 | NOTICE of Appearance by Shannon Wells Stevenson on behalf of State of Colorado (Stevenson, Shannon) (Entered: 04/14/2025) |

| | | |
|---|---|---|
| 04/14/2025 | 30 | NOTICE of Appearance by David Dana Day on behalf of State of Hawaii (Day, David) (Entered: 04/14/2025) |
| 04/14/2025 | 31 | NOTICE of Appearance by Lisa Catherine Ehrlich on behalf of State of California (Ehrlich, Lisa) (Entered: 04/14/2025) |
| 04/15/2025 | 32 | NOTICE of Appearance by Ryan Patrick Kane on behalf of State of Vermont (Kane, Ryan) (Entered: 04/15/2025) |
| 04/15/2025 | 33 | NOTICE of Appearance by Peter Farrell on behalf of State of Minnesota (Farrell, Peter) (Entered: 04/15/2025) |
| 04/15/2025 | 34 | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan R. Bolton Filing fee: $ 125, receipt number AMADC–10953304 by State of California. (Attachments: # 1 Certificate of Jonathan R. Bolton)(Green, Nicholas) (Entered: 04/15/2025) |
| 04/15/2025 | 35 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by State of California . (Green, Nicholas) (Entered: 04/15/2025) |
| 04/15/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice for admission of Adam Kirschner, Daniel Kobrin Filing fee: $ 250, receipt number AMADC–10953784 by State of California. (Attachments: # 1 Certificate of Adam Kirschner, # 2 Certificate of Daniel Kobrin)(Green, Nicholas) (Entered: 04/15/2025) |
| 04/15/2025 | 37 | MOTION for Leave to Appear Pro Hac Vice for admission of Colleen Kelly Faherty Filing fee: $ 125, receipt number AMADC–10953922 by State of California. (Attachments: # 1 Certificate of Colleen Kelly Faherty)(Green, Nicholas) (Entered: 04/15/2025) |
| 04/15/2025 | 38 | NOTICE of Appearance by Kalikoonalani Diara Fernandes on behalf of State of Hawaii (Fernandes, Kalikoonalani) (Entered: 04/15/2025) |
| 04/16/2025 | 39 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 34 Motion for Leave to Appear Pro Hac Vice. Jonathan R. Bolton added; granting 36 Motion for Leave to Appear Pro Hac Vice. Adam Kirschner and Daniel Kobrin added; granting 37 Motion for Leave to Appear Pro Hac Vice. Colleen Kelly Faherty added.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 04/16/2025) |
| 04/16/2025 | 40 | NOTICE of Appearance by Meghan Musso on behalf of State of New Jersey (Musso, Meghan) (Entered: 04/16/2025) |
| 04/16/2025 | 41 | NOTICE of Appearance by Jonathan B. Mangel on behalf of State of New Jersey (Mangel, Jonathan) (Entered: 04/16/2025) |
| 04/16/2025 | 42 | AFFIDAVIT OF SERVICE Executed by State of California. Benjamin W. Hovland served on 4/11/2025, answer due 5/2/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 43 | AFFIDAVIT OF SERVICE Executed by State of California. Christy McCormick served on 4/11/2025, answer due 5/2/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 44 | AFFIDAVIT OF SERVICE Executed by State of California. Donald L. Palmer served on 4/11/2025, answer due 5/2/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |

| 04/16/2025 | 45 | AFFIDAVIT OF SERVICE Executed by State of California. United States Election Assistance Commission served on 4/14/2025, answer due 5/5/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
|---|---|---|
| 04/16/2025 | 46 | AFFIDAVIT OF SERVICE Executed by State of California. Pamela Bondi served on 4/15/2025, answer due 5/6/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 47 | AFFIDAVIT OF SERVICE Executed by State of California. Pete Hegseth served on 4/14/2025, answer due 5/5/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 48 | AFFIDAVIT OF SERVICE Executed by State of California. Thomas Hicks served on 4/11/2025, answer due 5/2/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 49 | AFFIDAVIT OF SERVICE Executed by State of California. All Defendants. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/16/2025 | 50 | AFFIDAVIT OF SERVICE Executed by State of California. All Defendants. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/16/2025) |
| 04/17/2025 | 51 | NOTICE of Appearance by Daniel Michael Kobrin on behalf of State of Maryland (Kobrin, Daniel) (Entered: 04/17/2025) |
| 04/18/2025 | 52 | AFFIDAVIT OF SERVICE Executed by State of California. Donald J. Trump served on 4/18/2025, answer due 5/9/2025. Acknowledgement filed by State of California. (Brudigam, Malcolm) (Entered: 04/18/2025) |
| 04/18/2025 | 53 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua M. Whitaker, Karen J. Hartman−Tellez, Kara Karlson Filing fee: $ 375, receipt number AMADC−10960983 by State of California. (Attachments: # 1 Certificate of Joshua M. Whitaker, # 2 Certificate of Karen J. Hartman−Tellez, # 3 Certificate of Kara Karlson)(Green, Nicholas) (Entered: 04/18/2025) |
| 04/18/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice for admission of Erik A. Grill Filing fee: $ 125, receipt number AMADC−10961047 by State of California. (Attachments: # 1 Certificate of Erik A. Grill)(Green, Nicholas) (Entered: 04/18/2025) |
| 04/21/2025 | 55 | NOTICE of Appearance by Adam Kirschner on behalf of State of Maryland (Kirschner, Adam) (Entered: 04/21/2025) |
| 04/22/2025 | 56 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 53 Motion for Leave to Appear Pro Hac Vice Added Joshua M. Whitaker, Karen J. Hartman−Tellez, and Kara Karlson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>(SEC) (Entered: 04/22/2025) |
| 04/22/2025 | 57 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 54 Motion for Leave to Appear Pro Hac Vice Added Erik A. Grill.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be** |

| | | |
|---|---|---|
| | | **rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (SEC) (Entered: 04/22/2025) |
| 04/23/2025 | 58 | MOTION for Leave to Appear Pro Hac Vice for admission of Maryanne T. Donaghy Filing fee: $ 125, receipt number AMADC−10967673 by State of California. (Attachments: # 1 Certificate of Maryanne T. Donaghy)(Green, Nicholas) (Entered: 04/23/2025) |
| 04/23/2025 | 59 | MOTION for Leave to Appear Pro Hac Vice for admission of Charlotte Gibson Filing fee: $ 125, receipt number AMADC−10967754 by State of California. (Attachments: # 1 Certificate of Charlotte Gibson)(Green, Nicholas) (Entered: 04/23/2025) |
| 04/23/2025 | 60 | NOTICE of Appearance by Erik Grill on behalf of State of Michigan (Grill, Erik) (Entered: 04/23/2025) |
| 04/23/2025 | 61 | NOTICE of Appearance by James Grayson on behalf of State of New Mexico (Grayson, James) (Entered: 04/23/2025) |
| 04/23/2025 | 62 | MOTION to Transfer Case *and Consolidate Case or, in the alternative, Motion to Stay* to District of Columbia. by Donald J. Trump, Pamela Bondi, United States Election Assistance Commission, Donald L. Palmer, Thomas Hicks, Christy McCormick, Benjamin W. Hovland, Pete Hegseth.(O'Connor, Nicole) (Entered: 04/23/2025) |
| 04/23/2025 | 63 | MEMORANDUM in Support re 62 MOTION to Transfer Case *and Consolidate Case or, in the alternative, Motion to Stay* to District of Columbia. filed by Donald J. Trump, Pamela Bondi, United States Election Assistance Commission, Donald L. Palmer, Thomas Hicks, Christy McCormick, Benjamin W. Hovland, Pete Hegseth. (Attachments: # 1 Exhibit Complaint 25−cv−00946, # 2 Exhibit Complaint 25−cv−00952, # 3 Exhibit Complaint 25−cv−00955, # 4 Exhibit Order on Motion to Consolidate, # 5 Exhibit Order dated April 5, 2025)(O'Connor, Nicole) (Entered: 04/23/2025) |
| 04/23/2025 | 64 | NOTICE of Appearance by Kara M Karlson on behalf of State of Arizona (Karlson, Kara) (Entered: 04/23/2025) |
| 04/23/2025 | 65 | NOTICE of Appearance by Karen Hartman−Tellez on behalf of State of Arizona (Hartman−Tellez, Karen) (Entered: 04/23/2025) |
| 04/23/2025 | 66 | NOTICE of Appearance by Joshua M. Whitaker on behalf of State of Arizona (Whitaker, Joshua) (Entered: 04/23/2025) |
| 04/24/2025 | 67 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 58 Motion for Leave to Appear Pro Hac Vice, Maryanne T. Donaghy added; granting 59 Motion for Leave to Appear Pro Hac Vice, Charlotte Gibson added. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorneys. (SEC) (Entered: 04/24/2025) |
| 04/24/2025 | 68 | MOTION for Leave to File Excess Pages by State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin, State of California, State of Nevada, Commonwealth of Massachusetts, State of Arizona, State of Colorado, State of |

| | | Connecticut, State of Delaware, State of Hawaii, State of Illinois.(Quade, Kevin) (Entered: 04/24/2025) |
|---|---|---|
| 04/24/2025 | 69 | NOTICE of Appearance by Maura Bridget Murphy on behalf of State of Connecticut (Murphy, Maura) (Entered: 04/24/2025) |
| 04/24/2025 | 70 | NOTICE of Appearance by Colleen K. Faherty on behalf of State of New York (Faherty, Colleen) (Entered: 04/24/2025) |
| 04/25/2025 | 71 | NOTICE of Appearance by Jonathan Richard Bolton on behalf of State of Maine (Bolton, Jonathan) (Entered: 04/25/2025) |
| 04/28/2025 | 72 | NOTICE of Appearance by James J. Arguin on behalf of State of Rhode Island (Arguin, James) (Entered: 04/28/2025) |
| 04/29/2025 | 73 | NOTICE of Appearance by Maryanne Donaghy on behalf of State of Delaware (Donaghy, Maryanne) (Entered: 04/29/2025) |
| 05/05/2025 | 74 | Amended MOTION for Leave to File Excess Pages by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin.(Bellows, Anne) (Entered: 05/05/2025) |
| 05/05/2025 | 75 | MOTION for Preliminary Injunction by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Attachments: # 1 Proposed Order)(Bellows, Anne) (Entered: 05/05/2025) |
| 05/05/2025 | 76 | MEMORANDUM in Support re 75 MOTION for Preliminary Injunction filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Attachments: # 1 Table of Attachments, # 2 Declaration of Anne P. Bellows, # 3 Declaration of Jana M. Lean, # 4 Declaration of Mark Wlaschin, # 5 Declaration of Michelle Tassinari, # 6 Declaration of Natalie Adona, # 7 Declaration of Donna Barber, # 8 Declaration of Jonathan Brater, # 9 Declaration of Melissia Dorsey, # 10 Declaration of Arizona Secretary of State Adrian Fontes, # 11 Declaration of Julie L. Flynn, # 12 Declaration of Sarah Copeland Hanzas, # 13 Declaration of Paul Linnell, # 14 Declaration of Dean C. Logan, # 15 Declaration of Edmund Michalowski, # 16 Declaration of Rob Rock, # 17 Declaration of Hilary Rudy, # 18 Declaration of Kristen Zebrowski Stavisky, # 19 Declaration of Connecticut Director of Elections Kristen Sullivan, # 20 Declaration of Mandy Vigil)(Bellows, Anne) (Entered: 05/05/2025) |
| 05/06/2025 | 77 | NOTICE of Appearance by Bridget O'Hickey on behalf of Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission (O'Hickey, Bridget) (Entered: 05/06/2025) |
| 05/07/2025 | 78 | MEMORANDUM in Opposition re 62 MOTION to Transfer Case *and Consolidate Case or, in the alternative, Motion to Stay* to District of Columbia. filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Brudigam, Malcolm) (Entered: 05/07/2025) |
| 05/09/2025 | 79 | Judge Denise J. Casper: ELECTRONIC ORDER entered re: 62 Motion to Transfer Case and Consolidate Case or, in the alternative, Motion to Stay to District of Columbia. by Donald J. Trump, Pamela Bondi, United States Election Assistance Commission, Donald L. Palmer, Thomas Hicks, Christy McCormick, Benjamin W. Hovland, Pete Hegseth. |

Having considered Defendants' motion to transfer this case to the United States District Court for the District of Columbia (the "DC Court") and consolidate it with the matters challenging Executive Order No. 14,248,90 (the "EO"), there (the "DDC Cases"), or in the alternative, stay this matter pending resolution of the DDC Cases, D. 62–63, and Plaintiffs' opposition to same, D. 78, the Court DENIES the motion. Pursuant to 28 U.S.C. § 1404(a), a district court may transfer a civil action to another district if it could have been brought in the transferee court and the transfer is warranted "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); see Fed. R. Civ. P. 42(a) (allowing for discretionary consolidation of cases if they &ldquo;involve a common question of law or fact&rdquo;). The decision to transfer a case is discretionary. See Codex Corp. v. Milgo Elec. Corp., 553 F.2d 735, 737 (1st Cir. 1977). Moreover, there is a "strong presumption in favor of the plaintiff's choice of forum." Astro–Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009) (citation omitted).

Even assuming without deciding that this case could have been brought in the DC Court, the interest of justice does not favor transfer in this case. Although, as Defendants note, the issues raised in this matter overlap with those before the DC Court, D. 63 at 8, the differences between the matters counsel against consolidation. First, the parties are not the same &mdash; while the Plaintiffs before this Court are States, the DC Cases were brought by private parties. Compare D. 1 with League of United Latin Am. Citizens v. Exec. Off. of the President, No. 25–cv–0946–CKK. Likewise, while some defendants in the matters overlap, they do not all overlapp. Id. The matters also challenge different sections of the Executive Order. For example, Plaintiffs here challenge § 3(d) of the EO, the validity of which is not at issue before the DC Court. See id. Similarly, Plaintiff States are in a unique position to challenge certain other provisions of the Executive Order. See id., 2025 WL 1187730, at *52, *56 (D.D.C. Apr. 24, 2025) (noting that "the most natural parties to seek an injunction against enforcement under [§] 7(a) are the States themselves, not the Democratic Party Plaintiffs" and observing that the standing of States to challenge § 7(b) presents "a question for another day"). Likewise, while Defendants suggest the convenience of witnesses supports transfer to the DC Court, D. 63 at 6–7, they do not identify any witnesses and do not explain why witnesses are necessary where they acknowledged to the DC Court that "[i]n the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants [the Executive Branch] the power to act in a certain way is a pure question of law." League, 2025 WL 1187730 at *28 (quoting Defs.' Opp'n, D. 84 at 23)With respect to the stay that Defendants seek, proponents of a stay bear the burden of establishing that it is necessary. Clinton v. Jones, 520 U.S. 681, 708 (1997). Defendants suggest a stay could narrow the pending issues, D. 63 at 11–12, but where enforcement of that stay could, for example, result in unrecoverable compliance costs from states, see D. 78 at 19–20, Defendants have not met this burden. Accordingly, the Court denies the Defendants' motion, D. 62. (LMH) (Entered: 05/09/2025)

| | | |
|---|---|---|
| 05/09/2025 | 80 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 74 Motion for Leave to File Excess Pages. (LMH) (Entered: 05/09/2025) |
| 05/09/2025 | 81 | Judge Denise J. Casper: ELECTRONIC ORDER entered re: 68 Motion for Leave to File Excess Pages. Given the Court's allowance of D. 74, the Court DENIES D. 68 as moot. (LMH) (Entered: 05/09/2025) |
| 05/09/2025 | 82 | In light of the filing of a motion for preliminary injunction by Plaintiffs on May 5, 2025, D. 75, the Court ORDERS as follows: Defendants shall respond to the motion for preliminary injunction by May 19, 2025, Plaintiffs shall file their reply by May 27, 2025. The Court will hear the parties on the motion for preliminary injunction on June 6, 2025 at 10 a.m. ELECTRONIC NOTICE Setting Hearing on Motion 75 MOTION for Preliminary Injunction : Motion Hearing set for 6/6/2025 10:00 AM in Courtroom 11 (In person only) before Judge Denise J. Casper. (LMH) (Entered: 05/09/2025) |
| 05/14/2025 | 83 | MOTION for Leave to File *Response in Excess of Twenty Pages* by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission.(O'Connor, Nicole) (Entered: 05/14/2025) |
| 05/15/2025 | 84 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 83 Motion for Leave to File Response in Excess of Twenty Pages by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United |

| | | |
|---|---|---|
| | | States Election Assistance Commission; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (LMH) (Entered: 05/15/2025) |
| 05/15/2025 | 85 | MOTION for Leave to File *Amicus Brief* by Local Election Officials. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Miller, Jonathan) (Entered: 05/15/2025) |
| 05/16/2025 | 86 | Judge Denise J. Casper: ELECTRONIC ORDER entered allowing 85 MOTION for Leave to File Amicus Brief by Local Election Officials; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (SEC) (Entered: 05/16/2025) |
| 05/16/2025 | 87 | AMICUS BRIEF filed by Local Election Officials . (Miller, Jonathan) (Entered: 05/16/2025) |
| 05/19/2025 | 88 | NOTICE of Appearance by Thomas J. Basile on behalf of Republican Party of Arizona (Basile, Thomas) (Entered: 05/19/2025) |
| 05/19/2025 | 89 | MOTION for Leave to Appear Pro Hac Vice for admission of Kory Langhofer Filing fee: $ 125, receipt number AMADC–11018488 by Republican Party of Arizona. (Attachments: # 1 Exhibit Local Rule 85.5.3(E)(3) Certification)(Basile, Thomas) (Entered: 05/19/2025) |
| 05/19/2025 | 90 | MOTION for Leave to File *Unopposed* by Republican Party of Arizona. (Attachments: # 1 Exhibit A)(Basile, Thomas) (Entered: 05/19/2025) |
| 05/19/2025 | 91 | Opposition re 75 MOTION for Preliminary Injunction filed by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission. (O'Hickey, Bridget) (Entered: 05/19/2025) |
| 05/20/2025 | 92 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 89 Motion for Leave to Appear Pro Hac Vice Added Kory Langhofer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SEC) (Entered: 05/20/2025) |
| 05/22/2025 | 93 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon Eddy Filing fee: $ 125, receipt number AMADC–11026757 by Local Election Officials. (Attachments: # 1 Exhibit Certification for Admission)(Miller, Jonathan) (Entered: 05/22/2025) |
| 05/22/2025 | 94 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Adame Filing fee: $ 125, receipt number AMADC–11026773 by Local Election Officials. (Attachments: # 1 Exhibit Certification for Admission)(Miller, Jonathan) (Entered: 05/22/2025) |
| 05/23/2025 | 95 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 93 Motion for Leave to Appear Pro Hac Vice. Added Shannon Eddy; granting 94 Motion for Leave to Appear Pro Hac Vice Added Michael Adame.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorneys.

(SEC) (Entered: 05/23/2025) |
| 05/27/2025 | 96 | REPLY to Response to 75 MOTION for Preliminary Injunction filed by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Bellows, Anne) (Entered: 05/27/2025) |
| 05/27/2025 | 97 | MOTION for Leave to File *Brief of Bipartisan Former State Secretaries of State as Amici Curiae in Support of Motion for Preliminary Injunction* by Bipartisan Group of Former Secretaries of State. (Attachments: # 1 Exhibit Proposed Brief of Bipartisan Former State Secretaries of State as Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction)(Jarboe, Brendan) (Entered: 05/27/2025) |
| 05/28/2025 | 98 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 90 Motion for Leave to File Amicus Brief by Republican Party of Arizona; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (LMH) (Entered: 05/28/2025) |
| 05/28/2025 | 99 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 97 Motion for Leave to File Brief of Bipartisan Former State Secretaries of State as Amici Curiae in Support of Motion for Preliminary Injunction by Bipartisan Group of Former Secretaries of State; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (LMH) (Entered: 05/28/2025) |
| 05/28/2025 | 100 | AMICUS BRIEF filed by Bipartisan Group of Former Secretaries of State . (Jarboe, Brendan) (Entered: 05/28/2025) |
| 05/28/2025 | 101 | AMICUS BRIEF filed by Republican Party of Arizona . (Basile, Thomas) (Entered: 05/28/2025) |
| 06/02/2025 | 102 | NOTICE of Appearance by Michael P. Moore, Jr on behalf of Commonwealth of Massachusetts (Moore, Michael) (Entered: 06/02/2025) |
| 06/06/2025 | 103 | Electronic Clerk's Notes for proceedings held before Judge Denise J. Casper: Motion Hearing held on 6/6/2025 re 75 MOTION for Preliminary Injunction filed by State of Hawaii, Commonwealth of Massachusetts, State of Rhode Island, State of Minnesota, State of Nevada, State of Michigan, State of Vermont, State of New Jersey, State of Connecticut, State of Illinois, State of Arizona, State of Maine, State of Delaware, State of Wisconsin, State of California, State of Maryland, State of New Mexico, State of New York, State of Colorado. Arguments. Court takes under advisement 75 Motion for Preliminary Injunction. (Court Reporter: Debra Kane at debrakane0711@gmail.com.)(Attorneys present: Anne Bellows, Michael Cohen, Phoebe Fischer–Groban, Nicholas Reiss, Michael Moore and Kevin Quade for the plaintiffs. Nicole O'Connor and Bridget O'Hickey for the defendants.) (LMH) (Entered: 06/06/2025) |
| 06/10/2025 | 104 | Transcript of Motion Hearing held on June 6, 2025, before Judge Denise J. Casper. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Debra Kane at debrakane0711@gmail.com. Redaction Request due 7/1/2025. Redacted Transcript Deadline set for 7/11/2025. Release of Transcript Restriction set for 9/8/2025. (DRK) (Entered: 06/10/2025) |
| 06/10/2025 | 105 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 06/10/2025) |

| 06/12/2025 | 106 | MOTION for Leave to File *Memorandum in Excess of Twenty Pages* by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump.(O'Connor, Nicole) (Entered: 06/12/2025) |
|---|---|---|
| 06/13/2025 | 107 | Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER – For the foregoing reasons, the Court shall grant the motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d), 7(b) of the Executive Order and § 7(a) of the Executive Order as to civil or criminal enforcement actions.<br><br>None of the States shall be required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order.<br><br>Nothing in this Memorandum or the accompanying Order shall prevent the Executive Branch from taking any lawful action that is not based upon §§ 2(a), 2(d), 3(d), 7(a) or 7(b) of the Executive Order as described herein and in the accompanying Order. An Order of preliminary injunction shall be entered today in accordance with this Memorandum.(LMH)<br><br>(Entered: 06/13/2025) |
| 06/13/2025 | 108 | Judge Denise J. Casper: Order of Preliminary Injunction.(LMH) (Entered: 06/13/2025) |
| 06/13/2025 | 109 | MOTION to Dismiss by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission.(O'Hickey, Bridget) (Entered: 06/13/2025) |
| 06/20/2025 | 110 | STIPULATION *Regarding Deadlines Related to Defendants' Motion to Dismiss* by Commonwealth of Massachusetts, State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Attachments: # 1 Proposed Order)(Bellows, Anne) (Entered: 06/20/2025) |
| 06/26/2025 | 111 | Judge Denise J. Casper: Order Setting Deadlines Related to Defendants' Motion to Dismiss. (LMH) (Entered: 06/26/2025) |
| 07/03/2025 | 112 | MOTION to Modify Preliminary Injunction by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission.(O'Hickey, Bridget) (Entered: 07/03/2025) |
| 07/11/2025 | 113 | MEMORANDUM in Opposition re 109 MOTION to Dismiss filed by State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Cohen, Michael) (Entered: 07/11/2025) |
| 07/17/2025 | 114 | RESPONSE to Motion re 112 MOTION to Modify Preliminary Injunction filed by State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of Rhode Island, State of Vermont, State of Wisconsin. (Cohen, Michael) (Entered: 07/17/2025) |
| 07/18/2025 | 115 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered re: 112 Motion to Modify Preliminary Injunction by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission. Having considered Defendants' motion to modify the order of preliminary injunction, D. 112, and Plaintiffs' response to same, D. 114, the Court ALLOWS D. 112 and modifies its Order, D. 108, as requested. (LMH) (Entered: 07/18/2025) |
| 07/18/2025 | 116 | Chief District Judge Denise J. Casper: Amended Order of Preliminary Injunction.(LMH) (Entered: 07/18/2025) |
| 07/25/2025 | 117 | MOTION for Leave to File *Amicus Brief* by Michigan Republican Party, Cindy Berry. (Attachments: # 1 Proposed Amicus Brief, # 2 Ex. A – Affidavit of Cindy Berry)(Driscoll, Robert) (Entered: 07/25/2025) |

| | | |
|---|---|---|
| 07/25/2025 | 118 | Assented to MOTION for Extension of Time to File Response/Reply *in support of Defendants' motion to dismiss by six hours* by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission.(O'Hickey, Bridget) (Entered: 07/25/2025) |
| 07/25/2025 | 119 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered granting 118 Assented to MOTION for Extension of Time to File Response/Reply *in support of Defendants' motion to dismiss by six hours*. (SEC) (Entered: 07/25/2025) |
| 07/25/2025 | 120 | REPLY to Response to 109 MOTION to Dismiss filed by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission. (O'Hickey, Bridget) (Entered: 07/25/2025) |
| 07/28/2025 | 121 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered granting 117 Motion for Leave to File Amicus Brief by Michigan Republican Party, Cindy Berry; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (LMH) (Entered: 07/28/2025) |
| 07/28/2025 | 122 | AMICUS BRIEF filed by Cindy Berry, Michigan Republican Party . (Attachments: # 1 Ex. A – Affidavit of Cindy Berry)(Driscoll, Robert) (Entered: 07/28/2025) |
| 07/31/2025 | 123 | NOTICE OF APPEAL as to 108 Preliminary Injunction, 116 Order, 107 Memorandum & ORDER,,, by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/20/2025. (O'Hickey, Bridget) (Entered: 07/31/2025)** |
| 07/31/2025 | 124 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 123 Notice of Appeal. (MAP) (Entered: 07/31/2025) |
| 07/31/2025 | 125 | USCA Case Number 25−1726 for 123 Notice of Appeal, filed by Donald L. Palmer, Thomas Hicks, Pete Hegseth, Christy McCormick, Benjamin W. Hovland, Pamela Bondi, United States Election Assistance Commission, Donald J. Trump. (MAP) (Entered: 07/31/2025) |
| 08/12/2025 | 126 | MOTION for Leave to Appear Pro Hac Vice for admission of Mark Noferi Filing fee: $ 125, receipt number AMADC−11173346 by State of California. (Attachments: # 1 Certificate of Mark Noferi)(Green, Nicholas) (Entered: 08/12/2025) |
| 08/15/2025 | 127 | ELECTRONIC NOTICE Setting Hearing on Motion 109 MOTION to Dismiss : Motion Hearing set for 9/4/2025 11:00 AM in Courtroom 11 (In person only) before Chief District Judge Denise J. Casper. (LMH) (Entered: 08/15/2025) |
| 08/15/2025 | 128 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered granting 126 Motion for Leave to Appear Pro Hac Vice. Added Mark Noferi.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. |

| | | |
|---|---|---|
| | | (SEC) (Entered: 08/15/2025) |
| 09/03/2025 | 129 | MOTION for Leave to Appear Pro Hac Vice for admission of Craig A. Newby Filing fee: $ 125, receipt number AMADC–11214393 by Commonwealth of Massachusetts. (Attachments: # 1 Affidavit Certificate of Craig A. Newby)(Sterman, Anne) (Entered: 09/03/2025) |
| 09/04/2025 | 130 | Electronic Clerk's Notes for proceedings held before Chief District Judge Denise J. Casper: Motion Hearing held on 9/4/2025 re 109 MOTION to Dismiss filed by Donald L. Palmer, Thomas Hicks, Pete Hegseth, Christy McCormick, Benjamin W. Hovland, Pamela Bondi, United States Election Assistance Commission, Donald J. Trump. Arguments. Court takes under advisement 109 Motion to Dismiss. (Court Reporter: Debra Kane at debrakane0711@gmail.com.)(Attorneys present: Michael Cohen, Anne Bellows, Malcolm Brudigan and Craig Newby for the plaintiffs. Nicole O'Connor and Bridget O'Hickey for the defendants.) (LMH) (Entered: 09/04/2025) |
| 09/08/2025 | 131 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered granting 129 Motion for Leave to Appear Pro Hac Vice. Added Craig A. Newby.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(SEC) (Entered: 09/08/2025) |
| 09/17/2025 | 132 | Chief District Judge Denise J. Casper: ORDER entered. MEMORANDUM AND ORDER – The Court DENIES the Executive Branch's motion to dismiss, D. 109, under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). (LMH) (Entered: 09/17/2025) |
| 09/17/2025 | 133 | NOTICE of Appearance by Craig A. Newby on behalf of State of Nevada (Newby, Craig) (Entered: 09/17/2025) |
| 09/18/2025 | 134 | NOTICE of Scheduling Conference. Scheduling Conference set for 11/3/2025 03:30 PM in Courtroom 10 (Remote only) before Chief District Judge Denise J. Casper.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(LMH) (Entered: 09/18/2025) |
| 09/18/2025 | 135 | Chief District Judge Denise J. Casper: Standing Order Regarding Appearance of Counsel Via Telephone or Video Conference (LMH) (Entered: 09/18/2025) |
| 09/23/2025 | 136 | Transcript of Motion Hearing held on September 4, 2025, before Chief Judge Denise J. Casper. COA Case No. 25–1726. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Debra Kane at debrakane0711@gmail.com. Redaction Request due 10/14/2025. Redacted Transcript Deadline set for 10/24/2025. Release of Transcript Restriction set for 12/22/2025. (DRK) (Entered: 09/23/2025) |
| 09/23/2025 | 137 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 09/23/2025) |

| 09/24/2025 | 138 | Assented to MOTION for Extension of Time to October 22, 2025 to File Answer re 1 Complaint, by Pamela Bondi, Pete Hegseth, Thomas Hicks, Benjamin W. Hovland, Christy McCormick, Donald L. Palmer, Donald J. Trump, United States Election Assistance Commission.(O'Hickey, Bridget) (Entered: 09/24/2025) |
|---|---|---|
| 09/25/2025 | 139 | Chief District Judge Denise J. Casper: ELECTRONIC ORDER entered granting 138 Motion for Extension of Time to Answer re 1 Complaint to 10/22/25, All Defendants. (LMH) (Entered: 09/25/2025) |

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

$\qquad$ *Plaintiffs*,

$\qquad$ v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

$\qquad$ *Defendants*.

Case No. 1:25-cv-10810 (DJC)

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendants Donald J. Trump, et al., hereby appeal to the United States Court of Appeals for the First Circuit the preliminary injunction entered by this Court on June 13, 2025 (Dkt. No. 108), as amended (Dkt. No. 116), and the Memorandum and Order entered by this Court on June 13, 2025 (Dkt. No. 107).

Dated: July 31, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

/s/ *Bridget K. O'Hickey*
BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-8679
Bridget.K.O'Hickey@usdoj.gov

NICOLE M. O'CONNOR
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3112
Nicole.O'Connor@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Bridget O'Hickey, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: July 31, 2025

/s/ *Bridget K. O'Hickey*
BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General

JA 23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | |
| *Plaintiffs,* | Case No. 1:25-cv-10810 |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The President's constitutional role in elections is limited to competing in them and enforcing election laws enacted by Congress.  Nonetheless, on March 25, 2025, Defendant President Donald J. Trump issued Executive Order No. 14248, entitled "*Preserving and*

*Protecting the Integrity of American Elections*" ("Elections EO"), to transform how federal elections are conducted throughout the Nation.

2.      The United States Constitution is clear about the power to regulate elections: as the sovereigns closest to the people, the States have primary responsibility.  As Madison explained at the Virginia Convention, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people."  3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911).

3.      Under the Elections Clause, Congress may preempt State elections law for federal contests but nowhere does the Constitution provide the President, or the Executive Branch, with *any* independent power to modify the States' procedures for conducting federal elections.

4.      The Elections EO usurps the States' constitutional power and seeks to amend election law by fiat.

5.      In large measure, the unconstitutional Elections EO targets the Election Assistance Commission (the "Commission"), an independent, bipartisan agency that Congress established under its constitutional elections authority.  To protect our elections, Congress required the Commission to operate independently.  It also required the Commission to make its decisions under standards of bipartisanship, reasoned decision-making, and collaboration with the States, which actually administer the Nation's elections.  The Elections EO seeks to eradicate all those safeguards—aiming to force the Commission to rubberstamp the President's policy preferences on, among other things, voter registration and voting systems.

6.      If not enjoined, the Elections EO would impose onerous "documentary proof of citizenship" requirements for federal voter registration forms that would harm both Plaintiff States and their citizens.  This portion of the Order directly impacts most Plaintiff States because the National Voter Registration Act ("NVRA") requires all States subject to its provisions—44

out of 50—to make the federal mail registration form (the "Federal Form"), or its equivalent, available to register voters for federal elections.  52 U.S.C. §§ 20506, 20508.[1]

7.      The Elections EO would also effectively preclude Plaintiff States from administering vote-by-mail systems that permit voters to make their choices by Election Day, upending processes that accommodate more voters, decrease obstacles, and increase voter participation.  While unclear, it may also prohibit voters in Plaintiff States from curing minor technical problems with timely ballots after Election Day.  The Elections EO relies on a fundamentally incorrect interpretation of federal Election Day statutes to support this command, which itself is an unconstitutional invasion of State and Congressional election regulation.

8.      The Elections EO thus unconstitutionally treats Plaintiff States as mere instruments of the President's policy agenda.  To implement the President's policies, the Elections EO necessarily commandeers Plaintiff States' elections apparatus because States administer almost the entirety of the national elections system.  For instance, there is no federal voter registration database—each State maintains its own registration system.  The mandates of the Elections EO therefore require State officials to participate in the verification of voters' citizenship documentation, a purported requirement that is itself contrary to the NVRA.

9.      Likewise, Section 2(d) of the Elections EO commands the head of each State-designated federal voter registration agency under the NVRA to immediately begin "assess[ing] citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs."  This ambiguous provision potentially sweeps in a wide range of State and local

---

[1] The NVRA applies to Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia.  Six states are exempt.  *See* 52 U.S.C. § 20503(b); *see also* U.S. Dep't of Justice, *The National Voter Registration Act Of 1993 (NVRA) Questions and Answers* (Nov. 1, 2024), https://tinyurl.com/43whaduz.  Some of the exempt states, however, like Minnesota, accept the Federal Form as a valid voter registration form and will be required to make the same changes to that form for voters who choose to register in that manner.  Minn. Stat. § 201.071, subd. 1.

offices serving low-income and disabled residents, obligating them to bear new administrative burdens.

10.    Likewise, there is no national ballot; again, each State provides its own ballots, tabulates votes, and certifies its own results.  Each of these steps are governed by State law.  The Elections EO unilaterally and baselessly attempts to rewrite those laws to prohibit States from counting ballots that arrive after Election Day, even though they were postmarked on or before that date.

11.    The Elections EO violates the Constitution.  It interferes with States' inherent sovereignty and their constitutional power to regulate the time, place, and manner of federal elections.  It also usurps Congress's powers to legislate (under the Elections Clause) and to appropriate (under the Spending Clause) because Congress has not chosen to implement the changes the President seeks to impose by decree.  The critical funds at issue have in large measure already been appropriated by Congress.  And if these coercive threats were not enough, the Elections EO threatens to target Plaintiff States with Department of Justice investigations and potential prosecution.

12.    It bears emphasizing: the President has no power to do any of this.  Neither the Constitution nor Congress has authorized the President to impose documentary proof of citizenship requirements or to modify State mail-ballot procedures.  Indeed, the text, structure, and history of the NVRA itself confirm that the Federal Form can only require citizenship verification by attestation.  The President cannot add a documentary proof of citizenship requirement to the Federal Form, because even the Commission could not impose that requirement.  Even if a documentary proof of citizenship requirement were substantively consistent with the NVRA, which it is not, only the Commission can change the Federal Form, and then only "in consultation" with the States, with the majority approval of its bipartisan Commissioners, and through reasoned decision-making subject to Administrative Procedures Act ("APA") review.  *See* 52 U.S.C. §§ 20508, 20921, 20923, 20928; 5 U.S.C. § 706; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  As a consequence,

the Elections EO is facially unconstitutional, ultra vires, and an affront to the States' sovereignty and their constitutional authority to regulate the administration of elections.

13.     The injuries Plaintiff States face are real, imminent, and irreparable.  If the provisions of the Elections EO challenged in this lawsuit are not enjoined, they will immediately impose significant harm on Plaintiff States.  Elections administration is complex, and the Elections EO effectively orders Plaintiff States, at breakneck pace, to implement trainings, testing, coordination, implementation, and voter education across multiple State agencies and databases.  Forcing Plaintiff States to complete these tasks effectively orders them to invest enormous time and resources, diverting election staff from vital election priorities—like ensuring the operation of State voter registration systems and the sound operation of State and local elections, as well as primary preference elections, which occur regularly.  In the compressed and finite timeline of State elections and legislative sessions, this work cannot simply be picked up later.  For this reason, implementation of the Elections EO's unlawful directives necessarily comes at the cost of serving Plaintiff States' residents and implementing State priorities.  Even with this effort, the Elections EO sows confusion and sets the stage for chaos in Plaintiff States' election systems, together with the threat of disenfranchisement.

14.     If instead Plaintiff States choose not to comply with the President's blatantly unconstitutional attempt to legislate-by-fiat, they will suffer severe cuts in federal funding that will throw the national electoral system into disarray.  The Framers carefully crafted a federal compact that protects the States from this Hobson's choice.

15.     For all these reasons, the Elections EO is unconstitutional, antidemocratic, and un-American.  It intrudes on the constitutionally reserved powers of the States and Congress.  It purports to subvert laws that Congress has passed, in ways that Congress did not allow and in conflict with the text of those laws.  Through this action, Plaintiff States seek a judgment declaring certain, specific provisions of the Elections EO to be unlawful and void and corresponding preliminary and permanent orders enjoining action on or enforcement of those specific provisions by any Defendant except the President.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.

18.     The Commonwealth of Massachusetts is a resident of this District, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

## THE PARTIES

**I.     PLAINTIFFS**

19.     The State of California is a sovereign state of the United States.  California is represented by Attorney General Rob Bonta, who is the State's Chief Law Officer.

20.     The State of Nevada is a sovereign state of the United States.  Nevada is represented by Attorney General Aaron Ford, who is the State's Chief Law Officer.

21.     The Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the Commonwealth's Chief Law Officer.

22.     The State of Arizona is a sovereign state of the United States.  Arizona is represented by Attorney General Kris Mayes, who is the State's Chief Law Officer.

23.     The State of Colorado is a sovereign state of the United States.  Colorado is represented by Attorney General Philip J. Weiser, who is the State's Chief Law Officer.

24.     The State of Connecticut is a sovereign state of the United States.  Connecticut is represented by Attorney General William Tong, who is the State's Chief Law Officer.

25.     The State of Delaware is a sovereign state of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del.

1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  29 Del. C. § 2504.

26.     The State of Hawaii is a sovereign state of the United States.  Hawaii is represented by Attorney General Anne E. Lopez, who is the State's Chief Legal Officer.

27.     The State of Illinois is a sovereign state of the United States.  Illinois is represented by Attorney General Kwame Raoul, who is the State's Chief Law Officer.

28.     The State of Maine is a sovereign state of the United States.  Maine is represented by Attorney General Aaron M. Frey, who is the State's Chief Law Officer.

29.     The State of Maryland is a sovereign state of the United States.  Maryland is represented by Attorney General Anthony G. Brown who is the State's Chief Legal Officer.

30.     The People of the State of Michigan are represented by Attorney General Dana Nessel.  The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

31.     The State of Minnesota is a sovereign state of the United States.  Minnesota is represented by Attorney General Keith Ellison, who is the State's Chief Law Officer.

32.     The State of New Jersey is a sovereign state of the United States.  The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

33.     The State of New Mexico is a sovereign state of the United States.  New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

34.  The State of New York, represented by and through its Attorney General, is a sovereign state of the United States.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

35.     The State of Rhode Island is a sovereign state of the United States.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the State's Chief Law Officer.

36.     The State of Vermont is a sovereign state of the United States.  Vermont is represented by Attorney General Charity R. Clark, who is the State's Chief Law Officer.

37.     The State of Wisconsin is a sovereign state of the United States.  Wisconsin is represented by Attorney General Josh Kaul, who is the State's Chief Law Officer.

## II.    DEFENDANTS

38.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity, and only for declaratory relief.

39.     Defendant Pamela Bondi is the Attorney General of the United States.  She is sued in her official capacity.

40.     Defendant United States Election Assistance Commission is an independent federal commission established under 52 U.S.C. § 20921.  The Commission is responsible for developing the Federal Form, in consultation with the chief election officers of the States, for the registration of voters for elections for federal office.  52 U.S.C. § 20508(a)(2).  The Commission is further responsible for disbursing statutory elections funds to Plaintiff States.  *Id.* § 21001.

41.     Defendant Donald L. Palmer is a Commissioner and the Chairman of the Election Assistance Commission.  He is sued in his official capacity.

42.     Defendant Thomas Hicks is a Commissioner and the Vice Chair of the Election Assistance Commission.  He is sued in his official capacity.

43.     Defendants Christy McCormick and Benjamin W. Hovland are Commissioners of the Election Assistance Commission.  They are sued in their official capacities.

44.     Defendant Pete Hegseth is the Secretary of Defense.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

45.     On March 25, 2025, the President issued Executive Order No. 14248, entitled "Preserving and Protecting the Integrity of American Elections" ("Elections EO").  Although the

President invoked "the authority vested in [him] as President by the Constitution and the laws of the United States of America," the Elections EO is not authorized by either.

46.     Through the Elections EO, the President seeks to unconstitutionally seize the right to prescribe regulations for federal elections, authority reserved to the States and Congress.  The Elections EO also seeks to repurpose a set of existing federal programs and funding streams and use them as a cudgel to enforce rules that Congress never enacted.

47.     The Elections EO accomplishes these aims in part by purporting to order the independent, bipartisan, and multimember Commission to take actions that are contrary to law, trampling upon the protections that Congress created to ensure that the Commission's work would be evenhanded and independent.  The Elections EO is a unilateral attempt by the Executive to assume powers that the Constitution assigns exclusively to Plaintiff States and Congress.

48.     Plaintiff States and local elections officials, as frontline election administrators, will be directly harmed by the Elections EO's unconstitutional purported amendment of federal voting law.

49.     By this Complaint, Plaintiff States challenge the following specific provisions of the Elections EO (the "Challenged Provisions") that will cause imminent and irreparable harm to the States if they are not enjoined:

> a.   **Section 2(a).**  The Elections EO orders the Commission "to require, in its national mail voter registration form issued under 52 U.S.C. 20508 . . . documentary proof of United States citizenship," contrary to existing federal law and the status of the Commission as an independent agency.  *See* Elections EO, § 2(a).  The Elections EO directs State and local elections officials to implement the burdensome documentation requirements associated with this provision, though the President has no authority over State and local officials.  *See id.* § 2(a)(i)(B).
>
> b.   **Section 2(d).**  The Elections EO orders "the head of each Federal voter registration executive department or agency" to "assess citizenship prior to

providing a Federal voter registration form to enrollees of public assistance programs," raising the specter of commandeering Plaintiff State agencies and resources in violation of fundamental State sovereignty if it extends to State and local agencies designated under the NVRA.  *See id.* § 2(d).

c.      **Section 3(d).**  The Elections EO orders the Secretary of Defense to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote[,]" drastically amending the statute contrary to its purpose and text and rendering the application costly and challenging to implement.  *See id.* § 3(d).

d.      **Section 4(a).**  The Elections EO orders the Commission to "take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to" the unlawful Elections EO's requirements.  *See id.* § 4(a).

e.      **Section 7(a).**  The Elections EO directs the Attorney General to "take all necessary action to enforce" a draconian and incorrect interpretation of federal Election Day statutes that would preclude States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  *See id.* § 7(a). This erroneous interpretation might also conflict with State laws that allow voters to cure ballots with minor technical problems that were timely submitted.

f.      **Section 7(b).**  The Elections EO orders the Commission to enforce this interpretation of the Election Day statutes by conditioning "any available funding to a State on that State's compliance" with the Elections EO's new institution of a

"ballot receipt deadline of Election Day," even though the Commission has no

statutory authority to condition funding on these grounds.  *See id.* § 7(b).

## I.    STATE AND CONGRESSIONAL REGULATION OF ELECTIONS

50.    The President's unlawful order amending statutes governing the conduct of

federal elections dramatically oversteps the limits of Presidential power.

51.    The Constitution's Elections Clause reserves elections administration to the

States, subject only to Congress's preemption power: "The Times, Places and Manner of holding

Elections for Senators and Representatives, shall be prescribed in each State by the Legislature

thereof; but the Congress may at any time by Law make or alter such Regulations, except as to

the Places of chusing Senators."  U.S. Const. art. I, § 4, cl. 1.  Similarly, the Electors Clause

specifies that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a

Number of Electors, equal to the whole Number of Senators and Representatives to which the

State may be entitled in the Congress."  U.S. Const. art. II, § 1, cl. 2.

52.    The Constitution, then, "invests the States with responsibility for the mechanics of

[federal] elections," but allows Congress—not the President, unilaterally—to preempt those

choices in the context of federal elections.  *Foster v. Love*, 522 U.S. 67, 69 (1997).  Unless

Congress provides otherwise, States have the authority "to provide a complete code for [federal]

elections, not only as to times and places, but in relation to notices, registration, . . . protection of

voters, [and] prevention of fraud and corrupt practices."  *Smiley v. Holm*, 285 U.S. 355, 366

(1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 8–9 (2013)

(quoting *Smiley*, 285 U.S. at 366).  In short, States are authorized "to enact the numerous

requirements as to procedure and safeguards which experience shows are necessary in order to

enforce the fundamental right involved."  *Smiley*, 285 U.S. at 366.

53.    U.S. elections are administered consistent with the constitutional command.  State

legislatures, as representatives of their constituents, enact statutes that comprehensively structure

State and federal elections.  Plaintiff States' election officials implement and clarify those laws

with regulations and guidance.  These laws and regulations govern a wide range of election

issues, including early voting, vote-by-mail, and voter identification. Plaintiff States also design their own ballots and do their own redistricting—including redrawing congressional district boundaries. Election codes can differ significantly by State, with each State tailoring its rules to the needs and preferences of its residents.

54.     Beyond setting most election rules, Plaintiff States and their subdivisions also administer elections. Plaintiff States and their subdivisions purchase, maintain, test, and certify all voting machines, and maintain their election information management systems and poll books. Plaintiff States answer questions from voters and local election officials and develop a wide range of training and educational resources for their staff, counties, poll workers, and voters. These resources range from technical instructions for the voting machines to guidance on the implementation of a new law. Plaintiff States design and issue ballots; provide support for local officials who operate polling locations; and collect and secure ballots. Once voting has closed, States canvass and certify the vote. Finally, in a Presidential election, after all votes have been counted and the vote audited, Plaintiff States certify the results to Congress. 3 U.S.C. § 5.

55.     Especially relevant here, Plaintiff States also register voters, coordinate maintenance of voter registration lists, and ensure that voter registration data is secure and accurate. But they do not have free reign in deciding who to register and how. To facilitate registering voters and to ensure maximum access to the ballot in federal elections by eligible citizens, Congress exercised its Elections Clause preemptive authority—first with the Uniformed Overseas Citizen Absentee Voting Act ("UOCAVA"), then with the NVRA and the Help America Vote Act ("HAVA")—to regulate aspects of voting registration. Congress has also exercised its Spending Power under the U.S. Constitution, Article I, Section 8, to allocate federal funds to support States in implementing federal law and conducting elections. *See, e.g.*, 52 U.S.C. § 21001.

56.     In contrast, the President has no constitutional authority to "make or alter" laws governing federal elections. In fact, the Constitution grants the President no legislative power at all. *Cf.* U.S. Const. art. I, § 4. Although the President may "recommend to [Congress's]

consideration such measures as he shall judge necessary and expedient," *id.*, art. II, § 3, and may

veto legislation passed by Congress, *id.*, art. I, § 7, he may neither alter a duly enacted law nor

impose his own law by fiat.

57.    Instead of granting the President a free hand to rewrite federal law, the

Constitution imposes on him the mandatory duty to "take care that the laws be faithfully

executed." *Id.*, art. II, § 3.

58.    For these reasons, and as explained below, the Challenged Provisions are

unconstitutional, ultra vires, and violative of the separation of powers and State sovereignty.

## II.    FEDERAL LAWS ENACTED BY CONGRESS GOVERNING FEDERAL ELECTIONS

### A.    The National Voter Registration Act & the "Federal Form"

59.    Congress passed the NVRA in 1993 to reduce barriers to voter registration,

protect the integrity of federal elections, and improve the accuracy of voter registration rolls. *See*

52 U.S.C. § 20501(b).

60.    In crafting the NVRA, Congress sought to "make it possible for Federal, State,

and local governments to implement" the law "in a manner that enhances the participation of

eligible citizens as voters in elections for Federal office." *Id.*

61.    The NVRA establishes several methods to register to vote in federal elections, in

addition to any registration method provided by State law.  Those options include an "application

made simultaneously with an application for a motor vehicle driver's license," 52 U.S.C.

§ 20503(a)(1), a "mail application," *id.* § 20503(a)(2), and "by application in person" at a variety

of qualifying sites, including federal, state, and local agencies designated by the States, *id.* §

20503(a)(3).

62.    The NVRA requires States to accept and use a federal "mail voter registration

application form"—commonly referred to as the "Federal Form"—or its equivalent for mail

registration and during in-person registration at certain government or nongovernment offices

designated in the statute.  *See id.* §§ 20505(a)(1), 20506(a)(6)(A).  States may also create and use

their own mail registration forms for federal elections if they satisfy the NVRA's statutory criteria. *See id.* § 20505(a)(2).

63.     Responsibility for creating the Federal Form rests with the Commission, which was created by HAVA in 2002.  Congress made clear that the Commission must develop the Federal Form "in consultation with the chief election officers of the States."  *Id.* § 20508(a)(2).

64.     The Commission's discretion in developing the Federal Form is carefully circumscribed by statute.  For example, the Federal Form "may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant) as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  *Id*. § 20508(b)(1) (emphasis added).

65.     Likewise, the Federal Form "may *not* include any requirement for notarization or other formal authentication."  *Id.* § 20508(b)(3) (emphasis added).

66.     As the D.C. Circuit has explained, the statutory text of the NVRA is "straightforward."  *Newby*, 838 F.3d at 10.  If a given datapoint is "'necessary' to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion" in the Federal Form.  *Id.*  But "if not, the NVRA does not permit its inclusion and the Constitution is silent."  *Id.*

67.     The NVRA addresses citizenship by providing that the Federal Form must require the applicant to attest that they meet "each eligibility requirement (including citizenship)" and sign under penalty of perjury.  *Id.* § 20508(b)(2).  The decision to address citizenship through attestation rather than documentary proof reflects the considered judgment of Congress, which considered, but declined to adopt, a requirement of documentary proof of citizenship, reasoning that it was "not necessary or consistent with the purposes of" the NVRA.  H.R. Rep. No. 103–66, at 23–24 (1993).

68.     Indeed, the Commission has previously denied requests to include requirements for documentary proof of citizenship on the Federal Form.  In January 2014, acting on requests

from both Kansas and Arizona, the Commission declined to amend the Federal Form to include requirements for registrants in those States to provide documentary proof of citizenship.  Among other reasons for its decision, the Commission highlighted Congress's explicit rejection of proposals related to documentary proof of citizenship as inconsistent with the purposes of the NVRA and likely to interfere with its registration provisions, to the point of "effectively eliminat[ing]" mail-in registration.  The Commission also determined that the Federal Form "currently provides the necessary means for assessing applicants' eligibility," and that the States had "myriad of means available to enforce their citizenship requirements without requiring additional information from Federal Form applicants."  Finally, the Commission determined that granting the requests would undermine the purposes of the NVRA by imposing additional burdens on registrants and thwarting organized voter registration programs, which the NVRA sought to encourage in 52 U.S.C. § 20505(b) by directing States to make mail-in registration forms available for distribution, "with particular emphasis on making them available for organized voter registration programs."

69.    Even in the limited set of circumstances where the Commission may lawfully amend the Federal Form by adding required information, the Commission must comply with key procedural requirements.  Among other things, the Federal Form must be developed and amended "in consultation with the chief election officers of the States."  52 U.S.C. § 20508.  In other words, the Commission cannot act unilaterally.  And, even after consulting the States, the Commission can only amend the form following the normal notice-and-comment process mandated by the APA, with judicial review.  *See Newby*, 838 F.3d at 11–12.

70.    Congress took pains to define the Federal Form's substance and the process for development and amendment because the Federal Form is enormously important to the complex process of registering voters and administering federal elections.  The 44 States subject to the NVRA must "accept and use" the Federal Form for registering voters in federal elections.  52 U.S.C. § 20505(a)(1).

JA 38

71.     These requirements mean that, in practice, most Plaintiff States' voter registration mechanisms are intertwined with the Federal Form's requirements.

72.     In some Plaintiff States, the overlap is particularly extensive.  For example: Nevada registers voters online, by mail, at county clerks' offices, and at polling locations.  It also registers votes at the Nevada Department of Motor Vehicles; certain offices of the Nevada Department of Health and Human Services; the Nevada Department of Employment, Training and Rehabilitation; and U.S. Armed Forces Recruitment Offices.  Right now, each agency offers Nevada's version of the Federal Form, whether on paper or through verbal questions—which workers must be trained to administer.

**B.     The Help America Vote Act**

73.     Congress passed HAVA in 2002 following the 2000 presidential election.  HAVA sought to upgrade voting systems by setting standards for voting machines and voter registration databases and by providing federal funding to the States for elections purposes.  *See* 52 U.S.C. §§ 20901, 21081, 21083.  HAVA also established rules allowing voters to cast provisional ballots.  *Id.* § 21082.

74.     As explained above, HAVA established the independent, bipartisan Commission. *Id.* § 20921.  The four members of the Commission are appointed to four-year terms and are evenly split between the two political parties.  *Id.* § 20923(a), (b).  The four-year terms of Commission members are staggered at two-year intervals, and a Commission member may serve no more than two four-year terms.  *Id.* § 20923(b)(1), (2).  The Commission may only act within its statutory authority and with the "approval of at least three of its members."  *Id.* § 20928.

**C.     The Uniformed and Overseas Citizens Absentee Voting Act**

75.     In 1986, Congress passed UOCAVA, which governs voting by overseas citizens. 52 U.S.C. §§ 20301–20311.

76.     Under UOCAVA, each State is required to permit absent uniformed services voters and overseas voters to use absentee registration procedures and vote by absentee ballot in all federal elections.  52 U.S.C. § 20302(a)(1).

77.     The President is required to designate the head of an executive department to have the primary responsibility for federal functions under UOCAVA.  52 U.S.C. § 20301(a).  Chief among those responsibilities is to prescribe a single post card registration form and absentee ballot (the "Federal Post Card Application") to be sent to overseas voters and voters in the uniformed services for federal elections and which will be used by the States.  *Id.* § 20301(b)(2).

78.     Under UOCAVA, States must "use the official post card form" prescribed by the Secretary of Defense and "accept and process . . . any otherwise valid voter registration application and absentee ballot application from an absent uniformed services voter or overseas voter," which would include the Federal Post Card Application.  52 U.S.C. § 20302(a)(2), (4).  Several Plaintiff States have codified this requirement.  *See, e.g.*, Cal. Elec. Code §§ 3102(c), 3105(b)(2); Mass. Gen. Laws c. 54, § 91C.

### D.     Federal Laws Governing the Date of Federal Elections

79.     States have the authority to regulate the "Times, Places, and Manner" for congressional elections, unless preempted or supplemented by Congress.  U.S. Const. art. I, § 4, cl. 1.  And States establish the "Manner" of choosing Presidential electors, *id.* art. II, § 1, cl. 2, while Congress "determine[s] the Time of chusing the Electors, and the Day on which they shall give their Votes," *id.* art. II, § 1, cl. 4.  Among the "Manner[s]" left for the States to decide is the "counting of votes."  *Smiley*, 285 U.S. at 366.

80.     Congress has set days for federal elections, consistent with these constitutional mandates.  In 2 U.S.C. § 7, Congress has "established . . . the day for the election" of members of the House of Representatives, and in 3 U.S.C. §§ 1 and 21(1), the "election day" for Presidential electors.  Election Day statutes addressed the problem of some States setting their election day earlier than others, strongly influencing elections before they were concluded.  *Foster*, 522 U.S. at 73–74.  These laws required "only that if an election does take place, it may not be *consummated prior to election day*."  *Id.* at 71–72 & n.4 (emphasis added).  They do not prohibit States from receiving and counting ballots that were indisputably mailed by Election Day or

curing minor, technical errors after Election Day to ensure that ballots timely cast ballots before Election Day are counted.

81.    52 U.S.C. § 21081(a)(6) requires "[e]ach State" to "adopt . . . standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State."  It does not prescribe *what* standards must be used, nor does it provide that the President or the EAC has authority to dictate those standards.  Each Plaintiff State has adopted such standards.

82.    Consistent with this federal regulation, Plaintiff States have exercised their own constitutional and statutory authority to determine for each of their respective jurisdictions how to best receive and count votes that are timely cast by mail in federal elections.  Many of the Plaintiff States provide for the counting of otherwise timely absentee and mail ballots received after Election Day including, ballots postmarked by Election Day but received after the close of polls.  *See, e.g.*, Cal. Elec. Code § 3020(b); Mass. Gen. Laws c. 54, § 93; Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Election Law sec. 8-412(1), 8-710(1).  Others offer procedures allowing voters to fix or "cure" minor errors in timely cast ballots after Election Day to allow their ballot to be counted.

### E.    Congressional Efforts to Pass the SAVE Act

83.    Although some version of a bill amending the NVRA to impose proof of citizenship requirements for federal registrants has been introduced in the last two Congresses, it has never passed the Senate or been presented to the President for signature.

84.    In May 2024, Texas Congressman Chip Roy introduced the "Safeguard American Voter Eligibility Act," more commonly known as the "SAVE Act."  The SAVE Act would have amended the NVRA to provide that "[u]nder any method of voter registration in a State, the State shall not accept and process an application to register to vote in an election for Federal office unless the applicant presents documentary proof of United States citizenship with the application."  H.R. 8281 (118th Cong.), § 2.

85.     Although this version of the bill passed the House on a near party line vote, it was never referred to committee in the Senate or considered for final passage.

86.     The most recent version of Congressman Roy's bill, H.R. 22, was introduced on the first day of the new Congress, January 3, 2025.  The House referred the reintroduced version of the SAVE Act to the Committee on Administration, where it languished until March 27, 2025—three days after the President issued the Elections EO.  Then, without hearing, the bill was transferred to the House Rules Committee.  On April 1, 2025, the Rules Committee passed a resolution providing for the consideration of H.R. 22 by the House.

87.     Neither version of the SAVE Act has ever proven popular enough to pass through the ordinary democratic process.  President Trump and his administration cannot bypass the ordinary legislative process to legislate by fiat, assuming for the Executive Branch powers that are reserved for the States and the Legislative Branch.

## III.   THE ELECTIONS EO

88.     The Elections EO commands several significant changes to federal elections law and practice.  Some of these changes would be effectuated through the Commission and other federal agencies.  Others are imposed directly on the States, enforced by punitive funding conditions and investigatory threats.  This lawsuit addresses the following Challenged Provisions:

89.     **Forcing the Elections Assistance Commission and the States to Require Documentary Proof of Citizenship with the Federal Form.**  The Elections EO directs the Commission to take action to revise the Federal Form—within 30 days—to require "documentary proof of United States citizenship, consistent with 52 U.S.C. § 20508(b)(3)." Elections EO, § 2(a)(i).  The Elections EO defines the scope of documents sufficient to prove citizenship narrowly: a U.S. passport, a driver's license indicating citizenship, military identification indicating citizenship, or other "valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." *Id.* § 2(a)(ii).

90.     The Elections EO requires State and local officials to implement that mandate by "record[ing] on the [registration] form the type of document that [an] applicant present[s] as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document . . . while taking appropriate measures to ensure information security." *Id.* § 2(a)(i)(B).

91.     The Elections EO requires the Commission to "take all appropriate action to cease providing Federal funds to States" that do not accept the Federal Form, as unlawfully amended to require documentary proof of citizenship. *See id.* § 4(a).

92.     **Commandeering State Agencies to Determine Citizenship Before Registering Voters.**  Section 2(d) of the Elections EO commands the head of each State-designated federal voter registration agency under the NVRA to immediately begin "assess[ing] citizenship prior to" providing public assistance to residents.  These agencies represent a wide range of direct service providers.

93.     **Requiring Military and Overseas Voters to Submit Documentary Proof of Citizenship and Eligibility to Vote in State Elections.**  The Elections EO requires similar changes to the Federal Post Card Application form used for voters in the military or living abroad.  It orders the Secretary of Defense to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require" documentary proof of citizenship, as defined above, and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id.* § 3(d).

94.     **Coercing States to Alter Their Ballot Counting Laws.**  The Elections EO purports to enforce a single, "uniform day for appointing Presidential electors and electing members of Congress," which requires States to exclude "absentee or mail-in ballots received after Election Day [from] the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." *Id.* § 7(a).  The EO directs the Commission to "condition any available funding to a State on that

State's compliance with" the requirement that "each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote," including the requirement that States exclude absentee or mail ballots received after election day in the final tabulation of the vote for federal elections. *Id.* § 7(b).

## IV.   FEDERAL FUNDING STREAMS IMPLICATED BY THE ELECTIONS EO

95.    The Elections EO threatens to withhold various streams of federal funding to the States for purported noncompliance with the Challenged Provisions.  HAVA funds, upon which many Plaintiff States rely, are directly implicated.

96.    Section 4(a) of the Elections EO requires that the Commission "take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order."

97.    Section 7(b) of the Elections EO similarly directs that the Commission "condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote," including that there be a uniform ballot receipt deadline of Election Day for all methods of voting.

98.    Pursuant to HAVA, the Commission provides "requirements payments" to States for the primary purpose of improving the administration of elections for Federal offices.  *See* 52 U.S.C. § 21001(b).  These include grants to improve election infrastructure, update voting equipment, enhance cybersecurity, ensure accessibility, and support voter education initiatives. The amount of funding a State receives is determined through a formula that considers multiple factors.  By statute, each State must receive a minimum payment, not less than one-half of one percent of the total amount appropriated for the year.  *Id.* § 21002(c)(1).  A State's remaining amount is then determined by its "allocation percentage," a fixed calculation that is the quotient

of the State's voting age population and the total voting age population of all the States. *Id.*
§ 21002(b).

99.     Requirements payments disbursed by the Commission are statutorily conditioned
on States' certification of a funding plan that directs money to activities to improve the
administration of elections. *Id.* § 21003(b)(1); *see id.* § 21004(a).  States must also certify
compliance with a list of enumerated laws, including the Voting Rights Act of 1965, the Voting
Accessibility for the Elderly and Handicapped Act, the Americans with Disabilities Act of 1990,
and the NVRA. *Id.* § 21003(b); *see id.* § 21145(a) (listing laws).  With respect to the NVRA,
each State is required to accept and use the Federal Form issued by the Commission pursuant to
52 U.S.C. § 20508. *See id.* § 20505(a)(1).  However, outside of design and issuance of the
Federal Form and promulgation of related regulations, the Commission does not have "any
authority to issue any rule, promulgate any regulation, or take any other action which imposes
any requirement on any State or unit of local government." *Id.* § 20929.

100.     Since 2003, the Commission has administrated more than $4.35 billion in HAVA
formula funding to States and territories.  In that time, California has received a total of over
$505 million from the Commission.  Nevada has received over $36 million.  New York has
received more than $49 million in HAVA Election Security Grants since 2018, more than $172
million in HAVA Requirements Payments since 2005, and more than $16 million in HAVA
Election Improvement funds since 2003.  Michigan has similarly been awarded more than $27
million in HAVA Security Grant funding.  Delaware has received $13 million in HAVA
Requirements Payments.  Minnesota has received $17 million in HAVA funding.  Colorado has
received more than $16 million in HAVA Election Security Grants, and prior to 2018 received
more than $38 million in HAVA Election Improvement grants.  Arizona has received
approximately $12 million in HAVA funds since 2020, which the State apportions among
election officials at the county and State level to administer elections.  Massachusetts has
received more than $94 million in HAVA funding.  New Jersey has received more than $76
million in HAVA Section 251 payments.  Vermont has received $5 million in HAVA Election

Improvement Funds, over $12 million in HAVA Section 251 Requirements Payments, and $12 million in HAVA Security Grant funding.  Connecticut has received more than $13 million in HAVA Security Grant funding since 2018.  Rhode Island has received a total of $9.2 million in HAVA section 101 elections security grants since 2018, and previously received $13 million in HAVA section 251 grants.  Maine has received at least $9,634,743 in HAVA funds since 2018.

## V.    HARM TO PLAINTIFF STATES

101.    If the Challenged Provisions are implemented, they will irreparably harm Plaintiff States in several concrete ways.

102.    To start, the Challenged Provisions will blatantly transgress on the Plaintiff States' constitutional power to prescribe the time, place, and manner of federal elections.  The Elections EO amounts to an unprecedented seizure of power over elections administration by the federal Executive Branch, which has no constitutional authority over elections.  The Challenged Provisions seek to amend and dictate election law by fiat and relegate Plaintiff States to mere instruments of the President's policy agenda.  Its provisions do affirmative harm to Plaintiff States' efforts to secure the voting rights of their citizens.  This invasion of State constitutional power, in and of itself, amounts to concrete constitutional injury.

103.    Aside from usurping Plaintiff States' constitutional power over elections, the Challenged Provisions in the Elections EO directly harms them in at least three additional ways.

104.    *First*, the Elections EO's documentary proof of citizenship requirement would impose a significant burden on the voter registration systems maintained at the State and local level in the Plaintiff States.

105.    As required under HAVA, Plaintiff States maintain statewide voter registration databases.  52 U.S.C. § 21083(a).  In many Plaintiff States, counties and other smaller political subdivisions likewise maintain their own voter registration databases that push information to a statewide voter registration database.  The Elections EO commandeers this infrastructure wholesale, requiring State and local officials to check documentary proof of citizenship and record the type of proof shown when an applicant uses the Federal Form to register.  Elections

EO, § 2(a)(i)(B).  State and local elections officials would be required to devote time and personnel to setting up the infrastructure, policies, and technology to implement the new requirements, including by implementing "appropriate measures to ensure information security" with regard to the new information they are charged with collecting.  *Id.*, § 2(a).  Such sweeping changes to interconnected databases are a huge undertaking; they require time, money, and significant people power.[2]  Because elections administration is generally decentralized, implementing these changes requires substantial lead-time.

106.    ***Second***, the Elections EO presents Plaintiff States with a lose-lose proposition: implement the President's unconstitutional orders to change their elections administration systems, even though the changes would disenfranchise lawful voters and are contrary to the States' and Congress's judgment, or lose access to essential federal funding.

107.    The funding that Plaintiff States receive from Defendants is significant and ongoing.  Since 2003, the Commission has administered more than $4.35 billion in HAVA funding to the States and territories, including funding totaling $1.4 billion from 2018 to 2024.  These critical funds support the administration of elections for federal office, election security, and improvements to voting and elections systems.  This money is critical to some of the Plaintiff States.  For example, California has received a total of over $505 million from the Commission.  Nevada received at least $12 million for 2018 to 2024.  New York has received more than $49 million in HAVA Election Security Grants since 2018, more than $172 million in HAVA Requirements Payments since 2005, and more than $16 million in HAVA Election Improvement funds since 2003.  Michigan has similarly been awarded more than $27 million in HAVA Security Grant funding.  Delaware has received $13 million in HAVA Requirements Payments.  Minnesota has received $17 million in HAVA funding.  Colorado has received more than $16 million in HAVA Election Security Grants and prior to 2018 received more than $38

---

[2] One of the Plaintiff States, Arizona, already requires documentary proof of citizenship for voter registration, at least for State elections.  However, Arizona defines documentary proof of citizenship quite differently from how the Elections EO defines it.  *Compare* A.R.S. § 16-166(F) *with* Elections EO, § 2(a)(ii).

million in HAVA Election Improvement grants.  Arizona has received approximately $12 million in HAVA funds since 2020, which the State apportions among election officials at the county and State level to administer elections.  Massachusetts has received more than $94 million in HAVA funding.  New Jersey has received more than $76 million in HAVA Section 251 payments, including more than $22 million from 2019 to the present.  Vermont has received $5 million in HAVA Election Improvement Funds, over $12 million in HAVA Section 251 Requirements Payments, and $12 million in HAVA Security Grant funding, which are essential to administering elections in the state.  Connecticut has received more than $13 million in HAVA Security Grant funding since 2018.  Rhode Island has received a total of $9.2 million in HAVA section 101 elections security grants since 2018, and previously received $13 million in HAVA section 251 grants.  Maine has received at least $9,634,743 in HAVA funds since 2018. These existing funding amounts were not meant to cover the new requirements purportedly imposed by the Elections EO, and they are insufficient to cover the dramatic changes to voter registration systems and election administration procedures contemplated by the Executive Order.  Such unfunded mandates harm the States.

108.    The Elections EO presents Plaintiff States with an unconstitutional choice: either lose access to essential funds, harming States' practical ability to conduct their elections, or institute unlawful and unfunded conditions that would have the effect of disenfranchising their own citizens in order to continue receiving existing funding.

109.    ***Third***, the Elections EO further impacts Plaintiff States' administration of elections because it sets forth an interpretation of the federal Election Day statutes that is not consistent with the text of those statutes and conflicts with many Plaintiff States' method for counting ballots.  Under federal law, Plaintiff States must adopt standards that define what constitutes a vote and what will be counted as a vote.   52 U.S.C. § 21081(a)(6).  Plaintiff States have adopted varying standards pursuant to this requirement, including many Plaintiff States that allow absentee and mail-in ballots postmarked before or on Election Day to be counted, so long as they are received within a limited period of time after Election Day.  *See, e.g.*, Cal. Elec. Code

§ 3020(b); Mass. Gen. Laws c. 54, § 93; N.J. Stat. Ann. § 19:63-22(a); Nev. Rev. Stat. §

293.269921(1)(b), (2); N.Y. Election Law sec. 8-412(1), 8-710(1).  Many Plaintiff States also

have laws that allow rejected ballots—e.g., ballots with a non-matching signature—to be cured

by voters and counted.  Even these laws could be deemed to violate the Elections EO.

110.    The Elections EO declares these State laws that allow for counting a vote received

after Election Day to be "violations" of the federal Election Day statutes and directs the Attorney

General to enforce those Election Day statutes against States.  Plaintiff States with laws allowing

for the tabulation of timely cast ballots received or cured after Election Day intend to administer

federal elections in accordance with these State laws, notwithstanding this conflict.  Because the

Elections EO directs the Attorney General to "take all necessary action to enforce" the

President's incorrect and conflicting interpretation of federal law, there is an actual controversy

between Plaintiff States and the Attorney General and there is a credible threat of immediate

enforcement by the Attorney General against Plaintiff States.

111.    The Elections EO also seeks to give immediate, punitive effect to the President's

legal position by ordering the Commission to withhold funding from States that do not

acquiesce.  The Elections EO therefore directly interferes with Plaintiff States' administration of

federal elections because it attempts to force changes in the way votes are counted.  Were

Plaintiff States compelled to follow the President's erroneous interpretation of the federal

Election Day statutes, it would upend their established State laws and procedures for

administering federal elections, resulting in widespread voter confusion and disenfranchisement.

112.    No adequate remedy at law is available to redress these irreparable harms.

## FIRST CAUSE OF ACTION

**Elections EO § 2(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

113.    Plaintiff States restate and reallege paragraphs 1 to 112 as if fully set forth herein.

114.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

115.    The Elections EO instructs the Commission to amend the Federal Form to require documentary proof of citizenship.  Elections EO, § 2(a).  It also directs that State and local elections officials be tasked with implementing the burdensome documentation requirements associated with this provision.  *Id.* § 2(a)(I)(B).

116.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928.

117.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

118.    Because a substantive change to the Federal Form functions as a command to the sovereign States, the Commission can change the Federal Form only upon "consultation with the chief election officers of the States."  52 U.S.C. § 20508(a)(2).  And, like all Commission decisions, such changes require the approval of at least three out of four Commissioners.  *Id.* § 20928.  Commission changes to the Federal Form must also be made through reasoned decision-making subject to APA review.  *See id.* §§ 20921, 20923, 20928; 5 U.S.C. § 706; *Newby*, 838 F.3d at 11–12.

119.    Regardless, Congress has never authorized the Commission's creation of a documentary proof of citizenship requirement on the Federal Form.  In fact, in drafting the NVRA, Congress determined that a documentary proof of citizenship requirement was "not

necessary or consistent with the purposes of" the statute.  H.R. Rep. No. 103–66, at 23–24 (1993).

120.    The Commission may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

121.    The Plaintiff States will be harmed by implementing these burdensome, harmful, and costly requirements.

122.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 2(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

123.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 2(a) of the Elections EO.

## SECOND CAUSE OF ACTION

**Elections EO § 2(a) - Ultra Vires / Contrary to Statute - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(By all Plaintiff States except Arizona Against the President, the Commission, and Commissioners)[3]**

124.    Plaintiff States restate and reallege paragraphs 1 to 123 as if fully set forth herein.

125.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

---

[3] Due to unique requirements of Arizona law, Arizona does not join this cause of action.

126.    The Elections EO instructs the Commission to amend the Federal Form to require documentary proof of citizenship.  Elections EO, § 2(a).  It also directs State and local elections officials to implement the burdensome documentation requirements associated with this provision.  *Id.* § 2(a)(i)(B).

127.    The Elections EO violates the substantive provisions of the NVRA, which permits the Federal Form to "require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

128.    The "statutory text is straightforward."  *Newby*, 838 F.3d at 10.  If an aspect of the Federal Form is "'necessary' to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion; if not, the NVRA does not permit its inclusion and the Constitution is silent."  *Id.* at 11; *see also Tenn. Conf. of Nat'l Ass'n for Advancement of Colored People v. Lee*, 730 F. Supp. 3d 705, 740 (M.D. Tenn. 2024).

129.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional requirements is ultra vires and in excess of the President's powers.

130.    Congress has already decided that documentary proof of citizenship is not "necessary" for identifying eligible voters.  Citizenship is one aspect of a voter's eligibility.  Under the NVRA, citizenship is proven through attestation: the Federal Form "shall include a statement that" (a) "specifies" all voter eligibility requirements, "including citizenship"; (b) "contains an attestation that the applicant meets each such requirement each such requirement;"

and (c) "requires the signature of the applicant, under the penalty of perjury." 52 U.S.C. § 20508(b)(2). In drafting the NVRA, Congress concluded that attestation under penalty of perjury and criminal penalties were "sufficient safeguards to prevent noncitizens from registering to vote." S.Rep. No. 103–6, at 11 (1993). Indeed, the NVRA specifically prohibits including in the Federal Form "any requirement for notarization or other formal authentication." 52 U.S.C. § 20508(b)(3).

131.    Nor has the Commission deemed documentary proof of citizenship "necessary" for identifying eligible voters. To the contrary, the Commission has previously rejected that proposition.

132.    The Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences. These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

133.    The Plaintiff States will be harmed by this requirement, which would be burdensome, harmful, and costly to implement and administer.

134.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 2(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

135.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and Defendant Commissioners from enforcing or implementing Section 2(a) of the Elections EO.

**THIRD CAUSE OF ACTION**

**Elections EO § 3(d) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President and the Secretary of Defense)**

136.     Plaintiff States restate and reallege paragraphs 1 to 135 as if fully set forth herein.

137.     Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

138.     The Elections EO commands the Secretary of Defense to update the federal post card application provided under UOCAVA to require documentary proof of citizenship and proof of eligibility to vote in state elections.  Elections EO § 3(d).

139.     The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy in a manner inconsistent with Congressional requirements is ultra vires and in excess of the President's powers.

140.     Congress has never authorized the Election EO's additional requirements for the "official post card form" prescribed by the Secretary of Defense under UOCAVA for military and overseas voters to use to register to vote in federal elections.  52 U.S.C. § 20302(a)(4).  Nowhere in the Act is there a requirement that this form demand documentary proof of citizenship or proof of eligibility to vote in elections in the State in which the applicant is attempting to vote.  Rather, the Act unequivocally grants military and overseas voters the ability to register and cast a ballot "in the last place in which the person was domiciled before leaving the United States."  *Id.* § 20310(5)(B).

141.     By directing the Secretary of Defense to include requirements for the Federal Post Card Application not contained in federal law, the Elections EO attempts to amend, repeal,

rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

142.    The Plaintiff States will be harmed by this requirement, which would be burdensome and costly to implement and administer.

143.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 3(d) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

144.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Secretary of Defense from enforcing or implementing Section 3(d) of the Elections EO.

## FOURTH CAUSE OF ACTION

**Elections EO § 4(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

145.    Plaintiff States restate and reallege paragraphs 1 to 144 as if fully set forth herein.

146.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

147.    The Elections EO orders the Commission to condition federal funding to States on their acceptance of the Federal Form as unlawfully amended to require documentary proof of citizenship.  Elections EO, § 4(a).

148.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here,

the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.

149.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928.  The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

150.    Nor has Congress authorized the Commission to withhold funds on these grounds.  To the contrary, it has specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds.  52 U.S.C. §§ 21001–21003, 21142(c)(1).  Plaintiff States are statutorily entitled to those funds upon satisfaction of the requirements of the program under which the funds are provided.

151.    The Commission may exercise only that authority which is conferred by statute.  *See City of Arlington*, 569 U.S. at 297–98.  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

152.    This unlawful order will harm the Plaintiff States by targeting them for loss of federal funding.

153.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 4(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

154.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 4(a) of the Elections EO.

### FIFTH CAUSE OF ACTION

**Elections EO § 7(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses; Violation of the Elections Clause and the Electors Clause**

**(Against the President and the Attorney General)**

155.    Plaintiff States restate and reallege paragraphs 1 to 154 as if fully set forth herein.

156.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

157.    The Elections EO directs the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that purportedly "violate these provisions" by counting absentee or vote-by-mail ballots received after Election Day "in the final tabulation of votes for" federal office, adopting a draconian and incorrect rule that would preclude States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  Elections EO, § 7(a).

158.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, or invades the constitutional and statutory rights of the States, his action is properly struck down as violative of the constitutional separation of powers.

159.    The Elections EO attempts to direct the Attorney General to adopt and enforce an interpretation of the federal Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, that conflicts with State laws allowing for votes validly cast by Election Day but received after that date to be counted.  The President has no legal authority to amend the Election Day statues to prohibit the

counting of ballots validly cast under State law, nor to direct the Attorney General to enforce his erroneous interpretation of federal law against States.

160.    By directing the Attorney General to enforce the President's incorrect interpretation of federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections and Electors Clauses.

161.    This unlawful order harms Plaintiff States by the imminent threat of enforcement by the Attorney General.  There is an actual controversy about whether Plaintiff States can count ballots that are received after Election Day.  Plaintiff States intend to administer federal elections according to State laws, notwithstanding that many of those laws directly conflict with the Elections EO's incorrect interpretation of the federal Election Day statutes.  The Elections EO directs the Attorney General to take all appropriate actions to enforce the Elections EO's incorrect interpretation, establishing an actual controversy and a credible threat of civil prosecution.

162.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 7(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress and the Plaintiff States.

163.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the federal Election Day statutes do not preclude the Plaintiff States from enacting and implementing State laws that allow for counting a timely cast ballot received after Election Day.

164.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Attorney General from enforcing or implementing Section 7(a) of the Elections EO.

## SIXTH CAUSE OF ACTION

**Elections EO § 7(b) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

165.    Plaintiff States restate and reallege paragraphs 1 to 164 as if fully set forth herein.

166.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

167.    The Elections EO requires the Commission to condition federal funding on Plaintiff States' acquiescence to an incorrect interpretation of federal Election Day statutes that would preclude Plaintiff States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  Elections EO, § 7(b).

168.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.

169.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928. The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

170.    Nor has Congress authorized the Commission to withhold funds on these grounds. To the contrary, it has specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds.  52 U.S.C. §§ 21001–21003; *see*

*also* 21142(c)(1).  Plaintiff States are statutorily entitled to those funds upon satisfaction of the requirements of the program under which the funds are provided.

171.     Moreover, outside of specified duties regarding the design and issuance of the Federal Form, the Commission does not have "any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government," such as adopting the draconian position insisted upon in the Elections EO.  *Id.* § 20929.

172.     The Commission may exercise only that authority which is conferred by statute. *See City of Arlington*, 569 U.S. at 297–98.  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

173.     This unlawful order will harm Plaintiff States by targeting them for loss of federal funding.

174.     Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 7(b) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

175.     Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 7(b) of the Elections EO.

### <u>SEVENTH CAUSE OF ACTION</u>

**All Challenged Provisions – Separation of Powers / Intrusion on States' Election Powers Granted by Article I, Section 4 and Article II, Section 1 of the United States Constitution**

**(Against All Defendants)**

176.     Plaintiff States restate and reallege paragraphs 1 to 175 as if fully set forth herein.

177.    The Constitution "invests the States with responsibility for the mechanics of [federal] elections, but only so far as Congress declines to preempt legislative choices." *Foster*, 522 U.S. at 69 (citations omitted); *see also* U.S. Const. art. I, § 4, cl. 1; Art. II, § 1, cl. 2.  It is "solicitous of the prerogatives of the States, even in an otherwise sovereign federal province" because "the Framers recognized that state power and identity were essential parts of the federal balance."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 841 (1995).

178.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  For the same reasons, where the President takes action unauthorized by the Constitution or statute that undermines the constitutional powers of the States, his action is properly struck down as violative of the vertical separation of powers.

179.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that commandeers State executive power or otherwise intrudes on Plaintiff States' inherent sovereignty and powers granted by the Constitution.  In the Elections EO, the President invades Plaintiff States' sovereignty and their powers to regulate federal elections by Presidential fiat and commandeers State election administrative personnel and processes to implement a Presidential decree.

180.    Pursuant to their constitutional authority, Plaintiff States have each enacted statutes governing elections, and each maintains a complex administrative apparatus to carry out federal elections.  The Elections EO purports to overwrite State laws, regulations, and processes relevant to registration, voting systems, and ballot counting.  But it is *Congress*, not the Executive, in which the Constitution vests the power to "make or alter" State regulations governing federal elections.  *See* U.S. Const., art. I, § 4.  The Elections EO goes far beyond any statute lawfully enacted by Congress.

181.    The Elections EO conditions critical funding streams on Plaintiff States' capitulation to its new and unlawful rules.  It thus seeks to control Plaintiff States' exercise of their sovereign powers through raw Executive domination, contrary to the Constitution and its underlying principles of federalism and the separation of powers.

182.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Challenged Provisions of the Elections EO violates the separation of powers, intrudes on Plaintiff States' sovereignty and the election powers granted to them by Article I, Section 4 and Article II, Section 1 of the Constitution, and unconstitutionally commandeers States' executive powers to implement a Presidential decree.

183.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing all Defendants, except the President, from enforcing or implementing the Challenged Provisions of the Elections EO.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

1.    Issue a judicial declaration that the Challenged Provisions of the Elections EO are unconstitutional and void, because they are ultra vires and violate both the separation of powers and the States' sovereignty and elections power under the United States Constitution;

2.    Preliminarily and permanently enjoin all Defendants, except President Trump, from implementing or enforcing the Challenged Provisions of the Elections EO;

3.    Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and

4.    Grant any other relief as this Court may deem just and proper.

Dated: April 3, 2025

**ROB BONTA**
Attorney General of California

By: */s/ Nicholas R. Green*
Nicholas R. Green (BBO No. 698510)
    Deputy Attorney General
Anne P. Bellows*
    Deputy Attorney General
Thomas S. Patterson*
    Senior Assistant Attorney General
John D. Echeverria*
    Supervising Deputy Attorney General
Michael S. Cohen*
Malcolm A. Brudigam*
Kevin L. Quade*
Lisa Ehrlich*
    Deputy Attorneys General

Counsel for the State of California

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General

Counsel for the State of Arizona

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    Solicitor General
Peter Baumann*
    Senior Assistant Attorney General

Counsel for the State of Colorado

Respectfully Submitted,

**AARON FORD**
Attorney General of Nevada

By: */s/ Craig Newby*
Craig Newby*
    First Deputy Attorney General
Heidi P. Stern*
    Solicitor General

Counsel for the State of Nevada

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional &
    Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General

Counsel for the Commonwealth of
Massachusetts

**WILLIAM TONG**
Attorney General for the State of
Connecticut

*/s/ Maura Murphy*
Maura Murphy*
    Deputy Associate Attorney General

Counsel for the State of Connecticut

*(additional counsel on following page)*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
    Director of Impact Litigation
Vanessa L. Kassab*
Maryanne T. Donaghy*
    Deputy Attorneys General

Counsel for the State of Delaware

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ David D. Day*
David D. Day*
    Special Assistant to the Attorney
    General
Kaliko'onālani D. Fernandes*
    Solicitor General

Counsel for the State of Hawai'i

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
    Deputy Solicitor General

Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
    Assistant Attorney General

Counsel for the State of Maine

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
    Senior Assistant Attorney General

Counsel for the State of Maryland

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Danny Haidar*
Heather S. Meingast*
    Assistant Attorneys General

Counsel for the People of the State of
Michigan

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
    Deputy Solicitor General
Angela Behrens*
    Assistant Attorney General

Counsel for the State of Minnesota

**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
    Deputy Attorneys General

Counsel for the State of New Jersey

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
    Chief Deputy Attorney General

Counsel for the State of New Mexico

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
    Special Trial Counsel

Counsel for the State of New York

*(additional counsel on the following page)*

JA 64

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
    Special Assistant Attorney General

Counsel for the State of Rhode Island

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    Deputy Solicitor General

Counsel for the State of Vermont

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General

Counsel for the State of Wisconsin

*Pro hac vice applications forthcoming*

# Register To Vote In Your State
# By Using This
# Postcard Form and Guide



# For U.S. Citizens

# General Instructions

## Who Can Use this Application
If you are a U.S. citizen who lives or has an address within the United States, you can use the application in this booklet to:
- Register to vote in your State,
- Report a change of name to your voter registration office,
- Report a change of address to your voter registration office, or
- Register with a political party.

## Exceptions
Please do not use this application if you live outside the United States and its territories and have no home (legal) address in this country, *or* if you are in the military stationed away from home. Use the Federal Postcard Application available to you from military bases, American embassies, or consular offices.

**New Hampshire** town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form.
**North Dakota** does not have voter registration.
**Wisconsin** municipal clerks will accept this application only as a request for their own absentee voter mail-in registration form or for the purposes of the clerk directing that voter to the state's online voter registration system at https://myvote.wi.gov/en-us/.
**Wyoming** law does not permit mail registration.

## How to Find Out If You Are Eligible to Register to Vote in Your State
Each State has its own laws about who may register and vote. Check the information under your State in the State Instructions. All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election. You cannot be registered to vote in more than one place at a time.

## How to Fill Out this Application
Use both the Application Instructions and State Instructions to guide you in filling out the application.
- First, read the Application Instructions. These instructions will give you important information that applies to everyone using this application.
- Next, find your State under the State Instructions. Use these instructions to fill out Boxes 6, 7, and refer to these instructions for information about voter eligibility and any oath required for Box 9.

## When to Register to Vote
Each State has its own deadline for registering to vote. Check the deadline for your State on the last page of this booklet.

## How to Submit Your Application
Mail your application to the address listed under your State in the State Instructions. Or, deliver the application in person to your local voter registration office. The States that are required to accept the national form will accept copies of the application printed from the computer image on regular paper stock, signed by the applicant, and mailed in an envelope with the correct postage.

## First Time Voters Who Register by Mail
If you are registering to vote for the first time in your jurisdiction and are mailing this registration application, Federal law requires you to show proof of identification the first time you vote. Proof of identification includes:
- A current and valid photo identification or
- A current utility bill, bank statement, government check, paycheck or government document that shows your name and address.

Voters may be exempt from this requirement if they submit a **COPY** of this identification with their mail in voter registration form. If you wish to submit a COPY, please keep the following in mind:
- Your state may have additional identification requirements which may mandate you show identification at the polling place even if you meet the Federal proof of identification.
- Do not submit original documents with this application, only **COPIES**.

### If You Were Given this Application in a State Agency or Public Office
If you have been given this application in a State agency or public office, it is your choice to use the application. If you decide to use this application to register to vote, you can fill it out and leave it with the State agency or public office. The application will be submitted for you. Or, you can take it with you to mail to the address listed under your State in the State Instructions. You also may take it with you to deliver in person to your local voter registration office.
Note: The name and location of the State agency or public office where you received the application will remain confidential. It will not appear on your application. Also, if you decide not to use this application to register to vote, that decision will remain confidential. It will not affect the service you receive from the agency or office.

# Application Instructions

Before filling out the body of the form, please answer the questions on the top of the form as to whether you are a United States citizen and whether you will be 18 years old on or before Election Day. If you answer no to either of these questions, you may not use this form to register to vote. However, state specific instructions may provide additional information on eligibility to register to vote prior to age 18.

**Box 1 — Name**
Put in this box your full name in this order — Last, First, Middle. Do not use nicknames or initials.
*Note:* If this application is for a change of name, please tell us in **Box A** *(on the bottom half of the form)* your full name before you changed it.

**Box 2 — Home Address**
Put in this box your home address (legal address). Do **not** put your mailing address here if it is different from your home address. Do **not** use a post office box or rural route without a box number. Refer to state-specific instructions for rules regarding use of route numbers.

*Note:* If you were registered before but this is the first time you are registering from the address in Box 2, please tell us in **Box B** *(on the bottom half of the form)* the address where you were registered before. Please give us as much of the address as you can remember.

*Also Note:* If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C *(at the bottom of the form).*

**Box 3 — Mailing Address**
If you get your mail at an address that is different from the address in Box 2, put your mailing address in this box. If you have no address in Box 2, you **must** write in Box 3 an address where you can be reached by mail.

**Box 4 — Date of Birth**
Put in this box your date of birth in this order — Month, Day, Year. *Be careful not to use today's date!*

**Box 5 — Telephone Number**
Most States ask for your telephone number in case there are questions about your application. However, you do not have to fill in this box.

**Box 6 — ID Number**
Federal law requires that states collect from each registrant an identification number. You must refer to your state's specific instructions for item 6 regarding information on what number is acceptable for your state. If you have neither a drivers license nor a social security number, please indicate this on the form and a number will be assigned to you by your state.

**Box 7 — Choice of Party**
In some States, you must register with a party if you want to take part in that party's primary election, caucus, or convention. To find out if your State requires this, see item 7 in the instructions under your State.

If you want to register with a party, print in the box the full name of the party of your choice.

If you do not want to register with a party, write "no party" or leave the box blank. Do not write in the word "independent" if you mean "no party," because this might be confused with the name of a political party in your State.
*Note:* If you do not register with a party, you can still vote in general elections and nonpartisan (nonparty) primary elections.

**Box 8 — Race or Ethnic Group**
A few States ask for your race or ethnic group, in order to administer the Federal Voting Rights Act. To find out if your State asks for this information, see item 8 in the instructions under your State. If so, put in Box 8 the choice that best describes you from the list below:
- American Indian *or* Alaskan Native
- Asian or Pacific Islander
- Black, *not* of Hispanic Origin
- Hispanic
- Multi-racial
- White, *not* of Hispanic Origin
- Other

**Box 9 — Signature**
Review the information in item 9 in the instructions under your State. Before you sign or make your mark, make sure that:

(1) You meet your State's requirements, and
(2) You understand **all** of Box 9.

Finally, sign your **full** name or make your mark, and print today's date in this order — Month, Day, Year. If the applicant is unable to sign, put in **Box D** the name, address, and telephone number (optional) of the person who helped the applicant.

# Voter Registration Application

**Before completing this form, review the General, Application, and State specific instructions.**

| | |
|---|---|
| Are you a citizen of the United States of America? ☐ Yes ☐ No<br>Will you be 18 years old on or before election day? ☐ Yes ☐ No<br>**If you checked "No" in response to either of these questions, do not complete form.**<br>(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.) | This space for office use only. |

**1** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

**2** Home Address | Apt. or Lot # | City/Town | State | Zip Code

**3** Address Where You Get Your Mail If Different From Above | City/Town | State | Zip Code

**4** Date of Birth ___/___/___ Month Day Year

**5** Telephone Number (optional)

**6** ID Number - (See item 6 in the instructions for your state)

**7** Choice of Party (see item 7 in the instructions for your State)

**8** Race or Ethnic Group (see item 8 in the instructions for your State)

**9** I have reviewed my state's instructions and I swear/affirm that:
- I am a United States citizen
- I meet the eligibility requirements of my state and subscribe to any oath required.
- The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined , imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States.

Please sign full name (or put mark) ▲

Date: ___/___/___ Month Day Year

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## Please fill out the sections below if they apply to you.

If this application is for a **change of name,** what was your name before you changed it?

**A** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

If you were **registered before but this is the first time you are registering from the address in Box 2,** what was your address where you were registered before?

**B** Street (or route and box number) | Apt. or Lot # | City/Town/County | State | Zip Code

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

**C**
- Write in the names of the crossroads (or streets) nearest to where you live.
- Draw an X to show where you live.
- Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.

NORTH ↑

Example

Route #2 ● Grocery Store
Woodchuck Road
Public School ● X

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

**D**

## Mail this application to the address provided for your State.

OMB Control No. 3265-0015

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

FIRST CLASS
STAMP
NECESSARY
FOR
MAILING



OFFICIAL
ELECTION MAIL
*Authorized by the U.S. Postal Service* ®

OMB Control No. 3265-0015

# Voter Registration Application

**Before completing this form, review the General, Application, and State specific instructions.**

| | |
|---|---|
| Are you a citizen of the United States of America? ☐ Yes ☐ No<br>Will you be 18 years old on or before election day? ☐ Yes ☐ No<br>**If you checked "No" in response to either of these questions, do not complete form.**<br>(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.) | This space for office use only. |

**1** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

**2** Home Address | Apt. or Lot # | City/Town | State | Zip Code

**3** Address Where You Get Your Mail If Different From Above | City/Town | State | Zip Code

**4** Date of Birth ___ ___ ___ Month Day Year | **5** Telephone Number (optional) | **6** ID Number - (See item 6 in the instructions for your state)

**7** Choice of Party (see item 7 in the instructions for your State) | **8** Race or Ethnic Group (see item 8 in the instructions for your State)

**9** I have reviewed my state's instructions and I swear/affirm that:
- I am a United States citizen
- I meet the eligibility requirements of my state and subscribe to any oath required.
- The information I have provided is true to the best of my knowledge under penalty of perjury. If I have provided false information, I may be fined, imprisoned, or (if not a U.S. citizen) deported from or refused entry to the United States.

Please sign full name (or put mark) ▲

Date: ___ / ___ / ___ Month Day Year

**If you are registering to vote for the first time:** please refer to the application instructions for information on submitting copies of valid identification documents with this form.

## *Please fill out the sections below if they apply to you.*

If this application is for a **change of name,** what was your name before you changed it?

**A** ☐ Mr. ☐ Miss ☐ Mrs. ☐ Ms. | Last Name | First Name | Middle Name(s) | ☐ Jr ☐ Sr ☐ II ☐ III ☐ IV

If you were **registered before but this is the first time you are registering from the address in Box 2,** what was your address where you were registered before?

**B** Street (or route and box number) | Apt. or Lot # | City/Town/County | State | Zip Code

If you live in a rural area but do not have a street number, or if you have no address, please show on the map where you live.

**C**
- Write in the names of the crossroads (or streets) nearest to where you live.
- Draw an X to show where you live.
- Use a dot to show any schools, churches, stores, or other landmarks near where you live, and write the name of the landmark.

NORTH ↑

Example

Route #2

● Grocery Store

Woodchuck Road

Public School ●

X

If the applicant is unable to sign, who helped the applicant fill out this application? Give name, address and phone number (phone number optional).

**D**

## Mail this application to the address provided for your State.

OMB Control No. 3265-0015

JA 71

## FOR OFFICIAL USE ONLY

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

**FIRST CLASS STAMP NECESSARY FOR MAILING**



OFFICIAL
ELECTION MAIL
*Authorized by the U.S. Postal Service* ®

OMB Control No. 3265-0015

# State Instructions

## Alabama

Updated: 08-08-2024

Registration Deadline — Voter registration is closed during the fourteen days preceding an election. Applications must be post-marked or delivered by the fifteenth day prior to the election.

6. ID Number. Alabama driver's license number or Alabama nondriver identification card number. If you do not have an Alabama driver's license or nondriver identification card, you must provide the last 4 digits of your Social Security number.

7. Choice of Party. Do not complete this field. Alabama voters do not register by political party affiliation.

8. Race or Ethnic Group. You are required to fill in this box; however, your application will not be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9. Signature. To register in Alabama you must:

• be a citizen of the United States
• be a resident of Alabama and your county at the time of registration
• be 18 years old before any election
• not have been convicted of a felony involving moral turpitude (or have had your civil and political rights restored). The list of moral turpitude felonies is available on the Secretary of State web site at:
www.sos.alabama.gov/mtfelonies

• not currently be declared mentally incompetent through a competency hearing
• swear or affirm to "support and defend the Constitution of the U.S. and the State of Alabama and further disavow any belief or affiliation with any group which advocates the overthrow of the governments of the U.S. or the State of Alabama by unlawful means and that the information contained herein is true, so help me God"

Mailing address:
Office of the Secretary of State
P.O. Box 5616
Montgomery, AL 36103-5616

## Alaska

Updated: 03-01-2006

Registration Deadline — 30 days before the election.

6. ID Number. You must provide one of the following identification numbers; Alaska Driver's License or Alaska State Identification Card Number. If you do not have an Alaska Driver's License or Alaska State Identification Card, you must provide the last four digits of your Social Security Number. If you do not have any of these identification numbers, please write "NONE" on the form. A unique identifying number will be assigned to you for voter registration purposes. This information is kept confidential. Having this information assists in maintaining your voter record and may assist in verifying your identity (Title 15 of the Alaska Statutes).

7. Choice of Party. You do not have to declare a party affiliation when registering to vote. If you do not choose a party, you will be registered as Undeclared. Alaska has a closed primary election system. Each recognized political party has a separate ballot listing only candidates from that political party. Voters registered as a member of a political party may only vote that party's ballot. Voters registered as undeclared or non-partisan may choose one ballot from the ballots available.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Alaska you must:

• be a citizen of the United States
• be at least 18 years old within 90 days of completing this registration
• be a resident of Alaska
• not be a convicted felon (unless unconditionally discharged)
• not be registered to vote in another State

Mailing address:
Division of Elections State of Alaska PO Box 110017
Juneau, AK 99811-0017

## Arizona

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your completed voter registration form must contain the number of your Arizona driver license, or non-operating identification license issued pursuant to A.R.S. § 28-3165, if the license is current and valid. If you *do not have* a current and valid Arizona driver license or non-operating identification license, you must

include the last four digits of your social security number if one has been issued to you. If you do not have a current and valid driver license or non-operating identification license or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the Secretary of State.

7. Choice of Party. If you are registered in a political party which has qualified for ballot recognition, you will be permitted to vote the primary election ballot for that party. If you are registered as an independent, no party preference or as a member of a party which is not qualified for ballot recognition, you may select and vote one primary election ballot for one of the recognized political parties.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Arizona you must:
• be a citizen of the United States
• be a resident of Arizona and your county at least 29 days preceding the next election
• be 18 years old on or before the next general election
• not have been convicted of treason or a felony (or have had your civil rights restored)
• not currently be declared an incapacitated person by a court of law

Mailing address:
    Secretary of State/Elections
    1700 W. Washington, 7th Floor
    Phoenix, AZ 85007-2888

| Arkansas |
| --- |

Updated: 03-01-2006

Registration Deadline — 30 days before the election.

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or nonoperating identification number. If you do not have a driver's license or nonoperating identification, you must include the last four digits of your social security number. If you do not have a driver's license or a nonoperating identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.

7. Choice of Party. Optional. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Arkansas you must:
• be a citizen of the United States
• live in Arkansas at the address in Box 2 on the application
• be at least 18 years old before the next election
• not be a convicted felon (or have completely discharged your sentence or been pardoned)
• not claim the right to vote in any other jurisdiction
• not previously be adjudged mentally incompetent by a court of competent jurisdiction

Mailing address:
    Secretary of State
    Voter Services
    P.O. Box 8111
    Little Rock, AR 72203-8111

| California |
| --- |

Updated: 10-10-2021

Registration Deadline — 15 days before the election; conditional

voter registration up to and including Election Day.

6. ID Number. When you register to vote, you must provide your California driver's license or California identification card number, if you have one. If you do not have a driver's license or ID card, you must provide the last four digits of your Social Security Number (SSN). If you do not include this information, you will be required to provide identification when you vote if it is your first time voting in a federal election.

7. Choice of Party. If you wish to choose a party preference, please enter the name of the political party. If you do not want to choose a political party, enter "No Party Preference" in the space provided. California law allows voters who choose "No Party Preference" or have chosen a preference for a nonqualified political party to vote in the presidential primary election of any qualified political party that files a notice with the Secretary of State allowing them to do so. You can call 1-800-345-VOTE or visit www.sos.ca.gov to learn which political parties allow "No Party Preference" voters and voters who have disclosed a preference for a nonqualified political party to participate in their presidential primary election.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in California you must:
• be a citizen of the United States
• be a resident of California
• be at least 16 years old, but you must be 18 years of age or older on the date of the election at which you intend to vote

not currently serving a state or federal prison term for the conviction of a felony
• not currently found to be mentally incompetent to vote by a court
Your signature is required. If you meet the requirements listed above, please sign and date the registration card in the space provided.

Mailing address:
Secretary of State
Elections Division
1500 11th Street, 5th Floor
Sacramento, CA 95814

### Colorado

Updated: 1-8-2024

Registration Deadline — You may register up to, and on, Election Day. You must register 8 days or more before election day to have a ballot mailed to you. If you register less than 8 days before election day, then you must appear in person in your county to vote.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number or identification number. If you do not have a driver's license or state issued identification, you must include the last four digits of your social security number. If you do not have a driver's license or a state issued identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.
7.Choice of Party. You may register with a party. If you leave this section blank you will not be registered with any party.

8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Colorado you must:
• be a citizen of the United States
• be a resident of Colorado for at least 22 days immediately before the Election in which you intend to vote
• be at least 16 years old, but you must be 18 years of age or older on the date of the election at which you intend to vote
• not be serving a sentence for a felony conviction

Mailing address:
Colorado Secretary of State
1700 Broadway, Suite 550
Denver, Colorado 80290

### Connecticut

Updated: 09-03-2019

Registration Deadline — postmarked seven (7) days before the election; postmarked five (5) days before the primary.

6.ID Number. Connecticut Driver's License Number, or if none, the last four digits of your Social Security Number.
7.Choice of Party. This is optional, but you must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Connecticut you must:
• be a citizen of the United States
• be a resident of Connecticut and of the town in which you wish to vote
• be 17 years old. 17 year olds who will turn 18 on or before

Election Day, may participate in the general primary.
• have completed confinement and parole if previously convicted of a felony, and have had your voting rights restored by Registrars of Voters
• not currently be declared mentally incompetent to vote by a court of law

Mailing address:
Secretary of the State of Connecticut
Elections Division
P.O. Box 150470
Hartford, CT 06115-0470

### Delaware

Updated: 04-18-2018

Registration Deadline — The 4th Saturday before a primary or general election, and 10 days before a special election.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number or nonoperating identification number. If you do not have a driver's license or nonoperating identification, you must include the last four digits of your social security number. If you do not have a driver's license or a nonoperating identification or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State.
7.Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. You may register to vote in Delaware if you:

# State Instructions

- are a citizen of the United States, AND
- are a resident of Delaware; (Delaware is your home), AND
- will be 18 years old on or before the date of the next General Election.

You may not register to vote in Delaware if you:
- have been adjudged mentally incompetent. Adjudged mentally incompetent refers to a specific finding in a judicial guardianship or equivalent proceeding, based on clear and convincing evidence that the individual has a severe cognitive impairment which precludes exercise of basic voting judgment; OR
- were convicted of a felony and have not completed your sentence, OR
- were convicted of a disqualifying* felony and have not been pardoned.

    *List of Disqualifying Felonies:
- murder or manslaughter, (except vehicular homicide);
- any felony constituting an offense against public administration involving bribery or improper influence or abuse of Office, or any like offense under the laws of any state or local jurisdiction, or of the United States, or of the District of Columbia; or
- any felony constituting a sexual offense, or any like offense under the laws of any state or local jurisdiction or of the United States or of the District of Columbia.

Mailing address:
    State of Delaware
    Office of the State Election Commissioner
    905 S. Governors Ave., Suite 170
    Dover, DE 19904

## District of Columbia

Updated: 10-10-2021

Registration Deadline — 21 days before the election if registering by mail, online, or via mobile app, but a voter may register in-person during early voting and on Election Day.

6. ID Number. Federal law now requires that all voter registration applications must include either the applicant's driver's license number or the last four digits of the applicant's social security number in order to be processed.
7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8. Race or Ethnic Group. Leave blank.
9. Signature. To vote in the District of Columbia you must:
- Be a United States citizen
- Be a resident of the District of Columbia
- Maintain residency in the District of Columbia for at least 30 days prior to the election in which you intend to vote
- Not claim voting residence or the right to vote in another U.S. state or territory
- Be at least 17 years old (You may register to vote if you are at least 16 years old. You may vote in a primary election if you are at least 17 years old and you will be at least 18 years old by the next general election. You may vote in a general or special election if you are at least 18 years old).
- Not have been found by a court to be legally incompetent to vote

Mailing address:

District of Columbia Board of Elections
1015 Half Street, SE, Suite 750
Washington, DC 20003

## Florida

Updated: 11-30-2011

Registration Deadline — 29 days before the election.

6. ID Number. If you have one, you must provide your Florida driver's license number or Florida identification card number. If you do not have a Florida driver's license or identification card, you must provide the last four digits of your social security number. If you have not been issued any of these numbers, you must write the word "NONE."
7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8. Race or Ethnic Group. You are requested, but not required, to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).
9. Signature. To register in Florida you must:
- be a citizen of the United States
- be a legal resident of both the State of Florida and of the county in which you seek to be registered
- be 18 years old (you may pre-register if you are at least 16)
- not be adjudicated mentally incapacitated with respect to voting in Florida or any other State, or if you have, you must first have your voting rights restored.
- not be a convicted felon, or if you are, you must first have your civil rights restored if they were taken away.

"I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information in this application is true."

Mailing address:
State of Florida
Department of State
Division of Elections
The R.A. Gray Building
500 South Bronough St, Rm 316
Tallahassee, Florida 32399-0250

## Georgia

Updated: 08-15-2013

Registration Deadline — The fifth Monday before any general primary, general election, or presidential preference primary, or regularly scheduled special election pursuant to the Georgia Election Code. In the event that a special election is scheduled on a date other than those dates prescribed by the Georgia Election Code, registration would close on the 5th day after the call.

6. ID Number. Federal law requires you to provide your full GA Drivers License number or GA State issued ID number. If you do not have a GA Drivers License or GA ID you must provide the last 4 digits of your Social Security number. Providing your full Social Security number is optional. Your Social Security number will be kept confidential and may be used for comparison with other state agency databases for voter registration identification purposes. If you do not possess a GA Drivers License or Social Security number, a unique identifier will be provided for you.

7. Choice of Party. You do not have to register with a party to take part in that party's primary, caucus or convention.
8. Race or Ethnic Group. You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).
9. Signature. To register in Georgia you must:
• be a citizen of the United States
• be a legal resident of Georgia and of the county in which you want to vote
• be 18 years old within six months after the day of registration, and be 18 years old to vote
• not be serving a sentence for having been convicted of a felony
• not have been judicially determined to be mentally incompetent, unless the disability has been removed

Mailing address:
Elections Division
Office of the Secretary of State
2 Martin Luther King Jr. Drive
Suite 802 Floyd West Tower
Atlanta, Georgia 30334

## Hawaii

Updated: 10-10-2021

Registration Deadline — 10 days before the election.

6. ID Number. When you register to vote, you must provide your Hawaii driver's license or State identification number, if you have one. If you do not have a driver's license or ID number, you must provide the last four digits of your Social Security Number (SSN). If you do not have any of this information, the Clerk's Office will issue you a unique identification number, which will serve to identify you for voter registration purposes.
7. Choice of Party. A "choice of party" is not required for voter registration.
8. Race or Ethnic Group. Race or ethnic group information is not required for voter registration.
9. Signature. To register in Hawaii you must:
• be a citizen of the United States
• be a resident of the State of Hawaii
• be at least 16 years old (you must be 18 years old by election day in order to vote)
• not be incarcerated for a felony conviction
• not be adjudicated by a court as "non compos mentis"

Mailing address:
Office of Elections State of Hawaii
802 Lehua Avenue
Pearl City, HI 96782

## Idaho

Updated: 06-27-2022

Registration Deadline — 25 days before the election.

6. ID Number. Enter the number from your Idaho driver's license card or state identification card issued by the Idaho Transportation Department. If you have no such card, enter the last 4 digits of your social security number.
7. Choice of Party. Unless the political party chooses to have an open primary, affiliating with a political party is required if you wish to participate in a party's primary election.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Idaho you must:

• be a citizen of the United States
• have resided in Idaho and in the county for 30 days prior to the day of election
• be at least 18 years old
• not have been convicted of a felony, and without having been restored to the rights of citizenship, or confined in prison on conviction of a criminal offense

Mailing address:
    Secretary of State
    P.O. Box 83720 State
    Capitol Bldg.
    Boise, ID 83720-0080

## Illinois

Updated: 09-03-2019

Registration Deadline — Online Registration is available until 16 days before the election and in-person registration is available through Election Day.

6. ID Number. Illinois requires either the Driver's License (or Secretary of State ID Card) or the last 4 digits of Social Security Number. For people who do not have either of those items, and have not registered in Illinois before, a mail in registration form should be accompanied by a copy of other identifying information: you must send, with this application, either (i) a copy of a current and valid photo identification, or (ii) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. If you do not provide the information required above, then you will be required to provide election officials with either (i) or

(ii) described above the first time you vote at a voting place.
7. Choice of Party. Leave Blank. Exception: for primary elections, unless a voter only wishes to vote on public questions, a party preference should be indicated.
8. Race or Ethnic Group. Leave blank.
9. Signature. A signature is required. If signature is missing from registration form, you will be notified your registration is incomplete.
To register in Illinois you must:
• be a citizen of the United States
• be a resident of Illinois and of your election precinct at least 30 days before the next election
• be at least 18 years old on or before the next General Election or Consolidated Election
• cannot be serving a sentence of confinement in any penal institution as a result of conviction of any crime
• not claim the right to vote anywhere else

Preregistration for 17 Year Olds. Illinois permits registration by a 17 year old person who will be 18 on or before the General Election (or the Consolidated Election, the odd year election for city, township, school board and other local Offices) to register and vote in the General Primary (or Consolidated Primary) which will nominate candidates for that next following General Election (or Consolidated Election).

Mailing address:
    State Board of Elections
    2329 S. MacArthur Boulevard
    Springfield, IL 62704

## Indiana

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your state voter ID number is your ten digit Indiana issued driver's license number. If you do not possess an Indiana driver's license then provide the last four digits of your social security number. Please indicate which number was provided. (Indiana Code 3-7-13-13)
7. Choice of Party. Leave blank.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Indiana you must:
• be a citizen of the United States
• have resided in the precinct at least 30 days before the next election
• be at least 18 years of age on the day of the next general election
• not currently be in jail for a criminal conviction

Mailing address:
    Election Division
    Office of the Secretary of State
    302 West Washington Street, Room E204
    Indianapolis, IN 46204

## Iowa

Updated: 11-24-2023

Registration Deadline — Must be delivered by 5 p.m. 15 days before the election.* Registration forms which are postmarked 15 or more days before an election are considered on time even if received after the deadline.

*If you fail to meet the voter registration deadlines above you can register and vote by following the guidelines for election day

registration. You can find these on the Iowa Secretary of State's website: https://sos.iowa.gov/elections/voterinformation/edr.html.

6. ID Number. Your ID number is your Iowa driver's license number or Iowa non-operator identification number if you have one; if not then the last four digits of your social security number. The ID number you provide will be verified with the Iowa Department of Transportation or the Social Security Administration.

7. Choice of Party. You may, but do not have to, register with a party in advance if you want to participate in that party's primary election. You may change or declare a party affiliation at the polls on primary election day.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Iowa you must:
- be a citizen of the United States
- be a resident of Iowa
- be at least 17 years old; a person may vote if they will be 18 years old on or before election day. In the case of primary elections, a person may vote if they will be 18 years old on or before the corresponding regular election.
- not have been convicted of a felony or have had your rights restored by the Governor, including through Executive Order, after a felony conviction.
- not currently be judged by a court to be "incompetent to vote"
- not claim the right to vote in more than one place
- give up your right to vote in any other place

Mailing address:
    Elections Division
    Office of the Iowa Secretary of State
    Lucas Building- First Floor
    321 E. 12th Street
    Des Moines, IA 50319

## Kansas

Updated: 10-25-2013

Registration Deadline — Postmarked or delivered 21 days before the election

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or nondriver's identification card number. If you do not have a driver's license or nondriver's identification card, you must include the last four digits of your social security number. If you do not have a driver's license or a nondriver's identification card or social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State. The number you provide will be used for administrative purposes only and will not be disclosed to the public. (KSA 25-2309).

7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Kansas you must:
- be a citizen of the United States
- be a resident of Kansas
- be 18 by the next election

- have completed the terms of your sentence if convicted of a felony; a person serving a sentence for a felony conviction is ineligible to vote
- not claim the right to vote in any other location or under any other name
- not be excluded from voting by a court of competent jurisdiction

Mailing address:
    Secretary of State
    1st Floor, Memorial Hall
    120 SW 10th Ave.
    Topeka, KS 66612-1594

## Kentucky

Updated: 03-01-2006

Registration Deadline — 29 days before the election.

6. ID Number. Your full social security number is required. It is used for administrative purposes only and is not released to the public (KRS 116.155). No person shall be denied the right to register because of failure to include social security number.

7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Kentucky you must:
- be a citizen of the United States
- be a resident of Kentucky
- be a resident of the county for at least 28 days prior to the election date

• be 18 years of age on or before the next general election
• not be a convicted felon or if you have been convicted of a felony, your civil rights must have been restored by executive pardon
• not have been judged "mentally incompetent" in a court of law
• not claim the right to vote anywhere outside Kentucky

Mailing address:
   State Board of Elections  140 Walnut Street  Frankfort, KY 40601-3240

## Louisiana

Updated: 02-28-2019

Registration Deadline — 30 days before the election.

6.ID Number. You must provide your Louisiana driver's license number or Louisiana special identification card number, if issued. If not issued, you must provide at least the last four digits of your social security number, if issued. The full social security number may be provided on a voluntary basis. If the applicant has neither a Louisiana driver's license, a Louisiana special identification card, or a social security number, the applicant shall attach one of the following items to his application: (a) a copy of a current and valid photo identification; or (b) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of applicant. Neither the registrar nor the Department of State shall disclose the social security number of a registered voter or circulate the social security numbers of registered voters on commercial lists (R.S. 18:104 and 154; 42 U.S.C. § 405).

7.Choice of Party. If you do not list a party affiliation, you may not be able to vote in the Presidential Preference Primary and party committee elections. Political party affiliation is not required for any other election.
8.Race or Ethnic Group. Completing this box is optional.  See the list of choices under the Application Instructions for Box 8 (on page 2).
9.Signature. To register in Louisiana you must:
• be a citizen of the United States
• be a resident of Louisiana (Residence address must be address where you claim homestead exemption, if any, except for a resident in a nursing home or veteran's home who may elect to use the address of the nursing home or veterans' home or the home where he has a homestead exemption. A college student may elect to use his home address or his address while away at school.)
• be at least 17 years old (16 years old if registering to vote with application for Louisiana driver's license or in person at registrar of voters Office), and be 18 years old prior to the next election to vote
• not currently be under an order of imprisonment for conviction of a felony; or if under such an order (1) not have been incarcerated pursuant to the order within the last five years and (2) not be under an order of imprisonment related to a felony conviction for election fraud or any other election offense pursuant to R.S. 18:1461.2
• not be under a judgment of full interdiction for mental incompetence or limited interdiction where your right to vote has been suspended

Mailing address:
   Secretary of State
   Attention: Elections Division
   P.O. Box 94125
   Baton Rouge, LA 70804-9125

## Maine

Updated: 08-05-2024

Registration Deadline — Delivered to your municipality 21 days before the election (or a voter may register *in-person* up to and including election day).

6. ID Number. You must list your valid Maine driver's license number. If you don't have a valid Maine driver's license, then you must provide the last four digits of your Social Security Num-ber. Voters who don't have either of these forms of ID must write "NONE" in this space.
7. Choice of Party. Unenrolled voters may choose to take part in one party's primary election, caucus, or convention without enrolling in that party.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Maine you must:

• be a citizen of the United States
• be a resident of Maine and the municipality in which you want to vote
• be at least 16 years old (you must be 18 years old to vote, or 17 years old for a Primary Election in which you will be 18 years old by that General Election)

B. Prior address. Prior address is a required section for Maine voter registration. If you were previously registered to vote, whether in Maine or not, the address of prior registration is required to register to vote. If you have not been previously registered, write N/A.

Mailing address:
Elections Division Bureau of Corporations,
Elections and Commissions,
184 State House Station,
Augusta, ME 04333-0184

Municipal addresses: To meet registration deadlines, especially in the two weeks before the closed period (three weeks before an election) you should return the completed voter registration application directly to your municipal clerk. A complete list of municipal clerks is available at https://www.maine.gov/sos/cec/elec/.

## Maryland

Updated: 10-10-2021

Registration Deadline — In-person registration by 5:00 p.m., online registration by 11:59 p.m., or postmarked 21 days before the election.

6. ID Number. If you do not have a current, valid Maryland driver's license or MVA ID card, you must enter the last 4 digits of your social security number. The statutory authority allowing officials to request the last 4 digits of your social security number is Election Law Article, § 3-202.

The number will only be used for registration and other administrative purposes. It will be kept confidential.

7. Choice of Party. You must register with a party if you want to take part in that party's primary election.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Maryland you must:

- be a U.S. citizen
- be a Maryland resident
- be at least 16 years old*
- not be under guardianship for mental disability or if you are, you have not been found by a court to be unable to communicate a desire to vote
- not have been convicted of buying or selling votes
- not have been convicted of a felony, or if you have, you have completed serving a court ordered sentence of imprisonment.

*You may register to vote if you are at least 16 years old but cannot vote unless you will be at least 18 years old by the next general election.

Mailing address:
State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486

## Massachusetts

Updated: 09-03-2019

Registration Deadline — 20 days before the election.

6. ID Number. Federal law requires that you provide your driver's license number to register to vote. If you do not have a current and valid Massachusetts' driver's license then you must provide the last four (4) digits of your social security number. If you have neither, you must write "NONE" in the box and a unique identifying number will be assigned to you.
7. Choice of Party. If you do not designate a party or political designation in this box, you will be registered as unenrolled, which is commonly referred to as independent. Unenrolled voters and voters registered in political designations may vote in party primaries.

8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Massachusetts you must:

- be a citizen of the United States
- be a resident of Massachusetts
- be at least 16 years old (must be 18 years old to vote on Election Day)
- not have been convicted of corrupt practices in respect to elections
- not be under guardianship with respect to voting
- not be currently incarcerated for a felony conviction

Mailing address:
Secretary of the Commonwealth
Elections Division, Room 1705
One Ashburton Place
Boston, MA 02108

## Michigan

Updated: 09-17-2024

Registration Deadline — Postmarked at least 15 days before the election; or delivered in person to your city or township clerk by 8 p.m. on Election Day. If you are registering within 14 days of an election, you must provide residency verification to be eligible for that election.

6. ID Number. Your completed voter registration form must contain your state issued driver's license number or state issued personal identification card number. If you do not have a driver's license or state issued personal identification card, you must include the last four digits of your social security number. If you do not have a driver's license or a state issued personal identification card or a social security number,

please write "NONE" on the form. A unique identifying number will be assigned by the State.

7. Choice of Party. A "choice of party" is not required for voter registration.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Michigan you must:

• be a citizen of the United States
• be 18 years old by the next election
• be a resident of Michigan and at least a 30 day resident of your city or township by election day
• not be confined in a jail after being convicted and sentenced

Preregistration for 16 year olds—
To preregister in Michigan you must:

• be a citizen of the United States
• be at least 16 years of age but less than 17.5 years of age
• be a resident of Michigan and a resident of the city or township in which you are applying for preregistration.

A person who is preregistered to vote automatically becomes a registered voter on their 18th birthday. If you are using this form to preregister to vote, mark "yes" to the question "Will you be 18 years old on or before election day?" if you will be 18 years old at the first election in which you will vote.

*Notice:* If a voter possesses a Michigan driver license (DL) or personal ID (PID), Michigan law requires the same address be used for voter registration and DL/PID purposes. Use of this form will also change your DL/PID address. The Secretary of State will mail you a new address sticker for your DL/PID.

Mailing address:
Mail or deliver this completed application directly to your city or township clerk. Find your city or township clerk's address at Michigan.gov/Vote. If you are unable to find your city or township clerk's address, mail to:
    Michigan Department of State
    Bureau of Elections
    P.O. Box 20126
    Lansing, MI 48901-0726

## Minnesota

Updated 11/24/2023

Registration Deadline —
Delivered by 5:00 p.m. 21 days before the election (there is also election day registration at polling places).

6. ID Number. You are required to provide your Minnesota driver's license or state ID number to register to Vote. If you do not have a Minnesota driver's license or state ID then you will have to provide the last four digits of your social security number. If you have neither, please write "none" on the form.

7. Choice of Party. Leave blank.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Minnesota you must:

• be a citizen of the United States
• maintain residence in Minnesota for 20 days before the next election
• maintain residence at the address given on the registration form
• be at least 16 years old and understand that you must be at least 18 years old to be eligible to vote.
• not be currently incarcerated for a conviction of a felony offense
• not be under a court-ordered guardianship in which the right to

vote has been revoked
• not be found by a court to be legally incompetent to vote.

Mailing address:
    Secretary of State
    First National Bank Building
    332 Minnesota Street. Suite N201
    Saint Paul. MN 55101
You may also register online or find more information at mnvotes.gov/register.

## Mississippi

Updated: 05-07-2010

Registration Deadline — 30 days before the election.

6. ID Number. You are required to provide your current and valid driver's license number or, if you don't have one, the last four digits of your social security number.

7. Choice of Party. Mississippi does not have party registration. Therefore you do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Mississippi you must:

• be a citizen of the United States
• have lived in Mississippi and in your county (and city, if applicable) 30 days before the election in which you want to vote
• be 18 years old by the time of the general election in which you want to vote
• have not been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, armed robbery, extortion, felony bad check, felony shoplifting, larceny, receiving stolen property, robbery, timber larceny, unlawful taking of a motor

vehicle, statutory rape, carjacking, or bigamy, or have had your rights restored as required by law
• not have been declared mentally incompetent by a court

*Note:* State law changed by federal court order in 1998 and by state legislation in 2000. We now accept the form as registration for voting for <u>all</u> state and federal Offices.

Mailing address:
    Secretary of State
    P.O. Box 136
    Jackson, MS 39205-0136

Local county addresses:
You also may return completed applications to the county circuit clerk/registrar where you reside. A complete list of county circuit clerk/registrars is available on Mississippi's website at www.sos.ms.gov.

## Missouri

Updated: 09-12-2006

Registration Deadline — 28 days before the election.

6.ID Number. Your completed voter registration form must contain your state issued driver's license number. Your completed voter registration form must also include the last four digits of your social security number. (Section 115.155, RSMo). If you do not have a driver's license or a social security number, please write "NONE" on the form. A unique identifying number will be assigned by the State. Any electronic media, printouts or mailing labels provided under this section shall not include telephone numbers and social security

numbers of voters. (Section 115.157, RSMo).
7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To vote in Missouri you must:
• be a citizen of the United States
• be a resident of Missouri
• be at least 17-1/2 years of age (you must be 18 to vote)
• not be on probation or parole after conviction of a felony, until finally discharged from such probation or parole
• not be convicted of a felony or misdemeanor connected with the right of suffrage
• not be adjudged incapacitated by any court of law
• not be confined under a sentence of imprisonment

Mailing address:
    Secretary of State
    P.O. Box 1767
    Jeferson City, MO 65102-1767

## Montana

Updated: 03-15-2022

Registration Deadline — Regular registration closes 30 days before the election. A prospective elector may register or change the existing elector's voter information after the close of regular registration and be eligible to vote in the election if the election administrator in the county where the elector resides receives and verifies the elector's voter registration information prior to noon the day before the election.

6.ID Number. You must provide your Montana (MT) Driver's License number, MT Identification (ID) card number, or the last 4 digits of your Social Security number (SSN). If you are unable to provide the preceding forms of identification, you can provide a United States passport, Montana tribal ID card, military ID card, or Montana concealed carry permit when you register; or submit a photo identification, including, but not limited to, a school district or postsecondary education photo identification with your name on it, and a current utility bill, bank statement, paycheck, government check, or other government document that shows your name and current address. *For information on voter registration ID please visit https://sosmt.gov/voter-id/voter-registration-id-options/
7.Choice of Party. Montana does not require party registration to participate in any election. 8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Montana you must:
• be a citizen of the United States
• be at least 18 years old on or before the election
• be a resident of Montana and of the county in which you want to vote for at least 30 days before the next election
• not be in a penal institution for a felony conviction
• not currently be determined by a court to be of unsound mind
• meet these qualifications by the next election day if you do not currently meet them

Mailing address:
Mail your completed registration form to your local county election

office. The county contact information can be found on the Montana Secretary of State's website: Election-Officials-Master-Email-List (sosmt.gov). If you have difficulty finding your county election office, contact the Montana Secretary of State Elections and Voter Services Division for assistance at (888) 884-8683 or (406) 444-9608, or email soselections@mt.gov. (Note: Registrations may be sent to the Montana Secretary of State's Office, however, to avoid potential delays, we recommend you return your completed voter registration application directly to your county elections office.)

Secretary of State's Office
P.O. Box 202801
Helena, MT 59620-2801

## Nebraska

Updated: 10-17-2024

Registration Deadline — The third Friday before the election (or delivered by 6 p.m. on the second Friday before the election).

6. ID Number. You must provide your Nebraska driver's license number. If you do not have a Nebraska driver's license number then you must list the last four digits of your social security number.
7. Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Nebraska you must:
• be a citizen of the United States
• be a resident of Nebraska

• be at least 18 years of age or will be 18 years of age on or before the first Tuesday after the first Monday of November
• not have been convicted of a felony, or if convicted, you have completed your sentence for the felony, including any parole term
• not have been officially found to be mentally incompetent

Mailing address:
Nebraska Secretary of State
Suite 2300, State Capitol Bldg.
Lincoln, NE 68509-4608

## Nevada

Updated: 05-01-2020

Registration Deadline — The deadline for mail-in or in-person voter registration is the fourth Tuesday before any primary or general election. This is the date by which: (1) a mail-in voter registration application must be postmarked; or (2) a person must appear in person at the Office of the County Clerk/ Registrar of Voters. The deadline for online voter registration at www.RegisterToVoteNV.gov is the Tuesday preceding the primary or general election. Eligible voters who miss the voter registration deadlines can register to vote in person at the polling place either during early voting or on election day.

6. ID Number. You must supply a Nevada driver's license number or Nevada ID card number if you have been issued one by the DMV. If you do not have a valid Nevada driver's license or Nevada ID card, you must supply the last four digits of your Social Security Number. If you do not have a valid Neva-

da driver's license or Nevada ID card or a Social Security Number, please contact your County Clerk/ Registrar of Voters to be assigned a unique identifier.
7. Choice of Party. You must register with a major political party if you want to take part in that party's primary election, caucus, or convention. If you register with a minor political party or as a nonpartisan, you will receive a nonpartisan ballot for the primary election.
8. Race or Ethnic Group. Leave blank.
9. Signature. To register in Nevada you must:
• Be a citizen of the United States;
• Have attained the age of 18 years on the date of the next election;
• Have continuously resided in the State of Nevada, in your county, at least 30 days and in your precinct at least 10 days before the next election;
• Not be currently serving a term of imprisonment for a felony conviction;
• Not be determined by a court of law to be mentally incompetent; and
• Claim no other place as your legal residence.

Preregistration for 17 Year Olds — A person who is 17 years of age or older but less than 18 years of age and meets all other qualifications to vote in Nevada can preregister to vote using any of the means available for a person to register to vote. A person who is preregistered to vote automatically becomes a registered voter on his or her 18th birthday.

Felony Convictions — Any Nevada resident who is convicted

of a felony is immediately restored the right to vote upon the individual's release from prison. There is no waiting period or action required by the individual. The restoration of voting rights is automatic and immediate upon the individual's release from prison, regardless of the category of felony committed or whether the individual is still on either parole or probation. More information regarding the restoration of voting rights can be found on the Nevada Secretary of State's website at:

www.nvsos.gov.

Mailing address:
Secretary of State Elections Division
101 North Carson Street, Suite 3
Carson City, NV 89701-4786

Voter registration applications may be returned to the Secretary of State's office at the address above, but to avoid possible delays, you are advised to return your completed voter registration application directly to your local county election official.

Local county addresses: To meet registration deadlines, especially during the two weeks before the mail-in voter registration deadline, you should return completed voter registration applications to your respective County Clerk/ Registrar of Voters. A complete list of County Clerks and Registrars of Voters is available on the Nevada Secretary of State's website: www.nvsos.gov.

## New Hampshire

Updated: 03-01-2006

Registration Deadline — New Hampshire town and city clerks will accept this application only as a request for their own absentee voter mail-in registration form, which must be received by your city or town clerk by 10 days before the election. You need to fill in only Box 1 and Box 2 or 3.

The application should be mailed to your town or city clerk at your zip code. These addresses are listed on the Secretary of State web site at www.state.nh.us/sos/clerks.htm

It should be mailed in plenty of time for your town or city clerk to mail you their own form and for you to return that form to them by 10 days before the election.

## New Jersey

Updated: 03-28-2008

Registration Deadline — 21 days before the election.

6. ID Number. The last four digits of your Social Security number OR your New Jersey Driver's License number is required for voter registration. If you do not possess either of these identifications, please write "NONE" on the form. The State will assign a number that will serve to identify you for voter registration purposes.

7. Choice of Party. New Jersey's voter registration form does not provide a check-of for political party affiliation. A newly registered voter or voter who has never voted in a political party primary election can declare party affiliation at the polling place on the day of a primary election. In New Jersey, a primary election is only held for the Democratic and Republican parties. A voter may also file a political party declaration form to become a member of a political party. If a declared voter wished to change party affiliation he or she must file a declaration form 50 days before the primary election, in order to vote.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in New Jersey you must:
• be a citizen of the United States
• be at least 18 years of age by the time of the next election
• be a resident of this State and county at your address at least 30 days before the next election
• not be serving a sentence or on parole or probation as the result of a conviction of any indictable offense under the laws of this or another state or of the United States

Mailing address:
New Jersey Department of Law and Public Safety Division of Elections
PO BOX 304
Trenton, NJ 08625-0304

## New Mexico

Updated: 10-02-2024

Registration Deadline — 28 days before the election.

# State Instructions

6.ID Number. You must provide a driver's license or state identification number issued by the motor vehicle division of the taxation and revenue department or the last four digits of your social security number. Computerized listings of limited voter registration information (without social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or, if prohibited by voters, voters' telephone numbers) are available to the general public, and are furnished upon request to incumbent election officeholders, candidates, political parties, courts and non-profit organizations promoting voter participation and registration, for political purposes only.

7.Choice of Party. You must register with a party if you want to take part in that party's primary election, caucus, or convention.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in New Mexico you must:
• be a citizen of the United States
• be a resident of the State of New Mexico
• be 18 years of age at the time of the next election
• not currently be incarcerated as a result of a felony conviction.

Mailing address:
   Bureau of Elections
   325 Don Gaspar, Suite 300
   Santa Fe, NM 87503

## New York

Updated: 01-12-2023

Registration Deadline — 10 days before the election.

6.ID Number. Federal law requires that you provide your driver's license number. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you have neither, please write "NONE" on the form. A unique identifying number will be assigned to you by your State.

7.Choice of Party. You must enroll with a party if you want to vote in that party's primary election or caucus.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in New York you must:
• be a citizen of the United States
• be a resident of the county, or of the City of New York, at least 30 days before an election
• be 18 years old (you may pre-register at 16 or 17 but cannot vote until you are 18)
• not be in prison for a felony conviction
• not currently be judged incompetent by order of a court of competent judicial authority
• not claim the right to vote elsewhere

Mailing address:
   NYS Board of Elections
   40 North Pearl Street, Suite 5
   Albany, NY 12207-2729

## North Carolina

Updated: 08-22-2024

Registration Deadline — Postmarked 25 days before the election or received in the elections office or designated voter registration agency site by 5:00 p.m. 25 days before the election.

6. ID Number. Provide your North Carolina driver's license number, or North Carolina Department of Motor Vehicles ID number. If you do not have a driver's license, then list the last four digits of your social security number. If you do not have any of these identification numbers, please write "NONE" on the form. A unique identifying number will be assigned to you for voter registration purposes.

7. Choice of Party. You may choose to affiliate with any political party recognized in North Carolina. If you indicate a political party that is not a qualified party, or indicate no party, you will be listed as "Unaffiliated." If you are unaffiliated, you may choose to vote in any party's primary.

8. Race or Ethnic Group. You are required to fill in this box. However, your application will not be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9. Signature. To register in North Carolina you must:
• be a citizen of the United States
• be a resident of North Carolina and the county in which you live for at least 30 days prior to the election
• be at least 16 years of age and will be 18 years of age by the day of the next general election
• not be currently serving a felony sentence (including any probation, post-release supervision, or parole)

Mailing address:
State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255

## North Dakota

Updated: 03-01-2006

North Dakota does not have voter registration.

## Ohio

Updated: 09-16-2024

Registration Deadline — 30 days before the election.

6.ID Number. Your social security number is requested. Providing this number is voluntary. This information allows the Board of Elections to verify your registration if necessary (O.R.C. 3503.14). [Federal law requires that you provide your driver's license number to register to vote. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you don't have either number you will have to write "NONE" on the form and the State will assign you a number.]
7.Choice of Party. You do not register with a party if you want to take part in that party's primary election. Party affiliation is established by voting at a primary election.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Ohio you must:
• be a citizen of the United States
• be a resident of Ohio
• be 18 years old on or before election day. If you will be 18 on or before the day of the general election, you may vote in the primary election for candidates only.

• not be convicted of a felony and currently incarcerated
• not be found incompetent by a court for purposes of voting
Mailing address:
Office of the Ohio Secretary of State
180 S Civic Center Dr.
Columbus, Ohio 43215

## Oklahoma

Updated: 03-15-2022

Registration Deadline — 25 days before the election.

6.ID Number. You must provide either your valid Oklahoma driver's license number, state identification card number, or the last four digits of your Social Security number.
7.Choice of Party. You must register with a party if you want to take part in that party's primary election. A current list of recognized political parties in Oklahoma is available on the Oklahoma State Election Board website. Registered voters with no party affiliation may be allowed by recognized parties to participate in primary elections at the party's discretion. You will find a list of recognized political parties and a list of parties that allow voters with no party affiliation to vote in primaries at: https://oklahoma.gov/elections/voter-registration/political-party-info.html.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register to vote in Oklahoma you must:
• You must be a citizen of the United States and a resident of the State of Oklahoma.
• You must be 18 years old on or before the date of the next election. You may pre-register if you are at least 17½ years old,

but your voter registration will not be activated until you are 18 years old.

• If convicted of a felony, you must have fully served your sentence of court-mandated calendar days, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court.
• You must not now be under judgment as an incapacitated person, or a partially incapacitated person prohibited from registering to vote.
• Applications must be signed and dated by the applicant. The signature must be the original, handwritten autograph or mark of the applicant. No facsimile, reproduction, typewritten or other substitute signature, autograph or mark will be valid. It is against the law to sign an Oklahoma Voter Registration Application on behalf of another person.

Mailing address:
Oklahoma State Election Board
Box 528800
Oklahoma City, OK 73152-8800

You can also complete a voter registration application online, using the OK Voter Portal "wizard":
https://okvoterportal.okelections.us/Home/RegWizard
(Applications must be printed, signed, and mailed or hand-delivered to your county or State Election Board to complete the process.)

## Oregon

Updated: 08-05-2024

Registration Deadline — 21 days before the election.

6.ID Number. To be eligible to vote in Oregon elections, you must provide a valid Oregon

# State Instructions

License, Permit or ID number. If you do not have an Oregon-issued ID, then you will need to provide at least the last four digits of your social security number. If you have neither, you will need to write "NONE" on the form.

7.Choice of Party. In many cases, you must register with a party if you want to take part in that party's primary election. If you are not a member of a party or this space is left blank, you will be registered as a nonaffiliated voter.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Oregon you must be:
• a citizen of the United States
• a resident of Oregon
• and at least 16 years of age when registering. If you are not yet 18, you will not receive a ballot until an election occurs on or after your 18th birthday.

Mailing address:
Oregon Elections Division
Public Service Building
Suite 126
255 Capitol St. NE
Salem, OR 97310

Register or make changes to your registration online —
www.oregonvotes.gov.

## Pennsylvania

Updated: 05-01-2020

Registration Deadline — 15 days before an election or primary.

6.ID Number. You must supply a Driver's License Number, if you have one. If you do not have a Driver's License Number, you must supply the last four digits of your Social Security Number. If you do

not have either form of ID, please write "NONE" in the box.

7. Choice of Party. You must register with a major party if you want to take part in that party's primary election.

8.Race or Ethnic Group. You are requested to fill in this box. See the list of choices under the Application Instructions for Box 8 (on page 2).

9.Signature. To register in Pennsylvania you must:

• be a citizen of the United States at least one month before the next election
• be a resident of Pennsylvania and your election district at least 30 days before the election
• be at least 18 years of age on the day of the next election

Mailing address:
Office of the Secretary of the Commonwealth 210 North Office Bldg. Harrisburg, PA 17120-0029

You may also register online at register.votespa.com.

## Rhode Island

Updated: 09-03-2019

Registration Deadline — 30 days before the election.

6.ID Number. The applicant shall be required to provide their Rhode Island driver's license or State ID number if the applicant has been issued a current and valid Rhode Island driver's license or State ID. In the case of an applicant who has not been issued a current and valid driver's license or State ID, they must provide the last four (4) digits of their social security number. An applicant, who has neither, will

be assigned a unique identifying number by the State of Rhode Island.

7.Choice of Party. In Rhode Island, a person must register with a party if they wish to take part in that party's primary election. A person who fails to register with a party at the time of registration may, if they choose, register with a party on the day of that party's primary and take part in that party's primary election. If a person does not register with a party, they can still vote in general elections and nonpartisan primary elections.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Rhode Island you must:
• be a citizen of the United States
• be a resident of Rhode Island
• be at least 16 years of age (you must be 18 years old to vote)
• not be currently incarcerated in a correctional facility due to a felony conviction
• not have been lawfully judged to be mentally incompetent by a court of law

Mailing address:
Rhode Island State Board of Elections
50 Branch Ave.
Providence, RI 02904-2790

## South Carolina

Updated: 01-05-2021

Registration Deadline — 30 days before the election.

6.ID Number. You must provide at least the last four digits of your social security number. You may provide your full social security number on a voluntary basis. Social security number does not

appear on any report produced by the State Election Commission nor is it released to any unauthorized individual. (South Carolina Title 7-5-170)

7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8.Race or Ethnic Group. You are required to fill in this box. Your application may be rejected if you fail to do so. See the list of choices under the Application Instructions for Box 8 (on page 2).

9.Signature. To register in South Carolina you must:
• be a citizen of the United States
• be at least 18 years old on or before the next election
• be a resident of South Carolina, your county and precinct
• not be confined in any public prison resulting from a conviction of a crime
• never have been convicted of a felony or offense against the election laws, or if previously convicted, have served your entire sentence, including probation or parole, or have received a pardon for the conviction
• not be under a court order declaring you mentally incompetent
• claim the address on the application as your only legal place of residence and claim no other place as your legal residence

Mailing address:
   State Election Commission
   P.O. Box 5987
   Columbia, SC 29250-5987

## South Dakota

Updated: 10-10-2021

Registration Deadline — Received 15 days before the election.

6.ID Number. Any person registering to vote shall provide the person's valid South Dakota driver license number or a South Dakota nondriver identification number on the voter registration form. If a person does not have a valid South Dakota driver license or a South Dakota nondriver identification number, the person shall provide the last four digits of the person's social security number on the voter registration form. If a person does not have a valid South Dakota driver license, a South Dakota nondriver identification number, or a social security number, the person may only register at the county auditor's Office and shall sign a statement verifying the fact that the person does not have a valid South Dakota driver license, a South Dakota nondriver identification number, or a social security number. South Dakota Codified Law 12-4-5.4

7.Choice of Party. If you are currently registered to vote and you leave the choice of party field blank, you will remain registered with your current party affiliation. If you are not currently registered to vote and you leave the choice of party field blank, you will be entered as an independent/no party affiliation voter, which is not a political party in South Dakota. South Dakota Codified Law 12-4-15,12-6-26

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in South Dakota you must:
• Be a United States citizen
• Reside in South Dakota
• Be at least 18 years old on or before the next election
• Not currently serving a sentence for a felony conviction which included imprisonment, served or suspended, in an adult penitentiary system
• Not be judged mentally incompetent by a court of law
South Dakota Codified Law 12-4-6,12-4-8,l2-l-9,l2-l-4,12-4-18, South Dakota Constitution, Article VII, Section 2

Mailing address:
   Elections, Secretary of State
   500 E. Capitol
   Pierre, SD 57501-5070

## Tennessee

Updated: 05-01-2020

Registration Deadline — 30 days before the election.

6.ID Number. Your full social security number is required. Social security number, if any, is required for purposes of identification and to avoid duplicate registration (TCA 2.2.116).

7.Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.

8. Race or Ethnic Group. Optional.

9.Signature. To register in Tennessee you must:
• be a citizen of the United States
• be a resident of Tennessee
• be at least 18 years old on or before the next election

• not have been convicted of a felony, but if convicted, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction. For more information about this process, call 877-850-4959 or visit https://sos.tn.gov/restoration. If your conviction has been expunged, you are not considered to have a felony con-viction.
• not be adjudicated incompetent by a court of competent jurisdiction (or have been restored to legal capacity)

Mailing address:
Coordinator of Elections
Tennessee Tower, Seventh Floor
312 Rosa L. Parks Ave.
Nashville, TN 37243-1102

## Texas

Updated: 11-15-2018

Registration Deadline — 30 days before the election.

6.ID Number. You must provide your driver's license number to register to vote. If you do not have a driver's license then you will have to provide at least the last four digits of your social security number. If you have neither, please write "NONE" on the form. A unique identifying number will instead be assigned to you by your State.
7. Choice of Party. You do not have to register with a party if you want to take part in that party's primary election, caucus, or convention.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Texas you must:

• be a resident of the county in which the application for registration is made
• be at least 17 years and 10 months old (you must be 18 to vote)
• not be finally convicted of a felony, or if a convicted felon, you must have fully discharged your punishment, including any incarceration, parole, or supervision, period of probation or be pardoned.
• have not been declared mentally incompetent by fnal judgment of a court of law

Mailing address:
Office of the Secretary of State
Elections Division
P.O. Box 12060
Austin, TX 78711-2060

## Utah

Updated: 09-19-2019

Registration Deadline —
Registration deadlines vary:
• Mail: registration forms must be postmarked or otherwise marked as received by the Post Office 30 days before the election.
• In-person: registration forms may be dropped of at the county clerk's Office 7 days before the election.
• Online: registrations must be submitted 7 days before the election. Requires a valid Utah driver license or valid Utah ID.
• Same-Day: voters may register at the polls during the early voting period or on Election Day by filling out a provisional ballot.

6.ID Number. Your completed voter registration form must contain one of the following: a Utah Driver License number, a Utah State Identification number, or the last four digits of your

Social Security number. If you do not have a Utah Driver License or a Utah State Identification card, please write "None" in the designated space and fill in the last four digits of your Social Security number.
7.Choice of Party. Declaring a party is not required in order to register to vote. However, Utah's election law allows each political party to choose whom it will allow to vote in its primary election. If you do not affiliate with a party, you may be restricted from voting in the primary.
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in Utah you must:
• be a citizen of the United States
• have resided in Utah for 30 days immediately before the next election
• be at least 18 years old on or before the next election (individuals who are 16 and 17 years of age may pre-register to vote; if a 17 year old will be 18 years of age on or before the upcoming general election, they may pre-register and vote in the primary election)
• not be a convicted felon currently incarcerated for commission of a felony
• not be convicted of treason or crime against the elective franchise, unless restored to civil rights
• not be found to be mentally incompetent by a court of law
• currently resides within the voting district or precinct in which you register to vote

Mailing address:
Office of the Lieutenant
Governor
P.O. Box 142325
Salt Lake City, UT 84114

JA 90

# State Instructions

## Vermont

Updated: 09-19-2019

Registration Deadline — Your mailed registration must be received in the clerk's Office on the last day the clerk has hours before the election. Vermont has Election day voter registration at the polls as well as online voter registration. To register online visit – https://olvr.sec.state.vt.us.

6.ID Number. You must provide your Vermont Driver's license number, or if none, the last 4 digits of your Social Security number. If you do not have a Vermont Driver's license or a Social Security number, please write "NONE" on the form. The Secretary of State's Office will assign you a unique identifying number.

7.Choice of Party. Vermont does not require party registration to participate in any election.

8.Race or Ethnic Group. Not required.

9.Signature. To register in Vermont you must:

• be a citizen of the United States
• be a resident of Vermont
• be 18 years of age on or before election day
• have taken the following Oath: You solemnly swear (or affirm) that whenever you give your vote or suffrage, touching any matter that concerns the state of Vermont, you will do it so as in your conscience you shall judge will most conduce to the best good of the same, as established by the Constitution, without fear or favor of any person [Voter's Oath, Vermont Constitution, Chapter II, Section 42]

By signing in Box 9, you are attesting that you have sworn or affirmed the Vermont voter's oath as printed above.

Mailing address:
Office of the Secretary of State
Elections Division
128 State Street
Montpelier, VT 05633-1101

## Virginia

Updated: 09-19-2019

Registration Deadline — The application must be delivered or postmarked 22 days before the election.

6.ID Number. Your full social security number is required. Your social security number will appear on reports produced only for official use by voter registration and election officials and, for jury selection purposes, by courts. Article II, §2, Constitution of Virginia (1971).

7.Choice of Party. Leave blank.

8.Race or Ethnic Group. Leave blank.

9.Signature. To register in Virginia you must:

• be a citizen of the United States
• be a resident of Virginia and of the precinct in which you want to vote
• be 18 years old by the next May or November general election
• not have been convicted of a felony, or have had your civil rights restored
• not currently be declared mentally incompetent by a court of law

Mailing address:
Virginia State Board of Elections
1100 Bank Street, 1st floor
Richmond, VA 23219

## Washington

Updated: 01-17-2025

Registration Deadline — Online and mail registration forms must be received by an elections official no later than 8 days before the election. Register in person any time during business hours and before 8:00 p.m. on Election Day.

6. ID Number. You must provide your Washington driver's license or ID card number. If you do not have a Washington driver's license or ID card, you must provide the last four digits of your Social Security Number. Failure to provide this information may prevent your registration from being processed.

7. Choice of Party. You are not required to designate your party affiliation to register in Washington.

8. Race or Ethnic Group. Leave blank.

9. Signature. To register in Washington you must:

• be a citizen of the United States
• be a legal resident of Washington State
• be at least 18 years old by Election Day
• If you were convicted of a felony in Washington State, another state, or in federal court, your right to vote will be restored automatically as long as you are not currently serving a sentence of total confinement in prison. You may re-register.
• 16- and 17-year-olds can sign up as Future Voters and be automatically registered to vote when they qualify

Mailing address:
Secretary of State  Elections Division  P.O. Box 40229  Olympia, WA 98504-0229

## West Virginia

Updated: 05-24-2024

Registration Deadline — 21 days before the election.

6.ID Number. Enter your driver's license number. If you do not have a driver's license number, enter the last four numbers of your social security number. If you do not have a driver's license number or a social security number, an identification number will be assigned to you.
7.Choice of Party. You must  register with a party if you want to take part in that party's primary election, caucus, or convention
(unless you request the ballot of a party which allows independents to vote)
8.Race or Ethnic Group. Leave blank.
9.Signature. To register in West Virginia you must:
• be a citizen of the United States;
• live in West Virginia at the above address;
• be 18 years old (or be 17 years old and turning 18 before the general election);
• not be under conviction, probation, or parole for a felony, treason or election bribery;
• not have been judged "mentally incompetent" in a court of competent jurisdiction; and
• attest that the applicant meets each eligibility requirement.

Mailing address:
Secretary of State
Building 1, Suite 157-K
1900 Kanawha Blvd. East
Charleston, WV 25305-0770

## Wisconsin

Updated: 11-24-2023

Registration Deadline —  Wisconsin municipal clerks will accept this application only as a request for their own absentee voter mail-in registration form or for the purposes of the clerk directing that voter to the state's online voter registration system at https://my-vote.wi.gov/en-us/. You need to fill in only Box 1 and Box 2 or 3 or go directly to the MyVote website.

## Wyoming

Updated: 03-01-2006

Wyoming by law, cannot accept this form unless State law is changed.

The public reporting burden for this collection of information, OMB Control No. 3265-0015, is estimated to average 7 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to

U.S. Election Assistance Commission, 633 3rd Street NW, Suite 200, Washington, DC 20001, Attn: National Mail Voter Registration Form.

Respondents should be aware that not-withstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

# Voter Registration and Absentee Ballot Request

## Federal Post Card Application (FPCA)

**This form is for absent Uniformed Service members, their families, and citizens residing outside the United States. It is used to register to vote, request an absentee ballot, and update your contact information. See your state's guidelines at FVAP.gov.**

Print clearly in blue or black ink, please see back for instructions.

## 1. Who are you? Pick one.

I request an absentee ballot for all elections in which I am eligible to vote AND:

☐ I am on active duty in the Uniformed Services or Merchant Marine **-OR-** ☐ I am an eligible spouse or dependent.
☐ I am a U.S. citizen living outside the country, and I intend to return.
☐ I am a U.S. citizen living outside the country, and my intent to return is uncertain.
☐ I am a U.S. citizen living outside the country, I have never lived in the United States.

| Last name | | Suffix (Jr., II) | | ☐ Mr.  ☐ Miss |
| --- | --- | --- | --- | --- |
| | | | | ☐ Mrs.  ☐ Ms. |
| First name | | Previous names (if applicable) | | |
| Middle name | | Birth date (MM/DD/YYYY) | | |
| Social Security Number | | Driver's license or State ID# | | |

## 2. What is your address in the U.S. state or territory where you are registering to vote and requesting an absentee ballot?

Your voting materials will not be sent to this address.  See instructions on the other side of form.

| Street address | | Apt # | |
| --- | --- | --- | --- |
| City, town, village | | State | |
| County | | ZIP | |

## 3. Where are you now?  You MUST give your CURRENT address to receive your voting materials.

| Your mailing address. (Different from above) | Your mail forwarding address. (If different from mailing address) |
| --- | --- |
| | |

## 4. What is your contact information? This is so election officials can reach you about your request.

Provide the country code and area code with your phone and fax number. Do not use a Defense Switched Network (DSN) number.

| Email: | | Phone: | |
| --- | --- | --- | --- |
| Alternate email: | | Fax: | |

## 5. What are your preferences for upcoming elections?

A. How do you want to receive voting materials from your election office? (Select One)
☐ Mail
☐ Email or online
☐ Fax

B. What is your political party for primary elections?

## 6. What additional information must you provide?

Puerto Rico and Vermont require more information, see back for instructions. *Additional state guidelines* may be found at FVAP.gov. You may also use this space to clarify your voter information.

## 7. You must read and sign this statement.

**I swear or affirm, under penalty of perjury, that:**

- The information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury.
- I am a U.S. citizen, at least 18 years of age (or will be by the day of the election), eligible to vote in the requested jurisdiction, and
- I am not disqualified to vote due to having been convicted of a felony or other disqualifying offense, nor have I been adjudicated mentally incompetent; or if so, my voting rights have been reinstated; and
- I am not registering, requesting a ballot, or voting in any other jurisdiction in the United States, except the jurisdiction cited in this voting form.

**Sign here** X _____

**Today's date** (MM/DD/YYYY)

This information is for official use only. Any unauthorized release may be punishable by law. Previous editions are obsolete.  Standard Form 76 (Rev.01-2023), OMB No. 0704-0503, NSN 7540-00-643-5053

JA 93

# You can vote wherever you are.

## 1. Fill out your form completely and accurately.

- Your U.S. address is used to determine where you are eligible to vote absentee. For military voters, it is usually your last address in your state of legal residence. For overseas citizens, it is usually the last place you lived before moving overseas. You do not need to have any current ties with this address. DO NOT write a PO Box # in section 2.

- Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. New Mexico, Tennessee, and Virginia require a full SSN.

- If you cannot receive mail at your current mailing address, please specify a mail forwarding address.

- Many states require you to specify a political party to vote in primary elections. This information may be used to register you with a party.

- **Section 6 Requirements:** If your voting residence is Vermont, you must acknowledge the following by writing in section 6: "I swear or affirm that I have taken the Vermont Voter's Oath." If your voting residence is in Puerto Rico, you must list your mother's and father's first name.

- We recommend that you complete and submit this form every year while you are an absentee voter.

## 2. Remember to sign this form!

## 3. Return this form to your election official. You can find their contact information at FVAP.gov.

- Remove the adhesive liner from the top and sides. Fold and seal tightly. If you printed the form, fold it and seal it in an envelope.

- All states accept this form by mail and many states accept this form by email and fax. See your state's guidelines at FVAP.gov.

## Agency Disclosure Statement

The public reporting burden for this collection of information, OMB Control Number 0704-0503, is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or burden reduction suggestions to the Department of Defense, Washington Headquarters Services, at whs.mc-alex.esd.mbx.dd-dod-information-collections@mail.mil. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. DO NOT SUBMIT YOUR FORM TO THE E-MAIL ADDRESS ABOVE.

## Privacy Advisory

When completed, this form contains personally identifiable information and is protected by the Privacy Act of 1974, as amended.

**Questions?**
**Email: vote@fvap.gov**



**To**
(Fill in the address of your election office.
The address can be found online at FVAP.gov.)

NO POSTAGE NECESSARY IN THE U.S. MAIL – DMM 703.8.0

OFFICIAL ABSENTEE BALLOTING MATERIAL – FIRST CLASS MAIL

International airmail postage is required if not mailed using the U.S. Postal Service, APO/FPO/DPO system, or diplomatic pouch.

**From**
(Your name and mailing address)

PAR AVION



U.S. Postage Paid
39 USC 3406

JA 94

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>*Defendants.* | No. 1:25-cv-10810-DJC |

## DECLARATION OF ANNE P. BELLOWS

I, Anne P. Bellows, declare as follows:

1.       I am an attorney licensed to practice before all the courts of the State of California

and admitted *pro hac vice* in this matter.  ECF No. 8.  I am a Deputy Attorney General employed

by the Office of the Attorney General for the State of California, counsel of record for Plaintiff

State of California in this matter.  I submit this declaration in support of Plaintiff States' motion

for preliminary injunction, filed herewith.

2.     Attached hereto as Exhibit A is a true and correct copy of excerpts of the certified

transcript of the preliminary injunction hearing held by the U.S. District Court for the District of

Columbia on April 17, 2024 in *League of United Latin Am. Citizens, et al. v. Exec. Office of the*

*President, et al*., Case No. 25-0946.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.  Executed on April 29, 2025, in Oakland, California.


By:     */s/     Anne P. Bellows*

Anne P. Bellows

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LEAGUE OF UNITED LATIN          .
AMERICAN CITIZENS, et al.,      .
                                .   CA No. 25-0946 (CKK)
          Plaintiffs,           .
                                .
     v.                         .
                                .
EXECUTIVE OFFICE OF THE         .   Washington, D.C.
PRESIDENT, et al.,              .   Thursday, April 17, 2025
                                .   1:37 p.m.
          Defendants.           .
. . . . . . . . . . . . . . . .


PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For LULAC Plaintiffs:           DANIELLE M. LANG, ESQ.
                                Campaign Legal Center
                                1101 14th Street NW
                                Washington, DC 20005

For Nonpartisan                 SOPHIA L. LANKIN, ESQ.
Plaintiffs:                     American Civil Liberties
                                Union Foundation
                                125 Broad Street
                                New York, NY 10004

For Democratic Party            ARIA C. BRANCH, ESQ.
Plaintiffs:                     Elias Law Group LLP
                                250 Massachusetts Avenue NW
                                Washington, DC 20001

For Defendants:                 MICHAEL GATES, ESQ.
                                U.S. Department of Justice
                                950 Pennsylvania Avenue NW
                                Washington, DC 20530

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue NW
                                Washington, DC 20001

```
 1      then I'll let you explain.  Yes or no?
 2            MR. GATES:  Okay.  It is appropriate in this
 3      circumstance --
 4            THE COURT:  Okay.
 5            MR. GATES:  -- because the documentary proof is binary.
 6      You're either going to be required to provide it or not, and
 7      it has been decided by the executive order to provide the
 8      documentary --
 9            THE COURT:  I understand.
10            MR. GATES:  -- proof of citizenship, which is binary.
11            THE COURT:  So let me understand it.  As you are
12      describing it, it would appear that the president has set out
13      an executive order, what it is that he has ordered, and he
14      expects that the EAC is going to adopt it.  They're going to
15      go through the notice and comment.  Doesn't matter what's
16      going to come back because the end result is going to be what
17      the president wants.  Is that what you're saying?
18            MR. GATES:  No.  If I can explain, Your Honor.
19            THE COURT:  Okay.
20            MR. GATES:  The issue of whether there's documentary
21      proof is binary.  The way in which the language on the form,
22      which I have a copy before me, is manifest.  The language, the
23      words chosen, the way the form is designed, all of that is a
24      compilation of input from all the stakeholders.
25            THE COURT:  I understand.
```

1         MR. GATES:  So to answer your question, Your Honor,

2    that's why they go through the process, to get all of this

3    input.

4         THE COURT:  And that's my question.  You're not

5    answering my question.  My question is, they go through all of

6    this, the stakeholders and everybody else, and then they come

7    back and they -- let's say they decide they disagree with the

8    president on 2(a).  So would the expectation be that EAC would

9    say, no, we're not going to do that, or would the expectation

10   be, because of the executive order, that no matter what

11   process they went through and whoever said what, the end

12   result would be what the president wants?

13        MR. GATES:  Well, it's going to be that there's going

14   to be documentary proof because it's contemplated by the

15   executive order, and proof of citizenship is also contemplated

16   by Congress in about a dozen different statutes.  The

17   citizenship requirement is absolutely required by Congress by

18   legislation in order to vote.  You have to --

19        THE COURT:  Right.  But the question is, does it have

20   to be on the form, and do they have to provide proof of it?

21        MR. GATES:  The question for voter eligibility is

22   whether you're a citizen.

23        THE COURT:  Of course.  I'm not disputing that,

24   Mr. Gates.

25        MR. GATES:  And the only thing the president has

1    ordered is a mechanism to prove what the statutes passed

2    by Congress require.

3        THE COURT:  The point is, Mr. Gates, at this point the

4    expectation is that, yes, you have to be a citizen in order to

5    vote.  We all agree on that.

6        MR. GATES:  That's the law.

7        THE COURT:  So the question is whether the additional

8    provision in 2(a) should be added or not.  So you're ducking

9    my question.

10        MR. GATES:  I don't mean to.

11        THE COURT:  No, you are, sir.

12        MR. GATES:  I didn't intend to.

13        THE COURT:  You may not intend it, but you are.  So let

14    me just put it this way again, and then we'll move on:  Your

15    view is that what the president is requiring in 2(a) is legal.

16        MR. GATES:  Yes.

17        THE COURT:  Okay.  That's fine.  And you also agree

18    that they're going to go through the process of notice and

19    comment, they're going to be adding all these extra

20    consultations, etc.

21        MR. GATES:  Yes.

22        THE COURT:  And let's assume, at the end of what

23    they're required to do, they disagree with what the president

24    wants added to the form.  Okay?  Let's assume that that

25    happens.  The question for you is whether, if the expectation

1    is that despite their conclusion -- you seem to have decided

2    they can't conclude anything else.  But let us assume that

3    actually they could conclude at the end that there isn't a

4    need for it, or for whatever reason.  Would the expectation

5    be from your argument that it wouldn't matter if they decided

6    that it didn't need to be there as the president wanted in

7    terms of the proof, EAC would still be required to do this

8    because the president has ordered it?  Is that your view?

9         MR. GATES:  Yes, and I'm not ducking --

10        THE COURT:  Okay.  You answered my question.

11        MR. GATES:  Can I please explain?  The executive order

12   is binding --

13        THE COURT:  No, no.  You've answered my question.  It

14   goes to -- if I could follow up with this.  So as a practical

15   matter, the president has decided that this 2(a), with the

16   requirements that are in 2(a), should be something that EAC

17   should adopt and that --

18        MR. GATES:  Proof of citizenship.

19        THE COURT:  Okay.  And EAC is expected to go through

20   the process that's set out by statute and otherwise, okay?

21   And the expectation on the president's part, because he's

22   ordered it, is that the end result will be that 2(a) will be

23   adopted by EAC even if EAC decides, after they go through all

24   of their process, that they do not think it's needed, required,

25   or whatever their reason is, they wouldn't put it in except

1    for the president's order.  So would you agree that that's

2    your position?

3         MR. GATES:  Yes, but we don't know what the form is

4    ultimately going to look like.

5         THE COURT:  I agree.  I'm putting it totally in a

6    hypothetical form.  I'm trying to figure out whether from

7    your perspective that the EAC is expected to adopt 2(c) no

8    matter what process they go through.

9         MR. GATES:  That's the directive --

10         THE COURT:  And I don't know what the answer is.

11         MR. GATES:  Well, that --

12         THE COURT:  Yes or no?  This is a yes or no.  You can

13    explain, but it's a yes-or-no question.

14         MR. GATES:  I think it's a yes because the documentary

15    proof is required, but what the form is going to look like or

16    what information's going to be presented on the form won't be

17    in final form until the APA process has been completed.

18         THE COURT:  Right.  But I'm just saying to you, you go

19    through the APA process, and at the bottom, at the end, the

20    EAC decides that they do not want to adopt 2(a).  But your

21    view, as I understand it, and the president's view is that he

22    has mandated that it be included, that 2(a) be adopted; and

23    therefore, they can go through the whole process, but the

24    bottom line is 2(a) is going to be adopted by EAC.  Am I

25    correct?  Yes or no.

1    in this regard.  Only the states have standing in a claim like

2    this on the one hand.  On the other hand, 33 states, including

3    Arizona, have already adopted election-day ballot receipt

4    deadline requirements.

5         THE COURT:  I understand that.  You're bringing extra

6    arguments out, but they're not really what I was trying to

7    get at.  So let me get on to the rest of it.  I don't disagree

8    with what you said, and that is in the pleadings.

9      What actions could the attorney general take consistent

10   with applicable law to enforce the election-day statutes?

11   Does that mean lawsuits?

12        MR. GATES:  Any number of actions, including criminal

13   actions.

14        THE COURT:  Okay.  So it's bringing lawsuits or taking

15   court actions.  Right?

16        MR. GATES:  Any number of actions.  You could send

17   letters to correct -- to encourage compliance --

18        THE COURT:  I'm asking if one of the things would be

19   lawsuits, in other words.

20        MR. GATES:  Well, you and I have to look into our

21   crystal ball and make a prediction.

22        THE COURT:  Okay.  Let me move on a little bit as to

23   why I was getting to this.  So let me talk about lawsuits.

24   The Voting Rights Section of the DOJ Civil Rights Division has

25   always been historically responsible for bringing lawsuits on

1    behalf of the United States relating to election law rights.

2    I believe that's correct, and you're not going to disagree

3    with that.

4        So I had one of my law clerks look into the many lawsuits

5    your office has brought over the years, and what we found was

6    that DOJ has sued states and local governments under the

7    Voting Rights Act, which has explicit civil enforcement

8    provisions; the NVRA, which has explicit civil enforcement

9    provisions; The Uniformed and Overseas Citizens Absentee

10   Voting Act, which has an explicit civil enforcement provision;

11   HAVA, which has an explicit civil enforcement provision; and

12   the Civil Rights Act of 1964, which has an explicit civil

13   enforcement provision.

14       What I did not see is a single case in which the U.S.

15   brought a suit to enforce the election-day statutes, neither

16   of which has a civil enforcement provision, explicit or

17   otherwise.  So with that in mind, what would be the United

18   States' cause of action to enforce the election-day statutes

19   against the state?

20          MR. GATES:  Again, we'd have to look into our crystal

21   ball to try to anticipate --

22          THE COURT:  I'm asking you --

23          MR. GATES:  She's got a whole host -- a whole host of

24   recourse.  Like I said --

25          THE COURT:  What I asked about is statutes.  We're

1    talking about lawsuits.  All of the lawsuits they brought

2    to enforce have all been under statutes that have a civil

3    enforcement provision.  The ones you're talking about, as far

4    as I can tell, don't have any civil enforcement.

5         MR. GATES:  And I'm not denying that she could continue

6    to bring civil action.  I'm not --

7         THE COURT:  I'm asking you -- what I was asking you

8    is under what statute you'd be bringing the suit to enforce

9    the election-day statutes.  The election-day statutes don't

10   have enforcement provisions, explicit or otherwise, while all

11   of these other statutes that have been brought to enforce the

12   various rights, etc., or to enforce making sure that the

13   voting is done correctly and according to the law have a

14   specific enforcement.  So is it just that the president has

15   decided to grant this authority, or is there something else

16   they would be relying on?

17        MR. GATES:  Well, the attorney general would only

18   operate under lawful authority and this EO.  This executive

19   order has not been implemented yet.  I don't know that the

20   attorney general at this point has given any thought to what

21   her recourse or what her options would be to enforce.

22        THE COURT:  Okay.  So at this point, although it's in

23   the executive order, we don't know how that would actually be

24   enforced.  Would that be fair?

25        MR. GATES:  Not with certainty, no, Your Honor.  We

1     that are already on the books, the ones that Congress has long

2     passed, whether it's the NVRA of 1993, HAVA of 2002, or the

3     election-day statutes and so on and so forth.

4         So there isn't much new.  If you peel back the layers and

5     look at those statutes in the executive order, he's literally

6     directing his agencies to enforce law, and he has to because

7     for really the past couple decades, those agencies really have

8     not been enforcing those laws, including the fact that how

9     many criminal prosecutions do we know of that have occurred

10    against illegal aliens who have voted or who attempted to vote

11    through fraudulent means, I don't know of any.  That's just

12    one easy example of where the federal agencies have not been

13    enforcing the law.

14        The executive order basically says, hey, federal agencies,

15    you're under my purview, this is the executive branch, go

16    enforce the law.  Go enforce the NVRA, go enforce HAVA, go

17    enforce election day, go enforce the criminal statutes on

18    elections and false statements in order to attempt to become

19    eligible to vote and so on and so forth.

20        It's the constitutional authority of Article II that I'm

21    relying on.  The executive order, as I said, doesn't create

22    really anything new.  It says, go out and enforce the laws.

23        And with that, Your Honor, I would respectfully request

24    this court deny the preliminary injunction.  It's early.

25    Even if, as you said, the president's directive to EAC is to

1    require documentary proof, that's not going to show up on

2    the form for at least 120 days anyway.  So even if it is a

3    foregone conclusion, Your Honor, it's not going to show up

4    on the form and nobody's going to be harmed.

5         Counsel for DNC came up and implored this court, people

6    are being harmed today, they're being harmed every day.

7    Those were her words.  Yet the executive order hasn't been

8    implemented, and the federal form won't be updated for many,

9    many, many months.  That alone undermines the need for a

10   preliminary injunction.

11        It's extraordinary means, on top of the fact that none of

12   these plaintiffs, none of the 16 plaintiffs have standing,

13   Article III standing.  Article III standing is extremely rigid

14   and narrow, and it doesn't allow for these plaintiffs to be

15   here in this action and request this relief.  And with that,

16   Your Honor, I will submit.

17        THE COURT:  All right.  Then I've given you your

18   opportunity.

19        The plaintiffs have requested that I rule before April 24,

20   which is the executive order's deadline for the EAC to take

21   certain steps.  Are you asking for any different timelines

22   here, or are we still with that timeline?  I'm going to take

23   it under advisement, and I'm going to get it out before that

24   if that's it.  I just want to make sure, in terms of the date,

25   the date.

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## <u>DECLARATION OF JANA M. LEAN</u>

I, Jana M. Lean, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.      I am the Chief of the Elections Division, employed in the Office of the California

Secretary of State. I work for Secretary of State Shirley N. Weber, Ph.D. and support her in her

official capacity as the Chief Elections Officer for the State of California. In my role, I assist her

in the execution and enforcement of all state and federal laws relating to elections.

3.      I have served as the Chief of the Elections Division at the California Secretary of

State's Office since 2010.

4.      As California's Chief Elections Officer, the Secretary of State is responsible for

executing and enforcing all state and federal law relating to elections within the state. *See* Cal.

Gov't Code § 12172.5(a); Cal. Elec. Code § 10. The Elections Division is responsible for

implementing the Secretary of State's responsibilities with regard to elections, including

enforcing laws, ensuring that elections are conducted efficiently, and providing technical

information, advice, and assistance to County Clerks and Registrars of Voters ("county elections

officials") and the public. However, the Secretary's role does not include actually conducting

elections, which is primarily administered at the county level in California.

5.      In my role as Chief of the Elections Division at the California Secretary of State's

Office, I am responsible for overseeing the work of the Elections Division. The Elections

Division oversees the administration of federal and state elections within the State of California,

including by providing guidance on election laws and procedures to county elections officials,

assisting National Voter Registration Act ("NVRA") agencies in California and county elections

officials in ensuring compliance with the NVRA, including the training of county elections

officials and NVRA agencies preparing state voter information guides, printing and distributing

voter registration cards, maintaining a statewide database of all registered voters, coordinating and compiling all statewide voter registration statistics, qualifying candidates for statewide and special elections, certifying the list of candidates for state office, tracking and certifying ballot initiatives, surveying all of California's 58 counties regarding ballot transmittal statistics on military and overseas voters and reporting those statistics to the United States Department of Justice, administering a Voter Assistance Hotline for the entire state, receiving Election Day complaints from the public and coordinating the resolution of those complaints with all of California's 58 counties, coordinating the tabulation of votes from each county, certifying the election results, issuing nomination and election certificates to all victorious statewide candidates, educating California citizens about their voting rights, and promoting voter registration and participation.

6.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable confusion and disruption in California election administration and will likely continue to do so.

7.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the federal mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC: (1) a United States passport; (2) an identification document that both complies with the requirements of the REAL ID Act of 2005 and indicates the applicant is a citizen of the United States; (3) an official military identification card that indicates the applicant is a citizen of the United States; or (4) a valid Federal or State government-issued

photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship. EO, § 2(a)(ii)(A)-(D). It is my understanding that California residents can be issued U.S. passports that comply with Section 2(a)(ii)(A), although I do not have knowledge of how many Californians possess valid U.S. passports. It is also my understanding that the California Department of Motor Vehicles does not issue identification documents that indicate U.S. citizenship. And I am not sure what documents would comply with Sections 2(a)(ii)(C) and (D). The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

8.      Since the EO was issued, the EAC has communicated to states that it is moving forward with implementing the EO. I personally participated in a call with the National Association of State Election Directors where the EAC's Chair and General Counsel communicated that the EAC would be proceeding with implementation of the EO.  On April 11, 2025, the EAC's Executive Director sent the Secretary of State a letter stating that it was seeking consultation on the development of the Federal Form by including a requirement for DPOC.  The letter directly references and quotes from the EO and states that the EO "instructs" that DPOC be required in the Federal Form. Attached as __**Exhibit A**__ is a true and correct copy of the April 11, 2025, letter sent to the California Secretary of State. Five days later, on April 16, 2025, the EAC's Executive Director sent an email to the Secretary of State's office indicating that consultation feedback was due by May 2, 2025.  Thus, it is my understanding that the EAC is moving to implement the DPOC requirement on the Federal Form based on the EO's directive.

9.     The provisions of the EO, including Section 2(a), have directly impacted the Elections Division.  After the EO was issued, it required immediate attention from me and my team to consider how the various provisions of the EO could even be implemented, including coordinating with county elections officials across California.  We have had to conduct an analysis of all the various ways the EO will impact elections from both the state and local perspective. In particular, I met with the head of our statewide voter registration database ("VoteCal") to discuss how it could be modified to securely account for and record DPOC. These efforts to address the directed changes and impacts of the EO will continue to divert significant time and attention from other critical election preparation and will likely increase as the EAC moves forward with implementing DPOC on the Federal Form.

10.     Within my own team, the EO has created an immediate need for answers to various questions related to its implementation, ranging from big-picture considerations to granular issues. For example, it is unclear: how DPOC would be accepted and reviewed by state and county elections officials; where images of DPOC would be scanned and uploaded (i.e., "recorded") to the statewide voter registration database and how much capacity the existing system has to handle this new information; whether county elections officials could keep copies of DPOC and input the necessary information into their election management systems and provide that information to VoteCal; what exact modifications would need to occur to VoteCal to ensure that sensitive DPOC-related information will be secure (as required under the EO); what modifications county elections officials will have to make to their election management systems to be able to record DPOC and then transmit that record to the statewide voter registration database; and how much will these changes cost, how long will it take to implement, and whether adequate staffing is available to implement the change. In other words, the EO raises a

host of practical challenges that would be a huge undertaking at the state and county level in California.

11.     Notably, the EO requires significant changes to California's voter registration database, i.e., VoteCal. To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record that information into VoteCal, it will require modifying the database to include new fields for recording the new DPOC-related information. Specifically, Section 2(a) requires that state or local officials record the type of document presented as documentary proof, including the date of the document's issuance, the dates of the document's expiration, the office that issued the document, and any unique identification number associated with the document. The statewide voter registration database currently does not record DPOC, or any of the other related information required under the EO. That is a significant change because it requires designing exactly the types of changes that are desired, programing a software update to enact those changes, and thoroughly testing and implementing the update to ensure that it works correctly before it can be safely rolled out. Seemingly small problems can complicate this process. For example, the EO contemplates that certain documents constitute DPOC. EO, § 2(a)(ii)(A)-(C). However, the EO also includes a sweeping category in § 2(a)(ii)(D) to allow for the use of a federal or state government-issued photo identification card that is "otherwise accompanied by proof of United States citizenship." Because it is unclear what precise documents could constitute DPOC pursuant to the EO, it is difficult to determine at this time how our office will need to revise data fields in VoteCal to account for those documents. The update to VoteCal for DPOC would have to be designed with an appropriate code for each potential DPOC presented so the information could be recorded. This simple problem is merely representative of the countless questions and obstacles that arise when updating VoteCal. Past changes to VoteCal

have taken up to a year or longer to implement and have cost over $1 million. Though it is not possible to predict exactly how long implementing DPOC would take or how much it would cost, I anticipate that it would be a fundamental change to the system of voter registration in California.

12.    Indeed, the impact would be significant because changes would need to be made at the individual county-level. County elections officials in each of the 58 counties oversee their own county's election management systems, and each of those systems would have to be modified to ensure that they could record the DPOC-related information. In turn, these county-level election management systems must be able to communicate the DPOC information to VoteCal. In my conversations with county elections officials since the EO was issued, county elections officials have expressed significant concern about the feasibility of implementing a DPOC requirement into their election management systems, the cost to implement, the extensive testing of the election management systems with VoteCal, and how to administer the requirement. They have also expressed concern about the speed at which the EO appears to contemplate imposing DPOC, whether they would have adequate resources to accept in-person DPOC, the necessary training on how to implement the requirement, and how the DPOC requirement could lead to disenfranchisement of their residents.

13.    Taking on such a huge endeavor for the Secretary of State would divert our resources away from other important projects. For example, we have ongoing voter registration list maintenance duties under the NVRA. And the California Legislature has passed specific voter registration maintenance legislation (Assembly Bill 2841 (2021-2022 Reg. Sess.)) that required state courts to provide certain information to the Secretary of State, and for the VoteCal registration list to be updated based on that information. That project is scheduled to be

implemented into VoteCal in June 2025 and is something that we have spent over a year

preparing for. If the EO's DPOC requirement had to be implemented imminently, that project,

which is being implemented pursuant to state law, would likely need to be put on hold to divert

our efforts to implementing the EO's DPOC requirement.

14.    While overseeing the database changes discussed above, we must concurrently

develop training materials and guidance documents for use by county elections officials. This is

yet another aspect of the EO's implementation that will divert significant resources to

accomplish the EO's directives.

15.    The Federal Form is currently used and accepted in California. It is widely

available and well known to county elections officials. That is why the EO's directive to include

a new DPOC requirement on the Federal Form, as well as the requirement that state or local

elections officials record the type of DPOC presented, will require substantial education and

coordination with county elections officials on topics such as: (1) the new requirements and the

documents that suffice (e.g., can copies be provided in the mail, or must a registrant present

original documents in person), (2) how to implement the EO's requirement to record DPOC and

its related information, and (3) ceasing use of the old Federal Form.

16.    Specifically, educating county elections officials would involve preparing and

disseminating a written advisory to county elections official (known as "CC/ROVs") providing

written guidance and information from the Secretary of State's office on how best for county

elections officials to implement the new DPOC requirement. In addition, our office frequently

conducts training on various topics, especially when there are changes to the state's elections

system that affect all 58 counties. When we need to train county elections official in all 58

counties, the state is split into five regions and the trainings require coordination with all the

county elections officials in each region to conduct. In short, a rollout of a statewide change to our elections system on an accelerated timeline like the EO would generate a significant need for trainings around the state, written advisories, and constant follow-up and iterations in these materials based on feedback. And there would be an ongoing responsibility of ensuring that county elections officials are complying with the EO so long as it remains in effect. An analogous situation arose in 2020. The COVID-19 pandemic led to rapid changes to our state election laws to successfully run an election during an ongoing pandemic on short notice. This endeavor took massive coordination from the Secretary of State's Office involving statewide calls daily to respond to problems and issues arising in real time. I expect a similar demand on our time would arise to implement a DPOC requirement.

17.    Aside from the newly targeted advisories and training, the Secretary of State's Office has already produced training materials on voter registration and database management, including detailed training materials on implementing the NVRA (see, e.g., https://www.sos.ca.gov/elections/voter-registration/nvra/training/). Instituting DPOC would require modifying existing training materials and other public-facing materials.

18.    Apart from the impacts of immediately creating and implementing an education process for county elections officials to learn about the EO's directed changes and requirements, I believe the compressed timeline on which the EO purports to operate creates a substantial risk of confusion or mistake by county elections officials in their administration of voter registration and upcoming elections. These mistakes would have serious consequences. Eligible voters could be disenfranchised, or the federal government could take punitive action against California, such as withholding funding or pursuing enforcement actions for these any mistakes.

19.     Another impact from the EO is that it creates a need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new DPOC registration requirements for the Federal Form. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline required by the EO. We will also have to direct county elections officials to make these same changes.

20.     This public education campaign, which we will need to run at least through the conclusion of the 2026 elections, and perhaps thereafter, will require a significant amount of money and resources that are not currently contained in our state election budget.

21.     The EO's DPOC requirement also risks voter disenfranchisement. Approximately 15 percent of eligible voters in California are not registered.  If any of those voters register using the Federal Form, or an existing voter re-registers with the Federal Form, the requirement for DPOC can act as a barrier to registration for those individuals who lack ready access to DPOC. For example, many people might not have their DPOC readily available, the DPOC might not match their current identification due to a name change (e.g., when a spouse changes their last name to match their partner's), or the required documents may have been lost or destroyed, for example, in one of the fires or other natural disasters that has impacted many Californias over the last few years. Moreover, it is unclear to me whether the new DPOC requirement will only be prospective, or whether it will be necessary for voters who registered under the Federal Form to have to verify their citizenship retroactively. The EO's directives impose practical barriers to registering to vote that can lead to unnecessary disenfranchisement.

22.     It is my understanding that Section 2(d) of the EO immediately requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a Federal Form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide public assistance to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing clients' citizenship before they may even offer a Federal Form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any current legal requirement for an assessment of citizenship before a form is provided. Most concerning is that this requirement appears to take effect immediately.

23.     This requirement would be particularly burdensome for California voter registration agencies that provide public assistance. Those agencies currently do not provide the Federal Form, but instead provide our state voter registration form, and often do so through the state's online voter registration portal. California's state voter registration forms have affidavit numbers assigned to them; these affidavit numbers are used as a way for the state voter registration agencies to be kept accountable and tracked for the number of voter registrations that are occurring with enrollees through those agencies, and for compliance with California law. *See* Cal. Elec. Code §§ 2400-2408. Under Section 2(d) of the EO, it appears those voter registration agencies would have to begin providing the Federal Form, which would both disrupt any usage of the online state voter registration form and undermine California law to track and record voter registration through state voter registration agencies.

24.     Because Section 2(d) of the EO seems to require designated state voter registration agencies to "assess citizenship" before providing recipients of public assistance a

copy of the Federal Form, substantial coordination between the Secretary of State's Office,

county elections officials, and state voter registration agencies is likely necessary. This

requirement affects all 58 county elections offices, dozens of state and local agencies and

*hundreds* of their offices across California. *See* 52 U.S.C. § 20506; Cal. Elec. Code §§ 2400–

2408. The scope and breadth of implementing Section 2(d) is potentially staggering. These state

and local agencies have minimal expertise in voter registration. Given that Section 2(d) seems to

take effect immediately, this would require dedicating significant resources to assist the hundreds

of voter registration agency offices in California.

25.    It is my understanding that Section 3(d) of the EO requires the Secretary of

Defense to "update" the Federal Post Card Application ("Federal Post Card") pursuant to the

Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as

described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in

which the voter is attempting to vote. The EO does not provide a timeframe within which the

updating of the Federal Post Card must occur, but it appears these changes could take place at

any time at the direction of the Secretary of Defense. *See* EO, § 3(d).

26.    Pursuant to the EO, registering to vote using the Federal Post Card will create

substantial administrative burdens on the Secretary of State's Office and county elections

officials. By requiring DPOC on the Federal Post Card, the Secretary of State's Office and

county elections officials from all 58 counties must change how they process their Federal Post

Cards to account for DPOC. This raises many of the same challenges as the DPOC requirement

for the Federal Form and the impacts to VoteCal.

27.    In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's

changes to UOCAVA will require the Secretary of State's Office to expend resources to educate

county elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward.

28.     The EO disrupts the Secretary of State's ongoing work to prepare for upcoming elections. The start of the candidate filing period for the 2026 midterm elections is less than eight months away. The Secretary of State has obligations to California residents to prepare for those elections and work on behalf of their interests; these obligations are and will continue to be greatly impacted by the review of and planning for the implementation of the EO.

29.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

30.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," which would exclude ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

31.     Sections 7(a) and 7(b) of the EO will have substantial and adverse impacts on voting in California, as well as the State's ability to adequately administer elections.

32.     To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after

Election Day, the Secretary of State's Office will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Secretary of State's Office will be required to provide county elections officials with training and support to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Secretary of State's Office will need to provide public information and educational resources to voters regarding the new ballot deadline rule. In California, voters have become accustomed to an extended deadline for the receipt of their vote-by-mail ballots by their county elections office; the public information campaign necessary to inform voters of this new ballot deadline rule would be a significant undertaking as it fundamentally affects our elections now that all active registered voters receive their ballots in the mail.

33.    A significant portion of eligible voters in California will be affected by the EO's directive for Attorney General enforcement of the new ballot deadline rule. In California, every active registered voter is mailed a ballot, and approximately 80 percent of voters return their voted ballot by mail. Cal. Elec. Code § 3000.5.  Under state law, such ballots can be counted if post marked on or before Election Day and received by the county elections official no later than seven days after Election Day. Cal. Elec. Code § 3020(b). Vote-by-mail voters would be required to complete and mail their ballots well in advance of Election Day to ensure that their ballots arrive by Election Day. Returning ballots well in advance is still no guarantee they will arrive by Election Day.

34.    California law also allows voters who cast vote-by-mail ballots on or before Election Day to cure signature issues on their vote-by-mail ballot return envelope up to two days before certification of election results (which occurs up to 30 days after Election Day), potentially allowing their ballots to ultimately be counted. Cal. Elec. Code § 3019(d), (e). It is

not clear whether the EO prohibits tabulating ballots cured after Election Day, or if counting those cured ballots would instead be a basis for enforcement action against California or the loss of funding under Sections 7(a) and 7(b).

35.    In addition, because California law does not currently comply with the Election Day rule outlined in Section 7 of the EO, California risks a loss of federal elections funding that is integral to the state's ability to efficiently conduct elections. Since 2003, California has previously received a total of $505 million in federal funding under the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local level.  The funding threatened in Section 7(b) is critical to California's ability to safely and efficiently conduct elections.  For example, recent HAVA funds, known as Election Security funding, were distributed to counties and can be used for four high-level categories: cybersecurity, physical security, security and awareness training, and incident response.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April **23**, 2025, at Sacramento, California.

_____
Jana M. Lean
Chief of Elections Division
California Secretary of State's Office

15

JA 124

# EXHIBIT A

                                                                    VIA EMAIL
April 11, 2025


Dear Chief Election Officials,


Consistent with 52 U.S.C. § 20508(a)(2), the U.S. Election Assistance Commission ("EAC") is seeking consultation on development of the national mail voter registration form.

Executive Order 14248 of March 25, 2025, "Preserving and Protecting the Integrity of American Elections" ("EO 14248") provides instruction to the EAC. Section 2 of EO 14248 instructs the following be required in the national mail voter registration form:

> (A) documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3); and
> (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

Section 2 of EO 14248 also instructs that "documentary proof of United States citizenship" shall include a copy of:

> (A) a United States passport;
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States;
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

A current copy of the national mail voter registration form is available here: https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf. The EAC is seeking consultation on how states would propose to implement Section 2 of EO 14248, if required. The EAC is also seeking feedback on the impact of implementation on voter registration in your state. As required by 52 U.S.C. § 20508, the EAC will consider responses in any amendments to the national mail voter registration form or EAC implementing regulations.

The EAC looks forward to your input. Comments may be sent to NVRAUpdates@eac.gov or by mail at 633 3rd Street NW, Suite 200 Washington, DC 20001.

Thank you,

*Brianna Schletz*

Briannna Schletz
EAC Executive Director

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## <u>DECLARATION OF MARK WLASCHIN</u>

I, Mark Wlaschin, declare as follows:

1.     I am a resident of the State of Nevada. I am over the age of 18 and have personal

knowledge of all the facts stated herein, except those matters stated upon information and belief;

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Deputy Secretary of State for Elections in Nevada. I work for the Secretary of State and support him in his official capacity as the Chief Officer of Elections for the State of Nevada. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3.      I have served as the Deputy Secretary of State for Elections for over four and a half years (since October 2020). I have worked at the Nevada Secretary of State for five and a half years (since October 2019), previously serving as the Deputy Secretary of State for Operations at the Nevada Secretary of State from October 2019 to October 2020. Prior to working for the Nevada Secretary of State, I served over 20 years in the United States Marine Corps. I earned a BA in History from the University of South Carolina, an MBA in Strategic Leadership from New England College, and I am certified as a Project Management Professional (PMP).

4.      The Nevada Secretary of State is the State's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Nev. Rev. Stat. 293.124. The Elections Division of the Office of the Secretary of State is responsible for implementing the Secretary's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. *See* Election Procedures Manual, Chapter 2: Administration of Elections (Jan. 2025), https://www.nvsos.gov/sos/home/showpublisheddocument/13555/638681287129030000.

5.      In my role as Deputy Secretary of State for Elections, I am responsible for overseeing the Secretary of State's Elections Division, and thus I am responsible for the team of

elections officials who ensure the correct and legal administration of election processes in the State and enforcement of state and federal election laws and procedures, including compliance with the National Voter Registration Act, 52. U.S.C. §§ 20501-11, *et. seq.* ("NVRA"). In my role, I develop binding election-related regulations on a biannual basis and routinely provide non-binding guidance to elections officials across the state. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.

6.      I am extremely familiar with the system and administration of elections in Nevada, including, as relevant here, voter registration requirements, voter registration agencies, and the statewide voter database. I am directly involved in our State's work to implement state and federal law regarding voter registration and voting, as well as our continuing work to implement and improve Nevada's transition to a "top-down" statewide voter database as we prepare for the 2026 midterm elections.

7.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Nevada election administration, and will likely continue to do so. Like elections officials across the country, I take my job very seriously and routinely work over 50 hours a week. But I only have 24 hours in a day, and this imposes a natural limit on my ability to dedicate the time necessary to carry out my office's mandatory tasks, including implementing this EO. Below, I describe in detail the harm this EO is currently causing and its immediate consequences to Nevada's election administration. In sum, implementing this EO will divert more than half of my team for significant portions of the next few months, and likely more. It will hinder and even temporarily

halt our ability to accomplish other priorities established by the Secretary, including providing technical and operational analysis to support our Legislators during the current biennial legislative session, as well as focusing on the second phase of the implementation of Nevada's new "top-down" statewide voter database project. Diverting our resources now will have a cascading effect, preventing us from accomplishing important office priorities and causing significant harm to Nevada and Nevadans. And this is not to mention the elections officials and other agency officials statewide who will need to implement changes in the same timeframe. Furthermore, the EO purports to require changes potentially immediately that are likely to cause chaos, confusion, and inadvertent voter disenfranchisement in Nevada.

8.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including several document types that are not generally issued to Nevada residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

9.      The provisions of the EO, including Section 2(a), require immediate action from me and my team to implement and to coordinate with other State and local agencies across Nevada. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparation.

10.     Preparation for elections is constantly underway—there is no off-cycle for election administrators. While voters primarily experience our work directly at most a few times per year—during a period for in-person early voting or when they receive and cast their mail ballot—we are working year-round, every year to collaborate closely with county and city elections officials to conduct voter registration list maintenance pursuant to state and federal law; discuss the election cycle with county and city elections officials so as to capture and address their lessons learned from the previous elections cycle; inform the public about elections processes and procedures, cyber- and physical- security measures, and other ongoing enhancements; review and refine training plans and classes for state, county, and city elections officials in preparation for our annual training conference; review and revise elections regulations spanning nine chapters of state law; review vendor contracts and, when necessary, submit Requests For Proposal and initiate the procurement process pursuant to the State Administrative Manual and other State Purchasing requirements to ensure that the Nevada electorate is provided the best possible services and support throughout the electoral process; review and refine the voter experience relating to online applications, forms and templates, and other public-facing tools to ensure ADA compliance and to increase accessibility for voters; and support the biennial legislative session by reviewing, on average, more than 50 elections-related proposed Bill Draft Requests and provide fiscal, operational, and technical feedback relating to the possible implementation of each bill. Right now, we are preparing for the 2026 election cycle, where the first candidate filings will occur here in Nevada in January 2026, approximately nine months from now. In other words, with only our current work, my staff and I are fully occupied in preparing for our next election. Introducing additional requirements means that we must deprioritize those critical election tasks.

11.    Notwithstanding this ongoing work, shortly after the EO was issued, I immediately took action on it, including initiating implementation. Every day for at least the first two weeks after the EO was published, I spent significant time briefing relevant individuals and delegating key planning tasks to members of our team. Unfortunately, those are days and hours that I was unable to spend on other office priorities preparing for the next election—time that my staff and I cannot get back.

12.    Upon reading the EO on Tuesday, March 25, I immediately circulated the text of the EO to the Secretary and Executive team, then to all state, county and city elections officials, and even sent a text message to all 17 county elections officials to confirm receipt, a rare move that I only take with the most urgent and time sensitive of notifications. Local elections officials then immediately began responding with questions, and I have continued to receive a steady stream of questions and comments ever since. My team has also started receiving inquiries about the EO from members of the public. These questions relate to the implementation, timelines, and types of acceptable documentation, requiring additional time to begin developing an FAQ for the staff to use to answer questions while concurrently drafting information that will go on the Secretary's website to inform and reassure the public.

13.    On Wednesday, March 26, once our team had time to initially digest the contents of the EO, I began overseeing the changes necessary to comply with the EO, as detailed further below. This included bringing together relevant project teams to discuss the terms of the EO and the steps required to comply with it. For example, because the EO appears to require changes to our statewide voter database system, I called a meeting that afternoon with representatives from three different groups involved in the statewide voter database project: the senior leaders of the project team working on implementation of the database and election management system (a

product called TotalVote) across the state, Secretary of State IT staff, and representatives from the external vendor (KNOWiNK). I informed this nearly 20-person group of the EO's requirements, and that implementation would need to be fully in production and ready to go "live" statewide by April 24. We began discussing the new requirements and identifying questions the project team needs answered, either from our legal counsel or, if it relates to a policy decision, from the Secretary of State. The decisions that we need to make range from big-picture considerations regarding process and timeline (e.g., how to handle voter registration forms completed without DPOC, whether and how to develop a bifurcated list of state- and federal-voters, and technical steps necessary to add multiple new DPOC-related fields to the database), to granular issues like the meaning of the unique identifying number for certain documents required by Section 2(a)(i)(B) of the EO (e.g., how many digits? Should they be alpha-numeric?). Because this team has been working on a highly time-sensitive and complex merger project for the statewide system that must be in place before the start of Nevada's judicial candidate filing period (January 5, 2026), I typically avoid diverting their attention at all costs. But given the timeline required in the EO, unfortunately the EO planning conversation could not wait.

14.     The EO forces our team in Nevada to make a range of both small and big-picture decisions now about how to dedicate and prioritize limited staff and state resources to update our elections systems pursuant to the EO. In doing so, we must both implement the EO and avoid the risk of inadvertently disenfranchising eligible voters.

15.     Yet my staff's focus on EO implementation comes at a significant cost to Nevada election administration and preparation. We have several priorities with their own time-sensitive timelines that have had to be sidelined to address the EO.

16.     For example, the Nevada legislature is currently in session through June 2 of this year—just a little over one more month. Because the legislature ordinarily meets only every two years, supporting and informing legislative decision making for the next five weeks is a top priority. There is significant analysis required for all election-related legislation, especially the development and publication of fiscal notes from my office. After the EO was published, I had to delay review and analysis of critical fiscal notes.

17.     Additionally, changing the data required and stored in the state's voter registration database will require significant resources, interrupting an ongoing multi-phase statewide database effort required by Nevada law to consolidate the statewide voter registration database. Based on the timeline in the EO, however, the work to implement the EO must start now.

18.     Just last fall, Nevada implemented the Voter Registration and Election Management Solution (VREMS), a statewide voter registration database and election management system called TotalVote. *See* Press Release, Nevada Secretary of State's Office announces the implementation of the voter registration and election management solution, Nevada Secretary of State (Sept. 11, 2024), https://www.nvsos.gov/sos/Home/Components/News/News/3510/33. Our team is currently working through phase 2 of this project, which involves merging the largest county database in the state—Clark County—with the statewide database. This is an extremely technical, high-stakes process that needs to be in place by September or October of this year so that Nevada is prepared for the 2026 elections. Our team is hard at work ensuring that there are no glitches or errors that could result in confusion, inconvenience, or even disenfranchisement. This work ranges from highly technical programming issues, to ensuring that multiple voters with the same name (e.g., "John Smith") are not merged together in the transfer, that voter data is not lost or

improperly converted, and that all required checks and balances needed to maintain the statewide voter registration list are conducted pursuant to state and federal law. Any delay in this team's ability to complete the product development and testing required for this merger risks creating a domino effect and missed deadlines for further phases of this effort in the future. With something as important as a voter registration database merger, any hiccups or errors in rollout could be catastrophic. But any time spent implementing the EO puts this project on hold and at risk.

19.    Our choices on how to implement the EO will have significant consequences for both election administrators and voters in Nevada. Take, for example, an implementation question that came up almost immediately: what should elections officials do with a registration form from an otherwise eligible voter who completes the anticipated new Federal Form or new state form, but does not provide one of the specific DPOC documents required by the EO? In Nevada, REAL ID-compliant IDs do not "indicate[]" the applicant's citizenship as is necessary to satisfy the EO's requirement, nor to my knowledge do military IDs contain such an indication; that leaves only a U.S. passport as the acceptable documentation for most Nevadans under this EO. See EO §2(a)(ii)(A)-(D). In collaboration with other state officials, we must work though whether and how the State should implement a bifurcated election system, where some voters are only eligible to vote in State elections, to accommodate individuals who cannot provide proof of citizenship in the form of a passport. The decision to administer and track a bifurcated registration system alone would have massive consequences for both election administrators and voters. As described below, it will require updates to our systems and voter registration form. And it will require updates to our state trainings and public educational materials. These are just some of the many consequential decisions this EO forces us to make and implement immediately as there is no clarity on when there may be a change to the Federal Form.

20.      Implementing E.O. Sections 2(a) and 2(d) will require a series of changes to voter registration forms, database systems, and processes. To be consistent with prior practices, changing voter registration requirements in Nevada would mean changing six separate forms and systems: the state paper application form, Nevada's online voter registration application, the online downloadable PDF form, the form used at the Nevada Department of Motor Vehicles ("DMV"), our Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") voting and registration system called the Effective Absentee System for Elections ("EASE"), and the statewide voter registration system and database. And in Clark County, voter registration forms must be translated into both Spanish and Filipino to comply with the county's obligations under Section 203 of the Voting Rights Act. Significantly changing any one of these forms alone is typically a time-intensive process involving testing for functionality, legal review, and user design testing to reduce or prevent confusion with voters. Making changes to all of these forms and systems all at once is a herculean undertaking for all of the teams involved, particularly when there are still outstanding questions from the EO about requirements.

21.      Section 2 of the EO also purports to require significant changes to the Automatic Voter Registration ("AVR") process at the DMV. The DMV is a designated voter registration agency in Nevada.  Nev. Rev. Stat. 293.504. It is therefore required to either accept the Federal Form or a state form that must be "equivalent" to the federal form under 52 U.S.C. § 20506. And EO Section 2(d)'s directive that heads of voter registration agencies "assess citizenship" before providing applicants with the opportunity to register has already purportedly taken effect. It is unclear whether state agencies that are designated as voter registration agencies under the NVRA are included within Section 2(d)'s scope, but I must proceed under the assumption that they are.

22.     In Nevada, applications from DMV transactions for driver's license and state identifications are transmitted to the Secretary of State as applications to register to vote, so long as the applicant meets eligibility requirements, including attestation of U.S. citizenship. Applicants later receive a notification from their county registrar allowing for party selection or opt-out. But under Section 2(a) and the NVRA's command that voter registration agencies use an "equivalent" form to the Federal Form, our team has had to assume that it needs to immediately take several actions, including coordinating with the DMV to add a DPOC requirement to the agency's form, providing clear guidance on the narrow set of documents that satisfy that standard, and advising on the internal database changes they will need to make to ensure the Secretary of State and ultimately local elections officials receive all necessary information.

23.     Additionally, as mentioned above, Section 2(d) appears to impose an additional requirement that the DMV "assess citizenship" prior to providing a federal registration form, which directs designated state agencies to "assess citizenship" before even providing the form to register to vote to enrollees of public assistance programs. I will oversee coordination with the DMV to determine how the DMV will implement that screening in the context of AVR, and what internal database changes the DMV will need to make to ensure that all required steps are followed. The first calls with the DMV already occurred the morning of Friday March 28, 2025. We had considered waiting until Monday, but ultimately both the DMV staff and I agreed that the time sensitive nature of the EO demanded adjustment to our calendars to talk three days earlier to begin implementing these changes.

24.     Under normal circumstances, this amount of change would require much longer than 30 days to develop, test, and implement, because these changes would require changing the DMV process, the DMV form, testing the form, changing the database, testing the database and

its ability to transmit data successfully to the Secretary of State, and training all line staff on how

the new form works and how to answer the questions they will likely be asked (e.g., "is my birth

certificate sufficient?," "What about a Consular Report of Birth Abroad" (a document my

youngest son was issued upon his birth overseas and that is also not mentioned anywhere in the

EO)?, "What if I don't have a passport?"). For reference, past discussions about expanding AVR

in the state began over one year before the programmatic go-live date.

25.     Sections 2(a) and 2(d) also require changes to the form and processes at other

designated voter registration agencies. Currently, there are five categories of offices designated

and certified as voter registration agencies in Nevada, pursuant to the NVRA (52 U.S.C. §

20506) and Nev. Rev. Stat. 293.504: the Nevada DMV, Offices of the City and County Clerks,

United States Armed Forces Recruitment Offices, and divisions of the Nevada Department of

Health and Human Services and Nevada Department of Employment, Training and

Rehabilitation. *See* Nev. Sec'y of State, Voter Registration Agencies Designation,

https://www.nvsos.gov/sos/home/showpublisheddocument/8250/638593034891230000

26.     As with the DMV, because the state form provided at designated voter

registration agencies must be either the Federal Form or "equivalent" to the Federal Form under

the NVRA, we have had to assume that the form used at these designated agencies would require

DPOC per EO Section 2(a) by late April. This means our team at the Elections Division has

already started discussing required guidance for any new forms and preparing new forms.

Additionally, Section 2(d) appears to require a change in process for the other designated voter

registration agencies in Nevada, as the EO appears to direct them, too, to "assess citizenship"

prior to providing a registration form for individuals applying for public assistance.  It is unclear

what kind of "assessment" the EO contemplates, but I am unaware of any federal legal

requirement for an assessment of citizenship before a form is provided. Our team has already started coordinating with the DMV on how to comply with this "assess citizenship" requirement, how to implement the DPOC requirement, and other changes necessary to comply with the EO.

27. The same immediate need for action applies to any changes to the statewide voter database and the online voter registration portal that interfaces with it. To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record of document type into the statewide voter registration system will require modifying the database to include fields for recording the new information (e.g., whether DPOC was provided, the type of DPOC provided, the date of the document's issuance, any date of the document's expiration, the office that issued the document, and any unique identification number associated with the document). The project team working on TotalVote implementation across the state, Secretary of State IT staff, and representatives from the TotalVote vendor (KNOWiNK) will need to divert time, attention, and resources from phase 2 of the statewide database project to work on an expedited basis to have Section 2(a) requirements operational in the statewide database and online voter registration portal as soon as possible. Practically speaking, this means they will have to modify their current work schedules and the planned "Agile sprints" and "mock elections" they have planned over the coming months as part of their current work on the statewide merger project—which is required by law and of critical importance for election administration in the state.

28. At the same time that my team oversees the database and application form changes discussed above, we must concurrently develop training materials, guidance documents, and public educational materials to be published as soon as possible. This is yet another aspect of the EO's implementation that will divert more than half of our team's limited resources to accomplish.

29.     My office is responsible for producing training, materials, and communications for a variety of different constituencies related to voter registration, including county and city elections officials, voter registration agencies, nongovernmental organizations, and the voting public. This will take a variety of forms, including PowerPoint presentations, uploading new materials and videos to the online learning portal, and producing reference documents and guidance such as checklists and frequently asked questions guides.

30.     Currently, the Federal Form is used and accepted in Nevada. It is widely available, and county officials routinely receive them from Nevadan applicants. Thus, when the Federal Form changes, our office will need to communicate with local elections officials, voter registration agencies and organizations, and the public about, at a minimum, (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing to use the old form. This means our team must start developing guidance documents, communications materials, and answers to potential questions starting now.

31.     The same is true for developing a new state form for use at state voter registration agencies that is substantially "equivalent" to the Federal Form's new DPOC requirements. To prepare for that change, our office will need to communicate with local elections officials, voter registration agencies and organizations, and the public about the new information and documentation required. The first conversation with our county and city elections officials took place on Tuesday April 1, 2025. Nevada has 17 county clerks and 18 city clerks, and we have regularly scheduled twice a month one-hour calls to discuss relevant topics ranging from legislative discussions, TotalVote implementation, AVR enhancement, and other detailed topics. The call on April 1 would normally have included an update about state legislation but was

primarily focused on the EO and implementation. Again, this means our team must start

developing guidance documents, communications materials, and answers to potential questions

starting now. And given the lack of specificity and clarity in the EO, the meeting resulted in

considerable frustration from the individuals most responsible for carrying it out.

32.    All state agencies and local clerks who use old state forms will need to completely

eliminate their use, including throwing out copies and printing the new forms for distribution

statewide.  We will have to ensure this process is adequately overseen to avoid registration errors

which would lead to disenfranchisement.

33.    The EO requires my team to immediately begin developing training for local

elections officials on all of the changes to voter registration forms, requirements, and processes.

We will also begin developing training and guidance for state voter registration agencies, as the

Secretary of State is required to provide these materials.  This training must be developed and

begin being implemented shortly given the uncertainty around when the EAC might change the

Federal Form so that our elections officials and voter registration agencies are ready to comply

with their obligations. We will also need to develop guidance and answers to frequently asked

questions to provide to state staff and local elections officials because of the uncertainty of the

timeline for implementation.

34.    All of these training and guidance measures are important to have in place by the

time of any change to the Federal Form to minimize voter and elections official confusion,

ensure that eligible voters are not disenfranchised, and ensure that applicants receive consistent

treatment across the state.

35.    To begin the process of educating the public, we will also need to change our

website and external-facing resources with updated and correct information on the

documentation. I have already met with the person from our office who is responsible for interfacing with the public directly and asked them to begin formulating answers to the questions we will receive.

36.     Nevadans have already started calling our office to ask questions about how this EO affects them and their right to vote. We need to have answers now.

37.     We also need to plan to implement a public-facing education campaign pursuant to the EO that will need to be ready as soon as any modification is made to the Federal Form and run until the conclusion of the 2026 midterms. This education campaign will likely cost more than a million dollars from our budget—funds that were allocated to other critical election priorities and that may demand changes to our budget request that was submitted prior to the start of the legislative session.

38.     This communication to all relevant stakeholders and education for the public is essential, because Nevadans' confidence in our elections and their right to vote is at stake. We must make sure that changes are implemented uniformly while avoiding voter disenfranchisement to the greatest extent possible.

39.     Further, with an administrative challenge as significant as this one, we typically are very careful, especially when it comes to voter registration systems and voter-facing user interfaces. We test every possible use case to the fullest extent practicable, at all hours of the day, including every type of form, and think through possible pressure points before implementing dramatic changes for our elections officials and voters. By working methodically but efficiently, we minimize the risk that we will inadvertently discourage or disenfranchise voters. Particularly when it comes to online and database functionality, even small changes take time, and our resources are zero-sum.

40.     In sum, responding to just two provisions of the EO—Sections 2(a) and 2(d)—will require an all-hands-on-deck approach from the entire Elections Division, our state voter registration agencies, and our local elections officials across the state, and even then, it will still threaten confusion and chaos in Nevada's election system.

41.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO § 3(d).

42.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. Local elections officials will be burdened by increased questions relating to the validity of an application and an increased need to follow up with voters, including those overseas, who are historically the hardest group of voters to communicate with because of their location and inconsistent access to communication systems. The state would also need to modify EASE to ensure that military and overseas registrants can provide all required information.

43.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Secretary of State to expend time to educate state and local elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward. The Secretary of State would also have to expend time educating military and overseas voters.

44.     The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only nine months away from the start of the candidate filing periods for the 2026 midterm elections. I have obligations to Nevadans to prepare for those elections and work on behalf of their interests that are now largely put on hold to oversee the response to this EO so long as it remains in effect.

45.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO § 7(a).

46.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO § 7(b).

47.     Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Nevada, as well as the State's ability to adequately administer elections.

48.     To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, the Secretary of State will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Secretary of State will be required to provide state and local elections officials with training and supervision to

ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Secretary of State will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule. This would take the form of, at a minimum, newspaper notices, social media posts, mail notifications, and press briefings throughout 2026.

49.      As to voting, a significant portion of eligible voters in Nevada will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Nevada, all active registered voters generally receive and can use mail ballots to cast their votes. Nev. Rev. Stat. 293.269911(1). Under state law, such ballots can be counted in the tabulation of votes if sent on or before Election Day, so long as they are received by state elections officials shortly after Election Day. Nev. Rev. Stat. 293.269921. For the 2024 general election, 669,334 voters cast their ballot by mail ballot, representing nearly 45 percent of the total 1,490,334 ballots cast in that election.

50.      Nevada law also allows voters who cast mail ballots on or before Election Day to cure technical errors within six days after Election Day, allowing their ballots to ultimately be counted. Nev. Rev. Stat. 293.269927(6). For the 2024 general election, nearly 33,000 mail ballots needed to be cured in Nevada. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Nevada or the loss of funding under Sections 7(a) and 7(b).

51.      In addition, to the extent Nevada law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Nevada risks a loss of federal elections funding that is used to, among other things, "[i]mprov[e] the administration of elections for Federal office." 52

U.S.C. § 20901(b)(1)(B). Nevada has previously received over $36 million of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local level. The funding threatened in Section 7(b) is important to Nevada's ability to safely and efficiently conduct elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 28 , 2025, at Carson City, Nevada.

Mark Wlaschin
Deputy Secretary of State for Elections
Nevada Secretary of State

20

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |
| *Plaintiffs,* |  |
| v. |  |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, |  |
| *Defendants.* |  |

## <u>DECLARATION OF MICHELLE TASSINARI</u>

I, Michelle Tassinari, declare as follows:

1.      I am a resident of the Commonwealth of Massachusetts. I am over the age of 18

and have personal knowledge of all the facts stated herein, except those matters stated upon

information and belief; as to those matters, I believe them to be true. If called as a witness, I

could and would testify competently to the matters set forth below.

2.     I am the First Deputy Secretary as well as Director and Legal Counsel in

Massachusetts. I work for William Francis Galvin, Secretary of the Commonwealth, and support

him in his official capacity as the Chief Officer of Elections for the Commonwealth of

Massachusetts. In my role, I assist Secretary Galvin in the execution and enforcement of all state

and federal laws relating to elections.

3.     I have served as legal counsel since 2000 and director since 2005. In 2022, I was

named First Deputy Secretary. I have a BA from Brandeis University and a JD from New

England Law and have been an attorney in good standing in Massachusetts since 1997.

4.     The Secretary's office registers business entities, lobbyists and financial

professionals, certifies documents for foreign acceptance and administers oaths of office, among

other things.

5.     The Secretary of the Commonwealth is the state's Chief Election Official,

responsible for administering—and working with local election officials to ensure uniform

administration of—all state and federal law relating to elections within the state. The Elections

Division is responsible for implementing the Secretary Galvin's responsibilities with regard to

elections, including enforcing laws and providing technical information to the public, local

election officials and other parties. In Massachusetts, elections are conducted by local election

officials in each of the 351 municipalities. The Elections Division overseas administration of

state and federal primaries and elections, including printing ballots for each of the cities and

towns. We also maintain the statewide database of registered voters, print state voter registration

forms and vote by mail ballot applications; and provide training to local election officials and

voter registration agencies.  Before each regular state or federal primary or election, this Office is required by state law to send vote-by mail applications to each registered voter. Before each biennial state election, this Office is required by the state constitution to send an "Information for Voters" booklet to voters containing information regarding the statewide ballot questions.

6.      In my role as Director and Legal Counsel, I am responsible for overseeing day-to-day activities including responding to inquiries from local election officials, candidates and the public. We promulgate regulations in furtherance of state laws, issue guidance to local election officials and provide both online and in-person training on election administration to local election officials.  Whenever there is a new law or regulation, either state or federal, this Office issues advisories and training to local election officials relative to changes to existing processes or implementation of new procedures or requirements.

7.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption of election administration in Massachusetts, and will likely continue to do so.

8.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, a passport, military identification, and "a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States Citizen."  There is no widely available identification issued by the Commonwealth of Massachusetts that denotes citizenship;

in Massachusetts, so-called REAL IDs are available to lawful residents.  The EO also requires

state and local officials to "record . . . the type" of DPOC presented at the time of voter

registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The

EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to

impose these changes. *Id.* § 2(a)(i).

  9. The provisions of the EO, including Section 2(a), require immediate action from

me and my team in the Secretary's office to implement and to coordinate with other state and

local agencies across Massachusetts. Our efforts to address the directed changes and impacts of

the EO will divert time and attention from other critical election functions. We are currently

working on the development of a new statewide database of registered voters, which would have

to be drastically changed to accommodate the requirements in the EO.  This would significantly

delay deployment of the new system, which is critically necessary to be in place before our next

federal election. Our existing database relies upon older technology and can no longer be

modified to allow for efficiency with newer procedures from recent state law updates, including

vote by mail.  We intend to implement the new system before the spring elections in 2026, which

will allow for identification and fixing of any issues well in advance of the federal elections.  It

will require training to local election officials while they are conducting municipal elections.

  10. In fact, shortly after the EO was issued, I immediately began communicating with

local election officials as well as fielding inquiries from the public regarding implications from

the EO on voter registration and voting in Massachusetts.

  11. The EO has created an immediate need for answers to various questions related to

implementation, ranging from big-picture considerations to granular issues. For example, there is

lack of clarity as to what documents would be sufficient to comply with the EO and how to process forms without DPOC.

12.    In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly commence multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to both our online applications (online voter registration system and online ballot request system) and our statewide voter registration database. If we set aside all other projects and maintenance, we estimate it will take at least 6 months to make changes to our online applications, but it will take significantly longer to make changes to the statewide database of registered voters. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the applicant's document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. However, without clarity as to how incomplete documentation may affect voters when voting, it is unclear whether additional changes would be necessary to how the voter list prints or what types of notices to voters must be updated. As noted above, we are in the process of implementing a new database and have completed all requirements and most of the development.  To make changes to the requirements and further development would necessitate additional testing, extend the timeline for deployment and create a significant expense beyond the funding already budgeted.

13.    At the same time that my team oversees the application and database changes discussed above, we must concurrently develop training materials and guidance documents for use by local elections officials as soon as possible. This is yet another aspect of the EO's implementation that will divert resources usually dedicated to election administration training

and legal compliance with existing state and federal laws to accomplish the EO's directives on the purported timeline.

14.     The Federal Form is currently used and accepted in Massachusetts. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with local elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. This would include updating training materials provided to those who offer voter registration at agencies.

15.     Apart from the impacts of immediately creating and implementing an education process for elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by local election officials in their administration of voter registration and upcoming elections. In Massachusetts, most municipalities conduct their local elections annually between March and June while cities and towns with city forms of government hold elections biennially in November of odd numbered years. The deadline to register to vote before any election in Massachusetts is 10 days, which does not leave adequate time for a local election official to notify an applicant of a deficiency in the documentation provided with their voter registration form.

16.     As I understand the EO, the additional documentation requirements would apply to only voting in federal elections, not state or local elections.  There is only one database of registered voters that does not distinguish whether the voter has registered using a Federal Form or a state form.  Accordingly, if an applicant has submitted the state form or the Federal Form

but without documentation, we would need to create a mechanism to track which voter is eligible to vote in which elections.  This would create additional technical work on the database, confusion among local election officials and likely disfranchise voters who, irrespective of the EO, are eligible to vote in state and municipal elections.

17.     A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO.

18.     This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost at least $750,000, an amount not available in our current budget and not requested in the Fiscal Year 2026 budget. As such, we would need to request additional funding from the state legislature to implement such campaign.

19.     Since the EO was signed, we've received numerous inquiries from residents about how this will affect their ability to vote in upcoming elections.

20.     We would also need to specifically create materials for voter registration groups to use as well.  As there are many higher education institutions in Massachusetts with diverse populations from around the United States, various organizations will use the Federal Form to register students as they arrive on campus.  Completed forms are often submitted by the organization conducting the voter registration drive but sometimes by the applicant themselves.

21.     Apart from the costs associated with the massive public education campaign required to reach eligible voters and non-registered citizens to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. As Massachusetts has a significant student population, many of whom would be registering for the first time, it is unlikely that they would have ready access to DPOC documents such as their birth certificate or a passport.

22.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially applies to a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided.

23.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between the Secretary's office and state voter registration agencies. In addition to the Secretary's offices, there are currently eleven state offices or agencies designated as voter registration agencies in Massachusetts pursuant to the NVRA. *See* 52 U.S.C. § 20506; G.L.c. 50, § 1. After clarity is provided as to what type of assessment would be sufficient, we would need to coordinate with

the voter registration agencies and their staff that work with applicants to provide training and guidance on the process.  This would include creating new information materials for applicants in multiple languages so they also understand the requirements and process, which would appear to be strikingly different that the current procedures of offering voter registration to all applicants.

24.    It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application (FPCA) pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time, yet the language in the EO is not clear as to what is sufficient to prove eligibility to vote in the state. *See* EO, § 3(d).

25.    The mandated changes to the FCPA pursuant to UOCAVA will create substantial administrative burdens on state and/or local elections officials. In Massachusetts, voter registration is waived for UOCAVA voters who instead can apply for an absentee ballot without being registered. Many of the UOCAVA voters are known to their local election official.  For active duty military voters, it seems unlikely that they would travel with the DPOC paperwork and if they did, whether they'd be able to create a copy of it to submit with their application.  For oversees voters, they may also have issues accessing DPOC paperwork if they don't already have a copy of acceptable documentation.  In either scenario, there is no standard as to what or how they submit proof they are qualified to vote in Massachusetts (nor why such proof is required).

26.     In the 2024 Presidential Election, in Massachusetts 477 FPCAs were received for military voters and 21,417 FPCAs were received for overseas citizens.

27.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Secretary's office to expend resources to educate local elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward.

28.     The EO's commands therefore disrupt the Office's ongoing work. The necessary changes to our online applications and database will divert information technology resources from planned upgrades, improvements and security updates.  The administrative changes will stress our Elections Division staff that have already planned informational materials and trainings for local election officials, which will all have to be revised.  Given the uncertainty as to the implementation of the EO itself and how it affects the act of voting itself rather than just registration, we will need to prepare and train poll workers as well for when a voter appears to vote who may not have yet provided the necessary DPOC paperwork. This will likely require additional staff within a polling place to avoid creating backups for other voters checking in. Additionally, it appears there may be different rules for local elections versus federal elections, which will require significant training for local election officials and poll workers, considering municipal elections are ongoing this year through the fall and next year in the spring, prior to the federal elections in the fall of 2026.

29.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after

Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

30.    It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC also appears to take immediate effect. *See* EO, § 7(b).

31.    Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Massachusetts, as well as the State's ability to adequately administer elections.

32.    State laws were changed in 2022 to allow vote by mail ballots to be received up to three days after a general state (federal) election to still be counted, as long as they were postmarked on or before Election Day.  G.L.c. 54, § 25B(a)(13); G.L.c. 54, §.93 This Office spent significant resources to educate voters and election officials regarding these provisions. State law also allows absentee ballots from active duty military and US citizens residing outside of the US to be counted if postmarked on or before Election Day and received within 10 days of the election. G.L. c. 54, § 99.  Accordingly, the EO is directly in conflict with state law. Regardless whether the EO affects the counting of these ballots for federal offices, they still must be counted for state offices.

33.    To properly administer elections in accordance with the EO's Election Day rule, assuming its validity, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, the Secretary's office will be required to devote significant

additional resources to address the EO's Election Day provisions. As with other parts of the EO, it will be necessary for our Office to develop and deploy training and supervision to local elections officials to ensure that votes are received and tabulated consistent with the EO's requirements (which purport to establish one system for state elections and another for federal elections). At the same time, we will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

34.    We will further need to coordinate with the United States Postal Service to ensure timely delivery of ballots.  In recent years, the standard delivery time for first class mail has increased from 1-2 business days to 1-5 business days.  It appears that these extended delivery times are at least partially a result of structural changes within the postal service.  While local post offices were previously able to process mail received locally and immediately deliver to local addresses, it is our understanding that ALL mail must go to a distribution and processing center.  However, some of the facilities that process mail for Massachusetts are located outside of the state.  As such, mail pieces, including ballots, that are deposited into a mailbox in the municipality where they reside could be sent out of Massachusetts for processing only to be returned to the local post office to be delivered back to the local election official.

35.    Despite considerable communications with USPS over the years, we consistently receive complaints from local election officials regarding delayed delivery or errors in delivery.

36.    A December 2024 report from the United States Postal Service Office of the Inspector General found significant delays in mail processing at the Boston Processing Center. https://www.uspsoig.gov/sites/default/files/reports/2024-12/24-153-r25.pdf

37.     As to voting, a significant portion of eligible voters in Massachusetts will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Massachusetts, 1,203,106 voters cast their ballots by mail in the November 2024 election, which accounts for 34.2% of the total ballots cast.

38.     In addition, to the extent Massachusetts law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Massachusetts risks a loss of federal elections funding that is integral to the state's ability to conduct functional elections and provide for election security of our election systems. Massachusetts has previously received over $90m in federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding has been used to help facilitate the administration of elections at the state and local level. We are using original HAVA funding to develop our new statewide database of registered voters. Since 2018, we've also received HAVA Security Funds, which have enabled us to improve our cybersecurity posture and provide resources to our local election officials on cyber and physical security. The funding threatened in Section 7(b) is critical to our ability to safely and efficiently conduct elections.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 28, 2025, at Boston, Massachusetts.

_____
Michelle K. Tassinari, Esq.
First Deputy Secretary
Director and Legal Counsel, Elections Division
Office of the Secretary of the Commonwealth

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |
| *Plaintiffs,* | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

## <u>DECLARATION OF NATALIE ADONA</u>

I, Natalie Adona, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Elected Nevada County Clerk-Recorder/Registrar of Voters in California. In my role, I am responsible for the county-level administration of all state and federal laws relating to elections.

3.      I have served as the Elected Clerk-Recorder/Registrar of Voters for over two years and have served with Nevada County, California for over five years. I am an officer for the California Association of Clerks and Election Officials ("CACEO") and have served on the statewide Ballot Design Advisory Committee and various state working groups. Additionally, I serve in an advisory capacity for several nonprofit groups focused on elections, including the Bipartisan Policy Center, the Center for Election Innovation and Research, and the Overseas Voting Initiative. I hold a Master of Public Administration and a Juris Doctor from American University. I am a Certified Elections/Registration Administrator, a certificate program administered by the Election Center and Auburn University.

4.      The Nevada County Clerk-Recorder/Elections Office is responsible for administering all federal, state, and local elections. My staff and I follow all federal, state, and local election laws and provide information and education to the public and other parties. Nevada County is one of California's 58 counties that administer registration and election services. The State of California is a "bottom-up" state, meaning that the counties maintain a local voter registration roll and send data up to the statewide voter registration database ("VoteCal"). VoteCal simultaneously sends counties data on new and existing registrations, along with other data that are critical for managing the local voter roll—including, but not limited to data that may disqualify a voter. Counties use local election management systems ("EMS") to maintain the

local voter roll. There are three EMS that are certified for use in California, all of which must be able to maintain near real-time updates to registration and voter participation history, generate accurate lists of registrants, and successfully communicate with VoteCal. Successful VoteCal integration with the local EMS must include all required fields that are essential for maintaining an accurate voter roll.

5.     In my role as Elected Clerk-Recorder/Registrar of Voters, I oversee Nevada County's candidate filing services, voter registration services, vote-by-mail operations, warehouse/drayage operations, election security, voter education and outreach, and in person election services, among other duties. In addition to my elections responsibilities, I also oversee all of the functions of the County Clerk-Recorder, which includes preservation of official records, recording documents relating to real property, marriage licensing, and other functions critical to the lives of Nevada County residents.

6.     My office manages the roll of approximately 76,000 Nevada County registered voters, and I oversee all list maintenance activities. Every business day, my staff add new registrants from all data sources, update current registrant information, maintain voter participation history, and perform synchronization activities in partnership with VoteCal. My staff also ensure that voters receive the proper notifications when they register, move, or are disqualified from voting, pursuant to federal and state laws. Nevada County receives approximately 1,750 updates to voter registration a week during non-election periods, and around 3,500 updates a week during an election cycle. In Nevada County, there are three permanent staff who work in elections full time. My assistant, our administrative assistant, and I split our time between the Clerk-Recorder and Elections departments.

7.       I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Section 2(a) has undermined established election protocols and created widespread confusion. As a result, these provisions have already inflicted harm and, if left unaddressed, are poised to further destabilize the orderly administration of elections in Nevada County.

8.       It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. In my opinion, three of the four acceptable forms of DPOC will not be sufficient for a voter to establish citizenship. California's REAL ID and other identification cards from the Department of Motor Vehicles do not indicate citizenship status, nor do military IDs like the Common Access Card ("CAC"). The only identification we could accept is a U.S. passport or supporting documentation that is currently used to obtain a passport or REAL ID. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). Eligible Californians would have to carry their U.S. passport, birth certificate, naturalization papers, or other document evidencing citizenship to an elections official or entity that offers registration services so that the document type can be recorded. It is my understanding that obtaining the proper supporting documentation can take weeks or even months to acquire, especially if the voter requires documents that are not available in the county where they are registered. For example, our office can verify citizenship if the voter was born in Nevada County, as my office has access to official records like births and

deaths, assuming that such a process is permissible under the EO; that is not true for voters born outside of the County. The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i). This leaves Nevada County with little direction or time to figure out how quickly to administer these changes, which may be detrimental to our ability to administer the next regularly scheduled election, the June 2, 2026 statewide primary.

9.      The provisions of the EO, including Section 2(a), likely require immediate action from me and my team in Nevada County to implement these changes, but the full scope of those changes and the timing is currently unknown. It is very likely that our efforts to address the directed changes and impacts of the EO will divert time and attention from critical election preparation and will distract from my ability to oversee Clerk-Recorder operations. In every election, our small staff (including myself) conducts every aspect of election administration, including candidate filing, designing ballots, ordering supplies for mail and in person voting, testing voting equipment, voter registration list maintenance, site-specific accessibility compliance checks, community engagement, replenishing supplies, and many, many more tasks. Additionally, my office is completing a move of our vote-by-mail operation, implementing new technologies to better serve the public (including a new EMS), preparing paperwork and educational materials, finalizing our budgets, updating contingency plans and informational materials, conducting outreach activities, and participating in ongoing education and training. I will also likely have to spend significant time re-evaluating our fiscal budget to ensure that the EO's directives can be implemented.

10.     Shortly after the EO was issued, I was notified by the state's chief of elections. After reading the EO several times, I connected with other CACEO leaders, where we discussed

the content of the EO and related federal legislation  and shared our preliminary analyses and

concerns. I then began to outline the actions that Nevada County would need to take to

implement the EO—a process that is ongoing and continues to raise questions around process

and cost.

11.     The EO has created an immediate need for answers to various questions related to

implementation, ranging from big-picture considerations to granular issues. It is not clear, for

example, whether the EO requires the voter to appear in person to show DPOC, whether a copy

of the DPOC must be retained by elections officials along with the affidavit of registration, or if

the state and counties can make reasonable accommodations for voters who are away (e.g.,

military and overseas voters). In any circumstance, additional staff will be required to

successfully implement the EO to ensure the same level of service and continuity of operations

in my office. Whether there are in person or other requirements attached to providing DPOC can

determine how many staff ought to be added. One staff member can range between $85,000-

$106,000 (base pay + benefits) in additional annual costs to the County per person depending on

the staff person's qualifications. It is also unclear how long it might take to include any of the

available federal sources of citizenship information in VoteCal (see *id.* § 2(b)(i)-(ii)) and how

local elections officials should treat those data if voters have the onus of providing DPOC when

they register. If a voter must submit multiple DPOC to prove citizenship, it is not clear which

document ought to be recorded to satisfy the EO's directives. If a voter fails to provide DPOC in

any NVRA agency, whether that be the DMV or other entity, the presumption is that the voter's

registration will not be received by the county elections official, but there is no direction on how

to treat an existing registration for that same voter. There are also outstanding questions about

how much the cost of elections must increase as a result of the EO's directives, as Nevada

County and other counties have been required to shrink their budgets for the upcoming fiscal year and any future adjustments will prompt counties to make modifications.

12.     My team and I have taken preliminary steps to figure out how we might meet the EO's recording requirement given the current limitations within our EMS and VoteCal. The EO will require significant changes to VoteCal and all local EMS. For instance, integrating Section 2(a)'s requirements for DPOC on the Federal Form and recording document type into VoteCal will require modifying the database to include fields for recording the new information. After performing some due diligence, my staff and I found no field in the Nevada County EMS that would record the type of document the voter submitted as their DPOC, nor is there currently a way to communicate such data to VoteCal through the EMS to ensure proper document collection. Based on the conversations I have had with my county peers I believe that no certified EMS includes a field for DPOC. My experience suggests that adding a new DPOC field may take at least several months for VoteCal and for EMS vendors to implement.

13.     At the same time that my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by election staff as soon as possible. This is yet another aspect of the EO's implementation that I believe will divert more than half of our team's time and resources to accomplishing the EO's directives. Our staff will have to map out the details on office process updates, update manuals, incorporate any future state-based laws or regulations, and train temporary staff for the next election cycle. Because our small staff does not specialize in any single elections function, accomplishing the EO's directives on top of our regular elections responsibilities will result in increased overtime and put a strain on other parts of elections planning and implementation.

14. The Federal Form is currently used and accepted in California. It is widely available and well known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination on topics like: (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, (3) the process for notifying voters that their registration is incomplete, should they fail to provide DPOC for any reason, and (4) ceasing use of the old federal and state forms.

15. Apart from the impacts of immediately creating and implementing an education process for elections staff to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by local elections officials in their administration of voter registration and upcoming elections. As Nevada County's chief election official, I am ultimately responsible for all actions taken by me and my staff. I have serious concerns about the impact the EO will have on my staff's confidence and ability to keep pace with the EO's directives.

16. A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to update our website and external-facing resources with updated and accurate information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. Our office has already begun its research for what kinds of DPOC may be acceptable under the EO and what steps Nevada County voters

must take to acquire DPOC if it is not available in our Clerk-Recorder Department (i.e., citizens born out of state or county, or in another country).

17.    This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and likely thereafter, will increase the cost of election administration in Nevada County. Based on my office's preliminary calculations, we would have to increase our communications budget by as little as $115,000 and upwards of $133,000 through at least the next regularly scheduled election, the low end of which represents more than double what we currently spend on elections-related communications.

18.    In fact, Nevada County residents have already expressed concerns about what the EO will mean for them as voters. Many voters are generally worried about the uncertainty that the EO represents. Several have expressed concerns about the need for DPOC and the impact on married women who choose to take their spouse's last name. Some have shared with me personally that they had difficulty obtaining a REAL ID as a result of their last name change and worry that they might encounter similar obstacles with voter registration. While I and my staff will do our best to help voters, we cannot promise them that their particular circumstances will not present issues if the EO is implemented in California.

19.    Apart from the costs associated with the massive public education campaign required to reach eligible voters, the directives in the EO also risk voter disenfranchisement. Nevada County's electorate includes married women, elderly individuals, unhoused individuals, and young persons, all of whom may experience unique barriers to acquiring DPOC and may not know where to go if their DPOC cannot be obtained in the County. In the last election, Nevada County sent ballots to approximately 500 military and overseas ("UOCAVA") voters. Even if elections officials can use remote tools like phone, email, and video chats to record an overseas

voter's DPOC, my office may be ill-equipped to assist our UOCAVA voters, who are only available during non-business hours due to their location in the world. It is my understanding that service members typically carry the CAC. While my office can provide copies of birth certificates for anyone born in Nevada County, service members with only a CAC may need to seek DPOC in another jurisdiction. Ordering the appropriate DPOC can take weeks or months. Non-military U.S. citizens who were not born in the United States may find it even harder to obtain DPOC, and neither me nor my staff may have the expertise necessary to help the voter work through their particular issue.

20.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

21.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," thereby excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

22.     Sections 7(a) and 7(b) of the EO will have substantial and adverse impacts on Nevada County's ability to adequately administer elections.

23.     As to voting, a significant portion of eligible Nevada County voters will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is allowed to take effect. In Nevada County, anywhere between 90-94 percent of returned ballots were cast using vote-by-mail. Thousands of Nevada County ballots are placed in blue US Mail receptacles or in official drop boxes on Election Day. Under state law, mailed ballots can be counted in the tabulation of votes if post-marked on or before Election Day, even if received by local elections officials after Election Day, as long as the ballot is delivered no later than seven days after the Election. State law further allows voters to drop off a ballot in any official drop box in the state and provides that elections officials deliver the ballot to the proper county no later than eight days after receipt. If the EO's requirements under this provision were enforced, our office would have to reject hundreds or thousands of ballots cast by Nevada County citizens who used the US Mail or delivered a ballot out of county on or in the days before Election Day.

24.     California law also allows voters who cast ballots on or before Election Day to cure technical errors up to two days prior to certification of the election, allowing their ballots to ultimately be counted. Nevada County estimates that there are several dozen voters every cycle who cure a missing or mismatched signature after Election Day. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Nevada County or the loss of funding under Sections 7(a) and 7(b).

25.     In addition, to the extent California law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Nevada County risks a loss of federal elections funding supporting key activities that ensure our elections are secure and accessible to all voters. Since my tenure in Nevada County began in 2019, our office has received

$508,330.00 of federal funding pursuant to the Help America Vote Act ("HAVA"). This funding has provided the County with the support it needs to purchase accessibility tools for our voters with disabilities, has made in person voting locations more accessible and safer for all who choose to use them, provided us with the support to fortify our physical and cybersecurity infrastructure, supported our voter education and outreach efforts, and provided us with the support we needed to keep voting safe during the COVID-19 pandemic. Loss of this important federal funding source would put a further strain on Nevada County's general fund and may result in a reduction in services or higher elections costs for the districts within the County that request election services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2025, at Nevada City, California.

Natalie Adona
Clerk-Recorder/Registrar of Voters
Nevada County, California

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |
| *Plaintiffs,* | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

## <u>DECLARATION OF DONNA BARBER</u>

I, Donna Barber, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am a resident of the State of New Jersey. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief;

1

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Executive Director of the New Jersey Department of State (NJDOS), Division of Elections and support the Hon. Tahesha L. Way, Esq., Lieutenant Governor and Secretary of State of New Jersey, in her official capacity as the chief election official for the State of New Jersey.

3.      I have served as the Executive Director of the Division of Elections for 14 months. I spent my entire 40-year career working in the Division of Elections, most recently as the Elections Manager. I previously served as Acting Director of the Division of Elections on numerous occasions.

4.      NJDOS and the Secretary of State are responsible for overseeing various state functions, including elections, business and economic development, tourism, and cultural and historical programs.

5.      The Secretary of State is New Jersey's chief election official. The Division of Elections within NJDOS oversees electoral processes in New Jersey in collaboration with New Jersey county and municipal election officials and staff, maintaining the foundational democratic tenet of free and fair elections. As part of that mission, NJDOS is committed to enhancing voter access, improving the overall voting experience for New Jersey residents, and working with local election officials to coordinate the implementation of applicable federal and New Jersey elections laws.

6.      In my role as Executive Director, under the direction of the Secretary of State, I am responsible for the oversight and supervision of activities and programs within the Division of Elections, including creation and maintenance of the Statewide Voter Registration System,

certification of voting equipment, acting as the filing officer for federal and state public offices, compilation and certification of election results, oversight of polling place accessibility, printing and distribution of voter registration forms, organization of the Board of State Canvassers post-election and Electoral College post-Presidential Elections, acting as clearinghouse for all election information and responding to public inquiries, and serving as grant manager for HAVA funding awards.

7.     New Jersey has elections every year and throughout the year, such as municipal elections, school board elections, fire district elections, state primary and general elections, and federal primary and general elections, all of which require significant NJDOS time and resources. For the remainder of 2025, for example, NJDOS will have duties and involvement in the May municipal nonpartisan elections, the Primary Election in June which will include a Gubernatorial election and the first administration of a recently enacted statutorily extended early voting period, the special school board elections in September, and Election Day voting for the Gubernatorial General Election in November with a preceding nine day early voting period.

8.     I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO").

9.     It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the

EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

10.    To implement the DPOC requirements contemplated by Section 2(a) of the EO, there are a number of steps NJDOS would need to take to assess, fund, approve and implement changes required for compliance, all of which require time, resources and funding.

11.    First, New Jersey will need to assess various questions related to implementation, ranging from big-picture considerations to granular issues. For example, NJDOS will need to assess overarching issues such as whether there is an impact to New Jersey state voter registration forms, which do not include a DPOC requirement, or the impact to electronic voter registration, which accounts for the majority of registrations in New Jersey.  NJDOS will also need to consider more detailed issues, such as: (1) whether technical updates to the Statewide Voter Registration System or any other related NJDOS voter registration systems, such as the online voter registration system, are necessary to comply with Section 2(a); (2) the costs associated with any such updates; (3) the need for updated guidance and training for implementation of the DPOC requirements by local election officials in New Jersey's 21 counties and 564 municipalities; and (4) the need for voter education on the DPOC requirements.

12.    NJDOS would need to formalize and approve any technical updates to NJDOS voter registration systems with the relevant vendor, obtain approval for the costs associated with such technical updates, and liaise with the vendor for development and roll-out of the technical changes. NJDOS would further need to coordinate with the vendor for updated technical guidance documents and/or training, and obtain approval for funding for such work. Finally, NJDOS, or vendor personnel at additional cost, would need to allocate time to developing and providing ongoing guidance to local election officials on the technical updates and DPOC implementation.

13.     Diverting NJDOS personnel, time, and resources towards implementing the EO's requirement would directly harm New Jersey because NJDOS is currently engaged in critical tasks for the statewide Primary Election on June 10, 2025, and General Election on November 4, 2025, neither of which even has a federal office up for election.

14.     The Federal Form is currently accepted in New Jersey. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require education and coordination with local elections officials and voter agencies on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form.

15.     A separate impact of the EO's directive is that it may call for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, NJDOS would need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and may need to do so on an accelerated timeline as contemplated by the EO. This public education campaign, which may need to run at least through the conclusion of the 2026 midterm election in November 2026, could be a significant expense.

16.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). New Jersey residents may register to vote at locations of more

than 14 different types of state and local agencies designated as voter registration agencies in New Jersey pursuant to the NVRA. *See* 52 U.S.C. § 20506; N.J. Stat. Ann. 19:31-6.11.

17.     To my knowledge, these agencies merely provide and collect voter registration forms, and do not process voter registrations or have access to Statewide Voter Registration System. I have no knowledge as to whether these agencies have the training or resources required to "assess" citizenship. However, to the extent these designated state voter registration agencies are required to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, this would likely require updates to the agencies' Local Operating Plans, which NJDOS would need to review and approve.

18.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

19.     As with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require New Jersey state and local election officials and staff to expend resources for the assessment, guidance and implementation of the DPOC requirement, and to educate voters on the new requirements.

20.     The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only 8 months away from the start of the candidate filing periods for the 2026 midterm elections, as well as currently dealing with state and local elections in New Jersey almost every month between now and then, including the June 10 Primary Election and

November 4 General Election. This includes a high-turnout gubernatorial election.  NJDOS has obligations to New Jersey residents to prepare for those elections and work on behalf of their interests, but that work could be undermined by the need to respond to the EO.

21.    It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

22.    It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

23.    Sections 7(a) and 7(b) of the EO will have substantial costs and adversely impact the State's administration of elections.

24.    As to voting, a significant portion of eligible voters in New Jersey will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. Under New Jersey law, mail-in ballots are considered valid if postmarked by 8:00 p.m. on Election Day and received by mail no later than 144 hours (6 days) after the polls close on Election Day, or, if there is no postmark, if received by the county boards of election within 48 hours of the polls closing on Election Day. N.J. Stat. Ann. § 19:63-22(a). As permitted by New Jersey law, over the last two

decades, tens of thousands to hundreds of thousands of voters have consistently used mail-in ballots to cast their vote in any given election. Data collected by the Division of Elections shows between 21.9% and 41.1% of the votes in New Jersey elections between 2021 and 2023 were cast by mail-in ballot. In the last Presidential election in New Jersey in November 2024, over 16,000 mail-in ballots were received and accepted after Election Day for the primaries (5.2% of the total ballots), and more than 20,000 mail-in ballots were received and accepted after Election Day in the general election (2.4% of the total ballots). Furthermore, in the past four years, similar percentages of mail-in ballots received after Election Day in New Jersey elections were accepted. Under the EO, voters casting these nearly 125,000 otherwise-valid ballots would have been effectively disenfranchised merely because of the delay between mailing and receipt.

25.     New Jersey law also allows voters of otherwise valid mail-in and provisional ballots to cure missing or discrepant signature within 11 days after Election Day in a general election, or at least 48 hours prior to the final certification of election results in elections other than the general election. N.J. Stat. Ann. § 19:63-17. For example, in New Jersey's 2022, 2023, and 2024 primary and general elections, 12,002 voters cured their mail-in and provisional ballots after Election Day.

26.     In addition, to the extent New Jersey law does not currently comply with the Election Day rule outlined in Section 7 of the EO or to the extent New Jersey is at risk of inadvertent non-compliance with Section 2 of the EO, Section 7(b) and Section 4(a) of the EO mean that New Jersey risks losing federal elections funding that is presently integral to the state's ability to conduct functional elections. Without this federal funding, New Jersey's state and county election officials would be required to divert funds from other sources to compensate for this lost funding. The diversion of these state funds would cause a reduction in vital election administration resources across the State.

27. While New Jersey appropriates significant funding every year for election management and coordination, New Jersey's Division of Elections, counties and municipalities receive federal funding for critical election programs and infrastructure.

28. New Jersey is and has been eligible for HAVA formula grants awarded by the Election Assistance Commission (EAC) under the Help America Vote Act (HAVA) for many years. Pursuant to that eligibility, EAC has awarded $22.3 million in HAVA grants to New Jersey between fiscal years 2019 and 2025 to fund ADA compliance at polling locations, remediation efforts for both cyber and physical security vulnerabilities, seal tracking to track voting equipment and its chain of custody, critical staffing, voting equipment needs, and voter education. As of the date of this declaration, approximately $9.59 million in funding remains on these grants awarded to New Jersey, including more than $340,000 in encumbered grant funds.

29. The award and use of these funds is not and has never been conditioned upon New Jersey requiring documentary proof of U.S. citizenship for voter registration, amending New Jersey law and election processes to bar mail-in ballots received after Election Day or any other requirement of the EO.

30. New Jersey relies on federal funding threatened in Section 7(b) and 4(a) to operate critical elections programs and infrastructure that New Jersey residents depend on for free and fair elections, including funding to ensure election sites are accessible to individuals with disabilities and compliant with the Americans with Disabilities Act (ADA), for cybersecurity and physical security protective infrastructures, voter education, and maintenance of voting equipment.

31. Withholding federal funds that have already been obligated to the State of New Jersey or other loss of federal funds will have an immediate effect on several of the State's elections.

32.    The loss of federal funds directed by the EO will cause significant disruption to Division of Election, county and local elections operations and the ability to effectively conduct elections in conformance with applicable law. For example, if counties are no longer able to rely on federal funds to ensure ADA compliance at polling places, the burden of ensuring equal access to voting will fall more heavily on the State. Overall, New Jersey will have to take extraordinary measures to address the loss of funding and must devote substantial time and resources to planning for the severe financial and operational impacts caused by loss of federal funds.

33.    In addition to the potential loss of funding, to properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded because they are received after Election Day, New Jersey state and local election officials and staff will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, New Jersey will be required to provide state and local elections officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, New Jersey will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 23, 2025.

_Donna Barber_
Donna Barber
Executive Director
New Jersey Division of Elections

10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF JONATHAN BRATER

I, Jonathan Brater, declare as follows:

1.      I am a resident of the State of Michigan. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I have been employed by the Michigan Secretary of State since January 2, 2020 and in such capacity serve as Director of the Bureau of Elections (Bureau). I work for Secretary of State Jocelyn Benson and support her in her official capacity as the Chief Election Officer for the State of Michigan. M.C.L. 168.21. I assist her in the execution and enforcement of all state and federal laws relating to elections.

3.      In my capacity as Director of Elections, I am "vested with the powers and shall perform the duties of the Secretary of State under his or her supervision, with respect to the supervision and administration of election laws." M.C.L. 168.32.

4.      The Secretary of State is Michigan's Chief Election Officer, responsible for issuing "instructions" and "advis[ing] and direct[ing] local election officials in the proper methods of conducting elections." M.C.L. 168.31(1)(a)-(b). The Bureau of Elections is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing instructional information to the public and other parties. This includes the training of Michigan's 83 county clerks and 1,521 city and township clerks, all of whom participate in the administration of elections in Michigan.

5.      In my role as Director of Elections, I am responsible for overseeing the cancellation of voters under the National Voter Registration Act and other list maintenance activities completed by clerks and Bureau staff; the issuance of instructions and promulgation of administrative rules related to elections; the creation of forms in accordance with the Michigan Election Law; the investigation of election law administration and reporting of potential criminal violations to the Michigan Department of State, Office of Investigative Services or the Michigan

2

Department of Attorney General, or both; the administration of federal and state grants for election-related purposes; the maintenance of Michigan's voter roll, the Qualified Voter File; the creation of public-facing educational resources about elections; ensuring clerks comply with state and federal election laws while administering elections; and other duties related to election administration and voter registration.

6. I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO are already causing harm, confusion, and disruption in Michigan election administration, and will likely continue to do so.

7. It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It describes a limited number of specific documents that constitute acceptable DPOC. The listed compliant documents are a United States passport, a REAL ID-complaint identification document *that indicates the applicant is a citizen of the United States*, an official military identification card *that indicates that the applicant is a citizen of the United States*, or a valid Federal or State government-issued photo identification *if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States* (emphases added). It is my belief, based on my experience, that: the majority of Michigan residents do not have U.S. passports; the majority of Michigan residents do not have a military identification card; and the majority of Michigan residents do not have a REAL ID-compliant identification card or government-issued photo identification *that indicates the applicant is a*

3

*United States citizen.* The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

8.    The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Bureau of Elections to implement and to coordinate with other state and local agencies across Michigan. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparation, including all of the following: assisting local clerks in their preparations for elections in May, August, and November of 2025; implementation of recent statutory changes such as expanded automatic voter registration and online voter registration, electronic return of military ballots, and recount legislation; securing new voting systems, with an expected implementation date of February 2027; and modernizing our electronic pollbook due to recent statutory changes. The executive order would disrupt the work of virtually all staff associated with election administration in the Bureau of Elections, meaning that the majority of Bureau of Elections staff would be diverted from crucial work. Because the executive order would require our team to revise manuals and retrain Michigan's 1,604 county, city, and township clerks; to redevelop forms and make any required changes to election equipment; to allow for new fields to be entered into Michigan's Qualified Voter File and potentially perform as-yet-unspecified additional list maintenance procedures; and to ensure compliance with any new EAC standards and direction, the Bureau would be delayed in its work, including work to implement statutorily required programs described above.

4

9.    In fact, shortly after the EO was issued, I directed my staff to review the document and identify items that may conflict with the Michigan Constitution and state statutes. As clerks contacted the Bureau with questions about potential changes to forms, manuals, training, and voting systems, staff responded with guidance as we understand the EO currently but noted items in the EO that are unknown or dependent on actions by the EAC and other entities. This uncertainty is detrimental as Michigan plans for major state elections in 2026 and proceeds with its own planned and scheduled replacement of voting systems ahead of 2027. The EO has created an immediate need for answers to various questions related to implementation, ranging from broad considerations about how elections will be administered to specific questions about the details of how the EO would have to be implemented. For instance, much of the programming and coding associated with Michigan's Qualified Voter File is completed by staff at Michigan's Department of Technology, Management, and Budget (DTMB) based on requirements provided by Bureau staff. Additional DTMB staff have been added and priorities have been reassessed to ensure Michigan remains on target for the implementation of recent statutory changes set to take effect in 2025 and 2026. The required addition of multiple DPOC-related fields to the Qualified Voter File likely would delay work on those statutory requirements and could require additional hiring at a separate state agency, an action over which the Department of State has limited control and which would happen at expense to the state.

10.    In addition to the immediate and continuing need to assess and understand the EO, if the EO is implemented my team and I would be forced to quickly commence multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to the Qualified Voter File, Michigan's voter registration database. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record

5

document type into the statewide voter registration system would require modifying the Qualified Voter File voter registration interface to include fields for recording the new information. Changes to the structure of how voter registration data is collected and stored require extensive effort. This includes planning to develop the scope of the software changes needed; programming and development of the changes, review of the entire Qualified Voter File application to ensure the rest of the application functions properly with the new structure to the voter registration data, and extensive user testing. This would take, at minimum, several months of effort.

11.    At the same time that my team oversees the database changes discussed above, we would need to concurrently develop training materials and guidance documents for use by election officials as soon as possible. Staff have already begun the Bureau's in-person accreditation training for the 2025-2026 election cycle, an intensive two-day training conducted every two years across the state in all 83 counties. Not only would these trainings be impacted by the addition of new DPOC requirements and potential changes to voting systems, but Michigan's 19-chapter accreditation manual and other guidance documents would need to be revised to reflect the new requirement to collect DPOC. Because of the new document types, my team would also need to review and make sure clerks understand applicable laws for safeguarding sensitive or personal identifying information appearing on different types of DPOC documents. In addition, my team would need to update training materials and re-instruct clerks on how to use the Qualified Voter File to store DPOC information.

12.    The Federal Form is currently used and accepted in Michigan. It is widely available and known to local election officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials

6

record the type of DPOC presented, would require substantial education and coordination with

state elections officials on topics like (1) the new requirements and the documents that suffice,

(2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use

of the old Federal Form. Extensive training would also be necessary to explain the differing

types of requirements that may apply depending on whether a voter registration form used is

covered by the EO or not.

13.     Apart from the impacts of immediately creating and implementing an education

process for state elections officials to learn about the EO's directed changes and requirements,

the compressed timeline on which the EO purports to operate raises a distinct and substantial risk

of confusion or mistake by election officials in their administration of voter registration and

upcoming elections. The EO's requirements for DPOC apply to federal elections, but because

voters currently are simply registered to vote with no distinction between local, state and federal

elections, the EO has already caused confusion for upcoming local elections, including an

upcoming election on May 6, 2025. Clerks may mistakenly believe there are already new

requirements in place for voter registration, that voter registration forms have already been

changed, or that they should be collecting and documenting DPOC for new registrants or those

voting, including for the upcoming election. Even if these initial incidents of confusion are

overcome, it will still be difficult to incorporate new changes to voter registration requirements

in the middle of the election accreditation cycle for upcoming elections later this year and for

state and federal elections in 2026. Changing requirements that apply only to certain methods of

voter registration or apply only to federal elections will create additional potential for confusion

and will require extensive training, retraining, and communication.

14.    A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we would need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we would need to do so on the accelerated timeline contemplated by the EO. While it appears that the documentary proof of citizenship requirement would apply only to new registrants, the EO does not explicitly exclude those updating their registration. Either conclusion would require extensive communication to existing voters to allay confusion over whether the requirement applies only to new applicants, to voters who update their registration, or even to all voters in order to maintain registration. Individuals generally do not carry passports or birth certificates on their person, and the perception that proof of citizenship is required of *all* voters may be all the barrier needed to prevent untold Michiganders from exercising their right to vote. Even if these individuals are already registered to vote, they would need to understand the requirements of the EO and how the EO would apply to them if they re-register in the future or register at a different address in the state. The state would also likely need to send mailings to eligible but unregistered individuals, such as teenagers who will soon be of voting age, so that they understand the new voter registration requirements that would apply to them.

15.    This public education campaign, which we would need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, would likely cost in excess of $2.5 Million, based on the cost of past statewide mailings.

16.    Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the

8

JA 190

other state costs identified above, the directives in the EO also risk voter disenfranchisement. As noted above, my understanding is that the majority of Michiganders do not have a U.S. passport, the majority of Michiganders do not have military identification, and the majority of Michiganders do not have a REAL-ID or government-issued identification card *that indicates that they are a U.S. citizen*. A standard REAL-ID compliant credential does not distinguish between U.S. citizens and non-U.S. citizens who have provided documentation showing lawful presence in the United States. Receiving an "enhanced" credential that shows U.S. citizenship requires payment of an additional fee, and most Michiganders with a REAL-ID do not have one. Although many of the citizens who do not have these items likely could obtain them, doing so would require time, travel, and in many cases significant fees to obtain the required documentation. Other citizens may not have the documentation required to obtain one of the acceptable forms of DPOC. Past election data suggests that the number of eligible voters who will not be able to vote for lack of documentation far exceeds the number of ineligible individuals who would be prevented from voting. For example, in the November 2024 election 8,025 individuals voted by completing an affidavit of voter not in possession of photo ID under the Michigan Election Law. The number of individuals who lack DPOC is likely much higher than the number who lack photo ID, since the majority of photo ID documents do not include an indication that an individual is U.S. citizen as noted above. By comparison, the Department of State has identified 16 possible incidents of non-citizens voting in the November 2024 election.

17.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially

9

encompasses a wide range of state and local offices that provide services to residents with low incomes or disabilities. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but while I assume it is already the case that agencies do not offer a form to an individual they know is not a U.S. citizen, I am unaware of any federal legal requirement for an initial assessment of citizenship of *all* individuals before *any* form is provided. Instead, the voter registration form provided asks the individual if they are a U.S. citizen. This provision purports to take effect immediately. *Id.*

18.     To the extent Section 2(d) of the EO requires designated state voter registration agencies to "assess citizenship" through a separate screening before providing *all* applicants for public assistance benefits a federal voter registration form (which already asks the individual if they are a U.S. citizen), the EO may require substantial coordination between the Michigan Department of State and state voter registration agencies. The state of Michigan has designated state offices as voter registration agencies pursuant to the NVRA. *See* 52 U.S.C. § 20506. Our office would be required to create and send updated instructions and forms to these offices if a DPOC requirement was implemented.

19.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

10

20.      The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. The Federal Post Card Application is widely available and known to clerks. It is an important safeguard to ensure that members of our military and other Americans abroad who may have difficulty registering or voting by mail have a method of doing so. If the Application is changed to require DPOC and additional documentation, it will be more burdensome for these voters and could create a heightened risk for identity theft in the international mail stream. It would also require clerks to develop procedures for processing and receiving applications with accompanying documentation.

21.      In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA would require my office to expend resources to educate state election officials on the new requirements and to ensure their continued compliance with their obligations moving forward. This would include new training materials for clerks to receive these applications and accompanying documentation.

22.      The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We have already begun to receive filings for the 2026 midterm elections, an election at which the offices of Governor and Lieutenant Governor, Secretary of State, Attorney General, U.S. Senator, U.S. Representatives, and the entire state House and Senate will be on the ballot. Additionally, the consideration of a number of contested statewide ballot questions is anticipated, which I expect will require my staff to review approximately one million pages, possibly more, of nominating petitions and ballot question petitions. This work will be all-consuming for several members of my staff beginning in February 2026. I have obligations to Michigan residents to prepare for those elections and work on behalf of their interests, but that work is now disrupted as I oversee Michigan's response to the EO.

11

23.    It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

24.    It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

25.    Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Michigan, as well as the State's ability to adequately administer elections.

26.    Under Michigan's Constitution, military and overseas voters whose ballots are postmarked on or by Election Day are entitled to have their ballot counted if they are received by the appropriate election official within six days after Election Day. Mich. Const. 1963, art 2, §4(1)(b). Michigan law also allows voters who cast ballots on or before Election Day to cure a signature error by 5 p.m. on the third day after Election Day, allowing their ballots to ultimately be counted. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Michigan or the loss of funding under Sections 7(a) and 7(b).

27.    The EO would appear to deprive Michigan voters, including military personnel serving overseas, of their state constitutional rights to have their timely mailed ballots counted.

12

To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day despite their rights under Michigan law to have these ballots counted, Michigan would be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Michigan Bureau of Elections would be required to provide state and local elections officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Michigan Bureau of Elections would be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

28.     As to voting, a significant portion of eligible voters in Michigan will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Michigan, more than 2 million voters utilized mail-in or absentee ballots to cast their votes in November 2024. If the EO were to go into effect, any of these voters would be at risk of not having their ballot counted if they were overseas voters who postmarked their ballot by election day or if their ballot signature required a cure after election day.

29.     In addition, to the extent Michigan law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Michigan risks a loss of federal elections funding that is integral to the state's ability to conduct functional elections. Michigan has previously received $27,309,809 of federal funding pursuant to the Help Americans Vote Act ("HAVA") in a HAVA Security Grant. Additionally, it is my understanding that approximately $15 million in national HAVA funding was recently approved by Congress, which includes approximately $300,000 for Michigan. This funding is used to help facilitate the administration

13

JA 195

of elections at the state and local level. In the past, Michigan has used HAVA funds to purchase voting equipment and reimburse local clerks for the purchase of physical security materials like security cameras, signage, and emergency alert systems, cybersecurity and resiliency materials like backup generators and batteries and multi-factor authentication tokens, and secure storage materials like ballot containers. The funding threatened in Section 7(b) is critical to Michigan's ability to safely and efficiently conduct elections. As one of the most decentralized states in the administration of elections, Michigan relies on over 1,500 local clerks to provide safe and secure elections, many of whom serve in a part-time capacity with few voters and limited funding. The HAVA grants are critical to ensure clerks have the materials necessary to administer elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 24, 2025, Ann Arbor, Michigan

Jonathan Brater
Director of Elections
Michigan Department of State

14

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

Case No. 1:25-cv-10810-DJC

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; PAMELA
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in
his official capacity as Chairman of the U.S.
Election Assistance Commission; THOMAS
HICKS, in his official capacity as Vice Chair
of the U.S. Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN W.
HOVLAND, in their official capacities as
Commissioners of the U.S. Election Assistance
Commission; PETE HEGSETH, in his official
capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF MELISSIA DORSEY

I, Melissia Dorsey, declare as follows:

1

1.      I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Assistant Deputy Administrator for Election Policy in Maryland. I work for the State Administrator of Elections ("State Administrator") and support him in his official capacity as the Chief Officer of Elections for the State of Maryland. In my role, I assist him in the execution of all state and federal laws relating to elections.

3.      I have served as the Assistant Deputy Administrator for Election Policy for two years. Prior to this, I served as the Director of Election Reform and Management. I hold bachelor's degrees in English and Political Science from Towson University.  I hold a law degree from George Washington University Law School, where I focused my studies on Constitutional and Civil Rights Law.  Prior to my work in elections, I spent over seven years working at the Maryland Commission on Civil Rights, where I supervised a unit charged with enforcing the civil rights of Maryland residents.

4.      The Maryland State Board of Elections ("SBE") is responsible for managing and supervising federal and state elections in Maryland. It is a policy-making body, empowered with setting regulatory policy for the conduct of elections. SBE has 51 permanent state employees and 35 contractors.

5.      In Maryland, each county has its own local board of elections ("LBE"). A local board of elections administers election operations within its county. The local board of elections works at the direction and under the supervision of SBE and the State Administrator.

2

6. The State Administrator is the state's Chief Officer of Elections, responsible for election operations and executing and enforcing all state and federal law relating to elections within Maryland. *See* Md. Code, Elec Law § 2-103(b). In particular, Maryland law charges the State Administrator with responsibility for implementing a uniform, centralized, voter registration system. Elec. Law § 2-103(b)(8). The Assistant Deputy Administrator for Election Policy is responsible for implementing the State Administrator's responsibilities with regard to elections, including supervising the administration of electoral operations and providing technical information to the public and other parties.

7. Maryland electoral operations are organized in a centralized, top-down system. SBE sets the policies that are followed by each LBE to administer elections in their jurisdiction. There is little operational variation amongst LBEs in conducting elections. And with regard to voter registration, the State Administrator and his staff bear responsibility for maintaining the statewide voter registration database–MDVOTERS. LBE's are able to access MDVOTERS to update voter registration records and use those records to conduct electoral tasks; however, the State Administrator and his staff procured the voter registration system, support its ongoing maintenance and function, and bear responsibility for its responsiveness to changes in voter registration law.

8. Maryland Law provides multiple methods by which an applicant may register to vote. The State Administrator, in compliance with state law, maintains an online voter services system accessible by internet connection through which Maryland residents may register to vote or update their voter registration record. Elec. Law § 3-204.1. Maryland residents may also electronically register to vote or update their registration record through "automatic voter registration agencies" ("AVR's") while, for instance, concurrently applying for healthcare services

3

through the Maryland Health Benefit Exchange or when applying for licensure or identification services through the Maryland Motor Vehicle Administration (MVA). Elec. Law § 3-203. These electronic methods of application supplement traditional paper-applications, available online (for printing), at local boards of elections, and at multiple designated voter registration agencies throughout the state. Elec. Law § 3-204. Finally, Maryland law permits in-person, same-day registration during early voting and on election day. Elec. Law §§ 3-305 & 3-306.

9.      SBE has promulgated a regulatory scheme for the uniform administration of voter registration in Maryland. COMAR 33.05.01.01-33.05.07.05. Additionally, the State Administrator has provided standardized instruction and training on voter registration processes as well as election judge materials for election officials and election judges. LBE's may make minor adjustments to processes, but adjustments generally must be approved by SBE prior to implementation.

10.     In my role as Assistant Deputy Administrator of Election Policy, I am responsible for overseeing the administration of election processes and managing the agency's efforts to administer state and federal election laws, including the National Voter Registration Act ("NVRA") and state voter registration laws. My duties include oversight of the voter registration division, audit division, the division that coordinates training of elections officials, and the division that produces training materials for election judges. I work with SBE staff to develop guidance for both state and local staff regarding elections administration and voter registration. To ensure compliance with laws and policies, I oversee a team of auditors who perform regular audits of the LBEs. To facilitate development and updates of voting equipment and systems, I provide policy oversight to the Information Technology (IT) department by ensuring that the changes necessary to comply with legal requirements are requested, scheduled, and implemented in the systems that

4

facilitate voter registration, in person voting, mail-in voting and other election administration functions. Similarly, I act as a liaison with existing voter registration agencies to coordinate changes necessary to comply with state and federal law, as well as facilitate the policy and technical process of designating new voter registration agencies. I am directly involved in both the policy and technological aspects of elections administration.

11.     I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Maryland election administration, and will likely continue to do so.

12.     It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. The list includes several documents that are not issued as a matter of course to all Marylanders. Most notably, Maryland driver's licenses issued in accordance with REAL ID requirements and Maryland identification cards do not contain information about the holder's citizenship. Rather, they are an indication only of lawful status in the state. This means that Maryland residents are not able to use a driver's license or state-issued identification card as a proof of citizenship, and would be left to rely only on passports, official military documentation, and Federal government issued identification to prove citizenship. The EO also requires state and local officials to "record . . . the type" of DPOC "presented" at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). An applicant must provide the documentation itself or "a copy" to the local election official at the time

5

of application, and cannot simply provide information from the document on an application. *Id.* §
2(a)(ii). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24,
2025) to impose these changes. *Id.* § 2(a)(i). Maryland law provides that volunteers may assist
residents to apply to register to vote. See Elec. Law § 3-201(a)(7). However, the EO requires state
and local officials to "record . . . the type" of DPOC "presented" at the time of voter registration.
Id. § 2(a)(i)(B). Assuming voter registration volunteers are not state officials, this process could
no longer be utilized in the state.

13. The provisions of the EO, including Section 2(a), require immediate action from
SBE as a policy-making body and the IT professionals who work for SBE to implement and to
coordinate with other state and local agencies across Maryland. Our efforts to address the directed
changes and impacts of the EO will divert time and attention from other critical election
preparation.

14. The agency is currently working on implementing new laws that were passed
during the recent Maryland General Assembly session. Many of the bills that must be implemented
involve changes to the programming of the voter registration database and voting systems.

15. SBE and the State Administrator are also currently supporting a special election for
one of its local jurisdictions. In terms of voter registration database considerations, this election
is run like a small statewide vote-by-mail election, which requires significant time and resources.
When there is an active election, SBE severely limits development or changes to our voter
registration systems to ensure integrity of the systems.

16. Preparation for the 2026 election cycle has started. This includes developing
updates and enhancements to the voter registration database and voter services systems, the

6

provisional ballot application,  election judge training materials and curriculum in response to lessons learned from the past election cycles.

17.    The IT department is in the process of several large procurements, including procurement of a new pollbook and voting system solutions.  Many of the individuals who work on these projects are the same individuals who will need to devote significant resources to implementing the policy and technological changes necessary to comply with the EO.  However, it is essential that these projects remain on schedule, as both systems are at end of life.

18.    The combination of these current priorities demands  a full time effort from all agency staff IT, policy staff, and especially the MDVOTERS development team.

19.    Shortly after the EO was issued, the Deputy State Administrator immediately circulated the EO to senior staff. I shared the EO with my management team and met with them individually to discuss implementation.  SBE held a staff meeting to field questions about the EO from all personnel.  Senior staff held a meeting to discuss the EO with LBEs and field questions relating to implementation.   Additionally, senior staff prepared documentation on how each portion of the executive order would affect the current election administration processes, affect or require changes to IT processes, and conflict with state laws regarding elections administration. Senior staff engage in regular conversations surrounding these issues, especially as it pertains to voter registration and voting system procurement and certification.

20.    SBE is currently identifying all policies, guidance and documents that will need to be changed to comply with the directives of the EO, as well as analyzing the development that will need to take place to effectuate the changes needed to the major IT Systems by the EO. SBE has held meetings with stakeholders affected by the EO, including AVR agencies (such as Motor Vehicle Administration) and vendors, to discuss implementation.  Based on the aforementioned

7

assessment and communications, SBE is developing a comprehensive plan of action to pay for and implement the changes, and provide training and support to the LBEs.

21.    Of particular note, several current procurements are being reevaluated for compliance with the EO. The team managing the procurement of the new voting system revisited the Request for Proposals to update all references to EAC certification.  The pollbook team is preparing to consider alternative configurations necessary to implement the EO, as it affects the ability of voters to register at the polling place.

22.    The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues.  Chief among those issues is reprogramming the functionality of Maryland's voter registration database–MDVOTERS–to comply with DPOC requirements. In its current form, Maryland's voter registration database is fundamentally unable to comply with the DPOC requirements of the EO. Reprogramming the voter registration database, and fundamentally rewriting the business processes supporting it, will require significant expenditures of money and time.

23.    The current voter registration database does not include any information about citizenship status.  That functionality would need to be developed and implemented.  SBE would need to determine how to process voter registration forms with or without DPOC.  Maryland AVR agencies, such as the Health Benefit Exchange and Motor Vehicle Administration,  do not currently verify citizenship status. Thus implementation of a DPOC registration requirement with those agencies would need to be carefully planned and costly implemented from both  policy and technological perspective.

24.    Maryland offers an online voter registration system (OLVR), where voters can register to vote.  OLVR would need to be reassessed and developed to maintain compliance with

8

the EO, including additional fields for information and ability to submit and transmit copies of documentation. The current system does not allow for such submissions and would need significant changes or replacement to facilitate the capability. In addition, SBE has explored the possibility of using citizenship verification services, as envisioned by the EO. This would require updating business processes and paying to develop systems to process the information.

25. In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly commence multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to the structure of Maryland's voter registration database itself. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. Documentation type, issue/expiration date as appropriate, office issuing the citizenship document and a flag for documentation not having been provided or verified needs to be developed and implemented in our voter registration systems. This process will take multiple months to complete, as major changes to the system are built out across various releases to ensure compliance and data integrity.

26. Maryland's voter registration system is the state's database not only for voter registration processes, but also ballot creation, candidate filing, street file management, redistricting, and election worker management. As such, development to any of these functionalities is completed by the same development team that would implement the EO. Once the development team completes these mission critical updates to these processes, development can start on implementation of the EO. Accordingly, based on our current development cycle, changes to MDVOTERS to reflect the EO requirements cannot begin until after July 10th.

9

Currently, all development time prior to this is allotted to addressing operational updates and upgrades necessary to comply with state and current federal laws. The first of the EO changes could take effect in MDVOTERS no earlier Sept. 5th, and would need to continue in phases until complete. Given the immense scope of the changes needed, it is estimated that this would take at least one year to complete.

27.     Maryland would face a stark choice during that year of development time. While developing the database solutions responsive to the EO's requirement, SBE could leave standing and accessible its pre-EO voter registration system, which does not, and cannot, abide by the EO's DPOC requirements. This would allow Maryland residents to continue registering to vote, and updating their registration records, in the lead up to the 2026 election season. However, this would leave Maryland vulnerable to litigation and funding threats expressed by the EO, despite its efforts to comply with that order.

28.     Alternatively, SBE could shut down MDVOTERS entirely during the year of development. This would protect the state from the threat of litigation, but would leave state residents unable to access their voter registration system for the entire 2026 primary season, and part of the 2026 general election.   And, the full scope of making these systems even temporarily unavailable cannot be understated. In 2024 alone, 276,572 voters registered at the State's largest automatic voter registration agency, the Motor Vehicle Administration; 166,058 used OLVR to complete online voter registration applications; and 61,610 voters registered using same day registration (SDR). If immediate implementation of the EO requires the State to shut down its current voter registration system until a compliant one is ready, hundreds of thousands of voters (under the best-case estimate of one year of development time) could lose access to their ability to register to vote.

10

29.     The long development time stems largely from the fact that Maryland offers multiple methods for voter registration.  Currently, as mentioned before, Maryland residents may register or update their registration using the following methods of registration: electronic applications through automatic automatic voter registration agencies, electronic applications through the online voter registration system (OLVR), paper applications, and same day registration (SDR) during early voting and on election day.   Based on the method of registration, the information gathered on the application is inputted into the MDVOTERS, placed in electronic batches by county, verified by database software coded specifically for the task,  and sent to the LBE for processing.

30.     The magnitude of the update needed to the systems that facilitate voter registration is different for each method of registration, because the steps involved in processing each form of registration varies based on the source of registration.   For paper applications, SBE has promulgated two forms, the National Voter Registration Application ("NVRA Form") form and Voter Registration Application (VRA) form.  The two forms are currently a mirror image of one another, save for a notation that one is the NVRA Form.  The NVRA Form is used by agencies designated under the NVRA as "voter registration agencies."   When an LBE receives a paper application, it is scanned and saved to the voter record and the information from the form is manually input in MDVOTERS.   The state required information - either DL# or SSN4 - is then verified against MVA information using the MDVOTERS interface with MVA. If not verified with the MVA data, the information is sent via a secondary verification process and a different interface with MVA, which uses Social Security Administration data to attempt verification. Implementation of the DPOC order would require changes to this process and to the voter registration system.

11

31.     First, Maryland would need to decide whether to update its VRA form to require DPOC (permitting individuals who submit a VRA to register to vote in federal elections); or, in the alternative, to not require DPOC on its VRA, which would permit VRA applicants to only vote in state elections.  The latter would require the creation and maintenance of a bifurcated voter registration database with lists of voters eligible to vote in state and federal elections maintained separately.   Assuming SBE matches the VRA form to require DPOC, however, the voter registration system would need to be updated to allow for the forms of DPOC to be captured in the voter record.  This would involve both including an electronic copy of the document, including fields for the information, and indicating that citizenship has been verified.  The EO requires that the date of issuance, date of expiration, office of issuance, and ID number to be captured.  Each of these pieces of information would need their own field in MDVOTERS, which would require development, testing, implementation and training.

32.     For applications received through OLVR, the registration process involves coordination of two systems - voter services and MDVOTERS.  The voter services system captures the applicant's information and verifies it in real time against MVA information.   All online applications require an individual to provide either the last four of a social security number and a Maryland driver's license or identification card number.  At the time of application, the driver's license number must match a record on file with the MVA to use OLVR.  Additionally, the voter must enter a street address that is recognized by the voter services system.  Once a voter completes a voter registration application, voter services creates an electronic image of the voter registration. Voter services transmits the electronic image, MVA signature, and the data entered by the voter to a middleware component.  The middleware batches the information by source of change and jurisdiction.  Batches are sent to the appropriate county LBE for processing the new registration.

12

During processing, last four digits of the social security number are confirmed via a backend API (Interface) with the MVA.

33.    Implementation of the DPOC order would require significant changes to this process, including changes to both voter services and to MDVOTERS.  First, MDVOTERS would need to be updated to allow for the forms of DPOC to be captured in the voter record.  This would involve both including an electronic copy of the document, including fields for the information required by the EO, and indicating that citizenship has been verified.

34.    The voter services platform would need to be updated. Currently, the voter services platform has no capability to handle or transmit images of documents.  Because the EO requires "presentation" of DPOC, the voter services platform would either need to be redeveloped to securely receive and transmit images of documents containing sensitive personal information; or, an entirely new platform that can handle such a task would need to be procured.      Professional IT staff are currently assessing whether the voter services system can be redeveloped as necessary. And in either event, because SBE would electronically receive and transmit images of sensitive documents, a risk and security assessment for the electronic handling of sensitive documents would need to be conducted, with its associated costs and further development processes. Implementation of the DPOC requirement for electronic application through OLVR will therefore be an immense undertaking in terms of both development time and funding needed.

35.    The voter-facing OLVR form, accessible by internet website, would need to be updated to capture "presentation" of DPOC.

36.    Assuming the current voter services system would still be viable for use, it would need additional updates to capture the information required by the EO. This will trigger additional development needs for MDVOTERS and the middleware solutions. Because the EO requires that

13

the date of issuance, date of expiration, office of issuance, and ID number to be captured, each of these pieces of information would need their own field in voter services, which would require development, testing, implementation and training. Similarly, the OLVR electronic form would need to include fields for an applicant to submit date of issuance, date of expiration, office of issuance, and ID number. This would also require development, testing, implementation and training.

37.    None of the above-mentioned systems are currently capable of verifying DPOC with the U.S. Department of State (for passports) or branches of the military (for military documentation). An entire backend verification system would need to be procured and developed to implement the DPOC requirement into OLVR.

38.    Applications that come from AVR agencies, such as the MVA and Health Benefit Exchange, are processed similarly to OLVR applications. Applications are received through our voter services system. That system creates an electronic image, which is sent to the middleware component. The applications are then batched and sent to the LBEs for processing. In addition to the development needed for voter services and MDVOTERS mentioned above, there would be significant development guidance needed for AVR agencies. SBE would need to work with AVR agencies to update their online forms to gather the information needed to verify citizenship (assuming those agencies could fund such development updates). The voter services system would also need to be updated to gather that information from AVR agencies and then transmit it to MDVOTERS to store in the voter record.

39.    SBE would need to establish a secure site for AVR agencies to upload images of DPOC to include in the voter record. Once established, there would need to be development to match the copy of DPOC to the respective voter application. SBE is currently assessing whether

14

this is possible from a technology standpoint. If technologically possible, there will need to be a risk and security assessment on the uploading of documents to the system.

40.    Finally, Same Day Registration (SDR) is a source of registration that is quickly gaining popularity for Maryland voters.   In the 2024 Presidential General Election, 57,902 residents registered to vote at an early voting center or polling place in Maryland before immediately casting a ballot.  To facilitate this process, the MVA provides a list of voters who are prequalified for registration.  This means the voter has an active MVA record, but the voter did not opt to register to vote.  These prequalified voters are loaded into the electronic pollbook, which are then distributed to early voting centers and polling places for in person voting.  If a prequalified voter appears at a voting location with proof of residency, they may vote a standard ballot, not a provisional ballot.  The EO would require significant changes to the SDR process that would effectively eliminate the ability to vote a standard ballot.   Because of the need for documentary proof of citizenship, the MVA could not provide a list of prequalified voters for the pollbook.  This is because there would be no way to confirm citizenship prior to inputting them into the pollbook. In order to register to vote on election day, the voter would need to provide DPOC in addition to proof of residency.  This information would need to be gathered by an election judge, assuming that an election judge constitutes a "state or local election official."  The only way to do this would be to have the voter complete a provisional ballot application.  In addition, if an "election judge" does not constitute an election official, the state could no longer conduct SDR.

41.    At the same time that my team oversees the database changes discussed above, we will need to concurrently develop training materials and guidance documents for use by state elections officials and election judges as soon as possible. This is yet another aspect of the EO's implementation that will divert roughly 35-40% of our agency's full time resources and 75% of

15

our contractual resources, including SBE's entire voter registration policy, elections administration and elections operations divisions. And even utilizing all those resources on a full time or overtime basis, it will be impossible that the changes could be implemented in 30 days. Rather, the team would need to work hand in hand with the IT development staff for the one year development period. Only then could they transition to creating training materials and guidance documents to fully implement the changes.

42.     The Federal Form, created by the Election Assistance Commission ("EAC") is currently used and accepted in Maryland. It is widely available and well known to local election officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form.

43.     Maryland law requires the State Administrator to define, maintain, and administer the statewide voter registration list. In order to effectively do this, SBE sets out voter registration processes in regulations, policies, manuals, guidance and training for the local boards of elections. Each time a voter registration process is changed, if regulations are affected, they must be updated. This requires agency resources to draft, ensure legal compliance with federal and state laws, submit for publication, and respond to public comments. Additionally, the manuals and guidance documents provided to LBEs must be updated, including both voter facing and data entry considerations. Generally, training is held to explain the updated process and to seek feedback from the local boards. There would be an additional round of revisions, based on this feedback. Once finalized, the materials would be circulated to the LBEs via email, included in our biweekly

communication with a brief explanation, and uploaded to the online platform where SBE stores reference materials for future use. Additionally, all voter registration materials, website, and communications would need to be reviewed to ensure consistency with the new process.

44. Of note here, SBE is also responsible for producing an election judge training manual, curriculum, checklists and quick access documents. Because Maryland offers same day voter registration during early voting and on election day, these materials will have to be updated to reflect changes made in response to the EO. Similarly, this will require changes to the electronic pollbook processes used for same day registration, which will include development by our staff. Additionally, there will need to be ongoing monitoring to ensure that LBEs are complying with the DPOC requirement, including audits of transactions and voter records.

45. Apart from the impacts of immediately creating and implementing an education process for state elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state and local elections officials in their administration of voter registration and upcoming elections. Any change implemented to the voter registration process has both downstream and upstream effects on other election administration activities. Generally, when substantial legislative changes are implemented, there is a period of time prior to the effective date of such change to consider all the potential effects. This includes brainstorming with subject matter experts and meeting with local elections officials to gain their perspective on their implementation considerations. For large developments and changes, mock elections are conducted. Without the time to have such discussions about implementation and consequences of the change, there is an inherent risk in confusion at both the state and local level. This occurs because there is not sufficient time to provide thoughtful guidance, training and communication with all stakeholders.

17

Additionally, SBE has significant concerns about the negative impact of quickly issuing new processes and guidance without properly having taken the time to vet processes and ensure that they are working as intended.

46.     A separate and significant impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. SBE is currently working to identify all processes that will be affected.  This includes an analysis of website material and voter facing services like registration, voter update requests, and mail-in ballot requests.  Based on the potential changes to voter facing processes, SBE is developing a comprehensive approach to provide information to voters.

47.     This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost $900,000 to $1,200,000.  This is likely to divert money from other important resources at a time where the State has already cut our budget by roughly half a million dollars.

48.     In fact, state residents have already reached out via email and phone calls inquiring as to how the proof of citizenship requirement will affect them.  Additionally, they express confusion about the effect of the EO versus the potential effects of the SAVE Act that is currently in Congress.

18

49.     Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement.

50.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately.

51.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between SBE and state voter registration agencies. There are currently four state offices or agencies designated as automatic voter registration agencies - Maryland Motor Vehicle Association, Maryland Department of Human Services, Maryland Health Benefits Exchange, and Maryland Department of Transportation - pursuant to the NVRA. *See* 52 U.S.C. § 20506; Elec. Law § 3-204. Implementing Section 2(d) will require significant collaboration with these agencies and additional technological developments to facilitate the sharing of new required information.

19

52.     The agencies will need guidance on what information to collect and how to verify citizenship prior to offering a NVRA Form or Federal Form.  Additionally, SBE generally provides support and instruction on how to develop electronic voter registration applications for these agencies, which will also be necessary to implement the EO.  Both the voter registration agency and SBE will then have to work together to develop the technology to transmit citizenship information from the agency to SBE to include in the voter registration database.  This involves not only development to the voter registration database, but also to the voter services applications. This is because SBE processes all agency electronic applications through its voter services application.  This is not possible in the 30 days given to implement the order.  Additionally, it will require the entire bandwidth available for the voter services IT developer.  The agency has only one employee capable of programming changes for the online voter services applications.

53.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application ("FPCA") pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

54.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and/or local elections officials. To be eligible to vote, a UOCAVA voter must meet the requirements to register to vote in Maryland. *See* Elec. Law § 3-102.  For UOCAVA voters who have not established residency in another State, residency generally means the last place of domicile in Maryland.  SBE creates guidance and provides processing support for the LBEs that process UOCAVA applications.  Such guidance and support generally concerns

20

processing an FPCA and assisting the LBE in determining if the voter is eligible to register, if they are permanently residing out of Maryland, if they ever lived in Maryland, if they are eligible to vote for federal contests only, and ensuring all data entry is correct. The EO will require the updating of guidance and additional training on how to process the new citizenship requirements. Additionally, MDVOTERS has unique functionalities that are used only for UOCAVA voters. These functionalities will need to be updated to reflect the new requirements for FPCA data and to capture the images of the documents provided as DPOC.

55.     The citizenship requirement also creates conflict with current Maryland Election Law.  Specifically,  Election Law § 3-202.1(b) requires that SBE establish a process for voters to submit FPCA electronically and to accept an electronic signature applied by a Common Access Card (CAC). The EO's DPOC requirement would require Maryland to change this process. Specifically, the process is currently accomplished by using a PDF form.  However, if additional documentation is required to be submitted, such that the election official can document the information required in 2(a), there must be an electronic system created that offers the security features necessary to receive personal identifying information included in passports, official military ID or federal issued photo identification.  None of the current systems can facilitate this process.  Thus it will be necessary to either develop this as part of our voter services system or procure a turnkey solution to do so.  Both involve significant time and resources to accomplish, but  necessary in order to comply with both the state law requiring electronic submission of FPCA and the DPOC requirement.

56.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require SBE to expend resources to educate not only state and local elections officials, but the public on the new requirements and to ensure their continued compliance with

21

their obligations moving forward. This will include an update to the current UOCAVA website. It will also involve education and outreach to all currently registered UOCAVA voters to inform them of the new requirements. There are costs associated with any method of communicating with these voters, whether it be mailings, email or text messages. Unfortunately, these voters are very difficult to reach through traditional public outreach campaigns due to their location overseas, making individual outreach the most effective. Equally unfortunate, is the inability to reach out to the nonregistered voter overseas to share updates to the registration process due to the EO DPOC requirement.

57.     The EO's commands disrupt SBE's ongoing work to prepare for upcoming elections. The candidate filing periods for the 2026 midterm elections have already begun. SBE has obligations to Marylanders to prepare for those elections and work on behalf of their interests, but that work is now largely on hold as the entire policy department of SBE, which is also the executive leadership of the State Administrator's office, oversees Maryland's response to the EO.

58.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

59.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt

deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

60.     Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Maryland, as well as the state's ability to adequately administer elections.

61.     To properly administer elections in accordance with the EO's Election Day rule and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, SBE will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, SBE will be required to provide state and local elections officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, SBE will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule. Maryland currently allows for ballots received up to 10 days after Election Day to be counted.  To change this practice, significant public education will be needed. All voter facing websites, documents, and ballot packet information will need to be updated as well as various state laws and regulations.

62.     SBE will also have to reeducate the United States Postal Service (USPS) about election critical deadlines for mail-in ballots.  SBE has worked diligently over the last few years to build a relationship with Federal USPS managers and local post offices to reinforce deadlines and the importance of getting ballots to the LBEs by the last Friday after the election.  These business practices will need to be changed and communicated across the state and to local post offices.  This change in policy could result in confusion and failure to timely deliver ballots to local jurisdictions for canvassing.

23

63.     As to voting, a significant portion of eligible voters in Maryland will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. Currently, Maryland has 590,599 voters registered as "permanent absentee" voters (voters who have chosen to receive a mail-in ballot for every future voting opportunity). And, the number of mail-in ballots requested and returned in recent elections has steadily increased. During the 2024 Presidential Primary Election, Maryland voters requested 638,691 mail-in ballots and returned 393,542 of those ballots. During the 2024 Presidential General Election, voters requested 882,938 mail-in ballots and returned 761,773 of them.

64.     Under state law, mail-in ballots can be counted in the tabulation of votes if post-marked on or before Election Day and received at the appropriate local board of elections by 10:00 a.m. on the tenth day after Election Day. Elec. Law § 11-302(c)(1); COMAR 33.11.03.08B(4)(b). During the recent presidential election, approximately one-fifth of mail-in ballots, or almost 159,000 ballots, were received after Election Day. The EO would have Maryland invalidate the votes of those voters.

65.     Maryland law requires election officials grant voters an opportunity to cure a returned mail-in ballot. Elec. Law § 11-302(d)(4). If a ballot is returned timely, but without the necessary signature affixed to the ballot oath, an election official must notify the voter within three business days of observing the missing signature. *Id.*; COMAR 33.11.03.06C(1). A voter may then "cure" the missing signature by signing the necessary oath. COMAR 33.11.03.06C(3)(b). Such "curing" may take place whenever a mail-in ballot is timely received, whether before or after election day. During the 2024 Presidential General Election, voters successfully cured 1,105 mail-in ballots. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or

24

if they would instead be a basis for enforcement action against Maryland or the loss of funding

under Sections 7(a) and 7(b).

66.    In addition, to the extent Maryland law does not currently comply with the Election

Day rule outlined in Section 7 of the EO, Maryland risks a loss of federal elections funding that is

integral to the State's ability to conduct functional elections. Maryland has previously received

$80,853,042 of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding

is used to help facilitate the administration of elections at the state and local level. Historically,

funds have been used to purchase statewide voting equipment, for salaries of essential election

workers, and for elections security.  Currently, the majority of HAVA funds are used for election

management and security features, such as election auditing, voter registration system

improvement and management, reducing cyber vulnerabilities, staff training and communications.

67.    The removal of funding threatened in Section 7(b) is critical to Maryland's ability

to safely and efficiently conduct elections.  First, the majority of SBE's cybersecurity costs are

funded by HAVA funds.  Second, SBE is in the process of procuring a new voting system and

pollbooks, for which it intends to use HAVA funds.  To give perspective, the last time Maryland

did so, in the mid-2010's, roughly $47,000,000 of HAVA funds were used to purchase statewide

voting equipment and pay salaries for staff to support the implementation of these systems.

Finally, SBE currently funds several mission critical positions with HAVA funds, including its

Chief Information Security Officer, 85% of full-time audit positions that comprise the audit

division for the agency, and 40% of the full-time positions in the voter registration department.

There is no state funding currently available for personnel, as all new positions were removed from

the FY26 budget.  Thus, SBE would be in grave risk of losing these employees, thereby preventing

the administration and auditing of voter registration.  Significantly, these are the same employees

that will be needed to implement and ensure compliance with any change in voter registration requirements, including the EO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __24__, 2025, at Annapolis, Maryland

*Melissia Dorsey*
Melissia Dorsey
Assistant Deputy Administrator for Election Policy
Maryland State Board of Elections

26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF ARIZONA SECRETARY OF STATE ADRIAN FONTES

I, Adrian Fontes, declare as follows:

1.    I am a resident of the State of Arizona. I am over the age of 18 and have personal

knowledge of all the facts stated herein, except those matters stated upon information and belief;

1

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Secretary of State of the State of Arizona. In this role, I serve as the chief elections officer for the State.

3.      The Arizona Secretary of State's Office is responsible for the duties assigned by state law relating to keeping the official records of the State of Arizona, providing certain business services, and overseeing and administering federal and state elections. Indeed, the highest profile duty of the office is oversight and administration of secure and accurate elections. The Secretary of State serves as Chief Election Officer for the State. A.R.S. § 16-142. One of the goals of the office is to register more voters and encourage their active participation in elections. As part of Arizona's election administration, the office certifies: voting devices, election results, candidates and measures to the ballot, as well as the results of statewide elections. The Office is responsible for maintaining the statewide voter registration database and setting the standards and procedures for conducting elections in the state in a biennial Elections Procedures Manual ("EPM"). A.R.S. §§ 16-168(J), -452.

4.      In my role as Secretary of State, I am responsible for ensuring the correct, efficient and uniform administration of election processes. To effectuate these responsibilities, my office engages in, at a minimum, monthly meetings with the county recorders and election directors in each of Arizona's fifteen counties and multiple weekly meetings with county recorders regarding the statewide voter registration system.

5.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Arizona

2

election administration, and will likely continue to do so. Unlike legislation, where proposals

may be reviewed, receive public input, and questions addressed prior to the final enactment, this

EO leaves Arizona with more questions than it answers.

6.       It is my understanding that Section 2(a) of the EO directs the Election Assistance

Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as

provided by the National Voter Registration Act ("NVRA"), to require applicants to provide

"documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a

limited number of specific documents that constitute acceptable DPOC. The EO also requires

state and local officials to "record . . . the type" of DPOC presented at the time of voter

registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The

EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to

impose these changes. *Id.* § 2(a)(i).

7.       The provisions of the EO, including Section 2(a), purport to require immediate

action from me and my team in the Secretary of State's Office to implement and to coordinate

with other state and local agencies across Arizona. Our efforts to address the directed changes

and impacts of the EO will divert time and attention from other critical election preparations.

Currently my office is overseeing the administration of a Special Primary and General Election

to fill the vacancy in Arizona's Congressional District 7, which will take place on July 15 and

September 23, 2025, respectively. Candidate filing ended April 14, 2025, and the petition

challenge period was open through April 21, 2025.[1] Additionally, we are in the process of

implementing significant changes and improvements to our UOCAVA voting portal.

---

[1] Special Election calendar located at https://azsos.gov/sites/default/files/docs/CD7-Special-Election-Calendar-Rev04042025.pdf.

Concurrently, we are initiating a procurement to replace or renew our existing statewide voter registration system, which will take significant time and resources to complete and implement prior to 2028.

8.     In fact, shortly after the EO was issued, I immediately notified all county recorders of the provisions of the EO, and my staff began to research what action will be necessary under each section of the EO. I am particularly concerned with the possible changes that may be necessary to our statewide voter registration system and election equipment that the EO purports to require the EAC to implement.

9.     The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. The implementation issues are particularly salient with respect to the EO's direction to the EAC to update the Federal Form.

10.     In 2004, Arizona voters enacted a law requiring those registering to vote to provide satisfactory evidence of United States citizenship ("Arizona DPOC"). That law defines Arizona DPOC as:

       a.   The number of the applicant's Arizona driver license or nonoperating identification card issued after October 1, 1996;

       b.   An out-of-state driver license or nonoperating identification card if it indicates on its face that the person provided DPOC in that state;

       c.   Legible copy of a birth certificate;

       d.   Legible copy of the pertinent pages of a U.S. passport;

       e.   U.S. naturalization documents, Alien Registration Number, Naturalization Certificate Number, or Citizenship Certificate Number;

4

      f.   Indian Census Number, Bureau of Indian Affairs Number, Tribal Treaty Card Number, or Tribal Enrollment Number; and

      g.   Legible copy of Tribal Certificate of Indian Blood or Tribal or Bureau of Indian Affairs Affidavit of Birth;

A.R.S. § 16-166(F).  In addition, any person registered on the law's effective date, who does not move to a different Arizona county is deemed to have provided Arizona DPOC.  A.R.S. § 16-166(G).

     11.     The Arizona DPOC requirement was challenged on multiple grounds, including as violating the NVRA's requirement that states accept and use the Federal Form.  After seven years of litigation, the Supreme Court decided *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1 (2013).  The Court concluded that Arizona could not impose its DPOC requirement on those who register to vote using the Federal Form.  *Id.* at 20.  In 2018, Arizona's Secretary of State entered into a related consent decree, allowing certain voters who submit a *state* registration form without DPOC to vote in *federal* elections.  *See League of United Latin American Citizens of Arizona ("LULAC") et al. v. Reagan et al.*, D. Ariz. No. 2:17-cv-04102-DGC (Docs. 36, 37).  Following the *ITCA* decision, Arizona implemented a bifurcated voter registration system, under which those who do not provide Arizona DPOC when registering are registered as "federal only" voters, who receive ballots that include only the offices of President and Vice President, United States Senator, and United States Representative.

     12.     The EO's list of DPOC differs substantially from Arizona DPOC.  Specifically, the EO provides that only a U.S. passport, REAL ID, Military ID, or valid federal or state photo identification indicating United States citizenship suffice, which will prevent Arizona voters who used other forms of Arizona DPOC, such as birth certificates, naturalization documents, or tribal

5

identification from qualifying to vote in federal elections. Likewise, it is unclear if all registrants immediately become ineligible and when, or if those currently registered (and on which date) are deemed to have provided DPOC. After attempting to harmonize the conflicting state and federal requirements, Arizona will have to change our state voter registration form to accommodate and ensure Arizona voters may participate in both state and federal elections.

13.     In addition to the immediate and continuing need to assess and understand the EO, my office will be required to commence work relevant to implementation of the EO's directives. In particular, the changes to the Federal Form that the EO requires will require significant changes to Arizona's voter registration database. For instance, to integrate Section 2(a)'s requirements for the Federal Form to require DPOC and record document type, document issuance date, expiration date, the issuing agency, and any unique identification number associated with the document into the statewide voter registration system will require modifying the database to include fields for recording the new information. Our current statewide voter registration database has no field within which to enter the information contemplated by the EO, and to do so will require significant programming costs and time. First, the vendor must be notified of the specifics of the new requirements and develop a framework to program them into the existing database. New data fields will need to be added, estimates of time and costs to implement developed, legislative appropriation if necessary, and training of county recorders to ensure compliance. Given our current obligations and workload, implementing this within the short time frame contemplated by the EO will be impossible.

14.     While my team oversees the statewide voter registration system changes discussed above, if required, we must develop training materials and guidance documents for use by county elections officials as soon as possible. This is yet another aspect of the EO's

6

implementation that will divert the resources of our six-member statewide voter registration

database team away from their other obligations to accommodate the EO's directives on its

timeline.  Separately, we are currently in the midst of drafting and receiving feedback from our

county partners on the statewide EPM, which includes procedures that have the force of law

within Arizona and must be finalized for review by the Governor and Attorney General by

October 1, 2025.

      15.    The Federal Form is currently used and accepted in Arizona. It is widely available

and well known to local elections officials and nongovernmental organizations that engage in

voter registration activities. The EO's directive to include a new DPOC requirement on the

Federal Form, as well as the requirement that state and local elections officials record the type of

DPOC presented, will require substantial education and coordination with county elections

officials on topics like (1) the new requirements and the documents that suffice as DPOC,

(2) how these new requirements compare and interact with the Arizona DPOC requirements,

(3) how to implement the EO's commands regarding memorializing DPOC, and (4) whether to

continue to use and accept the old form. The questions this purported change gives rise to are

innumerable. My office will have to produce training materials, communicate the changes to

county recorders, and incorporate the changes into our EPM which is already well underway.

The sudden change and disparate forms of acceptable DPOC will likely lead to errors that will

adversely impact current and future registrants. My office regularly updates county recorders via

email and regular meetings as to law changes. We are currently drafting and counties are

reviewing and providing feedback on the 2025 EPM. Biennial Election Officer Certification

Training is scheduled to take place this summer, with additional required recertification training

in the fall and winter, and the training on the EO will require clear answers to outstanding

questions regarding implementation, development of training materials, and communicating to all the county recorders and staff.

16.    Apart from the impacts of immediately creating and implementing an education process for county elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state elections officials in their administration of voter registration and upcoming elections. For example, when Arizona implemented its DPOC requirement in 2005, there was a significant statewide education campaign about the documentation required, an Attorney General Opinion issued regarding identification requirements for voter registration (Op. Atty. Gen. I05-001), as well as significant and resource-consuming litigation regarding the new requirement and resulting bifurcated voter registration system. Even today, twenty years after Arizona voters approved a DPOC requirement, it continues to generate legal questions that require litigation to answer. *See ITCA, LULAC, Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025).  For example, in September 2024, my office discovered that it could not be determined from Arizona's Motor Vehicle Division records whether approximately 200,000 registrants had provided Arizona DPOC when they obtained a driver's license due to an administrative error. Arizona is still trying to develop a uniform way for county recorders, who all have their own legal counsel, to resolve this issue across the state consistent with the Arizona DPOC requirement. This will likely require yet another Attorney General Opinion, and possibly result in additional litigation.

17.    A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new federal registration requirements. To begin the process of educating the public, we will need to change our website

8

and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO.

18.     This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, is roughly estimated to cost approximately $250,000 per quarter, or more than $1 million through the 2026 elections, based on prior voter education campaigns.

19.     In addition, state residents have already made calls to our office with citizenship questions.

20.     Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. Arizona's current bifurcated system, where those who do not provide Arizona DPOC are designated federal-only voters and are only eligible to vote in presidential and congressional elections, is already complex, and will be made even more complex as a result of the EO's change. For example, it remains unclear how Arizona's broad DPOC definition will interact with the EO's strict DPOC definition, and it remains unclear whether the EO applies to voters who already registered (including voters who provided DPOC that meets Arizona's definition but not the EO's definition). To illustrate:  Arizona already has a large classification of voters who can vote only in *federal* elections because they did not provide DPOC as Arizona defines the term.[2]

---

[2] By most recent count, there are currently 37,691 federal-only voters in Arizona. *See* https://apps.azsos.gov/election/VoterReg/2025/Statistics-for-Federal-Only-Registrants-as-of-April-1st-2025.pdf.  This number does not include the voters mentioned above who, through no fault of their own, may not to have provided Arizona DPOC due to an administrative error.

The EO may require yet another classification of voters who can vote only in *state* elections (i.e., state-only voters) because they did not provide DPOC as the *EO* defines the term, even though they provided DPOC as Arizona defines the term. This trifurcated system—with federal-only voters, state-only voters, and full-ballot voters—is very likely to cause confusion.

21.    It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO potentially encompasses a wide range of state public assistance offices that provide services to low-income residents and residents with a disability. In other words, the EO potentially requires state public assistance agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately but will require significant training for public assistance agency clerks prior to implementation. *Id.*

22.    Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between the Arizona Secretary of State's Office and state voter registration agencies. There are currently three state agencies designated as voter registration agencies pursuant to NVRA in Arizona, including the Arizona Department of Health Services, Arizona Health Care Cost Containment System, and the Arizona Department of Economic Security. *See* 52 U.S.C. § 20506; A.R.S. § 16-140. Arizona law also requires the Arizona Game and Fish Department to make voter registration forms

10

available. A.R.S. § 16-132. In addition, the Arizona Governor has directed numerous other state

agencies, including the Arizona Departments of Child Safety, Transportation, Veterans'

Services, Administration, Corrections, Rehabilitation and Reentry, Public Safety, Juvenile

Corrections, Housing, and Revenue to facilitate voter registration by, inter alia, making voter

registration forms available. Ariz. Exec. Order 2023-25 (Nov. 1, 2023).

23.    It is my understanding that Section 3(d) of the EO requires the Secretary of

Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas

Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of

the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is

attempting to vote. It appears that these changes to the UOCAVA voting process could take

place at any time. *See* EO, § 3(d).

24.    To the extent Section 3(d) imposes the DPOC requirement described in Section

2(a) of the EO, it is likely to increase costs and confusion as explained above with reference to

Section 2(a).

25.    The mandated changes to voting pursuant to UOCAVA will create substantial

administrative burdens on state and/or local elections officials. In particular, because the Federal

Post Card Application can be used both to register to vote and for already registered voters to

request an absentee ballot, it appears to impose the EO's DPOC requirement on UOCAVA

voters who are requesting a ballot, even if they already provided DPOC at registration. This

change will amplify the problems described above caused by the different types of DPOC

required by the EO and Arizona law.

26.    In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's

changes to UOCAVA voting will require the Secretary of State's Office to expend resources to

11

educate county elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward.

27.     The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections, including the Special Primary and General Election to fill the vacancy in Arizona Congressional District 7 this year. In addition, we are less than 12 months away from the start of the candidate filing periods for the 2026 midterm elections.

28.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

29.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

30.     Arizona law allows voters who cast ballots on or before Election Day to cure technical errors within five calendar days post-Election Day for any federal election, and three calendar days post-Election Day for all other elections, allowing their ballots to ultimately be counted. For example, more than 35,000 ballots were successfully cured for the 2024 general election, including a substantial portion of which were cured after the close of the polls on November 5, 2024. It is not clear whether the EO prohibits tabulating ballots cured after

12

JA 234

Election Day, or if Arizona's curing law will be a basis for enforcement action against Arizona or the loss of funding under Sections 7(a) and 7(b).

31.     In addition, to the extent Arizona law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Arizona risks a loss of federal elections funding that is integral to the state's ability to conduct functional elections. Since 2020, Arizona has received more than $12 million of federal funding pursuant to the Help America Vote Act ("HAVA"), of which approximately $4 million is available for future election-related projects. This funding is used to help facilitate the administration of elections at the state and county level. Arizona's HAVA funds are appropriated by the Arizona Legislature for election activities, with up to 75% going directly to counties and 25% to my office. The funding threatened in Section 7(b) is critical to Arizona's ability to safely and efficiently conduct elections.

32.     In particular, HAVA funds have been a vital part of election administration for my office and for Arizona counties. As national attention increased on Arizona's election outcomes in recent years, this funding source helped my office remain a prominent figure in election integrity and continue to protect Arizona's election infrastructure, administer the statewide voter registration database, and dynamically address cybersecurity vulnerabilities. Our BallotTrax initiative, funded by HAVA monies, enables voters to receive text message updates about their early ballot status.  While the Text2Cure initiative, also funded by HAVA monies, allows voters to conveniently cure ballot issues through text. BallotTrax and Text2Cure ensures that more ballots are verified and counted, bringing peace of mind to Arizona voters.  My office has also been able to provide HAVA funds sub-grants to county offices that enabled them to implement cyber security best practices, improve the physical security of election offices, replace voting equipment, and provide crucial professional development for election administrators.

13

I declare under penalty of perjury that the foregoing is true and correct.

       Executed on April 24, 2025, at Phoenix, Arizona

                                   Adrian Fontes
                                   Secretary of State
                                   State of Arizona

14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF JULIE L. FLYNN

I, Julie L. Flynn, declare as follows:

1.      I am a resident of the State of Maine. I am over the age of 18 and have personal

knowledge of all the facts stated herein, except those matters stated upon information and belief;

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am a Deputy Secretary of State for the State of Maine.  I am responsible for overseeing the Bureau of Corporations, Elections and Commissions, which is a part of the Department of Secretary of State.  I work for the Maine Secretary of State and support her in her official capacity as the chief election official for the State of Maine.  In my role, I assist the Secretary in the administration of state and federal laws relating to elections.

3.      I have served in my current role since February of 1999. I served as Director of the same Bureau, including the Elections Division, from March 1995 until I was appointed Deputy.  The Elections Division is comprised of 13 staff members, including a Bureau Director, a Director of the Division of Election Administration and an Assistant Director of Elections and an Assistant Director of Voter Registration, all of whom work closely with me.

4.      The Department of Secretary of State, through the Elections Divisions, oversees state and federal elections in Maine and, together with municipal clerks and registrars of voters, administers the Maine election laws set forth in Title 21-A of the Maine Revised Statutes, including the voter registration laws set forth in Chapter 3 of Title 21-A.

5.      The Secretary of State is Maine's chief elections officer, responsible for ensuring compliance with all state and federal laws relating to elections within the state.  The Elections Division within the Department of Secretary of State is responsible for implementing the Secretary of State's responsibilities with regard to elections.  Unlike most states outside New England, which administer elections at the county level, Maine elections are administered at the municipal level.  The Elections Division works closely with Maine's approximately 485 municipalities that conduct their own elections to train local elections officials, to assist them in

administering county, state, and federal elections, and to ensure that they are complying with
state and federal election laws.

6.       I oversee all aspects of Maine's county, state, and federal elections.  I am
responsible for overseeing the development, operation, and maintenance of Maine's central voter
registration application software and database (CVR), including ensuring that it can facilitate
compliance with state and federal voter registration laws.  I am responsible for overseeing
Maine's compliance with the National Voter Registration Act (NVRA) and the Help America
Vote Act (HAVA), including the administration of grants under HAVA and the conduct of the
statewide voter list maintenance program required by the NVRA.  I also oversee trainings and
communications with municipal election officials to ensure they are complying with state and
federal election law.  Given the small size of the Elections Division, I frequently work directly
with individual municipal clerks and registrars to resolve problems or issues that they experience
in the administration of elections.  And I oversee registrations and voting under the Uniformed
and Overseas Citizens Absentee Voting Act (UOCAVA), which in Maine is handled centrally by
the Elections Division.

7.       I am familiar with the Executive Order published on March 25, 2025, entitled
"Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d),
and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Maine
election administration, and will likely continue to do so.

8.       It is my understanding that Section 2(a) of the EO directs the Election Assistance
Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as
provided by the National Voter Registration Act ("NVRA"), to require applicants to provide
"documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a

limited number of specific documents that constitute acceptable DPOC, including document types that are not issued to Maine residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

9.     The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Elections Division to implement and to coordinate with other state and local agencies across Maine. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparation. In particular, the Elections Division is currently working on implementation of a new CVR system. This is an urgent project to replace an aging, legacy system that has become increasingly challenging to maintain. Currently, three of our senior Elections Division staff (out of a total staff of 13) and I are spending most of every workday on implementing and testing the new system, so that it will be ready for use in the November 2025 statewide referendum election. By late June, virtually all Election Divisions staff will be spending substantial time working on tasks relating to rollout of the new CVR system. Not only will compliance with the EO require the Elections Division to take time away from these critical tasks, it would require us to seek modifications to the design of the new system in order to allow for recording of the newly required citizenship documentation. In addition to likely costing the Elections Division tens of thousands of dollars in change orders, I have grave concerns that the need for such modifications will disrupt our implementation schedule and make it impossible to bring the new system online in time for the November election. And this is to say nothing of other important tasks planned for this year that

would likely be disrupted, such as a planned NVRA postcard mailing to identify voters who no longer live at their registered address.

10.     Shortly after the EO was issued, I immediately met with senior staff and counsel from the Office of Attorney General to determine what obligations the EO purported to impose on the Department of Secretary of State and municipal election officials.  The Department of Secretary of State was also forced to respond to numerous communications from members of the public, elected officials, and media with questions or concerns about how the EO would affect Maine.

11.     The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues.  For example, as already noted, we have considered the need for a costly change order requesting a redesign of the new CVR system to track proof-of-citizenship documentation.  In addition, in other instances in which an applicant for voter registration fails to provide a required identification document, Maine law allows the registrar to provisionally register the applicant, subject to a requirement that the applicant provide the missing document at the time they vote.  We have discussed whether Maine could still follow this procedure if the missing document is one that is required by the EO.  Yet another issue we have discussed is what sorts of documents might be sufficient to satisfy § 2(a)(ii)(D), which allows use of a photo ID that does not indicate citizenship if it is "accompanied by proof of United States citizenship."  It is unclear, for example, whether a person who might need to show court records to establish their citizenship would need to obtain and provide certified copies of those records.

12.     In addition to the immediate and continuing need to assess and understand the EO, my team and I will be forced to quickly commence multiple streams of work relevant to

implementation of the EO's directives. In particular, as already discussed, the EO appears to

require significant changes to CVR.  The only citizenship information that can be tracked in both

the current and forthcoming CVR systems is whether the applicant checked "Yes" to the

question on the application as to whether the applicant is a U.S. Citizen.  Given the requirements

of the EO, CVR would need to allow for tracking information about the type or types of proof of

citizenship offered, dates of issuance, dates of expiration, etc.  Given its limited resources and

need to work with a private contractor on such changes, it is unrealistic that the Elections

Division could implement such changes within the 30-day window contemplated by the EO,

even if it stopped all other work.  Further complicating matters is that the current CVR system is

expected to be retired before the November 2025 election.  Thus, the EO's timeline would seem

to require Maine to execute changes to both its current CVR and its planned replacement CVR

virtually simultaneously.  To the extent this could be done at all, it would be a massive and

highly disruptive undertaking.

13.     At the same time that my team oversees the database changes discussed above, we

must concurrently develop training materials and guidance documents for use by municipal

elections officials as soon as possible. This is yet another aspect of the EO's implementation that

will divert significant resources to accomplish the EO's directives on the purported timeline.

14.     The Federal Form is currently used and accepted in Maine.  The EO's directive to

include a new DPOC requirement on the Federal Form, as well as the requirement that state and

local elections officials record the type of DPOC presented, will require substantial education

and coordination with state elections officials on topics like (1) the new requirements and the

documents that suffice, (2) how to implement the EO's commands regarding memorializing

DPOC, and (3) ceasing use of the old form.  The Elections Division is responsible for providing

training on election administration to all of Maine's 485 municipalities. *See* 21-A M.R.S. § 505(7-A). The Elections Division also provides frequent memos to municipal elections officials on election administration issues. Complying with the EO will require the Elections Division to augment their training materials, draft written guidance memos to clerks, and potentially hold additional in-person or remote trainings in the coming months. I also expect that the Elections Division will receive phone calls and emails from municipal officials seeking assistance with specific compliance issues as they arise, furthering burdening Election Division staff.

15.     Apart from the impacts of immediately creating and implementing an education process for state elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state elections officials in their administration of voter registration and upcoming elections. Given that Maine has roughly 485 jurisdictions responsible for processing voter registration applications, some of which are staffed by part-time employees with many other responsibilities, this rushed timeline creates a high risk of errors and non-uniform implementation of the EO across jurisdictions.

16.     A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO.

17.     The Elections Division runs on a very tight budget, which comprises mainly of ballot-printing costs, leasing of ballot tabulators and accessible ballot marking devices for municipalities, and payroll costs for our small staff.  Absent additional appropriations by the Maine Legislature, the Department of Secretary of State has virtually no funds available for such a public education campaign, which would need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter.  The campaign would thus need to be conducted using existing resources, such as the Secretary of State's existing website, provision of model educational materials to municipalities for printing and distribution, and earned media.  Such a limited campaign may not be effective at reaching all affected voters.

18.     The directives in the EO also risk voter disenfranchisement.  The drivers' licenses and photo identification cards issued by the Maine Bureau of Motor Vehicles do not indicate citizenship status, and are therefore insufficient under the EO to prove citizenship.  On information and belief, most Maine citizens do not have passports.  In addition, Maine has many residents, typically living in rural areas along the Canadian border, who are U.S. citizens but have Canadian birth certificates because they were born across the border in Canadian hospitals.  These residents may find it challenging or even impossible to meet the EO's DPOC requirement if they lack a passport.   Based on these facts, I believe there are many U.S. citizens in Maine who would have difficulty meeting the EO's DPOC requirements.  In contrast, cases of voter fraud in Maine are extremely rare.  I am aware of only two cases in Maine since 2020 in which individuals were prosecuted for instances of voter fraud.

19.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public

assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. *Id.*

20.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between the Elections Division and state voter registration agencies. Maine has designated seven types of federal, state, and local agencies as voter registration agencies pursuant to the NVRA, including Maine's largest agency, the Department of Health and Human Services. *See* 52 U.S.C. § 20506; 21-A M.R.S. § 181.  To the extent the EO might require state or local voter registration agencies to alter their practices, they would look to the Elections Division to provide them with training, guidance, and procedures on how to carry out the EO's requirements.  The Elections Division would likely need, at a minimum, to prepare guidance memos and conduct trainings to ensure that state and local voter registration agencies were properly and uniformly complying with the EO.

21.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is

attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

22.    The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state elections officials.  In Maine, all Federal Post Card Applications are received and processed centrally by the small staff at the Elections Division.  In the November 2024 election, we processed over 6,000 requests for ballots from UOCAVA voters, including many requests from first-time registrants and current registrants updating their registration.

23.    In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Elections Division to engage in public education efforts concerning these new requirements.  As explained above, absent additional appropriations from the Maine Legislature, these efforts will need to be undertaken using existing resources and would further burden Elections Division staff who are already stretched thin due to tasks relating to implementation of the new CVR system.

24.    The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only 8 months away from the start of the candidate filing periods for the 2026 midterm elections. I have obligations to Maine residents to prepare for those elections and work on behalf of their interests and our efforts to comply with the requirements of the EO will necessarily take time away from those important tasks.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 24, 2025, at Augusta, Maine.

_____/s/ Julie L. Flynn_____
        Julie L. Flynn
        Deputy Secretary of State
        Maine Department of Secretary of State

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF SARAH COPELAND HANZAS

I, Sarah Copeland Hanzas, declare as follows:

1.      I am a resident of the State of Vermont. I am over the age of 18 and have personal

knowledge of all the facts stated herein, except those matters stated upon information and belief;

1

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Background**

2.     I am the Secretary of State in Vermont. In this role, I am the Chief Officer of Elections for the State of Vermont. The Elections Division is under my supervision and control. I ensure that the Director of Elections and his staff execute elections and enforce all state and federal laws relating to elections.

3.     I have served as the Secretary of State since January of 2023. Before that, I was a member of the Vermont House of Representatives for eighteen years.  During the last four years of my service in the House, I was Chair of the House Committee on Government Operations.  In that role, I oversaw Committee discussions regarding bills making any changes in election law and policy.

4.     The Vermont Secretary of State's Office is responsible for overseeing all federal and state elections in the State of Vermont.  The Office is also responsible for providing support to local elections. As an Office, we provide technological tools to conduct elections and register voters. We maintain the statewide voter checklist. Elections are conducted at the town level in Vermont by town clerks.  We provide support and training to two hundred and forty-seven (247) town clerks.

5.     The Secretary of State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See*  17 V.S.A. § 2103(40). The Vermont Secretary of State's office is responsible for implementing the Chief Officer of Elections' responsibilities for elections, including enforcing laws and providing technical information to the public and other parties. In my role as Secretary of State, I am

2

responsible for overseeing and ensuring federal and statewide elections are conducted equitably and safely. I am responsible for ensuring that Vermont complies with the National Voter Registration Act of 1993, the Help America Vote Act of 2002, and the MOVE Act of 2009. In fulfilling these responsibilities, my office is responsible for providing and maintaining the Vermont Election Management System and the Vermont Voter Checklist. We also oversee voter registration requirements and the process for voter registration. We provide voter registration training for clerks, our partner state agencies who register voters, and partner nonprofit organizations. Furthermore, we assist groups that register voters within the community or at community events. We provide voter outreach materials for all of these groups.

6.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused and will likely continue to cause considerable harm, confusion, and disruption in Vermont election administration.

**The Impacts and Harms Caused by Executive Order Section 2(a)**

7.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including the Real ID. In Vermont, the Real ID is not proof of citizenship. Vermont issues a Real ID to citizens and lawful residents.  In Vermont, we have approximately 352,000 people with Real ID. Vermont also issues an Enhanced Drivers License ("EDL").   The EDL does require proof of citizenship before it is issued. In Vermont, we have approximately 118,000 people who hold an EDL.  For

3

Vermont election administrators, the only drivers' license that will provide adequate proof of citizenship is the EDL. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

8.      The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Vermont Secretary of State's Office to implement and to coordinate with other state and local agencies across Vermont. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparations. Most critically, our Election Division is in the final stages of the IT build of our elections management system. This is a 28-month long project that is the technological backbone of our office. It is critical that my team focuses on the development, testing, and training our clerk users to use our new system. The clerks and members of the public have expressed significant concerns about the EO, and as a result our team is triaging and spending significant time, effort, and resources responding to those concerns.

9.      In fact, shortly after the EO was issued, I immediately communicated with the 247 town clerks in Vermont. I wanted to provide direct information about what was within the EO and what immediate actions should be taken. I also have been fielding questions from the public and media related to the EO. Vermont has had preliminary conversations with our IT vendor about the required changes in the Vermont Election Management System that would be required to comply with the EO. The required changes range from process flow changes to new security requirements based on the types of documents and information that are stored in the system. The EO has created an immediate need for answers to various questions related to

4

implementation, ranging from big-picture considerations to granular issues. We have needed to provide immediate answers to town clerks who are concerned about these changes and continue to do so.

10.    Our office also immediately reached out to the Department of Motor Vehicles. We will need to coordinate efforts with other state agencies who are required to register voters. We also had an urgent conversation with our IT vendor to understand the implications on our election management system. While it is not clear at this time all the IT implications, it appears that we will need the ability to have clerks upload the required proof of citizenship securely, with any applicable expiry dates.  This is functionality that we do not have built into the system at this time. Our system has limited upload capability, and it was not built with the necessary security measures to meet this purpose. As a result, we will need to build out new functionality in the system. Section 2(b) of the EO requires that state and local officials identify unqualified voters who are currently registered to vote but the timeline and process to conduct this review is unclear within the EO. For instance, will this require that town clerks or the Vermont Secretary of State's Office reach out to all registered voters to instruct them to provide proof of citizenship?

11.    In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly commence multiple streams of work relevant to the implementation of the EO's directives. In particular, the EO requires significant changes to Vermont's voter registration database. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. Currently, photo ID with current residency status or alternative proof of residency is required but those documents are not held in the Vermont Election Management System. The EO requires

5

that when an election official registers a voter they will have to record: 1) the type of document(s) used to prove citizenship; 2) the date of the document's issuance; 3) the expiry date of the document if applicable; 4) the office that issued the document; and 5) any unique identification numbers. Our election management system does not have these fields or data points built into it at this time.

12.    Even more critically, while our new system is focused on security and is built with protection from external intrusion as the top priority, it was not built to protect information from authorized users. The sensitive data required by the EO to be entered into the system will require significant design and development work to ensure that Vermonters' data, while entered into the system as required, is protected from all authorized users unless there is a legitimate need to unmask it for a user or a requester. Any changes to a database necessarily involve expending time and resources, and making the changes required by Section 2(a) are no exception. This will also impact the Vermont team's ability to focus on other critical work. Section 2(b) of the EO requires that Vermont's Election Management System be fully accessible to the Department of Homeland Security and DOGE.  This is functionality that is not currently within the system.  I do not have information as to the requirements of either of these agencies for integration. This will need to be understood to build that functionality.

**Guidance and Training for Election Officials**

13.    At the same time that my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by state and local elections officials (town clerks, their staff, volunteer poll workers) as soon as possible. This is yet another aspect of the EO's implementation that will divert at least one staff person of our six-member election team to accomplish the EO's directives on the purported timeline.

6

14.     The Federal Form is currently used and accepted in Vermont. It is widely available and well-known to state and local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. It is the role of the Vermont Secretary of State to provide election procedures training to Vermont's 247 town clerks. Having clerks be responsible for identifying and storing proof of citizenship will require significant training. Even within Vermont, a relatively small state, the required documents do not all look the same.  For instance, the format of Vermont's birth certificates has shifted dramatically over the last seventy years. Additionally, town clerks will need to verify documents from outside of Vermont's borders. Our office anticipates that we will need to create training materials for clerks. Preparing and creating these training materials will require significant research and preparation. Our office has discussed creating a PowerPoint, holding multiple in-person and remote training sessions, producing a video for broader circulation, and publishing FAQs and a quick-use checklist for clerks. These training materials will need to focus on appropriately verifying documents and inputting those documents into new functionality in our elections management system.

15.     Apart from the impacts of immediately creating and implementing an education process for state and local elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state and local elections officials in their administration of voter registration and upcoming elections. Our office has heard significant

7

concern from town clerks about the immediate impact of the EO on their work. Vermont town clerks perform voter checklist clean-up in odd years because we do not have a statewide or federal election. Clerks are confused about what, if any, actions they need to take while performing that critical function. As the chief elections official, I am concerned that the enhanced responsibilities for town clerks and the accelerated timeline of the EO will confuse town clerks because we do not have adequate time to create the required training materials.

**Public Information and Education**

16.　　A separate impact of the EO's directive concerns is the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. We have already started creating an extensive media outreach plan and attending several community forums. We anticipate that this work will need to increase in the upcoming months to comply with the EO's timeline.

17.　　This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost approximately one million dollars. This is one-sixth of our yearly elections budget.

18.　　In fact, state residents have already contacted our office in record numbers. Our team does not normally answer questions from state residents about their voting rights unless we are within sixty days before an election. State residents are concerned about how they will register to vote and if they need to prove citizenship to remain on the voter checklist.

8

**Disenfranchisement**

19.     Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. Vermont does not have information about how many of our residents have a current passport. We know that only one-fifth of Vermont's drivers can use their driver's license to prove citizenship. While some Vermonters may have a certified copy of their birth certificate, we anticipate that many do not. And, of course, many Vermonters have changed their name since they were born, particularly married women. If a Vermonter has changed their name, they will need to show a certified copy of the court order or marriage certificate. Since the issuance of the EO, our office of Records and State Archives has seen a dramatic increase in the requests for these materials. As the Chief Officer of Elections, I am very concerned about the impact of these new requirements on Vermonters' access to ballots. Obtaining certified copies of required documents is a significant burden for low-income Vermonters, who are less likely to hold an EDL or passport. This will require people to take time off from work and have access to a computer. This concern is particularly acute in Vermont since elections for statewide officials occur every two years.

**Impacts and Harms Caused by Executive Order Section 2(d)**

20.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide services to low-income and

disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. Our office will need to be in contact with our partner executive departments to ensure that they clearly understand this new requirement. *Id.*

**Coordinating with State Voter Registration Agencies**

21.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between the Vermont Secretary of State's Office and state voter registration agencies. There are currently 150 state offices or agencies designated as voter registration agencies in Vermont pursuant to the NVRA. *See* 52 U.S.C. § 20506; 17 V.S.A. § 2145b. Vermont will need to provide significant training to our partner state voting agencies. This will include coordination of messaging to Vermont residents, provision of training materials, and external-facing materials to provide to Vermonters. We also anticipate ongoing questions and concerns from our partner agencies that our office will need to address. The Vermont Secretary of State's Office is just beginning to assess and understand any process changes that will be necessary at those agencies. The immediate effective date of the EO puts extreme pressure on these conversations and coordination.

10

**Impacts and Harms Caused by Executive Order Section 3(d)**

22.    It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

23.    The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and/or local elections officials. Currently, UOCAVA voters are exempt from providing any identification, including a photo ID. Instead, voters self-attest that they are citizens and qualified UOCAVA voters. The changes to the UOCAVA voting process are dramatic. It is unclear to me how we would receive and verify documents received electronically. We are concerned about the security of documents sent electronically across state and country borders. And, if it is required that Vermont accepts those documents via mail, it would not be possible for these documents to be originals. These outstanding questions make the requirements for compliance at the town clerk and IT system levels very unclear at this time.   In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Vermont Secretary of State's Office to expend resources to educate state elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward. The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only 12 months away from the start of the candidate filing periods for the 2026 midterm elections. I have obligations to Vermont residents to prepare

11

for those elections and work on behalf of their interests, but that work is now largely on hold as I oversee Vermont's response to the EO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April _25_, 2025, at Montpelier, Vermont.

Sarah Copeland Hanzas
Secretary of State
Vermont Secretary of State's Office

12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

Case No. 1:25-cv-10810-DJC

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; PAMELA
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in
his official capacity as Chairman of the U.S.
Election Assistance Commission; THOMAS
HICKS, in his official capacity as Vice Chair
of the U.S. Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN W.
HOVLAND, in their official capacities as
Commissioners of the U.S. Election Assistance
Commission; PETE HEGSETH, in his official
capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF PAUL LINNELL

I, Paul Linnell, declare as follows:

1.    I am a resident of the State of Minnesota. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Elections Director for the State of Minnesota. I work for Secretary of State Steve Simon and support him in his official capacity as the Chief Officer of Elections for the State of Minnesota. In my role, I assist him in the administration of all state and federal laws relating to elections.

3.      I have served as the Elections Director since July 2024. I also have extensive prior experience in election administration, having served as an Elections Specialist, Elections Operations Administrator, and Elections Manager for Anoka County, Minnesota from 2015 to 2022 and as the Deputy Elections Director for Secretary Simon from 2022 to 2024, before assuming my current position. My current duties include supervising all election administration duties of the Office of the Secretary of State.

4.      The Secretary of State is Minnesota's Chief Officer of Elections, responsible for the administration of state and federal law relating to elections within the state. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections.

5.      Elections in Minnesota are managed by local officials with support from the Secretary of State's Office. Under Minnesota law, counties are responsible for processing voter registration applications, applying or removing challenges to voter records and conducting absentee balloting. Cities, townships, and (where appropriate) school districts are responsible for determining precinct boundaries, setting polling locations, and hiring election judges. Some counties delegate additional tasks to cities and townships, such as the training and certification of election judges and the administration of absentee balloting. The Secretary of State administers

2

the statewide voter registration system, provides technical assistance and training to local election officials, and monitors compliance of state election laws.

6.      In my role as Elections Director, I am responsible for ensuring the correct and legal administration of election processes and developing election guidance. I am quite familiar with the systems necessary to oversee the administration of elections in Minnesota, including the requirements necessary to register to vote and the statewide voter registration system.

7.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO will cause considerable harm, confusion, and disruption in Minnesota election administration.

8.      While we are not far past the November 2024 general election, my team is already hard at work preparing for the 2026 midterm elections. We are implementing changes to Minnesota election laws that were enacted by the Minnesota Legislature, updating training guides and manuals, testing and certifying voting equipment, and engaging in administrative rulemaking, in addition to supporting the administration of regularly scheduled odd year elections and several unplanned special elections. This work already consumes all of my team's time. We do not have the capacity to implement widescale changes to our election system. The EO, however, does just that, and does so without providing any financial or logistical support to the states to make those changes.

9.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a

3

limited number of specific documents that constitute acceptable DPOC, including REAL ID, which is actually available to citizens and non-citizens in Minnesota.[1]

10.     The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

11.     Minnesota is exempt from the requirements of the NVRA because it has offered election day registration since the NVRA went into effect. 52 U.S.C. § 20503(b)(2). Minnesota does not currently require DPOC to register to vote. The Minnesota voter registration application provides spaces for the eligible voters to provide their first and last name, middle name, previous name (if applicable), current address, any previous address, voter's date of birth, municipality and county of residence, school district (if known), telephone number, email address, current and valid Minnesota driver's license number or Minnesota state identification number, or if the voter has no current and valid Minnesota driver's license or Minnesota state identification, the last four digits of the voter's Social Security number. Minn. Stat. § 201.071, subd. 1. The application also requires the voter to sign and date the form and certify under penalty of perjury that the voter meets eligibility requirements, including that the voter is a United States citizen.

12.     Minnesota does, however, accept the Federal Form authorized under the NVRA as a valid form of registration. Minn. Stat. § 201.071, subd. 1. It is not clear from the EO which of its provisions (including Section 2(a)) will apply to use of the Federal Form in Minnesota. If

---

[1] Minnesota also offers an enhanced driver's license and identification card that meets the standards of REAL ID and is available only to those who provide proof of citizenship. *See* Minn. Stat. § 171.01, subds. 31a and 31b.

these provisions apply they will require me and my team to make significant changes to the Minnesota voter registration and election processes.

13.    Since the EO was issued, I have met with team members to assess the impact the EO would have on Minnesota voter registration requirements and Minnesota's statewide voter registration system; fielded questions from county officials about the impact the EO would have on Minnesota elections; and worked with my colleagues to determine how to address questions from the public about what impact the EO would have on Minnesota voter registration requirements. We have already spent several hours on these issues and will need to spend more time on them going forward.

14.    Any change to the Federal Form in Minnesota will require significant changes to Minnesota's statewide voter registration system database. Minnesota's statewide voter registration system is a database that the Secretary of State's election development team has created "in-house." It is maintained by Secretary of State staff who are already operating at full capacity to modernize the system and implement other necessary upgrades to maintain its security and functionality.

15.    Currently, there is nowhere in the statewide voter registration system for an election administrator to enter information regarding proof of citizenship. Significant programming time would be needed to modify this database so that election administrators could do so. Developers would need to create a new field in which administrators could identify whether documentary proof of citizenship was provided, what type of proof was provided, and the date of expiration of that proof. Such a project would take considerable time and cost a substantial amount of money. Similar projects in the past have taken hundreds of hours of programming time and cost thousands of dollars. The Secretary of State does not have the ability

5

to undertake such a project now and on the timelines proposed by the EO, as those resources are needed to make other preparations in advance of other upcoming elections.

16.     In addition, our elections administration team will need to develop training materials and guidance documents for use by our local election partners to explain any changes to the Federal Form. While the Federal Form is not widely used across the state, it is well known to election officials and available on many websites that provide voting information, including the Vote.gov website maintained by the federal government. *See How to Register to Vote in Minnesota*, https://vote.gov/register/minnesota (last visited April 16, 2025). The EO's DPOC requirement on the Federal Form, as well as the requirement that local elections officials record the type of DPOC presented, will require substantial education and coordination with local elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old federal form. This will require my team to spend substantial time and resources updating training materials for election officials, including the County Elections Administration Guide, https://www.sos.mn.gov/media/ukxlp5k0/county-election-administration-guide.pdf (last visited April 16, 2025) and the Absentee Voting Administration Guide, https://www.sos.mn.gov/media/4n4llsbx/absentee-voting-administration-guide.pdf (last visited April 16, 2025). Typically, it already takes my team several hours to update these guides to account for relatively modest changes that are made to Minnesota election laws each year. The changes proposed by the EO are much more dramatic and will take considerably more time to train local election officials on. In all likelihood, my team will need to develop additional materials and provide additional training in-person sessions on these requirements. All of these materials will take considerable time to update to account for the changes. I also anticipate our

6

team will need to consult with local officials on these requirements repeatedly to ensure compliance with these requirements as the 2026 elections approach.

17.    In addition, Minnesota law requires the commissioner of each state agency, as well as any "community-based public agency or nonprofit corporation that contracts with the state agency to carry out obligations of the state agency" to provide voter registration services for employees and the public. *See* Minn. Stat. § 201.162. My team will need to spend considerable time working with these agencies to train them on the EO's impact on Minnesota.

18.    The uncertainty of the EO's applicability to Minnesota, as well as the dramatic changes it purports to make on such a short timeline poses a substantial risk of confusion or mistake by state and local elections officials in their administration of voter registration and upcoming elections.

19.    Perhaps most critically, the EO poses a substantial risk of voter confusion. Already, my team has fielded emails, letters, and phone calls from voters wondering if they need to re-register to vote, provide DPOC when they register, or what other steps they must take to be eligible to vote. My team anticipates working with our communications and voter outreach divisions to develop resources necessary to educate Minnesota voters about the EO and whether it applies to them. For example, we will need to change our website and external-facing resources with updated and correct information regarding the EO and how to register to vote in Minnesota. This will take substantial time and resources.

20.    In addition, the EO's changes to the Federal Form pose a risk of voter disenfranchisement. Many Minnesota residents do not have easy access to DPOC. Less than 60 percent of Minnesotans have a U.S. Passport. Passport Possession by State, https://www.americanprogress.org/wp-content/uploads/sites/2/2025/01/SAVEact-tables.pdf (last

7

visited April 17, 2025). After 20 years since the passage of the REAL ID Act, just over 40

percent have a REAL ID license; even fewer have the enhanced license necessary to establish

citizenship. *See* REAL ID driver's license and ID card | Minnesota Department of Public Safety,

https://dps.mn.gov/divisions/dvs/license-and-id/dl-and-id-card-information/real-id-dl-and-id-card

(last visited April 16, 2025).

21.     It is a time consuming and expensive process to obtain the enhanced driver's

license or identification card showing citizenship in Minnesota. Applicants must provide proof of

their date of birth, full legal name, social security number, and U.S. Citizenship, as well as a

photographic identification card. *See* Enhanced Driver's License and ID Card Identification

Requirements, https://s3.us-east-2.amazonaws.com/assets.dps.mn.gov/s3fs-public/migrated-

files/divisions/dvs/forms-documents/Documents/EDL-EID-Identification-Requirements.pdf (last

visited April 16, 2025). It is my understanding that similar documentation is required to apply for

a U.S. Passport. Many Minnesotans will not have easy access to this material. These individuals

will struggle to provide the DPOC necessary to register using the Federal Form.

22.     It is my understanding that Section 3(d) of the EO requires the Secretary of

Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas

Citizens Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of

the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is

attempting to vote. It appears that these changes to the UOCAVA voting process could take

place at any time. *See* EO, § 3(d).

23.     The mandated changes to voting pursuant to UOCAVA will create substantial

administrative burdens on state and/or local elections officials. Currently, those eligible to vote

under UOCAVA can register using the Federal Post Card Application or online through the

Secretary of State's website by providing an email address and either a Driver's License or ID card number or the last four digits of their Social Security Number. My team will need to update these registration processes to ensure applicants provide DPOC and proof of eligibility to vote in Minnesota when they register (as well as make the corresponding changes to the statewide voter registration system described above).

24.     In addition, as outlined above regarding the changes in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Secretary of State to expend substantial resources to educate elections officials and voters of the new requirements and to ensure their continued compliance with their obligations moving forward. There is a risk of substantial impact on UOCAVA voters who are confused or unclear about the new requirements. UOCAVA voters face longer delivery timelines for returning their ballots from overseas locations. Any delay or disruption to that process increases the chances that their ballot will not be returned and accepted by the Election Day deadline. To minimize the potential impacts on voters and election officials, we will need to begin planning those education efforts in the coming weeks.

25.     We are only 13 months away in Minnesota from the start of the candidate filing period for the 2026 midterm elections. We already need all of that time to prepare for that election. The new requirements of the EO therefore disrupt our ability to prepare for the upcoming election.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 24, 2025, at St. Paul, Minnesota.

PAUL LINNELL
ELECTIONS DIRECTOR
OFFICE OF THE MINNESOTA
SECRETARY OF STATE

9

JA 268

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>*Defendants.* | Case No. 1:25-cv-10810-DJC |

## <u>DECLARATION OF DEAN C. LOGAN</u>

I, Dean C. Logan, declare as follows:

1.     I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Introduction and Background**

2.      I am the Registrar-Recorder/County Clerk ("RR/CC") for the County of Los Angeles ("County") in the State of California ("State"). In my role, I oversee the County's voter registration process and voter file maintenance, and administer all federal, state, local and special elections conducted in the County, in addition to verification and certification of initiative, referenda and recall petitions, real property document recording; maintenance and custody of vital records of births, deaths and marriages; and other related programs.

3.      I have served as Los Angeles County Registrar-Recorder/County Clerk for more than 16 years. I have more than 25 years of experience in election administration, records management, and public service. Prior to moving to Southern California, I served as the director of records, elections, and licensing services for King County, Washington; as state elections director for the Washington Secretary of State; and as the elected county clerk and chief deputy county auditor in Kitsap County, Washington. I serve on the Board of Advisors and the Standards Board for the United States Election Assistance Commission ("EAC"), on the Board of Directors (past President) for the California Association of Clerks and Election Officials ("CACEO"), on the Board of Directors for the Election Center (National Association of Election Officials), and on advisory bodies for the MIT Election Data Science Lab, the Auburn University Graduate Certificate in Elections Administration program, and the Electoral Psychology Observatory at the London School of Economics and Political Science. Additionally, I serve on the California Secretary of State's Language Accessibility Advisory Committee, and as President of the County Recorders' Association of California. I am an instructor for the MPA program at

California State University, Northridge. I hold a degree in organizational leadership from Azusa Pacific University and an executive MPA from the Evans School of Public Policy and Governance at the University of Washington, and I am a Certified Elections and Registration Administrator through Auburn University and the Election Center (National Association of Election Officials).

4.     The Los Angeles County Registrar-Recorder/County Clerk serves as the ex-officio Supervisor of Elections for the County and is one of 58 county elections officials in the State working together with the State's chief elections officer, the Secretary of State, to register voters, maintain voter registration records, administer elections and certify election results, among other things. *See e.g.*, National Voter Registration Act of 1993, 52 U.S.C. Section 20501 et seq., Cal. Elec. Code Sections 2162, 2168, 2170, 2187, 2188, 2193, 2194, 2201, 2206, 2211.5, 2212, 2214, 2225, 2226, 2404, 2405, 2407, 2501,2550, 2600, 3019.7, 3025, ,3026, 3101, 4005 et seq., 8020.5, 8025, 8026, 8070, 8081, 8082, 8083, 8100, 8105, 8106, 8120, 8123, 8124, 8125, 8148, 8228. At the County level, the RR/CC is responsible for registering voters, maintaining voter files, and conducting federal, state, local and special elections in the County. This includes the development, purchase, licensing, contracting, use and maintenance of equipment and materials used to facilitate the modern, accessible and secure administration of elections, including the devices used to check voters in when voting in-person - Electronic Pollbooks ("ePollbooks"); the devices voters use for in-person voting - Ballot Marking Devices ("BMD"); the equipment and processes used to issue and process vote by mail ballots; the programs and processes used for ballot layout, and modernized systems for scanning ballot images, recognizing and interpreting votes, tabulating vote totals and producing election results - Tally Systems. Los Angeles County is unique among all jurisdictions in having developed the first and only

publicly-designed and publicly-owned voting system, Voting Solutions for All People ("VSAP"). Each year, the office facilitates the administration and certification of elections for approximately 200 school districts, cities and special districts in addition to all state and federal executive, legislative, and judicial elections held within Los Angeles County. There are approximately 5.8 million registered voters, as well as 5,000 voting precincts established for countywide elections. The County is the largest and most complex electoral jurisdiction in the country, with 88 cities, over 100 school and community college districts, 55 general and special districts, approximately 140 unincorporated areas, and provides voting materials in 19 languages under provisions of the Federal Voting Rights Act and the California Elections Code.

5.     As Los Angeles County Registrar-Recorder/County Clerk, I oversee Los Angeles County's voter registration process, voter file maintenance, and federal, state, local and special election administration.

6.     I reviewed the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO") including Sections 2(a), 2(d), 3(d), 7(a), and 7(b).

7.     It is my understanding that Section 2(a) of the EO directs the EAC to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. *Id.* § 2(a)(ii). The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to

"take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

**Immediate Impacts and Response by RR/CC**

8.      The provisions of the EO, including Section 2(a), require immediate action from me and the staff of the RR/CC to identify compliance requirements, modify or develop new programs or procedures, implement associated activities, and coordinate with jurisdictions and stakeholders across the County. The RR/CC anticipates efforts to address the directed changes and impacts of the EO, which, if unchanged, will divert time, resources, and attention from other critical departmental responsibilities and election preparation, including assisting voters displaced by the Palisades and Eaton Canyon fires; upgrading the County's Election Management System ("EMS") which serves as the backbone of the voter registration intake and database; and engaging in a site by site analysis of all 600-plus Vote Center locations to ensure they meet accessibility standards.

9.      Shortly after the EO was issued on March 25, 2025, I immediately began fielding questions from Los Angeles County and state elected officials and staff, election administrators in other jurisdictions, and media. The department began researching and holding multiple meetings with key staff and counsel to discuss and research how the EO's language might be interpreted and implemented.

10.     In the discussions of the immediate and known impacts of the EO and based on our understanding of the EO, we are researching the impacts and resources needed to amend, modify, or expand the existing contract for development of a new EMS system that the County uses to receive and store voter registration and election information, to enable receipt, scanning, and storage of DPOC images as specified in the EO; to purchase hundreds of new scanning or

image capture devices; to expand storage capacity; and to hire and train hundreds of additional staff to manage a modified registration process. We are also assessing the impact of having to modify and/or replace over 31,000 Ballot Marking Devices because the EO disallows the use of a QR Code (except as necessary to accommodate persons with disabilities), even when the voter can verify their choices on a Voter Verifiable Paper Ballot as required under provisions of the California Elections Code and through the County's publication of a verification key. These are the devices that County voters use for in-person voting to mark their ballot selections on a touchscreen and print out a paper ballot before casting the ballot. These devices, valued at more than $141,000,000, are also necessary to comply with the accessibility provisions of the Help America Vote Act ("HAVA") and language provisions of the federal Voting Rights Act. We have also begun analyzing and planning to restructure our ballot intake processes to segregate mailed ballots that were cast on or before Election Day but arrived after because the EO would disallow counting ballots cast on or before but received after Election Day in contradiction to existing provisions of the California Elections Code. As Section 6 of the EO appears to require any and all individuals involved with federal election administration to be U.S. citizens, we further discussed how we could set up a citizenship verification process for all County employees and community, multi-lingual, and student election workers; contractors; truck drivers; translators; vendors; school principals; librarians; Elks Lodge building managers; and the thousands of others who are involved in specific and essential aspects of election administration. We are looking at what the impact might be if we excluded people who are lawfully in the United States but not citizens from providing support in election administration. We further discussed the extensive public education campaign that would be needed to inform voters of the EO's requirements and of the new and revised processes for voter registration and

election administration in order to reduce the substantial risk of voter disenfranchisement. We also discussed the need for an overhaul of State laws and processes to align with the directives in the EO. As such, this initial research and planning process involved staff from across the entire RR/CC, including senior leadership, the Information Technology Bureau, Candidate and Voter Services Bureau, Election Operations and Logistics Bureau, as well as the Media and Creative Services team and the Policy and Program Compliance team. These early discussions alone have minimally diverted 250 work hours of RR/CC staff time and are ongoing and continuous.

11.    The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. At a high level, the County faces the difficulty of compliance where the EO conflicts with provisions of other laws, including the National Voter Registration Act, HAVA, Voting Rights Act, and a myriad of state laws and local practices. As an example, the NVRA has strict requirements for what information may be obtained to register a voter and what may not. The NVRA currently requires the acceptance and processing of an application where the prospective voter has attested to age and citizenship requirements for voting by signature and check box responses. If we comply with the EO, we risk violating the NVRA. If the County elects to comply with federal law, but violate the EO, the EO provides for the U.S. Attorney General and/or private individuals a right of action to litigate or deny federal funding to a jurisdiction and contemplates broad prosecution powers against elections officials.

12.    Additional granular questions arise about what documents serve as DPOC — several documents are explicitly listed in the list of documents that can be used as proof of citizenship, but not a birth certificate issued by a U.S. jurisdiction. We are informed and believe 90% of eligible voters are citizens who derive their citizenship from being born within the

jurisdiction of the United States. The State Department reports that approximately 50% of Americans have passports. For the remaining 45-50% of U.S.-born citizens, there is an open question about whether they can present a birth certificate alone as proof of citizenship. Additional questions include whether a registrant can provide a copy or image of DPOC or if the original document must be presented; whether a registered voter who is updating their name, address, party preference, language selection, or other information will need to also provide DPOC; if DPOC is required for any such registration updates, what document(s) will a person who has changed their name (e.g.: because of marriage) need to provide; will we need to store scanned images of DPOC in our EMS and for how long; and how will we address the increased risks of privacy violations and data breaches associated with storing and maintaining extensive personally identifiable information.

**Potential Impacts of Executive Order Section 2(a)**

13.      In addition to the immediate and continuing need to assess and understand the EO, my team and I had to quickly commence multiple work streams relevant to the implementation of the EO's directives. In particular, the EO requires significant changes to the State's voter registration database, and Los Angeles County's EMS.

14.      **Potential Costs to Taxpayers.** To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the DPOC type into the County EMS, RR/CC would have to determine what document or combination of documents are acceptable and responsive to multiple user scenarios (naturalized citizens; U.S.-born citizens; people who have to change their names, have moved, want to change their party preference, or register their language need). We anticipate this would involve a plan to design for workflow integration, database schema changes and User Interface changes to build a new process that can receive new data including potentially

the type of DPOC provided, the identifying number, the date of document(s) issuance and expiration, and an image of the document(s). RR/CC also anticipates the need to engage County resources and contractors to write or re-write code, test, and deploy new fields to record the DPOC information in the EMS. To comply with the EO, we anticipate needing to design, test and purchase new equipment (scanners or other image capture devices) to collect images when people come to register in person at the RR/CC Headquarters, satellite sites, or one of over 600 Vote Centers throughout the County during elections. To be able to assist the thousands of new registrants each year in person, RR/CC estimates needing to hire and train hundreds of new permanent and temporary workers and expand physical capacity to respond to the increased volume of in-person registrants and extra work associated with keying in data, learning what documents or combination of documents are permitted to establish DPOC, reviewing documents, and scanning the DPOC documents. Because there is a possibility that registrations can no longer be received online, through the mail, or via fax, we may have to prepare for the dramatic increase of registrants who register in person, and the additional volume of work that entails. One related critical task would be to carry out an education campaign to help eligible voters navigate a new process that likely will involve longer wait times and lines, additional documentary requirements, and potentially multiple, in-person visits. In total, we preliminarily estimate these costs to be $30 million.

15.    Change of this magnitude requires multiple years of planning and careful execution. It would be impossible to complete in the shortened timeframe contemplated by the EO without significant risk of administrative error, false positive data matching, and under-resourcing other critical elements of election administration and security. Moreover, there is a

significant likelihood of a drop in eligible voter participation, higher registration data error rates, and non-compliance with conflicting federal and state laws, and additional costs to taxpayers.

16.    **Risk of Disenfranchisement**. Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also pose a high risk of voter disenfranchisement. In Kansas, which implemented a law that required DPOC, federal courts found that over 30,000 U.S. citizens otherwise eligible to vote, were unconstitutionally blocked from registering to vote because of the documentation requirements and ordered the suspension of the law. Using the Kansas rate of denial (12% of new registrants unconstitutionally disenfranchised), this EO could result in over 40,000 U.S. citizens blocked from registering to vote in Los Angeles County in any given year.

**Potential Impacts of Executive Order Section 2(d)**

17.    It is my understanding that Section 2(d) of the EO requires "[t]he head of each federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates and whether retention of the DPOC documents, electronic data associated with the DPOC, or images or physical copies of the DPOC would be required by the agency or the elections official. I am not aware of any federal legal requirement, guidance, or uniform practice

for an assessment of citizenship before a registration application is provided. This provision purports to take effect immediately. *Id.*

18.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a voter registration application, the EO may require substantial coordination between Los Angeles County and County and State voter registration agencies. In the County, the offices or agencies that engage in voter registration include the 88 cities in the county; libraries; the Sheriff's Department; schools, community colleges and universities; parks and recreation; Department of Social Services; Probation; and others, pursuant to the NVRA. *See* 52 U.S.C. § 20506. Los Angeles County RR/CC anticipates needing to research, identify, and develop new guidelines, training, and a deployment plan in collaboration with these local entities and agencies to implement changes within a short period of time. Because of the restrictions prescribed by Section 6 of the EO, prohibiting non-citizens from participating in the administration of federal elections, these changes may also necessitate system-wide protocols for verifying the citizenship status of every individual who assists in the administration of the elections, including registering people to vote, providing facilities to serve as voting locations, and providing staff and volunteers to serve as election workers. These changes will require a significant investment of time and resources, given the significant policy and protocol changes, the thousands of people affected, and the challenges associated with implementing any changes necessary at state voter registration agencies on a short timeline, and absent established guidelines and uniform practices, especially because Section 2(d) purports to be in effect immediately.

**Potential Impacts of Executive Order Section 3(d)**

19.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

20.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on Los Angeles County RR/CC. The Federal Voting Assistance Program (FVAP) process is designed to allow registration by members of the military, their families, and Americans living abroad who cannot register to vote in-person while in their county of domicile. Depending on how the EO is implemented, it is possible that UOCAVA voters will not be allowed to register to vote at all, particularly if there is a requirement that they present DPOC in person in Los Angeles County. If the EO is implemented to allow individuals to upload an image or send a copy of their DPOC along with the completed Federal Post Card (voter registration) application (FPCA), RR/CC staff would need to review, determine the sufficiency, scan and upload an image(s) of the provided DPOC. As with other parts of the EO, additional staff, training and resources would be required. In addition, if the DPOC provided was determined not to be sufficient, additional staff time is expected to communicate with the individual to assist in curing the deficiency, if possible. In 2024, the County received over 14,000 FPCA voter registration applications from UOCAVA voters via fax, emails, and mail.

**Potential Impacts of Executive Order Sections 7(a) and 7(b)**

21.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

22.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires states to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting" - but excluding ballots cast pursuant to the UOCAVA – "after which no additional votes may be cast." This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

23.     Sections 7(a) and 7(b) of the EO could have substantial and adverse impacts on voting in Los Angeles County, as well as on the County's ability to adequately administer elections. First, the two sections present seemingly conflicting language, making it impossible for RR/CC to comply.  Section 7(a) appears to require the Attorney General to take all action necessary to enforce states from counting any ballots that are received by mail after Election Day. Section 7(b) appears to require the EAC to condition funding to states based on their creation of rules for enforcing Election Day receipt as the standard for what ballots are tabulated — with one exception, for Uniformed and Overseas Voters.  If RR/CC disqualifies all ballots received by mail after Election Day, in accordance with Section 7(a), we risk violating UOCAVA and state laws, and, based on the EO's language, we risk denial of federal funding.

Conversely, if RR/CC counts the ballots of Uniformed and Overseas voters cast on or before Election Day, but arriving after, RR/CC risks prosecution by the Attorney General under Section 7(a).

24.     Further, Section 7(b) of the EO could potentially create two standards for handling ballots: UOCAVA ballots received by mail after Election Day, cast on or before Election Day could be counted; and those received under the same conditions from all other voters would not be counted.

25.     In Los Angeles County, conservative estimates are that as many as 70,000-100,000 voters who cast ballots on or before Election Day could have their ballots disqualified from being counted because of the EO's ballot receipt requirements, which conflict with existing provisions of the California Elections Code and voting practices in the State of California that have existed for decades. Data shows that impacted voters are representative of the range and distribution of voter demographics in the County's voter population, including age, geographic location, and political party preference.

26.     The County will be required to devote significant additional resources to a voter education campaign to properly administer elections in accordance with the EO's changes to ballot receipt deadlines and potential elimination of certain voting options. As with other parts of the EO, the County will be required to provide staff and election workers with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements.

**Potential Impacts of the Executive Order Generally**

27.     The EO's commands will almost certainly disrupt RR/CC's ongoing work to prepare for upcoming elections. We are only months away from the start of the candidate filing

periods for the 2026 midterm elections. I have obligations to Los Angeles County's 5.8 million registered voters and its electoral districts/jurisdictions to prepare for those elections and work on behalf of their interests to ensure the administration of safe and fair elections but that work is now largely on hold given conflicting directives in Federal and State Law and the directives in the EO that must be resolved.

28.    To minimize disenfranchisement of eligible voters unable to register to vote because of new DPOC requirements, ballots being disqualified because of new ballot receipt deadlines, and other changes promulgated by the EO, the County will be required to mount a large-scale public information and educational campaign. Based on past experience, a voter education campaign designed to help County residents navigate significant election process changes is estimated to require a minimum investment of $20,000,000 for media and outreach. These resources would be used to educate an estimated 6 million registered and eligible voters about the election law changes and new processes to ensure minimal confusion and avoid disenfranchisement; thereby diminishing resources and activities that have been previously effective at encouraging voter participation and advising voters of verification options. The cost and effort of such a large-scale campaign is compounded by the fact that there is no lead time for the media campaign and voter outreach; typically, a Countywide media and outreach campaign of the EO's magnitude would require years in lead time to effectively plan and implement.

29.    **Risk of Disenfranchisement**. As to voting, a significant portion of eligible voters in the County are anticipated to be adversely affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Los Angeles County, 2,732,752 voters utilized mail-in or absentee ballots to cast their votes in the 2024 General Election. Under state law, ballots that are

cast on or before Election Day may be counted in the tabulation of votes; Vote By Mail ballots must be post-marked on or before Election Day. State law allows Vote By Mail ballots that are appropriately post-marked to arrive within 7 days of Election Day at county election offices and be counted if all requirements are met. (Cal. Elec. Code § 3020). Based on our 2024 General Election experience, between 60,000-150,000 voters could be disenfranchised by the EO, if their ballots are disqualified because they arrive after Election Day.

30.     California law also allows voters who cast ballots on or before Election Day to cure technical errors within the canvassing period after Election Day, allowing their ballots to ultimately be counted. (Cal. Elec. Code § 3019). It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if doing so would be a basis for an enforcement action or the loss of funding against the County or State under Sections 7(a) and 7(b).

31.     **Potential Costs to Taxpayers.** In addition, to the extent California law does not currently comply with the Election Day ballot receipt rule outlined in Section 7 of the EO, the County risks a loss of federal elections funding that is integral to the County's ability to conduct elections. The County has previously received $7,085,920.49 of federal funding pursuant to HAVA. In this fiscal year, the County has dedicated staff and resources for network security, cyber threat monitoring and analysis, incident response, and training programs of security and network services teams amounting to approximately $700,000 (currently budgeted) with $49,000 in newly-awarded federal HAVA funding. The County also expects to spend $1.8 million in HAVA funds for Polling Place Accessibility work in 2024 and 2025 related and responsive to HAVA accessibility requirements.

32.     The funding threatened in Section 7(b) is critical to Los Angeles County's ability to conduct elections safely, accessibly and securely. For instance, LA County utilizes grants of

HAVA funding to make voting locations, including the path of travel, entrances, exits, and voting areas of each polling facility, physically accessible to individuals with the full range of disabilities to enhance their access to and participation in elections for federal and State office. LA County additionally uses federal grants to ensure the entire voting experience, including the design of ballots and ballot marking devices, provide the same opportunity for access, privacy and independence to individuals with the full range of disabilities as for other voters. These funds would also support acquisition or deployment of a remote accessible vote by mail system, which allows voters with disabilities to receive a blank ballot to mark electronically, print, and then cast by returning the printed ballot to the elections office. The funds also would cover the development, production, translation, and transcription into Braille of manuals, programs, posters, brochures, and other printed materials for training of election workers or Vote Center leads; formatting and re-printing materials into "large-type"; and the acquisition of items such as accessible voting tables, handrails, and magnifying glasses for voters with a range of disability accommodations. These funds are necessary to improve accessibility in accordance with the Americans with Disabilities Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __23__, 2025, at Norwalk, California.


_Dean C. Logan_
_____
Dean C. Logan
Registrar-Recorder/County Clerk
Los Angeles County

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## DECLARATION OF EDMUND MICHALOWSKI

I, Edmund Michalowski, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1

1.    I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I am the Deputy Clerk for Elections for the Office of the Cook County Clerk. I work for the Cook County Clerk Monica Gordon and support her work as chief election authority in Cook County, Illinois. In my role, I assist in the execution of the election process at the local level. I have served in this role since 2019.

3.    The Cook County Clerk is the election authority responsible for administering elections in suburban Cook County, Illinois. As the local election authority, the Cook County Clerk handles local voter registration, trains election judges and deputy voter registrars, selects polling places, prints ballots, oversees Election Day activities, and supervises the vote count. The Cook County Clerk is the largest election authority in the State of Illinois with approximately 1.6 million registered voters in suburban Cook County. Specifically, for the November 5, 2024 Presidential Election, there were a total of 1,640,040 registered voters in suburban Cook County. A total of 1,089,942 voters cast ballots in that election.

4.    In my role as Deputy Clerk for Elections, I am responsible for preparing and conducting all primary, general, and special elections held in Cook County; developing, implementing, and directing the activities of the Election Division, including registration, candidate filings, all forms of voting, ballot programming and testing, and voter outreach efforts; drafting the Election Division's long-term and short-term strategic

2

goals; working with voters, political parties, candidates, political jurisdictions, media, county departments, and other entities; and developing and presenting a proposed budget.

5.    I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). The EO—specifically Sections 2(a), 7(a), and 7(b)—has substantial and adverse impacts on voting in Cook County, as well as the Cook County Clerk's ability to adequately administer elections.

6.    It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). The EO requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B).

7.    The Cook County Clerk currently uses and accepts the Federal Form when registering new voters. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require an overhaul of the Cook County Clerk's voter registration process, which will include (1) phasing out use of the old forms; (2) training those involved in the registration process on these new requirements and updating related training materials; and (3) modifying the registration database to account for these changes as well as ensure data security of the DPOC. Specifically, the Cook County Clerk will require an increased terminal-based computer system to scan, collect, and store the

3

requisite documentation, costing an estimated $900,000. Further, our efforts to address these directed changes on such a compressed timeline will divert time and attention from other critical election preparation.

8.      Section 2(a) also risks voter disenfranchisement. Many eligible voters may not be able to easily obtain DPOC or may not be aware of this new requirement before the next election, resulting in them being unable to register to vote. This risk is not justified given that in the more than five years that I have served as Deputy Clerk for Elections for the Cook County Clerk, I have not learned of any issues related to widespread fraud in the registration of voters who were not citizens of the United States.

9.      It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including States that count absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

10.     The Illinois Legislature in Article 19 of the Illinois Election Code has provided for mail balloting for registered voters. Ballots duly postmarked by the United States Post Office on or before the date of the election are valid if received within 14 days after the date of the election, through delivery to the Cook County Clerk by the United States Post Office. 10 ILCS 5/19-3, 19-8.

11.     For the November 5, 2024 Presidential Election, the Cook County Clerk received a total of 193,943 mail-in ballots. Of the total number of mail-in ballots, 66,132 mail-in ballots, postmarked on or before Election Day, were received by the Cook County Clerk through delivery by the United States Post Office after Election Day. This included

4

ballots received from residents within the State of Illinois, registered voters temporarily outside the State of Illinois, and 2,074 overseas ballots, such as from military personnel serving outside the State of Illinois.

12.    The Illinois Election Code also allows voters who cast mail-in ballots on or before Election Day to cure technical errors within 14 days after Election Day, allowing their ballots to ultimately be counted. 10 ILCS 5/19-8(g-5) (providing that if a vote-by-mail ballot is rejected by the election judge or official for any reason, the voter may appear before the election authority, on or before the 14th day after the election, to show cause as to why the ballot should not be rejected). It is not clear whether the EO allows tabulating ballots cured after Election Day, or if such tabulation would instead be a basis for enforcement action against the Cook County Clerk.

13.    To minimize the number of voters whose ballots will be disregarded for being received or cured after Election Day, the Cook County Clerk will be required to devote significant additional resources to properly administer mail-in ballots in accordance with Section 7(a).

14.    Specifically, the Cook County Clerk will need to expend a tremendous amount of time and expense to, among other things, train and retrain several hundred Cook County Clerk staff and more than 8,000 election judges and deputy voter registrars on the new policy regarding mail-in ballots. Implementation and management of the proposed change would require 100 plus more staff at a minimum of $7,500,000 in cost as well as the cost of acquiring additional rental space to accommodate increased staff. Further, the Cook County Clerk will have to institute a massive voter education program to ensure Cook County voters are familiar with this requirement. The Cook County Clerk engages in a

mailing campaign prior to each election to educate eligible voters on the election process. The Cook County Clerk will have to completely revamp its mailing materials prior to the next election cycle to reflect the new policy. As the largest election authority in Illinois, the Cook County Clerk will struggle to implement these changes in the shortened timeframe contemplated by the EO. As such, Section 7(a) could irreparably harm the orderly administration of elections in Cook County.

15.    Further, like other provisions of the EO, Section 7(a) risks voter disenfranchisement. Given that Illinois law has long provided for additional time to receive and cure mail-in ballots, a significant portion of eligible voters in Cook County will be affected if Section 7(a) is permitted to take effect—potentially resulting in their votes not being counted—because they are not aware of the new requirement. This risk is not justified given that in the more than five years that I have served as Deputy Clerk for Elections for the Cook County Clerk, I have not learned of any issues related to widespread fraud in the casting and delivery of mail-in ballots that were received or cured in the 14 days after Election Day.

16.    It is my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

17.     To the extent Illinois law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Illinois risks a loss of federal elections funding that is integral to its ability to conduct functional elections. The Cook County Clerk in particular received $2,300,000 of federal funding pursuant to the Help America Vote Act during the last election cycle. This funding was used to help facilitate the administration of the election at the local level, particularly voter registration. The funding threatened in Section 7(b) is critical to the Cook County Clerk's ability to safely and efficiently conduct elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025, at Chicago, Illinois.

Edmund Michalowski
Deputy Clerk for Elections
Office of the Cook County Clerk

7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |
| *Plaintiffs,* | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

**DECLARATION OF ROB ROCK**

I, Rob Rock, declare as follows:

1.     I am a resident of the State of Rhode Island. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.      I am the Deputy Secretary of State/Director of Administration for the State of

Rhode Island. I work for Secretary of State Gregg M. Amore and support him in his official

capacity as the Chief State Election Official for the State of Rhode Island. In my role, I assist

Secretary Amore in the execution and enforcement of all state and federal laws relating to

elections.

3.      I have served as the Deputy Secretary of State/Director of Administration for the

RI Department of State for two years and three months. Prior to serving in this capacity, I was

the state Elections Director from 2015-2023. I have undergraduate (Political Science) and

Master's (Public Administration) degrees from the University of Rhode Island.

4.      The Secretary of State is Rhode Island's third ranking elected official, following

the Governor and Lt. Governor. State law gives the Secretary of State many different duties. As

Rhode Island's chief state election official, the Secretary of State oversees the state's voter

registration system, certifies candidates, prepares ballots, and administers oaths of office. The

Secretary of State also works with companies registered to do business in Rhode Island and

regulates lobbying activity in the Executive and Legislative branches of government. The

Secretary of State also must sign all laws and other official acts, such as issuing bonds, to make

them official. Additionally, the Secretary of State processes, preserves, and gives public access

to hundreds of thousands of historic documents and public records.

5.      The Secretary of State is Rhode Island's chief state election official responsible

for the coordination of the State's responsibilities under the National Voter Registration Act of

1993 (NVRA) and complying with all state and federal laws relating to elections within the state.

2

*See* R.I. Gen. Laws § 17-6-1 (general powers), § 17-6-1.3 (designated chief elections official). The Department of State's Elections Division is responsible for implementing the Secretary of State's responsibilities regarding elections, including providing technical information to the public and other parties. In Rhode Island, elections administration is a collaboration among the Secretary of State's Elections Division, the State Board of Elections, and local cities and towns (local boards of canvassers).

6.      In my role as Deputy Secretary of State/Director of Administration, I am responsible for overseeing the administration of elections in Rhode Island, including overseeing the state's voter registration system, training local election officials on elections administration, maintaining the online voter registration and mail ballot application portals, certifying state and federal candidates, preparing ballots, preparing and sending mail ballots to voters, preparing election calendars, providing candidate and voter information guides, implementing a statewide elections education campaign, and providing voter identification cards. I have personally overseen these responsibilities since February 2015 and, therefore, have substantial first-hand knowledge of administering elections in Rhode Island, including voter registration requirements and the statewide voter registration system.

7.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Rhode Island elections administration, and will likely continue to do so.

8.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide

3

"documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including several document types, like the REAL ID with proof of citizenship, that are not issued to Rhode Island residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

9.    The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Elections Division to educate voters across Rhode Island. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparations. Despite being slightly over a year away from candidates filing for the 2026 election cycle, our team is involved in election preparations such as voter list maintenance activity, a training and certification program for our local election officials, and lobbying for legislation that would improve the conduct of elections in Rhode Island. There are also several special elections that state and local election officials are currently administering.

10.    In fact, shortly after the EO was issued, I immediately undertook steps to ensure that all Rhode Island election officials were well versed in the contents of the EO. These measures included briefings for office staff, including the Secretary of State, on the EO; ensuring distribution of the EO to all state and local elections officials; and preparing press releases and fielding questions from the public on the EO's new requirements.

11.    The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. Specific concerns center around how cities and towns would handle the new voter registration requirements, how

4

our military and overseas citizens would comply with the new mandates, and how to combat the clear disenfranchisement of eligible Rhode Island voters.

12.    In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly begin to think about multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to Rhode Island's voter registration database. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. The system will also need to be updated to create a second voter registration list containing voters who are eligible to vote yet do not have the means to provide proof of citizenship. These voters would be eligible to vote in state and local elections but would not be eligible to vote in federal elections. These modifications must be done carefully and must not be rushed. Updating complex systems risk unintended consequences because even minor changes have a ripple effect throughout the system. Additionally, updates to the system will be expensive which makes this EO an unfunded mandate on state and local election officials. Even if state funds are available, there is an annual budget process that does not align with the timetable of this EO, which makes it impossible to expend state funds on this matter.

13.    In addition to modifications to the voter registration system, the electronic poll book system would have to be updated to handle the bifurcated voter lists. Like voter registration system updates, backend software changes cannot be made in an accelerated and rushed timeframe. Additionally, these changes would require a significant allocation of funds, that were not provided for or contemplated in the EO.

5

14.     While my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by state and local election officials as soon as possible. This is yet another aspect of the EO's implementation that will divert resources to accomplish the EO's directives on the purported timeline. The State Board of Elections would also be required to redo all the poll worker training materials and modify their training procedures to comply with the EO.

15.     The Federal Form is currently used and accepted in Rhode Island. It is widely available and well-known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require substantial education on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. Most notably, this EO will require a major revision to our online voter registration portal. Currently, tens of thousands of Rhode Island voters register to vote or update their voter registration information at vote.ri.gov. The portal requires a voter to enter their first name, last name, date of birth, zip code, and driver's license/state identification number to register to vote or update their address. Currently, the portal has no mechanism to accept a proof of citizenship document. Even if we update the portal to allow a document to be provided, this will further disenfranchise voters who do not have scanning equipment or are unable to visit a local board of canvassers office in-person during their municipality's operating business hours to register or update their information.

16.     Apart from the impacts of immediately creating and implementing an education process for state and local election officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and

6

substantial risk of confusion or mistake by state and local election officials in their administration of voter registration and upcoming elections. Since the EO would fundamentally make online voter registration illegal in its current form, local boards of canvassers will have to manually enter most new and changed voter registrations by hand. This will undoubtedly lead to a significant increase in manual data entry mistakes, which ultimately will lead to a less accurate voter registration database. Local boards of canvassers will be forced to rely more frequently on poor handwriting and illegible documents when entering voter data. This will inherently make our state's elections less secure than they are at present, causing immediate and irreparable harm to the integrity of any elections conducted under the EO's directed framework.

17.    A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and corrected information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. To ensure voters are educated on the new processes, our office will engage in a statewide campaign in which significant resources will be dedicated. It is imperative that we visit senior and community centers, high schools, colleges, community events, parades, nursing homes, assisted living facilities and many more to educate voters about the drastic changes in the EO. Additionally, our office spent $83,000 to ensure voters had relevant elections information ahead of the 2024 election. I expect outreach to cost significantly more regarding this EO.

18.    This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost hundreds of

7

thousands of dollars. Due to state budget constraints, the forced reliance on federal grant money means other important aspects of elections administration like cybersecurity improvements and voting equipment upgrades will be in jeopardy.

19.     Since the EO was announced, we have received several inquiries from the public related to the new registration requirements. Responding to these requests has required the Office to develop talking points and devote staffing to respond to these inquiries.

20.     Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. The most common way to prove citizenship is by producing a US passport or a birth certificate. According to Massachusetts Institute of Technology (MIT) professor Charles Stewart, 40% of Rhode Island residents do not have a passport. To obtain one, it can cost up to $165, not to mention the time and effort required. Additionally, people who have changed their name (whether because of marriage or another reason) do not have a birth certificate that has their current information on it. As an example, to obtain a certified vital record birth certificate from the City of Providence, it costs $22. Hundreds of thousands of Rhode Island voters will potentially be disenfranchised or forced to spend money to register to vote or change their voter information.

21.     The risk of voter disenfranchisement is far outweighed by the lack of evidence of any widespread voter fraud in Rhode Island. In 2020 over 521,000 people cast a ballot and only three people were prosecuted for voter fraud. None of those cases involved non-citizen voting. Rather, in each of the three cases, the voters cast ballots in Rhode Island and in another state. Those three prosecutions represent .0000057% of the total votes case in that election.

8

22.    It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. *Id.*

23.    Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination among the Secretary of State, the State Board of Elections, and state voter registration agencies like the Division of Motor Vehicles. There are currently six state offices or agencies designated as voter registration agencies in Rhode Island pursuant to the NVRA. *See* 52 U.S.C. § 20506; R.I. Gen. Laws § 17-9.1-7 (registration at DMV), § 17-9.1-8 (permitting registration at other designated places). The State Board of Elections oversees voter registration at state agencies. Their office will be responsible for ensuring that those agencies comply with the EO and affected rules, regulations, and procedures which will draw their attention away from other important elections administration tasks such as improvements to poll worker training and assessments of the state's current voting equipment. The Board is also currently overseeing several special elections.

9

24.     It is my understanding that Section 3(d) of the EO requires the Secretary of

Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas

Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of

the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is

attempting to vote. It appears that these changes to the UOCAVA voting process could take

place at any time. *See* EO, § 3(d).

25.     As with the changes outlined in Sections 2(a) and 2(d), the EO's changes to

UOCAVA will require our office to expend resources to educate military and overseas voters on

the new requirements and to do everything we can to ensure their ballot will be received in time

and that they will not be disenfranchised. We will utilize resources updating our educational

materials, mail ballot instructions, and online content. These resources will take away from other

important elections administration work like securing our systems.

26.     The EO's commands also disrupt my team's ongoing work to prepare for

upcoming elections. We are only 14 months away from the start of the candidate filing period for

the 2026 midterm elections. I have obligations to Rhode Islanders to prepare for those elections

and work on behalf of their interests, but that work is now sidetracked as I oversee Rhode

Island's response to the EO.

27.     It is my understanding that Section 7(a) of the EO requires the Attorney General

to "take all necessary action" to enforce the federal Election Day statutes "against States that

violate these provisions," including by counting mail ballots received after Election Day in the

final tabulation of the vote for federal offices. This provision of the EO appears to take

immediate effect. *See* EO, § 7(a).

10

28.     It is also my understanding that Section 7(b) of the EO directs the EAC to

"condition any available funding to a State on that State's compliance with" federal law that

requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid

and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt

deadline of Election Day for all methods of voting," excluding ballots received after Election

Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

29.     Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting

in Rhode Island, as well as the State's ability to adequately administer elections. Although R.I.

Gen. Laws § 17-20-16 generally requires that ballots must be received by 8 p.m. on Election

Day, the Rhode Island General Assembly provided an exception for ballots cast by uniformed

and overseas citizens pursuant to UOCAVA, which may be counted if received by 4 p.m. on the

seventh day following an election or the third day following a primary. R.I. Gen. Laws § 17-20-

16; § 17-20-6.1. Due to the various locations around the world that our military and overseas

voters are stationed or live, the mail service is oftentimes inadequate, at best. Providing the extra

seven days for an election and extra three days for a primary allows those who are fighting for

our country more time for mail services to deliver their ballots to the proper election officials.

30.     This EO will undoubtedly prevent some of our military personnel from casting

their ballots in a timely fashion. They will be disenfranchised if the EO's directive for Attorney

General enforcement against states that permit the counting of timely cast ballots received after

Election Day is permitted to take effect. In Rhode Island, 3,564 voters utilized the UOCAVA

mail ballot process to cast their votes in the 2024 federal elections. Under state law, such ballots

can be counted in the tabulation of votes if cast on or before Election Day, even if the mail ballot

is received by state election officials within 7 days after Election Day. In the 2024 general

11

election, 34 UOCAVA mail ballots were mailed before but received after Election Day. Under the EO, these votes would be excluded from the final count, even though timely received under state law.

31.    Additionally, to properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, Rhode Island will be required to devote additional resources to address the EO's Election Day provisions. As with other parts of the EO, Rhode Island will be required to change processes to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, Rhode Island will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

32.    Rhode Island law also allows voters who cast ballots on or before Election Day to cure technical errors within seven days after an election and within three days after a primary, allowing their ballots to ultimately be counted. *See* 410 R.I. Code of Regulations § 20-00-23.12. Over 100 voters were contacted about curing their mail ballot in the 2024 general election. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Rhode Island or the loss of funding under Sections 7(a) and 7(b).

33.    In addition, to the extent Rhode Island law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Rhode Island risks a loss of substantial federal elections funding that could adversely affect the state's ability to conduct functional elections. Since 2018, Rhode Island has received $9.2 million of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of

12

elections at the state and local levels. In the last six years, we have provided security grants to the cities and towns, built a new voter registration system, purchased state-of-the-art voting equipment, and procured cybersecurity training for the state's election officials all with federal funds. Additionally, through September 30, 2022, Rhode Island received over $13 million of federal funding pursuant to HAVA section 251 grants, which were used to buy new voting equipment and keep up with federal laws related to accessible voting units. The loss of funding threatened in Section 7(b) would adversely impact Rhode Island's ability to safely and efficiently conduct elections. Technological improvements, law changes, and directives from federal and state leaders, though often well-intended, create challenges for election officials. Federal funds have been instrumental in making elections administration better in Rhode Island. The loss of federal funds would have a significant negative impact on how elections are administered in Rhode Island.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025, at Providence, RI.

Rob Rock
Deputy Secretary of State/Director of Administration
Rhode Island Department of State

13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

                       *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; PAMELA
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in
his official capacity as Chairman of the U.S.
Election Assistance Commission; THOMAS
HICKS, in his official capacity as Vice Chair
of the U.S. Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN W.
HOVLAND, in their official capacities as
Commissioners of the U.S. Election Assistance
Commission; PETE HEGSETH, in his official
capacity as Secretary of Defense,

                       *Defendants.*

Case No. 1:25-cv-10810-DJC

## DECLARATION OF HILARY RUDY

I, Hilary Rudy, declare as follows:

JA 306

1.      I am a resident of the State of Colorado, I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Deputy State Elections Director in Colorado. I work for the Secretary of State and support her in her official capacity as the Chief Election Official for the State of Colorado. In my role, I assist her in the oversight, execution and enforcement of all state and federal laws relating to elections.

3.      I have served as the Deputy Elections Director in the Colorado Department of State (the "Department") since May 2013 and have worked in the state elections office in various roles since 2006. I hold a law degree from Thomas Jefferson School of Law, and an undergraduate degree in Business Management from Colorado Mesa University, formerly Mesa State College.

4.      The Secretary of State is Colorado's Chief Election Official. In Colorado, elections are primarily conducted at the county level. However, among other duties, the Secretary is responsible for supervising the conduct of elections, enforcing the provisions of Colorado's Elections Code, coordinating Colorado's responsibilities under the National Voter Registration Act ("NVRA"), and serving as the chief state election official under the federal Help America Vote Act of 2002 ("HAVA").

5.      The Secretary is also responsible for maintaining the statewide voter registration system, known as "SCORE." An accurate and up-to-date voter registration list is particularly important in Colorado because Colorado is primarily a mail-ballot state.

6.    Under Colorado's mail-ballot system, each active, registered voter receives a ballot through the mail in advance of the upcoming election. Voters may cast their votes on that ballot, and return it by mail, in person at a Voting Service and Polling Center ("VSPC"), or at one of over 400 24-hour secure drop boxes across the state. If a voter prefers to vote in person, at a VSPC, they have the option to do so. Colorado opens VSPCs for in person voting 15 days before a General Election and eight days before a Primary Election.

7.    Colorado prides itself on having a commonsense voting system that makes it easy for eligible voters to cast their ballots. As a result, Colorado consistently has one of the highest voter participation rates in the country, measured both as a percentage of active voters and as a percentage of the state's voting-age population.

8.    In my role as Deputy Elections Director, I am responsible for overseeing the implementation of state and federal laws and regulations relating to Colorado's voting processes and procedures, including rules, guidance, and forms. I am responsible for overseeing the management of the statewide voter registration system, including guidance and training, functionality development, and maintenance. And I am responsible for overseeing the development and implementation of training, guidance, and forms to implement state and federal voter registration laws, including those related to agency-based registration and third-party voter registration organizations. Additionally, I am responsible for overseeing the training and certification program for local election officials in Colorado.

9.    I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), 3(d), 7(a), and 7(b) of the EO have already caused considerable harm, confusion, and disruption in Colorado election administration, and will cause continued confusion and disruption to an

election system that works for the citizens of our sovereign state. It is my understanding that

Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the

national mail voter registration form ("Federal Form"), as provided by the National Voter

Registration Act ("NVRA"), to require applicants to provide "documentary proof of United

States citizenship" ("DPOC") when registering to vote or updating an existing voter registration

using that form. *See* EO, § 2(a)(i)(A).

10.     It outlines a limited number of specific documents that constitute acceptable

DPOC, including several document types that are not issued as a matter of course to Colorado

citizens. For example, Colorado's REAL ID driver's licenses do not indicate the citizenship

status of the holder. It is therefore not a qualifying document under Section 2(a) of the EO which

appears to require that the ID physically demonstrate citizenship. Thus, while every person who

acquires a Colorado driver's license provides documents on their citizenship status plus two

credentials demonstrating identity, this ID would illogically not meet the DPOC requirements

laid out in the EO. The EO also requires state and local officials to "record . . . the type" of

DPOC presented at the time of voter registration, including recording specific information about

the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30

days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

11.     Colorado's election infrastructure ensures that only eligible Colorado voters cast

votes. For example, in Colorado, the overwhelming majority of voter registrations are processed

through automatic voter registration when voters obtain a driver's license or state ID. These

registrations occur *only* when a Colorado voter presents documentation to the DMV proving

citizenship to obtain a REAL ID. The voter is later sent a mailing that confirms the registration

and allows the voter to withdraw the registration if they choose. Non-citizen voting is

vanishingly rare in Colorado--and implementing wholesale changes to the registration process

that could result in substantial voter confusion and disenfranchisement of eligible voters is

unwarranted. In short, and as described in more detail below, Section 2(a) of the EO is a

problematic solution to a nonexistent problem.

12.     The provisions of the EO, including Section 2(a), require immediate action by the

Colorado Department of State to implement and coordinate with other state and local agencies

across Colorado. Our efforts to address the directed changes and effects of the EO will divert

time, attention and resources from other critical election preparation. The Department currently

has a full schedule of development for the statewide voter registration system necessary to

implement new state laws ahead of the November 2025 state election, as well as to make critical

system upgrades. It would be extremely difficult—if not impossible—to complete both the

already queued development and the changes necessary to implement the EO. This would result

in the state failing in its compliance with legal requirements for the state election, leaving local

election officials without critical support from the Department heading into the upcoming state

election.

13.     In fact, shortly after the EO was issued, I immediately began receiving questions

from local election officials about its provisions. Multiple staff in the elections division set aside

their daily work and immediately began reviewing the EO, summarizing it, and analyzing the

impacts it would have on the Department, and began discussing the various effects with the

affected teams. The elections division and Department leadership have held a series of ongoing

meetings in an effort to fully comprehend the scope and effect on Colorado elections

administration, all while setting aside the daily work of the Department to support the counties in

preparing to conduct the upcoming state election. And I have spent countless hours of my own time interpreting the EO, including the drafting of the instant declaration.

14.    The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. Currently unanswered are questions including what specific documents would be considered valid DPOC, how to process a Federal Form or federal postcard application that does not include the required DPOC, and how state and local election officials comply with the requirement in the EO to record the document presented by an applicant as DPOC.

15.    In addition to the immediate and continuing need to assess and understand the EO, implementing the directives of the EO would initiate multiple streams of work. In particular, the EO requires significant changes to Colorado's voter registration system. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record document type into the statewide voter registration system will require modifying the database to include fields for recording the new information.

16.    Colorado's statewide voter registration system manages all of the factors related to what specific contest a voter is eligible to vote on and manages ballot style assignment and vote credit. The Department would need to do significant software development to update the system to create an entirely new category of voters, namely those that have complied with the requirements to vote in a state election but have not provided DPOC. The system would also need to be updated to allow the local election official to send a mailing to the voter explaining the requirement and providing instructions for the voter to supply the missing DPOC. The system would need further development to track the type of ID provided by a voter returning a Federal Form or federal postcard application. The development required to complete these items

is significant, would require the SCORE development team's entire bandwidth, and would displace queued development necessary to implement new state law requirements or any other necessary work. Given the complexities, it is highly likely that ongoing training and development will be needed as errors are identified.

17.    While my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by state elections officials as soon as possible. This is yet another aspect of the EO's implementation that will divert significant resources from the elections division to accomplish the EO's unnecessary directives on the purported timeline. The Federal Form is currently used and accepted in Colorado. It is widely available and well known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form.

18.    The division regularly conducts training and provides guidance to county election officials, third-party registration organizations, and agency partners. Each training would need to be significantly revised, and administrative rules must be updated. To update the administrative rules, the division would need to draft, circulate for comment, and publish election rules which will define how to treat voters without DPOC. This must be accomplished on an accelerated timeline so that these voters can still participate in any election which may occur after they register using the mail voter form. An administrative rule change of this magnitude requires

input from multiple teams within the division as well as department leadership, requiring all of these teams to set aside other scheduled work to prepare for the November state election.

19.     In addition to the significant work described above, the compressed timeline on which the EO purports to operate raises a substantial risk of confusion or mistake by state elections officials in their administration of voter registration and upcoming elections. Rapid and significant changes to voting processes create substantial risk of implementation, failure by county election officials, technical failure due to accelerated development timelines for technical and complex changes to the statewide voter registration system, and confusion by voters leading to decreased participation.

20.     The directives in the EO also pose other voter disenfranchisement risks. Because of Colorado's automatic voter registration process, more than 98% of voters have a Colorado driver's license associated with their voter record. However, as discussed above, the license does not on its face indicate that the driver is a citizen and therefore does not meet the DPOC requirements. Given that the driver's license is the most common form of ID and voters would have proved citizenship to obtain a REAL ID and be automatically registered, voters will likely mistakenly believe their Colorado REAL ID satisfies DPOC requirements. Further, it is highly likely that voters will think they are required to provide DPOC with ANY voter registration form and thus would simply not register. Finally, because the development of the statewide voter registration system will take months to complete, even as the new DPOC policy takes effect, it will be extremely logistically challenging for election officials to maintain a record that meets the new federal mandate. Thus, voters will provide the DPOC believing that their registration is complete for future elections only to find that their record was not updated the first time they presented DPOC. This is why an organized, thoughtful rollout of such a disruptive policy change

is necessary for success. There is just no justifiable public policy rationale to divert resources for these purposes.

21.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a Federal Form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing citizenship status before they offer a Federal Form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. *Id.*

22.     Section 2(d) of the EO will further require substantial coordination between the Colorado Department of State and state voter registration agencies. There are currently 243 state offices or agencies designated as voter registration agencies in Colorado pursuant to the NVRA. *See* 52 U.S.C. § 20506; § 1-2-504, C.R.S. As the chief election official under the NVRA, it is the Department's responsibility to communicate with, train, and gather data from NVRA agencies across the state.

23.     In order to implement Section 2(d) of the EO, the Department must, at a minimum, update the voter registration agency form and instructions, train the agency contacts throughout the state, update the agency technology which offers voter registration as part of, for example, an application for food stamp benefits. The Department has worked closely with the state's agencies to streamline the NVRA process and has taken pains to make sure each agency

understands their specific role under the NVRA. This EO undoes that certainty, will require changes to practice and technology, and will be met with scattered compliance and mass confusion around the state. The coordination needed to implement these changes is significant. Currently one Department staff member spends approximately 20% of their day on agency coordination. This staff member would now need to spend all of their time on agency coordination, and other staff will need to set aside their normal duties to devote resources towards educating agencies on the changes and monitoring progress toward compliance.

24.    It is also my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the federal post card application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

25.    The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and/or local elections officials. UOCAVA voters in Colorado may register to vote in many ways, however, one of the primary methods is through use of the federal postcard application. In Colorado, a person who registers using the federal postcard application is presumed to be a UOCAVA voter, and so many of them use this form for that specific purpose. UOCAVA voters will face many of the same implementation challenges as voters using the Federal Form, but changes to this form will be a bigger issue because this form is used more commonly in Colorado. I have seen no evidence of a problem that would justify the potential disenfranchisement of military voters.

26.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Colorado Department of State to expend resources and divert staff time from critical election support activities to educate state elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward. The EO's directive to include a new DPOC requirement on the federal postcard application will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, (3) how to communicate with voters who do not have proper DPOC and (4) ceasing use of the old form. These impacts closely mirror the impacts discussed with respect to the implementation of Section 2(a) of EO as set forth in paragraphs 18-21, *supra.*

27.      The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only eight months away from the start of the candidate filing periods for the 2026 midterm elections. I, and the Department as a whole, have obligations to Colorado residents to prepare for those elections and work on behalf of their interests, but that work would be in jeopardy should the Department be forced to divert its attention to implementing the EO.

28.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

29.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that

requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC also appears to take immediate effect. *See* EO, § 7(b).

30.     Unlike some states, Colorado law requires ballots to be received by 7:00pm on Election Day in order to be counted.

31.     However, Colorado law includes a robust "cure" process by which voters whose ballots are initially held for cure can ensure those ballots get counted.

32.     It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Colorado or the loss of funding under Sections 7(a) and 7(b).

33.     One way in which Colorado verifies that the voter to whom a ballot was mailed was the voter who filled out that ballot is through signature verification. Each mail ballot a county receives is reviewed to compare the affirmation signature on the mail ballot envelope to the voter's signature or signatures in the statewide voter registration database. If, during this process, multiple election judges agree that the signatures do not match, the voter's ballot is not opened, and the ballot is held for cure. The ballot cure process is also used for ID deficiencies.

34.     Colorado counties contact voters whose ballots have been held for cure by mail, email (if available), and through Colorado's ballot tracking system. If the voter did complete their ballot, the voter can "cure" the alleged signature mismatch by filling out a form confirming that they filled out the ballot sent to them.

35.     If the voter returns this form within eight days of Election Day, Colorado counties will open and count the voter's ballot.

36.     In 2024, Colorado counties processed 11,671 ballots that were cured after election day. These are voters who lawfully filled out their ballots, but who may have been disenfranchised if the opportunity to cure their ballot was not available.

37.     It is unclear whether the EO's purported prohibition on counting ballots received after election day would affect these voters. But if so, the lack of a meaningful opportunity to cure ballots that are held for a signature mismatch would substantially undermine Colorado's signature verification process for verifying voter identity.

38.     At minimum, if the EO does apply to ballot cure in Colorado, the Department and Colorado counties will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Department of State will be required to provide state and local elections officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Department of State will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule. The EO might even result in confusing and discriminatory outcomes, whereby voters who turn in their mail ballots prior to Election Day are afforded an opportunity to cure, but voters who turn in valid ballots on Election Day are not.

39.     In addition, if Colorado's cure procedures are determined to violate the Election Day rule outlined in Section 7 of the EO, Colorado risks a loss of federal elections funding that is integral to the state's ability to conduct functional elections. Colorado has previously received federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to

help facilitate the administration of elections at the state and local level. The Department has awarded $3,467,084.14 to counties through sub-grants since 2022. That amount includes: $2,070,671.96 for security, accessibility, drop boxes, and other improvements to the administration of elections; $1,060,197.55 for additional election judge pay for federal elections in 2024; and $336,214.63 to upgrade ballot marking device printers. The funding threatened in Section 7(b) is critical to Colorado's ability to safely and efficiently conduct elections. This funding has allowed counties to make substantial improvements to security and accessibility that they would not have been able to afford otherwise. This includes securing ballots and equipment with keycard entry and installing additional 24-hour cameras with improved backups and redundancy. And the printer grants helped counties afford upgraded printers for ballot marking devices that accommodate larger, full-faced ballots to eliminate the use of a tabulation QR code. Ongoing funding is critical to ensure counties, and the state, can make future security improvements to meet evolving threats.

40.     For the foregoing reasons, it is my view that implementation and enforcement of the EO would cause significant disruption to the state election system in Colorado, result in the disenfranchisement of potentially hundreds of thousands of voters, and create far more problems than it purports to solve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2025, at Pittsburgh, PA.

_/s/ Hilary Rudy_
Hilary Rudy
Deputy State Elections Director
Colorado Department of State

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |
| *Plaintiffs,* | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

**DECLARATION OF KRISTEN ZEBROWSKI STAVISKY**

I, KRISTEN ZEBROWSKI STAVISKY, declare as follows:

1.    I am a resident of the State of New York. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Co-Executive Director of the New York State Board of Elections. The New York State Board of Elections is governed by a bipartisan board of four commissioners consisting of two democratic commissioners and two republican commissioners, and two Co-Executive Directors who oversee day-to-day activities of the agency. Additionally, within this context, I am the Chief State Election Official designated pursuant to 52 USC 20509. In that role, I am directly involved in the application and implementation of state and federal laws relating to elections.

3.      I have served as the Co-Executive Director and Chief State Election Official since 2021. I previously served as Commissioner of Elections at the Rockland County Board of Elections.  Accordingly, I am familiar with voter registration processes in New York, election funding, and the interplay between state and federal laws governing elections.

4.      The New York State Board of Elections implements or oversees the requirements of federal law with regard to elections, including enforcing laws and providing technical information to the public and other parties. Voter registration and conducting the mechanics of New York's elections is done by local boards of elections, specifically the New York City Board of Elections and, outside of the City of New York, county boards of elections.

5.      In my role as Co-Executive Director, I am among those responsible for overseeing the correct and legal administration of election processes like NVRA, developing election guidance, voting machine certification, the infrastructure of the statewide voter registration database and grant funding for local boards of elections.

2

6.     I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in New York election administration, and will likely continue to do so.

7.     It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC.  Notably, while the EO provides for use of REAL ID drivers' licenses for this purpose, in New York such documents are issued to both citizens and those with permanent residency without citizenship (i.e. Green Card holders) and do not connote citizenship.  The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i). The EAC has begun a process of consultation with state officials related to these requirements.

8.     The provisions of the EO, including Section 2(a), require immediate action from me and other staff at the New York State Board of Elections to coordinate with other state and local agencies across New York State and discuss these matters with other states' officials and EAC personnel. Our efforts to address the asserted changes and impacts of the EO will continue to divert time and attention from other critical election preparation. State and local officials have begun to receive calls and questions from voters asking how to obtain information on how to comply with the putative new identification requirements.

3

9.      In fact, shortly after the EO was issued, I immediately held discussions with Board of Elections staff on the implications of the EO, had numerous discussions with local election commissioners, consulted with legal staff and directed participation of my staff in conference calls of elections officials from around the country. We have had to analyze the possible impact to changes in the voluntary voting systems standards, implications to data management and field structure in our registration systems, implications for on-going upgrades and improvements to registration systems.

10.     The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. For example, if these requirements come into operation, there is currently no mechanism by which New York can capture and chronicle the document production required on days of election – given most voters register by mail or online – and no way to address the high likelihood that administering such requirements at polling stations during voting periods would create administrative chaos and long lines for all voters. Our local boards use at least five different local voter registration systems and three different electronic poll book systems which would need to have multiple new DPOC-related fields added and communicate relevant information about them to the state database.  These types of changes are costly and not able to be implemented in less than several months, if not longer.

11.     At the same time that my team would need to oversee the database changes discussed above, we would need to concurrently develop training materials and guidance documents for use by state elections officials as soon as possible. This is yet another aspect of the EO's implementation that would be all consuming of the agency's efforts to accomplish the EO's objectives in *any manner* remotely close to the EO's purported timeline.  To be clear, if the

4

EO had to be implemented, more than 90% of the management efforts of the agency, in my estimation, would need to be brought to bear.

12.     The Federal Form is currently used and accepted in New York. It is widely available and is known to local elections officials, albeit the majority of registrations in New York come on state forms. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice to establish proof of citizenship, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form.  The New York State Board of Elections prints the state's voter registration forms and provides a statewide on-line voter registration system. The New York State Board of Elections also produces voter registration system procedure manuals and materials and makes communications to elections officials on a regular cadence via monthly calls, and twice-annual training conferences.  All of these materials would need to be rewritten.

13.     Apart from the impacts of immediately creating and implementing an education process for state elections officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state and local elections officials in their administration of voter registration and upcoming elections.

14.     A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of any new registration requirements. Already members of the voting public are confused. I am aware that election officials within New York have already received questions from voters who believe they now

5

need a passport or other document to vote. To begin the process of educating the public, if the EO becomes operative, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we would need to do so on the accelerated timeline contemplated by the EO. We have not made an assessment of what specifically would be required due to lack of resources to do so.

15.    This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost state and local elections offices millions of dollars that have not been contemplated in any state or local budgetary processes.

16.    Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. New York has one of the highest percentages of adults without any Drivers' Licenses. And it is not difficult to understand that many people simply do not have ready access to their birth certificate.

17.    New York and federal law require that voters attest to citizenship in order to vote, and the voter rolls and voting history of persons on the voting rolls are public information meaning any voting by a noncitizen would be recorded and subject to discovery, has meant non-citizen voting in New York is exceedingly rare.

18.    It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public

6

assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately despite being impossible – and unnecessary – to comply with given there is no evidence of a noncitizen voting problem. *Id.*

19.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

20.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. UOCAVA voters generally register to vote and apply for a ballot by mail, but communications with these voters, including in most instances transmission of ballots to the voters, occurs through an electronic system which cannot be simply changed overnight. In 2024, more than 50,500 UOCAVA voters cast ballots in the federal election.

21.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA would require the New York State Board of Elections to expend resources

to educate state elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward.

22.     The EO's commands if realized would therefore disrupt ongoing work to prepare for and administer upcoming elections. We are less than a year away from the start of the candidate filing periods for the 2026 midterm elections.  We have obligations to New Yorkers to prepare for those elections and work on behalf of their interests, and that work is overshadowed by the looming application of the EO. Furthermore, with local elections scheduled for this year, our ability to provide guidance and support to county boards of elections in administering those elections will be hamstrung by the need to spend time preparing for the implementation of the EO.

23.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

24.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

25.     Sections 7(a) and 7(b) of the EO could have substantial and adverse impacts on voting in New York, as well as the State's ability to adequately administer elections. Currently

New York allows ballots to be postmarked on or before election and counted if they are received

by the appropriate board of elections within seven days after the election (13 for military and

overseas ballot with respect to a General Election).

26.    To properly administer elections in accordance with the EO's Election Day rule,

and to minimize the number of voters whose ballots will be disregarded for being received after

Election Day, the New York State Board of Elections will be required to devote significant

additional resources to address the EO's Election Day provisions. As with other parts of the EO,

the agency will be required to provide state and local elections officials with training and

supervision to ensure that votes are received and tabulated consistent with the EO's

requirements. At the same time, the New York State Board of Elections would be required to

offer additional public information and educational resources to provide voters with awareness

and familiarity with the new ballot deadline rule.

27.    As to voting, a significant portion of eligible voters in New York will be affected

if the EO's directive for Attorney General enforcement against states that permit the counting of

timely cast ballots received after Election Day is permitted to take effect. In New York voters

utilize mail-in or absentee ballots to cast their votes. Under state law, such ballots can be counted

in the tabulation of votes if post-marked on or before Election Day, even if received by state

election officials up to seven days after Election Day (thirteen days for UOCAVA voters after a

General Election), as provided for by, e.g., N.Y. Election Law 8-412; 8-710; 10-114; 11-212.

Changing this rule would assuredly disenfranchise voters. In 2024, more than 836,000 New York

voters voted by mail.

28.    New York law also allows voters who cast ballots on or before Election Day to

cure technical errors in relation to the outside of a ballot envelope, in some circumstances, after

Election Day, allowing their ballots to ultimately be counted, as provided for by N.Y. Election

Law 9-209 (3). It is not clear whether the EO prohibits tabulating ballots cured after Election

Day, or if they would instead be a basis for enforcement action against the state or the loss of

funding under Sections 7(a) and 7(b). In 2024, more than 23,250 ballot underwent cure

processes, many after the election.

29.     In addition, to the extent New York law does not currently comply with the

Election Day rule that Section 7 of the EO purports to impose, New York risks a loss of federal

elections funding.  New York has previously received millions of dollars of federal funding

pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the

administration of elections at the state and local level, including purchase of voting machines and

other infrastructure, supplies and security elements critical to election administration and

integrity. The break down is, specifically, as follows:

| HAVA Election Security Grants | $49,241,277.00 | Started 2018 |
|---|---|---|
| Help America Vote Act Requirements Payments | $172,076,865 | Started 2005 |
| HAVA Election Improvement 101 | $16,494,325.00 | Started 2003 |

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on April 23ʳᵈ, 2025, at ___West Nyack Rockland County___, New York

KRISTEN ZEBOWSKI STAVISKY

10

JA 329

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

---

## DECLARATION OF CONNECTICUT DIRECTOR OF ELECTIONS KRISTIN SULLIVAN

1

I, Kristin Sullivan declare as follows:

1.      I am a resident of the State of Connecticut. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**A.  Professional Experience**

2.      I am the Director of Elections in the Office of the Connecticut Secretary of the State (SOTS). As the Director of Elections, I work for the Connecticut Secretary of the State, the Honorable Stephanie Thomas, and support her in her official capacity as the Commissioner of Elections for the State of Connecticut. *See* Conn. Gen. Stat. § 9-3.  As the Director of Elections, I oversee a relatively small team of four attorneys, six elections officers, and two administrative staff in the Legislation and Election Administration Division (LEAD) of the Office of the Secretary.

3.      I have served as the Director of Elections since 2023.  Before becoming the Director of Elections, I worked as the Research Director at the Center for Election Innovation & Research and prior to that I worked at the Connecticut General Assembly's nonpartisan Office of Legislative Research (OLR). For nine of the seventeen years I worked at the OLR, I was a Chief Legislative Analyst.

4.      As the Director of Elections, my team at LEAD and I are responsible for many functions but most relevant to this matter are our responsibilities regarding state and federal voter registration laws, including coordinating state duties under the National Voter Registration Act (NVRA), 52 U.S. Code § 20501 *et seq*.; Conn. Gen. Stat. § 9-23k.  In addition, LEAD is responsible for prescribing voter registration forms and instructional materials for voters and local

2

election officials, such as facts sheets, voter guides and comprehensive manuals; assisting with the implementation of automatic voter registration; maintaining a statewide centralized voter registration system (CVRS); sharing information from CVRS with other states to maintain the voter registry list; and issuing annual reports with the number of voters on the voter registry list, including the number of active and inactive voters. We also provide ongoing assistance and training to local election officials regarding the CVRS and respond to requests from candidates, political parties, and the public for public information in CVRS.

5.    LEAD is responsible for creating the election calendar for voters, candidates and local election officials; providing information to the public about how and where to vote, and how and where to register to vote; and is the repository for various elections-related documents. The Secretary and LEAD interpret Title 9 of the Connecticut General Statutes and issue instructions and opinions to effectuate the administration of elections and primaries. *See* Conn. Gen. Stat. § 9-3. Together with the Secretary, LEAD may issue an order to any local registrar of voters (ROV) or election moderator to correct any irregularity or impropriety in the conduct of an election, primary, recanvass, or audit. *Id.*

6.    At present there are over 2.5 million people registered to vote in Connecticut: 2,277,161 active voters and 247,109 inactive voters. An inactive voter can easily become active again by voting in an election or signing a petition of a candidate seeking access to the ballot.

7.    Connecticut maintains the following information about voters in CRVS: (1) the voter's name, and name history; (2) his or her bona fide residence; (3) mailing address, if any; (4) telephone number, if any; (5) date of birth; (6) previous voting residence in Connecticut, if any; (7) age; (8) party affiliation, if any; (9) date of initial voter registration; (10) date of changes to voter registration information, if any; (11) Connecticut motor vehicle operator's license number

3

or, if none, the last four digits of the applicant's Social Security number; and (12) voter's history of voting.

8.      The CVRS is a public record, in part, and is available for purchase for $300 pursuant to the Connecticut Freedom of Information Act. *See* Conn. Gen. Stat. § 1-200 *et seq.* The publicly available information about a voter's birth date is limited to the month and year of birth, the day of birth is excluded unless the information is requested and used for a governmental purpose. *See* Conn. Gen. Stat. § 9-50d.

9.      The CVRS is utilized by all 169 towns in Connecticut. It is the exclusive means by which a town produces an official voter registry list for every election in the town. The system includes information contained in voter registration applications, indicates whether eligible voters participated in past elections and primaries, and whether they voted in person or by absentee ballot. This election history information is required to be updated by all towns within 60 days after each election or primary.

10.     While the Connecticut Secretary of the State is the state's Chief Election Official, *see* Conn. Gen. Stat. § 9-3, Connecticut's elections are administered to a significant degree on the local level.  Each of Connecticut's 169 towns have Registrars of Voters (ROVs)—typically two, with one from each of the major parties—and a Town Clerk who together administer elections. The Secretary has some oversight of local election officials, *see* Conn. Gen. Stat. §§ 9-3, 9-4, but her oversight is limited by statute.

11.     Voter registration in Connecticut is carried out in the following ways: (1) online through the online voter registration system, *see* Conn. Gen. Stat. § 9-19k; (2) in person with an admitting official in the office of a Town Clerk or ROV, *see* Conn. Gen. Stat. § 9-20; (3) through the mail using the National Voter Registration Act Form, *see* Conn. Gen. Stat. § 9-231; (4) through

4

the mail using the Connecticut mail-in application, *see* Conn. Gen. Stat.§ 9-23g; (5) at the Connecticut Department of Motor Vehicles, *see* Conn. Gen. Stat. § 9-19h; (6) at a private entity that the Connecticut Department of Motor Vehicles contracts with such as AAA, *see* Conn. Gen. Stat. § 9-19h; (7) at voter registration agencies, such as public assistance offices, public offices that primarily serve people with disabilities, and public libraries, *see* Conn. Gen. Stat. § 9-23n; and (8) at public higher education institutions, *see* Conn. Gen. Stat. § 9-23p.

12.    Many other entities in Connecticut participate in encouraging people to register to vote. Many Connecticut residents register through high schools, at naturalization ceremonies, or through local non-profits.

13.    Connecticut also makes it easy to participate in elections by providing Same-Day Registration (SDR), which permits a resident to register to vote and vote during the early voting period before a general election or on Election Day by going to a specified location in town, which is usually the town hall. SDR permits anyone who meets the eligibility requirements for voting in Connecticut and is not already registered or is registered in one town but has moved to another town, to register and vote in person. By law, in Connecticut a person is eligible to register and vote if he or she is (1) a U.S. citizen, (2) age 18 or older, (3) a bona fide resident of the town in which he or she applies for admission, and (4) has completed confinement if previously convicted of a disfranchising felony.

14.    While Connecticut SOTS does not directly administer elections, we do provide extensive training to local election officials, including to ROVs, Towns Clerks, poll workers, and other town staff.

5

15.     SOTS helps the towns to administer the UOCAVA by providing related training and guidance to Town Clerks and ROVs. We also work in conjunction with the Federal Voting Assistance Program (FVAP) to produce a guide for UOCAVA voters.

16.     I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), 3(d) and 4(b) of the EO have already caused considerable harm, confusion, and disruption here at Connecticut SOTS, as well as in other Connecticut agencies and offices responsible for registering voters, and among local election officials. I expect that this confusion and disruption will not only continue but also intensify in the coming months as we continue to register voters, implement our new voter registration system and roll out the new voting tabulators we purchased in 2024, all while preparing for our 2025 local elections, as well as any state special elections that might occur, and the 2026 federal and state elections.

**B.  The Executive Order Section 2(a) Requirement that Connecticut Collect Proof of Citizenship will be Disruptive and Costly for Connecticut**

17.     It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. In Connecticut, we accept a naturalization certificate, for example, as proof of citizenship for a naturalized citizen. *See* Conn. Gen. Stat. § 9-20a. But DPOC is not currently required to register to vote in Connecticut. Applicants must attest to their citizenship, and provide an acceptable form of identification, such as a birth certificate, driver's license, or Social Security card. *See* Conn. Gen. Stat. §§ 9-20 and 9-23h. The EO also requires

6

state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *See* EO, § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

18.    The EO, including Section 2(a), have already significantly impacted SOTS.  After the EO was issued, the entire Connecticut SOTS team had to turn to focus on trying to figure out whether and how we can even begin to comply with the EO's requirements on the designated timeline and with no financial support.  Overall, we have had to undertake a full analysis of the EO and what it means for the state and our local election officials. We have sought clarity on the EO's many ambiguous provisions by joining calls with the EAC and other state election officials, reviewing input from National Association of Secretaries of State (NASS) and National Association of State Election Directors (NASED).  We have had to answer many questions from local election officials, state agency officials, state legislators, and members of the public about the EO.

19.    We have had to speak with our tabulator vendor, Election Systems & Software (ES&S), to determine whether our new tabulators are compliant with the EO requirements.  We have also had to speak the with our new voter registration system vendor, Knowink, to determine whether the EO will require changes to our new CVRS before going live in order to be compliant with the EO.  We have also asked Knowink if they can provide a final product to SOTS that meets the new requirements that our new voter registration system interface with federal databases under the EO.  We have to do a lot more work on this aspect of the EO to understand what is required and whether our vendors have the capabilities to assist us with compliance.

7

20.    The SOTS IT Director has had to determine whether the existing CVRS can be updated to incorporate not only a DPOC field to record the type of DPOC that a voter provided to the official, but also fields to record the agency that issued the DPOC and the expiration date, if any, of the DPOC. Similarly, the Director has had to determine whether the new voter registration system, which is currently slated to go live in July of 2025, can be updated to incorporate the same changes. For both the CVRS and the Online Voter Registration Portal (OLVR), we are in the process of trying to make a final determination regarding the cost associated with the additional changes. At this time, the cost of changing the CVRS and OLVR, which syncs the CVRS with the Connecticut Department of Motor Vehicles (DMV) signature field, to record DPOC will be in the range of $85,000 to $100,000. This cost estimate does not include the costs for integrating the CVRS and OLVR with federal databases maintained by the Department of Homeland Security or other agencies to validate the DPOC. At present, we are uncertain about how our system is going to communicate and interface with federal databases under the EO and what the EO specifically requires or whether there will be any federal assistance to facilitate this new process.

21.    SOTS is also uncertain about whether the EO's new DPOC requirement is prospective only and will be required for newly registered voters going forward or if the 2.5 million registered voters in Connecticut will somehow have to have their citizenship verified retroactively. Essentially re-registering 2.5 million people before the 2026 federal election would be a massive undertaking, and I do not know if we could accomplish it with the resources we have at present.

22.    We have spent many hours consulting with our legal team and other Connecticut public offices that implement the NVRA's registration requirement, such as the Connecticut DMV to see how or whether they are able to comply with the EO.

8

JA 337

23.    We have also had to assess the potential loss of millions of dollars of federal funds and how that will affect Connecticut's immediate and longer-term capability to run orderly, transparent and safe elections that our voters can be confident in. A special area of concern for Connecticut is the threat to strip Connecticut of millions of dollars of federal election security funds. In 2016, Connecticut was one of 21 states whose voter registration system or databases was targeted by Russian hackers. *See* Federal government: Connecticut a target of election hacking | AP News (last viewed April 10, 2025); Statement From Secretary of the State Denise Merrill (last viewed April 10, 2025). Fortunately, those malicious attempts were unsuccessful in 2016, but the threat persists and strong cooperation from the federal government, including financial support, is essential to keep Connecticut's elections secure.

24.    While my team oversees the database changes discussed above, we must concurrently amend our training materials and guidance documents for use by state elections officials as soon as possible. This is yet another aspect of the EO's implementation that will divert SOTS' ability to accomplish the EO's directives on the purported timeline.

25.    The Federal Form is currently used and accepted in Connecticut. It is widely available and well known to local elections officials and others involved in voter registration. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. Apart from the impacts of immediately creating and implementing an education process for local elections officials to learn about the EO's directed changes and requirements, I believe the compressed timeline on which the EO purports

9

to operate creates a substantial risk of confusion or mistake by state and local elections officials in their administration of voter registration and upcoming elections. And if our election officials make mistakes, I expect the consequences could be severe, either because eligible voters may be disenfranchised, or the federal government may take drastic action against Connecticut in retribution for any errors or perceived, real or imagined, violations of the EO.

26.     A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources to update and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. We will also have to direct towns to update their websites and generally scrub any outdated voter registration form from third-party registration offices like AAA. We likely will have to review and alter our voter guides, fact sheets, and comprehensive training manuals. We are currently so short staffed and back logged that these unfunded mandates will be very burdensome for our small team.

27.     The updates to our public materials and training materials alone will cost at least $125,000 in my estimation and we have no additional funding to support this. This will detract from our ability to pay for other election security and preparation efforts leading up to our 2025 local and state special elections and the 2026 federal and state elections.

28.     All of this confusion and abrupt change to our election administration will almost certainly result in eligible voters not being properly informed about the changes to the registration process and an increased risk of voter disenfranchisement.

10

**C. Executive Order Section 2(d) is Vague and Will be Difficult to Implement in Connecticut**

29.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide services to low-income residents and those with disabilities. In other words, the EO potentially requires state voter registration offices to immediately begin assessing a person's citizenship before they may even offer a federal voter registration form to a potential registrant.  It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is even provided.

30.     Because Section 2(d) of the EO may require designated state voter registration offices to "assess citizenship" before providing applicants for public assistance benefits with a federal voter registration form, the EO may require substantial coordination between SOTS and state voter registration agencies. There are at least ten different state offices or agencies designated as voter registration agencies in Connecticut pursuant to the NVRA. *See* 52 U.S.C. § 20506; Conn. Gen. Stat. § 9-23n.

**D. Executive Order Section 4(b)(i) Is Vague and Potentially Disastrous for Connecticut if it Renders Connecticut's Newly Acquired Voting Tabulators Unusable in Federal Elections**

31.     It is my understanding that Section 4(b)(i) of the EO requires states to acquire voting machines or tabulators that meet amended Voluntary Voting System Guidelines 2.0 (VVSG 2.0) standards.  I also understand the EO to require that tabulators not only meet VVSG 2.0 but

11

that the tabulators "provide a voter-verifiable paper record."  Once again, the EO is vague and confusing but if the EO requires something beyond the current VVSG 2.0 standards and something other than a paper ballot in order for tabulators to be used in federal elections in 2026, then the consequences for Connecticut could be disastrous.

32.     Connecticut recently completed a multi-year procurement process to replace its twenty-year old voting tabulators in all 169 towns.  In 2024, Connecticut contracted with Election Systems & Software (ES&S) to purchase three different models of voting machines: the DS300, DS450 and DS950, for a cost to the State of over $20 million.

33.     ES&S tabulators already have the VVSG 1.0 certification and ES&S is well along in the process to acquire the VVSG 2.0 certification for the machines Connecticut purchased. While Connecticut is at least in process to have its new DS300, DS450 and DS950 tabulators VVSG 2.0 certified, with the certification from the EAC being provided hopefully sometime in 2025, Connecticut may not be prepared to meet any newly amended VVSG 2.0 standards within the EO's required timeframe for compliance.  It is hard to say for sure since the EO is vague on this point.  The VVSG certification process is lengthy and involved.  If Connecticut's vendor, ES&S, is required to essentially begin a new certification process because the VVSG 2.0 requirement is changed midstream, this will be extremely disruptive.

34.     Another potential issue arising out of Section 4(b)(i) of the EO is the ambiguity of the term provide a "voter-verifiable paper record."  Connecticut voters currently vote on a paper ballot and that ballot is then deposited by the voter into a scanner tabulator.  If the EO simply requires a paper ballot that can be later hand counted if needed or audited, then Connecticut would not have a concern with this aspect of the EO because it is already in compliance.  However, once again, the EO is vague and causing us grave concern.  If the EO requires that the paper ballot be

12

somehow simultaneously "verifiable" by the voter at the time the vote is cast in a way beyond the voter seeing his or her ballot has been properly deposited in the tabulator, then Connecticut's new machines could be out of compliance with the EO. We do not know.

35.     The EO's abrupt changes to tabulator requirements stand in stark contrast to how the federal government normally implements changes to election systems. For example, when HAVA was adopted in 2002, states were given substantial lead time and financial support by the federal government so that they could make changes to voting infrastructure in a way that was thoughtful, organized and without hidden pitfalls. Consistency and planning are so critical to a well-run election system. It is my understanding that, in many instances, federal government approval for changes like new tabulator requirements was provided *before* significant financial outlays were made by states. This EO is basically changing the rules without notice to states, and without meaningful options for compliance. It has the potential to cause states like Connecticut to lose millions of dollars in contracts that could be rendered useless because the contracted for services and products can no longer be used in federal elections.

36.     All this confusion is causing SOTS to spend administrative time and resources on yet another task, spending time drafting a public comment to the EAC in response to the EAC's Chief Election Official Consultation Letter.

### E.     Executive Order Section 3(d) Will Disrupt and Impede the Administration of Voting by Military and Overseas Citizens

37.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote.

13

It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

38.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. Under the EO, we think that election officials will have to do things differently, but we are not clear about what exactly will have to be changed.

39.     Requirement 2 regarding proof of eligibility to vote in elections in the state in which the voter is attempting to vote is an issue because UOCAVA voters generally do not possess the required nexus to Connecticut to be registered as a Connecticut voter.  Because UOCAVA voters often do not have a "bone fide" residence in Connecticut, they are not entered into CVRS and are instead listed in a separate UOCAVA registry list by the Town Clerks because they are only eligible to vote for federal offices.  Therefore, it is unclear how Connecticut would be able to allow any UOCAVA ballots to be counted under this EO because those UOCAVA voters are not in any Connecticut CVRS that might collect and maintain DPOC.

40.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require Connecticut to expend resources to educate local elections officials on the new UOCAVA requirements and to ensure their continued compliance with their obligations moving forward.

41.     The EO's disrupts SOTS' ongoing work to prepare for upcoming elections. The EO interferes with our focus on state special elections and municipal elections held in 2025 because we have had to prematurely focus on the 2026 federal election.  Normally, we work in a cycle where in odd numbered years we focus on our local elections and state special elections.

14

42.    In addition to interfering and disrupting our normal work focus in an odd numbered year, we are not sure we can even accomplish all these changes in time for the 2026 federal elections even if we could exclusively or mostly focus on federal issues this year, which we cannot do.  We are just over one year away from the start of the candidate filing periods for the 2026 midterm elections.  Connecticut SOTS has already begun preparations for these elections by developing and implementing a new voter registration system, developing and implementing a new election management system, deploying new voting tabulators, updating our training manuals based on election law changes made during the 2025 legislative session, updating our online poll worker training program, and preparing for related training sessions for local election officials.

**F.    The EO's Prohibition on States' Counting of Ballots Cast on or before Election Day but not Received by An Election Official Until after Election Day Could Affect Connecticut's Implementation of Its Newly Adopted "No-Excuse" Absentee Balloting**

43.    Connecticut voters recently voted to amend the Connecticut Constitution to permit absentee balloting without any requirement that a voter have an excuse for not voting in person.  As of 2024, Connecticut was one of only a handful of states that required a voter have a specific reason for voting by absentee ballot.  Now that Connecticut voters approved "no excuse" absentee balloting in November 2024, the Connecticut General Assembly is considering legislation to implement that constitutional amendment by the people.  In addition to removing the statutory requirements that a voter have a specific reason for voting absentee, *see* Conn. Gen. Stat. § 9-135, the legislature could adopt a provision that permits absentee ballots received after Election Day to be counted in the final tabulation of the vote for all offices. *See, e.g.,* HB 7241, *An Act Concerning Absentee Voting For All* (last viewed April 17, 2025).  At present, Connecticut requires ballots, including absentee ballots, be received by 8 p.m. on Election Day or cast by a voter who is line by 8 p.m. *See* Conn. Gen. Stat. § 9-174(a).

15

JA 344

44.    While the current version of Connecticut HB 7241 does not extend the deadline for receipt of absentee ballots beyond 8 p.m. on Election Day, the Connecticut legislature could amend this legislation before the end of the legislative session in June 2025 to permit the counting of absentee ballots received after 8 p.m. on Election Day and, if adopted by the Connecticut legislature, that statute would be contrary to the EO, § 7(a). This EO purports to strip Connecticut of that policy option as it adopts new absentee balloting laws.

### G.    The EO Threatens Federal Funding that Connecticut Relies Upon to Protect Connecticut Elections from Malicious Actors, and to Improve the Administration of Election and Expand Access to the Franchise

45.    Connecticut, like most, if not all states, relies on federal funding to support its work in administering safe, secure, orderly and transparent federal elections. As a part of that, Connecticut receives HAVA Section 101 election security funds from the EAC to "improve the administration of elections for Federal office, including to enhance election technology and make election security improvements" to the systems, equipment and processes used in federal elections. From 2018–2022, Connecticut received $11,876,298 in HAVA Section 101 funds. For the period of May 31, 2023 to September 30, 2027, Connecticut will receive $2,000,000 in HAVA Section 101 election security funds.

46.    In addition to the election security funds that Connecticut receives from the EAC directly, Connecticut SOTS also receives federal funding for election security in the form of "pass through" grants from the Connecticut Department of Emergency Services and Public Protection (CT DESPP). For the period of October 1, 2023 to April 30, 2026, SOTS received a $145,425 "pass through" grant from CT DESPP. This pass through grant was part of a $4,847,500 federal award to Connecticut to support homeland security in Connecticut. My understanding of the EO

16

is that not only is CT SOTS' pass through grant threatened under the EO but Connecticut's larger homeland security award could also be rescinded.

47.    Connecticut receives funds from the EAC authorized by HAVA to encourage college students to work at the polls on Election Day. From February 1, 2024 to January 31, 2026, Connecticut will receive $71,176 for the College Poll Worker Program.

48.    SOTS also received $1 million in funding to support the implementation of Connecticut's newly adopted early voting process through the American Rescue Plan Act of 2021 (ARPA).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025, at Hartford, Connecticut

Kristin Sullivan
Director of Elections,
Office of the Connecticut Secretary of the State
Legislation and Elections Administration Division

17

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810-DJC |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## <u>DECLARATION OF MANDY VIGIL</u>

I, Mandy Vigil, declare as follows:

1.      I am a resident of the State of New Mexico. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Election Director in New Mexico. I work for the New Mexico Secretary of State, Maggie Toulouse Oliver and support her in her official capacity as the Chief Election Officer for the State of New Mexico. In my role, I assist her in the uniform application and compliance of all state and federal laws relating to election administration.

3.      I have served as a public servant for twenty years. Most recently I have served as an election administrator in the Office of the Secretary of State since 2011. Currently I serve as the [State Election Director], I have served in this role for [seven years]. [Prior to my role as the State Election Director I served as the Deputy Election Director, Ethics Division Manager and as a Compliance Officer. In addition, I serve as an election subject matter expert and representative of New Mexico for several election related organizations. I am the Immediate Past President of the National Association of State Election Directors, Executive Board Member of the Electronic Registration Information Center, Election Assistance Commission Standards Board Representative, as well as a member of the Bipartisan Policy Center's Taskforce on elections and Election Workforce Advisory Council.

4.      The Secretary of State is the state's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* NMSA 1978 § 1-2-1 (2023). The Elections Bureau is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. The Secretary of State is also responsible for obtaining and maintaining uniformity in the application, operation and interpretation of the Election Code, and subject to the State Rules Act, to make rules pursuant to the provisions of,

2

and necessary to carry out the purposes of, the Election Code. She furnishes to the thirty-three county clerks copies of such rules, and is authorized by law to approve all forms or procedures used in any election held pursuant to the Election Code.

5.      In my role as Elections Director, I am responsible for overseeing all programs related to election administration within the state. This includes election related systems, and compliance. I am responsible for ensuring the correct and legal administration of election processes like list maintenance including a program required to comply with the NVRA, developing election guidance, providing training and implementing new and improved processes and technology in support of election related stakeholders. I work directly with internal and external partners to develop all systems and procedures related to the administration of statewide elections. As the agency's subject matter expert and Election Director I have extensive knowledge of the daily operations, legal requirements and stakeholders involved. I provide direction on guidance and system and process implementation to include all voter registration activities. I oversee the development and ongoing maintenance of our voter registration database and ballot management system.

6.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in New Mexico's election administration, and will likely continue to do so.

7.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a

limited number of specific documents that constitute acceptable DPOC. The EO also requires

state and local officials to "record . . . the type" of DPOC presented at the time of voter

registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The

EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to

impose these changes. *Id.* § 2(a)(i).

8.      The provisions of the EO, including Section 2(a), require immediate action from

me and my team in the Secretary of State's Office to implement and to coordinate with other

state and local agencies across New Mexico. Our efforts to address the directed changes and

impacts of the EO will divert time and attention from other critical election preparation.

Implementation of the provisions within the EO would create a significant hardship on the

election community within the state of New Mexico. The provisions make drastic changes to the

current procedures and workflow, require significant legal analysis that will translate to critical

training and outreach to all local election officials, state voter registration agencies, as well as

current and future registered voters. Furthermore, the EO implementation will require significant

enhancements to our statewide voter registration database and ballot management systems that

will require significant time and effort working in partnership with several vendors. We do not

have any resources to dedicate to this effort. This would require a shift of 100% of our elections

staff to these efforts and will dramatically interfere with our ability to prepare for upcoming

statewide elections resulting in the need for additional staff and extended work hours.

9.      In fact, shortly after the EO was issued, I was immediately engaged in numerous

meetings, both internally with the Secretary of State's leadership team and also with my

counterparts at the National Association of State Elections Directors, as well as National

Association of Secretaries of State to discuss the analysis and impact of the EO. My staff has

4

fielded many calls from members of the public who are understandably concerned about the effect of the EO on their ability to register and to vote. In all, the Secretary of State's office has spent hundreds of personnel hours in dealing with the EO, which has distracted greatly from carrying out the many regular duties required of this office by law.

10.     The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. We have determined there to be a substantial number of changes that would require a change in various aspects of our current election administrative process. We will have to completely redesign our current voter registration process not only in our system but in the systems that are managed by other state agencies and designated voter registration agencies. It will require significant time and monetary resources to be accomplished. It will further impact our ability to administer same day registration. All processes are complex and require coordination of multiple systems.

11.     In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly commence multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to New Mexico's voter registration database. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. New Mexico voter registration database system, which is called SERVIS ("State Elections, Registration & Voting Integrity Systems") is provided and maintained by an outside vendor who contracts with the Secretary of State. The requirements imposed by the EO will involve significant adjustments to the programming and the fields for entry of data related to new requirements of the EO. Based on past experience, even modest changes to programming in

5

SERVIS can take several months to accomplish, and then to test and work out any "bugs" that may be encountered. To the extent that the EO imposes new and different requirements that apply to federal elections, it is impossible to predict the amount of work, expense, and time involved to separate SERVIS to distinguish and accommodate federal elections from state elections, other than to say that it will be considerable.

12. At the same time that my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by state elections officials as soon as possible. This is yet another aspect of the EO's implementation that will divert more than half of our team's resources to accomplish the EO's directives on the purported timeline.

13. The Federal Form is currently used and accepted in New Mexico. It is widely available and well known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination with state elections officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. [The SOS is required by law to provide training, guidance and resources to all local election administration offices, voter registration agencies and other local governments to ensure the uniform application of state and federal election laws. We provide a large array of systems and materials to support this effort. We conduct all trainings related to systems in support of voter registration, voting processes and list maintenance.

14. Apart from the impacts of immediately creating and implementing an education process for state elections officials to learn about the EO's directed changes and requirements,

6

the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by state elections officials in their administration of voter registration and upcoming elections. A statewide election requires months of preparation before the actual Election Day, during which a myriad of statutory deadlines must be met. A considerable amount of time-consuming behind-the-scenes work is involved, such as design, proofing, and finalizing ballots, and conducting logic and accuracy testing of voting equipment. To introduce the type of sea changes and requirements as are ordered by the EO is to guarantee chaos in the orderly administration of elections.

15.    A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change multiple pages on our website, our collateral materials, information on our social media platforms, and all other external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO.

16.    This public education campaign, which we will need to begin as soon as possible and run at least through the conclusion of the 2026 midterm election, and likely thereafter, is certain to be costly and will require significant additional funding by the legislature, since the Secretary of State's budget currently cannot provide such spending. For example, a six-month statewide public education campaign administered by the Secretary of State's office in 2024 cost approximately $225,000, so any public education campaign about the EO's new requirements would cost substantially more and would need to be budgeted.

17.     Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. New Mexico is the fifth largest state by area, but ranks 36th in population, which translates to long distances between remote towns and villages. New Mexico also is home to 19 federally recognized Native American pueblo tribes, many of which are also remotely located. A recent survey conducted by the Brennan Center indicated that approximately 21.3 million American citizens of voting age do not have proof of citizenship readily available. Because of the unique population and geographical dynamics found in New Mexico, requiring DPOC in order to register to vote would impact New Mexican residents to a greater degree than many other states.

18.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. *Id.*

19.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination between the

8

Secretary of State and state voter registration agencies. There are currently numerous state offices or agencies designated as voter registration agencies in New Mexico, pursuant to the NVRA. *See* 52 U.S.C. § 20506; NMSA 1978 Şec. 1-4-5.2 (2023). The Secretary of State's office will be primarily responsible for coordinating a comprehensive training program to educate the staff at all motor vehicle department offices, and any state agency that provides public assistance or services to persons with disabilities. In view of the fact that 2(d) purports to be in effect immediately, the planning and execution of the training and changes in processes required by the EO simply cannot be done.

20.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

21.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and/or local elections officials. [As an example, the SOS administers a secure portal to provide for Federal Qualified Electors to send/receive their ballots electronically as required by law. The successful use of this application requires months of prior planning and coordination between the state, counties and multiple vendors. Local election officials are tasked with the review and processing of applications submitted by Federal Qualified Electors, they are by definition not able to appear in person to register or vote, the EO will create a barrier in accepting the application for registration and voting. Systems will again require enhancements to accommodate the shift in procedure. Time, coordination and funding

9

are necessary to successfully accomplish the proposed changes.  Sudden shifts in process require

outreach to voters, this particular subset of voters is out of the country and may be on active

military duty. Communication is not swift, and they most likely do not have usual access to the

required DPOC or mechanisms to submit them in person as required. Federal law requires that

UOCAVA voters are provided access to their ballots within strict timelines. Any change to

process places the ability to comply with this necessary provision at risk.

      22.    In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's

changes to UOCAVA will require the Secretary of State's Office to expend resources  to educate

state elections officials on the new requirements and to ensure their continued compliance with

their obligations moving forward.

      23.    The EO's requirements therefore disrupt my team's ongoing work to prepare for

upcoming elections. We are only three months away from the start of the candidate filing periods

for the 2026 midterm elections. I have obligations to New Mexico residents to prepare for those

elections and work on behalf of their interests, but that work is now largely on hold as I oversee

New Mexico's response to the EO.

      24.    It is my understanding that Section 7(a) of the EO requires the Attorney General

to "take all necessary action" to enforce the federal Election Day statutes "against States that

violate these provisions," including by counting absentee or mail-in ballots received after

Election Day in the final tabulation of the vote for federal offices. This provision of the EO

appears to take immediate effect. *See* EO, § 7(a).

      25.    It is also my understanding that Section 7(b) of the EO directs the EAC to

"condition any available funding to a State on that State's compliance with" federal law that

requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid

and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

26.    Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in New Mexico, as well as the State's ability to adequately administer elections.

27.    To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, the New Mexico Secretary of State will be required to devote significant additional resources to educate election administrators and the public about the EO's Election Day provisions. As with other parts of the EO, the Secretary of State's Office will be required to provide state and local elections officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Secretary of State's Office will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule. As detailed above in Sections 17 and 18, statewide public education campaigns will necessarily require substantial personnel efforts and monetary investment by the Secretary of State's Office.

28.    As to voting, a significant portion of eligible voters in New Mexico will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In the 2024 general election, 111,403 New Mexico voters utilized mail-in or absentee ballots to cast their votes. Under state law, such ballots can be counted in the tabulation of votes if received by 7:00 p.m. on  Election Day.

29.     New Mexico law also allows voters who cast ballots on or before Election Day to cure technical errors until the Friday before the state canvassing board's meeting, which occurs on the third Tuesday after Election Day, allowing their ballots to ultimately be counted. Voters have this opportunity through the canvass window and concluding the Friday prior to the state certification meeting. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against New Mexico or the loss of funding under Sections 7(a) and 7(b).

30.     Section 4(b)(i) of the EO, which requires the EAC to amend the Voluntary Voting System Guidelines 2.0 and issue other appropriate guidance establishing standards for voting systems to protect election integrity." Subsection (b)(2) says "Within 180 days of the date of this order, the EAC shall…review and, if appropriate, re-certify voting systems under the new standards established under subsection(b)(i)…" New Mexico, in passing NMSA Sec. 1-9-7.4, made compliance with the Voluntary Voting System Guidelines mandatory, not voluntary. That statute provision was amended in 2023 to add the words "and implemented" after "guidelines adopted" to recognize the reality that the EAC had not been able to certify any independent voting system testing laboratories ("VSTL") to test and certify voting systems to the 2.0 standard. The National Institute of Standards and Technology ("NIST") is responsible for developing the test processes and procedures for VSTLs, and only recently, two VSTLs were finally certified after a four-year effort. However, no voting systems have undergone the certification and testing process, and in fact, such certification is not expected to be complete until 2027. All EAC-approved systems across the nation are currently certified to the 1.0 standard.  Thus, the "180-days after the date of this order (March 28, 2025) is completely unrealistic, and to tie provision of federal funding to the states to VVSG standards will amount to a denial of funding.

12

31.    In addition, to the extent New Mexico law does not currently comply with the Election Day rule outlined in Section 7 of the EO, New Mexico risks a loss of federal elections funding that is integral to the state's ability to conduct functional elections. New Mexico has previously received approximately one million dollars of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local level. This funding is critical to supporting the physical and cyber security of our elections. The funding threatened in Section 7(b) is critical to New Mexico's ability to safely and efficiently conduct elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __27__, 2025, at Santa Fe, New Mexico.


_____
Mandy Vigil
Director of Elections
New Mexico Secretary of State

13

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I electronically filed the foregoing

Joint Appendix with the Clerk of the Court for the United States Court of Appeals for

the First Circuit by using the appellate CM/ECF system.  Service will be

accomplished by the appellate CM/ECF system.


*s/ Joshua Waldman*
Joshua Waldman