# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

*v.*

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States; PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCORMICK, in the official capacity as Commissioner of the U.S. Election Assistance Commission; BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S. Election Assistance Commission; PETE HEGSETH, in the official capacity as Secretary of Defense,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts

## ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

*(Counsel listed on inside cover)*

AARON D. FORD
  *Attorney General of Nevada*
HEIDI PARRY STERN
  *Solicitor General*
1 State of Nevada Way
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov

*Counsel for the State of Nevada*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
M. PATRICK MOORE
  *First Assistant Attorney General*
ANNE L. STERMAN
  *Chief, Government Bureau*
PHOEBE FISHER-GROBAN
  *Deputy Chief, Constitutional &
  Administrative Law Division*
CHRIS PAPPAVASELIO
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
IAN FEIN
  *Deputy Solicitor General*
ANNE P. BELLOWS
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
LISA C. EHRLICH
NICHOLAS R. GREEN
KEVIN L. QUADE
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Suite 11000
San Francisco, CA  94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

*(Additional counsel listed in signature block)*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement of the issues ................................................................ 3

Statement of the case................................................................... 3

     A.    Legal background ................................................... 3

          1.    The Constitution entrusts States and Congress—not the President—with authority to regulate federal elections ......................................................... 3

          2.    Congress has promoted and simplified voter registration, and rejected requests to require proof of citizenship ................................................................. 5

          3.    Congress has accommodated state laws that allow timely cast mail-in ballots to be received after Election Day................................................................ 8

     B.    Factual and procedural background ....................... 10

          1.    The President issues an Executive Order to alter rules for voter registration and state ballot-receipt deadlines........................................................ 10

          2.    The district court preliminarily enjoins implementation of five directives in the Executive Order ......................................................... 11

Summary of argument................................................................. 14

Standard of review ..................................................................... 17

Argument..................................................................................... 17

I.    The district court properly enjoined the Executive Order's attempts to impose documentary proof-of-citizenship requirements on voter registration.................................... 17

     A.    The Court should affirm the injunction as to Section 2(a)...... 18

1. Plaintiffs' challenge is likely to succeed because Section 2(a) unlawfully required documentary proof of citizenship ................................................................. 18

2. Plaintiffs' challenge to Section 2(a) is ripe .................. 27

B. The Court should affirm the injunction as to Section 3(d) ..... 28

1. Plaintiffs' challenge to Section 3(d) is likely to succeed because requiring documentary proof of citizenship is inconsistent with the statutory "post card form" ................................................................. 29

2. Plaintiffs have standing to challenge Section 3(d), and their claim is ripe ..................................................... 33

C. Defendants cannot challenge the scope of the injunction as to Sections 2(a) and 3(d) for the first time on appeal ............. 36

II. The District Court properly enjoined the Executive Order's attempts to force changes to state ballot-receipt laws ...................... 38

A. The Court should affirm the injunction as to Section 7(a) ...... 39

1. Plaintiffs' challenge to Section 7(a) is likely to succeed because federal law does not preempt state ballot-receipt deadlines ................................................. 39

2. Plaintiffs' challenge to Section 7(a) is ripe, and enforcement would cause irreparable harm ................. 44

B. Defendants do not challenge the injunction as to Section 7(b) ...................................................................... 49

Conclusion ................................................................................... 51

# TABLE OF AUTHORITIES

Page

CASES

*Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*)
570 U.S. 1 (2013)................................................................4, 5, 27

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*
631 F.3d 1072 (9th Cir. 2011) ....................................................25

*California v. Trump*
--- F. Supp. 3d --- (D. Mass. Sept. 17, 2025)..............................13

*Campanale & Sons, Inc. v. Evans*
311 F.3d 109 (1st Cir. 2002)........................................................24

*City & Cnty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ...............................................23, 46

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020)....................................................49, 50

*Colón-Marrero v. Vélez*
813 F.3d 1 (1st Cir. 2016)..............................................................5

*CTS Corp. v. Waldburger*
573 U.S. 1 (2014).........................................................................43

*Democratic Nat'l Comm. v. Wis. State Legis.*
141 S. Ct. 28 (2020).........................................................44, 45, 48

*Dep't of Com. v. New York*
588 U.S. 752 (2019).....................................................................26

*Doe v. Trump*
157 F.4th 36 (1st Cir. 2025)..............................................17, 35, 36, 38

*Donald J. Trump for President, Inc. v. Way*
492 F. Supp. 3d 354 (D.N.J. 2020)..............................................42

*FEC v. Democratic Senatorial Campaign Comm.*
454 U.S. 27 (1981)......................................................................6

*Fish v. Schwab*
957 F.3d 1105 (10th Cir. 2020) ...............................................50

*Foster v. Love*
522 U.S. 67 (1997)..............................................................*passim*

*Kobach v. U.S. Election Assistance Comm'n*
772 F.3d 1183 (10th Cir. 2014) ..........................................6, 24

*League of United Latin Am. Citizens v. Exec. Off. of President
(LULAC I)*
780 F. Supp. 3d 135 (D.D.C. 2025)....................................*passim*

*League of United Latin Am. Citizens v. Exec. Off. of President
(LULAC II)*
--- F. Supp. 3d --- (D.D.C. Oct. 31, 2025).........................*passim*

*League of Women Voters of United States v. Newby*
838 F.3d 1 (D.C. Cir. 2016)...............................................48, 50

*Little Sisters of the Poor v. Pennsylvania*
591 U.S. 657 (2020)..................................................................24

*Mass. Delivery Ass'n v. Coakley*
769 F.3d 11 (1st Cir. 2014).......................................................47

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*
923 F.3d 209 (1st Cir. 2019).....................................................34

*MedImmune, Inc. v. Genentech, Inc.*
549 U.S. 118 (2007)..................................................................47

*Millsaps v. Thompson*
259 F.3d 535 (6th Cir. 2001) ...................................................43

# TABLE OF AUTHORITIES
## (continued)

Page

*N.H. Lottery Comm'n v. Rosen*
    986 F.3d 38 (1st Cir. 2021)........................................................................47

*New York v. Trump*
    133 F.4th 51 (1st Cir. 2025)......................................................................26

*Philip Morris, Inc. v. Harshbarger*
    159 F.3d 670 (1st Cir. 1998)....................................................................36

*Republican National Committee v. Wetzel*
    120 F.4th 200 (5th Cir. 2024) .............................................................39, 43

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*
    397 F.3d 56 (1st Cir. 2005)......................................................................49

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
    102 F.3d 12 (1st Cir. 1996)......................................................................48

*Ex parte Siebold*
    100 U.S. 371 (1879)................................................................................44

*Smiley v. Holm*
    285 U.S. 355 (1932)..................................................................................3

*State v. Meadows*
    88 F.4th 1331 (11th Cir. 2023) ..................................................................4

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014)......................................................................44, 47, 49

*Trump v. CASA*
    606 U.S. 831 (2025)..........................................................................13, 37

*Trump v. United States*
    603 U.S. 593 (2024)..................................................................................4

*United States v. Alabama*
    778 F.3d 926 (11th Cir. 2015) ............................................................29, 32

*United States v. Alabama*
   998 F. Supp. 2d 1283 (M.D. Ala. 2014) ....................................31

*United States v. Carroll*
   105 F.3d 740 (1st Cir. 1997) .......................................................20

*United States v. Classic*
   313 U.S. 299 (1941) ....................................................................40

*United States v. Coviello*
   225 F.3d 54 (1st Cir. 2000) ..................................................20, 49

*United States v. Zenon*
   711 F.2d 476 (1st Cir. 1983) .....................................................37

*Watson v. Republican Nat'l Comm.*
   --- S. Ct. --- (2025) ....................................................................39

*Wyeth v. Levine*
   555 U.S. 555 (2009) ...................................................................43

**FEDERAL STATUTES AND REGULATIONS**

2 U.S.C. § 7 ....................................................................9, 39, 41

3 U.S.C.
   § 1 ............................................................................*passim*
   § 21 .................................................................................9
   § 21(1) ...........................................................................39

52 U.S.C.

§ 20301(b) .................................................................8, 29, 30
§ 20302(i) ...........................................................................29
§ 20302(a) .................................................................8, 29, 33
§ 20302(b) ...........................................................................34
§ 20302(e) ...........................................................................34
§ 20303(b) .....................................................................8, 42
§ 20304(b) .....................................................................8, 42
§ 20310(1) ...........................................................................32
§ 20503(a) .............................................................................5
§ 20503(b) .............................................................................5
§ 20505(a) .............................................................................5
§ 20506(a) .............................................................................7
§ 20508(a) .........................................................6, 19, 20, 21, 25
§ 20508(b) ...................................................................*passim*
§ 20921 ...............................................................................19
§ 20923 ..........................................................................7, 19
§ 20928 ......................................................................7, 19, 20
§ 21001(b) ...........................................................................49
§ 21132 ...............................................................................20

Act of Feb. 2, 1872, Chapter 11, § 3, 17 Stat. 28 ..........................40

Act of Jan. 23, 1845, 5 Stat. 721 ................................................40

Act of June 4, 1914, 38 Stat. 384 ................................................40

Pub. L. No. 78-277, 58 Stat. 136, (1944) ....................................41

Pub. L. No. 84-296, 69 Stat. 584 (1955) .....................................30

Pub. L. No. 103-31, 107 Stat. 77 (1993) ..................................5, 6

Pub. L. No. 107-252, 116 Stat. 1666 (2002) .............................7, 20

Pub. L. No. 111-84, 123 Stat. 2190 (2009) .................................42

# TABLE OF AUTHORITIES
## (continued)

Page

Pub. L. No. 117-328, 136 Stat. 4459 (2022)....................................................42

11 C.F.R. § 9428.3 .............................................................................................37

22 C.F.R. § 53.2 .................................................................................................32

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
   § 2, cl. 1.......................................................................................................4
   § 4, cl. 1....................................................................................................3, 4
   § 7, cl. 2.......................................................................................................4

U.S. Const. art. II
   § 1...............................................................................................................4
   § 3...............................................................................................................4

**STATE STATUTES**

1986 Ala. Sess. Laws, ch. 85, §§ 9-11 ..............................................................9

Cal. Political Code § 1360 (1924).....................................................................41

Kan. Stat. § 25-1106 (1923).............................................................................41

1985 Md. Laws 2768 ..........................................................................................9

1985 Mass. Acts 792 ..........................................................................................9

1933 Mo. Laws 218 ..........................................................................................41

1984 N.Y. Laws 1784 .........................................................................................9

1981 N.D. Laws 564 ...........................................................................................9

1984 Ohio Laws 137 ...........................................................................................9

1984 V.I. Sess. Laws 132....................................................................................9

Page

32 D.C. Reg. 3828 (July 5, 1985) ...................................................9

**OTHER AUTHORITIES**

Black's Law Dictionary 311 (7th ed. 1999) ...................................24

Black's Law Dictionary (12th ed. 2024) .......................................46

H.R. Rep. No. 99-765 (1986)..............................................8, 32, 42

H.R. Rep. No. 103-66 (1993)............................................................6

Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter
    of the Civil War* (1915) ...............................................................41

N. Webster, *An American Dictionary of the English Language*
    (Charles Goodrich & N. Porter eds. 1869) .................................40

National Council of State Legislatures, *Receipt and Postmark
    Deadlines for Absentee/Mail Ballots* (updated Dec. 24, 2025),
    https://www.ncsl.org/elections-and-campaigns/table-11-
    receipt-and-postmark-deadlines-for-absentee-mail-ballots.........9

## INTRODUCTION

The Constitution entrusts States and Congress—not the President—with the responsibility to set rules for federal elections. And yet, in March 2025, President Trump issued an Executive Order that attempted to force sweeping changes to federal elections and the ways that States administer them. At issue in this appeal are two of the Order's directives that would have imposed burdensome proof-of-citizenship requirements on voter registration, and another that directed the Attorney General to bring enforcement actions against States that count mail-in ballots postmarked on or before, but received shortly after, Election Day.

The President lacked authority to issue these directives, which the district court properly enjoined. The directives defy the statutes that Congress enacted to simplify voter registration and increase participation in federal elections. They would irreparably harm Plaintiff States by forcing them to overhaul their complicated and costly election systems. And they would undermine the public interest by causing confusion and disenfranchising many eligible voters.

On appeal before this Court, defendants primarily try to recast the Executive Order—which was described at its signing as "the farthest-reaching Executive action taken in the history of the Republic to secure our elections"—as much ado

about nothing.[1]  The President, they now suggest, did not try to overhaul rules for federal elections, but merely asked the relevant agency to *consider* adding a documentary proof-of-citizenship requirement to the federal voter registration form, and suggested that the Attorney General *encourage* States to amend their ballot-receipt laws to align with the President's preferred policy.

But those modest measures described in defendants' opening brief bear no resemblance to the Executive Order itself, which directed the agency to *require* documentary proof of citizenship, and the Attorney General to *enforce* the President's ballot-receipt deadline against States.  Defendants' characterizations in this appeal also contradict their prior representations to another court about what the Executive Order required.  And their shifting positions are betrayed by the President's own statements, which confirm—even after the preliminary injunction was entered in this case—his intent to dictate unilaterally how States administer elections.  "Remember," the President admonished, "the States are merely an 'agent' for the Federal Government in counting and tabulating the votes.  They must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."[2]

---

[1] Remarks at a Document Signing Ceremony, The American Presidency Project (March 25, 2025), https://www.presidency.ucsb.edu/node/377599.

[2] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, 4:17 AM), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254.

The district court acted well within its discretion in preliminarily enjoining implementation of the challenged directives.  This Court should affirm.

## STATEMENT OF THE ISSUES

1.  Whether the district court acted within its discretion in preliminarily enjoining implementation of Sections 2(a) and 3(d) of the Executive Order, which would have imposed burdensome proof-of-citizenship requirements on forms that Congress designed to simplify voter registration.

2.  Whether the district court acted within its discretion in preliminarily enjoining civil and criminal enforcement actions pursuant to Section 7(a) of the Executive Order against Plaintiff States that do not comply with the President's ballot-receipt deadline.

## STATEMENT OF THE CASE

### A.   Legal Background

#### 1.   The Constitution entrusts States and Congress—not the President—with authority to regulate federal elections

The Constitution empowers States to prescribe rules for federal elections, subject to legislation enacted by Congress.  The Elections Clause provides that States shall prescribe the "Times, Places, and Manner of holding" congressional elections.  U.S. Const. art. I, § 4, cl. 1.  That provision's broad scope allows States to regulate, among other things, voter "registration" and the "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  But the clause also grants Congress the

power to "make or alter" such regulations through federal legislation.  U.S. Const. art. I, § 4, cl. 1.[3]  States thus have primary "responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices."  *Foster v. Love*, 522 U.S. 67, 69 (1997).  And States, alone, have the power to determine voter qualifications (like citizenship, which every State requires).  *See Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 16-17 (2013) (citing, e.g., U.S. Const. art. I, § 2, cl. 1); JA 67.

The Constitution vests none of these powers in the President.  *See League of United Latin Am. Citizens v. Exec. Off. of President (LULAC II)*, -- F. Supp. 3d --, 2025 WL 3042704, at *4 (D.D.C. Oct. 31, 2025) (noting this "conspicuous absence"), *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025).  The President executes the laws enacted by Congress, but his role in enacting or amending election law is limited to proposing and signing legislation.  *See* U.S. Const. art. I, § 7, cl. 2; *id.* art. II, § 3.  "[T]he President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections."  *State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023); *accord Trump v. United States*, 603 U.S. 593, 627-628 (2024).

---

[3] For presidential elections, the Constitution grants States authority to determine the "Manner" of appointing electors, and Congress the power to determine the "Time" of choosing them.  U.S. Const. art. II, § 1, cl. 2, cl. 4.

**2. Congress has promoted and simplified voter registration, and rejected requests to require proof of citizenship**

Congress enacted the National Voter Registration Act (NVRA) to "increase the number of eligible citizens who register to vote" and help officials at all levels of government "enhance[] the participation of eligible citizens as voters in elections for Federal office." Pub. L. No. 103-31, § 2(b), 107 Stat. 77, 77 (1993) (codified at 52 U.S.C. § 20501(b)). The Act established a baseline set of voter registration procedures that States must follow, such as allowing voters to register by mail or when applying for a driver's license. 52 U.S.C. § 20503(a).[4] The statute's "primary emphasis is on simplifying the methods for registering to vote in federal elections." *Colón-Marrero v. Vélez*, 813 F.3d 1, 10 n.13 (1st Cir. 2016).

Central to this appeal is the NVRA's requirement that States "accept and use" a national "mail voter registration application form," 52 U.S.C. § 20505(a)(1)—commonly referred to as the Federal Form. Congress created the form to guarantee that "a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 12. The Act sets strict limits on the form's contents, which "may require *only* such . . . information . . . as is *necessary*" to enable state election officials to assess a voter's eligibility and administer the registration and election

---

[4] Six States (Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming) are exempt from the NVRA because, when the statute was enacted, they either did not have a voter registration system or allowed voter registration on Election Day. *See* 52 U.S.C. § 20503(b).

process.  52 U.S.C. § 20508(b)(1) (emphasis added).  The form also includes a

statement the applicant must sign, under penalty of perjury, attesting that they meet

"each eligibility requirement (including citizenship)."  *Id*. § 20508(b)(2).  To

ensure the form remains a simple means of registering, it "may not include any

requirement for notarization or other formal authentication."  *Id*. § 20508(b)(3).

When considering the bill that became the NVRA, the Conference Committee

rejected a Senate-proposed amendment that would have allowed States to require

"documentation relating to citizenship of an applicant for voter registration."  H.R.

Rep. No. 103-66, at 23 (1993) (Conf. Rep.).  Conferees concluded that such an

amendment was "not necessary or consistent with the purposes of this Act" and

might invite "registration requirements that could effectively eliminate, or

seriously interfere with, the mail registration program."  *Id.*; *see Kobach v. U.S.

Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014).

To insulate the Federal Form from unilateral or partisan influence, Congress

entrusted authority over the form to a bipartisan, multi-member commission, and

provided that it may be amended only "in consultation with the chief election

officers of the States."  52 U.S.C. § 20508(a)(2).  In the NVRA, Congress initially

gave responsibility for the form to the Federal Election Commission, *see* Pub. L.

No. 103-31, § 9(a)(2), 107 Stat. at 87—an "inherently bipartisan," independent,

six-member body, *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27,

37 (1981). In 2002, as part of the Help America Vote Act (HAVA), Congress transferred responsibility over the form to the newly created Election Assistance Commission (EAC), another multi-member, bipartisan, "independent entity." Pub. L. No. 107-252, Titles II, VIII, § 201, 802, 116 Stat. 1666, 1673, 1726 (2002). Congress required partisan balancing between the EAC's four members, 52 U.S.C. § 20923(a)-(c), and provided that the EAC may not act without "approval of at least three of its members," *id.* § 20928. In practice, and by design, these requirements ensure the EAC only takes actions that have bipartisan support. *See LULAC II*, 2025 WL 3042704, at *6.

Congress also enacted measures to make the Federal Form widely available and accessible. The NVRA required States to designate "voter registration agencies," for example, to distribute the form to applicants and assist them in completing it. 52 U.S.C. § 20506(a)(1), (4)-(6). These agencies must include all offices in a State that provide "public assistance" or "State-funded . . . services to persons with disabilities," and may include other offices that the State designates— such as public libraries or, subject to their agreement, federal and nongovernmental offices. *Id.* § 20506(a)(2)-(3).

Much as Congress provided a simple method for registering to vote in federal elections with the Federal Form, Congress also streamlined registration and absentee voting rules for members of the military who are away from home on

active duty, their spouses and dependents, and other citizens residing overseas. In particular, the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) provided for the creation of an "official post card form"—commonly referred to as the Federal Post Card Application—that would serve as a simple absentee voter registration and ballot application for these voters. 52 U.S.C. § 20301(b)(2). Like with the Federal Form, Congress required that States accept and use the post card form and provided for applicants to affirm statements in the form, such as those confirming their citizenship, under penalty of perjury. *Id.* § 20302(a).

### 3. Congress has accommodated state laws that allow timely cast mail-in ballots to be received after Election Day

In enacting UOCAVA, Congress also wanted to ensure that military and overseas voters' absentee ballots would be accepted and counted in federal elections. Congress was aware that, at the time of UOCAVA's enactment, "several States accept absentee ballots . . . for a specified number of days after election day." H.R. Rep. No. 99-765, at 8 (1986). And a House Report praised those state initiatives as "protecting the voting rights of these citizens." *Id.* In UOCAVA, Congress provided that overseas absentee ballots would be subject to the "deadline for receipt of the State absentee ballot under State law," 52 U.S.C. § 20303(b), and it later directed federal officials to deliver such ballots to the appropriate State election officials "not later than the date by which an absentee ballot must be received in order to be counted in the election," *id.* § 20304(b)(1). When Congress

enacted UOCAVA, at least eight jurisdictions had laws accepting absentee ballots that were postmarked by, but received shortly after, Election Day.[5]

That number has since grown and now covers over half the country. As of the filing of this brief, fourteen States (Alaska, California, Illinois, Maryland, Massachusetts, Mississippi, Nevada, New Jersey, New York, Oregon, Texas, Virginia, Washington, and West Virginia) and the District of Columbia generally accept such ballots. *See* National Council of State Legislatures, *Receipt and Postmark Deadlines for Absentee/Mail Ballots* (updated Dec. 24, 2025), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots. An additional fifteen States (Alabama, Arkansas, Colorado, Florida, Georgia, Indiana, Iowa, Michigan, Missouri, North Carolina, North Dakota, Ohio, Pennsylvania, Rhode Island, and South Carolina) accept such ballots from UOCAVA voters. *Id.*

By requiring that mail-in ballots be postmarked on or before Election Day, these state laws accord with the federal statutes that specify the Tuesday after the first Monday in November in certain even-numbered years as the general "election" day for federal offices. 2 U.S.C. § 7; 3 U.S.C. §§ 1, 21. Congress enacted those federal statutes to address the problem of some States setting their

---

[5] *E.g.*, 1986 Ala. Sess. Laws, ch. 85, §§ 9-11; 32 D.C. Reg. 3828 (July 5, 1985); 1985 Md. Laws 2768; 1985 Mass. Acts 792, 792-93; 1984 N.Y. Laws 1784; 1981 N.D. Laws 564, 564-65; 1984 Ohio Laws 137; 1984 V.I. Sess. Laws 132.

election days earlier than others, which influenced later voting in other states, as well as the burden on voters if congressional and presidential elections were held on different days. *See Foster*, 522 U.S. at 73-74. While the federal statutes require that voters cast their ballots by Election Day, they do not speak to the mechanisms States may adopt for the receipt of mail-in ballots.

### B. Factual and Procedural Background

#### 1. The President issues an Executive Order to alter rules for voter registration and state ballot-receipt deadlines

On March 25, 2025, President Trump signed an Executive Order that mandated sweeping changes to the administration of federal elections. The order addressed many election-related topics, including electronic voting systems, *see* Addendum 53, but at issue in this appeal are directives targeting two categories of rules: (1) how voters demonstrate U.S. citizenship when registering to vote, and (2) whether States may count, in accordance with their own election laws, ballots that are cast by Election Day but received shortly after. On these two issues, the Executive Order complained that current law "relies on self-attestation for citizenship," and that many States allow "voting by mail, with many officials accepting ballots . . . received well after Election Day." *Id.* at 47.

As relevant to this appeal, the Executive Order included three directives to change voter registration processes to require documentary proof and assessment of citizenship. First, Section 2(a) commanded that the EAC "shall," within thirty

days, act to "require" in the Federal Form "documentary proof of United States citizenship" from the applicant, and to require state or local election officials to record the type of proof presented. Addendum 48-49. Second, Section 2(d) required that voter registration agencies "shall assess citizenship" prior to providing the Federal Form to "enrollees of public assistance programs." *Id.* at 50. And third, Section 3(d) ordered the Secretary of Defense to "update" the Federal Post Card Application for absent military members and overseas voters to "require" "documentary proof of United States citizenship" and "proof of eligibility to vote" in the relevant State. *Id.* at 51.

The Executive Order also included two directives that sought to "achieve full compliance with" the President's stated policy that all ballots must be received by Election Day. Addendum 53. Section 7(a) directed the Attorney General to take "all necessary action to enforce" the policy "against States" that violate it. *Id.* And Section 7(b) directed the EAC to withhold certain statutory funding from States that do not adopt a "ballot receipt deadline of Election Day." *Id.* at 53-54.

### 2. The district court preliminarily enjoins implementation of five directives in the Executive Order

Plaintiff States filed this lawsuit and moved to preliminarily enjoin implementation of the five Executive Order directives described above. In support of their motion, plaintiffs submitted declarations from state and local election officials describing the significant costs and disruptions they would suffer if the

directives were not enjoined.  *See* JA 110-359.  Plaintiffs also explained that implementation of the directives would disenfranchise many voters, including vulnerable populations (like the elderly, poor, or those with disabilities) who may lack ready access to newly required citizenship documents and who rely on mail-in voting.  *See* Dkt. 76 at 23, 26-27, 30.

The district court granted a preliminary injunction.  Addendum 1-46.  As to the three directives addressing proof-of-citizenship requirements, the court observed that defendants had not identified "any source of authority for the President to impose" such requirements, given that "the authority for election requirements is in the hands of Congress," and "its statutes (the UOCAVA, the NVRA and the HAVA) do not require it."  *Id.* at 4-5.  As to the two directives targeting state ballot-receipt laws, the court concluded that "nothing in the text of the Election Day statutes" bars States from "counting ballots received in accordance with their ballot receipt laws," nor does the President have authority to "condition election funding to States" based on such laws.  *Id.* at 5-6.  The court also concluded that plaintiffs' claims were ripe, and that they faced a "risk of irreparable harm in the absence of an injunction" because implementation would "burden the States with significant efforts and substantial costs" to overhaul their election systems.  *Id.* at 4-6.

A few weeks later, defendants moved to modify the injunction in light of *Trump v. CASA*, 606 U.S. 831 (2025)—which had partially stayed "universal injunctions" entered against another Executive Order. *See* Dkt. 112 at 1-4. Defendants asked the district court here to modify the scope of its preliminary injunction only as to Section 2(d); they did not argue that any other parts of the injunction—such as those regarding Sections 2(a) or 3(d)—were inconsistent with *CASA*. *Id.* In response, plaintiffs did not object to a modification and noted that they had originally sought to enjoin implementation of Section 2(d) only as to state and local agencies "in Plaintiff States." Dkt. 114. On July 18, the district court amended its injunction by adding "as to the Plaintiff States" in the part of the injunction addressing Section 2(d). Addendum 1-2. Two weeks later, Defendants appealed the amended preliminary injunction to this Court. JA 22-23.

The district court subsequently denied defendants' motion to dismiss the complaint. *California v. Trump*, --- F. Supp. 3d ---, 2025 WL 2663106 (D. Mass. Sept. 17, 2025). In that motion, defendants argued—for the first time—that Plaintiff States lacked standing to challenge Section 2(d) because it applied only to federal departments and offices and did not require anything of state or local voter registration agencies. *See id.* at *6-7. Based on a joint stipulation of the parties, the court later dismissed without prejudice Plaintiff States' claim challenging Section 2(d). Dkt. 175.

As of the filing of this brief, the parties are briefing cross-motions for summary judgment on Plaintiff States' remaining claims in the district court. *See* Dkts. 166, 167. That briefing is scheduled to conclude on January 20, 2026, with a hearing on the cross-motions set for February 26, 2026. *See* Dkt. 150.[6]

## SUMMARY OF ARGUMENT

I. The district court properly enjoined implementation of the Executive Order directives that would have imposed documentary proof-of-citizenship requirements on forms that Congress designed to simplify voter registration. For Section 2(a), defendants do not even dispute that the court acted within its discretion if it construed the directive correctly. Instead, they limit their appeal to arguing the directive means something different than it plainly said. Section 2(a) ordered the EAC to "require" documentary proof of citizenship in the Federal Form; it did not merely direct the EAC to *consider* adding such a requirement, as defendants now suggest. That is made clear by the additional details Section 2(a) required; by the

---

[6] Other plaintiffs have challenged the Executive Order in the U.S. District Courts for the District of Columbia and the Western District of Washington. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:25-cv-0946 (D.D.C.); *Washington v. Trump*, No. 2:25-cv-00602 (W.D. Wash.). The district court in D.C. preliminarily enjoined implementation of Sections 2(a) and 2(d), *League of United Latin Am. Citizens v. Exec. Off. of President (LULAC I)*, 780 F. Supp. 3d 135 (D.D.C. 2025), and, in October 2025, granted partial summary judgment and permanently enjoined implementation of Section 2(a), *LULAC II*, 2025 WL 3042704, at *1, *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025). As of the filing of this brief, those district courts are still considering plaintiffs' other claims challenging the Executive Order directives.

EAC's actions after the Executive Order was issued; and by representations that defendants' own counsel made to another district court. Plaintiffs are therefore likely to succeed in their challenge to Section 2(a), and their claim is ripe.

Plaintiffs are also likely to succeed in their challenge to Section 3(d), which would have added a documentary proof-of-citizenship requirement to the Federal Post Card Application for military and overseas voters. Requiring that voters submit such documentary proof would contravene Congress's command that the application be on a simple "post card form" that can be mailed without an envelope. Section 3(d) also would defy Congress's objectives by adding, rather than removing, roadblocks to registration by military and other overseas voters. And the unrecoverable time, cost, and effort spent addressing the documentary proof-of-citizenship would irreparably harm plaintiffs, absent the injunction.

The district court properly limited the scope of the preliminary injunction to the Plaintiff States where feasible. Defendants' contention that the parts of the injunction addressing Sections 2(a) and 3(d) should have been similarly limited is meritless and was forfeited by defendants' failure to raise it in the district court.

II. The district court also properly enjoined implementation of the Executive Order directives that targeted State laws allowing timely cast ballots to be received shortly after Election Day. On the merits, plaintiffs are likely to succeed in their challenge to Section 7(a) because nothing in the text of the federal election-day

statutes bars States from counting timely cast ballots received in accordance with their ballot-receipt laws.  Those federal statutes require only that votes be cast by Election Day, not that they are received by that date.  And Congress in other statutes has expressly acknowledged and incorporated state laws that allow absentee ballots to be received and counted after Election Day.  Defendants' contrary interpretation rests entirely on an outlier Fifth Circuit decision, but the Supreme Court has granted certiorari to review that decision.  And the reasoning of that decision is not persuasive in any event.

The challenge to Section 7(a) is ripe because plaintiffs with state laws targeted by the directive face a credible threat of enforcement.  The President announced a policy to "require" that all votes in federal elections be received by Election Day, and sought to "achieve full compliance" by ordering the Attorney General to "enforce" the policy "against States" that violate it.  Defendants' suggestion that the Attorney General might simply send a letter "encouraging" States to comply with the President's policy is inconsistent with Section 7(a)'s plain text.  States are not required to wait for the enforcement actions threatened by the President, particularly as the next federal midterm elections near.  The district court therefore acted well within its discretion by enjoining civil or criminal enforcement actions pursuant to Section 7(a) against the affected Plaintiff States.

Finally, the district court also enjoined implementation of Section 7(b), which sought to withhold millions of dollars in statutory funding from States that do not adopt the President's ballot-receipt policy.  Defendants do not contest this part of the injunction on appeal, so even if they prevailed in *all* their other arguments, the district court's injunction could, at most, only be reversed or vacated *in part*.

## STANDARD OF REVIEW

This Court reviews a grant of a preliminary injunction for abuse of discretion, with legal determinations reviewed de novo and findings of fact for clear error. *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025).

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY ENJOINED THE EXECUTIVE ORDER'S ATTEMPTS TO IMPOSE DOCUMENTARY PROOF-OF-CITIZENSHIP REQUIREMENTS ON VOTER REGISTRATION

Two of the challenged directives—Sections 2(a) and 3(d)—sought to impose burdensome documentary proof-of-citizenship requirements on federal forms that Congress had created to simplify voter registration.  As the district observed, there is "no dispute" in this case that "U.S. citizenship is required to vote in federal elections" or that federal registration forms "require attestation of citizenship." Addendum 4.  The question instead is whether the President may unilaterally order that documentary proof of citizenship be required—above and beyond the attestation—where the relevant statutes themselves "do not require it." *Id.*  The district court correctly concluded that plaintiffs were likely to succeed in their

challenges to the directives, that the claims were ripe, and that implementation of the directives would cause them irreparable harm.

## A. The Court Should Affirm the Injunction as to Section 2(a)

### 1. Plaintiffs' challenge is likely to succeed because Section 2(a) unlawfully required documentary proof of citizenship

a. The district court enjoined implementation of Section 2(a) on the understanding that it "mandates" the Election Assistance Commission (EAC) to "require documentary proof of citizenship in the federal voter registration form." Addendum 1. On appeal, defendants do not dispute that the court acted within its discretion if it understood the directive correctly. That is, they do not dispute that plaintiffs are likely to succeed in their challenge to Section 2(a)—or that the claim is ripe, *infra* pp. 27-28—if the President "preordain[ed] the outcome" of the EAC's procedures by ordering the EAC to require documentary proof of citizenship on the Federal Form. Addendum 20. Defendants' appeal turns instead on their contention that Section 2(a) did not order the EAC to *require* documentary proof of citizenship, but merely directed it to *consider* whether doing so was "necessary" under the National Voter Registration Act (NVRA). Opening Br. 17, 20.

Defendants have limited their arguments on appeal for good reason. As the district court observed, "neither the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form." Addendum 18 (quoting *League of United Latin Am. Citizens v. Exec. Off.*

*of President (LULAC I)*, 780 F. Supp. 3d 135, 195 (D.D.C. 2025)). And if the

President alone "could dictate the content of the Federal Form," it would defy

Congress's "careful structural choices." *LULAC I*, 780 F. Supp. 3d at 200.

Congress chose, for example: to assign responsibility for the form to a multi-

member, bipartisan panel, 52 U.S.C. §§ 20921-20923; to allow that panel to

require information on the form "only" if a majority of the panel's members find it

"necessary" to enable state election officials to carry out their election duties, *id.*

§§ 20508(b)(1), 20928; and to allow the panel to make that finding only after

"consultation with the chief election officers of the States," *id.* § 20508(a)(2).

These choices serve to prevent those with the "power to act unilaterally" from

altering the form for perceived political or partisan gain. *League of United Latin*

*Am. Citizens v. Exec. Off. of President (LULAC II)*, --- F. Supp. 3d ---, 2025 WL

3042704, at *27 (D.D.C. Oct. 31, 2025), *appeal docketed*, No. 25-5476 (D.C. Cir.

Dec. 31, 2025).[7]

---

[7] In a footnote (at 20 n.3), defendants appear to dispute the district court's characterization of the EAC as an "independent and bipartisan panel." Addendum 19. But Congress itself described the four-member panel as an "independent entity," 52 U.S.C. § 20921, and required bipartisanship by proscribing that, for each pair of initial appointments, "not more than one" could be "affiliated with the same political party," *id.* § 20923(b)(2). Subsequent appointments are subject to those same conditions, *id.* § 20923(b)(3)(A), and the EAC's chair and vice chair "may not be affiliated with the same political party" either, *id.* § 20923(c)(1).

Congress further required bipartisanship by providing that the EAC may act "only with the approval of at least three of its members." 52 U.S.C. § 20928.

(continued…)

Because defendants' opening brief does not dispute that an injunction as to Section 2(a) is proper if the President ordered the EAC to require documentary proof of citizenship, it is "well-settled" that they cannot raise such arguments "for the first time in a reply." *United States v. Coviello*, 225 F.3d 54, 70 n.10 (1st Cir. 2000). And as explained below, the arguments defendants do raise on appeal contravene Section 2(a)'s plain text, are inconsistent with how the EAC understood the President's directive, and disregard what defendants' own counsel told another district court.

b. The text of Section 2(a) is clear. It orders that the EAC "shall" act to "require" documentary proof of citizenship in the Federal Form. Addendum 48. Section 2(a)(i)(B) further directs the EAC to "require" that state and local officials record specific information about that documentary proof on the Federal Form. *Id.* at 48-49. And Section 2(a)(ii) dictates four types of documents—such as a U.S.

_____

Defendants suggest this majority-approval requirement does not apply to amending the Federal Form because that authority appears in a different chapter of the U.S. Code. *See id.* §§ 20508(a), 20928. But the Statutes at Large, not the U.S. Code, controls. *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir. 1997). And the Statutes at Large confirm that the majority-approval requirement applies to "[a]ny action which the [EAC] is authorized to carry out *under this Act*," Pub. L. No. 107-252 § 208, 116 Stat. at 1678 (emphasis added)—i.e., the Act that assigned responsibility over the Federal Form to the EAC, *id.* § 802, 116 Stat. at 1726 (codified as amended at 52 U.S.C. § 21132). The majority-approval requirement therefore plainly applies to EAC actions with respect to the Federal Form.

passport, or other forms of identification indicating U.S. citizenship—that acceptable documentary proof "shall include." *Id.* at 49.

As the district court concluded, Section 2(a) "unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form." Addendum 22. In fact, it not only "'require[s] the EAC to amend the Federal Form,'" it also "precisely dictates what should be included" in the amended form. *Id.* at 18 (quoting *LULAC I*, 780 F. Supp. 3d at 185).

Defendants' contention that the President merely directed the EAC to *consider* requiring documentary proof of citizenship "cannot be squared with the plain text of the Executive Order." *LULAC II*, 2025 WL 3042704, at *20. Defendants hang their interpretation on Section 2(a)'s direction that the EAC "shall *take appropriate action* to require" documentary proof of citizenship. Addendum 48 (emphasis added). They suggest that the italicized phrase directed the EAC to take two distinct actions, Opening Br. 18-20—to consult with the "chief election officers of the States," 52 U.S.C. § 20508(a)(2), and to determine, after that consultation, whether documentary proof of citizenship is "necessary" to enable state election officials to assess a voters' eligibility and administer the registration and election process, *id.* § 20508(b)(1). But if that is what Section 2(a) meant, it presumably would have cited 52 U.S.C. § 20508(a)(2) or (b)(1), or at least made

*some* reference to "consulting with the States" or "the required 'necessary' finding," Opening Br. 20. Section 2(a) did neither.[8]

Defendants' interpretation also ignores the further details specified in Section 2(a)(i)(B) and (a)(ii). If defendants were correct that Section 2(a) directed the EAC to amend the Federal Form "only after consulting with the States and only if it makes the required 'necessary' finding," Opening Br. 20, they do not explain how Section 2(a) could have further specified what types of documentary proof are acceptable, or what state and local officials must record about that documentary proof on the Federal Form. Presumably, under defendants' new interpretation, those questions, too, should have been left for the EAC. But instead, "[b]y purporting to preordain the outcome" of the EAC's "required procedures, the Executive Order render[ed] them meaningless." Addendum 20.

The Executive Order's so-called saving clause—which provides that it "shall be implemented consistent with applicable law," Addendum 54—does not support defendants' interpretation either. Previously, defendants argued that it *was* consistent with applicable law for the President to direct the EAC to require documentary proof of citizenship. *See, e.g.*, Dkt. 91 at 11. And the district court did not enjoin Section 2(a) "based on speculation that the Order may be carried out

---

[8] Instead, it inexplicably cited 52 U.S.C. § 20508(b)(3), which prohibits requiring "notarization or other formal authentication" in the Federal Form.

in an unlawful manner." Opening Br. 21. Rather, the court concluded that Section 2(a) *itself* was unlawful because it "unambiguously requires the EAC to implement a documentary proof of citizenship requirement." Addendum 22. Defendants' current reading of Section 2(a), by contrast, is "grounded not in the text of the Executive Order but in a desire to avoid legal consequences." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018). If a saving clause like the one here "'precludes a court from examining whether [an] Executive Order is consistent with law,'" judicial review would become a "'meaningless exercise.'" Addendum 21-22 (quoting *San Francisco*, 897 F.3d at 1240).

c. Defendants themselves previously understood and described Section 2(a) as ordering the EAC to require documentary proof of citizenship. On April 11, 2025, the EAC executive director sent States' chief election officers a letter, stating that Section 2(a) "instructs" that documentary proof of citizenship (and associated state recordkeeping) "be required" in the Federal Form. JA 126-127. The letter then sought "consultation on *how* states would propose to implement" the new requirements. *Id.* (emphasis added). The letter did not request consultation on *whether* the new requirements should be adopted or—for that matter—could satisfy the "necessary" standard for amending the Federal Form.

But if Section 2(a) meant what defendants now say it does—and directed the EAC to add a documentary proof-of-citizenship requirement "only after consulting

with the States and only if it makes the required 'necessary' finding," Opening Br. 20—the EAC presumably would have consulted with the States' chief election officers on that "required 'necessary' finding." Recall that the statute asks whether new information on the Federal Form is "necessary *to enable the appropriate State election official*" to assess voter eligibility and administer election processes. 52 U.S.C. § 20508(b)(1) (emphasis added).[9] Seeking States' consultation on "only the implementation of the President's policy and not the policy itself" is therefore not consistent "with the consultation Congress had envisioned." Addendum 19.

Defendants try to avoid that implication by asserting that, because the Administrative Procedure Act "contains no 'open-mindedness'" requirement "during a notice-and-comment period," Opening Br. 19 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020)), the EAC need not "approach its consultation [with States' chief election officials] with an open mind" either, *id.* But "consultation," which means "'asking the advice or opinion of someone,'" necessarily entails "something more than general participation in the public comment process." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117-118 (1st Cir. 2002) (quoting Black's Law Dictionary 311 (7th

---

[9] The EAC executive director previously found that a documentary proof-of-citizenship requirement was not "necessary" because States have several other means to ensure that noncitizens do not register using the Federal Form. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014).

ed. 1999)); *accord Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1085-1088 (9th Cir. 2011). Defendants' apparent argument—that "consultation with the chief election officers of the States" need not include asking those officers whether information "is necessary to enable the appropriate State election official" to administer voter registration tasks, 52 U.S.C. §§ 20508(a)(2), (b)(1)—illustrates how profoundly they disregard the important federalism principles that Congress codified in the statute and that lie at the heart of this case.

Contrary to their current arguments in this appeal, defendants' counsel also understood Section 2(a) as ordering the EAC to require documentary proof of citizenship. At the preliminary injunction hearing before the district court in D.C. in a different case brought by private litigants challenging the Executive Order, counsel for defendants explained that, under "the directive" of Section 2(a), which is "binding," the EAC must require documentary proof of citizenship because that is what "the [P]resident has ordered." JA 100-103. Counsel explained—consistent with the EAC's April 11 letter—that any ensuing consultation or procedures would address only technical details, such as how the requirement would be embodied on the Federal Form, but not the substance of *whether* documentary proof of citizenship would be required. *See* Addendum 17, 20 (citing JA 99-103).

Defendants dispute (at 22-23) the district court's assertion that they are now "estopped" from changing their interpretation of Section 2(a). But that assertion—

which appeared in only a single sentence of the court's decision, Addendum 20—did not disturb the court's separate conclusion that Section 2(a) "unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form." *Id.* at 22; *accord LULAC II*, 2025 WL 3042704, at *30 & n.41. And representations by defendants' counsel to another federal court about what Section 2(a) required are at least *relevant* to interpreting that provision, especially where those representations "affirmed that the Executive Order means what it says: The EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form." *LULAC I*, 780 F. Supp. 3d at 199. Courts, "in reviewing the record," are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (quoting *Dep't of Com. v. New Yor*k, 588 U.S. 752, 785 (2019)).[10]

d. Finally, although not necessary to this appeal, defendants misrepresent the record by suggesting it is "uncontested"—and that the district court purportedly "acknowledged"—that the EAC itself could lawfully require documentary proof of citizenship in the Federal Form. Opening Br. 20, 29. Plaintiffs *have contested* the

---

[10] Although defendants on appeal now expressly disavow their counsel's prior representations, they notably did *not* do so during the preliminary injunction proceedings below. The district court specifically referenced those prior representations at its own hearing, and asked defendants' counsel whether anything had "changed in this regard as to 2(a) since the D.C. District Court hearing." Dkt. 104 at 20-22. Their counsel replied: "Not to my knowledge." *Id.*

issue.  *See* Dkt. 76 at 10-11; Dkt. 96 at 10-11.  And the district court expressly *reserved* the question, explaining that the "issue [wa]s not before the Court on this preliminary injunction, and the Court, therefore, does not reach it."  Addendum 21 n.6.  The court noted that the district court in *LULAC I* had done the same.  *Id.* (citing 780 F. Supp. 3d at 197).  Both courts also observed that "'Congress considered and rejected a proposal that would have allowed . . . the kind of documentary proof of citizenship requirement that the President's Executive Order now directs the EAC to adopt.'"  Addendum 21 (quoting *LULAC I*, 780 F. Supp. 3d at 196).  To the extent defendants imply (at 20, 29) that *Arizona v. Inter Tribal Council of Arizona, Inc.* (*ITCA*), 570 U.S. 1 (2013), resolved the issue, they are wrong:  the Court noted possible avenues for future judicial review of the issue, *id.* at 19-20, but did not suggest what the outcome of such litigation would be.  So while the separate question of whether the EAC could lawfully require documentary proof of citizenship on the Federal Form is not at issue in this appeal, the Court should not accept defendants' assertion that the question is "uncontested" or that the district court purportedly "acknowledged" an answer below.

### 2.    Plaintiffs' challenge to Section 2(a) is ripe

Defendants contend that plaintiffs' challenge to Section 2(a) is unripe, but their arguments on this score turn (again) on whether the district court correctly understood the directive to order that documentary proof of citizenship be required.

Opening Br. 23-24.  In other words, defendants argue that this claim is not ripe because Section 2(a) only requires the beginning of a process and that the documentary-proof requirement purportedly remains "uncertain" and "contingent upon the EAC's ultimate conclusion as to whether such a requirement is 'necessary.'"  *Id.* at 24.  But, for the reasons explained above, "Section 2(a) leaves no uncertainty about what it requires from the EAC."  *LULAC II*, 2025 WL 3042704, at *20.  Because Section 2(a) did not merely direct the EAC to "consider" whether a documentary proof-of-citizenship requirement is necessary, but rather ordered it to "require" such proof, the district court correctly concluded that plaintiffs' challenge to the President's directive is ripe.  Addendum 16-18.

## B.  The Court Should Affirm the Injunction as to Section 3(d)

Similar to the documentary proof-of-citizenship requirement that Section 2(a) would impose on voter registration through the Federal Form, Section 3(d) sought to add a documentary proof-of-citizenship requirement to the Federal Post Card Application for absent military members, their immediate family, and overseas voters.  Addendum 51.  Unlike Section 2(a), however, there is no dispute about Section 3(d)'s meaning:  defendants concede it ordered the Secretary of Defense to add such a requirement.  As explained below, plaintiffs are likely to succeed in their challenge to the directive and would be irreparably harmed by its implementation.

### 1. Plaintiffs' challenge to Section 3(d) is likely to succeed because requiring documentary proof of citizenship is inconsistent with the statutory "post card form"

Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) to streamline registration and absentee voting for members of the military who are away from home on active duty, their spouses and dependents, and other U.S. citizens living abroad. 52 U.S.C. §§ 20301-20311. To that end, the Act provided for an "official post card form" through which such voters could register and request an absentee ballot. *Id.* §§ 20301(b)(2), 20302(a)(4), (i). Through measures like this simple Federal Post Card Application, the statute "committed to eliminating procedural roadblocks" that could otherwise prevent overseas voters and military members "from sharing in the most basic of democratic rights." *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015).

Section 3(d)'s directive to add a documentary proof-of-citizenship requirement to the Federal Post Card Application contradicts Congress's clear instruction that the application be in a "post card form." 52 U.S.C. §§ 20301(b)(2), 20302(a)(4). As the district court observed, the ordinary meaning of "post card" means that it can be "mail[ed] without an envelope." Addendum 24 (quoting Miriam-Webster Dictionary). Congress's choice that the application be in "post

card form" is both longstanding and deliberate.[11] In making that choice—and allowing military and overseas voters to mail their applications without an envelope—Congress precluded any additional requirement that an applicant append extrinsic documentation. Instead, as with the Federal Form, Congress required that applicants affirm the accuracy of information in the application (including statements about their eligibility and U.S. citizenship) via a "standard oath" under penalty of perjury. 52 U.S.C. § 20301(b)(7). For these reasons, the district court concluded that plaintiffs were likely to succeed in their claim that Section 3(d) could not lawfully add a documentary proof-of-citizenship requirement to the "official post card form." *Id.* § 20301(b)(2); Addendum 23-25.

On appeal, defendants acknowledge the "requirement that the form be a 'post card,'" and concede that this requirement "might place some limit on the format of the voter registration application." Opening Br. 30-31. But they do not suggest what those limits might be. Instead, they contend that if the district court's interpretation were correct, "the currently existing post card form would itself be inconsistent with the statute." *Id.* at 30-31. That is not true. While the current

---

[11] An earlier statute, the Federal Voting Assistance Act of 1955, similarly required that overseas absentee ballot applications take the "form of [a] post card," and went so far as to prescribe its size and contents. Pub. L. No. 84-296, § 204, 69 Stat. 584, 586-587. UOCAVA did not carry forward the specific size and content requirements from that statute, but Congress retained the essential requirement that the application remain in "post card form." 52 U.S.C. § 20301(b)(2).

Federal Post Card Application is "8 ½ x 11," defendants' description of it as a "two page" document is misleading. *Id.* at 31. The current application is printed on a *double-sided* piece of paper, which explains that after applicants complete one side and sign the oath, they can "[r]emove the adhesive liner from the top and sides"; "[f]old" the form on the dotted line; and "seal tightly" before mailing, with U.S. postage prepaid. JA 93-94.

The current application thus satisfies the "post card form" requirement because it can be "mail[ed] without an envelope" and without the need for any other additional attachments or enclosures. Addendum 24. That applicants can choose to mail the current application in an envelope, or submit it electronically via email or fax, Opening Br. 31 (quoting JA 94), does not mean the President can *require* such steps by mandating that voters submit additional documentation under Section 3(d). Doing so would render the application no longer a "post card."[12]

As the district court observed, requiring documentary proof of citizenship in the Federal Post Card Application would contravene not only the statute's text, but also its purpose to "remove procedural roadblocks" for military and overseas

---

[12] As the district observed, although Arizona presently requires applicants to submit additional documentation, that submission affects "only whether a voter can obtain a ballot for *state* elections," and thus does not implicate UOCAVA's post-card form requirement because it has "no impact on a voter's ability to obtain a ballot for *federal* []elections." Addendum 24 n.7 (emphasis added); *see United States v. Alabama*, 998 F. Supp. 2d 1283, 1290-1291 (M.D. Ala. 2014) ("UOCAVA is aimed at only federal elections"), *aff'd* 778 F.3d 926.

voting.  Addendum 25 (citing *Alabama*, 778 F.3d at 928).  Defendants do not dispute this was Congress's purpose or, even, that requiring documentary proof would add a procedural roadblock.  Instead, they nitpick some of the facts cited by the district court, noting, for example, that while only about half of citizens have passports, Addendum 25 (quoting JA 276), "overseas voters" presumably obtained one before departing the United States.  Opening Br. 31-32.  That presumption does not extend to military members, however, who need not be stationed overseas to use the Federal Post Card Application, *see* 52 U.S.C. § 20310(1); who are often exempted from needing a passport overseas, *see* 22 C.F.R. § 53.2(b); and whose military identification cards may not indicate citizenship, *see* JA 136, 164.

Regardless, even when military or overseas voters do have documentary proof of citizenship, Section 3(d)'s requirement that they submit such documentation would still pose an additional burden—as they would have to find copiers, scanners, fax machines, computers, and/or envelopes to submit such documents with their applications.  *See* JA 156.  And certainly when Congress enacted UOCAVA in 1986, those steps would have posed a particular challenge for civilians or members of the military who are located "in remote areas."  H.R. Rep. No. 99-765, at 10-11 (1986).  Defendants thus cannot seriously contest that requiring documentary proof of citizenship under Section 3(d) would add, rather

than remove, a "procedural roadblock[]" for such voters, and that such a requirement would be "contrary to the will of Congress." Addendum 25.[13]

### 2. Plaintiffs have standing to challenge Section 3(d), and their claim is ripe

In the district court, defendants did not contest that implementation of Section 3(d) would injure plaintiffs by, "at a minimum, imposing compliance costs" on them. Addendum 14-15. Defendants now contend, however, that "Plaintiff States are not injured by Section 3(d)" because, while Section 2(a)(i)(B) imposed an express recordkeeping requirement on state and local officials, there is "no similar recordkeeping requirement" under Section 3(d). Opening Br. 33.

Defendants' earlier position was correct. If Section 3(d) were implemented and documentary proof of citizenship required as part of the Federal Post Card Application, state and local officials who receive completed applications would have to "accept," "process," and (at the very least) properly store or dispose of the submitted documentary proof, 52 U.S.C. § 20302(a)(2)—even if they need not follow the precise directions prescribed for the Federal Form in Section 2(a)(i)(B). That is particularly so because submitted documentary proof will likely include

---

[13] Defendants observe, in a footnote (at 33 n.5), that the district court did not separately address Section 3(d)(ii), which directed that the application also require "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." Addendum 51. But the court's reasoning would prevent requiring any extrinsic proof for voting in federal elections attached to the "post card form."

sensitive personal information.  Local election officials explained below that it would not only require "additional staff time to process . . . and review" post card applications if Section 3(d) were implemented, but also that "the very act of receiving copies of sensitive data like [documentary proof of citizenship] creates data security risks and costs."  Dkt. 85-1 at 10-13; *see* 52 U.S.C. § 20302(e)(6)(B) (requiring that States "ensure" protection of "personal data of an absent uniformed services voter or overseas voter who requests . . . a voter registration application").

State election officials would also have to field and answer questions from affected voters about the new documentary proof-of-citizenship requirement.  *See* 52 U.S.C. § 20302(b)(1) (requiring that "[e]ach State shall designate a single office which shall be responsible for providing information regarding voter registration procedures and absentee ballot procedures to be used by absent uniformed services voters and overseas voters").  And state officials would have to "issue guidance related to the documentary proof of citizenship requirement" and "conduct trainings for agencies and local election officials" about what to do with the submitted documents.  Addendum 36.  Thus, plaintiffs would face "substantial administrative burdens," and need "additional staff, training[,] and resources," if Section 3(d) were implemented and a documentary proof-of-citizenship requirement added to the Federal Post Card Application.  JA 280, 342, 355-356; *see Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221-228

(1st Cir. 2019) (finding standing to challenge federal action when "likely chain of events" would lead to some fiscal injury to State).

Defendants also contend that plaintiffs' challenge is unripe because, even though Section 3(d) leaves no question *whether* the Secretary of Defense will include a documentary proof-of-citizenship requirement in the Federal Post Card Application, "it remains to be seen *how* the Secretary will implement this requirement." Opening Br. 34 (emphasis added). For the reasons explained above, however, *any* documentary-proof requirement would violate UOCAVA by imposing procedural roadblocks and deviating from the required "post card form."

Finally, defendants briefly contend that plaintiffs have not shown that they would be irreparably harmed by implementation of Section 3(d), but their contention merely repeats their standing arguments. Opening Br. 43-44. The contention fails for the same reasons. The unrecoverable "time, cost, and effort" spent addressing the documentary proof-of-citizenship requirement would irreparably harm plaintiffs, absent the injunction. Addendum 35-36; *accord Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025) (affirming irreparable harm finding based on "unrecoverable costs" States would spend modifying systems, processes, and guidance in response to challenged Executive Order).

### C. Defendants Cannot Challenge the Scope of the Injunction as to Sections 2(a) and 3(d) for the First Time on Appeal

Plaintiffs carefully limited the scope of their requested injunction where appropriate and feasible. They asked, for example, that Section 2(d) be enjoined only "as to state and local agencies in Plaintiff States," and that Section 7(a) and 7(b) be enjoined only as to the thirteen Plaintiff States affected by those directives. Dkt. 75-1 at 4. Plaintiffs did not similarly limit their requested injunction as to Sections 2(a) and 3(d), however, because "national uniformity" on the Federal Form and Federal Post Card Application are "central to Congress's design." *LULAC I*, 780 F. Supp. 3d at 222. At no point during the district court proceedings did defendants contest the scope of plaintiffs' requested injunction as to these two directives. *See* Dkts. 91, 104.

On appeal, defendants now contend the injunction is "overbroad" with respect to Sections 2(a) and 3(d) because those parts of the injunction should have been limited to the Plaintiff States, too. Opening Br. 41-43. But defendants "cannot surface an objection to a preliminary injunction for the first time in an appellate venue." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st Cir. 1998). Because defendants never argued in the district court that relief as to Sections 2(a) or 3(d) should—or could—be limited to Plaintiff States, they "forfeited the opportunity" to contend on appeal that those parts of the preliminary injunction are "overbroad." *Id.*; *accord Doe*, 157 F.4th at 81.

In fact, after the district court granted the preliminary injunction and the Supreme Court decided *Trump v. CASA*, 606 U.S. 831 (2025), defendants *still* did not ask the district court to modify the scope of the injunction as to Sections 2(a) or 3(d), even while they moved the court to modify the scope of the injunction *as to Section 2(d)*. *See supra*, p. 13; Dkt. 112 at 1-4; Addendum 1-2.[14]  In asking the district court to modify that part of the injunction after *CASA*, defendants did not argue that the scope of the injunction was overbroad as to Sections 2(a) or 3(d). Thus, "*at no point*" did defendants comply with the "basic rule" that they must "state their objections to the injunction to the district court, so that the district court can consider them and correct the injunction if necessary, without the need for appeal."  *United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983).

Defendants now suggest that, if the injunction as to Sections 2(a) and 3(d) were limited to the Plaintiff States, a requirement for documentary proof of citizenship could be added to the state-specific instructions of the Federal Form or Federal Post Card Application for non-plaintiff States.  Opening Br. 42-43.  But such instructions are for "*the state's* specific voter eligibility and registration requirements," 11 C.F.R. § 9428.3(b) (emphasis added)—not for purported *federal*

_____

[14] Because the district court has since entered a stipulated dismissal of plaintiffs' claim challenging Section 2(d), *see supra* p. 13, this Court need not consider defendants' arguments about that directive, Opening Br. 24-28.  *See* Defs.' Letter to Clerk, Dec. 22, 2025, ECF No. 00118382804 ("The stipulation renders the portion of the preliminary injunction [addressing Section 2(d)] moot.").

requirements that apply in only a patchwork of States. And in any event, the Court should not even consider this suggestion because defendants below never "fleshed out how any narrower injunction would work." *Doe*, 157 F.4th at 82.

## II. THE DISTRICT COURT PROPERLY ENJOINED THE EXECUTIVE ORDER'S ATTEMPTS TO FORCE CHANGES TO STATE BALLOT-RECEIPT LAWS

In addition to imposing proof-of-citizenship requirements on voter registration, the Executive Order also announced a policy to require that all votes in federal elections be received by state election officials by Election Day. Section 7(a) ordered the Attorney General to take "all necessary action to enforce" the policy "against States" that violate it. Addendum 53. And Section 7(b) sought to withhold funding from States that do not adopt the President's ballot-receipt deadline. The district court concluded that Ballot Receipt States (thirteen plaintiffs with state laws contrary to the policy) were likely to succeed in challenging these directives. The court enjoined defendants from bringing civil or criminal enforcement actions pursuant to Section 7(a) or from implementing Section 7(b) against those States. On appeal, defendants contest the injunction as to Section 7(a) but not as to Section 7(b).

## A. The Court Should Affirm the Injunction as to Section 7(a)

### 1. Plaintiffs' challenge to Section 7(a) is likely to succeed because federal law does not preempt state ballot-receipt deadlines

The district court concluded that plaintiffs were likely to succeed in their challenge to Section 7(a) because "nothing in the text of the Election Day statutes"— 2 U.S.C. § 7; 3 U.S.C. § 1—"bars the Ballot Receipt States from counting ballots received in accordance with their ballot receipt laws."  Addendum 5.  Defendants' opening brief and the Executive Order rest their contrary interpretation on *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), where the Fifth Circuit held that a Mississippi ballot-receipt law was preempted by the federal statutes.  Opening Br. 38-41; Addendum 47.  The Supreme Court, however, has since granted certiorari to review the Fifth Circuit's decision.  *Watson v. Republican Nat'l Comm.*, --- S. Ct. ---, 2025 WL 3131802 (2025).  If this Court resolves the present appeal after the Supreme Court decides *Watson*, it would have the benefit of the Supreme Court's resolution of the merits issue that underlies the preliminary injunction as to Section 7(a).  Were the Court to consider the issue now, however, it should affirm the injunction.  Nothing in the text, purpose, or history of the election-day statutes suggests that Congress adopted the President's preferred ballot-receipt deadline.

a. Federal statutes specify the Tuesday after the first Monday in November as the "election" day for federal offices.  2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1).

Congress set this date for presidential elections in 1845, Act of Jan. 23, 1845, ch. 1, 5 Stat. 721, and for elections of congressional representatives in 1872, Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28.[15] The term "election" means the "act of choosing a person to fill an office." *Foster v. Love*, 522 U.S. 67, 71 (1997) (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869)); *see also United States v. Classic*, 313 U.S. 299, 318 (1941) ("From time immemorial an election to public office has been in point of substance no more and no less than the *expression* by qualified [voters] of their *choice* of candidates." (emphasis added)).

States laws that allow the counting of ballots mailed on or before Election Day but received shortly after (or that allow voters to cure timely-submitted ballots with minor technical problems, like a missing signature) are consistent with the federal statutes. Under such state laws, voters make their "final act of selection" and express their choice of candidates by Election Day, *Foster*, 522 U.S. at 72— even if election officials may not count all the votes or confirm the ultimate winner until some days later.

State ballot-receipt laws are also consistent with the purpose and history of the federal election-day statutes. The federal statutes addressed the problem of

---

[15] As States began electing senators directly, Congress also tied that election day to the one for representatives. Act of June 4, 1914, ch. 103, § 1, 38 Stat. 384 (codified as amended at 2 U.S.C. § 1).

some States *completing* their elections earlier than others (the results of which could then influence voting in other States), and sought to avoid the burden on voters if presidential and congressional elections were held on different days. *Foster*, 522 U.S. at 73-74. But the receipt or curing of timely cast ballots after Election Day has no bearing on either issue. During the Civil War, moreover, several States permitted soldiers to cast absentee ballots with military officers in the field, which necessarily meant those ballots were not received by election officials until sometime after the relevant election day. *See* Josiah Henry Benton, *Voting in the Field: A Forgotten Chapter of the Civil War* 171-173, 186-187, 190 (1915). Yet when Congress subsequently enacted 2 U.S.C. § 7, it omitted any deadline for the receipt of ballots. Nor did it later add any ballot-receipt deadline to that statute or to 3 U.S.C. § 1, even as more States passed laws allowing timely cast ballots to be received after Election Day. *See, e.g.*, Kan. Stat. § 25-1106 (1923); Cal. Political Code § 1360 (1924): 1933 Mo. Laws 218, 222.

In fact, Congress acknowledged and accommodated such state laws when it enacted statutes governing absentee voting by members of the military. *See, e.g.*, Pub. L. No. 78-277, § 311(b)(3), 58 Stat. 136, 146 (1944). A House Report about UOCAVA in 1986 observed that "several States accept absentee ballots, particularly those from overseas, for a specified number of days after election day," and—far from expressing any suggestion that such laws are, or should be,

preempted—instead *praised* those state initiatives as "protecting the voting rights of these citizens." H.R. Rep. No. 99-765, at 8; *see supra* pp. 8-9 & n.5. Congress then expressly incorporated such state deadlines into the statute, acknowledging the "deadline for receipt of the State absentee ballot under State law." 52 U.S.C. § 20303(b). And when Congress later amended the statute, it directed federal officials to facilitate the delivery of absentee ballots "not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(b)(1); Pub. L. No. 111-84, § 580(a), 123 Stat. 2190, 2324 (2009). Defendants suggest these provisions are "narrow exceptions" to an otherwise blanket preemption of such state laws. Opening Br. 40. But had Congress intended them as mere exceptions, it presumably would have said so. Instead, Congress recognized States' ballot-receipt deadlines as the baseline, and enacted measures to ensure that military members may vote in accordance with them.

Today, twenty-nine States and the District of Columbia allow at least some timely cast ballots to be received after Election Day. *Supra*, p. 9. And Congress was certainly aware of that widespread practice—as well as of court decisions rejecting the President's position on the issue, *e.g.*, *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020)—when it amended the presidential electors statute in 2022 and defined the term "election day." *See* Pub. L. No. 117-328, div. P, § 102, 136 Stat. 4459, 5233. Yet Congress chose—once

again—to leave States' ballot-receipt deadlines undisturbed. In other words, "'Congress has indicated its awareness of the operation of state law in a field of federal interest,'" and has decided to "leave [that] state law untouched." *CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014) (quoting *Wyeth v. Levine*, 555 U.S. 555, 574-575 (2009)); Addendum 30-31.

b. Defendants' contrary arguments rely on the unpersuasive reasoning of the Fifth Circuit's decision in *Wetzel*. Opening Br. 38-41. That court purported to extract from *Foster* a tripartite test for "election day"—requiring "(1) official action, (2) finality, and (3) consummation." *Wetzel*, 120 F.4th at 207. But those terms do not appear in the relevant statutes, and the Supreme Court explained in *Foster* that its decision "does not [identify] precisely what acts a State must cause to be done on federal election day." 522 U.S. at 71.

In any event, neither the Fifth Circuit nor defendants persuasively explain why it is permissible under their purported test for election officials to continue "*counting* ballots" after Election Day (which they concede is lawful and necessary), Opening Br. 39, but not for state law to allow those officials to count ballots they *receive* after Election Day, so long as the ballots were postmarked on or before that date. In both circumstances, the voter consummated their conclusive choice by Election Day, even if the election official cannot confirm the final results until some days after. *Cf. Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001)

(a "focus on the single act of receiving a ballot from a voter presents an unnatural and stilted conception of the actions taken by [elections officials]").

Below, defendants conceded that "Congress has not spoken to the issue" of whether ballots must be received by Election Day, and asserted instead that "[t]he President answered that question" in the Executive Order. Dkt. 91 at 17-18, 21. But it is only "the action of Congress"—not the President—that may "supersede[]" state election laws, *Ex parte Siebold*, 100 U.S. 371, 384 (1879), and even then Congress's preemptive power extends only "so far as it is exercised, and no farther," *id.* at 392. Here, Congress left it for States to determine, in accordance with their own state laws, whether timely cast mail-in ballots may be received after Election Day. And as Justice Kavanaugh observed on this very issue, "our constitutional system of federalism" means that "[d]ifferent state legislatures may make different choices." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 32 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

### 2. Plaintiffs' challenge to Section 7(a) is ripe, and enforcement would cause irreparable harm

Ballot Receipt States face a sufficiently "credible threat of enforcement" to challenge Section 7(a). *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014). Section 1 declares it the "policy" of the Trump Administration to "enforce" the federal election-day statutes and "require that votes be cast and received by the election date established in law." Addendum 47. To "achieve full

compliance" with that policy, Section 7(a) then directs the Attorney General to take "all necessary action to enforce" the President's ballot-receipt deadline "against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes." *Id.* at 53.

That directive—for the Attorney General to take "all necessary action to enforce" Section 7(a) "against" such States, Addendum 53—plainly creates a "threat of enforcement" for the Plaintiff States with laws that allow the counting of timely cast ballots received or cured after Election Day. Addendum 5, 28. And defendants' counsel confirmed that threat when he told the district court in D.C. that the Attorney General could bring civil or criminal enforcement actions against States to enforce Section 7(a). JA 104-106. Defendants (again) complain that the district court here relied on counsel's representations in that other litigation. Opening Br. 37. But a U.S. Department of Justice attorney's representations that the federal government may bring enforcement actions against States is certainly relevant to whether those States face a credible enforcement threat—especially where defendants have since declined to disavow those statements. Addendum 28. Ballot Receipt States' claim is therefore ripe because their laws are "presently in conflict with the Administration's . . . policy as described in the Executive Order,"

and defendants have threatened enforcement.  *San Francisco*, 897 F.3d at 1237-

1238.[16]

Defendants' argument—that the Attorney General might merely send letters

"encouraging [States'] compliance," Opening Br. 35—does not reflect the text of

the Executive Order.  Sending a letter *encouraging* compliance would not be

consistent with the Attorney General's directive "to *enforce*" the President's

policy.  Addendum 53 (emphasis added); see *Enforce*, Black's Law Dictionary

(12th ed. 2024) ("To give force or effect to (a law, etc.); to compel obedience to.").

And even if it could be so characterized, Section 7(a) commands the Attorney

General to take "all necessary [enforcement] action" to "achieve full compliance."

Addendum 53.  So unless the Ballot Receipt States amended their state laws in

response to the letters posited by defendants—an unlikely prospect given the

considered policy choices that those laws reflect—Section 7(a) would require the

Attorney General take further enforcement actions against them.

In any event, the district court did not enjoin defendants from sending such a

letter, which went "beyond what the States challenge here."  Addendum 5.

Instead, the court enjoined defendants only from bringing "civil or criminal

---

[16] Defendants note (at 37) that the *LULAC I* court declined to enjoin
enforcement of Section 7(a).  But they neglect to mention a key reason:  "Section
7(a) directs enforcement 'against' States, not private parties" (like the plaintiffs in
that case).  780 F. Supp. 3d at 214.  So the "most natural parties to seek an
injunction against enforcement under Section 7(a) are the States themselves."  *Id.*

enforcement actions pursuant to Section 7(a)" against the Ballot Receipt States. Addendum 2. And although the federal election-day statutes do not themselves expressly allow for such actions, *id.* at 32, the U.S. Department of Justice under this Administration has filed several other preemption enforcement actions against Ballot Receipt States based on non-statutory Supremacy Clause causes of action — which makes the threat of enforcement here "not remote or speculative." *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 16-17 (1st Cir. 2014).[17]

Defendants suggest the Ballot Receipt States must nonetheless wait to challenge Section 7(a) until enforcement actions are brought against them. Opening Br. 36-37, 44-45. But Article III does not require the States to "sit like Damocles" and patiently wait for the federal government to sue them. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 53 (1st Cir. 2021). "[W]here threatened action by *government* is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-129 (2007). An actual "enforcement action is not a prerequisite to challenging the law," *Driehaus*, 573 U.S. at 158, and "Damocles's sword does not have to actually fall" before the

---

[17] *See, e.g.*, *United States v. California*, No. 2:25-cv-06230 (C.D. Cal. filed July 9, 2025); *United States v. Colorado*, No. 1:25-cv-01391 (D. Colo. filed May 2, 2025); *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025); *United States v. Illinois*, No. 1:25-cv-01285 (N.D. Ill., filed Feb. 6, 2025).

courts "will issue an injunction," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Forcing Ballot Receipt States to wait for an enforcement action would be particularly problematic in the context of this case, given the 2026 federal midterm elections and the "basic tenet of election law" that "rules of the road should be clear and settled" in advance of the next election. *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring in denial of application to vacate stay). "[R]unning a statewide election is a complicated endeavor," and "at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots." *Id.* If States had to wait and face enforcement actions close to an election—or, even worse, shortly after it concludes—that could cast an intolerable shadow on the election results, undermining the public's faith in the State's election.

Similar reasons explain why the Ballot Receipts States would suffer irreparable harm from such enforcement actions. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("injury to goodwill and reputation is . . . often held to be irreparable"). Defendants suggest enforcement actions would not harm the States because, "in defending against such an action," they could assert "their view that the Election Day statutes do not preempt their respective State laws." Opening Br. 44. But States would be "forced to divert

significant time and resources" to respond to such actions, *Driehaus*, 573 U.S. at 165—which would collectively be much more burdensome and costly than this pre-enforcement case brought by States together as co-plaintiffs. And the additional costs of defending against such actions would be irreparable because States "cannot adequately be compensated . . . by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

## B. Defendants Do Not Challenge the Injunction as to Section 7(b)

Section 7(b) of the Executive Order sought to condition millions of dollars in statutory funding—which States use to administer federal elections, 52 U.S.C. § 21001(b)—on a State's compliance with the President's view of the ballot-receipt deadline. Addendum 53-54. The district court enjoined implementation of this directive, finding that it "threaten[ed] to unlawfully deprive states of this crucial funding source," *id.* at 37 & n.16, and that plaintiffs were likely to succeed in their challenge because—even putting the President's erroneous interpretation of the election-day statutes—Section 7(b) "impose[d] an extra-statutory condition on the disbursement of congressionally authorized funds," *id.* at 33-35 (discussing *City of Providence v. Barr*, 954 F.3d 23, 34-35 (1st Cir. 2020)).

Defendants have raised no arguments on appeal contesting the district court's injunction as to Section 7(b) and therefore have forfeited any challenge to that part of the injunction. *See Coviello*, 225 F.3d at 70 n.10. So, contrary to the relief

requested in their opening brief (at 17, 45), the district court's decision and injunction could, at most, only be reversed or vacated *in part*.

*    *    *

In addition to concluding that plaintiffs are likely to succeed on the merits and would suffer irreparable harm from the challenged Executive Order directives, the district court also determined that the equities and public interest favored granting the preliminary injunction. Addendum 43-44. The court found a substantial risk that voters will be disenfranchised if the directives were implemented, *id.* at 40-41, 44, and that the "chaos and confusion" caused by "changing decades of established practice with respect to voter registration and ballot counting" could "result in voters losing trust in the election process," *id.* at 44 & n.19 (citing, e.g., *Newby*, 838 F.3d at 12-13). By contrast, the court found "little evidence" that the directives would increase confidence in federal elections, particularly because defendants had not shown that substantial numbers of noncitizens register to vote. *Id.* at 43 (citing *Fish v. Schwab*, 957 F.3d 1105, 1142 (10th Cir. 2020)). These findings, which defendants do not contest on appeal, further support the district court's decision to preliminarily enjoin the President's unlawful directives.

# CONCLUSION

The preliminary injunction should be affirmed.

Dated: January 5, 2026

Respectfully Submitted,

AARON D. FORD
  *Attorney General of Nevada*

HEIDI PARRY STERN
  *Solicitor General*
CRAIG A. NEWBY
  *First Assistant Attorney General*
1 State of Nevada Way
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov

*Counsel for the State of Nevada*

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

M. PATRICK MOORE
  *First Assistant Attorney General*
ANNE L. STERMAN
  *Chief, Government Bureau*
PHOEBE FISHER-GROBAN
  *Deputy Chief, Constitutional &*
  *Administrative Law Division*
CHRIS PAPPAVASELIO
  *Assistant Attorney General*
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov

*Counsel for the Commonwealth of*
*Massachusetts*

ROB BONTA
  *Attorney General of California*

By: *s/ Ian Fein*
SAMUEL T. HARBOURT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
IAN FEIN
  *Deputy Solicitor General*
ANNE P. BELLOWS
MALCOLM A. BRUDIGAM
MICHAEL S. COHEN
LISA C. EHRLICH
NICHOLAS R. GREEN
KEVIN L. QUADE
  *Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3466
Ian.Fein@doj.ca.gov

*Counsel for the State of California*

KRISTIN K. MAYES
  *Attorney General of Arizona*

JOSHUA M. WHITAKER
KAREN J. HARTMAN-TELLEZ
KARA KARLSON
  *Assistant Attorneys General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-7738
Joshua.Whitaker@azag.gov

*Counsel for the State of Arizona*


WILLIAM TONG
  *Attorney General of Connecticut*

MAURA MURPHY
  *Deputy Associate Attorney General*
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov

*Counsel for the State of Connecticut*


ANNE E. LOPEZ
  *Attorney General of Hawaii*

DAVID D. DAY
  *Special Assistant Attorney General*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
David.D.Day@hawaii.gov

*Counsel for the State of Hawaii*


PHILIP J. WEISER
  *Attorney General of Colorado*

SHANNON STEVENSON
  *Solicitor General*
PETER BAUMAN
  *Senior Assistant Attorney General*
1300 Broadway
Denver, CO 80203
(720) 508-6400
Shannon.Stevenson@coag.gov

*Counsel for the State of Colorado*


KATHLEEN JENNINGS
  *Attorney General of Delaware*

MARYANNE T. DONAGHY
VANESSA L. KASSAB
  *Deputy Attorneys General*
IAN R. LISTON
  *Director of Impact Litigation*
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*


KWAME RAOUL
  *Attorney General of Illinois*

ALEX HEMMER
SARAH A. HUNGER
  *Deputy Solicitors General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

*Counsel for the State of Illinois*

AARON M. FREY
  *Attorney General of Maine*

JONATHAN R. BOLTON
  *Assistant Attorney General*
6 State House Station
Augusta, ME 04333
(207) 626-8800
Jonathan.Bolton@maine.gov

*Counsel for the State of Maine*


ANTHONY G. BROWN
  *Attorney General of Maryland*

JULIA DOYLE
  *Solicitor General*
ADAM D. KIRSCHNER
  *Senior Assistant Attorney General*
DANIEL M. KOBRIN
  *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
akirschner@oag.state.md.us

*Counsel for the State of Maryland*


DANA NESSEL
  *Attorney General of Michigan*

ERIK GRILL
DANNY HAIDAR
HEATHER S. MEINGAST
  *Assistant Attorneys General*
525 W. Ottawa, 5th Floor
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov

*Counsel for the State of Michigan*


KEITH ELLISON
  *Attorney General of Minnesota*

ELIZABETH C. KRAMER
  *Solicitor General*
PETER J. FARRELL
  *Deputy Solicitor General*
ANGELA BEHRENS
  *Assistant Attorney General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us

*Counsel for the State of Minnesota*

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

MEGHAN K. MUSSO
JONATHAN MANGEL
  *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
Meghan.Musso@law.njoag.gov

*Counsel for the State of New Jersey*

LETITIA JAMES
  *Attorney General of New York*

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ANDREA TRENTO
  *Special Trial Counsel*
COLLEEN J. FAHERTY
  *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov

*Counsel for the State of New York*

CHARITY R. CLARK
  *Attorney General of Vermont*

RYAN P. KANE
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.Kane@vermont.gov

*Counsel for the State of Vermont*

RAUL TORREZ
  *Attorney General of New Mexico*

JAMES W. GRAYSON
  *Chief Deputy, Attorney General*
P.O. Drawer 1508
Santa Fe, NM 87504
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

PETER F. NERONHA
  *Attorney General of Rhode Island*

JAMES J. ARGUIN
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jarguin@riag.ri.gov

*Counsel for the State of Rhode Island*

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

AARON BIBB
CHARLOTTE GIBSON
  *Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707
(608) 266-0810
Aaron.Bibb@wisdoj.gov

*Counsel for the State of Wisconsin*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,097 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.



*/s/ Ian Fein*
Ian Fein

## CERTIFICATE OF SERVICE

I hereby certify that on this January 5, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Ian Fein