No. 25-1726

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA, *et al.*,

Plaintiffs-Appellees

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the
United States, *et al.*,

Defendants-Appellants.

Appeal from the United States District Court
For the District of Massachusetts

## BRIEF FOR *AMICUS CURIAE* THE SOCIETY FOR
## RULE OF LAW INSTITUTE IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

NANCY A. TEMPLE
ELLIE BUCHANAN
  *Of Counsel*
Katten & Temple, LLP
209 S. LaSalle Street Suite 950
Chicago, IL 60604

BRENDAN J. HASKIN
  *Of Counsel*
2950 Van Ness Street, NW, No. 607
Washington, D.C. 20008

RICHARD BERNSTEIN
  Counsel of Record
1875 K Street, NW
Washington, D.C. 20006
(301) 775-2064
Rbernsteinlaw@gmail.com

January 12, 2026

Counsel for *Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus does not have a parent corporation, is not a publicly traded company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT………………………………… i

TABLE OF CONTENTS………………………………………………… ii

TABLE OF AUTHORITIES…………………………………………….. iv

INTEREST OF *AMICUS CURIAE*……………………………………… 1

INTRODUCTION AND SUMMARY OF ARGUMENT……………………… 1

ARGUMENT………………………………………………………… 4

    I.    Presidential Election Day Consummates When Voters Choose Presidential Electors……………………………………………….. 4

        A.    Article II, § 1, Clause 4 Defines Every Presidential Election Day As "the Time of Chusing the Electors."………………… 4

        B.    3 U.S.C. § 3 Says "the time of choosing electors."…………. 5

        C.    An 1845 Statute Enacted An Election Day For "choosing electors." …………………………………………………… 6

            a.    The Election Day For The President Remained When Electoral Votes Are Transmitted, Not Received…………………………………………….... 9

        D.    The ECRA Did Not Silently Add A Mail-In Ballot Receipt Deadline………………………………………………………13

    II.    Election Day Consummates When Voters Choose Members of Congress…………………………………………………………..16

    III.    Section 7 Usurps State Legislative Power to Set A Mail-in Ballot Receipt Deadline………………………………………..22

        A.    A Mail-In Receipt Deadline Regulates "Manner," Not Time……………………………………………………… 22

B.    Section 7 May Not Usurp The Legislative Power To Set
      A Receipt Deadline…………………………………………. 25

CONCLUSION……………………………………………………………….. 27

# TABLE OF AUTHORITIES

Page(s)

Cases

*Burroughs v. United States,*
290 U.S. 534 (1934)..................................................................25

*Bush v. Gore,*
531 U.S. 98 (2000)...............................................................22, 23

*Chiafalo v. Washington,*
591 U.S. 578 (2020)...........................................................3, 9, 10

*Crawford v. Marion County Election Bd.,*
553 U.S. 181 (2008)............................................................... 8

*Donald J. Trump for President, Inc. v. Cegavske,*
488 F. Supp. 3d 993 (D. Nev. 2020) ..............................15

*Foster v. Love,*
522 U.S. 67 (1997)......................................... 1, 6, 16, 19, 20, 21

*In re Green,*
134 U.S. 377 (1890)...........................................................10, 11

*McPherson v. Blacker,*
146 U.S. 1 (1892) .................................................................. 6

*Moore v. Harper,*
600 U.S. 1 (2023) ...............................................................26

*Ray v. Blair,*
343 U.S. 214 (1952).........................................................10, 11, 14

*Republican Party of Pennsylvania v. Degraffenreid,*
141 S. Ct. 732 (2021)........................................................23, 24

*Smiley v. Holm,*
285 U.S. 355 (1932)............................................................3, 22

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
484 U.S. 365 (1988)............................................................. 6

*United States Post Serv. Bd. Of Governors v. Aikens,*
460 U.S. 711 (1983).............................................................26

*United States v. Classic,*
313 U.S. 299 (1941)..........................................................3, 8, 18

*United States v. Rahimi,*
602 U.S. 680 (2024)............................................................. 8

Statutes and Constitution

1 Stat. 239……………………………………………………4, 10, 11, 14
2 Stat. 295………………………………………………………………14
5 Stat. 721……………………………………………… 6, 7, 12, 14
14 Stat. 243……………………………………………………… 16
17 Stat. 28…………………………………………………………… 15
136 Stat. 5237………………………………………………………… 15
2 U.S.C. § 1……………………………………………………………3, 16
2 U.S.C. § 1a…………………………………………………………2, 16
2 U.S.C. § 7 ………………………………………3, 15, 17, 19, 20, 21
3 U.S.C. § 1 …………………………………………………5, 6, 14, 15
3 U.S.C. § 2………………………………………………………5, 13, 14
3 U.S.C. § 3 ………………………………………………1, 5, 6, 14, 15
3 U.S.C. § 5 …………………………………………………………23
3 U.S.C. § 5(a)(1) …………………………………………………26
3 U.S.C. § 7 …………………………………………………………15
3 U.S.C. § 21(1)……………………………………………………14
3 U.S.C. §§ 12 and 13 ……………………………………………15
28 U.S.C. § 1746……………………………………………………26
Revised Statutes, Title III, §§ 131-132 (1874)……………………… 5, 7, 11, 19
U.S. Const. Art. I § 2, Cl. 1……………………………………… 3, 17
U.S. Const. Art. I § 2, Cl. 2……………………………………… 2
U.S. Const. Art. I § 3, Cl. 1……………………………………… 17
U.S. Const. Art. I § 3, Cl. 3………………………………………… 2, 17
U.S. Const. Art. I § 4, Cl. 1………………………………………… 2,17
U.S. Const. Art. II § 1, Cl. 1………………………………………… 9
U.S. Const. Art. II § 1, Cl. 2……………………………………….. 3
U.S. Const. Art. II § 1, Cl. 3………………………………………. 10
U.S. Const. Art. II § 1, Cl. 4……………………………………... 1,4

Other Authorities

John Ash, *A New and Complete Dictionary of the English Language* (1775)… 18
Nathan Bailey, *A Universal Etymological English Dictionary* (20th ed. 1763).. 18
J. Elliot, *The Debates in the Several State Conventions* 104-06 (J. Elliot ed., 2d ed. 1836)………………………………………………. 6, 18
M. Farrand, *Records of the Federal Convention* (ed. 1911)…………………2, 9, 19
A. Keyssar, *Voter Registration: A Very Short History*………………………… 7, 8

Nat'l Conf. of State Legislatures, *The Evolution of Absentee/Mail Voting Laws 2020-22, Table 6: Absentee/Mail Ballot Received-By Deadlines*, (updated Oct. 26, 2023)……………………………………………………… 13, 24

*Republican Party of Pennsylvania v. Boockvar,*
Petition for Certiorari, No. 20-542, filed Oct. 23, 2020 (S. Ct.)……………… 15

A. Scalia & B. Garner, *Reading Law* (2012)…………………………………………. 5, 14

*Scarnati v. Pennsylvania Democratic Party,*
Petition for Certiorari, No. 20-574, filed Oct. 27, 2020 (S. Ct.)…………… 15

J. Story, *Commentaries on the Constitution*, § 1466 (1833)……………………... 6

*Texas v. Pennsylvania,*
Motion for Preliminary Injunction and Temporary Restraining Order,
22O155 (U.S. filed Dec. 7, 2020)……………………………………………….. 13

U.S. Election Assistance Commission, *Election Administration and Voting Survey Comprehensive Report, Overview Table 2: In-Person and Other Modes of Voting* 41 (June 2025)……………………………………………………. 21

# INTEREST OF *AMICUS CURIAE*

*Amicus* The Society for the Rule of Law Institute ("SRLI") is a non-profit, non-partisan organization dedicated to defending the conservative legal principles of the rule of law, separation of powers, federalism, and government by the people.[1] SLRI has an interest in seeing that these principles are not violated by improperly taking from the States their authority over the manner of federal elections.

# INTRODUCTION AND SUMMARY OF ARGUMENT

A federal election "may not be consummated prior to election day." *Foster v. Love*, 522 U.S. 67, 72 n. 4 (1997). This brief addresses only whether the federal election day statutes specify (a) by when voters must mail their choices versus (b) by when state election officials must receive the mailed ballots. The text and history of the pertinent federal statutory provisions, and the constitutional provisions they implement, show that a federal election consummates when voters must transmit their choices. Accordingly, § 7 of Executive Order 14248 ("Section 7") is invalid.

Start with presidential electors. Article II, § 1, Clause 4 empowered Congress to set an election day as "the Time of *chusing* the Electors." (All

---

[1] The parties have consented to the timely filing of this brief. *Amicus* states that no counsel for any party authored this brief in whole or in part and that no entity, aside from *amicus* and its counsel, made any monetary contribution toward the preparation or submission of this brief.

emphases in this brief are added.)  From 1792 until today's 3 U.S.C. § 3, the presidential election statutes have described the time when the election of presidential electors occurs as "the time of *choosing* electors."  The Constitutional Convention illustrated the original understanding that an election day is when voters must transmit their votes, not when those votes are received.  A Sept. 17, 1787, Resolution of the Constitutional Convention ("the 1787 Resolution"), states that "the *Day* fixed for the *Election* of the President" is when the electors "vote" and "should *transmit their votes*" to the seat of the federal government.  2 *Records of the Federal Convention* 665-66 (M. Farrand ed. 1911) ("*Farrand's Records*").  Only subsequently to that "Day fixed for the Election," after the new Congress and the President of the Senate convene, does the "*receiving*, opening and counting the Votes for President" occur.  *Id.* at 666.

Turn to Senators.  The Elections Clause itself–Article I, § 4, Clause 1–states that "holding Elections for Senators" refers to "*chusing* Senators."  Article I, § 3, Clause 3 connects the time of their election to this choosing by requiring that each Senator "*when elected*, be an Inhabitant of that State for which he shall be *chosen*." In turn, 2 U.S.C. § 1a states that a "Senator has been *chosen*" at an "election."

Next are Representatives in the House.  Article I, § 2, Clause 2 connects the time of their election to choosing by voters by requiring that each Representative "*when elected*, be an Inhabitant of that State in which he shall be *chosen*."  Indeed,

*United States v. Classic,* 313 U.S. 299 (1941), interpreted "Elections" in the Elections Clause, examined "the words of the Constitution read in their historical setting," *id.* at 317, and concluded: "From time immemorial an *election* to public office has been in point of substance *no more and no less than the expression by qualified electors [voters] of their choice* of candidates." *Id.* at 318. The word "election" in 2 U.S.C. § 7, which sets the day of a House election, is transplanted from "Elections" in the Elections Clause, and therefore has the same meaning. 2 U.S.C. § 1 confirms this by stating that "*at* [an] *election* a Representative to Congress is regularly by law to be *chosen*."

An election is choosing and the choosing consummates on election day. Here, the people choose—not states or officials. Article I, § 2, Clause 1 says Representatives are "chosen . . . by the People." The Seventeenth Amendment says Senators are "elected by the people." Article II, § 1, Clause 2 (the "Electors Clause") says presidential electors are chosen "in such Manner as the Legislature [of the State] may direct," and all states have enacted voting by the people as the manner of choosing electors. Thus, in presidential elections "here, We the People rule." *Chiafalo v. Washington*, 591 U.S. 578, 597 (2020).

A state statute "in relation to . . . counting of votes . . . and making and publication of election returns" by officials governs the "manner" of an election, *not* its time. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). A state statutory deadline

for when an election official receives a ballot mailed by election day is one of the permissible "manner" deadlines governing the counting and announcing by election officials. Such a deadline merely cuts off the counting by officials of timely-cast votes, so that officials may announce the results sooner. Because an election official's time of receipt is not part of the time of the election, no federal statute requires that an election official receive the ballot by election day.

What the federal election day statutes require is that voters submit their choices by election day. Mailing by a voter satisfies this. The federal election day statutes do not preempt the many other deadlines set by state law for other aspects of the election process–including receipt by an official of mail-in ballots. The election day statutes leave that policy judgment to each state legislature.

## ARGUMENT

### I. PRESIDENTIAL ELECTION DAY CONSUMMATES WHEN VOTERS CHOOSE PRESIDENTIAL ELECTORS.

A. *Article II, § 1, Clause 4 Defines Every Presidential Election Day As "the Time of Chusing the Electors."*

Clause 4 of § 1 of Article II starts: "The Congress may determine the *Time of chusing* the Electors." Thus, this election is choosing and the election consummates at the time of choosing, *not* any subsequent activity by an official.

B. *3 U.S.C. § 3 Says "the time of choosing electors."*

In 1792, Congress enacted "An Act relative to the *Election* of a President and Vice President of the United States . . . ." 1 Stat. 239 ("1792 Election Time Statute"). § 1 of this statute provided that "electors shall be appointed in each state for the election of a President and Vice President of the United States, within thirty-four days preceding the first Wednesday in December." *Id.*

Most important, § 1 described the time when "electors shall be appointed in each state" as "the *time of choosing* electors." *Id.* Specifically, in addressing how many electoral votes each state had, § 1 included a provision: "That where no apportionment of Representatives shall have been made after any enumeration [census], *at the time of choosing electors*, then the number of electors shall be according to the existing apportionment of Senators and Representatives." *Id.*

This provision, including the words "the time of choosing electors," remains in 3 U.S.C. § 3. Because 3 U.S.C. § 1 and 3 U.S.C. § 3 relate to the same subject, they should be read *in pari materia*, "as though they were one law." A. Scalia & B. Garner, *Reading Law* 252 (2012). In the 1792 Election Time Statute, the time-of-the-election provision and the predecessor of 3 U.S.C. § 3 were enacted in the same statute. In the first codification of federal law, the election day statute and what is now 3 U.S.C. § 3 were back-to-back. *See* Revised Statutes, Title III, §§ 131-132 (1874). As they are today in 3 U.S.C. §§ 1, 3, after the repeal of former 3

U.S.C. § 2.  3 U.S.C. §§ 1 and 3 exemplify where one provision is "clarified by the remainder of the statutory scheme."  *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  The "election day" in 3 U.S.C. § 1 consummates the "time of choosing" by the voters in 3 U.S.C. § 3.

C. *An 1845 Statute Enacted An  Election Day For "choosing electors."*

By 1845, every one of the 24 states except South Carolina used popular voting for presidential elections.  *McPherson v. Blacker*, 146 U.S. 1, 32 (1892).[2]  It was clear that news of the announced results from the popular voting in some states was settling who would be the next President before the people of other states had voted.  *See Foster*, 522 U.S. at 74.

In 1845, Congress enacted a statute entitled "An Act to establish a uniform time for holding *elections* for electors of President and Vice President in all the states of the Union."  5 Stat. 721 ("1845 Election Day Statute").  That statute provided that "the electors of President and Vice President shall be appointed in each State on the Tuesday next after the first Monday in the month of November." *Id.*  As of 1845, for the states with popular election of the electors, "appointed"

---

[2] The Founding generation understood that whether the voters choosing the electors were the people or legislators, an "election" had occurred.  *See e.g.*, 4 *The Debates in the Several State Conventions* 104-06 (J. Elliot ed., 2d ed. 1836) ("*Elliot's Debates*") (North Carolina ratification debates refer interchangeably to the "choosing of the electors" and "the election" of the electors); Article I, §§ 2- 4 (describing both when Representatives are "chosen . . . by the People" and when Senators are "chosen by the Legislature" as "Elections"); Article I, § 6, Clause 2 (describing both Senators and Representatives as "elected").

was understood to mean "chosen . . . by the people."  3 J. Story, *Commentaries on the Constitution*, § 1466 (1833) ("At present, in nearly all the states, the electors are chosen either by the people by a general ticket, or by the state legislature.").

Indeed, the 1845 Election Day Statute added an exception that confirmed that the touchstone of election day was voters "choosing electors": "when any state shall have held an *election* for the purpose of *choosing* electors, and shall fail to make a choice on the day aforesaid, then the electors may be appointed on a subsequent day in such manner as the state shall by law provide."  5 Stat. 721. This exception was added because of a New Hampshire statute requiring a run-off election if, on the day for "the choice of electors," no electors were chosen by "a majority of all the votes cast."  Cong. Globe, 28th Cong., 2d Sess. 14 (Dec. 9, 1844) (Rep. Hale).  Critically, the 1845 Election Day Statute left in place "the time of choosing electors" language from the 1792 Election Time Statute.  *See* Revised Statutes, Title III, §§ 131-32 (1874).

In 1845, in the states with in-person popular voting, the voter's choice and the official's receipt occurred on the same day.  But that does not diminish that election day consummates "the time of choosing electors," not the receipt of votes.

No one argues that states are preempted from adopting mail-in voting.  As was well known before and after 1845, the methods of popular elections have changed frequently.  Advance voter registration, secret ballots, printed ballots,

voting booths, voting machines, identification of voters by photo or social security number, and more were once innovations. *See, e.g.,* A. Keyssar, *Voter Registration: A Very Short History*, available at www.responsivegov.org ("Voter registration laws initially appeared in a handful of states (mostly in the Northeast) during the first half of the nineteenth century.").

*Classic* held in interpreting "Elections" in the Elections Clause:

> Long before the adoption of the Constitution the form and mode of that expression [of voters' choice of candidates] had changed from time to time. There is no historical warrant for supposing that the framers were under the illusion that the method of effecting the choice of the electors [voters] would never change . . . . 313 U.S. at 318.

A federal court should never apply federal election law to mail-in voting based on a judge's view that this policy change is prudent or unwise. As Justice Scalia wrote regarding requiring voters to provide photo identification: "It is for state legislatures to weigh the costs and benefits of possible changes to their election codes." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 208 (2008) (Scalia, J., concurring).

Instead, a court should apply the election day statutes to mail-in voting based on the principle revealed by the pertinent federal texts. *See Classic*, 313 U.S. at 318. "Historical regulations reveal a principle, not a mold." *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barret, J., concurring). Here, the texts of the Constitution, the 1792 Election Time Statute, and the 1845 Election Day Statute

reveal that a presidential election day consummates "the time of choosing electors" by the voters.

Indeed, as the next subsection explains, before 1845, there existed already an application demonstrating this principle. An election day for President *by* the electors consummated when voters transmitted their votes, even though those votes were *not* first received by any election official until many days later. Nothing in the 1845 Election Day Statute intimated that Congress was forever banning states from adopting a similar procedure for the popular voting *for* electors.

    a. *The Election Day For The President Remained When Electoral Votes Are Transmitted, Not Received.*

Article II, § 1, Clause 1 states that the President is "chosen" and "elected." Clause 4 empowers Congress to determine "the Day on which they [the Electors] shall give their Votes; which day shall be the same throughout the United States." When the electors "'vote' by 'ballot'" on the day set by Congress, "they do indeed elect a President." *Chiafalo,* 591 U.S. at 592 (internal quotes in original). That day when the electors "meet and cast ballots to *send* to the Capitol," *id.*, is when the election of the President consummates. What happens thereafter in Washington, D.C.–including the receipt of the electoral votes by the President of the Senate–occurs *after* that election day.

This was established by the 1787 Resolution, which the Constitutional Convention adopted at the conception of our federal Republic, immediately after

the Framers witnessed the Constitution. 2 *Farrand's Records* at 663-65. That Resolution provided that "the *Day fixed for the Election* of the President" by statute is when the electors meet, "vote," and "should *transmit their votes*" to the seat of the federal government. *Id.* at 665-66. Only subsequently, after the new Congress and the President of the Senate convene, does the "*receiving*, opening, and counting the Votes for President" occur. *Id.* at 666.

Article II, § 1, Clause 3 provides that the first election official who receives electoral votes for is the President of the Senate:

> The Electors shall meet in their respective states, and *vote by ballot* . . . and they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and *transmit* sealed to the Seat of the Government of the United States, *directed to the President of the Senate*.

The Twelfth Amendment uses the same language, except "List" became "Lists," because the amendment requires a separate vote for Vice President. Importantly, in the Constitution, no state official acts as an election official who receives electoral votes.

The presidential electors are *not* themselves officials who receive their own electoral votes on the day they cast them. The Supreme Court has twice rejected that presidential electors are officials or act in any other capacity other than as voters. *See Ray v. Blair*, 343 U.S. 214, 224 (1952); *In re Green*, 134 U.S. 377, 379-80 (1890).

Section 2 of the 1792 Election Time Statute required the electors to "meet and give their votes on the said first Wednesday in December." 1 Stat. 239. § 2 required these electors to "deliver" a sealed certificate of "all the votes by them given" to the President of the Senate in two ways. *Id.* at 239-40. First, the electors had to appoint a person to "*deliver* [one certificate] to the President of the Senate, at the seat of government, before the first Wednesday in January then next ensuing." *Id.* at 240. The electors thus had *27 to 34 days* after the day on which the election consummated to effectuate receipt of their votes by the pertinent election official. Second, § 2 also required the electors to "forthwith *forward by the post-office* to the President of the Senate, at the seat of government, one other of the said certificates." *Id.* at 240.

Section 4 provided that if both the by-hand delivery and mailed certificates "shall not have been *received* at the seat of government on the said first Wednesday in January"–*28 days or 35 after* the presidential election had occurred–the U.S. Secretary of State was commanded to send a special messenger to the district judge in the pertinent state who had the third sealed certificate, "who shall forthwith transmit the same to the seat of government." *Id.* Necessarily, this third sealed certificate would not be received by the President of the Senate until *28 days* or more after the day set by statute for casting the electoral votes. Under the provisions of the 1792 Election Time Statute, no state official received electoral

votes. These provisions remained in effect after the 1845 Election Day Statute was enacted. *See* Revised Statutes, Title III, §§ 140-41 (1874).

This is relevant because the Congress that enacted the 1845 Election Day Statute was aware of the 1792 Election Time Statute. Specifically, (1) changing from the 1792 statute's 34-day period for voters to choose the electors to choosing by a single day and (2) adding a provision for filling vacancies in the electors. 5 Stat. 721.

In contrast, the 1845 Election Day Statute, however, *left in place* the provisions in §§ 2 and 4 of the 1792 Election Time Statute under which the presidential election consummates when the electors cast their ballots on the day set by Congress, even though their votes are not received by any election official until up to 27 or more days later. Most important, nothing in the 1845 Election Day Statute hinted that it was banning a state from choosing a procedure for the voting *for* electors that resembled the decades-old federal statutory procedure for the voting *by* electors. Put another way, nothing in the 1845 Election Day Statute hinted that it was silently adding a federal deadline for receipt by an election official in the "election for the purpose of *choosing* electors." 5 Stat. 721.

Finally, the electoral vote procedure rebuts the argument that consummation of an election requires the ballot box to be closed. A presidential election consummates when the electors send their votes from their home states. *See supra*,

at 9-11.  But U.S. Senate staff only put any electors' certificates in the ballot boxes *after* the certificates are received on a later day in Washington D.C.  *See* Ballot Box/Electoral College, Object Description, available at

https://www.senate.gov/art-artifacts/decorative-art/other/79_00051_001.htm.

D. *The ECRA Did Not Silently Add A Mail-In Ballot Receipt Deadline.*

By election day in 2020, 21 states and the District of Columbia counted all mail-in ballots that were postmarked by election day and were received by election officials by a subsequent specified day.  *The Evolution of Absentee/Mail Voting Laws 2020-22, Table 6: Absentee/Mail Ballot Received-By Deadlines*, Nat'l Conf. of State Legislatures ("NCSL") (updated Oct. 26, 2023).  When the 2020 election results indicated that the Democratic nominee had won the Presidency, many publicly argued that the "failed" choice exception from the 1845 Election Day Statute–by 2020 codified as 3 U.S.C. § 2–enabled state legislatures to award their states' electoral votes to the Republican nominee, even *after* the electors had voted.  *E.g.,* Motion For Preliminary Injunction And Temporary Restraining Order, at 4-5, 19, 26, 32, 35, filed Dec. 7, 2020, in *Texas v. Pennsylvania,* No. 22O155.

Congress responded in the Electoral Count Reform Act of 2022 ("ECRA"). In pertinent part, the ECRA (a) defined the term "election day" as continuing to mean the "Tuesday next after the first Monday in November" and (b) replaced the fail-to-make-a-choice exception from the 1845 Election Day Statute with an

exception limited to when "prior to such day" a state has enacted a law that extends "the period of voting" when "necessitated by force majeure events that are extraordinary and catastrophic" and such events had occurred.  3 U.S.C. § 21(1). Thus, federal law remained unchanged: Except for the narrower "force majeure" exception, "[t]he electors of President and Vice President shall be appointed, in each State, on" "the Tuesday next after the first Monday in November."  3 U.S.C. §§ 1, 21(1).

The ECRA's use of "election day" in 3 U.S.C. § 1 did not change the prior statutory rule for over 200 years that election day consummates "the time of choosing electors" by the voters that 3 U.S.C. § 3 still codifies.  "Election" or "elections" had been in the title and text of prior statutes that linked elections to choosing: the 1845 Election Day Statute, 5 Stat. 721, and the 1792 Election Time Statute, 1 Stat. 239, which language an 1804 statute made continue to "extend and apply to every election of a President and Vice President," 2 Stat. 295. Constitutional provisions and the 1787 Resolution also linked "election" and "Elections" to the time and place of choosing and transmitting votes, *not* receiving. *See supra*, at 1-5, 9-10.  Nothing suggested that in 2022, the reference to "election day" in 3 U.S.C. § 1 somehow secretly changed any of this.  *See Reading Law*, at 256 ("stylistic or nonsubstantive changes" do not change meaning); *id.* at 257 (in a "recodification[,] . . . new language does not amend prior enactments unless it does

so clearly"). This silence was despite the fact that some had objected in 2020 that Pennsylvania (pursuant to a state supreme court decision) and Nevada (pursuant to a state statute) had violated 3 U.S.C. § 1 by requiring election officials to count mail-in ballots received after election day. *See* Petition for Certiorari, at 32, in *Republican Party of Pennsylvania v. Boockvar,* No. 20-542, filed Oct. 23, 2020 (S. Ct.); Petition for Certiorari, at 2-3, in *Scarnati v. Pennsylvania Democratic Party,* No. 20-574, filed Oct. 27, 2020 (S. Ct.); *Donald J. Trump for President, Inc. v. Cegavske,* 488 F. Supp. 3d 993, 996-97 & n.5 (D. Nev. 2020).

This silence contrasts with 3 U.S.C. §§ 12 and 13, as amended by the ECRA, *see* 136 Stat. 5237. 3 U.S.C. §§ 12 and 13 continue to provide procedures for obtaining a state's electoral votes when no electoral votes "from any State shall have been *received* by the President of the Senate . . . by the fourth Wednesday in December"—eight days *after* the electors have voted, *see* 3 U.S.C. § 7. When Congress sets a day for votes to be "received," it does so expressly.

Most telling, the ECRA did not repeal or amend the language dating back to the 1792 Election Time Statute that has described the day of the election of the electors as "the time of choosing electors." That language remains codified in 3 U.S.C. § 3.

## II. ELECTION DAY CONSUMMATES WHEN VOTERS CHOOSE MEMBERS OF CONGRESS.

In 1872, Congress enacted the first federal statute that established "the day for the election . . . of Representatives." 17 Stat. 28. This provision is codified in 2 U.S.C. § 7.

In 1866, Congress had enacted "An Act to regulate the Times and Manner of holding *Elections* for Senators in Congress." 14 Stat. 243. § 1 specified when each state's legislature was "*to choose*" a Senator. *Id.* § 3 of this 1866 statute, as revised in 2 U.S.C. § 1a, has required a Governor "of the State from which any Senator has been *chosen* to certify his *election* . . . to the President of the Senate." Congress in 1914 adopted, *see* 38 Stat. 384, what is now codified as 2 U.S.C. § 1, which provides that "the regular election . . . *at which election* a Representative to Congress is regularly by law to be *chosen*" is also when "a United States Senator . . . shall be elected by the people."

Given all these references to "to choose" and "chosen," from every perspective, the "day for the election" under 2 U.S.C. §§ 1, 1A, and 7–especially when read *in pari materia*, *see supra*, at 5–6 is by when the voters choose Representatives and Senators. It is not a federal deadline by when an election official must receive a mail-in ballot.

*First*, *Foster v. Love* holds that election day consummates "all elections for Congress and the Presidency on a single day." 522 U.S. at 70. In particular, the

purpose of the later 1872 Election Day Statute was to align the House election day with the election day set by the 1845 Election Day Statute for voting for presidential electors. *Id.* at 73-74. Thus, because the 1845 Election Day Statute sets a date by when voters express their choice, so must the 1872 Election Day Statute.

*Second*, "election" in 2 U.S.C. § 7 is transplanted from "Elections" in Article I, § 4, Clause 1 of the Constitution. The meaning of "Elections" in this Elections Clause is that congressional elections consummate when the applicable voters choose.

Article I, § 2, Clause 1 stated that "[t]he House of Representatives shall be composed of Members *chosen* every second Year *by the People*." Clause 2 tied the time of every Representative's election to this choosing by requiring that each Representative "*when elected*, be an Inhabitant of that State in which he *shall be chosen*." Clause 1 of § 3 of Article I stated that "[t]he Senate . . . shall be composed of two Senators from each State, *chosen* by the Legislature." (The Seventeenth Amendment transferred that choosing to "the people."). Clause 3 of § 3 of Article I tied the time of every Senator's election to choosing by requiring that each Senator "*when elected*, be an Inhabitant of that State for which he *shall be chosen*."

The Elections Clause itself states that the "Places . . . of *holding Elections for Senators*" are "the Places of *chusing* Senators."  So, when the Elections Clause refers to "[t]he Times . . . of holding Elections for Senators and Representatives," it similarly refers to the times of choosing Senators and Representatives.

This is established by *United States v. Classic*.  *Classic* interpreted "elections" in the Elections Clause to embody the "chosen . . . by the People" language that governed congressional elections under § 2 of Article I and the Seventeenth Amendment's revision to § 3.  313 U.S. at 318.  *Classic* concluded that in the Elections Clause: "*From time immemorial* an *election* to public office has been in point of substance *no more and no less than the expression by qualified electors [voters] of their choice* of candidates."  *Id.*  This holding also distinguishes the hypothetical fantasy that a state could permit a voter to leave a ballot in a drawer at home.  *See* Appellants' Br. at 39.  Unlike mailing, the *untransmitted* ballot in the drawer is not an "expression" of the voter's choice.

*Classic*'s description of the original understanding is confirmed by founding era dictionaries that define "election" as "chusing or choice."  Nathan Bailey, *A Universal Etymological English Dictionary* (20th ed. 1763); John Ash, *A New and Complete Dictionary of the English Language* (1775) ("the act of choosing, the power of choice, voluntary choice").  Indeed, at the New York Ratifying Convention, Hamilton encapsulated "the true principle of a republic . . ., that the

people should *choose* whom they please to govern them" as "popular *election*," which "should be . . . the most unbounded liberty allowed." 2 *Elliot's Debates* 257.

Most important, the 1787 Resolution stated that "on the *Day* fixed for the *Election* of the President" the electoral voters "should *transmit* their votes," but that "receiving" by those who open and count "the Votes for President'" would occur on a *later* date in a different place. 2 *Farrand's Records* 665-66. This remained the process for voting by electors in 1872. *See* Revised Statutes, Title III, §§ 135, 140-41 (1874). Nothing suggests that Congress meant the 1872 Election Day Statute to preempt states from using a similar process for popular voting.

Popular voters who use mail-in ballots "choose" when they transmit their ballots. Accordingly, under the definition of "Elections" in the Elections Clause– transplanted into 2 U.S.C. § 7–an election official's post-choosing receipt of a mail-in ballot need not occur by the election day set by Congress.

*Third,* in construing the 1872 Election Day Statute, *Foster v. Love* quoted an 1869 dictionary as "defining 'election' as '[t]he *act of choosing* a person to fill an office.'" 522 U.S at 71 (citation omitted). This definition and case, like many constitutional and federal statutory provisions, describe an election day as the act of choosing by voters. The appellants have never cited any such definition,

Supreme Court decision, or federal provision that describes an election as receiving votes by election officials.

*Fourth*, making the time of receipt by an election official the touchstone under the election day statutes would enable states to make all voters choose long before election day. If election day under the federal statutes were the received-by deadline, *any* state could (a) adopt all mail-in voting, (b) require voters to postmark their ballots by a given date in October, *and* (c) require that the ballots be received by election day. Voters would be deprived of any ability to make their choices on election day.

Moreover, any other state could adopt a similar all mail-in voting scheme but with a required postmarking day in October (or earlier) that was *different* from the first state. Further, any state could have *different* postmarking deadlines for House, Senate, and presidential elections, so long as the state had the same received-by deadline of election day for all federal elections.

Nothing in *Foster v. Love* supports a statutory reading that would allow a state to require all voting to *cease before* election day, and different states or the same state to have different days when federal voting stops. *Foster* was only about whether federal election day statutes allow a state to require *all* aspects of a federal election to be completed *before* election day, not which activities by an election official violate the federal election day statutes if they occur *after* election day.

*Foster* stated that "election" in 2 U.S.C. § 7 refers "to the combined actions of voters and officials meant to make a final selection of an officeholder."  *Id.* at 71.  Because winning a majority in Louisiana's October open primary meant that neither Louisiana voters nor officials were doing *any act* on election day, 2 U.S.C. § 7 was violated.  *Id.* at 72.  ("no act in law or in fact [was] to take place on the date chosen by Congress").  *Foster* expressly disclaimed that it was providing guidance on "what acts a state must cause to be done on federal election day (and not before it) in order to satisfy the statute" or "whether a State must always employ the conventional mechanics of an election."  *Id.* at 72 & n. 4.

Unlike in *Foster,* election officials of the states at issue do *not* sit on their hands on election day.  Those election officials are: (1) Receiving, opening, and processing mail-in ballots; (2) manning facilities open for in-person voting, dropping off of mail-in ballots, or both; and (3) counting both in-person and mail-in votes.  In 2024, in California, 1,836,518 votes were cast in person on election day.  U.S. Election Assistance Commission, *Election Administration and Voting Survey Comprehensive Report*, Overview Table 2: In-Person and Other Modes of Voting 41 (June 2025).

In sum, the touchstone of voter choice underlies all election day provisions in the Constitution and federal statutes.  Suppose, for example, that Soldier Able and Soldier Baker are friends from California stationed in Florida.  Both soldiers

mail their ballots in the same Florida mailbox at the same time four days before election day.  Each envelope is postmarked three days before the election.  Able's ballot is received on election day, while Baker's vote is received the next day.  How fast the mail moves is not a matter of a voter's choice.  If Able's vote is counted while Baker's vote is rejected, voter choice cannot be the reason.

### III.    SECTION 7 USURPS STATE LEGISLATIVE POWER TO SET A MAIL-IN BALLOT RECEIPT DEADLINE.

*A. A Mail-In Receipt Deadline Regulates "Manner," Not Time.*

Unlike the federal election day statutes, state statutes relating to when to stop counting votes and announce results regulate the "manner," not the time, of holding elections.  *Smiley v. Holm*, 285 U.S. 355 (1932), delineated which powers are over the "manner" of congressional elections, rather than powers "only as to times and places."  *Id* at 366.  Statutes "*in relation to* . . . counting of votes . . . and making and publication of election returns" are laws regulating the "manner" of elections.  *Id.*

In *Bush v. Gore*, 531 U.S. 98 (2000), the concurrence concluded that the Florida Supreme Court had usurped the legislature's "manner" authority by badly misinterpreting statutes relating to, among other things, when election officials "count the votes," "provid[e] results," and "the certification deadline."  *Id.* at 116-18.  Most important, *Bush v. Gore* treated two post-election deadlines from the Florida legislature that cut off the counting of some timely-cast votes as

regulations of the "manner" of the election. First, the concurrence read Florida statutes to give its Secretary of State discretion, once the certification deadline occurred, to reject votes subsequently found by a recount to be cast properly. *Id.* at 117-18. Second, the *per curiam* majority opinion said that the Florida "legislature intended" the counting of ballots to stop by the optional federal December 12 date in then-3 U.S.C. § 5, which in 2000 made conclusive a state's determination of which electors won. *Id.* at 110. The *per curiam* opinion therefore stopped the counting in Florida on December 12, even though some timely-cast votes likely remained uncounted. *Id.*

A post-election day deadline for receiving mail-in ballots is like the other "manner" deadlines discussed in *Bush v. Gore.* A mail-in receipt deadline for ballots mailed by election day embodies the state legislature's policy judgment, in the exercise of its "manner" power, as to when reaching finality sooner in the *counting* by officials of votes justifies a deadline that cuts off their counting of some timely-cast mail-in votes.

This is underscored by the opinions of three Justices in 2021 who dissented from the denial of certiorari in *Republican Party of Pennsylvania v. Degraffenreid,* 141 S. Ct. 732 (2021) ("*RPP*"). In *RPP,* petitioners had challenged the Pennsylvania Supreme Court's extension of Pennsylvania's mail-in ballot receipt deadlines for both presidential and congressional elections from election day, as a

Pennsylvania statute required, to three days later. *Id.* at 733 (Thomas, J., dissenting). Justice Thomas stated there was a "strong argument" that the Pennsylvania Supreme Court had violated the Elections and Electors Clauses by usurping the "state legislature['s] authority to determine the '*Manner*' of federal elections." *Id.* at 732, 733. Justice Alito and Justice Gorsuch agreed with Justice Thomas that the Court should have granted certiorari over this issue. *Id.* at 738. No Justice mentioned the other question presented by that case's petitioners, *see supra*, at 14-15—whether the federal election day statutes had been violated.

Statutes set many "manner" deadlines that do not constitute the time of the election. For example, all states have deadlines for registering. No one mistakes registration deadlines as constituting the time of the election—even though in 2024, the registration deadline in twenty states was election day. *See Same-Day Voter Registration*, NCSL (updated Oct. 25, 2024). Similarly, no one mistakes post-election day deadlines for counts, recounts, contests, and certification as extending the election's time.

One federal statutory deadline consummates the time of the election: the day by when voters must submit their choices. *See supra*, at 4-22. State statutes that require *mailing* ballots by election day satisfy that deadline, whether a state sets its "manner" deadline for receiving mail-in ballots to occur after, or coincide with, election day.

*B. Section 7 May Not Usurp The Legislative Power To Set A Receipt Deadline.*

Because mail-in ballot receipt deadlines are an issue of the "manner" of congressional elections, *see supra*, at 22-24, Article I's Elections Clause gives Congress—*not* the Executive Branch—power to set those deadlines. Congress did *not* regulate "manner" in 2 U.S.C. §§1 and 7, however, as reflected in section Titles that refer to "Time for election" and "Time of Election."

Congress also has the power to set a mail-in ballot receipt deadline in presidential elections, although Article II gives only the States power over the "manner" of choosing electors. The Necessary and Proper Clause gives Congress power to set a vote-counting deadline in presidential elections to ensure meeting the federal timeline of voting by presidential electors in mid-December of every presidential election year, counting of electoral votes by Congress on January 6 of the following year, and starting the term of the President on January 20 of that year. *See Burroughs v. United States,* 290 U.S. 534, 545 (1934).

The ECRA exercised power under the Necessary and Proper Clause to set a deadline of six days before the meeting of the electors for the "executive of each state" to "issue a certificate of ascertainment of appointment of electors." 3 U.S.C. § 5(a)(1). In stark contrast, however, although litigants in 2020 had complained about state mail-in ballot receipt deadlines, *see supra*, at 14-15, Congress set no deadline with respect to a state's receipt of mail-in ballots.

Appellants recently argued in the District Court that Illinois improperly counts a ballot that arrives without a postmark but with a certification that it was mailed by election day.  ECF No. 166 at 28-29.  The constitution and federal election statutes leave to the state legislatures to adopt any reasonable method of proving that mailing occurred by election day.   State legislatures "provide a complete code for congressional [and presidential] elections, including regulations relat[ing] to . . . *supervision of voting* . . . [and] *prevention of fraud and corrupt practices*."  *Moore v. Harper*, 600 U.S. 1, 29 (2023) (cleaned up; brackets added).  Surely, states may legislate methods that Congress also has used to prove facts, including a declaration or certification, *see, e.g.,* 28 U.S.C. § 1746, or a presumption.  *See e.g., United States Post Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983).

With zero late-mailing ballot fraud over many decades, fraud speculation is also nonsensical.  Someone who engages in the surpassingly rare crime of mail-in ballot fraud would mail *early*—to guarantee counting and avoid scrutiny.  The very likely tardy postmark would nullify the late-mailed vote and identify a potential fraudster.

Section 7 usurps the legislative policy judgment whether voters must mail their choices sufficiently *before* election day so that their ballots are received by

election day by an election official.  The Constitution and the federal election day statutes have left that policy judgment to each state.

## CONCLUSION

The Court should affirm.

Dated: January 12, 2026                                    Respectfully Submitted,

NANCY A. TEMPLE                              RICHARD BERNSTEIN
ELLIE BUCHANAN                                  Counsel of Record
   *Of Counsel*                                          1875 K Street, NW
Katten & Temple, LLP                            Washington, D.C. 20006
209 S. LaSalle Street, Suite 950            (301) 775-2064
Chicago, IL 60604                                  Rbernsteinlaw@gmail.com

BRENDAN J. HASKIN
   *Of Counsel*
2950 Van Ness Street, NW, No. 607
Washington, D.C. 20008

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of The Society For The Rule of Law Institute in Support of Plaintiffs-Appellees and Affirmance contains 6,489 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 365 in 14-point Times New Roman.

*/s/ Richard D. Bernstein*
Richard D. Bernstein
Attorney for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January 2026, I electronically filed the foregoing Brief *Amicus Curiae* of The Society For The Rule of Law Institute In Support of Plaintiffs-Appellees and Affirmance, with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Richard D. Bernstein*
Richard D. Bernstein
Attorney for *Amicus Curiae*
