No. 25-1726

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CON-
NECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE
OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF
RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

Plaintiffs – Appellees,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States;
PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED
STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official
capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the of-
ficial capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCOR-
MICK, in the official capacity as Commissioner of the U.S. Election Assistance Commission;
BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S. Election As-
sistance Commission; PETE HEGSETH, in the official capacity as Secretary of Defense,

Defendants – Appellants.

*On Appeal from the United States District Court
for the District of Massachusetts*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

ARGUMENT ........................................................................................................ 5

    I.    The Elections Clause Empowers Congress—Not the President—to "Make or Alter" Regulations Governing Federal Elections ............... 7

    II.    Using Its Elections Clause Power, Congress Enacted the NVRA and Created the EAC to Increase Political Participation and Establish Uniform Rules Governing Voter Registration Forms ......................... 12

    III.    The Executive Order Violates the Separation of Powers by Usurping Congress's Established Procedure for Adding Requirements to the Federal Form ........................................................................................ 20

CONCLUSION .................................................................................................... 23

# TABLE OF AUTHORITIES

CASES

*ACLU v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017)................................................... 16

*Ariz. v. Inter Tribal Council, Inc.*,
570 U.S. 1 (2013)................................................5, 7, 11, 19

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015)................................................. 4

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016)................................. 12

*INS v. Chadha*,
462 U.S. 919 (1983)................................................. 22

*Kendall v. United States ex rel. Stokes*,
37 U.S. 524 (1838)................................................. 22

*Kobach v. U.S. Election Assistance Comm'n*,
772 F.3d 1183 (10th Cir. 2014)............................. 6, 19

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)....................... 3, 4, 21

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
Nos. 25-0946, 25-0952, 25-0955, 2025 WL 3042704 (D.D.C. Oct. 31,
2025)................................................................................. 3

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................... 5, 17-19

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020)................................................. 22

*Moore v. Harper*,
600 U.S. 1 (2023)................................................... 7, 22

*Smiley v. Holm*,
285 U.S. 355 (1932)................................................. 11

*United States v. Stevens*,
559 U.S. 460 (2010)............................................... 23

# TABLE OF AUTHORITIES – cont'd

Page(s)

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .............................................................. 6, 20-22

CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATE-RIALS

5 U.S.C. § 551 .......................................................................... 18

42 U.S.C. 3501 ......................................................................... 18

52 U.S.C. § 20501 .................................................................... 1

52 U.S.C. § 20503 .................................................................... 16

52 U.S.C. § 20505 .................................................................... 2, 17

52 U.S.C. § 20506 .................................................................... 16, 17

52 U.S.C. § 20507 .................................................................... 16

52 U.S.C. § 20508 ...................................................................2, 5, 17, 18

52 U.S.C. § 20923 .................................................................... 6, 18

52 U.S.C. § 20928 .................................................................... 18

52 U.S.C. § 20929 .................................................................... 18

139 Cong. Rec. (1993) ............................................................. 14

Help America Vote Act of 2002,
  Pub. L. No. 107-252, 116 Stat. 1666 ..................................... 5

H.R. Conf. Rep. No. 103-66 (1993) .......................................... 16

H.R. Rep. No. 103-9 (1993) ...................................................... 4, 13

H.R. Rep. No. 107-329 (2001) .................................................. 17

National Voter Registration Act of 1993,
  Pub. L. No. 103-31, 107 Stat. 77 ............................................ 1, 5

U.S. Const. art. I, § 4, cl. 1 ....................................................... 1, 7

BOOKS, ARTICLES, OTHER AUTHORITIES

*Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) ................................................. 7, 10, 11

Exec. Order No. 14,248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 25, 2025)..................................... 2, 20, 23

*The Federalist No. 59* (Clinton Rossiter ed., 1961).................................... 8

Letter from Timothy Pickering, Delegate, Pa. Ratifying Convention, to Charles Tillinghast (Dec. 24, 1787), *quoted in* Charles W. Upham, 2 *The Life of Timothy Pickering* (1873)............................................................ 9, 11

*Records of the Federal Convention* (Max Farrand ed., 1911)................... 4, 9, 10

# INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case and the questions it raises about our Constitution's separation of powers.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

The Elections Clause empowers Congress to "at any time by Law make or alter" regulations governing federal elections. U.S. Const. art. I, § 4, cl. 1. Exercising this power, Congress passed the National Voter Registration Act ("NVRA") to increase political participation and simplify voter registration processes. *See* National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. § 20501 *et seq.*). To further these goals, the NVRA created a federal "mail voter registration application form" that states must "accept

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to this brief.

and use" to register voters ("Federal Form").  52 U.S.C. § 20505(a)(1).  And Congress subsequently charged the Election Assistance Commission ("EAC") with developing the Federal Form in accordance with the NVRA's substantive and procedural requirements.  *See id.* § 20508(a)(1)-(2).  Among other things, the NVRA provides that the Form should "require only such . . . information . . . as is necessary . . . to assess the eligibility of the applicant."  *Id.* § 20508(b)(1).

Notwithstanding the specific guidance Congress provided about the information that may be required on the Federal Form, on March 25, 2025, President Trump issued an executive order providing that the EAC "shall take appropriate action to require, in its national mail voter registration form . . . documentary proof of United States citizenship."  Exec. Order No. 14,248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005, 14006, § 2(a)(i)(A) (March 25, 2025) [hereinafter "Executive Order"].  On its face, the plain language of the Executive Order demands the EAC change the Federal Form to include a documentary proof of citizenship requirement ("DPOC"), as the district court recognized, *California v. Trump*, No. 25-cv-10810, D.E. 107, at 20.

Appellants now dispute the district court's conclusion, contending that the EO does nothing more than require the EAC to consider adding the DPOC to the Federal Form and is therefore consistent with federal law.  Appellants Br. 17-22.  That reading of the EO is wrong, as Appellees explain, Appellees Br. 21-26, and

the EO thus violates federal law, as the district court properly held, *California*, D.E. 107, at 17.

The EO also violates the Constitution's separation of powers, although this Court need not reach the constitutional question to resolve this case. As the district court properly recognized, "[t]he Constitution does not grant the President any specific powers over elections." *California*, D.E. 107, at 5. Rather, as the text and history of the Elections Clause make clear, "[o]ur Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), 780 F. Supp. 3d 135, 155 (D.D.C. 2025); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, Nos. 25-0946, 25-0952, 25-0955, 2025 WL 3042704, at *4 (D.D.C. Oct. 31, 2025) ("The States have initial authority to regulate elections. Congress has supervisory authority over those regulations. The President does not feature at all.").

After lengthy debates over the Elections Clause, the Framers conferred on Congress the power to "make or alter" regulations of the time, place, and manner of holding federal elections in order to protect the right to vote and allow Congress to set uniform rules for those elections. The Elections Clause provides a "safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate."

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). The Elections Clause uses "words of great latitude," because "[i]t was impossible to foresee all the abuses that might be made of the [States'] discretionary power." 2 *Records of the Federal Convention* 240 (Max Farrand ed., 1911) [hereinafter *Farrand's Records*]. Critically, however, while the Framers fiercely debated how the power over federal elections would be allocated between Congress and state legislatures, no one in the debates suggested that the President should possess lawmaking authority over the electoral process. *See LULAC*, 780 F. Supp. 3d at 159 ("The President does not feature at all. In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds . . . ."). It was unthinkable that the President—who has no lawmaking powers under the Constitution—would have the power to regulate federal elections.

Using its power under the Elections Clause, Congress passed the NVRA in 1993. Congress was troubled by "the steady decline in citizen participation in Federal elections over" the preceding thirty years, and it understood that it had the "authority and responsibility to make the [voter] registration process for Federal elections as accessible as possible while maintaining the integrity of the electoral process." H.R. Rep. No. 103-9, at 3 (1993). The NVRA was enacted to achieve these goals. Among the NVRA's many reforms were its creation of the Federal Form and the requirement that states accept and use the Form. As Congress explained,

"[b]road dissemination" of the Federal Form "when coupled with the other proce-dures of this bill, should reach most persons eligible to vote, and is, therefore, a key element of the voter outreach feature of this bill." *Id.* at 10.

While the Federal Election Commission was initially charged with develop-ing the Federal Form, *see* NVRA § 9(a), 107 Stat. at 87, Congress transferred those responsibilities to the EAC in the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, § 802(a), 116 Stat. 1666, 1726 (codified at 52 U.S.C. § 20508). But the EAC does not have free rein to design the Federal Form as it wishes. Con-gress, through the NVRA, has specified what must be on the Federal Form, *see* 52 U.S.C. § 20508(b)(2) (requiring an attestation of citizenship signed under penalty of perjury); what cannot be on the Form, *see id.* § 20508(b)(3) (the Form "may not include any requirement for notarization or other formal authentication"); and what changes the EAC is allowed to make to the Form, *see id.* § 20508(b)(1) (limiting required information to only that which is "necessary" to determine if the applicant is eligible to vote). Moreover, the NVRA also imposes procedural constraints on how the Federal Form can be modified, including requiring the EAC to consult with state election officials. *See id.* § 20508(a)(1)-(2). Courts have consistently enforced these requirements and held that efforts to add DPOC requirements to the Federal Form outside of the prescribed procedures are irreconcilable with the NVRA. *See, e.g., Ariz. v. Inter Tribal Council, Inc.*, 570 U.S. 1, 15 (2013); *League*

*of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9-10 (D.C. Cir. 2016); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1194 (10th Cir. 2014).

By usurping Congress's power over federal elections, the Executive Order violates the separation of powers. The President's authority to issue the Executive Order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution plainly gives the President no such authority. After all, the Elections Clause empowers Congress, not the President, to pass regulations governing federal elections. And Congress has not given the President that authority either. To the contrary, Congress entrusted the EAC—an independent, bipartisan commission—with developing the Federal Form pursuant to strict requirements Congress itself laid out in the NVRA. While the President appoints the EAC's Commissioners, *see* 52 U.S.C. § 20923(a)(1), the President has no authority to demand by executive order that the EAC add DPOC to the Federal Form and ignore the congressionally mandated procedures governing the Federal Form and its contents.

Appellants do not contest this core constitutional point. Instead, they seek to distance themselves from the language of the Executive Order and their own prior representations about its mandatory character, insisting that Section 2(a) is nothing more than a suggestion that the EAC consider whether, in its discretion, to add a documentary proof of citizenship requirement to the Federal Form. *See* Appellants

6

Br. 17-22.  But that is not what the Executive Order says.  In all its particulars, the Executive Order is a direct command to the EAC to add DPOC to the Federal Form.  This Court should not rewrite the Executive Order.

## ARGUMENT

### I.    The Elections Clause Empowers Congress—Not the President—to "Make or Alter" Regulations Governing Federal Elections.

The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. art. I, § 4, cl. 1.  As its plain text makes clear, the Elections Clause serves "two functions."  *Inter Tribal Council*, 570 U.S. at 8.  "The Clause 'imposes' on state legislatures the 'duty' to prescribe rules governing federal elections.  It also guards 'against the possibility that a State would refuse to provide for the election of representatives' by authorizing Congress to prescribe its own rules."  *Moore v. Harper*, 600 U.S. 1, 10 (2023) (quoting *Inter Tribal Council*, 570 U.S. at 8); *see also* 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 62 (Jonathan Elliot ed., 1836) [hereinafter "*Elliot's Debates*"] ("[I]n the first part of the clause, th[e] power over elections is given to the states, and in the latter part the same power is given to Congress."); *id.* at 68 (explaining that the Elections

Clause "enables Congress to alter such regulations as the states shall have made with respect to elections").

Writing in support of the Elections Clause, Alexander Hamilton explained "that there were only three ways in which [the power over elections] could have been reasonably modified and disposed." *The Federalist No. 59*, at 362 (Clinton Rossiter ed., 1961) (Alexander Hamilton). The first option was to give the power "wholly [to] the national legislature"; the second option was to give the power "wholly [to] the State legislatures"; and the third option was to split it between the two, with the power over elections "primarily in" state legislatures but "ultimately in" Congress. *Id.* The Framers chose the third option. *See id.* Notably neither Hamilton nor other delegates to the Constitutional Convention considered giving the President power over elections.

The Framers gave Congress the express power to "make or alter" election law because they were concerned that states would use their power to regulate the time, place, and manner of federal elections to deny or abridge the right of "We the People" to freely select federal representatives. During the debates over the Elections Clause at the Constitutional Convention, James Madison explained that the grant of power to Congress to override state regulations of federal elections was necessary because "State Legislatures will sometimes fail or refuse to consult the

common interest at the expense of their local conveniency or prejudices." 2 *Farrand's Records*, *supra*, at 240; *id.* at 241 ("Whenever the State Legislatures had a favorite measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed."). To prevent abuses by the states, it was necessary to give "a controuling power to the Natl. legislature." *Id.* The Elections Clause protected against the possibility that "the State governments *may* abuse their power, and regulate these elections in such manner as would be highly inconvenient to the people," giving Congress the express "constitutional power of correcting them." Letter from Timothy Pickering, Delegate, Pa. Ratifying Convention, to Charles Tillinghast (Dec. 24, 1787), *quoted in* 2 Charles W. Upham, *The Life of Timothy Pickering* 357 (1873) (emphasis in original).

When addressing concerns about Congress's power, Madison emphasized that Congress, like state legislatures, was a representative body chosen by the people. At the time, the Senate was "chosen by the State Legislatures," and the House of Representatives was "elected by the same people who elect the State Legislatures." 2 *Farrand's Records*, *supra*, at 241. If the people could be trusted to elect members of the state legislatures (which then chose Senators) and the House, Madison argued, then there was no reason why Congress should not be trusted to regulate federal elections alongside state legislatures. *See id.* At the core of Madison's

defense was the importance of representative bodies being the branches of government empowered to make the rules governing federal elections.

At the Founding, the breadth of Congress's express power to "make or alter" regulation of federal elections was understood by supporters and detractors alike. The plain text of the Elections Clause, as Madison explained at the Constitutional Convention, uses "words of great latitude," recognizing that "[i]t was impossible to foresee all the abuses that might be made of the [states'] discretionary power." *Id.* at 240. As Madison noted, "[w]hether the electors should vote by ballot or vivâ voce, should assemble at this place or that place; should be divided into districts or all meet at one place, [should] all vote for all the representatives; or all in a district vote for a number allotted to the district; these & many other points would depend on the Legislatures[] and might materially affect the appointments." *Id.* at 240-41. Opponents of the Elections Clause, too, understood that the Clause gave Congress sweeping power to regulate the time, place, and manner of federal elections, explaining that their "great difficulty" was that "the power given by the 4th section was unlimited," 2 *Elliot's Debates*, *supra*, at 25, and "admits of the most dangerous latitude," 3 *id.* at 175. Thus, the Framers' understanding was that Congress would have final say over questions of balloting, location of polling places, districting, and other of "the numerous requirements as to procedure and safeguards

which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). That includes voter registration. *See Inter Tribal Council*, 570 U.S. at 9.

When the Elections Clause was vigorously challenged during the ratification debates as a usurpation of state legislatures' power, *see, e.g.*, 4 *Elliot's Debates*, *supra*, at 51 (the Clause "strike[s] at the state legislatures, and . . . take[s] away that power of [elections] which reason dictates they ought to have among themselves"), the Constitution's supporters emphasized the importance of Congress's role in securing equal voting rights. As Madison stressed, "Some states might regulate the elections on the principles of equality, and others might regulate them otherwise. . . . Should the people of any state by any means be deprived of the right of suffrage, it was judged proper that it should be remedied by the general government." 3 *id.* at 367. These abuses "could only be guarded against by giving this discretionary power, to Congress, of altering the time, place, and manner of holding the elections." *Id.* at 10. The Clause's defenders also emphasized the importance of establishing uniform ground rules in federal elections. *See id.* at 367 (Madison) ("the regulation of time, place, and manner, of electing the representatives, should be uniform throughout the continent"); *see also* Letter from Timothy Pickering to Charles Tillinghast (Dec. 24, 1787), *supra*, at 357 ("[I]f any particular State government should be refractory and . . . either make no such regulations or

improper ones, then the Congress will have power to make such regulations as will ensure to the *people* their rights of election and establish a *uniformity in the mode of constituting the members of the Senate and House of Representatives*.").

In the end, the Elections Clause's supporters carried the day. While the Framers debated how the power over federal elections should be divided between state legislatures and Congress, they ultimately decided to give Congress the final say over election mechanics to safeguard the right to vote against recalcitrant states and ensure national uniformity, establishing the constitutional framework for federal regulation of federal elections that still governs more than two centuries later. And Congress used its Elections Clause powers to enact the NVRA and create the EAC, as the next Section explains.

## II. Using Its Elections Clause Power, Congress Enacted the NVRA and Created the EAC to Increase Political Participation and Establish Uniform Rules Governing Voter Registration Forms.

**A.** In 1993, "[a]cting pursuant to the Elections Clause, Congress crafted and passed the NVRA against a backdrop of lackluster voter registration and political participation." *Fish v. Kobach*, 840 F.3d 710, 720 (10th Cir. 2016). "[A]lmost 70 million eligible citizens . . . did not participate in the [1992 presidential] election because they were not registered to vote." S. Rep. No. 103-6, at 2 (1993). Congress understood that while there were "multiple and complex factors that contrib-

ute[d] to the decline in voter participation in Federal elections" and "most contributing factors may not be affected by legislation," *id.*, "the difficulties encountered by eligible citizens in becoming registered to vote [was] an issue which can be directly addressed through the legislative process," H.R. Rep. No. 103-9, at 3.

Indeed, the NVRA was not the first legislation Congress passed to try to address arduous voter registration laws. "Restrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of citizens from voting": "immigrants," "black [voters]," and "the rural poor." *Id.* at 2. "[T]he Voting Rights Act of 1965 eliminated the more obvious impediments to registration, but left a complicated maze of local laws and procedures" that were "in some cases as restrictive as the outlawed practices." *Id.* at 3. As Congress explained, "[t]he unfinished business of registration reform is to reduce these obstacles to voting to the absolute minimum while maintaining the integrity of the electoral process." *Id.* Simplifying voter registration was critical to increasing political participation: because "[t]he most common excuse given by individuals for not voting is that they are not registered," S. Rep. No. 103-6, at 2, and because registered voters are much more likely to turn out to vote than unregistered voters, *see id.*, making voter registration more accessible would greatly increase voter turnout.

Members of Congress repeatedly emphasized the importance of the NVRA to protecting the right to vote. *See, e.g.*, 139 Cong. Rec. 2427 (1993) (Rep. Rush) ("The right to vote is a fundamental right in America. It is the duty of the Federal Government to protect this right. The [NVRA] provides simple and effective means to ensure this right for all Americans."); *id.* at 2431 (Rep. Hilliard) (the NVRA "will extend democracy to everyone"); *id.* at 5223 (Sen. Kennedy) ("The right to vote is the cornerstone of our democracy. Without it, all our other rights are in danger."). They also underscored that "[d]eclining voter participation jeopardizes the very roots of our democratic system." *Id.* at 5227 (Sen. Rockefeller). As Senator Rockefeller explained, "Confusing registration forms, lack of convenient access to registration offices, and demanding registration requirements have led to the ineffectiveness of our current registration system." *Id.* Another congressman put it succinctly: "If we care about a healthy, participatory democracy in its fullest sense, it's imperative that we facilitate voter registration." *Id.* at 2435 (Rep. Becerra); *see also id.* at 9222 (Rep. Kleczka) ("Congress has the responsibility to make the registration process as easy as possible.").

Not all in Congress, however, supported the NVRA's measures to increase voter registration. In particular, some members of Congress were concerned that easing voter registration procedures would open the door to noncitizens voting in federal elections. *See, e.g.*, *id.* at 2443 (Rep. Bachus) (arguing that the NVRA

"will result in the registration of millions of . . . illegal aliens"); *id.* at 2450 (Rep. Canaday) ("millions of illegal aliens and other noncitizens will flood into the American electoral system"). The Act's champions, however, believed that the bill's measures protecting against noncitizen registration were sufficient and that worries about noncitizen voting were exaggerated. *See id.* at 5224 (Sen. Kennedy) ("The contention that the bill will encourage voter fraud or voting by noncitizens is simply wrong. The bill requires everyone who applies to register to vote to attest that they are U.S. citizens and are eligible to vote."); *id.* at 9224 (Rep. Swift) ("The fact is that this legislation contains for the first time in the history of the U.S. Federal law that will provide criminal penalties for fraudulently registering to vote.").

Questions about permissible citizenship verification measures came to a head in the Senate. After the NVRA passed the House, the Senate passed a version of the bill that included a "rule of construction" providing that "[n]othing in this Act shall be construed to preclude a State from requiring presentation of documentary evidence of the citizenship of an applicant for voter registration." *Id.* at 5098; *see id.* at 5099 (amendment agreed to). Some Senators expressed concerns about this provision and pressed the Conference Committee to address it. *See id.* at 5232 (Sen. Simon) ("This bill safeguards against the potential problem and the provision permitting States to require documentary evidence of citizenship at registration time is at best unnecessary and at worst may be implemented in a discriminatory

fashion that may violate the Voting Rights Act. Accordingly, it is my hope that the conferees look at this provision closely and seriously reconsider it."). The House and Senate versions of the bills were subsequently conferenced, and the Conference Committee deleted this amendment. As the Committee explained, the amendment was "not consistent with the purposes of" the NVRA and "could be interpreted by States to permit registration requirements that could effectively eliminate, or seriously interfere with, the mail registration program of the Act." H.R. Conf. Rep. No. 103-66, at 23 (1993). Ultimately, the NVRA was enacted without the rule of construction.

**B.** "The [NVRA] has four main goals: (1) increasing the number of registered voters, (2) increasing participation in federal elections, (3) maintaining current and accurate voter rolls, and (4) ensuring the integrity of the voting process." *ACLU v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017). To achieve these ends, the NVRA instituted several reforms to voter registration, such as creating procedures by which eligible citizens can register to vote when applying for a driver's license, *see* 52 U.S.C. § 20503(a)(1); increasing access to voter registration at state offices, including public assistance agencies, *see id.* § 20506; and regulating how states maintain their voter rolls both to maintain their accuracy and avoid unnecessarily purging voters, *see id.* § 20507.

Critically, the NVRA established "uniform national voter registration procedures for Federal elections," S. Rep. No. 103-6, at 3, by "direct[ing] each state to 'accept and use' a federally prescribed national mail voter registration form, often called 'the Federal Form,'" *Newby*, 838 F.3d at 4 (quoting 52 U.S.C. § 20505(a)(1)). "Whatever methods of voter registration a state uses for its own elections, it cannot decline to register for federal elections an applicant who completes and timely submits a valid Federal Form." *Id.* at 5. The NVRA also requires that certain state offices ensure that eligible voters seeking their services can register to vote using the Federal Form at those offices. *See* 52 U.S.C. § 20506(a)(1), (a)(4), (a)(6).

"Although the NVRA was originally administered by the Federal Election Commission, Congress [through HAVA] transferred to the newly created Election Assistance Commission . . . the power, 'in consultation with the chief election officers of the States,' to 'develop' the Federal Form and to promulgate regulations needed to carry out that task." *Newby*, 838 F.3d at 5 (citations omitted) (quoting 52 U.S.C. § 20508(a)(1)-(2)). The EAC was established to "provid[e] information and assistance to state and local governments on best practices to successfully administer elections." H.R. Rep. No. 107-329, at 33 (2001). Congress designed the EAC to be a bipartisan and independent body: the EAC is "composed of four commissioners, appointed for a term, [with] two from each party," and "requires a vote

of three Commissioners" to act. *Newby*, 838 F.3d at 5; *see* 52 U.S.C. § 20923(a)(1), (b)(2); *id.* § 20928. The Commissioners are "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 20923(a)(1).

To ensure that the Federal Form can accurately determine a person's eligibility to vote without posing unnecessary obstacles for those seeking to register, Congress set out baseline substantive and procedural requirements for how the EAC specifies the Form's contents. Congress required the Federal Form to "include a statement that specifies each eligibility requirement (including citizenship)," "an attestation that the applicant meets each such requirement," and "the signature of the applicant, under penalty of perjury." *Id.* § 20508(b)(2). At the same time, the Form "may not include any requirement for notarization or other formal authentication," *id.* § 20508(b)(3), and "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant," *id.* § 20508(b)(1). The EAC is also required to "consult[] with the chief election officers of the States" when it prescribes regulations on the Federal Form. *Id.* § 20508(a)(1)-(2). Lastly, the EAC must comply with the notice-and-comment requirements of the Administrative Procedure Act, *see id.* § 20929; 5 U.S.C. § 551, and the Paperwork Reduction Act, *see* 42 U.S.C. 3501 *et seq.*

Courts have repeatedly rejected attempts to make an end-run around the NVRA's mandated processes for adding requirements to the Federal Form, including adding a DPOC requirement. In 2013, the Supreme Court held that the NVRA preempted state laws that required applicants to submit DPOC with the Federal Form. *See Inter Tribal Council*, 570 U.S. at 15. Courts have also strictly enforced the NVRA's requirement that the EAC determine whether changes to the Federal Form are necessary. For example, the D.C. Circuit held that the EAC Executive Director's decision to allow certain states to add a DPOC requirement to those states' Federal Forms was unlawful under the APA because he failed to assess whether the requirement was necessary as required under the NVRA. *See Newby*, 838 F.3d at 9-10. And in *Kobach*, the Tenth Circuit rejected the argument that the EAC had a "nondiscretionary duty to approve state requests" to change the Federal Form and upheld the EAC's rejection of Arizona's and Kansas's requests to add a DPOC required to those states' specific Federal Form instructions. *See* 772 F.3d at 1196. These rulings underscore that the NVRA's procedures governing the Federal Form are not optional: any additional requirements on the Federal Form may only be implemented pursuant to the NVRA's detailed processes.

\* \* \*

In sum, Congress exercised its Elections Clause authority to enact the NVRA and make voter registration more accessible. As a key part of the NVRA,

Congress created the Federal Form and charged the EAC with developing the Form subject to specific substantive and procedural requirements. The EAC must follow these rules, including consulting with state election officials and determining whether any additional information requested by the Federal Form is "necessary" to determine the eligibility of the applicant, before it promulgates any regulation changing the Federal Form.

### III. The Executive Order Violates the Separation of Powers by Usurping Congress's Established Procedure for Adding Requirements to the Federal Form.

The Executive Order provides that the EAC "shall take appropriate action to require in [the Federal Form] documentary proof of citizenship." Executive Order § 2(a)(i)(A). The Executive Order mandates that the EAC add a DPOC requirement to the Federal Form, even if the EAC, exercising its own judgment after following the NVRA-mandated procedures, concludes that such a requirement is not necessary under the NVRA. By usurping Congress's role in regulating federal elections and contravening the procedures Congress mandated the EAC follow in modifying the Federal Form, the Executive Order violates the separation of powers.

**A.** "The President's power, if any," to command the EAC to add a DPOC requirement to the Federal Form "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Here, as the district

court recognized, "'neither the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form.'" *California*, D.E. 107, at 16 (quoting *LULAC*, 2025 WL 1187730, at *35). The Constitution empowers Congress, not the President, to "make or alter" regulations governing federal elections, and Congress, in turn, empowered the EAC, not the President, to determine whether changes to the Federal Form are warranted, consistent with specific substantive and procedural guidance set out by Congress itself. Aside from nominating members to serve on the EAC, the President has no constitutional or statutory role in determining what information should be required on the Federal Form.

Because the Executive Order is "incompatible with the expressed or implied will of Congress," the President's executive "power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see also California*, D.E. 107, at 19 ("In short, § 2(a)'s instruction to add a documentary proof of citizenship requirement to the Federal Form conflicts with the will of Congress."); *LULAC*, 780 F. Supp. 3d at 195 (the President's "unilateral instruction to add a [DPOC] requirement to the Federal Form is contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA"). The President cannot accomplish by executive order what the Elections Clause demands be done by

Congress through legislation. *See Youngstown*, 343 U.S. at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."). To hold otherwise would be to "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838). It would render meaningless the Elections Clause's explicit empowerment of Congress to "prescribe its own rules" governing federal elections, *Moore*, 600 U.S. at 10, and authorize an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for passing legislation, *INS v. Chadha*, 462 U.S. 919, 959 (1983); *see Youngstown*, 343 U.S. at 655 (Jackson, J., concurring) ("except for recommendation and veto, [the President] has no legislative power").

**B.** Appellants offer no meaningful response to the fact that, under our constitutional scheme and the NVRA, the President lacks the authority to command the EAC to alter the Federal Form and require DPOC. Rather than grappling with the Executive Order's frontal assault on the constitutional balance of powers, they insist that the Executive Order leaves to the EAC the decision whether to amend the Federal Form to add DPOC. This flatly contradicts the text of the Executive Order, which states that the EAC "shall take appropriate action" to "require" the DPOC requirement. *See Maine Cmty. Health Options v. United States*, 590 U.S.

296, 310 (2020) ("The first sign that the [Executive Order] impose[s] an obligation is its mandatory language: 'shall.'").  The Executive Order establishes a thirty-day timetable for the EAC to reverse course and mandate DPOC on the Federal Form and even dictates what forms of documentation will suffice to prove citizenship. *See* Executive Order § 2(a)(i), (ii).  In short, the Executive Order, quite plainly, demands a DPOC requirement by executive fiat.  This Court should decline Appellants' invitation to sanction the Executive Order's arrogation of power by rewriting its terms.  *See United States v. Stevens*, 559 U.S. 460, 481 (2010).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: January 12, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,367 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief *amicus curiae* complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 12th day of January, 2026.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on January 12, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 12th day of January, 2026.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*