# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States; PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY MCCORMICK, in the official capacity as Commissioner of the U.S. Election Assistance Commission; BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S. Election Assistance Commission; PETE HEGSETH, in the official capacity as Secretary of Defense,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts (Case No. 1:25-cv-10810-DJC)

## BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

BRENDAN T. JARBOE (Bar No. 1169283)
Block & Leviton LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
brendan@blockleviton.com

JOHN B. HILL (Bar No. 1219054)
DONALD K. SHERMAN
Citizens for Responsibility
and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
dsherman@citizensforethics.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF AMICI ..................................................................................... 1

INTRODUCTION .......................................................................................... 1

ARGUMENT ................................................................................................. 3

    I.    The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration. ....................................... 5

        A.    The states' role in regulating and administering elections is constitutionally mandated. ......................................................... 5

        B.    The Constitution reflects an intentional choice to prioritize the states' accountability to voters. ................................................... 7

        C.    Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President. ................................................................................ 8

    II.    The President has no standalone power to regulate or administer elections. ...................................................................................... 8

    III.    The President cannot direct the EAC, which is an "independent entity," to take specific actions. ......................................................................... 11

    IV.    The EO violates federalism and the separation of powers by infringing on the Elections Clause. ..................................................................... 14

    V.    The EO violates federal law in many other ways. ................................. 18

        A.    EO Section 2(a) would write states out of the statutory process for developing the Federal Form. ............................................... 18

        B.    EO Section 7 attempts to invalidate numerous states' laws for receiving and tabulating votes. .................................................. 22

    VI.    State election administrators face actual, imminent, and irreparable harm from the EO. ............................................................................ 25

CONCLUSION .............................................................................................. 29

**Cases**

*In re Aiken Cnty.*,
  645 F.3d 428 (D.C. Cir. 2011) ............................................................................ 11

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ........................................................................................... 2

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013) ........................................................................................ *passim*

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
  56 F.3d 791 (7th Cir. 1995) ................................................................................ 6

*Bognet v. Sec'y Commonwealth of Pennsylvania*,
  980 F.3d 336 (3d Cir. 2020) ............................................................................. 23

*Bond v. United States*,
  564 U.S. 211 (2011) ........................................................................................... 9

*Bost v. Ill. State Bd. of Elections*,
  684 F. Supp. 3d 720 (N.D. Ill. 2023) ............................................................... 23

*Bush v. Gore*,
  531 U.S. 98 (2000) ............................................................................................. 8

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. June 13, 2025) ......................................... *passim*

*Campanale & Sons, Inc. v. Evans*,
  311 F.3d 109 (1st Cir. 2002) ............................................................................ 21

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ......................................................................................... 16

*Colorado v. DeJoy*,
  No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ...................... 10

*Donald J. Trump for President, Inc. v. Way*,
  492 F. Supp. 3d 354 (D.N.J. 2020) .................................................................. 24

*Georgia v. Clark*,
  119 F.4th 1304 (11th Cir. 2024) ...................................................................... 10

*Georgia v. Meadows*,
  692 F. Supp. 3d 1310 (N.D. Ga. 2023) .............................................................. 9

**Cases—continued**

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) ...................................................6

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ...............................................................15

*Harkless v. Brunner*,
  545 F.3d 445 (6th Cir. 2008) ...................................................6

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. Apr. 24, 2025) .......................*passim*

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................19

*Libertarian Party of Virginia v. Alcorn*,
  826 F.3d 708 (4th Cir. 2016) ...................................................7

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) .................................................26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................21

*Moore v. Harper*,
  600 U.S. 1 (2023) ....................................................................6

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ...............................................................25

*Republican Nat'l Comm. v. Wetzel*,
  120 F.4th 200 (5th Cir. 2024) ...........................................22, 24

*Roudebush v. Hartke*,
  405 U.S. 15 (1972) ..................................................................9

*Sandusky Cnty. Democratic Party v. Blackwell*,
  387 F.3d 565 (6th Cir. 2004) .................................................19

*Seila Law LLC v. Consumer Financial Protection Bureau*,
  591 U.S. 197 (2020) ..........................................................13, 14

*Smiley v. Holm*,
  285 U.S. 355 (1932) .................................................................5

*State v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) ........................................8, 9, 16

**Cases—continued**

*State of Washington v. Donald Trump*,
  No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) ................................................................................... 3, 13

*Storer v. Brown*,
  415 U.S. 724 (1974) ............................................................................. 8

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025) ...................................................................... 12

*U.S. v. Gradwell*,
  243 U.S. 476 (1917) ......................................................................... 6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ..................................................................... 17, 25

**Constitutional Provisions**

Mich. Const. 1963, art. II, § 4(1)(b) ............................................... 23

U.S. Const. art. I, § 4, cl. 1 ................................................................ 5

**Statutes**

42 U.S.C. § 901(a) .............................................................................. 11

52 U.S.C.
  § 20303(b)(3) ................................................................................... 24
  § 20304(b)(1) ................................................................................... 24
  § 20508(a)(2) ................................................................................... 18
  § 20508(b)(1) ............................................................................. 18, 20
  § 20921 ............................................................................................ 11
  § 20923(a)(3) ............................................................................. 11, 12
  § 20928 ............................................................................................ 12

10 Ill. Comp. Stat. 5/19-8, 5/18A-15 ............................................. 23

17 R.I. Gen. Laws § 17-20-16 ......................................................... 23

Cal. Elec. Code § 3020(b) ................................................................ 23

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ....................... *passim*

Mass. Gen. Laws ch. 54, § 93 .......................................................... 23

Md. Code Regs. § 33.11.03.08(B)(4) ............................................... 23

Md. Elec. Law, § 11-302(c) .............................................................. 23

Mich. Comp. Laws § 168.759a(18) .................................................. 23

**Statutes—continued**

N.J. Stat. Ann. § 19:63-22(a) ...............................................23

N.Y. Elec. Law
    § 8-412(1)..............................................................23
    § 8-710(1)..............................................................23

Nev. Rev. Stat. § 293.269921(1)(b), (2) ..............................23

**Other Authorities**

148 Cong. Rec. 4,405 (2002) ................................................12

3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911) ..............................................................................7

Agenda, EAC Technical Guidelines Development Committee (July 2, 2025) .........................................................................25

Consultation, *Black's Law Dictionary* (12th ed. 2024) .........21

Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 7:17 a.m. ET) ...........................................................16

Exhibits to Declaration, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946, ECF No. 95-1 (Apr. 16, 2025) .....................................................................20, 21

The Federalist No. 59 (A. Hamilton) (C. Rossiter ed. 1961)...................7

Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385 (2021) ...........................................................17

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025)...............................................................10

NCSL, *Helping America Vote, Election Administration in the United States 2024* (2025) ..............................................................27

Patrick Marley and Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data*, Wash. Post (July 16, 2025) .........................................................................26

U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) ............10

William J. Clinton, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993).........................20

## INTEREST OF AMICI[1]

Amici are a bipartisan group of nine former state secretaries of state—four republicans and five democrats—who served as their states' chief election administrators. *See also* Addendum (Amici's biographies). Although Amici may not always have agreed about what constitutes the best election policies, Amici nonetheless share a common commitment to ensuring that elections are free and fair, and Amici are unified in their understanding of states' pivotal role in enacting and executing election laws, as set forth in the U.S. Constitution.

## INTRODUCTION

The District Court here—like every court that has considered the questions presented in this case—got it exactly right: "As amici, bipartisan former secretaries of state, explain, 'allowing the President to change election rules and procedures on his whim whenever he sees fit, without any input from election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice.'" *California v. Trump*, 786 F. Supp. 3d 359, 391 (D. Mass. June 13, 2025).

---

[1] All parties have consented to this brief. No counsel for any party authored this brief in whole or in part, and no person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

As former secretaries of state, Amici faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "[d]eference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* at 817 (cleaned up).

President Trump's March 25, 2025, Executive Order—"Preserving and Protecting the Integrity of American Elections" (the "EO")—seeks to upend this constitutional framework by using mandatory language to (purportedly) require, among other things, unilaterally adding new requirements to the federal voter registration form (the "Federal Form") and prohibiting states from processing absentee and mail-in ballots received after Election Day. Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Contrary to the federalism and separation of powers principles codified in the Constitution's Elections Clause, the EO would unilaterally coronate the President as the country's chief election policymaker and

administrator. To voters, Amici's successors, and every state legislator in the country, the EO therefore represents an existential threat.

Indeed, the District Court here and the District Court for the District of Columbia recognized exactly this by enjoining enforcement of various provisions of the EO because "the authority for election requirements is in the hands of Congress" and that the EAC must "consult with the States before implementing any changes to the federal forms for voter registration." *California*, 786 F. Supp. 3d at 371; *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 155 (D.D.C. Apr. 24, 2025) ("*LULAC*"); *State of Washington v. Donald Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *2 (W.D. Wash. Jan. 9, 2026). The Court should affirm that result here.

## ARGUMENT

This Court's decision will have severe implications far beyond the current case. Reversing the decision below would legitimize the Executive Branch's usurpation of authority from constitutionally designated lawmakers and election officials and, in doing so, confer on future Presidents unchecked power to claim authority the Constitution expressly reserves to the States and Congress. The Court should affirm for six reasons.

*First*, under the Elections Clause, states play an irreplaceable role in election regulation and administration. Recognizing this, the Supreme Court has held the

U.S. Constitution permits only the states and Congress to regulate the time, places, and manner of federal elections, the qualifications for voter registration, and the manner of appointing presidential electors.

*Second*, caselaw reaffirms that the President plays no standalone role in regulating or administering elections.

*Third*, Congress created the Election Assistance Commission ("EAC") as an independent entity. The President cannot exercise unilateral supervisory authority to direct the Commission to act in a specific way.

*Fourth*, to the extent that the EO attempts to draw power from federal laws enacted by Congress, none of the laws at issue have displaced states' traditional role in elections—indeed those laws explicitly reserve powers for states that the EO disregards.

*Fifth*, various provisions of the EO violate federal election laws.

*Sixth*, executive overreach and the imposition of new requirements onto state election officials is already irreparably harming state election administrators' ability to carry out their constitutionally mandated role.

I. **The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration.**

A. **The states' role in regulating and administering elections is constitutionally mandated.**

The Constitution explicitly gives states the responsibility to enact election laws and administer elections. The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

This provision endows the states with "sweeping" authority to enact election laws, subject only to the rest of the Constitution and preemption by Congress. *LULAC*, 780 F. Supp. 3d at 158. The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner,' … are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013) ("ITCA") (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)) (emphasis added); *California*, 786 F. Supp. 3d at 372 (stating same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('shall be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [2] upon Congress it confers the power to alter those regulations or supplant them

altogether." *Id.* at 8 (citing *U.S. Term Limits*, 514 U.S. at 804-05); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (States hold a "constitutional duty to craft the rules governing federal elections."). "In other words, only Congress has the power to adjust state election rules." *California*, 786 F. Supp. 3d at 379.

In addition to giving the states and Congress the power to regulate elections, under the current regime enacted pursuant to the Elections Clause, states are responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures … is to administer the elections through its own procedures.") *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (The Elections Clause "reserve[es] to the States default responsibility for administering federal elections….").

In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," and separately Congress may also "assume[] to regulate such elections … by positive and clear statutes." *U.S. v. Gradwell*, 243 U.S. 476, 485 (1917).

## B. The Constitution reflects an intentional choice to prioritize the states' accountability to voters.

The Elections Clause reflects the Framers' view that states are well situated to regulate and administer federal elections, subject to Congressional preemption. That is because of state officials' accountability and proximity to local needs. "All other things being equal, it is generally better for states to administer elections…. [L]ocal administration … allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016) (Wilkinson, J.). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Indeed, even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases … both more convenient and more satisfactory." The Federalist No. 59, p. 360 (A. Hamilton) (C. Rossiter ed. 1961); *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 780 F. Supp. 3d at 158-59. Of course, Madison and Hamilton also agreed that under the Elections Clause, Congress—*but not the President*—was

a necessary check on potential abuses by state legislatures. *See Gradwell*, 243 U.S. at 484-85.

### C. Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President.

In practice, the Elections Clause creates a regime in which state officials, like Amici, possess unique expertise in local election procedures that the Federal Government, and in particular the President, simply does not have. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). As a result, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* In turn, it is state and local officials like Amici—*i.e.*, those charged with developing and operationalizing those comprehensive election codes—who possess the "expertise" necessary to implement such a complex system. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

### II. The President has no standalone power to regulate or administer elections.

"The Constitution empowers *only* the states and Congress to 'regulate the conduct of [federal] elections.'" *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir.

2023) (emphasis added), *cert. denied*, 145 S. Ct. 545 (2024) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). That is because, with respect to the Elections Clause, "[t]he President does not feature at all. In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *LULAC*, 780 F. Supp. 3d at 159. As a result, given that the "Constitution clearly grants the States the power to manage elections under the Elections Clause[,]" the Executive Branch cannot declare, on its own initiative, "power to involve itself in States' election procedures[.]" *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1327-28 (N.D. Ga. 2023) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)); *see also LULAC*, 780 F. Supp. 3d at 194 (The Elections Clause and federal law "vest control over federal election regulation in other actors, leaving no role for the President.").

The Executive Branch does not have constitutional authority to exercise—let alone usurp—the states' and Congress's Constitutionally delegated power to regulate and administer elections. Rather, federal courts have consistently found that "neither the Constitution, nor statutory law, nor precedent" support a broad authority to "superintend the states' administration of elections." *Meadows*, 88 F.4th at 1346. Indeed, Executive Branch officials have themselves "long recognized that the States *– not the federal government –* are responsible for administering elections, determining the validity of votes, and tabulating the

results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts." U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) (emphasis added); *accord Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). Or as Senator Mitch McConnell bluntly stated in a recent article: "[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols."[2]

To the extent Executive Branch *agencies or commissions* play any role in the states' administration of elections, their authority to do so is strictly limited to the parameters set by Congress under the Elections Clause. *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) ("Although the Constitution allows Congress to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service – an agency of the federal executive branch."). When a similar conflict of authority arose in *Colorado v. DeJoy*, concerning whether a federal executive official of the Postal Service could implement policy that would intrude on the state's power to administer its election, the court enjoined the policy because if found no caselaw that "would permit this constitutional authority, specifically delegated to Congress,

---

[2] Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq.

to be massively enlarged so as to cloak [a federal agency] and its agents with the power over-ride the election functions of a state sovereign." *Id.* The EO at issue here attempts to do exactly this, epitomizing unconstitutional executive overreach of the highest and most alarming degree.

### III. The President cannot direct the EAC, which is an "independent entity," to take specific actions.

The President does not have the authority to order or direct an *independent*, *bipartisan* Congressionally created entity to act.

"[T]here are two kinds of agencies in the Executive Branch: executive agencies and independent agencies…. [A]n independent agency … operates free of presidential direction and supervision." *In re Aiken Cnty.*, 645 F.3d 428, 439 (D.C. Cir. 2011) (Kavanaugh, J., concurring). By statute, Congress established the EAC as such an "independent entity." 52 U.S.C. § 20921. It is not unique in this respect: many other agencies, like the Social Security Administration, are similarly "independent." 42 U.S.C. § 901(a).

But Congress did not stop there. It also ensured that the EAC is bipartisan by stating that no more than half of the EAC's members may be affiliated with the same political party. *See* 52 U.S.C. § 20923(b). In other words, the Government is objectively wrong when it claims that "the President is free under the statute to appoint whomever he chooses (with the consent of the Senate)" to the EAC. Gov.

Br. at 21, fn. 3.[3] Moreover, Congress ensured that all actions taken by the EAC shall occur on a bipartisan basis by prescribing that "[a]ny action" the EAC takes "may be carried out only with the approval of at least three of its members," *i.e.*, with at least one member from each political party. 52 U.S.C. § 20928. The EAC's bipartisanship is thus a feature rather than bug. Indeed, for election administrators like Amici and for voters, the EAC's bipartisan is crucial, because it ensures stability across presidencies, insulating election administration from political parties' changing priorities and from attempts to misuse election administration and election policy as a cudgel for partisan gain. As HAVA's primary Democratic sponsor, Senator Chris Dodd, put it, the EAC's bipartisan structure "reflect[s] the need for a continuing nonpartisan approach to election administration." 148 Cong. Rec. 4,405 (2002). The Government cites no authority—because there is none— establishing that the President may compel an independent, bipartisan, Congressionally-created entity like the EAC to act in a particular way.

In at least some circumstances, bipartisan administrative bodies carrying out expertise-based functions with a measure of independence are protected from presidential control. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (discussing

---

[3] The Government is also wrong that the President has unfettered appointment power regarding EAC commissioners for another reason: each commissioner "shall have experience with or expertise in election administration or the study of elections." 52 U.S.C. § 20923(a)(3).

Federal Reserve's Board of Governors or other members of the Federal Open Market Committee). In other circumstances, the Supreme Court has held that under Article II of the Constitution's Vesting Clause, the President may at most control certain independent entities by *appointing and removing* their officers. *See Wilcox*, 145 S. Ct. at 1415 ("Because the Constitution vests the executive power in the President … he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents[.]" (citing *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 215-18 (2020))); *Seila Law*, 591 U.S. at 227 ("[T]he President's removal power stems from Article II's vesting of the 'executive Power' in the President.")

The District Court for the Western District of Washington, quoting arguments made by these Amici, made clear that, "[a]s noted by amici Bipartisan Former State Secretaries of State, 'there is no understanding of executive power that grants the President the authority to control the day-to-day actions of the EAC." *Washington*, 2026 WL 73866, at *27. In *Seila Law*, although the Court concluded that the CFPB's leadership by a single independent director violated the separation of powers because the director necessarily had to be subject in some way to presidential control, *id.* at 231-232, the *remedy* the Court chose was neither to transfer to the President the CFPB director's ability to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and

determine what penalties to impose on private parties," *id.* at 225, nor to strike

down the entire CFPB because of its independence from the President. *See id.* at

232-35. Instead, the Court struck only the statutory provision that protected the

CFPB director from removal. *See id.* In other words, even in the circumstances

where the President may exercise control over an independent, congressionally

created entity, he does so only by *removal*. Here, the Court need not address

whether and to what extent President may remove the independent EAC

commissioners under *Seila Law*. Rather, it is enough that the President does not, in

any circumstance, have supervisory authority to direct the EAC to act in a specific

way.

## IV. The EO violates federalism and the separation of powers by infringing on the Elections Clause.

Notwithstanding the Government's attempt to reframe this case as one of

statutory interpretation, *see* Gov. Br. at 17-22, the EO is, plain and simple, a

blatantly unconstitutional exercise of Executive Power. *See California*, 786 F.

Supp. 3d at 382 (holding "States' *separation of powers* challenge to § 2(a) is …

likely to succeed on the merits" (emphasis added)). Irrespective of Amici's views

about the policy decisions reflected in the EO, Amici all agree that the EO violates

the Constitution and that its implementation would represent a cataclysmic sea of

change in election administration.

"Perhaps the principal benefit of the federalist system is a check on abuses of government power. 'The "constitutionally mandated balance of power" between the States and the Federal Government was adopted by the Framers to ensure the protection of "our fundamental liberties."'" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citation omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*

The EO represents the Executive Branch mounting a direct assault on these principles by claiming for the President powers reserved for the states and Congress under the Elections Clause. To start, the EO purports to require—in mandatory terms—that various executive agencies and the Elections Assistance Commission unilaterally execute policy changes that neither the states nor Congress has enacted in accordance with the Elections Clause. *See*, *e.g.*, EO, §§ 2, 4, 7 (using the verb "shall" to direct action by EAC).[4] Moreover, since issuing the EO, the President has doubled-down on his view that he has unilateral authority to set election policy through executive action, declaring that he would be "signing an

_____

[4] The States only seek to preliminarily enjoin Executive Order §§ 2(a), 2(d), 3(d), and 7.

EXECUTIVE ORDER to help bring HONESTY to the 2026 Midterm Elections.

Remember, the States are merely an 'agent' for the Federal Government in

counting and tabulating the votes. They must do what the Federal Government, as

represented by the President of the United States, tells them, FOR THE GOOD OF

OUR COUNTRY, to do."[5]

The law reflects that the president has no such authority, however. As

established above, "the President has no 'direct control' over the individuals—

members of Congress and state officials—who conduct federal elections."

*Meadows*, 88 F.4th at 1347. In other words, "the President has done much more

than state his views: He has issued an 'Order' directing that an independent

commission 'shall' act to 'require' changes to an important document, the contents

of which Congress has tightly regulated. That command exceeds the President's

authority." *LULAC*, 780 F. Supp. 3d at 199 (cleaned up). As a result, "[b]y

increasing the power of the President beyond what the Framers envisioned," the

EO "compromises the political liberty of our citizens, liberty which the separation

of powers seeks to secure." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998)

(Kennedy J., concurring). Amici are particularly sensitive to the risks inherent in

the EO's reallocation of power over elections. Election administration is already

---

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 7:17 a.m.
ET), https://archive.ph/BwFe0.

intricate and demanding; it requires an enormous amount of manpower and careful coordination, with preparation beginning months, if not years, in advance.

Though the Government argues the President is not exercising unlawful unilateral control over election administration by directing the EAC to do the President's bidding, the EO nonetheless stretches the separation of powers past its breaking point. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). That is especially true "in the field of election administration," where "Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021). Thus, "the President's power is 'at its lowest ebb' because his unilateral instruction" to change election procedures "is contrary to the manifest will of Congress, as expressed in the text, structure, and context of" federal election law. *LULAC*, 780 F. Supp. 3d at 196 (quoting *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)). And because, beyond federal election statutes, "the President has no constitutional power over election regulation that would support this unilateral exercise of authority," the EO is unlawful. *Id.* at 197.

## V. The EO violates federal law in many other ways.

In addition to violating the Constitution by illegally arrogating power to the President, the EO directly conflicts with statutes that Congress enacted using its authority under the Elections Clause—statutes that maintain the states' central role in election administration.

### A. EO Section 2(a) would write states out of the statutory process for developing the Federal Form.

The EO ignores that states must play a role in developing the Federal Form. The National Voter Registration Act ("NVRA"), which Congress enacted under the Elections Clause, requires that the EAC "*shall* develop a mail voter registration application form" "*in consultation with the chief election officers of the States*." 52 U.S.C. § 20508(a)(2) (emphasis added); *see also ITCA*, 570 U.S. at 5 ("The EAC is explicitly instructed, however, to develop the Federal Form 'in consultation with the chief election officers of the States.'"). Further, the Federal Form "may require *only* such [information] as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1) (emphasis added). As a result, to determine whether information is necessary to state officials, the EAC *must* as an antecedent step seek input from state officials, as reaffirmed by the requirement that the Federal Form be developed "in consultation with" states. 52 U.S.C. § 20508(a)(2). "Critically, Congress has never assigned any

responsibility for the content of the Federal Form to the President or to any other individual in the Executive Branch with the power to act unilaterally." *LULAC*, 780 F. Supp. 3d at 195. The President cannot carve the states out of a process in which federal law requires their involvement.

The statutory division of responsibility between the EAC and states regarding the Federal Form makes sense, because Congress created the Federal Form in the NVRA and established the EAC in the Help America Vote Act ("HAVA"), which both ensure states' continued role in election administration. "Nowhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections …." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004); *see also* McConnell *supra* n. 2 ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections."). And under the NVRA, the very "purpose of the federal form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[T]he Federal Form requires registrants to supply information as part of their application only insofar as it is '*necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to

administer voter registration and other parts of the election process.'" (quoting 52 U.S.C. § 20508(b)(1))); William J. Clinton, Remarks on Signing the National Voter Registration Act of 1993 (May 20, 1993), https://www.presidency.ucsb.edu /node/219638 (describing NVRA's "implementation by States"). EO Section 2(a) therefore contravenes both the text and intent of HAVA and the NVRA, by stripping from federal law the mandatory role that secretaries of state like Amici must play in developing the federal voter registration form.

Nor is there any question that EO Section 2(a) purports to be mandatory. In the *LULAC* case,"[a]t the hearing on Plaintiffs' Motions, [the Government] affirmed that the EO means what it says: The EAC *must* add a documentary-proof- of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States to assess voter qualifications." 780 F. Supp. 3d at 199 (emphasis in original).

The EAC's initial steps to execute the EO confirm this point. In April, the EAC's Executive Director sent a letter and email to state officials ostensibly gesturing towards states providing consultation in amending the Federal Form. *See* Exhibits to Declaration, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946, ECF No. 95-1 (Apr. 16, 2025) (the "April EAC Communications"). However, purporting to seek the states' "input" on "on how

states would propose to *implement"* the President's policy is not the participatory process envisioned by Congress. *Id.* (emphasis added). "Consultation" requires seeking the "advice or opinion of someone[,]" here, the election officers of the States. Consultation, *Black's Law Dictionary* (12th ed. 2024). "[I]f Congress has required consultation … we must presume that such consultation will have a serious purpose that is likely to produce tangible results." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J., concurring) (describing congressionally required consultation between agencies). Thus, as the First Circuit has emphasized, "[c]onsultation … must mean something more than general participation … , otherwise the consultation requirement would be rendered nugatory." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002) (interpreting "consultation" in context of the Atlantic Coastal Act). Moreover, the EAC's April EAC Communications communicates to the states that the EO "instructs" new provisions are "required" to be included in the Federal Form, making clear that the EAC understands EO Section 2 to require the EAC to unilaterally make certain specific and substantive changes to the federal national mail voter registration form, regardless of any input the EAC allows states to nominally provide.

In a last-ditch effort to rescue the EO, the Government emphasizes the President's instruction that the EAC "take appropriate action." *See* Gov. Br. at 18-

19. But this selective reading ignores the rest of the sentence on which the Government relies: the EAC "*shall* take appropriate action *to require* in its national mail voter registration form issued under 52 U.S.C. 20508: (A) documentary proof of United States citizenship…." EO, § 2(a)(i)(A). As discussed above, the President cannot mandate that the EAC "shall" do anything, *see supra* Sections II-III, nor can the EAC unilaterally act to "require" changes to the Federal Form— rather it must consult with states to see whether changes to the Federal Form are required to seek information that is necessary to states.

The President clearly intended EO Section 2(a) to circumvent the states' statutory role in offering their advice or opinion regarding the substance of the Federal Form.[6] The Government's gambit is unconstitutional and the Court should not sanction it.

## B. EO Section 7 attempts to invalidate numerous states' laws for receiving and tabulating votes.

Finally, EO Section 7 seeks to unilaterally propagate one court's outlier interpretation of federal law regarding the meaning of "Election Day." *See Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024) (interpreting federal "Election Day" laws, 2 U.S.C. § 7 and 3 U.S.C. § 1) *cert granted sub. nom.*

---

[6] The Government's argument that the EAC may change the Federal Form if it complies with all procedural requirements is therefore a red herring. Even if the Government is correct, here the EAC did not follow the procedures set forth in federal law.

*Watson v. Republican National Committee.* By imposing that interpretation on states across the country, the Government effectively seeks to nullify many other states' rules for vote counting.

Under the Elections Clause, states have enacted laws that permit mail ballots to be returned after Election Day.[7] The last court to address whether those states' laws conflict with federal law—in the context of this section of this EO—enjoined civil or criminal enforcement actions to enforce § 7(a) and all of § 7(b), because "the text of the Election Day statutes require only that all votes are cast by Election Day, not that they are received by that date." *California*, 786 F. Supp. 3d at 386 (collecting cases). As the Third Circuit similarly concluded, such states' laws "and federal laws setting the date for federal elections can, and indeed do, operate harmoniously" and thus the federal laws do not preempt the states laws. *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 354 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). Other federal courts agree. *See Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736-37 (N.D. Ill. 2023), *aff'd on other grounds*, 114 F.4th 634

---

[7] See Cal. Elec. Code § 3020(b); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15; Mass. Gen. Laws ch. 54, § 93; Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4); Mich. Const. 1963, art. II, § 4(1)(b); Mich. Comp. Laws § 168.759a(18); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law §§ 8-412(1), 8-710(1); 17 R.I. Gen. Laws § 17-20-16.

(7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020).

Congressional inaction further supports this view. "Congress has not endorsed the Executive Branch's present interpretation of Election Day statutes even as Congress has amended other aspects of federal election administration within the last few years.… Indeed, the UOCAVA acknowledges the variances in state ballot receipt deadlines." *California*, 786 F. Supp. 3d at 386 (citing 52 U.S.C. § 20303(b)(3), § 20304(b)(1)). Here, because "the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable." *Id.*

Although the Fifth Circuit reached a different conclusion in *Wetzel*, *see* 120 F.4th at 215, the Supreme Court has now granted certiorari to review that outlier decision, and in any event that one court's ruling was explicitly limited to *Mississippi*. *See id.* Neither the President nor anyone else in the Executive Branch can extend *Wetzel*'s holding to invalidate the laws of states other than Mississippi. Only Congress or the federal courts can do so, and neither did so here. "The Constitution provides that Congress shall make laws, the President execute laws, and courts interpret laws. It did not provide for government by injunction in which the courts and the Executive Branch can 'make law' without regard to the action of

Congress." *New York Times Co. v. United States*, 403 U.S. 713, 742 (1971)

(Marshall, J., concurring) (citing *Youngstown*, 343 U.S. 579).

Because states have authority under the Elections Clause to enact laws

regulating vote tabulation, unless or until Congress or some federal court

invalidates laws permitting counting mail ballots received after Election Day, those

state laws remain valid—no matter what the President might think about that fact.

## VI.    State election administrators face actual, imminent, and irreparable harm from the EO.

In addition to constituting an unlawful intrusion into the states' sovereign

prerogative, the EO is immediately and irreparably harming states' abilities to

administer their elections. The EAC has already taken steps to implement the EO,

including sending letters to states regarding revising the Federal Form,[8] taking

steps to change voting systems guidelines,[9] and demanding that states turn over

---

[8] *LULAC*, 780 F. Supp. 3d at 187 ("[O]n April 11, the EAC began taking action in response to Section 2(a). That day, the EAC's Executive Director Brianna Schletz sent a letter on EAC letterhead to the chief election officials of each State 'seeking consultation on development of' the Federal Form.")

[9] Agenda, EAC Technical Guidelines Development Committee (July 2, 2025) ("Discussion of the Implementation of the Executive Order to Protect the Integrity of American Elections"), https://www.eac.gov/sites/default/files/2025-06/TGDC_ 2025_Annual_Meeting_Agenda.pdf.

copies of their voter rolls and share information about voters.[10] Many of those steps have explicitly required action by the states.

Moreover, in Amici's experience, even modest changes to election law require state and local officials to divert resources away from established administrative processes—an effect that is amplified when, as here, the proposed changes are substantial. Election administration depends on layered and highly interdependent processes, systems, and materials that require extensive advance planning and are already constrained by chronic underfunding. Election administrators working across the country have confirmed that the EO is already disrupting their work. (*See* D. Ct. ECF No. 76). That alone constitutes irreparable harm. *See Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting in "nonrecoverable compliance costs"). And because the EO purports to mandate immediate implementation of certain provisions and affords minimal notice for others, state election administrators are forced to divert resources to prepare for— and in some instances even begin implementing processes—in anticipation of potential judicial approval.

---

[10] Patrick Marley and Yvonne Wingett Sanchez, *DOJ hits states with broad requests for voter rolls, election data*, Wash. Post (July 16, 2025), https://archive.ph/6aqa8.

Administering elections is complicated, and the complexity of its layered processes strengthens security and integrity. As the National Conference of State Legislatures ("NCSL") has described, election administration "requires proficiency in many areas, including event planning, logistics, procurement, warehouse management, human resources, physical security and cybersecurity skills…. These additional responsibilities come with unique funding and staffing challenges."[11] Though the EO seemingly presupposes that changes to election administration can be made immediately and with the ease of flipping a switch or swiping a credit card, election administrators like Amici know that the work required for successful election administration spans across multiple state and local agencies, relies on many different cross-sector stakeholders, and requires year-round dedication. NCSL for example recognizes that "new voting policies" and "systems that require implementation and procedural changes" are among the factors that most significantly burden election workforces.[12] Amici's experience confirms this. Changes to election laws necessarily have a ripple effect, and implementing those changes and addressing their consequences takes away from the steady flow of tasks that are already on state election administrators' plates, including: managing

[11] NCSL, *Helping America Vote, Election Administration in the United States 2024* at 92 (2025), https://tinyurl.com/mr3hka63.

[12] *Id.* at 95.

outward facing websites, communicating with county and city elections officials, voter list maintenance, complying with state laws, informing the public about elections processes and procedures, reviewing and implementing cyber- and physical- security measures, reviewing and refining training plans and elections regulations, reviewing vendor contracts, initiating and submitting procurement process pursuant to the State law concerning purchasing equipment, ensuring ADA compliance and generally increasing accessibility for voters, supporting state legislative efforts related to elections, and countless other technical, operational, time-intensive aspects of election administration.

That burdensomeness of immediately implementing the EO—so significant that it nears impossibility—is compounded by the EO's threatened stripping of state election funding. *See*, *e.g.*, EO, § 7(b). Election funding is already inadequate and tenuous. The funds that the EO claims to newly restrict, those mandated by HAVA, were directed to the states precisely because of the need to ensure safe and secure elections. By holding hostage crucial state election funding, the EO jeopardizes rather than secures election administration.

Further, the EO has caused the proliferation of controversy and false narratives about the safety and security of American elections. Every step to implement the EO will increase such misinformation. On its face, the EO falsely claims that "the United States has not adequately enforced Federal election

requirements that, for example, prohibit States from counting ballots received after Election Day or prohibit non-citizens from registering to vote." EO § 1. Election administrators and states bear the brunt of these false assertions and the EO's other misleading innuendos. They have been and will continue to be responsible for maintaining voters' confidence in elections and their understanding of how elections *actually* are administered.

Drawing from their extensive experience, Amici emphasize the substantial, immediate, and continuing burdens and operational challenges this EO places on election officials. Each hour allocated to implementing, assessing, or responding to the President's top-down mandate has and will continue to irreversibly cost election administrators time and resources that should have been put toward existing policy priorities.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the Court affirm the District Court's decision.

Dated: January 12, 2026

Respectfully submitted,

 */s/ John B. Hill*
JOHN B. HILL (Bar No. 1219054)
DONALD K. SHERMAN
Citizens for Responsibility
and Ethics in Washington
P.O. Box 14596
Washington, D.C. 20044
(202) 408-5565

jhill@citizensforethics.org
dsherman@citizensforethics.org

BRENDAN T. JARBOE (Bar No. 1169283)
Block & Leviton LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600
brendan@blockleviton.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and because it contains 6,493 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ John B. Hill*

## CERTIFICATE OF SERVICE

I hereby certify that on this January 12, 2026, I electronically filed theforegoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ John B. Hill*

# ADDENDUM

## Biographies of *Amici Curiae*

### Mary Estill Buchanan, Former Secretary of State for the State of Colorado

– The Colorado Secretary of State is an elected member of the Executive Branch of Colorado's state government. The Secretary of State serves as the chief executive of an office that oversees and administers many laws, including the Colorado Election Code, Voter Registration Laws, and Campaign Finance Laws.

Secretary Buchanan was a public servant in Colorado for many years and a tireless advocate for democracy and women in public service. Most relevant here, Buchanan served two terms as Colorado's Secretary of State—from 1974 to 1983—as a Republican. When she took office, she was the first woman to hold that office in Colorado. During her tenure, Buchanan was the only Republican in statewide office, working across the aisle to ensure efficient, effective administration of Colorado's elections. As Secretary, Buchanan advocated for and implemented reforms to improve transparency for elections and public office.

### Miles Rapoport, Former Secretary of State for the State of Connecticut

– The Secretary of State of Connecticut is the Commissioner of Elections for the State. The Secretary is charged with administering, interpreting, and implementing election laws and ensuring fair and impartial elections. The Elections and Voting Division of the office administers, interprets, and implements all state and federal

laws pertaining to elections, primaries, nominating procedures, and the acquisition and exercise of voting rights.

Secretary Rapoport was elected Secretary of the State as a Democrat in 1995 and served until 1998, leading multiple initiatives to expand voting and election participation. Before that, Rapoport served five terms in the Connecticut House of Representatives, from 1984 to 1994, chairing the Committee on Elections.  Since 2021 he has served as the Executive Director of 100% Democracy, an initiative committed to promoting a more representative democracy. He is the co-author, with *Washington Post* columnist E.J. Dionne, of *100% Democracy: The Case for Universal Voting,* published in March 2022 by the New Press.

**Ben Ysursa, Former Secretary of State for the State of Idaho** – The Idaho Secretary of State is an elected constitutional officer within the executive branch of the state government. The Secretary's Elections Division works to ensure the accuracy and integrity of Idaho's elections, to ensure every voice is heard and every vote is counted properly.

Secretary Ysursa was elected Idaho's 26th Secretary of State on November 5, 2002, and was re-elected in 2006 and 2010. While serving as Secretary, Ysursa was an active member of the National Association of Secretaries of State, serving as co-chair of the Company Formation Task Force. Secretary Ysursa started his professional career serving first as Deputy Secretary of State from 1974 to 1976

and then as Chief Deputy Secretary of State from 1976-2002. He has conducted numerous workshops on elections for county, city and district officials throughout the state and has authored various manuals.

**Joan Anderson Growe, Former Secretary of State for the State of Minnesota** – The Secretary of State of Minnesota is an elected constitutional officer serving in the state's executive branch. One of the office's primary responsibilities is overseeing statewide elections and operating the statewide voter registration system.

Secretary Growe served first in the Minnesota House of Representatives before being elected as Minnesota Secretary of State as a Democrat. When she was elected, Growe became the first woman to be elected to a Minnesota statewide office without having been first appointed. During her six-term tenure, Growe was tireless in her advocacy of voter participation, and, for most of her tenure, Minnesota led the nation in voter turnout.

**John Gale, Former Secretary of State for the State of Nebraska** – The Secretary of State serves as Nebraska's chief election officer. Working with election officials in the state's 93 counties, the Elections Division oversees election law, the conduct of elections in the state, election tabulation equipment and the state voter registration system.

Secretary Gale served as Nebraska Secretary of State from December 2000 until 2019, winning election to the office as a Republican four times. While in office he significantly improved Nebraska's election process, including implementing major election improvements in Nebraska to meet the requirements of the federal Help America Vote Act. Under Secretary Gale's leadership, all Nebraska counties received new ballot tabulation equipment and switched to a computerized statewide voter registration system. He also promoted efforts to increase voter participation, resulting in Nebraska setting new turnout records in both the 2004 and 2008 presidential elections. Secretary Gale is a 5th generation Nebraskan, practicing law in North Platte for 29 years before being appointed Secretary of State. He served as legislative assistant to U.S. Senator Roman Hruska and as an assistant U.S. Attorney in Omaha and Lincoln.

**Phil Keisling, Former Secretary of State for the State of Oregon** – The Oregon Secretary of State is an elected constitutional officer within the executive branch of the state government. One of the Secretary's chief roles is to oversee the state's election system, to maximize voter participation, and to protect ballot security.

Secretary Keisling's career over four decades has included stints in the worlds of journalism, elective politics, the private sector, and academia. In 1991, Keisling was appointed Oregon Secretary of State by Governor Barbara Roberts.

He was then elected and re-elected as a Democrat to this statewide position. During his tenure, he helped lead the successful effort to make Oregon the nation's first state to conduct all elections only by mail. Keisling is also the chair of the board of directors of the National Vote At Home Institute, a nonpartisan, 501(c)(3) nonprofit organization that works to increase voters' access to, use of, and confidence in mailed-out ballots.

**Kathy Boockvar and Leigh Chapman, Former Secretaries of the Commonwealth of Pennsylvania** – The Secretary of the Commonwealth is the chief state election official in Pennsylvania and leads the Pennsylvania Department of State. The Department of State is responsible for ensuring the security, integrity, and accessibility of the electoral process in Pennsylvania, by overseeing free, fair, and accurate elections.

Secretary Boockvar served as the Secretary of the Commonwealth from 2019 until 2021, and before that as Senior Advisor on election security, under Governor Tom Wolf (D). Boockvar was also co-chair of the National Association of Secretaries of State's Elections Committee from 2019 to 2020 and as a Representative on the Election Infrastructure Subsector Government Coordinating Council (EIS-GCC), a collaboration among federal, state, and local officials. During her tenure, Boockvar co-chaired Pennsylvania's Inter-Agency Election Security and Preparedness Workgroup, strengthened election security and voting

rights measures across the state, and oversaw secure and accessible elections amid a global pandemic, marked by unparalleled transparency and voter participation. In prior years, Boockvar served as a poll worker and as a voting-rights attorney for a national civil rights organization and has been dedicated to public service throughout her career. After serving as Secretary, Boockvar became Vice President of Election Operations for the Center for Internet Security, and she is currently President of Athena Strategies, continuing work to strengthen election security and amplify understanding and civil discourse about elections.

Secretary Chapman served as the acting Secretary of the Commonwealth from January 2022 until January 2023. Chapman also previously held the position of Policy Director for the Pennsylvania Department of State, from July 2015 until May 2017. In that role, Chapman managed the Department's policy and regulatory development process in coordination with the Governor's Office of Policy, including in the elections program area. Chapman also has served as the Executive Director for Deliver My Vote, the Voting Rights Program Director at The Leadership Conference on Civil and Human Rights, as a Senior Policy Advisor at Let America Vote, and as a Staff Attorney at the Advancement Project in the Voter Protection Program.

**<u>Sam Reed, Former Secretary of State for the State of Washington</u>** – The Secretary of State of Washington is the state's chief elections officer. The

Secretary of State serves as an elected constitutional officer with rule-making authority. The duties of the office included maintaining the statewide voter registration database, overseeing state and local elections, certifying the results of state primaries and general elections, filing and verifying statewide initiatives and referendums, and producing and distributing the state voters' pamphlet and election-notice legal advertising.

Secretary Reed served the citizens of Washington for over three decades in elected public office. At the age of 28, Reed was appointed assistant Secretary of State, and was chosen by Governor Dan Evans to head the Governor's Advisory Council on Urban Affairs. Reed was elected as a Republican to serve as Washington's fourteenth Secretary of State in 2000—a title which he held until his retirement in January 2013. His many accomplishments included major election reform, including a new statewide voter registration system that prevents opportunity for fraud.