No. 25-1726

In the United States Court of Appeals
For the First Circuit

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW
YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, in the official capacity as President of the United States;
PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED
STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in the official
capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in the
official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY
MCCORMICK, in the official capacity as Commissioner of the U.S. Election Assistance
Commission; BENJAMIN W. HOVLAND, in the official capacity as Commissioner of the U.S.
Election Assistance Commission; PETE HEGSETH, in the official capacity as Secretary of
Defense,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS AND LOCAL
GOVERNMENTS IN SUPPORT OF APPELLEES AND IN SUPPORT OF
AFFIRMANCE OF THE PRELIMINARY INJUNCTION**

Shannon Eddy
Jonathan B. Miller
Michael Adame
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST..........................................................................1

SUMMARY OF ARGUMENT ......................................................................2

ARGUMENT....................................................................................................3

I.    THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE ILLEGAL, IMPRACTICAL, AND DISENFRANCHISING .................................4

    A.    Sections 2(a) and 3(d) would disenfranchise voters ....................5

    B.    Sections 2(a) and 3(d) would cause significant disruption to local election administration........................................................ 10

    C.    Sections 2(a) and 3(d) create an unfunded requirement that local election officials collect and store sensitive data............... 14

    D.    Noncitizen voting is very rare....................................................... 19

II.    THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO OVERRIDE STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTION OFFICIALS ..........................21

    A.    Section 7(a) would lead to voter confusion and disenfranchisement ..................................................................... 21

    B.    Section 7(a) creates administrative burdens and confusion........ 23

CONCLUSION.............................................................................................. 24

APPENDIX A–List of *Amici Curiae*............................................................ 26

# TABLE OF AUTHORITIES

**CASES**

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
　48 F.3d 618 (1st Cir. 1995)...................................................................... 3

*Democratic Nat'l Comm. v. Wis. State Legislature*,
　141 S. Ct. 28 (2020).......................................................................... 2

*Fish v. Schwab*,
　957 F.3d 1105 (10th Cir. 2020) .................................................. 7, 19

*League of United Latin Am. Citizens v. Exec. Off. of
　President*,
　No. 25-cv-0946, 2025 WL 3042704 (D.D.C. Oct. 31,
　2025)...................................................................... 5, 6, 20

*Mi Familia Vota v. Fontes*,
　719 F. Supp. 3d 929 (D. Ariz. 2024) ....................................... 19, 20

*N.H. Indonesian Cmty. Support v. Trump*,
　157 F.4th 29 (1st Cir. 2025) .......................................................... 3, 4

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
　102 F.3d 12 (1st Cir. 1996).......................................................... 3, 4

*United States v. Alabama*,
　778 F.3d 926 (11th Cir. 2015) .......................................................... 6

*Washington v. Trump*,
　No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash.
　Jan. 9, 2026)...................................................................... 5, 21

**STATUTES**

2 U.S.C. § 7 .................................................................................. 21

3 U.S.C. § 1 .................................................................................. 21

18 U.S.C. § 701 .................................................................................. 8

52 U.S.C. §§ 20301(a)–(b)(2)...................................................... 4

52 U.S.C. § 20302(a)(4) ........................................................... 4

52 U.S.C. § 20501(a) ........................................................ 1, 6, 8

52 U.S.C. § 20501(b) ............................................................... 6

52 U.S.C. § 20505(a)(1) ........................................................... 4

52 U.S.C. § 20508(b) ............................................................... 4

H.B. 1569, 2024 Gen. Court, Reg. Sess. (N.H. 2024) ......................... 7

Mich. Comp. Laws § 168.497(1)–(2) ................................... 13

N.H. Rev. Stat. Ann. § 654:7 ............................................... 7

Or. Rev. Stat. § 247.292 .................................................. 19

Or. Rev. Stat. § 247.555 .................................................. 19

Or. Rev. Stat. § 247.563 .................................................. 19

Or. Rev. Stat. § 247.570 .................................................. 19

25 Pa. Cons. Stat. § 1329 ................................................. 19

Wash. Rev. Code §§ 29A.08.810–.850 ............................... 19

## EXECUTIVE ORDERS

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................................................................*passim*

## OTHER AUTHORITIES

Billy Kauffman, *PennDOT DLC workers overwhelmed and overworked by REAL ID demand*, AFSCME13 (July 7, 2025) ........................................................................... 14

Brianna Lennon & Eric Fey, *Navigating New Proof of Citizenship Requirements with New Hampshire's Tina Guilford*, KBIA (Apr. 30, 2025) ........................................... 7, 9, 12

*Celebrate National Voter Registration Day!*, City of
  Madison, Wis. (Sept. 16, 2024), https://perma.cc/NAA5-
  P8F7......................................................................................... 9

Council of State Gov'ts, *Access to and Usage of Faxing by
  Military and Overseas Voters* 23 (July 2022) ............................... 16

Ctr. for Internet Sec., *Data Management Policy Template:
  CIS Critical Security Controls v8.1* (Aug. 2025) ........................... 17

Donald F. Norris & Laura K. Mateczun, *Managing
  cybersecurity in local governments: 2022*, 2025 J. of
  Cybersecurity Educ., Rsch. & Prac. 1 (2025)................................. 17

Emilia Wisniewski, *Almost two dozen Concord residents
  were turned away at the polls because of new voter
  registration guidelines*, Concord Monitor (Nov. 6, 2025) ............... 7

*Enhanced or Real ID*, N.Y. Dep't of Motor Vehicles.......................... 8

Fed. Trade Comm'n, *Protecting Personal Information: A
  Guide for Business* (Oct. 2016) ...................................................... 17

Frank LaRose, Ohio Sec'y of State, *Substitute Senate Bill
  153 Proponent Testimony* (Oct. 28, 2025) ..................................... 24

*Georgia citizenship audit finds few noncitizens on voter rolls*,
  Associated Press (Oct. 23, 2024)..................................................... 20

Holly Ramer, Michael Casey & Christina A. Cassidy, *New
  Hampshire town elections offer a preview of citizenship
  voting rules being considered nationwide*, Associated
  Press (Mar. 25, 2025) ....................................................................... 7

Jesse Bethea & Kate Millard, *Ohio governor signs bill
  eliminating absentee ballot grace period*, WOWK 13
  News (Dec. 20, 2025)....................................................................... 24

Jessica Huseman, *Two secretaries of state unpack the lessons
  of proof-of-citizenship laws for voting*, Votebeat (May 19,
  2025)............................................................................................... 11

Jillian Rothschild, Samuel B. Novey & Michael J. Hanmer,
    Ctr. for Democracy & Civic Engagement, *Who Lacks
    Documentary Proof of Citizenship?* (Mar. 2025) ............................ 8

Letter from Nat'l Ass'n of Sec'ys of State & Nat'l Ass'n of
    State Election Dirs. to Postmaster Gen. Louis DeJoy (Sept.
    11, 2024) ....................................................................................... 22

Matt Mencarini, *Township clerks run elections for half of
    Michigan residents. But what if no one wants the job?*,
    Lansing State Journal (Oct. 23, 2024) ........................................... 13

Miriam Seifter & Adam Sopko, *Election-Litigation Data:
    2018, 2020, 2022 State and Federal Court Filings*, State
    Democracy Rsch. Initiative (Mar. 21, 2023) .................................. 24

*Mobile Voter Services Satellite Office Outreach*,
    Montgomery Cnty., Pa. (May 2, 2025) ............................................ 9

*Mobile Voter Services Satellite Office Outreach*,
    Montgomery Cnty., Pa. (May 8, 2025) ............................................ 9

Shea Johnson, *Pierce County library was hit by data breach.
    What was in the stolen files*, The News Tribune (Sept. 9,
    2025) ............................................................................................. 18

Steve Simon, Minn. Sec'y of State, *ICYMI: Secretary Simon
    Remarks on Federal Support for Election Security* (Mar. 4,
    2025) ............................................................................................. 18

Trishna Begam, *Center for Internet Security facing federal
    funding cuts*, ABC News10 (Apr. 22, 2025) .................................. 18

*U.S. courts prepare for increase in election lawsuits*, Am.
    Bar Ass'n (Oct. 28, 2024) .............................................................. 24

U.S. Dep't of State, *Citizenship Evidence* (July 10, 2025) ................. 12

Wayne Schutsky, *Arizona counties are contacting 200,000
    voters who haven't provided proof of citizenship*, KJZZ
    Phoenix (Apr. 2, 2025) .................................................................. 14

## STATEMENT OF INTEREST

*Amici* are local election officials and local governments representing 38 jurisdictions, and they file this brief to support affirmance of the district court's preliminary injunction against the implementation of certain sections of the executive order entitled, "Preserving and Protecting the Integrity of American Elections." Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO" or "Executive Order").[1] *Amici* are responsible for administering local, state, and federal elections in their respective jurisdictions, and most are duty-bound under the National Voter Registration Act ("NVRA") to "promote the exercise of" the right to vote. 52 U.S.C. § 20501(a). All *amici* are committed to holding free and fair elections for their residents. Drawing from combined decades of election administration experience, they write to highlight the potential detrimental effects of the EO and emphasize that affirmance of the preliminary injunction is in the public interest, while reversal would cause the Appellees, *amici*, and their voters harm.

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached as Appendix A.

## SUMMARY OF ARGUMENT

"[R]unning a statewide election is a complicated endeavor" requiring "thousands of state and local officials and volunteers" to "participate in a massive coordinated effort." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). The EO's unlawful, one-size-fits-all directives purport to override legislation enacted at both the state and federal levels to facilitate that coordinated effort. Without the injunction in place, the EO would disrupt carefully considered election processes, disenfranchise voters, and severely burden election administration.

The EO's requirement that voters must present documentary proof of citizenship ("DPOC") when registering to vote using the National Mail Voter Registration Form ("Federal Form") and the Federal Post Card Application ("Post Card") would make it more difficult to register and result in disenfranchisement, contrary to the purpose of the statutes authorizing these forms. Such requirements would also compromise state and local election administration resources that are already stretched thin by adding burdensome steps to registration processes, including recordkeeping and data security requirements. Likewise, any attempt by the Attorney General to follow the EO's directive to override state mail-in ballot deadlines using civil or criminal enforcement actions would cause

disenfranchisement and increase costs and workloads for state and local election officials in states that count those ballots.

Costly disruption to election administration and voter disenfranchisement are not in the public interest. The injunction entered by the district court is necessary to prevent these harms and keep local governments from having to expend limited resources to address provisions of the EO that will likely be found to be unlawful. Accordingly, this Court should affirm the district court's preliminary injunction.

## ARGUMENT

"The purpose of a preliminary injunction is to preserve the status quo . . . ." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). That is exactly what the district court did when it issued the preliminary injunction in this case. It properly analyzed "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions…and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). To secure a preliminary injunction, plaintiffs "need only make a clear showing that they are '*likely* to suffer irreparable harm.'" *N.H. Indonesian Cmty. Support v. Trump*, 157 F.4th 29, 35 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added in *N.H. Indonesian Cmty.*). This Court reviews a

grant of a preliminary injunction for abuse of discretion. *N.H. Indonesian Cmty.*, 157 F.4th at 34.

Appellants have not met their "considerable burden of demonstrating that the trial court mishandled" its analysis when it granted the injunction. *Ross-Simons*, 102 F.3d at 15. Appellees are likely to succeed on the merits. *See also* Appellees' Br. at 18-27, 39–44. *Amici* write to emphasize that implementation of the EO's directives will also disenfranchise voters and irreparably harm state and local election officials who serve on the front lines of election administration, and that the district court's preliminary injunction is emphatically in the public interest.

## I.   THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE ILLEGAL, IMPRACTICAL, AND DISENFRANCHISING

The EO directs the Election Assistance Commission ("EAC") and the Secretary of Defense to take action to require DPOC to register to vote using either the Federal Form, prescribed by the NVRA, 52 U.S.C. §§ 20505(a)(1), 20508(b), or the Post Card, mandated by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301(a)–(b)(2), 20302(a)(4). The EO defines sufficient DPOC with a list including a passport, a military identification card that indicates citizenship, a REAL ID that indicates citizenship, or government-issued photo identification "otherwise accompanied by proof of United States citizenship." EO § 2(a)(ii). The EO also explicitly requires state or local officials who process

Federal Forms to record information about each registrant's DPOC "while taking appropriate measures to ensure information security." *Id*. § 2(a)(i)(B). Both district courts that have evaluated summary judgment motions concerning Section 2(a)'s validity have found it to be unlawful. *Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *27 (W.D. Wash. Jan. 9, 2026); *League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC II*"), No. 25-cv-0946, 2025 WL 3042704, at *26 (D.D.C. Oct. 31, 2025). Both district courts that have issued opinions on challenges to Section 3(d), including the court below, have found that the plaintiffs challenging the section had plausibly alleged that it was unlawful. *Washington*, 2026 WL 73866, at *28.

Along with being unlawful, the EO's documentary proof of citizenship directives are contrary to the public interest because they would disenfranchise voters, cause significant disruption to the orderly administration of elections, and create an unfunded requirement that election officials collect and store personally identifying data of voters who use either the Federal Form or Post Card to register. These burdens on voters and election officials cannot be justified in the name of preventing the exceedingly rare occurrence of noncitizen voting.

## A.    Sections 2(a) and 3(d) would disenfranchise voters.

Implementation of the EO's proposed DPOC requirements would make it harder for *amici*'s voters to register to vote in contravention of the purposes of the

statutes establishing the Federal Form and the Post Card. *See* 52 U.S.C. § 20501(b) (identifying a purpose of the NVRA as "increas[ing] the number of eligible citizens who register to vote"); *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015) (noting that, in passing UOCAVA, "Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights"). It would require a voter registration applicant who does not have an official copy of a specified DPOC at home to overcome multiple administrative hurdles to obtain it in advance of registration deadlines, straining scarce local government resources and rendering ineffective *amici*'s efforts to fulfill their duties to make registration accessible to all eligible voters. *See* 52 U.S.C. § 20501(a); *LULAC II,* 2025 WL 3042704, at *34 (finding, in parallel litigation challenging the EO, "a 'substantial risk' that . . . 'citizens will be disenfranchised in the present federal election cycle'" absent an injunction (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

The disenfranchising effects of the EO are not mere speculation. Some states have implemented their own requirements, and the results are clear: when states have instituted DPOC requirements, fewer eligible voters have been able to vote. For example, when Kansas attempted to impose DPOC requirements in 2011, over 30,000 new voter registrants' applications were cancelled or suspended for failure

to provide DPOC. *See Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020). Most recently, New Hampshire, which is not subject to the NVRA due to its laws offering same-day voting registration, *see* N.H. Rev. Stat. Ann. § 654:7, adopted its own DPOC requirement. *See* H.B. 1569, 2024 Gen. Court, Reg. Sess. (N.H. 2024). According to local election officials, implementation has been "difficult,"[2] and as a result of the statute, voters were disenfranchised in last year's elections.[3]

These results are not surprising. Many eligible voters simply do not have the kinds of documents named by the EO as sufficient evidence of citizenship. Of the EO's list of acceptable DPOC, two are scarce. For example, there does not appear to be any military ID card that currently shows citizenship, and it is illegal to make copies of some of the most common military ID cards outside of statutory purposes.

---

[2] *See* Brianna Lennon & Eric Fey, *Navigating New Proof of Citizenship Requirements with New Hampshire's Tina Guilford*, KBIA (Apr. 30, 2025), https://perma.cc/5246-TKB4 (transcribing a local election official's comments that administering elections under New Hampshire's new DPOC requirement "has been difficult").

[3] Multiple people attempting to register and vote in a lower-turnout local election in March 2025 had to be turned away, including one who did not have documentation from her first marriage in the 1970s, while at least one other voter who had changed her name in marriage had to make three trips to her polling place because of confusion over the identification requirements related to her name change. *See* Holly Ramer, Michael Casey & Christina A. Cassidy, *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, Associated Press (Mar. 25, 2025), https://perma.cc/9BU4-AA8H; *see also* Emilia Wisniewski, *Almost two dozen Concord residents were turned away at the polls because of new voter registration guidelines*, Concord Monitor (Nov. 6, 2025), https://perma.cc/KG77-CXHE.

*See* 18 U.S.C. § 701. And as the Government concedes, only four of the plaintiff states offer enhanced REAL IDs with proof of citizenship, Appellants' Br. 32 n.4, and they can be more expensive than standard REAL IDs available in those states.[4] Only about half of Americans have a passport, the most widely available document on the EO's list. Logan Decl. ¶12, JA276. That leaves the remaining eligible voters to prove citizenship through the EO's vague category of photo identification "otherwise accompanied by proof of United States citizenship," EO § 2(a)(ii), and millions of eligible voters do not have other traditional forms of DPOC that might fit this category—such as birth certificates—ready to produce.[5]

The EO also reduces *amici*'s ability to promote the exercise of the right to vote, 52 U.S.C. § 20501(a), among eligible citizens who *do* have DPOC readily accessible at home. For example, some local election officials run voter registration drives in their communities to meet eligible voters where they are—an effort that would be stymied by Section 2(a)'s DPOC requirements. One election office in

---

[4] *E.g.*, *Enhanced or Real ID*, N.Y. Dep't of Motor Vehicles, https://perma.cc/H5QU-FHQA (compared to a REAL ID, "Enhanced" IDs that can be used as a passport cost an additional $30).

[5] A University of Maryland survey conducted to gauge the potential impact of the SAVE Act, legislation that would require DPOC to register to vote, found that "[o]ver 21.3 million eligible voters (9%) across the country do not have, or do not have easy access to, DPOC." Jillian Rothschild, Samuel B. Novey & Michael J. Hanmer, Ctr. for Democracy & Civic Engagement, *Who Lacks Documentary Proof of Citizenship?* at 3 (Mar. 2025), https://perma.cc/2QL7-FKJS.

Madison, Wisconsin routinely attends community events to register voters, including events held at food pantries, botanical gardens, pizza shops, libraries, churches, and bakeries.[6] Similarly, Montgomery County, Pennsylvania has invested in a voter services van and has registered voters and performed other services at a town's "First Friday" community event and at a shopping mall.[7] *Amici*'s efforts to fulfill their duties and promote voter registration in these ways would be rendered ineffective by a DPOC requirement, as most people do not bring their passports to the pizzeria or to the mall. Indeed, in New Hampshire, a similar hurdle has become clear. A New Hampshire local election official reported that while residents who recently moved to the state used to be able to register to vote when they came to clerks' offices to register their car—a top of mind task upon moving—that happens less now because people generally do not bring proof of citizenship to register their car.[8]

---

[6] *See Celebrate National Voter Registration Day!*, City of Madison, Wis. (Sept. 16, 2024), https://perma.cc/NAA5-P8F7.

[7] *Mobile Voter Services Satellite Office Outreach*, Montgomery Cnty., Pa. (May 2, 2025), https://perma.cc/E8CY-TLGL; *Mobile Voter Services Satellite Office Outreach*, Montgomery Cnty., Pa. (May 8, 2025), https://perma.cc/84AW-2LF9.

[8] Lennon & Fey, *supra* note 2.

**B.    Sections 2(a) and 3(d) would cause significant disruption to local election administration.**

Like state election officials, local election offices will face extensive administrative challenges if the EAC and Department of Defense were to carry out the EO's direction to require DPOC with the Federal Form and Post Card. To begin, DPOC review would require additional policy development and training for staff, followed by creation and dissemination of voter education materials. These burdens would fall on election officials. State election officials would have to develop guidance to local offices, and local election officials would in turn have to create their own policies and train their staff on this new state guidance and new local policies. For instance, the Clerk-Recorder in Nevada County, California explained that her office would have to "map out the details on office process updates, update manuals, incorporate any future state-based laws or regulations [related to the EO], and train temporary staff for the next election cycle." Adona Decl. ¶ 13, JA167. Local and state election officials would have to dedicate time and resources to answering calls from concerned voters and provide them with extra assistance, and indeed they already are. *See, e.g.*, Linnell Decl. ¶ 19, JA266 (noting that the Minnesota Secretary of State's Office started to receive calls from confused voters about DPOC after the EO was issued); Rock Decl. ¶ 19, JA300 (same in Rhode

Island).[9] Proactive educational outreach would vary by jurisdiction depending on resources and voter needs, but could include updating website and social media materials, buying ad space on various media platforms, sending mailers, and translating all such outreach materials into languages sufficient to reach all voters in the community.

Additionally, DPOC review would require more staff time to process each Federal Form and Post Card in states where local officials would be responsible for such review. Reviewing citizenship documentation is not a matter of a mere glance at a document familiar to a clerk, such as the clerk's own state driver's license. Instead, depending on the DPOC available to an applicant, it could require review of multiple documents of varying familiarity to the reviewer to satisfy the EO's category of photo ID "otherwise accompanied by proof of United States citizenship." EO § 2(a)(ii)(D). Where the voter has changed their name through marriage or divorce, for example, election officials would be responsible for examining—and, for Federal Form applications, recording—multiple forms of documentation. If the birth certificate did not match the name on photo ID for someone who changed their

---

[9] *See also* Jessica Huseman, *Two secretaries of state unpack the lessons of proof-of-citizenship laws for voting*, Votebeat (May 19, 2025), https://perma.cc/G6CW-LVME (noting that the Secretaries of State of New Hampshire and Arizona, states with DPOC requirements, both acknowledged increased burdens on election administrators, including increased need for voter education, resulting from DPOC requirements).

name in marriage, local election offices would be responsible for connecting the dots by reviewing and recording a photo ID, birth certificate, *and* marriage license, which would require training and extra review time.[10] There are also more complex DPOC scenarios that could take even more time to review.[11]

This extra review, including for name changes and more complicated cases, is simply not possible with current staff, space, and infrastructure in many jurisdictions.[12] Los Angeles County "estimates needing to hire and train hundreds of

---

[10] *See* Lennon & Fey, *supra* note 2 (transcribing a local election official who administers elections under New Hampshire's new DPOC requirement as explaining, "But citizenship is where it's hard . . . [L]ocal election authorities, at least in our case, are not experts on validating the validity of a birth certificate or a marriage license or something like that.").

[11] The U.S. State Department's website explaining citizenship verification for passports previews what more complicated cases could entail. It delineates multiple classes of evidence that applicants must present depending on where they were born, including translation requirements if some documents come from another country, and a particularly long list of documents required for certain naturalized citizens. *See* U.S. Dep't of State, *Citizenship Evidence* (July 10, 2025), https://perma.cc/H5Z3-G8KX.

[12] *Amici* for Appellants, a state Republican party and a single election clerk, contend that the district court erred in recognizing the harm that could result from increasing processing burdens on local election officials, including the burden of additional DPOC review. *See* Br. of Amici Curiae Michigan Republican Party & Cindy Berry 6–8. *Amici*, local election officials from 39 jurisdictions across the country and 2 more local governments, disagree based on their experiences and expertise. The brief of the Michigan Republican Party and election clerk Cindy Berry also mischaracterizes the *amici* local election officials who signed the brief below as "Democrat Election Officials." While some of the *amici* local election officials serve in elected positions, others do not, and all sign as individuals with election administration experience, not as political party representatives.

new permanent and temporary workers and expand physical capacity to respond to the increased volume of in-person registrants and extra work associated with keying in data, learning what documents or combination of documents are permitted to establish DPOC, reviewing documents, and scanning the DPOC documents." Logan Decl. ¶ 14, JA277. In smaller jurisdictions, staff and resource constraints can make it difficult to tolerate major administrative changes that are not accompanied by adjustments to the state statutory scheme governing election administration, including funding adjustments. For example, in Michigan, local clerks—who are responsible for carrying out voter registration, *see* Mich. Comp. Laws § 168.497(1)–(2)—often work part time in smaller townships without any support staff.[13]

The costs of implementation would be significant in funding and employee time. Especially as deadlines approach, offices could be flooded with registrations and face bottlenecks that require overtime and associated overtime pay. This is not conjecture but a realistic expectation based on *amici*'s broad election experiences, analogous circumstances, and documented impacts in states with DPOC requirements. In a recent analogous circumstance, for example, as the deadline requiring REAL ID to fly domestically approached, processing offices were

---

[13] *See* Matt Mencarini, *Township clerks run elections for half of Michigan residents. But what if no one wants the job?*, Lansing State Journal (Oct. 23, 2024), https://perma.cc/7SLJ-SZKD. For example, a clerk in Noble Township, Michigan serves 400 voters on a salary of $4,000 per year and cannot afford basic office resources like a photocopier. *Id.*

overwhelmed with appointments that forced administrators reviewing documents to work long overtime shifts.[14] In larger election jurisdictions, implementing DPOC review could cost millions. *See* Logan Decl. ¶ 14, JA277 (estimating that the changes would cost $30 million in Los Angeles County, California). And any large-scale data collection will come with complications that extend costs over time. For example, in Arizona, where state law has required some form of proof of citizenship in state and local elections for over 20 years, county recorders are still grappling with paperwork challenges as they spend a taxing amount of time following up with voter registration applicants who did not submit such documentation in initial applications. *See* Fontes Decl. ¶ 16, JA230.[15]

### C.   Sections 2(a) and 3(d) create an unfunded requirement that local election officials collect and store sensitive data.

The EO requires state and local officials to record sensitive information about voters' DPOC provided through the Federal Form, including any "unique

---

[14] *See* Billy Kauffman, *PennDOT DLC workers overwhelmed and overworked by REAL ID demand*, AFSCME13 (July 7, 2025), https://perma.cc/B7WP-YG6W (noting that Pennsylvania's Department of Transportation employees were forced into "mandatory overtime" to respond to REAL ID applications, working "10-12 hour days with no breaks").

[15] *See also* Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ Phoenix (Apr. 2, 2025), https://perma.cc/33R8-H3XW. Election officials are reaching out to an estimated 200,000 voters to resolve these issues; one official said she is handling outreach in batches "to give my small staff the ability to keep up with the influx of calls and responses." *Id.*

identification number associated with the document," while also "taking appropriate measures to ensure information security." EO § 2(a)(i)(B). The EO's directive that the Secretary of Defense amend the Post Card to require DPOC likewise requires election officials to take at least temporary possession of the DPOC. EO § 3(d). While local election officials are adept at processing and storing sensitive voter information, they are not in the business of processing and storing citizenship documentation or particularly sensitive information such as full social security numbers. As such, this directive creates an unfunded requirement for election officials to collect and store highly sensitive data—a costly endeavor that could require building new databases and increasing cybersecurity.

Appellants contest the district court's finding that Section 3(d) imposes compliance costs on Appellees, arguing that the EO's explicit recordkeeping requirement only applies to the Federal Form and not the Post Card. Appellants' Br. 33. Appellants, however, misapprehend the practical effects of the EO: Sections 2(a) and 3(d) of the EO both create data and privacy costs for the state and local governments handling them. This is because in order to review DPOC submitted remotely with either the Federal Form or the Post Card, election offices must receive a copy of that DPOC, which would have to be stored at least temporarily as a hard copy or digital copy, including in election offices' hard drives or recipients' email

inboxes, since many *amici* accept those forms via email or secure websites.[16] Even temporary storage creates data privacy and security obligations, including developing and implementing policies to securely dispose of the data.

The process of creating data infrastructure that could store the anticipated volume of DPOC could be enormous. It would require analyzing offices' present data processing capabilities against new needs, including compatibility with state-level databases;[17] determining how to accommodate new fields, including complex entries like Section 2(a)(ii)(D)'s photo identification "accompanied by proof of United States citizenship"; reviewing state data privacy laws to determine whether there are mandated storage requirements around this type of documentation for local governments; building out infrastructure to accommodate these changes; testing processes; and training staff to use the new systems. All of these steps are costly. In Cook County, Illinois, for example, an updated computer system capable of processing DPOC would cost an estimated $900,000. Michalowski Decl. ¶ 7, JA288–289. Depending on how offices store data, recording DPOC could also require additional staff time when producing information responsive to public

---

[16] *See* Council of State Gov'ts, *Access to and Usage of Faxing by Military and Overseas Voters* 23 (July 2022), https://perma.cc/5MUY-EQXP.

[17] In California, for example, each of the 58 counties maintains its own election management system. Those counties would have to devote resources to ensuring that those systems are compatible with the statewide "VoteCal" system with respect to storing DPOC records. *See* Lean Decl. ¶¶ 11–12, JA115–116.

records requests, as local election offices would need to redact unique identifiers like social security numbers from such productions.

Even temporary possession of DPOC and data like full social security numbers on the face of some DPOC would likely require investment in additional cybersecurity resources. Best practices around such data begin with limiting the amount collected in the first place.[18] But once election offices do collect it, they must develop controls on the data throughout its lifecycle from acquisition to protection and from handling to disposal.[19] Local governments already face "seemingly unrelenting" cybersecurity attacks, including ransomware attacks,[20] and a new nationwide mandate that local governments store sensitive personal data would make them more attractive targets for bad actors who profit from selling this data to

---

[18] *See, e.g.*, Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* 6 (Oct. 2016), https://perma.cc/W2D8-7GDD ("If you don't have a legitimate business need for sensitive personal identifying information, don't keep it. In fact, don't even collect it.").

[19] The Center for Internet Security, a nonprofit organization that serves as a trusted partner of states and local governments in their efforts to protect their networks and data, issues cybersecurity best practices in their CIS Controls publication. *See, e.g.*, Ctr. for Internet Sec., *Data Management Policy Template: CIS Critical Security Controls v8.1* at 6 (Aug. 2025), https://perma.cc/5G4Y-4VA2.

[20] Donald F. Norris & Laura K. Mateczun, *Managing cybersecurity in local governments: 2022*, 2025 J. of Cybersecurity Educ., Rsch. & Prac. 1, 10 (2025) https://perma.cc/ZPU7-3YLY.

fraudsters or holding it for ransom. Such data breaches are extremely costly for local governments.[21]

Critically, at the same time as the EO attempts to create this unfunded data security mandate, the federal government has actually *reduced* cybersecurity resources to support local governments. For instance, the Department of Government Efficiency cut funding to the Center for Internet Security, which had been designated by the federal government to run the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"), a program that provides resources and services to local election offices to combat cybersecurity threats.[22] Many *amici* have relied on that program's no-cost and low-cost cybersecurity defense software and security operations center, among other services that local election offices cannot fund on their own.[23]

---

[21] In just one recent example, when hackers stole just names and addresses from a data breach of the Pierce County, Washington public library, the library covered the costs of free credit monitoring and identity protection services and has also been sued by patrons who had their data stolen. *See* Shea Johnson, *Pierce County library was hit by data breach. What was in the stolen files*, The News Tribune (Sept. 9, 2025), https://perma.cc/F3DK-U9T5.

[22] *See* Trishna Begam, *Center for Internet Security facing federal funding cuts*, ABC News10 (Apr. 22, 2025), https://perma.cc/ACV6-R8S4. According to Albany County's Chief Information Officer, "The loss of programs like . . . EI-ISAC will certainly impact our nation's collective ability to quickly detect cyber threats and remediate them." *Id.*

[23] *See* Steve Simon, Minn. Sec'y of State, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security* (Mar. 4, 2025), https://perma.cc/VLZ4-DJTU.

**D.     Noncitizen voting is very rare.**

The EO justifies its DPOC requirements in the name of ensuring that noncitizens do not vote in federal elections, an occurrence that is exceedingly rare. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024) (finding that in Arizona, attempts to vote by noncitizens were "quite rare"), *aff'd in part and vacated in part on other grounds*, 129 F.4th 691 (9th Cir. 2025); *Fish*, 957 F.3d at 1142 (determining that plaintiff had not shown a substantial amount of noncitizen voter registrations when only 39 noncitizens had made it onto Kansas voter rolls between 1999–2013 and "administrative anomalies could account for the presence of many—or perhaps even most" of those 39 (citation modified)).

State and local governments already have myriad methods at their disposal to maintain accurate voting lists without impeding local election administration or disenfranchising voters. In some states, for instance, county officials are responsible for regularly updating voter registration records. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570. Some *amici* local election officials are also responsible for overseeing voter challenges under state law, whereby individual voters' eligibility may be challenged by local authorities or members of the public who have reason to believe that a registered voter is not eligible to vote in that jurisdiction. *See, e.g.*, 25 Pa. Cons. Stat. § 1329; Wash. Rev. Code §§ 29A.08.810–.850.

Moreover, the federal government and state governments already investigate voter fraud, although targeted efforts to identify unauthorized noncitizen voters using that power have been largely fruitless. From 2002 to 2005, the U.S. Attorney General conducted such an investigation and ultimately indicted only 15 people for noncitizen voting, out of 200 million total votes that had been cast in federal elections during that period. *See Mi Familia Vota*, 719 F. Supp. 3d at 966. Recently, Georgia reviewed its voter rolls to identify noncitizens and found only 20 registered noncitizens (just nine of whom had ever voted) out of a pool of 8.2 million total registered voters.[24]

Accordingly, the substantial burdens of the EO's DPOC requirements—risking mass disenfranchisement of eligible voters, overwhelming local election offices, and creating unfunded responsibilities of data collection and storage—cannot be justified by the very rare occurrence of noncitizen voting in federal elections, for which there already exist numerous valid enforcement methods. Because they harm voters and state and local election officials without meaningfully contributing to election integrity, the EO's DPOC directives are not in the public interest. *See LULAC II*, 2025 WL 3042704, at *35.

---

[24] *Georgia citizenship audit finds few noncitizens on voter rolls*, Associated Press (Oct. 23, 2024), https://perma.cc/Y2L8-SMEK.

II.     **THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO OVERRIDE STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTION OFFICIALS**

The EO further attempts to improperly override state laws that establish mail-ballot and absentee ballot receipt deadlines after Election Day. Section 7(a) directs the Attorney General to "enforce" the EO's position that federal law prohibits the counting of mail-in and absentee ballots that arrive after Election Day, EO § 7(a), notwithstanding the fact that the federal Election Day statutes are silent on mail-in ballot receipt deadlines. *See* 2 U.S.C. § 7 and 3 U.S.C. § 1. The only district court that has evaluated Section 7(a) in a summary judgment posture has found it to be unlawful. *Washington*, 2026 WL 73866, at *36.

*Amici* agree with the district court, PI Order at 30, that Section 7(a) of the EO is likely to be found unlawful, and write to emphasize that the preliminary injunction enjoining the Attorney General from taking civil or criminal enforcement actions to enforce Section 7(a) prevents irreparable harm and supports the public interest.

A.     **Section 7(a) would lead to voter confusion and disenfranchisement.**

Federal enforcement efforts under Section 7(a) would result in confusion for *amici*'s voters in states that allow mail-in ballots to arrive after Election Day. In those states, voters are accustomed to the states' valid post-Election Day deadlines, and *amici* and state election officials in those states have devoted resources to

educating the public about these deadlines for years. Appellants downplay the impact of the Attorney General filing a lawsuit under 7(a) without proper statutory authority as directed by the EO, arguing that the states could simply challenge her authority at that stage. Appellants' Br. at 36. But even if any such lawsuits by the Attorney General are doomed to fail, lawsuits confuse voters, who often ask local election officials about the impact of ongoing litigation. *Amici* local election officials and state election officials would have to devote significant resources to voter outreach and education about any Section 7(a) enforcement actions. *See, e.g.*, Michalowski Decl. ¶ 14, JA 290–291; Rock Decl. ¶ 31, JA 304. That outreach would include regular updates about the status of any litigation, especially as election deadlines approach, and could be expensive. *See* Part I.B, *supra* (discussing voter communication and outreach methods).

Even if voters were aware of the EO's purported ballot receipt deadline, they could still be at risk of disenfranchisement through no fault of their own if it were "enforced" through litigation, given documented delays in mail pick-up and drop-off. State and local election officials across the political spectrum have repeatedly noted that absentee and mail-in ballots, especially when mailed through the U.S. Postal Service, may be subject to delayed processing and delivery.[25] Some *amici*

---

[25] *See, e.g.*, Letter from Nat'l Ass'n of Sec'ys of State & Nat'l Ass'n of State Election Dirs. to Postmaster Gen. Louis DeJoy (Sept. 11, 2024), https://perma.cc/8KCZ-7DDD.

have experienced these delays directly and understand that they can result in inadvertent disenfranchisement. Having considered these problems, many state legislatures have responded by creating ballot receipt deadlines that protect voters from disenfranchisement. Section 7(a) improperly disregards these decisions.

### B.     Section 7(a) creates administrative burdens and confusion.

Section 7 enforcement actions would be costly and confusing for local election officials. They would need to seek counsel to advise them on any litigation against their state and how it might interfere with other aspects of state election law that depend on ballot deadlines. For example, election officials in states where voters are able to "cure" mail-in ballots that contain technical errors are concerned that post-Election Day cure periods required under state law could also be challenged under Section 7, disrupting valid state ballot hearings that enable voters to protect their right to vote. *See, e.g*., Rock Decl. ¶ 32, JA 304.

And of course, litigation itself is costly. Apart from the expense of legal counsel, it draws election officials away from other important duties. Indeed, Defendants are aware of the burdens of litigation directed at election officials. In a state legislative hearing about changing the Ohio mail-in ballot deadline to reject mail-in ballots that arrive after Election Day, Ohio Secretary of State Frank LaRose testified that DOJ sent him a letter "implor[ing] Ohio to take immediate action (legislative or otherwise) to comply with federal law, and *avoid costly litigation in*

*federal court*."[26] Litigation over election administration has increased in recent years,[27] causing confusion for voters and election administrators, and these lawsuits would only add more confusion and costs.

## CONCLUSION

The Executive Order, along with being an unlawful overreach by the executive branch, threatens irreparable harm to *amici* local election officials and *amici*'s voters. The challenged provisions of the EO would disenfranchise a substantial number of eligible voters, disrupt state and local election administration, and create an unfunded requirement for election officials to collect and store sensitive data. These harms are weighty, and they cannot be justified by a desire to prevent the exceedingly rare occurrence of noncitizen voting. Therefore, *amici* respectfully ask this Court to affirm the district court's preliminary injunction in order to preserve the status quo and prevent the unnecessary expenditure of limited local government resources.

---

[26] Frank LaRose, Ohio Sec'y of State, *Substitute Senate Bill 153 Proponent Testimony* (Oct. 28, 2025), https://perma.cc/J92T-X5CQ (emphasis added). The bill changing the election deadline passed, and the Governor of Ohio "reluctantly" signed it. Jesse Bethea & Kate Millard, *Ohio governor signs bill eliminating absentee ballot grace period*, WOWK 13 News (Dec. 20, 2025), https://perma.cc/7WCK-SEP9.

[27] Miriam Seifter & Adam Sopko, *Election-Litigation Data: 2018, 2020, 2022 State and Federal Court Filings*, State Democracy Rsch. Initiative (Mar. 21, 2023), https://perma.cc/VB7H-VSWE; *U.S. courts prepare for increase in election lawsuits*, Am. Bar Ass'n (Oct. 28, 2024), https://perma.cc/W6RS-H99L.

Dated: January 12, 2025

Respectfully submitted,

*/s/ Shannon Eddy*

Shannon Eddy
Jonathan B. Miller
Michael Adame
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Phone: (510) 738-6788
shannon@publicrightsproject.org
jon@publicrightsproject.org
michael@publicrightsproject.org

*Counsel for Amici Curiae*

## ADDITIONAL COUNSEL

DAVID CHIU
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
*Attorney for the City and County of San Francisco, California*

TONY LOPRESTI
County Counsel
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
*Attorney for the County of Santa Clara, California*

## APPENDIX A–List of *Amici Curiae*

Tim Dupuis
*Registrar of Voters, Alameda County, California*

David Voye
*Elections Division Manager, Allegheny County, Pennsylvania*

Rocky Raffle
*Elections Office Member / Chairperson, Athens-Clarke County, Georgia*

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

Eneida Tavares
*Board of Election Commissioners Chair, City of Boston, Massachusetts*

Dante Santoni
*Commissioner, Berks County, Pennsylvania*

Diane Ellis-Marseglia
*Commissioner, Bucks County, Pennsylvania*

Bob Harvie
*Commissioner, Bucks County, Pennsylvania*

Michael Siegrist
*Clerk, Canton Township, Michigan*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Greg Kimsey
*Auditor, Clark County, Washington*

Aubrey Sonderegger
*Recorder, Coconino County, Arizona*

Kristin Connelly
*Clerk-Recorder and Registrar of Voters, Contra Costa County, California*

Kirk McDonough
*Board of Canvassers Chairperson, City of Cranston, Rhode Island*

Nick Lima
*Board of Canvassers Registrar / Director of Elections, City of Cranston, Rhode Island*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Dele Lowman
*Board of Voter Registration and Election Board Member, DeKalb County, Georgia*

Jim Allen
*Board of Elections Director, Delaware County, Pennsylvania*

Paul Lopez
*Clerk and Recorder, Denver City and County, Colorado*

Dawn Marie Sass
*Clerk / Deputy Treasurer, City of Exeter, Wisconsin*

Domonique Clemons
*County Clerk & Register of Deeds, Genesee County, Michigan*

Juan Pablo Cervantes
*Clerk, Recorder & Registrar of Voters, Humboldt County, California*

28

Barb Byrum
*Clerk, Ingham County, Michigan*

Julie Wise
*Director of Elections, King County, Washington*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Gina Martinez
*Registrar of Voters, Monterey County, California*

Neil Makhija
*Commissioner, Montgomery County, Pennsylvania*

Jamila Winder
*Commissioner, Montgomery County, Pennsylvania*

Armando Salud-Ambriz
*Clerk-Recorder / Registrar of Voters, Nevada County, California*

Lisa Brown
*Clerk / Register of Deeds, Oakland County, Michigan*

Lisa Deeley
*Commissioner, City of Philadelphia, Pennsylvania*

Diana Fuentes
*Clerk, City of San Diego, California*

Mark Church
*Chief Elections Officer & Assessor-County Clerk-Recorder, San Mateo County, California*

City and County of San Francisco, California

County of Santa Clara, California

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Dyana Limon-Mercado
*Clerk, Travis County, Texas*

Celia Israel
*Tax Assessor-Collector, Travis County, Texas*

Cathy Garrett
*Clerk, Wayne County, Michigan*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Jesse Salinas
*Registrar of Voters, Yolo County, California*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are governmental entities and individuals for whom no corporate disclosure is required pursuant to Federal Rule of Appellate Procedure 26.1.

## CERTIFICATE OF COMPLIANCE

I, Shannon Eddy, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,831 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

*/s/ Shannon Eddy*
Shannon Eddy
Public Rights Project

Dated: January 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Shannon Eddy*

Shannon Eddy
Public Rights Project

Dated: January 12, 2025