No. 25-1726

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF
HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF
MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE
OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK;
STATE OF RHODE ISLAND; STATE OF VERMONT; and STATE OF
WISCONSIN,

*Plaintiffs-Appellees*,

v.

PRESIDENT DONALD J. TRUMP, in his official capacity as President of
the United States; PAMELA J. BONDI, in the official capacity as Attorney
General of the United States; U.S. ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in the official capacity as
Chairman of the U.S. Election Assistance Commission; THOMAS HICKS,
in the official capacity as Vice Chair of the U.S. Election Assistance
Commission; CHRISTY A. MCCORMICK, in the official capacity as
Commissioner of the U.S. Election Assistance Commission; BENJAMIN W.
HOVLAND, in the official capacity as Commissioner of the U.S. Election
Assistance Commission; and PETE HEGSETH, in the official capacity as
Secretary of Defense,

*Defendants-Appellants*.

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 25-cv-10810
Hon. Denise J. Casper

BRIEF FOR *AMICI CURIAE* LEAGUE OF UNITED LATIN
AMERICAN CITIZENS AND SECURE FAMILIES INITIATIVE IN
SUPPORT OF APPELLEES AND AFFIRMANCE

Norman L. Eisen
Tianna J. Mays
Pooja Chaudhuri
Sofia Fernandez Gold
Jacob Kovacs-Goodman
DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE
#15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org
jacob@democracydefenders.org

Jon Greenbaum (D.C. Bar No. 489887)
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

Danielle Lang
Anna Baldwin
Heather Szilagyi
Ben Phillips
William Hancock
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegal.org
abaldwin@campaignlegal.org
hszilagyi@campaignlegal.org
bphillips@campaignlegal.org
whancock@campaignlegal.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

CORPORATE DISCLOSURE STATEMENT ................................................. v

INTEREST OF *AMICI CURIAE* ................................................................ vi

INTRODUCTION................................................................................... 1

ARGUMENT ........................................................................................ 2

I.    The Court Should Affirm the Preliminary Injunction as to
      Section 3(d)................................................................................ 2

      A. Section 3(d) violates UOCAVA ............................................... 3

      B. Section 3(d) imposes serious harms on the military and
         overseas voters who rely on the Post Card Form to register to
         vote and request an absentee ballot................................................ 7

II.   The Court Should Affirm the Preliminary Injunction as To
      Section 7(a) ............................................................................. 10

      A. Defendants' actions threatening at least one state with "costly
         litigation in federal court" over its ballot receipt deadline
         forecloses their ripeness defense.................................................. 12

      B. Congress has permitted states to decide whether they will
         count mail ballots cast by Election Day but received after
         Election Day................................................................................. 15

      C. Section 7(a) causes significant harm to amici's organizations,
         their members, and voters across the country ........................... 20

CONCLUSION.................................................................................... 29

CERTIFICATE OF COMPLIANCE.................................................... 31

CERTIFICATE OF SERVICE.............................................................. 32

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Pages**

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ........... 4

*Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278 (N.D. Ga. 2020) ................................................................................................ 22

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................... 7

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025) ................................................ 2

*Foster v. Love*, 522 U.S. 67 (1997) ...........................................15, 18, 19, 20

*League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ...................................... 12

*Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024) ...............................................16, 17, 19, 20

*Republican National Committee v. Wetzel*, 132 F.4th 775 (5th Cir. 2025) ............................................................ 17

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) ..................... 3

*United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012)........... 5

*Watson v. Republican National Committee*, No. 24-1260, 2025 WL 3131802 (U.S. Nov. 10, 2025)............................................................. 16

**Statutes, Codes, and Rules**

2 U.S.C. § 1 ............................................................................................ 11

2 U.S.C. § 7 .........................................................................................2, 11

3 U.S.C. § 1 .........................................................................................2, 11

3 U.S.C. § 21(1) ..................................................................................... 18

52 U.S.C. §§ 20301–20311 ....................................................................... 1

52 U.S.C. § 20301(b)(2) ........................................................................... 4

52 U.S.C. § 20301(b)(4) ................................................................... 4

52 U.S.C. § 20301(b)(7) ................................................................... 4

52 U.S.C. § 20302(a)(4) ............................................................... 3, 6

52 U.S.C. § 20303 ...................................................................... 16, 26

52 U.S.C. § 20304(b)(1) ................................................................ 17

52 U.S.C. § 21083 ............................................................................ 5

52 U.S.C. § 21083(b)(3)(C)(i) ........................................................ 5

La. Rev. Stat. Ann. § 42:1360 ...................................................... 19

Tex. Elec. Code § 84.001(b) ......................................................... 23

Tex. Elec. Code § 86.004(a) .......................................................... 23

W. Va. Code Ann. § 3-3-2 .............................................................. 23

## Other Authorities

Brief for Campaign Legal Center and Protect Democracy Project as
 Amicus Curiae, *Watson v. Republican National Committee*, No. 24-
 1260 (U.S. Jan. 9, 2026) ....................................................... 18

Executive Order No. 14,248 (Mar. 25, 2025) ................................ 1, 2, 8, 10

Federal Voting Assistance Program, 2020 Report to Congress,
 https://perma.cc/7R7L-VCZM ............................................. 25

Federal Voting Assistance Program, *International Mailing Systems and
 Voting by Overseas Citizens* (Nov. 28, 2016), https://perma.cc/D68M-
 6D3Q .................................................................................... 28

Hearing on S.B. 153, Before the Ohio Senate General Government
 Committee (Oct. 28, 2025) (statement of Frank LaRose)
 https://www.legislature.ohio.gov/legislation/136/sb153/committee ..... 14

Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666
 (2002) ...................................................................................... 4

H.R. Rep. No. 99-765 (1986) .......................................................... 5

Military and Overseas Voter Empowerment Act of 2009 ("MOVE"),
Pub. L. No. 111-84, §§ 577–83(a) (2009) ................................. 16

N.D. Legis. H.B. 1165 (2025) (eff. Aug. 1, 2025) ....................................... 21

Pew, *"No Time to Vote" for Many Military Personnel Overseas, Pew Study
Finds* (Jan. 2009), https://perma.cc/GFQ7-2794 ................................. 28

Pub. L. No. 117-328, div. P, tit. I, § 102 (2022) ......................................... 18

S.B. 293, 135th Gen. Assemb., Reg. Sess. (2025)
(Ohio eff. Mar. 20, 2026) ..................................................14, 21

Texas Department of Housing & Community Affairs, *2019 State of Texas
Low Income Housing Plan and Annual Report* (2019),
https://perma.cc/J5QS-XCWX................................................. 23

U.S. Census Bureau, *2010 Census Participation Rates* (Oct. 8, 2021),
https://perma.cc/8696-WUJN................................................. 23

iv

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

Date: January 12, 2026

*/s/ Anna Baldwin*
Anna Baldwin

*Counsel for Amici Curiae*

## INTEREST OF *AMICI CURIAE*[1]

Amici are plaintiffs in *League of United Latin American Citizens ("LULAC") v. Executive Office of the President*, No. 1:25-cv-946 (D.D.C. 2025), which was consolidated with *League of Women Voters Education Fund v. Trump*, No. 1:25-cv-955 (D.D.C. 2025), a separate challenge to Executive Order 14,248. Amici have obtained summary judgment and a permanent injunction from the D.C. district court as to their challenge to Section 2(a) of the Executive Order, *LULAC*, No. 25-cv-0946, 2025 WL 3042704 (D.D.C. Oct. 31, 2025), and have challenges to Sections 3(d) and 7(a) of the Executive Order currently pending before the D.C. district court on a fully briefed motion for summary judgment.[2]

Amici are the League of United Latin American Citizens ("LULAC") and Secure Families Initiative ("SFI"). LULAC is the largest and oldest

---

[1] In accordance with Rule 29 of the Federal Rules of Appellate Procedure, *amici* state that no party authored any part of this brief and that no person other than *amici* and its counsel contributed any funds for the preparation or submission of this brief.

[2] As referenced in the separate brief filed by amici League of Women Voters Education Fund, League of Women Voters of the United States, League of Women Voters of Arizona, Hispanic Federation, National Association for the Advancement of Colored People, OCA-Asian Pacific American Advocated, and Asian, and Pacific Islanders American Vote (collectively, "LWV amici"), those groups and the present amici jointly briefed their successful challenge to Section 2(a) in the D.C. district court. LWV amici

Latino civil rights organization in the United States with a mission to improve the lives of Latino families and to protect their civil rights, including voting rights. LULAC advances the economic conditions, educational attainment, political influence, housing, health, and civil and voting rights of Hispanic Americans through community-based programs. LULAC has more than 400 councils and more than 500,000 members nationwide, many of whom rely on absentee and mail voting due to age, disability, military service, educational commitments, distance from the nearest polling place, and experience with in-person harassment and intimidation when voting.

SFI is a non-partisan 501(c)(4) non-profit organization that consists of military spouses and family members. The mission of SFI is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities. SFI believes that mobilizing its community to vote and advocate is the most effective way to reshape the country's

---

did not challenge Sections 3(d) and 7(a) of the Executive Order before the D.C. District Court.  As such, LULAC amici file this brief regarding Sections 3(d) and 7(a) of the Executive Order and note their full support of the arguments laid out in the amicus brief filed by the LWV amici regarding Section 2(a).

conversations around military intervention and ensure its members have a seat at the table as to decisions that affect their own lives. A core part of SFI's mission is increasing turnout of the military community to close the 27% voting gap between military-connected and civilian voters.[3]

Both organizations help eligible citizens navigate the voter registration and mail voting processes nationwide and have substantial experience developing voter registration tools, educational materials, and programs that increase voter participation. Amici provide this brief in support of appellees to highlight the harms that Sections 3(d) and 7(a) impose on their missions and members.

---

[3] Decl. of Brandi Jones ¶¶ 10, 55, Dkt. 194-4, *LULAC*, No. 25-cv-946 (D.D.C.) (hereinafter Jones Decl.).

## INTRODUCTION

Section 3(d) of the challenged Executive Order commands the Secretary of Defense to update the Federal Post Card Application ("Post Card Form") for military and overseas voters to require specified forms of documentary proof of citizenship to register or request an absentee ballot. Executive Order No. 14,248 (Mar. 25, 2025), § 3(d) ("EO"). But, as the district court correctly held in granting Plaintiffs a preliminary injunction, "neither the Constitution nor any statute grants the President the authority to enact § 3(d)" as it conflicts with the requirements Congress set forth in the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") of 1986, 52 U.S.C. §§ 20301–20311. Addendum 25. The district court was also correct in holding that this provision's requirements "threaten to chill voter registration and participation." Addendum 35.

Section 7(a) of the Executive Order seeks to prohibit states from counting "absentee or mail-in ballots received after Election Day" that were validly and timely cast in accordance with State law. EO § 7(a). The district court correctly held that Plaintiffs were entitled to a preliminary injunction because their claim was ripe and because the federal election-

day statutes, 2 U.S.C. § 7; 3 U.S.C. § 1, "require only that all votes are *cast* by Election Day, not that they are *received* by that date." Addendum 28–32 (emphasis added).

## ARGUMENT

This Court should affirm the district court's preliminary injunction as to Sections 3(d) and 7(a) of the Executive Order. Review before this Court is under an abuse of discretion standard, with legal determinations reviewed de novo and findings of fact reviewed for clear error. *Doe v. Trump*, 157 F.4th 36, 46 (1st Cir. 2025). The district court did not abuse its discretion. The challenged provisions of the Executive Order are unlawful and impose serious harms on amici and their members as they seek to register, vote, and participate in the political process.

## I.  The Court Should Affirm the Preliminary Injunction as to Section 3(d).

Section 3(d) of the Executive Order provides that: "The Secretary of Defense shall update the Federal Post Card Application, pursuant to [UOCAVA] to require (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order[.]" EO § 3(d). The district court found that this provision is unlawful because it conflicts with requirements Congress enacted in UOCAVA. Addendum 24. That

2

conclusion is correct and should be affirmed.

### A.    Section 3(d) violates UOCAVA.

Section 3(d) of the Executive Order is unlawful because it directs the President's designee to violate UOCAVA by jettisoning the Post Card Form that Congress mandated and to substitute in its place a set of documentary proof of citizenship requirements that are unauthorized by and incompatible with UOCAVA's text and purpose.

*First*, Congress specifically mandated that the Post Card Form must actually be a "post card," 52 U.S.C. § 20302(a)(4)—meaning that neither the President nor his designee can add additional documentation requirements in addition to or in lieu of the Post Card Form. Contrary to Defendants' arguments, the district court did not "read too much into" the literal words of the statute and Congress's decision to require a Post Card Form in UOCAVA. Opening Br. at 30. "When a term goes undefined in a statute," courts are to give "the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of a "post card" means that the form must be capable of being sent without further attachment or documentation appended— it is a mailing with no need of having even an envelope. Addendum 24.

3

This ordinary meaning is confirmed by Congress's express instruction for the designee to prescribe envelope designs only for *absentee ballots themselves*, but not for applications to register or obtain an absentee ballot—which are covered by a post card that necessarily needs no envelope. *Compare* 52 U.S.C. § 20301(b)(2) and (b)(4).

*Second*, UOCAVA expressly sets out a single, exclusive method for validating the information that a UOCAVA voter provides: through a standardized oath prescribed by the presidential designee. 52 U.S.C. § 20301(b)(7). Indeed, when UOCAVA was enacted, *no state* required documentary proof of citizenship as part of the voter registration process. *Cf. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 4 (2013) (describing Arizona's adoption of such a requirement in 2004 and holding that it is preempted by the NVRA). Therefore, Congress could not have contemplated or implicitly authorized such a measure to prove the citizenship of UOCAVA voters. Years after enacting UOCAVA, Congress did address the issue of proving a voter's residency in the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (2002). There, Congress required that certain voters include a document—such as a utility bill, bank statement, or government paycheck—to confirm their

residency when registering to vote by mail. 52 U.S.C. § 21083. Notably, Congress expressly exempted all UOCAVA voters from this requirement. *Id.* § 21083(b)(3)(C)(i). At every turn, Congress has been consistent: UOCAVA voters need only verify their citizenship and residency through the standardized oath prescribed by UOCAVA.

This scheme of using the Post Card Form verified by a standardized oath is both a substantive requirement mandated by the plain language of UOCAVA and an essential policy choice made by Congress to fulfill its purposes in enacting the statute. The oath-verified Post Card Form was designed to eliminate the legal and administrative barriers that "discourage[d] or confuse[d] overseas citizens" from voting in federal elections. H.R. Rep. No. 99-765, at 9 (1986). "As cannot be doubted, for our citizens overseas, voting by absentee ballot may be the only practical means to exercise the right to vote," and for "the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion." *United States v. Alabama*, 857 F. Supp. 2d 1236, 1242 (M.D. Ala. 2012) (citation modified).

By specifically requiring a post card verified by a standardized oath, Congress necessarily precluded a requirement to append additional

documentation beyond the four corners of the form. Congress acted to ensure that there would be one streamlined form (without so much as an envelope needed) that UOCAVA voters, if they chose, could use to register and request a ballot. But Section 3(d) replaces the single Post Card Form required by Congress with additional documentation requirements imposed by the President. As such, the Executive Order directly conflicts with Congress's mandate that a singular Post Card Form be made available to military and overseas voters "for simultaneous voter registration application and absentee ballot application." 52 U.S.C. § 20302(a)(4).

Defendants are also wrong in arguing that the current format of the Post Card Form—a two-sided piece of paper with adhesive liner that can be folded, allowing it to be mailed without using an envelope—somehow supports their position. Opening Br. at 30–31. Defendants argue that because the form is a whole sheet of paper that may be mailed in an envelope, or printed, and in some States submitted online, undermines Plaintiffs' arguments here. Not so. That voters may *choose* to print out the form and are *permitted* to return it in an envelope or online does not mean that the President's designee is free to *require* such steps, or to

6

*require* voters to submit additional documentation as under Section 3(d). Neither the President nor his designee may unilaterally invalidate Congress's decision that a Post Card Form, by itself, must be sufficient to register and request an absentee ballot. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

**B.    Section 3(d) imposes serious harms on the military and overseas voters who rely on the Post Card Form to register to vote and request an absentee ballot.**

Defendants also argue that the district court erred in reasoning that imposing a documentary proof of citizenship requirement on UOCAVA voters using the Post Card Form would be burdensome. Opening Br. at 31. The States here amply show why that argument is incorrect. Appellees' Br. at 32–33. The record from *LULAC* further supports this understanding. Both SFI and LULAC have members who rely on the Post Card Form to register and vote and who would be burdened by the inability to use a post card to register and vote. After all, Congress mandated access to a Post Card Form because it recognized that military voters, their families, and other overseas voters need a

streamlined process for voting that requires minimal administrative tasks.

To start, the EO provides that an "official military identification card that indicates the applicant is a citizen of the United States" is an acceptable form of DPOC for purposes of Sections 2(a) and 3(d) of the Executive Order. EO § 2(c). But crucially, "military identification cards issued to both military servicemembers and dependents do not indicate citizenship status and are not a viable form of proof of citizenship."[4] In the *LULAC* case, Defendants did not dispute this fact.[5] Moreover, in the *LULAC* record, it is also undisputed that "military servicemembers stationed overseas are able to travel between the United States and their duty station without a passport and may not have their passport when using the Post Card Form."[6] Many SFI and LULAC members and other UOCAVA voters lack access to the required forms of DPOC.

In addition, even for those persons using the Post Card Form who do hold one of the requisite forms of proof of citizenship, many will

---

[4] Jones Decl. ¶ 27.
[5] Dkt. 213-2 ¶ 19, *LULAC*, No. 25-cv-946 (D.D.C.).
[6] Jones Decl. ¶ 26; Dkt. 213-2 ¶ 22, *LULAC*, No. 25-cv-946 (D.D.C.).

struggle to access them at the requisite time. Members of the military and their families do not always have reliable access to their personal effects, such as passports. As military dependents, SFI members move frequently, and during this process it is common for even correctly packed personal items and sensitive documents, including U.S. passports, to be delayed for months at a time and/or lost in transit.[7] And it is important to note that servicemembers and their dependents can use the Post Card Form to register and vote when they are absent from their place of residence, but still within the United States, because of active duty service.[8] Such deployments can be on short notice and occur at any time, including for national guard personnel activated pursuant to federal orders. In exactly those situations, access to mail voting through the Post Card Form is essential.

Moreover, while there are many current military-connected UOCAVA voters who do not possess a requisite form of DPOC, even for

---

[7] Jones Decl. ¶¶ 29–30.

[8] Decl. of Juan Proaño ¶¶ 11–15, Dkt, 194-5, *LULAC*, No. 25-cv-946 (D.D.C.) (hereinafter Proaño Decl.); Decl. of Luis Reyna ¶¶ 4, 13–15, Dkt, 194-6, *LULAC*, No. 25-cv-946 (D.D.C.) (hereinafter Reyna Decl.).

those who do, when deployed, Section 3(d) would add incredibly burdensome requirements. Many SFI members are trained on security risks and threats from foreign adversaries and are concerned about transmitting copies of sensitive documents with personal information through the mail or electronically.[9] Furthermore, Section 3(d) unreasonably mandates service members to have ready access not only to their personal documents but also to the ability to copy and submit them with their registration applications and absentee ballot request forms.[10] Finally, Section 3(d) is particularly burdensome because it would require UOCAVA voters to provide documentary proof of citizenship not just once, but each and every time that they request an absentee ballot using the Post Card Form.[11] All of these uncontested facts strongly weigh in favor of the district court's finding of likely irreparable harm.

## II. The Court Should Affirm the Preliminary Injunction as To Section 7(a).

Section 7(a) of the Executive Order orders the Attorney General to:

take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the

---

[9] Jones Decl. ¶¶ 32–33.
[10] Jones Decl. ¶¶ 22, 28, 31.
[11] Jones Decl. ¶ 34.

final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

EO § 7(a). The district court found that Section 7(a) is not authorized by any federal statutory or constitutional authority, as the federal election-day statutes do not prohibit states from counting mail-in ballots received by election officials after Election Day provided they are cast on or before Election Day.[12] The district court also found that the Attorney General has no enforcement authority under the federal election-day statutes. Addendum 27–30.

Defendants claim that the district court erred both in finding ripeness and on the merits as to the challenge to Section 7(a). Not so. Defendants' ripeness argument is contingent on the Attorney General taking no unlawful enforcement action to compel states to change their ballot receipt laws. Opening Br. at 36. But that argument is foreclosed by DOJ's recent actions in Ohio. There, threatened enforcement action by DOJ (action that is unsupported by any federal statutory authority) was cited by Ohio officials in changing the state's ballot receipt law.[13]

---

[12] 2 U.S.C. § 7; 2 U.S.C. § 1; 3 U.S.C. § 1.
[13] *See* Dkt. 219-2 at 3, *LULAC*, 25-cv-946 (D.D.C.).

Defendants' merits argument is similarly unavailing as it rests on one outlier decision that is fundamentally flawed and contrary to the weight of all other authority. Finally, because amici have had an opportunity to flesh out the specific harms faced by their organizations, their members, and voters more broadly if Section 7(a) is permitted to be fully implemented, amici provide the Court with detailed evidence of these harms below.

### A.     Defendants' actions threatening at least one state with "costly litigation in federal court" over its ballot receipt deadline forecloses their ripeness defense.

Defendants argue that the district court erred in rejecting its ripeness defense regarding Section 7(a) for two reasons. First, they assert that any harm is speculative because there was no basis to believe the Attorney General would enforce Section 7(a) through litigation. Opening Br. at 36–37. Second, they claim the district court improperly relied on the government's own statement in *LULAC* that the Attorney General may take "any number of actions, including criminal actions" to enforce Section 7(a). Addendum 28; *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 213 (D.D.C. 2025). Among Defendants' contentions as to why the district court "inappropriately" relied on counsel's statement in

*LULAC* is that the *LULAC* court stated that "'it is unclear *on the present record* whether Section 7(a) will lead imminently to any unlawful action'" because the court "'cannot simply assume that the Attorney General will disregard the requirement of lawful implementation.'" Opening Br. at 37 (quoting *LULAC*, 780 F. Supp. 3d at 213–14) (emphasis added).

Both of these arguments are undermined by the Department of Justice's own subsequent actions. Since the preliminary injunction decision here and the district court's preliminary injunction decision in *LULAC*, the Department of Justice threatened Ohio with "costly litigation in federal court" if it did not change its ballot receipt deadline to Election Day, which resulted in Ohio changing its law. Dkt. 219-2, *LULAC*, No. 1:25-cv-00946 (D.D.C.).

At the time the Executive Order was issued, Ohio accepted mail in ballots postmarked by Election Day and received by election officials four days after the election. Ohio's Secretary of State Frank LaRose then submitted written testimony to the Ohio Legislature that on September 29, 2025, the Assistant Attorney General of the Civil Rights Division of the Department of Justice sent a letter to the Ohio Attorney General, Governor, and Ohio Secretary of State, "implor[ing] [them] to take

13

immediate action (legislative or otherwise) to comply with federal law, and avoid costly litigation in federal court" by changing the State's ballot receipt deadline from four days after Election Day to Election Day.[14] Secretary LaRose testified that he told the Department of Justice attorneys he wanted an opportunity to work with the Ohio Legislature to address this issue through legislation and that the DOJ attorneys agreed with that approach. *Id.* at 1–2. He also testified that he shared his correspondence and discussions with Ohio legislative leaders and asked them to consider changing the ballot receipt deadline "in hopes of avoiding costly litigation in federal court, which resulted in bill language that changed the ballot receipt deadline to election day." *Id.* at 2. The Legislature subsequently enacted a law changing the deadline. S.B. 293, 135th Gen. Assemb., Reg. Sess. (2025) (Ohio eff. Mar. 20, 2026).

The Department of Justice's efforts to strong-arm the State of Ohio into adopting an Election Day ballot receipt deadline are clear proof that that Appellees' concerns that the Attorney General may attempt to

---

[14] Hearing on S.B. 153, Before the Ohio Senate General Government Committee (Oct. 28, 2025) (statement of Frank LaRose) https://www.legislature.ohio.gov/legislation/136/sb153/committee, at 2.

enforce Section 7(a) through litigation (notwithstanding the lack of any legal basis to do so) are not speculative and that their claims against Section 7(a) are ripe.

## B. Congress has permitted states to decide whether they will count mail ballots cast by Election Day but received after Election Day.

The Elections Clause of the U.S. Constitution reserves plenary authority to regulate elections to the states, except where Congress has acted or the Constitution sets otherwise applicable requirements. *Foster v. Love*, 522 U.S. 67, 69 (1997). As such, the Attorney General has no authority to enforce Section 7(a) unless *Congress* has enacted a law prohibiting states from accepting mail in ballots placed in the mail by Election Day but received by election officials after Election Day. Opening Br. at 38. But Congress has done no such thing.

Defendants claim that the federal election-day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, provide that ballots must be received by Election Day to count. But as the district court found here, these statutes state the ballots must be cast by Election Day but are silent as to when ballots must be received. Addendum 30. The district court also noted that several courts have reached the same conclusion. Addendum 30. In claiming

error, the government's argument is predicated on the reasoning of one outlier decision, *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). Opening Br. at 38–41. Notably, since the district court's decision, the Supreme Court granted the petition for certiorari as to that Fifth Circuit decision. *Watson v. Republican Nat'l Comm.*, No. 24-1260, 2025 WL 3131802, at *1 (U.S. Nov. 10, 2025).

*Wetzel* contains numerous flaws. Central among them is the court of appeals' failure to take account of the fact that Congress has time and again deferred to state processes on mail ballot receipt instead of acting to preempt those laws. When Congress enacted UOCAVA in 1986, it could have required that military and overseas ballots be received by election officials no later than Election Day. Instead, Congress expressly acknowledged and took as a baseline "the deadline for receipt of the State absentee ballot under State law" for the Federal Write-in Absentee Ballot ("FWAB"). 52 U.S.C. § 20303. Subsequently, Congress passed the Military and Overseas Voter Empowerment Act of 2009 ("MOVE"), Pub. L. No. 111-84, §§ 577–83(a) (2009), which amends UOCAVA to provide procedures for the delivery of overseas absentee ballots. There, Congress directed federal officials to implement procedures so that

16

voters' ballots are returned to state election officials by "the date by which an absentee ballot must be received in order to be counted in the election." 52 U.S.C. § 20304(b)(1).

The Fifth Circuit's wrongheaded treatment of UOCAVA underscores the weakness of its opinion. After initially writing that UOCAVA was "silent" on post-Election Day receipt deadlines, the *Wetzel* opinion author later acknowledged that UOCAVA accounts for a state law post-Election Day receipt window. *Compare Wetzel*, 120 F.4th at 211, *with Republican Nat'l Comm. v. Wetzel*, 132 F.4th 775, 778 (5th Cir. 2025) (Oldham, J., concurring in denial of petition for rehearing *en banc*). The panel, citing no authority, attempted to paint federal laws that accommodate post-Election Day receipt deadlines as "narrow exception[s]" to the federal election-day statutes. *Wetzel*, 120 F.4th at 212. But Congress has never explicitly or implicitly suggested such a thing in deferring to state ballot-receipt deadlines in UOCAVA and MOVE.

Moreover, when the *Wetzel* court concluded that the term "Election Day" includes the requirement that all ballots be received by election officials on that day, *Wetzel*, 120 F.4th at 207, it failed to meaningfully

17

address recent legislation that defines "Election Day" for Presidential elections. In 2022, Congress expressly defined "Election Day" within the Electoral Count Reform Act. In doing so, it incorporated the concept of a "period of voting" yet made no reference to mail ballot receipt deadlines. Pub. L. No. 117-328, div. P, tit. I, § 102 (2022).[15]

The *Wetzel* court also misapplied the central precedent on which it relied: *Foster v. Love*, 522 U.S. 67 (1997). *Foster* dealt with a challenge to Louisiana's congressional election system, wherein the State held a primary for all candidates in October and, if one candidate received a majority of votes in that primary, that candidate was elected with no

---

[15] When Congress drafted and passed the ECRA in 2022, it did so with full knowledge not only that many states' ballot receipt deadlines fell after the federal Election Day, but also that then-existing court precedents had unanimously held that the federal election-day statutes do not displace state ballot receipt deadlines. Congress ratified that understanding by reenacting in the ECRA 3 U.S.C. § 1 and 3 U.S.C. § 21 without any change that would have undermined that line of consistent precedent. Where Congress adopted new deadlines in the ECRA, those provisions were crafted to ensure respect for the "laws of the State enacted prior to . . . 'election day," 3 U.S.C. § 21(1), in express deference to the states' ability to regulate the casting and counting of ballots, including ballot receipt deadlines. *See* Brief for Campaign Legal Center and Protect Democracy Project as Amicus Curiae, *Watson v. RNC*, No. 24-1260 (U.S. Jan. 9, 2026).

further November election. 522 U.S. at 70. If no candidate received a majority, the top two finishers would have a runoff on the November election day. *Id.* The Supreme Court held "that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates § 7 [because the election concluded before Election Day]." *Id.* at 72. *Foster* dealt solely with the conclusion of casting ballots and did not in any way discuss or imply that ballots could not be received or counted after Election Day if they were cast by Election Day.

Examples abound of how the Fifth Circuit misread *Foster*, but one is particularly salient—the panel's emphasis on "consummation." *Wetzel*, 120 F.4th at 208. Despite the panel's emphasis, *Foster* references "consummation" only once, in a footnote: "We hold today only that if an election does take place, it may not be *consummated* prior to federal election day." 522 U.S. at 72 n.4 (emphasis added). *Foster*'s narrow holding prohibits only the complete determination of an election's outcome prior to Election Day. In fact, *Foster* highlights that a congressional primary may be held on Election Day, La. Rev. Stat. Ann.

§ 42:1360, with a runoff taking place *after* Election Day, *Foster*, 522 U.S. at 71 n.3. The panel concludes from *Foster* that "[r]eceipt of the last ballot, by contrast, constitutes consummation of the election, and it must occur on Election Day." *Wetzel*, 120 F.4th at 209. But *Foster* says nothing about the administrative process of receiving and counting ballots cast *on or before* Election Day. As such, it does not advance the *Wetzel* court's argument.

Defendants provide no persuasive reason, through its invocation of *Wetzel* or otherwise, to overturn the district court's merits determination on Section 7(a).

## C. Section 7(a) causes significant harm to Amici's organizations, their members, and voters across the country.

Finally, Amici bring to this Court's attention the harm their members and voters generally will experience if Defendants are able to fully enforce Section 7(a). These harms are present already in North Dakota and Ohio, two states that have not challenged the Executive Order but instead have changed their ballot receipt deadlines after its issuance.[16]

---

[16] N.D. Legis. H.B. 1165 (2025) (eff. Aug. 1, 2025); S.B. 293, 135th Gen.

Post-Election Day receipt deadlines provide meaningful access to the ballot box for voters living in states across the country and deployed across the world who depend on voting by mail for a variety of reasons. For many, Section 7(a) does not merely regulate the vote, it may effectively eliminate it. Many LULAC members—and other voters like them—rely on mail-in voting due to age or disability-related mobility issues that preclude standing for any significant period, driving, or traveling to the post office without assistance.[17] For these voters, their ability to return their ballots by mail often depends on whether and when a caregiver, friend, or family member can take those ballots to the post office.[18] There are also LULAC members, including military veterans, who rely on mail-in or absentee voting as they recover from temporary disabilities, such as recovering from medical procedures.[19] Without absentee ballots, these individuals would face extreme hardship when

---

Assemb., Reg. Sess. (2025) (eff. Mar. 20, 2026).

[17] Decl. of Irma Gonzalez ¶¶ 8–10, 13, Dkt. 194-7, *LULAC*, No. 25-cv-946 (D.D.C.) (hereinafter Gonzalez Decl.); Decl. of James Fukuda ¶¶ 15–17, Dkt. 194-9, *LULAC*, No. 25-cv-946 (D.D.C.)(hereinafter Fukuda Decl.); Reyna Decl. ¶¶ 20–22.

[18] *Id.*

[19] Reyna Decl. ¶ 20; Gonzalez Decl. ¶ 8; Decl. of Ana Orellana ¶ 17, Dkt. 194-8, *LULAC*, No. 25-cv-946 (D.D.C.) (hereinafter Orellana Decl.).

attempting to vote.

Further, many LULAC members, and indeed many Latino voters, rely on voting by mail to avoid the harassment and intimidation they fear at physical polling places. LULAC leaders report that their members "rely on mail-in voting because polling locations . . . can be intimidating" and "voting in person does not feel safe the way voting by mail does."[20]

LULAC members living in rural communities also rely heavily on post-Election Day ballot receipt deadlines due to unreliable mail service.[21] Latinos are disproportionately likely to live in "postal deserts," where lack of accessible postal locations combines with socio-economic barriers to make participation particularly resource intensive.[22] As just one example, approximately 500,000 Texans, over ninety percent of whom are Latino, live in border community "colonias," where home delivery of mail is impossible because there are no official street

---

[20] Orellana Decl. ¶¶ 19–20.

[21] *See* Proaño Decl. ¶ 34; Orellana Decl. ¶¶ 10, 16; Gonzalez Decl. ¶¶ 11, 17.

[22] *See Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1297, 1323 (N.D. Ga. 2020), *aff'd sub nom.*, *Black Voters Matter Fund v. Sec'y of State for Ga.*, 11 F.4th 1227 (11th Cir. 2021).

addresses.[23]

The negative effect on rural voters would be particularly pronounced in States where mail ballot applications must be physically signed by a voter.[24] In these States, a voter who does not have the ability to download and print their application at home must first request an application from their county, wait for the application to arrive, sign the application, send back the application, wait for the application to be processed, and then wait for the actual ballot to arrive. Given that counties can take many days to process an application,[25] and that each leg of mail for a rural voter may take up to five days, voters often face a thirty-plus day period between requesting an application and their completed ballot being received by the election administrator. The delay in receiving the ballot itself means that, despite applying for mail ballots well in advance, rural LULAC members often are only able to return

---

[23] Tex. Dep't of Hous. & Cmty. Affs., *2019 State of Texas Low Income Housing Plan and Annual Report* at 40 (2019), https://perma.cc/J5QS-XCWX; U.S. Census Bureau, *2010 Census Participation Rates* (Oct. 8, 2021), https://perma.cc/8696-WUJN (describing impossibility of mail participation due to lack of addresses).

[24] *See, e.g.*, Tex. Elec. Code § 84.001(b); W. Va. Code Ann. § 3-3-2.

[25] *See, e.g.*, Tex. Elec. Code § 86.004(a) (providing up to seven days).

their ballot days before Election Day.[26] Thus, rural voters are often especially reliant on their States' ballot receipt windows to ensure that their mail ballots count.[27]

Additionally, LULAC has many student members who vote by mail and live in States with post-Election Day ballot receipt windows.[28] Many of these students receive ballots at their parents' home address, or through slow and unreliable student mail.[29] These members are then faced with a ticking clock to return their ballots, and the small post-Election Day receipt window is essential for their successful exercise of the franchise.[30]

The harms that Section 7(a) would impose on members of SFI are also acute. The nature of military service means that SFI members are heavily reliant on absentee voting and often experience routine mail delivery delays and challenges both receiving absentee ballots and returning them on time to vote in federal elections.[31] According to the

---

[26] Proaño Decl. ¶ 34; Orellana Decl. ¶¶ 10, 16; Gonzalez Decl. ¶¶ 11, 17.
[27] Orellana Decl. ¶¶ 16–18; Gonzalez Decl. ¶¶ 8–10, 17.
[28] Proaño Decl. ¶ 36; Orellana Decl. ¶¶ 8–11.
[29] Orellana Decl. ¶ 8; Gonzalez Decl. ¶ 11.
[30] Orellana Decl. ¶ 11; Gonzalez Decl. ¶¶ 11, 15.
[31] Jones Decl. ¶¶ 41–46, 49, 51.

Federal Voting Assistance Program, the most common reason UOCAVA ballots are rejected is that they are received after the deadline, an experience common for SFI's members.[32]

SFI members frequently experience challenges returning their ballots on time.[33] SFI members are military dependents, and they are often absent from their place of residency to accommodate the deployments of their family members. These SFI members do not have in-person ballot return options and generally must mail their ballots to their state of residence.[34] Though some states allow email or online portal return of absentee ballots, many states that are the top states for military recruitment with large numbers of SFI members, including California, Texas, Florida, Georgia, and New York, do not.[35] SFI members—particularly those located outside of the United States—must mail their ballots far in advance of when voters located in the United States would typically need to do so in order to meet the state ballot return deadline.[36]

---

[32] Fed. Voting Assistance Program, 2020 Report to Congress, at 57 https://perma.cc/7R7L-VCZM; Jones Decl. ¶¶ 52–53.

[33] Jones Decl. ¶¶ 42–53.

[34] *Id.* ¶ 41.

[35] *Id.*

[36] *Id.* ¶¶ 43, 45.

This poses challenges to SFI members, who are already frequently burdened or disenfranchised by mail delivery issues.[37]

SFI members stationed abroad often face difficulty returning their ballots on time, and this challenge is even more acute for SFI members who are forced to use the FWAB. The FWAB allows UOCAVA voters located outside of the United States to vote in federal races if they do not receive their absentee ballots.[38] The FWAB is an option of last resort, and SFI members who make use of it are inherently submitting their ballot closer to Election Day than intended because they did not receive their full absentee ballot.[39] Given that it can take weeks for mail from abroad to reach the United States, these members benefit from having as much time as possible to have their ballot received by their election official.[40] Using the FWAB already presents logistical challenges to SFI members, and eliminating extended ballot return deadlines in states in which large numbers of SFI members vote would cause further hardship and potential disenfranchisement to those members and others like them.

---

[37] *Id.* ¶¶ 42–44, 46, 49, 51.

[38] 52 U.S.C. § 20303; *see also* Jones Decl. ¶ 47.

[39] Jones Decl. ¶ 47.

[40] Jones Decl. ¶¶ 47–48.

SFI members who are UOCAVA voters and who reside in a different state than which they are registered to vote within the United States also face considerable challenges, including frequent moves and remote deployments.[41] Many SFI members already incur significant personal expense in their efforts to return their ballots on time, and they will be forced to incur even more as a result of the Executive Order's attempt to shorten ballot return deadlines.[42]

LULAC also has a significant number of members in the military, many of whom can be deployed at a moment's notice such that they are forced to send their mail-ballots at the last minute and must rely on their States' ballot receipt window.[43] These deployments, which include domestic deployments to respond to natural disasters, "can occur at any time, including in the run-up to—or even during—elections."[44] Because of last-minute deployments, LULAC service members often do not know "where [they] will be sending [their] ballots from, how long [their ballots] will take to arrive, or how reliable the mail service is" at any given

---

[41] *Id.* ¶ 34.
[42] *Id.* ¶¶ 50, 53.
[43] Proaño Decl. ¶ 37; Reyna Decl. ¶¶ 11–16.
[44] *Id.* ¶¶ 12, 14.

27

location.[45] And for those members of LULAC deployed abroad, especially those in developing countries, ballots routinely encounter postal delays, justifying a window of time after Election Day for ballots to be received by election officials.[46] Without any post-Election Day window, many of these servicemembers will be disenfranchised.

Finally, to the extent that Section 7(a) is applied to prohibit ballot cure periods, it will prevent thousands of ballots with minor defects—such as a signature mismatch—from being cured, including the ballots of LULAC and SFI members.[47] Thousands of ballots arrive by Election Day with minor defects, such as a signature mismatch, that then need to be cured. Some voters are only notified of such defects *after* Election Day.[48] Post-Election Day receipt windows provide a critical window for these

---

[45] *Id.* ¶ 17; Fukuda Decl. ¶ 27.

[46] *See* Fed. Voting Assistance Program, *Int'l Mailing Sys. & Voting by Overseas Citizens* (Nov. 28, 2016), https://perma.cc/D68M-6D3Q ("Overseas citizens in countries with the most reliable postal systems are 65 percent more likely to have a vote recorded compared to those in countries with the lowest observed levels of postal reliability."); *see generally* Pew, *"No Time to Vote" for Many Military Personnel Overseas, Pew Study Finds* (Jan. 2009), https://perma.cc/GFQ7-2794.

[47] Proano Decl. ¶ 39; Jones Decl. ¶¶ 52–53; Reyna Decl. ¶ 22; Gonzalex Decl. ¶ 20; Reyna Decl. ¶ 22.

[48] Gonzalez Decl. ¶ 20.

voters to access to equal voting opportunities.

For all of the reasons above, Amici have demonstrated the tremendous harm their organizations, their members, and voters broadly face under Section 7(a) of the Executive Order. These harms make clear that the district court did not abuse its discretion in preliminarily enjoining Section 7(a).

## CONCLUSION

For the forgoing reasons, the Court should affirm the district court's preliminary injunction.

Dated: January 12, 2026                    Respectfully submitted,

|  | */s/ Anna Baldwin* |
|---|---|
| Norman L. Eisen | Danielle Lang |
| Tianna J. Mays | Anna Baldwin |
| Pooja Chaudhuri | Heather Szilagyi |
| Sofia Fernandez Gold | Ben Phillips |
| Jacob Kovacs-Goodman | William Hancock |
| DEMOCRACY DEFENDERS FUND | CAMPAIGN LEGAL CENTER |
| 600 Pennsylvania Avenue SE #15180 | 1101 14th St. NW, Suite 400 |
| Washington, D.C. 20003 | Washington, D.C. 20005 |
| (202) 601-8678 | (202) 736-2200 |
| norman@democracydefenders.org | dlang@campaignlegal.org |
| tianna@democracydefenders.org | abaldwin@campaignlegal.org |
| pooja@democracydefenders.org | hszilagyi@campaignlegal.org |
| sofia@democracydefenders.org | bphillips@campaignlegal.org |
| jacob@democracydefenders.org | whancock@campaignlegal.org |

Jon Greenbaum (D.C. Bar No. 489887)
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,384 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Century Schoolbook font.

Date: January 12, 2026

*/s/ Anna Baldwin*
Anna Baldwin

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


Date: January 12, 2026

*/s/ Anna Baldwin*
Anna Baldwin

*Counsel for Amici Curiae*
